| UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>"JOHN DOE,"<br><br>Defendant. | 98 Civ. 1101 (ILG)<br><br>To: Hon. Brian Cogan |



RECEIVED
HON. Brian M. Cogan

MAR 13 2012

## Memorandum of Law Submitted on Behalf of Richard E. Lerner in Opposition to John Doe's Motion for Civil Contempt, and in Support of Relief Pursuant to Rule 11 and Local Rule 83.6

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
Attorneys for Richard E. Lerner
3 Gannett Drive
White Plains, NY 10604-3407
Coleen Friel Middleton
914-872-7778 (Direct)
914-323-7000 (Main)
914-323-7001 (Fax)
coleen.middleton@wilsonelser.com

1

4963319v.1

## Preliminary Statement

This memorandum of law is respectfully submitted on behalf of Richard E. Lerner, a member of the firm of Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, who has been accused – without any evidentiary or legal basis – of having violated a court order. The issue presented is quite narrow, in view of the order to show cause that has been signed by this court. The court ordered as follows:

> ORDERED, that Richard Lerner, Esq., and Richard Roe, an attorney, show cause before the Honorable Brian M. Cogan, United States District Judge … why they should not be held in civil contempt of the Court of Appeals' February 14, 2012 Summary Order … for their disclosure of sealed information to the New York Times in violation of the Summary Order.

As the Febraury 14, 2011 order is the only one allegedly violated – the only order as to which this court issued its order to show cause – and as Doe's counsel has pointed to no decretal language in the February 14, 2011 order that (a) purports to bar anyone from revealing Roe's true name, or that (b) purports to bar anyone from revealing to anyone documents that are a matter of public record, there is simply no merit to Doe's motion.[1]

That being said, we will take a moment to dispel the notion that the February 14, 2011 order expressly constitutes a prior-restraint gag order that bars Roe and Lerner from stating in public, and discussing in public, information and documents that are already matters of public record. First, in this court's order of May 13, 2011, the court acknowledged that "information available to the public was not covered by the Second Circuit's injunctions.…" (*See* Decision

---

[1] Although in the supplemental papers submitted by Doe's counsel on March 1st, counsel raises claims concerning the February 10, 2011 order of the Second Circuit, that order was not made the subject of the order to show cause. This Court's order to show cause did not direct Roe or Lerner to show cause why they should not be held in contempt of the February 10, 2011 order. Accordingly, we need not address such arguments here.

2

and Order of the Honorable Brian M. Cogan, May 13, 2011).[2] We acknowledge that there is decretal language in various orders that bars Roe (and thus Lerner) from disseminating John Doe's PSR, his criminal complaint, his criminal information and his cooperation agreement. However, there is no order – for there could not possibly have been an order – that barred Roe (or Lerner) from discussing documents that are in the public domain, or that barred them from speaking of what was heard or seen in a public courtroom.

Moreover, the Second Circuit acknowledged that Roe could use the press release that is contained in the Congressional Record for whatever purposes he wished. Please recall that the Second Circuit stated that "proof of Doe's conviction ... remains available from other public documents – including a press release by the United States Attorney's Office for the Eastern District of New York...."[3] That hardly looks like a gag order. Rather, it is an express statement of the obvious, that Roe could freely use the press release to establish that the person identified in that press release by his true name had pled guilty to charges connected with his activities at White Rock and State Street. All that Roe is barred from doing, at this juncture, is revealing documents that are allegedly *under seal*. The June 29, 2011 order of the Second Circuit reiterated that, per the Second Circuit's prior order of February 14, 2011, Roe and his associates were "temporarily enjoined ... from distributing or revealing in any way any documents or contents thereof subject to sealing orders in Doe's criminal case or on appeal." There is no allegation that any of the documents that are subject to a sealing order, or their contents, were revealed to anyone.

---

[2] A copy of the Court's May 13, 2011 Order is annexed hereto as Exhibit A.

[3] A copy of the Second Circuit's June 29, 2011 Summary Order is annexed hereto as Exhibit B.

3

As there is no evidence that any order was violated, much less that any "sealed" document, or information derived therefrom, was disclosed to the New York Times by Lerner (or Roe), there is simply no viable basis for a prosecution for civil contempt.[4] Indeed, we contend that Doe's counsel's allegations are so frivolous that they warrant the imposition of Rule 11 sanctions and an award of costs, disbursements and attorneys' fees pursuant to Local Rule 83.6.

### General Denials

We hereby make general denials in order to preserve the following issues for review.

We deny that an implied (ergo unwritten, and therefore unenforceable) order could be sufficiently clear and unambiguous as to provide a predicate for a contempt finding.

We deny that there is an express "sealing" order that was ever issued in 98-cr-1101. Accordingly, to the extent that any Second Circuit order barred the dissemination of "sealed" information, if it is contended that the criminal complaint, the criminal information, and the cooperation agreement were improperly disseminated, we demand a copy of the written sealing order proving that that document was properly sealed. If it was not *properly* sealed, then *it was not sealed*; rather, it was unconstitutionally hidden, not sealed.

We deny that any document has properly been made subject to a sealing order; that is, we deny that any of the requirements and procedures set forth in *U.S. v. Alcantara*, 396 F.3d 189 (2d Circ. 2005) and *Hartford Courant v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004), have been followed. We note that Judge Glasser himself acknowledged that he never signed any such sealing order;

---

[4] The true identity of "Richard Roe" was within the personal knowledge of Lerner and Oberlander (and others). It was not even necessary to turn to public documents, much less *sealed* documents, to be able to ascertain Roe's true identity.

rather, he has indicated that there is an implicit sealing order, though that is, of course, a legal impossibility.[5]

We deny that any court has the power to enjoin a citizen from revealing information obtained from outside of court process, such as Congressional sources, newspapers and other periodicals, the Internet, public dockets of court cases, independent witnesses, etc. Indeed, we maintain that any effort to enjoin the dissemination of such information would be blatantly unconstitutional. And we maintain that no court could lawfully bar anyone from investigating, and finding, such information in the public realm, and then revealing that publicly available information to the New York Times or anyone else.[6]

---

[5] An "implicit" sealing order could not possibly constitute a prior restraint gag order, for it could not comply with FRCP Rule 65(d). FRCP 65(d), which provides:

*CONTENTS AND SCOPE OF EVERY INJUNCTION AND RESTRAINING ORDER.*

(1)    *Contents.* Every order granting an injunction and every restraining order must:

    (A)    state the reasons why it issued;

    (B)    state its terms specifically; and

    (C)    describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.

[6] See *International Products v. Koons*, 325 F.2d 403 (2d Cir. 1963); *Parker v. CBS*, 320 F.2d 937 (2d Cir. 1963) (a court does not have equity jurisdiction over documents obtained outside of judicial process). In *Bridge CAT Scan Assoc. v. Technicare*, 710 F.2d 940 (2d Cir. 1983), plaintiff filed a complaint containing an exhibit – obtained pre-suit, without court process – which the defendant claimed contained confidential information. The defendant sought a protective order and the court enjoined Bridge from disclosing it. Following *Koons* and *Parker*, the Second Circuit reversed, holding that courts lack the power to embargo information obtained outside of court process. "[T]he court has inherent equitable power to prohibit a party from abusing ... process by disseminating information ... [qua judicial documents]; but, in light of First Amendment considerations, the court generally has no ... power to prohibit dissemination of the information itself, stripped of its judicial garb, if that information has been gathered independently of judicial processes ... the court's ... order infringed Bridge's First Amendment rights and was contrary to historic principles of equity."

Argument

**Point I:**     **A Party Seeking to Establish Contempt Bears a Heavy Burden. The Claim Must be Established by Clear and Convincing Evidence, and the Order Allegedly Violated must be Clear and Unambiguous.**

Any party seeking to establish contempt bears a "heavy" burden. *See Air Products and Chemicals, Inc. v. Inter-Chemicals, Ltd.*, 2005 WL 196543, *3 (E.D. Pa. Jan. 27, 2005); cf. *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003) (district court's contempt power is "narrowly circumscribed," necessitating a more "exacting" appellate review than other discretionary decisions).

To establish civil contempt, which is generally compensatory in nature, the movant bears the burden of presenting "clear and convincing" evidence that the alleged contemnor has violated a "clear and unambiguous" judicial order. *Fonar Corp. v.. Deccaid Servs., Inc.*, 983 F.2d 427, 429 (2d Cir. 1993); *Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114,115 (2d Cir.198S) (explaining that "[n]o one may be held in contempt for violating a court order unless the order is clear and specific and leaves no uncertainty in the minds of those to whom it is addressed"); *Littlejohn v. BIC Corp.*, 851 F.2d 673, 683-84 (3d Cir. 1988); *Lesco v. Masane*, 2006 WL 2166862, *5 (E.D.N.Y. July 27).[7]

Because of the serious nature of contempt charges, certain procedural protections apply depending on the nature of the contempt proceeding. In civil contempt proceedings, the alleged contemnor is entitled to notice of the grounds for the contempt and an opportunity to be heard, but is not obliged to present any evidence should the movant fail in establishing any of the three elements of contempt. *Electrical Workers Pension Trust Fund v. Gary*, 340 F.3d 373, 379 (6th

---

[7] To establish criminal contempt, which results in the imposition of punitive sanctions, the movant must establish beyond a reasonable doubt that the contemnor violated a similarly specific judicial order. *Mackler Productions, Inc. v. Cohen*, 225 F.3d 136, 142 (2d Cir. 2000); *United States v. NYNEX Corp.*, 8 F.3d 52, 54 (D.C. Cir. 1993) (requiring willful violation of specific order).

6

Car. 2003) (burden of proof and production rest with movant); see generally *International Union United Mine Workers of America v. Bagwell*, 512 U.S. 821, 826-34 (1994) (discussing difference in protections provided for criminal versus civil contempt). In no event may the movant rely on unsworn assertions to establish the critical elements of civil or criminal contempt. *Mackler Productions, Inc. v. Cohen*, 225 F.3d 136, 146 (2d Cir. 2000). [8]

The frivolity of John Doe's order to show cause is demonstrated by the very simple fact that counsel (a) has not pointed to a single decretal paragraph of the February 14, 2011 order that was violated; (b) has not pointed to a single "sealed" document that was subject to a prior restraint gag order which was (c) improperly disseminated to the New York Times. And given the rule that only a clear and unambiguous order may provide a predicate for a finding of contempt, we note that this court has already acknowledged, on the record, that the February 14, 2011 does not clearly and unambiguously state that Roe (or Lerner) could not reveal Roe's true identity to anyone. As this Court stated at the February 27, 2012 proceeding:

> The only provision that's been pointed out to me as to which there
> may be a contempt is the second paragraph in the Court of Appeals
> summary order filed February 14th, 2011, which simply notes that
> the Court is referring to Richard Roe as Richard Roe because the
> disclosure of his true identity might lead to the improper disclosure
> of materials here at issue. **That is not a decretal paragraph;** it is
> simply a statement of the reason why the Court of Appeals is using
> a pseudonym. That is not to say that the disclosure of Roe's true
> identity may not be contemptuous. One inference that could
> possibly -- although I am not presently drawing any such inference
> -- but one inference that could be drawn is that there is a scheme

---

[8] For these reasons, courts have emphasized the importance early on of indicating whether the contempt proceedings are criminal or civil in nature, so that the appropriate procedural and substantive protections may be provided to the alleged contemnor. *In re Jessen*, 738 F. Supp.960, 962 (W.D.N.C. 1990). This is because the determination often requires asking what remedy the court has been asked to impose after finding contempt. *Hess New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 115 (2d Cir. 1988) (sanction of as little as $1000 considered exercise of criminal contempt power because purpose was to punish for past violations).

7

between Mr. Lerner and Mr. Roe, or either one of them, to
undermine the injunctive orders that have been previously issued,
and one means of undermining those injunctive orders would be
the disclosure of the true identity of Richard Roe.

That fact, combined with others, both public and nonpublic, might
well lead to the harm which the injunctive provisions entered by
the Second Circuit and Judge Glasser expressly sought to prevent.
**But that theory has not been made before me on this motion.**
I've only been pointed to that first recital paragraph in the Second
Circuit's order. **And as I say, it is not a decretal paragraph.**

We also remind the court that the only order that is the subject of the order to show cause

is the February 14, 2011 Summary Order. There is no issue about the revelation to the New York

Times of public documents, for there could not lawfully (i.e., constitutionally) be an inquiry into

the dissemination of public documents to the New York Times. Rather, the scope of the order to

show cause that was signed by your Honor is very clear, and very narrow. The only issue is

whether "sealed information" was provided to the New York Times:

ORDERED, that Richard Lerner, Esq., and Richard Roe, an
attorney, show cause … why they should not be held in civil
contempt of the Court of Appeals' February 14, 2012 Summary
Order … for their disclosure of sealed information to the New
York Times in violation of the Summary Order.

So the claim that must be proved, by clear and convincing evidence, is whether Lerner

(or Roe) violated a decretal paragraph of the February 14, 2011 order by disclosing "sealed

information" to the New York Times. But Doe cannot point to any decretal language that was

violated, much less a single piece of "*sealed*" information that was disclosed to the New York

Times.  Let us consider Doe's contentions:

--      *The Alleged Disclosure of Roe's True Identity*

8

Doe contends in the moving papers that Roe told the New York Times his true identity. However, the New York Times story does not state that Roe identified himself to the reporter as Oberlander – that is, there is no basis to believe that the New York Times reporter did not just figure it out on his own – and this court acknowledged on February 27th that there is no decretal language in any order that barred anyone from telling anyone else that Roe was Oberlander.

We presume that Doe's own counsel recognizes this, for Doe submitted a letter on August 11, 2011 to Judge Buchwald, ***without even requesting that it be placed under seal***, that identified "Richard Roe" as the plaintiffs' attorney in the proceeding before Judge Buchwald. (*Kriss v. Bayrock*, docket number 10-cv-3959).[9] While it is contended that Roe put the dots together for the New York Times, one can just as readily infer that it was Doe's own counsel who put two dots together for everyone in the world, not just the New York Times. Anyone of even the most humble intelligence would infer, upon reading that publicly docketed letter of August 11th, that "Richard Roe" was Oberlander, inasmuch as the public docket of the case listed Oberlander as plaintiffs' counsel of record.[10]

The August 11th letter also referred to the recent Second Circuit appeal involving "Richard Roe." So any member of the public could have plugged the words "Second Circuit" and "Richard Roe" into Google and found the recent decisions of that court. One may just as well infer that the New York Times did just that, rather than that Roe told him of the February 14th, and June 29th decisions of the Second Circuit. So what order did ***John Doe's*** counsel violate when he sent that letter to Judge Buchwald on August 11, 2011? We maintain that when

---

[9] The August 11, 2011 letter is attached hereto as Exhibit C.

[10] A copy of the public docket is annexed hereto as Exhibit D.

Doe's counsel publicly and implicitly revealed that "Richard Roe" is Oberlander, he violated no decretal language of any order.

And we further note that Doe's own counsel revealed Roe's identity to a third person, a Mr. Walter Saurack, who has never appeared as counsel of record for anyone in the 98-cr-1101 proceedings. This is proved by the fact that (a) Doe's counsel's letter of August 11th was cc'd to Mr. Saurack, and (b) Saurack had docketed as a related matter a complaint on August 19, 2010 (See *Bayrock v. Bernstein*, SDNY docket no. 10-cv-6338), wherein Oberlander was identified as the person to whom Bernstein had given Doe's "confidential" documents, documents that were allegedly placed by Doe on the Bayrock computer server.)[11] By identifying "Richard Roe" as the plaintiffs' attorney in docket 10-cv-3959, Doe's own counsel disclosed to Mr. Saurack that "Richard Roe" is Mr. Oberlander.

And what order did John Doe's counsel violate when he revealed to Mr. Saurack that Roe is Oberlander? We maintain that no order was violated. And we maintain that *if* (and we say this for sake of argument, and not as an admission) that publicly docketed letter had been disseminated by Roe or Lerner, or by anyone else, to anyone in the world, no decretal language of any order would have been violated, for the February 14th Summary Order only barred dissemination of "sealed" documents. If Mr. Saurack – a third-party to the 98-cr-1101 matter – could be freely told that Roe was Oberlander, anyone could be told.

> -- *The Alleged Disclosure of a Document Contained in the Congressional Record – viz., the March 2, 2000 Press Release.*

Doe further contends that the press release issued by the U.S. Attorneys' Office for the Eastern District of New York on March 2, 2000 was provided to the New York Times. Yet he

---

[11] The complaint in the Bayrock v. Bernstein action is annexed hereto as Exhibit E.

10

fails to show that it was provided to the New York Times by Roe or Lerner. In any event, as noted above, the Second Circuit stated in its June 29, 2011 decision that Roe could use the press release for whatever purposes he wished. The genie was out of the bottle.

>    *The Alleged Disclosure of the Transcripts of the Proceedings*
>    *Before Judge Glasser.*

Though it is alleged that Roe (or Lerner) violated a court order by revealing transcripts of the proceedings before Judge Glasser, those proceedings were not sealed; rather, Judge Glasser expressly stated that they were public. On June 14, 2010, Judge Glasser stated that the transcript was not under seal. "There's nothing about these proceedings[,] I don't believe[,] that requires the record of these proceedings to be sealed, unless there's something I'm missing." (p.15).[12] At the hearing on June 21, 2010, Judge Glasser expressly acknowledged that the transcript was not being sealed: (See pp. 116-117).

| Mr. Lerner: | My client wishes to know whether these proceedings today are sealed. |
| Ms. Moore: | [A]ll I ask is [that] the name be redacted to change to John Doe. ... |
| Ms. Moore: | ... I would also ask everyone present in the courtroom be directed that they not advise anyone [that] the John Doe referenced in the document is my client.... |
| The Court: | Ms. Moore, there is I think an extent even to which the broad enormous powers of the Federal Courts do not extend and I think the limit to which you're requesting that power be extend is beyond the borders of the Federal Court power.... I'm not directing the court or the world at large with respect to this proceeding, John Doe or everybody here.... [¶] With respect to the last request you made it is denied.[13] |

---

[12] A copy of the June 14, 2010 transcript is annexed as Exhibit F.

[13] A copy of the June 21, 2010 transcript is annexed as Exhibit G.

4963319v.1

During the proceedings before Judge Glasser on July 20, 2010, no request was made by Doe's counsel to seal the transcript. Rather, Doe's counsel only requested that his client's true name be replaced throughout the transcript with the name "John Doe." (See p. 27). [14]

As the foregoing transcripts were never sealed, their dissemination could not be enjoined. Thus, to the extent it is claimed that they were provided by Lerner (or Roe) to the New York Times, that cannot form a basis for a finding of contempt. Moreover, it is outside the scope of the order to show cause, inasmuch as this Court only ordered Lerner and Roe to show cause why they should not be held in contempt for "their disclosure of sealed information to the New York Times in violation of the [February 14, 2011] Summary Order." Neither Lerner nor Roe may be called to answer for allegedly disclosing *unsealed* information to anyone. That is not the subject of the order to show cause, nor could it be.

The U.S. Supreme Court's decision in *Craig v. Harney*, 331 U.S. 367 (1947), makes this perfectly clear. In that case, a trial court had adjudged petitioners guilty of contempt for having reported what they had observed in the courtroom, and for having harshly criticized the trial judge. The U.S. Supreme Court reversed the finding of contempt, which contempt finding was predicated upon the notion that the publications "were reasonably calculated to interfere with the due administration of justice." 331 U.S. at 373.

In reversing, the U.S. Supreme Court stated, "The history of the power to punish for contempt and the unequivocal command of the First Amendment serve as constant reminders that freedom of speech and of the press should not be impaired through the exercise of that power, unless there is no doubt that the utterances in question are a serious and imminent threat to the administration of justice." 331 U.S. at 373. "What transpires in the court room is public

---

[14] A copy of the July 20, 2010 transcript is annexed as Exhibit H.

4963319v.1

property. If a transcript of the court proceedings has been published, *we suppose none could claim that the judge could punish the publisher for contempt.* ... Those who see and hear what transpired can report it *with impunity*. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." 331 U.S. at 374 (emph. added).

Thus, it is black-letter law, and it is undisputable, that the dissemination of the transcripts of the hearings conducted before Judge Glasser, which were conducted in an open courtroom, and which were quite expressly never sealed could not, consistent with the First Amendment, be enjoined, much less made the predicate for a contempt finding, as the U.S. Supreme Court stated in *Craig v. Harney.*

We return to the point that the February 14, 2011 order of the Second Circuit contained no decretal language barring the dissemination of the transcripts that had already been declared unsealed. But we also remind this court that any such order would have been beyond the power of the Court. As the Second Circuit recognized in *Gambale v. Bankers Trust Co.*, 377 F.3d 133, 144 (2d Cir. 2004), "We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again.... The genie is out of the bottle, albeit because of what we consider to be the district court's error. We have not the means to put the genie back." We presume that this court well understood the law when it stated in its May 13, 2011 decision that "[a]t the April 1 [2011] hearing, I opined that information available to the public was not covered by the Second Circuit's injunctions...." (*See* Decision and Order of the Honorable Brian M. Cogan, May 13, 2011).

Finally, inasmuch as what is heard in a public courtroom could never be enjoined, we note that, in the event of an evidentiary hearing, we believe that there is a non-party witness who

13

will voluntarily attend, and give evidence that she was present when "John Doe" testified, saw him when he was sworn in *using his true name*, and that she also recognized him from newspaper and magazine stories, and from having seen his picture on the Internet.

We so advise the court, because Doe's counsel has contended that the revelation of Roe's true identity has brought the public one step closer to knowing who Doe is. In fact, Doe's true identity could be (if it has not yet already been) lawfully made public by that non-party witness whenever she pleases, without relying on any "sealed" materials. Indeed, we expect that the witness will testify that she felt she had a First Amendment right to tell anyone in the world the true identity of that person who was sworn in, and had a right to recount his testimony to anyone she wished. Indeed, we expect that the witness will testify that she heard Judge Glasser state that even with his "enormous" power, he still could not gag her from revealing whatever she heard and saw in that courtroom. Accordingly, we note that the witness had an absolute right to tell anyone she pleased of the true identity of "John Doe."

Additionally, we believe that the witness will testify that she read the publicly disseminated February 14, 2011 and June 29, 2011 decisions of the Second Circuit, and immediately recognized that "Richard Roe" was Oberlander, and believed that she had every right to tell anyone she wished that "Richard Roe" was Oberlander.

All this is to say, John Doe cannot establish that there was a violation of any decretal language of the February 14, 2011 Summary Order of the Second Circuit, for there is no showing that any "sealed information" was provided to the New York Times. And the notion that public information could be barred from dissemination is so offensive as to warrant the imposition of FRCP 11 sanctions.

14

4963319v.1

**Point III:**     **Though this has Been Designated a "Civil" Contempt Proceeding, Criminal Due Process Rights Attach, inasmuch as Opprobrium or a Substantial Monetary Award may be Issued.**

Case law is replete with appeals from contempt proceedings which went on for days and weeks on the court's assumption – and order and denomination – that they were purely civil, only to be determined – typically on appeal – that they were not, that they were actually criminal, and that thus the full criminal due process rights attached immediately at the beginning. Such failures require that the entire hearing be vacated and any remedy voided. For example, in *Cobell v. Norton*, 334 F.3d 1128 (DC Cir. 2003), contempt proceedings began in response to motions for civil and criminal contempt. The order to show cause issued thereafter directed the respondents to show cause why they should not be held in ***civil contempt of court.*** No criminal contempt charges were announced. From then, no party questioned the civil nature of the proceeding.

The order ultimately issued applied civil contempt principles in "fashioning specific relief" based on the contumacious and sanctionable conduct of the defendants. No fine or order of imprisonment was ordered. Nevertheless, at oral argument, the DC Circuit Court of Appeals raised the issue and held that the entire proceeding had been criminal, not civil, because the relief ordered was a reprimand, and as such was a punishment, making the entire proceeding *ab initio* criminal – and utterly, and fatally, devoid of criminal due process. Needless to say, the claim that an attorney violated a court order, if proved, may bring opprobrium upon him, and the *Cobell* court noted, that such opprobrium implicates full criminal due process protection.

There can be no doubt that the same result would obtain in this Circuit, not only because it is dictated by Supreme Court precedent, but because of circuit precedent on point, also following *Bagwell*, that compels that conclusion. In the *Mackler* cases, the district court imposed

15

a punitive sanction of $2,000 and compensatory sanctions of $45,000 on an attorney for litigation

misconduct, including subornation. [15]  In holding that criminal due process rights must be

accorded to an alleged contemnor, the Second Circuit stated noted that the $2000 award imposed

was punitive, implicating all criminal due-process rights, such as notice, the opportunity to be

heard, the right to a public trial, the assistance of counsel, the presumption of innocence, the

privilege against self-incrimination, and the requirement of proof beyond a reasonable doubt.

The court noted that,

> The sanction was not intended to be compensatory; indeed, the court imposed it in
> addition to a compensatory sanction and explicitly labeled it as punitive. The
> imposition was retrospective, by reason of past wrongful conduct; it did not seek
> to coerce future compliance, and no opportunity to purge was provided. The
> sanction was payable to the court, rather than to the injured party, further
> confirming its punitive nature. And the size of the required payment was
> substantial.
>
> * * *
>
> [W]e conclude, as we did in the previous appeal, that the District Court erred in
> imposing the "punitive" sanction [of $2000] on Cohen without employing the
> procedures appropriate to a criminal trial. The gravamen of our analysis in
> *Mackler II* – and of the Supreme Court's analysis in *Bagwell*, on which we relied
> heavily-was whether or not the sanction at issue was criminal or civil in character.
> See *Mackler II*, 146 F.3d at 128-30; see also *Bagwell*, 512 U.S. at 827
> ("[W]hether a contempt is civil or criminal turns on the 'character and purpose' of
> the sanction involved."); *id.* at 828 ("[C]onclusions about the civil or criminal
> nature of a contempt sanction are properly drawn ... from an examination of the
> character of the relief itself." (citations and internal quotation marks omitted)).
> Although we concluded that the size of a sanction is one factor to be weighed in
> making this determination, we plainly held that whether a sanction should be
> treated as criminal or civil in nature turns on several factors, including whether
> the sanction is intended to be compensatory or punitive; whether it is payable to
> the court or to the injured party; whether it is based on past wrongful conduct or is
> intended to coerce future compliance; and whether any opportunity to purge the
> sanction is provided. See *Mackler II*, 146 F.3d at 129; see also *Margo v.
> Weiss*, 213 F.3d 55, 62 (2d Cir. 2000) (emphasizing some of the factors, other
> than size, on which we relied in *Mackler II*); cf. *Satcorp Int'l Group v. China
> Nat'l Silk Import & Export Corp.*, 101 F.3d 3, 6 n.1 (2d Cir. 1996) (discussing the
> civil-criminal fine distinction without reference to the size of the fine). Here, for

---

[15] See *Mackler Productions*, 225 F.3d 136 (2d Cir. 2000), and prior cases in the eight-year history of that matter.

the reasons we stated in *Mackler II*, see 146 F.3d at 129, all of these other factors support the conclusion that the "punitive" sanction at issue in this case is criminal in nature. Thus, notwithstanding the reduction of the sanction from $10,000 to $2000, we hold that the District Court erred in denying Cohen the procedural protections appropriate to a criminal case. fn/ Cf. *Bagwell*, 512 U.S. at 829 ("[A] flat, unconditional fine totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance." (internal quotation marks omitted)).

Full criminal due process rights must be accorded here, because (a) the alleged contemnors are at risk of opprobrium; (b) the alleged contempt cannot be purged; (c) there is no opportunity to reduce or avoid the penalty through compliance; (d) Doe has not alleged any actual damages, and thus any award in Doe's favor would only serve to punish rather than to compensate; (e) the Court has already acknowledged that the purpose of the contempt proceeding would not be to compensate Doe, who has suffered no damages, but to somehow to serve as a warning to others that witnesses will be protected by the government; and (f) the size of any payment to Doe might be substantial. Therefore, in the event testimony is to be taken at an evidentiary hearing, full criminal due process protection must be accorded, meaning that Lerner cannot be compelled to testify, nor may an adverse inference be drawn from his refusal to testify, and Doe must prove his case beyond a reasonable doubt. Moreover, Lerner is entitled to a jury trial, as a constitutional right.

**Point IV:       Roe has the Absolute Right to Subpoena Witnesses.**

Finally, we note the Court of Appeals' holding in *United States v. Cutler*, 6 F.3d 67, 73-74 (2d Cir. 1993), wherein the court stated:

> Other than Cutler's own testimony, which of course cannot be compelled, the evidence that Cutler seeks from the Reporters and the TV Stations is probably the only significant proof regarding his assertedly criminal behavior. Further, even if Cutler should choose to testify, we see no justification for consigning him to his unassisted memory when clearly relevant evidence is readily available from the Reporters and TV Stations.

17

To the extent that the court will wish to conduct an evidentiary hearing on April 16, 2012,

we request that the court "so order" the list of subpoenas that accompanies this memorandum of

law, and allow the witnesses to be deposed if beyond the reach of the court.

### Conclusion

Wherefore, it is respectfully submitted that:

1) The relief sought in John Doe's motion, brought by order to show cause, for civil contempt should be DENIED.

2) Sanctions should be awarded against Doe and his counsel, pursuant to Rule 11, for filing a motion that has no basis in law or fact.

3) A judgment for costs, disbursements and attorneys' fees should be awarded against Doe, pursuant to Local Rule 83.6.

4) The court should publicly docket all documents filed herein.

5) The court should provide the public with advance notice of all hearings to be conducted.

6) The court should maintain an open courtroom throughout all proceedings.

7) The court should assign a separate caption and index number for these proceedings.

8) In the event of any evidentiary hearing, it should be conducted as a jury trial, with a jury of twelve.

9) The should court recognize that all criminal due process protections have attached.

10) The subpoenas submitted herewith should be so ordered.

Dated:      White Plains, New York
            March 12, 2012

                                    Respectfully submitted,

                                    WILSON ELSER MOSKOWITZ
                                    EDELMAN & DICKER LLP

                                    By _Coleen Friel Middleton_
                                    Coleen Friel Middleton
                                    Attorneys for Richard E. Lerner
                                    3 Gannett Drive
                                    White Plains, NY 10604-3407
                                    Coleen Friel Middleton
                                    914-872-7778 (Direct)
                                    914-323-7000 (Main)
                                    914-323-7001 (Fax)
                                    coleen.middleton@wilsonelser.com

4963319.1

# EXHIBIT A

FILED
U.S. IN CLERK    OFFICE
★ DISTRICT   RT E.D.N.Y
M  1 3 2011 ★

KLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                :

UNITED STATES OF AMERICA,       :     **ORDER**

             Plaintiff,        :

                                :     98 Cr. 1101 (ILG)

          - against -       :

                                :

JOHN DOE,                      :

             Defendant.      :

                                :
------------------------------------------------------------ X

        Richard Roe is an attorney who seeks to use documents and information from this sealed

criminal case against John Doe in public discourse and unrelated civil litigation. Judge Glasser,

who presided in the underlying criminal case which culminated in a 2009 sentencing of John

Doe, has permanently enjoined Roe from possessing, distributing, or using in any way the

Presentence Investigation Report ("PSR") and other documents prepared for this case (the

"sealed documents"). Roe has filed several civil cases alleging Doe's involvement in fraudulent

business practices, and objects to the continued sealing of Doe's criminal case. The Government

has asserted that maintenance of the sealing orders for at least part of the criminal docket is

necessary to maintain the personal safety of Doe and national interests in law enforcement and

security.

        On February 14, 2011, the Second Circuit issued an order addressing Richard Roe's

appeal from Judge Glasser's injunction, Roe's petition for a writ of mandamus directing Judge

Glasser to allow public access to the case docket, and the Government's request for a temporary

injunction to restrain Roe from dissemination of any sealed materials. The Circuit denied Roe's

petition and granted the Government's motion for an emergency stay in unsealing the docket and

a temporary injunction prohibiting Roe from "distributing or revealing in any way . . . any documents or contents thereof" from this case or any related sealed cases. Roe's appeal of Judge Glasser's injunction is pending.

In connection with the February 14 Order, the Circuit remanded the case to the Eastern District with instructions for the Chief Judge to assign a District Judge "with the limited mandate of implementing and overseeing compliance with our orders and the orders previously entered by Judge Glasser." By Order of February 15, 2011, then-Chief Judge Dearie referred the case to me for enforcement of this limited mandate.

In the exercise of my limited jurisdiction, I held a hearing on April 1, 2011, to address Roe's request for clarification of the Second Circuit's Order. This Memorandum Decision and Order addresses his question as to whether he may disseminate information available in public records. Roe has brought to the Court's attention several instances of publication of information contained in the sealed documents at issue, including newspaper and magazine articles describing Doe's past and particulars of the case, and a press release from the U.S. Attorney stating that Doe had pleaded guilty to RICO charges.

At the April 1 hearing, I opined that information available to the public was not covered by the Second Circuit's injunction, but emphasized that extrapolation from sealed documents would not be permitted because it could easily be combined with and thereby tainted by Roe's knowledge of non-public, sealed information. I suggested that insofar as Roe sought a more specific interpretation of the Second Circuit's orders, he might submit a chart that listed single sentence statements juxtaposed with their sources, which he has done. Doe has objected to the use each of the three proposed statements, and I evaluate them in turn.

2

The first fact upon which Roe has requested clarification is: "98-CR-1101 is . . . [the] criminal case [of John Doe's real name] and John Doe is [John Doe's real name]." The specific sources listed for this statement are that the caption for the case once included John Doe's real name rather than "Doe," a magazine article, more than a decade old, which noted that a "sealed" complaint existed, and a newspaper article, nearly five years old. Roe also cites an unsealed recent hearing associated with the case's docket number.

Roe lists no source that refers to "Doe" by his real name and includes docket number 98-CR-1011. Roe argues that because the case was once accessible on PACER under the caption that included Doe's real name along with the docket number, the information is in the public domain. The Second Circuit's Order does not permit dissemination of such material because Roe has not pointed to a source currently available to the public that contains the same information.

The remaining public sources cited in support of this statement simply do not link John Doe, by his real name, with the docket number. Instead, in making the statement, Roe adds his knowledge of the docket number to public information that a sealed case exists, which is exactly what the injunction seeks to prevent. Roe makes the frivolous argument that because Judge Glasser did not explicitly reiterate the prohibition on disclosing Doe's real name at this unsealed hearing, Doe's name may be made public. However, Doe's real name was intentionally never mentioned at the hearing. Thus, just as in the instant Order, the prohibition against revealing Doe's real name is implicit based on the sealing of the case as a whole and the use of "Doe" at that hearing. Doe's identity cannot be discerned from that hearing and the Second Circuit's Order staying an unsealing of the docket enjoins Roe from revealing such information.

The second statement combines the public information that Doe was convicted of RICO charges – accessible to the public in a press release published by the U.S. Attorney – with non-public information regarding the nature of the predicate acts underlying the RICO charges. It does not appear that the names and descriptions of the predicate acts are publicly available from any source other than a letter in a related case that Roe downloaded from PACER in 2010, but is now under seal and thus subject to the Second Circuit's injunction. Roe's distribution or revelation of the information contained in the letter would violate court orders.

Finally, Roe seeks to make a third statement: "On October, 23, 2009," John Doe, by his real name, "was sentenced to probation and a $25,000 fine." The Government's request to unseal certain information about Doe's sentence is currently pending before Judge Glasser. Unless and until Judge Glasser orders this information unsealed, it remains subject to the Second Circuit's injunction.

It seems obvious that Roe is seeking to fatally undermine the purpose of the injunctions by publicizing information that would render them ineffective. Roe therefore may not issue any of the three statements submitted in his April 14 letter.

**SO ORDERED.**

S/BMC
_____
U.S.D.J.

Dated: Brooklyn, New York
       May 13, 2011

4

# EXHIBIT B

Westlaw.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

**H**
This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Richard ROE, an attorney, Appellant,
Jane Doe and John Doe II, clients of Richard Roe, Pro
Se Appellants,
v.
UNITED STATES of America, Appellee,
John Doe, Defendant–Appellee.

Nos. 10–2905–cr, 11–479–cr, 11–1408–cr,
11–1411–cr, 11–1666–cr, 11–1906–cr, 11–2425–cr.
June 29, 2011.

**Background:** Attorney filed civil action under Racketeer Influenced and Corrupt Organizations Act (RICO) against criminal defendant and others in the United States District Court for the Southern District of New York, and both attached as exhibits to complaint sealed materials from defendant's criminal case and referenced within complaint confidential information in exhibits. The United States District Court for the Eastern District of New York, I. Leo Glasser, J., issued permanent injunction against dissemination of defendant's presentence report (PSR) and extended temporary restraining order governing disclosure of other sealed documents. Attorney appealed, and petitioned for writ of mandamus. The Court of Appeals, 414 Fed.Appx. 327, denied petition, granted government's motion for temporary stay of unsealing of appeal, temporarily enjoined attorney and others from distributing or revealing documents or their contents subject to sealing orders in criminal case or on appeal, and remanded for assignment of district judge to oversee compliance with orders. The District Court, Cogan, J., ordered attorney to destroy or return sealed documents, and thereafter denied attorney's request to release information from sealed documents. Attorney appealed.

**Holdings:** The Court of Appeals held that:
(1) permanent injunction barring dissemination of PSR and requiring attorney to return PSR to government was warranted and did not violate attorney's First

Amendment rights;
(2) attorney waived right to challenge orders requiring destruction or return of sealed documents; and
(3) jurisdiction did not exist over appeal from scheduling order.

Ordered accordingly.

West Headnotes

[1] Constitutional Law 92 ⏤2109

92 Constitutional Law
   92XVIII Freedom of Speech, Expression, and Press
     92XVIII(V) Judicial Proceedings
      92XVIII(V)2 Criminal Proceedings
       92k2108 Court Documents or Records
        92k2109 k. In general. Most Cited Cases

Injunction 212 ⏤1160

212 Injunction
   212IV Particular Subjects of Relief
     212IV(A) Courts and Actions in General
      212k1152 Commencement and Prosecution in General
       212k1160 k. Particular proceedings or remedies in actions. Most Cited Cases
    (Formerly 212k26(1))

Sentencing and Punishment 350H ⏤296

350H Sentencing and Punishment
   350HII Sentencing Proceedings in General
     350HII(E) Presentence Report
      350Hk292 Disclosure of Report
       350Hk296 k. Disclosure to third parties. Most Cited Cases

   Disclosure of criminal defendant's presentence report (PSR) in subsequent civil action brought against him under Racketeer Influenced and Corrupt Organizations Act (RICO) was not required to meet the ends of justice, particularly given that proof of

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

defendant's conviction was available from other sources and that PSR was of dubious utility in civil action, except as tool to intimidate and harass defendant by subjecting him to danger through exposure of his government cooperation, and therefore permanent injunction barring dissemination of PSR and requiring attorney in civil action to return PSR to government was warranted and did not violate attorney's First Amendment rights. U.S.C.A. Const.Amend. 1; 18 U.S.C.A. § 1961 et seq.

[2] Federal Courts 170B ☞770

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
                    170Bk770 k. On separate appeal from interlocutory judgment or order. Most Cited Cases

To the extent that Court of Appeals had discretion to exercise pendent jurisdiction over orders in which district court temporarily restrained continued possession and dissemination by attorney in civil action under Racketeer Influenced and Corrupt Organizations Act (RICO) of sealed documents from one defendant's criminal case, Court of Appeals would decline to do so, warranting dismissal of attorney's appeals from temporary restraining orders. 18 U.S.C.A. § 1961 et seq.

[3] Federal Courts 170B ☞915

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)7 Waiver of Error in Appellate Court
                170Bk915 k. In general. Most Cited Cases

Appellant waived right to challenge district court's orders requiring destruction or return of sealed documents from civil defendant's criminal case, which were entered following filing of appellant's opening brief on appeal, where appellant did not raise any arguments with respect to his appeal of those orders in his reply brief on appeal, or move for leave to submit

supplemental briefing.

[4] Federal Courts 170B ☞585.1

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk585 Particular Judgments, Decrees or Orders, Finality
                    170Bk585.1 k. In general. Most Cited Cases

Court of Appeals lacked jurisdiction over appeal from district court's scheduling order, which was not final order subject to appeal and did not fall within exception to final judgment rule. 28 U.S.C.A. § 1291.

*62 Appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order issued by the United States District Court for the Eastern District of New York (I. Leo Glasser, Judge); appeal also from orders of April 1, 2011, April 4, 2011, and May 13, 2011 of the United States District Court for the Eastern District of New York (Brian M. Cogan, Judge).
UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court permanently enjoining the dissemination of John Doe's Pre–Sentence Report is AFFIRMED.Richard E. Lerner, Wilson Elser Moskowitz Edelman & Dicker LLP (David A. Schulz and Jacob P. Goldstein, Levine Sullivan Koch & Schulz LLP; Paul G. Cassell, S.J. Quinney College of Law at the University of Utah, on the brief), New York, N.Y. and Salt Lake City, UT, for Appellant, Richard Roe.

Todd Kaminsky, Assistant United States Attorney (Peter A. Norling and Elizabeth J. Kramer, Assistant United States Attorneys; Loretta E. Lynch, United States Attorney, on the brief), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY, for Appellee, United States Of America.

Nader Mobargha, Beys, Stein & Mobargha LLP, New York, NY,FN* for Defendant–Appellee, John Doe.

    FN* Pursuant to our order of February 14,

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

2011, John Doe was not invited to brief this appeal, nor has he moved to submit a brief. However, Doe has filed various letters and opposition papers in response to Roe's motions throughout the course of the appeal.

PRESENT: JOSÉ A. CABRANES, ROSEMARY S. POOLER and DENNY CHIN, Circuit Judges.

SUMMARY ORDER

**1 The appeal in Docket No. 10–2905–cr is DISMISSED in part, and the appeal in Docket No. 11–1408–cr is DISMISSED in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

The appeal in Docket No. 11–1411–cr is DISMISSED because appellant has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

The appeal in Docket No. 11–1906–cr is DISMISSED for want of jurisdiction.

With respect to Docket No. 11–2425–cr, the order of Judge Cogan is AFFIRMED.

The appeal in Docket No. 11–1666–cr by *pro se* appellants is DISMISSED in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is AFFIRMED.

The Clerk of Court is DIRECTED to close Docket Nos. 11–1408–cr, 11–141 1–cr, 11–1906–cr, and 11–2425–cr upon entry of this order. The Clerk of Court is also DIRECTED to close Docket No. 11–479–cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See* Order, *Roe v. United States*, 414 Fed.Appx. 327 (2d Cir.2011).

The remainder of this cause (Docket Nos. 10–2905–cr, 11–1666–cr) is REMANDED to the District Court (I. Leo *63 Glasser, *Judge*) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding the dissemination of the other sealed documents does *not* result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is ORDERED to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

It is further ORDERED that, pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir.1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

**2 It is hereby ORDERED that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir.1994), over any appeals from any orders or judgments entered by Judge Cogan.

Finally, it is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *post*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

The Clerk of Court is DIRECTED to transmit a copy of this order to Judge Cogan.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

## INTRODUCTION

Appellant Richard Roe ("Roe"), an attorney, and two of his clients, *pro se,* appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order entered by Judge Glasser. Because the *pro se* appellants incorporate Roe's arguments as their own and make no other independent legal claims, our legal conclusions apply to all appellants, though our order refers principally to Roe.

## BACKGROUND

A. The SDNY Complaint and Judge Glasser's Initial Rulings

On May 10, 2010, Richard Roe publicly filed a civil RICO complaint against John Doe ("Doe") and other defendants in the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge* ). Attached to the complaint were exhibits that included sealed materials from Doe's criminal case in the *64 Eastern District of New York. The complaint itself explicitly referenced the confidential information in the exhibits, including the fact that Doe had cooperated with the government.

On May 18, 2010, upon an application by Doe, Judge Glasser issued an order to show cause why a preliminary injunction should not be entered against Roe's dissemination of the sealed materials from Doe's criminal case. He also temporarily restrained Roe and his clients from "disseminating the Sealed and Confidential Materials or [the] information therein." The materials in Roe's possession included a 2004 Pre–Sentence Report ("PSR"), two proffer agreements, Doe's cooperation agreement, a criminal complaint, and a criminal information. The TRO was later extended multiple times without objection (and, on some occasions, at Roe's request) until a hearing could be held on June 21, 2010.

**3 At the June 21, 2010 hearing, Judge Glasser heard testimony from Roe before issuing a permanent injunction against dissemination of the 2004 PSR, pursuant to *United States v. Charmer Industries, Inc.,* 711 F.2d 1164 (2d Cir.1983). He also directed Roe to return the PSR to the United States Attorney's Office (Roe eventually returned the PSR directly to the court). With respect to the other sealed documents, Judge Glasser extended his temporary restraining

order until July 20, 2010, with Roe's consent, and requested that the parties brief whether the court had the authority to permanently enjoin the dissemination of those documents.

On July 9, 2010, Roe filed a notice of appeal concerning Judge Glasser's May 18, 2010 and June 21, 2010 orders.

On July 20, 2010, Judge Glasser held another hearing at which he recited his factual findings, including: (1) that Roe knew the documents at issue were sealed prior to his public filing of those documents; (2) that one of Roe's clients had "wrongfully taken" and had "no legal right to those documents"; and (3) that dissemination of the documents would cause "irreparable harm, which is imminent to Mr. John Doe ... [and] would put Mr. John Doe's safety at risk." Over Roe's objection, Judge Glasser reaffirmed his ruling of June 21, 2010 regarding the permanent injunction against dissemination of the PSR and extended his TRO with respect to the other sealed documents for another 10 days. He further ordered that the permanent injunction and TRO should cover all copies of the documents at issue, and that all originals and copies of such documents were to be returned or destroyed until Roe met his "burden with respect to whether or not there is some need to maintain those documents or to keep them." The TRO was subsequently extended to August 13, 2010, by request of the parties, while they negotiated a possible settlement.

On August 10, 2010, Roe filed a notice of appeal concerning the July 20, 2010 order that re-affirmed the permanent injunction and extended the TRO.[FN1] Judge Glasser has not since issued a final ruling regarding the disclosure of the non-PSR sealed documents.

> FN1. On February 7, 2011, Roe also filed a petition for a writ of mandamus requesting that we order the District Court to withdraw its various injunctive and temporary restraining orders and publicly docket Doe's criminal case. We denied this petition in our order of February 14, 2011. *See* Order, *Roe v. United States,* 414 Fed.Appx. 327 (2d Cir.2011).

B. Our February 14, 2011 Order and Judge Cogan's Assignment to Enforce Our Mandate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

On February 14, 2011, we heard oral argument on the government's motion for *65 a temporary stay of the unsealing of the appeal. In an order issued that day orally and later in written form, we granted the government's request to keep the appeal under seal and temporarily enjoined Roe and his associates from distributing or revealing in any way any documents or contents thereof subject to sealing orders in Doe's criminal case or on appeal. *See* Order, <u>Roe v. United States, 414 Fed.Appx. 327 (2d Cir.2011)</u>. We also remanded the cause to the District Court for the Eastern District of New York for the limited purpose of allowing the Chief Judge to assign a District Judge to "implement[ ] and oversee[ ] compliance with our orders and the orders previously entered by Judge Glasser." <u>Id.</u> Pursuant to our order, then-Chief Judge Dearie referred the case to Judge Brian M. Cogan for enforcement of this limited mandate.

**4 On March 1, 2011, Roe submitted a letter requesting "clarification" from Judge Cogan that, notwithstanding our order of February 14, 2011, he was permitted to disseminate certain information within the sealed documents because that information was allegedly public knowledge. On April 1, 2011, Judge Cogan held a hearing regarding Roe's request. At that hearing Judge Cogan learned that Roe had not yet destroyed or returned certain electronic and paper copies of the original PSR and other sealed documents, in violation of Judge Glasser's July 20, 2010 order. Accordingly, by oral order on April 1, 2011, and by a subsequent written order of April 4, 2011, Judge Cogan ordered Roe to destroy or return any remaining electronic or paper copies of the PSR and other sealed documents, without prejudice to his ability to seek the documents if any of the various sealing orders were vacated by our Court. *See* Order, *United States v. Doe* (E.D.N.Y. Apr. 4, 2011).

On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011.

On May 13, 2011, Judge Cogan issued a written order denying Roe's March 1, 2011 request to release certain information contained within the sealed documents. After opining that information "available to the public" was not covered by our injunction, Judge Cogan nevertheless ordered that Roe could not "extrapolate from sealed documents ... [which] could easily be combined with and thereby tainted by Roe's

knowledge of non-public sealed information." Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon a review of the specific statements and information that Roe intended to release, Judge Cogan further concluded that "[i]t seems obvious that Roe is seeking to fatally undermine the purpose of the injunctions by publicizing information that would render them ineffective." *Id.*

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011.

C. Recent Events before Judge Glasser
    On March 17, 2011, after learning that Doe's criminal conviction had been disclosed in a press release by the U.S. Attorney's Office for the Eastern District of New York, the government moved before Judge Glasser for a limited unsealing of the docket and certain documents in Doe's underlying criminal case. The government explicitly sought to unseal only those docket entries and documents that did not refer to Doe's cooperation with the government.

On March 23, 2011, Judge Glasser issued a scheduling order in which he stated that he was "uncertain of [his] continuing jurisdiction to address the controversy presented by [Roe's February 4, 2011 'demand' that the case be docketed and the *66 government's March 17, 2011 motion for a limited unsealing of the case]." Scheduling Order, *United States v. Doe (E.D.N.Y.* March 23, 2011). Accordingly, he requested that "the government, Richard Roe and John Doe [ ] brief the issue of the Court's jurisdiction and submit their briefs simultaneously on April 8th, 2011." *Id.*

**5 In addition to setting the briefing schedule, the order reflected Judge Glasser's factual finding that Roe had "knowingly and intentionally flouted a Court order" by "unilaterally deciding" to disclose information in Doe's sealed criminal case. *Id.*

On May 11, 2011, Roe filed a notice of appeal concerning Judge Glasser's March 23, 2011 order.

On April 19, 2011, upon requests from both Roe and the government, we issued an order confirming that Judge Glasser retained jurisdiction "to decide the government's motion to unseal, as well as to decide any other pending or future motions to unseal that would not result in the public disclosure of docket

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

entries or underlying documents *that reference John Doe's cooperation with the government.*" Order, *Roe v. United States,* Docket Nos. 10–2905–cr, 11–479–cr (2d Cir. Apr. 19, 2011) (emphasis in original).

Judge Glasser has not yet acted on the government's March 17, 2011 motion to unseal.

We assume the parties' familiarity with the remaining facts and procedural history of the case.

## DISCUSSION
### (i)

[1] On appeal, Roe argues that the District Court violated his First Amendment rights in permanently enjoining the dissemination of Doe's PSR and requiring him to return it to the government. We review a district court's grant of a permanent injunction for abuse of discretion. *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006); *see also Sims v. Blot,* 534 F.3d 117, 132 (2d Cir.2008) (explaining "abuse of discretion").

Under *United States v. Charmer Industries, Inc.,* 711 F.2d 1164 (2d Cir.1983), third parties must satisfy a heightened standard in order to obtain access to a PSR, which is a sealed "court document designed and treated principally as an aid to the court in sentencing." *Id.* at 1176. Specifically, a third party seeking access to a PSR bears the burden of making a "compelling demonstration that disclosure of the report is required to meet the ends of justice." *Charmer Indus., Inc.,* 711 F.2d at 1175.

Here, Judge Glasser, who had presided over Doe's criminal case and was therefore familiar with the extent of Doe's cooperation and his assistance in obtaining the convictions of myriad violent criminals, explicitly entered a finding that releasing proof of Doe's cooperation would cause him irreparable harm and would put his safety at risk.

Judge Glasser also found that Roe had improperly refused to submit an application to the Court to unseal the report, despite his knowledge that the report was sealed and came from a sealed criminal case. *See id.* at 1170 ("[T]he presentence report is a court document and is to be used by nonjudicial federal agencies and others *only with the permission of the court.*" (emphasis supplied)); *see also In re Zyprexa Injunction,* 474 F.Supp.2d 385, 417 (E.D.N.Y.2007) (enforcing a preliminary injunction requiring the return of sealed

documents pursuant to the court's "inherent authority to enforce [its] orders"), *aff'd,* 617 F.3d 186 (2d Cir.2010). Judge Glasser found, instead, that Roe had determined unilaterally that he was entitled to publicly disclose the report.

**6 Judge Glasser balanced his findings of physical danger to Doe and the intentional *67 defiance of a sealing order by Roe—findings that we hold were not clearly erroneous—against Roe's asserted need to use the PSR in the SDNY civil case to establish that Doe had defrauded investors and others by not revealing his conviction. Because proof of Doe's conviction (as opposed to his cooperation) remains available from other public documents—including a press release by the United States Attorney's Office for the Eastern District of New York—and because the PSR is an incomplete and ultimately inadmissible document to which neither Doe nor the government will ever have the opportunity to object, *see Charmer Indus., Inc.,* 711 F.2d at 1170–71, the PSR is of dubious utility in the civil case except as a tool to intimidate and harass Doe by subjecting him to danger. Accordingly and in sum, disclosure of the report is not "required to meet the ends of justice," *id.* at 1175—indeed, quite the opposite. The District Court did not err, much less abuse its discretion, in imposing a permanent injunction against dissemination of the PSR. *See, e.g., United States v. Charmer Indus., Inc.,* 711 F.2d at 1177 (stating that a "central element in the showing required of a third person seeking disclosure is the degree to which the information in the [PSR] cannot be obtained from other sources").

### (ii)

[2] Doe argues that the District Court violated his First Amendment rights by temporarily restraining his continued possession and dissemination of the other sealed documents from Doe's criminal case.

A TRO, which is appropriate when "speed is needed ... to prevent irreparable harm," *Garcia v. Yonkers Sch. Dist.,* 561 F.3d 97, 106 (2d Cir.2009) (internal quotation marks omitted), is not a final judgment and is not ordinarily appealable. *See Gen. Motors Corp. v. Gibson Chem. & Oil Corp.,* 786 F.2d 105, 108 (2d Cir.1986). To the extent we may, in our discretion, exercise pendent jurisdiction over the order pursuant to *Swint v. Chambers Cnty. Comm'n,* 514 U.S. 35, 45, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995),

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

we decline to do so here. Accordingly, Roe's appeal is dismissed insofar as it challenges the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010.

(iii)

[3] On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011. Roe did not raise any arguments with respect to that appeal in his reply brief of April 18, 2011, nor has he filed a motion for leave to submit supplemental briefing.<sup>FN2</sup> Accordingly, we hold that Roe has waived his right to challenge Judge Cogan's orders of April 1 and April 4, 2011. *See, e.g., In re Wireless Data, Inc.*, 547 F.3d 484, 492 (2d Cir.2008) (deeming arguments not raised on appeal waived).

> FN2. Although arguments raised for the first time in a reply brief are generally deemed waived, *see Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n. 13 (2d Cir.2010), Roe's opening brief was filed on March 28, 2011, and therefore could not have raised any arguments with respect to Judge Cogan's orders of April 1 and April 4, 2011. Accordingly, we do not base our finding of waiver on Roe's failure to discuss Judge Cogan's orders in his opening brief; rather, our holding is based on his failure to discuss them in his reply brief or in a motion for leave to submit supplemental briefing.

His appeal from those orders is hereby dismissed.

(iv)

[4] Roe appeals from Judge Glasser's scheduling order of March 23, 2011, insofar as it reflects Judge Glasser's factual finding that Roe "knowingly and intentionally *68 flouted" a court order. Scheduling Order, *United States v. Doe* (E.D.N.Y. Mar. 23, 2011).

**7 We do not have jurisdiction over Roe's claim because the March 23, 2011 order was not a final order pursuant to 28 U.S.C. § 1291, nor are any of the exceptions to the "final judgment rule" applicable in the circumstances presented. *See generally Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 745 (2d Cir.2000) (discussing the "final judgment rule" and its exceptions).

Accordingly, Roe's appeal from the March 23,

2011 order is dismissed.

(v)

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011. We review Judge Cogan's interpretation of his February 14, 2011 order and his interpretation of the sealing orders of Judge Glasser *de novo*.

After an item-by-item review of the specific information that Roe wished to publicly release—including (a) John Doe's real name, linked with his criminal docket number, (b) the specific nature of the predicate acts leading to his criminal conviction, and (c) the sentence imposed by the District Court—Judge Cogan concluded that the information either was not public at all or was not public to the extent and with the level of detail that Roe intended to disclose. Accordingly, he denied Roe's request for permission to release the information. Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon our own independent review, we agree with Judge Cogan that Roe's proposed disclosures would have violated our temporary injunction of February 14, 2011 and the sealing orders of Judge Glasser. Judge Cogan's order of May 13, 2011 is affirmed.

CONCLUSION

To summarize:

(1) The judgment of the District Court permanently enjoining the dissemination of John Doe's Pre-Sentence Report is AFFIRMED.

(2) The appeal in Docket No. 10–2905–cr is DISMISSED in part, and the appeal in Docket No. 11–1408–cr is DISMISSED in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

(3) The appeal in Docket No. 11–1411–cr is DISMISSED because Roe has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

(4) The appeal in Docket No. 11–1906–cr is DISMISSED for want of jurisdiction.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.)))

(5) With respect to Docket No. 11–2425–cr, the order of Judge Cogan is AFFIRMED.

(6) The appeal in Docket No. 11–1666–cr by *pro se* appellants is DISMISSED in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is AFFIRMED.

(7) The Clerk of Court is DIRECTED to close Docket Nos. 11–1408–cr, 11–1411–cr, 11–1906–cr, and 11–2425–cr upon entry of this order. The Clerk of Court is also DIRECTED to close Docket No. 11–479–cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See Order, Roe v. United States,* 414 Fed.Appx. 327 (2d Cir.2011).

**8 (8) The remainder of this cause (Docket Nos. 10–2905–cr, 11–1666–cr) is REMANDED to the District Court (I. Leo Glasser, *Judge* ) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion*69 of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding the dissemination of the other sealed documents does not result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is ORDERED to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

(9) It is further ORDERED that, pursuant to *United States v. Jacobson,* 15 F.3d 19 (2d Cir.1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

(10) It is hereby ORDERED that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson,* 15 F.3d 19 (2d Cir.1994), over any appeals from any orders or judgments entered by Judge Cogan.

(11) Finally, it is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *ante*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

(12) The Clerk of Court is DIRECTED to transmit a copy of this order to Judge Cogan.

C.A.2 (N.Y.),2011.
Roe v. U.S.
428 Fed.Appx. 60, 2011 WL 2559016 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT C

AUG.11.2011  8:05PM   TROUTMAN SANDERS LLP                    NO.463   P.1



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/26/11

Beys, Stein & Mobargha LLP

Nader Mobargha

August 11, 2011

RECEIVED IN CHAMBERS
OF NAOMI REICE BUCHWALD

AUG 12 2011

UNITED STATES COURT JUDGE

**VIA FACSIMILE (212) 805-7927**

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: <u>Kriss, et al. v. Bayrock Group, LLC, et al., 10 Civ. 3959 (NRB)</u>

Dear Judge Buchwald:

    We represent defendant John Doe in the above-captioned matter, for which "there is no operative complaint" as of yet, and for which the deadline to file a complaint was August 10, 2011. We write to respectfully request notice of any further adjournment requests by plaintiff's counsel, Richard Roe, and to request that the Court impose a deadline on when Roe must file a redacted complaint.

    Roe has flatly refused our request to provide copies of his correspondence with the Court, including his letter, dated May 27, 2011, to Your Honor ("May 27th Letter"), which we have not received to date. His basis for his refusal is that "no one has answered the complaint (i.e., the non-operative complaint) there is no basis for, and so I am not, cc'ing [counsel for John Doe on] this letter." *See* Letter from Your Honor to R. Roe, dated May 31, 2011 ("May 31st Letter"). Indeed, had Your Honor not provided us with a copy of your May 31st letter, we would not have even known that Roe's May 27th letter existed.

    We expressly demanded that Roe provide us a copy of his May 27th letter. He responded, however, as follows:

*[handwritten annotations in right margin: Application denied without prejudice. So Ordered. ... Roe letter received, USDC 8/25/11]*

The Chrysler Building
405 Lexington Avenue
7th Floor
New York, New York 10174
212-387-8200 (Main)
212-387-8229 (Fax)
nmobargha@bsmlegal.net

Page 2 of 2

The letter you refer to advised Judge Buchwald why I was not copying you. Presumably if she had wanted you to see it she would have attached it to her letter. But as a courtesy to you I will tell you that I told her as neither you or anyone has answered the complaint there was no need based on the contents of the letter to copy you or any of the other defendants as the letter was not a judicial document since it sought no relief and made no request that the court exercise or refrain from exercising any Article III function….. In smaller words, that means I made no application.

*See* Exhibit ("Ex.") 1, Email from R. Roe to N. Mobargha, dated June 2, 2011. Roe should be ordered to copy us on any and all correspondence with the Court, including any requests to adjourn the deadline by which to file the currently non-operative, non-pending complaint.

Finally, we also request that Roe be given a deadline to file a redacted complaint. The Court of Appeals recently denied all of Roe's appeals in their entirety, effectively rejecting his numerous attempts to disclose Doe's sealed and confidential information. *See* Ex. 2, Summary Order, dated June 29, 2011. Accordingly, all sealed and confidential information concerning Doe must remain sealed, and by extension, Roe cannot disclose any of it in a publicly filed complaint as he has sought to do since May 2010. Without any legal recourse left (except to file an appeal to the Supreme Court, a tactic that has already attempted), Roe now must file a redacted complaint omitting all references to Doe's sealed and confidential information, or refrain from filing any complaint at all. Accordingly, we respectfully request that the Court impose a hard deadline for Roe to do so without granting any further extensions.

Respectfully submitted,

Nader Mobargha
*Counsel for Defendant John Doe*

cc:   Richard Roe, Esq. (by email)
      *Counsel to Plaintiffs*

      Walter Saurack, Esq. (by email)
      *Counsel to the Bayrock Group*

# EXHIBIT D

ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:10-cv-03959-PAE

Kriss et al v. BayRock Group LLC et al
Assigned to: Judge Paul A. Engelmayer
Demand: $9,999,000
Related Case: 1:10-cv-06338-NRB
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 05/10/2010
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt
Organization
Jurisdiction: Federal Question

**Plaintiff**

**Jody Kriss**
*directly and derivately on behalf of*
*BayRock Group LLC*

represented by **Frederick Martin Oberlander**
Mundie Law Firm
11 Penn Plaza, 5th Floor
New York, NY 10001
212-826-0357
Fax: 212-202-7624
Email: fred55@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Michael Ejekam**
*directly and derivately on behalf of*
*BayRock Group LLC*

represented by **Frederick Martin Oberlander**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BayRock Spring Street LLC**

represented by **Frederick Martin Oberlander**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BayRock Whitestone LLC**

represented by **Frederick Martin Oberlander**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BayRock Group LLC**

**Defendant**

Tevfik Arif

**Defendant**
Julius Schwarz

**Defendant**
Felix Satter

**Defendant**
Brian Halberg

**Defendant**
Salvatore Lauria

**Defendant**
Alex Salomon

**Defendant**
Jerry Weinrich

**Defendant**
Salomon & Company PC

**Defendant**
Akerman Senterfitt LLP

**Defendant**
Martin Domb

**Defendant**
Craig Brown

**Defendant**
Duval & Stachenfeld LLP

**Defendant**
Bruce Stachenfeld

**Defendant**
David Granin

**Defendant**
Nixon Peabody LLP

**Defendant**
Adam Gilbert

**Defendant**

**Roberts & Holland LLP**

<u>Defendant</u>
**Elliot Pisem**

<u>Defendant</u>
**Michael Samuel**

<u>Defendant</u>
**Mel Dogan**

<u>Defendant</u>
**BayRock Spring Street LLC**

<u>Defendant</u>
**John Does 1-100**

<u>Defendant</u>
**BayRock Whitestone LLC**

<u>Defendant</u>
**BayRock Camelback LLC**

<u>Defendant</u>
**BayRock Merrimac LLC**

<u>Defendant</u>
**BayRock Group Inc.**

<u>Defendant</u>
**National Union Fire Insurance Co. of Pittsburgh, PA**

<u>Nominal Defendant</u>
**BayRock Group LLC**

<u>Nominal Defendant</u>
**BayRock Spring Street LLC**

<u>Nominal Defendant</u>
**BayRock Whitestone LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/10/2010 | 1 | COMPLAINT against Tevfik Arif, Julius Schwarz, Felix Satter, Brian Halberg, Salvatore Lauria, Alex Salomon, Jerry Weinrich, Salomon & Company PC, Akerman Senterfitt LLP, Martin Domb, Craig Brown, Duval & Stachenfeld LLP, Bruce Stachenfeld, David Granin, Nixon Peabody LLP, |

| | | |
|---|---|---|
| | | Adam Gilbert, Roberts & Holland LLP, Elliot Pisem, Michael Samuel, Mel Dogan, BayRock Spring Street LLC, John Does 1-100, BayRock Whitestone LLC, BayRock Camelback LLC, BayRock Merrimac LLC, BayRock Group Inc., National Union Fire Insurance Co. of Pittsburgh, PA, BayRock Group LLC. (Filing Fee $ 350.00, Receipt Number 904026)Document filed by Jody Kriss, Michael Ejekam, BayRock Spring Street LLC, BayRock Whitestone LLC.(ama) (Entered: 05/14/2010) |
| 05/10/2010 | | SUMMONS ISSUED as to Tevfik Arif, Julius Schwarz, Felix Satter, Brian Halberg, Salvatore Lauria, Alex Salomon, Jerry Weinrich, Salomon & Company PC, Akerman Senterfitt LLP, Martin Domb, Craig Brown, Duval & Stachenfeld LLP, Bruce Stachenfeld, David Granin, Nixon Peabody LLP, Adam Gilbert, Roberts & Holland LLP, Elliot Pisem, Michael Samuel, Mel Dogan, BayRock Spring Street LLC, John Does 1-100, BayRock Whitestone LLC, BayRock Camelback LLC, BayRock Merrimac LLC, BayRock Group Inc., National Union Fire Insurance Co. of Pittsburgh, PA, BayRock Group LLC. (ama) (Entered: 05/14/2010) |
| 05/10/2010 | | Magistrate Judge Frank Maas is so designated. (ama) (Entered: 05/14/2010) |
| 05/10/2010 | | Case Designated ECF. (ama) (Entered: 05/14/2010) |
| 05/14/2010 | 2 | ORDER: It is hereby ORDERED that no further dissemination of the complaint and exhibits thereto or the sealed information contained therein be made pending further order of the Court; and it is further ORDERED that plaintiffs' counsel immediately contact all persons who have received a copy of the complaint and inform them of this Court's order that there be no further dissemination of the complaint and exhibits thereto or the sealed information contained therein pending further order of the Court. Copies Mailed By Chambers. (Signed by Judge Naomi Reice Buchwald on 5/13/2010) (jfe) Modified on 5/14/2010 (jfe). (Entered: 05/14/2010) |
| 05/14/2010 | 3 | ORDER: It is hereby ordered that the original complaint be sealed pending further order of the Court; and it is further ORDERED that a redacted version of the original complaint, redacting any sealed documents or references to sealed documents, be filed with the Clerk of the Court by May 19, 2010, to be followed by an electronic (.pdf) version of the redacted complaint. (Signed by Judge Naomi Reice Buchwald on 5/14/2010) Copies Mailed By Chambers. (jpo) Modified on 5/18/2010 (jpo). (Entered: 05/18/2010) |
| 05/14/2010 | | Transmission to Sealed Records Clerk. Transmitted re: 3 Order, Set Deadlines/Hearings,,, to the Sealed Records Clerk for the sealing or unsealing of document or case. (jpo) (Entered: 05/18/2010) |
| 05/14/2010 | | Minute Entry for proceedings held before Judge Naomi Reice Buchwald: Telephone Conference held on 5/14/2010. (mro) (Entered: 05/24/2010) |
| 05/17/2010 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney Frederick Martin Oberlander for noncompliance with Section (14.3) of the S.D.N.Y. Electronic Case Filing Rules & Instructions. E-MAIL the PDF for Document 1 Complaint,, to: case_openings@nysd.uscourts.gov. (mro) (Entered: 05/17/2010) |
| | | |

| 05/25/2010 | 4 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Brian A. Herman dated 5/25/2010 re: On 5/14/2010, this Court sealed the complaint in this matter and the exhibits thereto. In connection with certain sealed proceedings now before Hon. Judge Glasser concerning the use of certain information in the Complaint, counsel requests permission to provide a copy of the Complaint to Judge Glasser. ENDORSEMENT: Application granted. (Signed by Judge Naomi Reice Buchwald on 5/25/2010) (tro) (Entered: 05/25/2010) |
| --- | --- | --- |
| 08/11/2010 | 5 | ORDER ENLARGING TIME TO SERVE COMPLAINT; Good cause being shown, Plaintiffs' time to serve the complaint, as such may or may not be amended hereafter, shall be enlarged to extend through October 29, 2010. (Service due by 10/29/2010.)(Signed by Judge Naomi Reice Buchwald on 8/11/10); (djc) (Entered: 08/12/2010) |
| 11/02/2010 | 6 | ORDER ENLARGING TIME TO SERVE, FRCP 4,6: Good cause being shown, Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of December 31, 2010. (Signed by Judge Naomi Reice Buchwald on 11/1/10) (mro) (Entered: 11/02/2010) |
| 12/23/2010 | 7 | ORDER ENLARGING TIME TO SERVE: It is ordered, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of March 1, 2011. (Signed by Judge Naomi Reice Buchwald on 12/23/10) (mro) (Entered: 12/28/2010) |
| 12/23/2010 | 8 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT, that should any or all Plaintiffs file a first amended and supplemental complaint on or before March 1, 2011, such filing: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15(a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file subsequent supplemental complaint(s). (Amended Pleadings due by 3/1/2011) (Signed by Judge Naomi Reice Buchwald on 12/23/2010) (lnl) (Entered: 12/28/2010) |
| 12/23/2010 | | ***DELETED DOCUMENT. Deleted document number 9 ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT. The document was a duplicate of Doc. #8 filed in this case. (ae) (Entered: 02/09/2011) |
| 02/25/2011 | 9 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15 (a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended |

| | | |
|---|---|---|
| | | complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3)Shall not preclude Plaintiffs from requesting permission to tile subsequent supplemental complaint(s). (Signed by Judge Naomi Reice Buchwald on 2/24/2011) (lnl) (Entered: 02/25/2011) |
| 02/25/2011 | 10 | ORDER ENLARGING TIME TO SERVE: It is ordered, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of May 10, 2011. (Service due by 5/10/2011) (Signed by Judge Naomi Reice Buchwald on 2/24/2011) (lnl) (Entered: 02/25/2011) |
| 05/11/2011 | 11 | ORDER TO ENLARGE TIME TO SERVE - FRCP 4,6: It is ordered, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of 8/10/2011. (Signed by Judge Naomi Reice Buchwald on 5/11/2011) (ab) (Entered: 05/11/2011) |
| 05/11/2011 | 12 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT, FRCP 15: It is ordered, that should any or all Plaintiffs file a first amended and supplemental complaint on or before 8/10/2011, such filing: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15(a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file subsequent supplemental complaint(s). (Signed by Judge Naomi Reice Buchwald on 5/11/2011) (ab) (Entered: 05/11/2011) |
| 08/17/2011 | 13 | ORDER ENLARGING TIME TO SERVE: It is ordered, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of October 10, 2011. (Signed by Judge Naomi Reice Buchwald on 8/16/2011) (ab) (Entered: 08/17/2011) |
| 08/23/2011 | 14 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT: It is Ordered, that should any or all plaintiffs file a first amended and supplemental complaint on or before October 10, 2011, such filing: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15(a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file subsequent supplemental complaint(s).( Amended Pleadings due by 10/10/2011.) (Signed by Judge Naomi Reice Buchwald on 8/22/2011) (mro) (Entered: 08/23/2011) |
| | | |

| 08/30/2011 | 15 | ENDORSED LETTER addressed to Judge Naomi Reice Buchwald from Nader Mobargha dated 8/11/2011 re: We represent defendant John Doe in this action, for which "there is no operative complaint" as of yet, and for which the deadline to file a complaint was August 10, 2011. We write to respectfully request notice of any further adjournment requests by plaintiff's counsel, Richard Roe, and to request that the Court impose a deadline on when Roe must file a redacted complaint. ENDORSEMENT: Application denied without prejudice. So ordered. (Signed by Judge Naomi Reice Buchwald on 8/25/2011) (lmb) (Entered: 08/30/2011) |
|---|---|---|
| 09/28/2011 | 16 | NOTICE OF CASE REASSIGNMENT to Judge Paul A. Engelmayer. Judge Naomi Reice Buchwald is no longer assigned to the case. (sjo) (Entered: 09/28/2011) |
| 10/12/2011 | 17 | ORDER: It is ORDERED, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of December 12, 2011. It is FURTHER ORDERED, that should any or all Plaintiffs file a first amended and supplemental complaint on or before December 12, 2011, such filing: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15(a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file a subsequent supplemental complaint(s). ( Amended Pleadings due by 12/12/2011., Service due by 12/12/2011.) (Signed by Judge Paul A. Engelmayer on 10/11/2011) (mro) (Entered: 10/12/2011) |
| 12/09/2011 | 18 | ORDER ENLARGING TIME TO SERVE: Good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of 1/19/2012. ( Service due by 1/19/2012.) (Signed by Judge Paul A. Engelmayer on 12/8/2011) (cd) (Entered: 12/09/2011) |
| 12/09/2011 | 19 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT: It is ordered, that should any or all Plaintiffs file a first amended and supplemental complaint on or before January 19, 2012, such filing shall not be deemed made pursuant to FRCP 15(a)(I), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint, as set forth within this Order. ( Amended Pleadings due by 1/19/2012.) (Signed by Judge Paul A. Engelmayer on 12/8/2011) (jfe) (Entered: 12/09/2011) |
| 01/27/2012 | 20 | ORDER: The Court has received a submission from the law firm of Beys, Stein & Mobargha, counsel to one of the named defendants in this matter, opposing further enlargements of time for plaintiffs to serve their complaint.The Court notes that the Second Circuit has recently remand of certain matters to the Honorable I. Leo Glasser of the Eastern District of New York with instructions to rule on a pending motion to unseal portions of a criminal docket. Once Judge Glasser rules on the unsealing motion and any |

| | | |
|---|---|---|
| | | appeal taken from that determination has run its course, it will be incumbent upon plaintiffs' counsel to either amend the complaint he filed on April 20, 2010 such that it does not reference any sealed material, or to discontinue this action if it cannot be maintained without improper reference to sealed documents. Until that time, defendants' objections to the enlargements of time to serve the complaint are denied. This Order relates solely to the issue of plaintiffs' time to serve their complaint in this action. Nothing in this Order alters in any way the obligation(s) imposed upon plaintiffs' counsel by previous orders of this Court or various orders of the U.S. Court of Appeals for the Second Circuit or the U.S. District Court for the Eastern District of New York. (Signed by Judge Paul A. Engelmayer on 1/27/2012) (djc) (Entered: 01/27/2012) |
| 01/27/2012 | 21 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FRCP 15: It is ordered, that should any or all Plaintiffs file a first amended and supplemental complaint on or before February 29, 2012, such filing: (1) Shall not be deemed made pursuant to FRCP 15(a)(1), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15 (a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file subsequent supplemental complaint(s). (Signed by Judge Paul A. Engelmayer on 1/26/2012) (djc) (Entered: 01/27/2012) |
| 01/27/2012 | 22 | ORDER: It is ordered. good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of February 29, 2012 (Signed by Judge Paul A. Engelmayer on 1/26/2012) (js) (Entered: 01/27/2012) |
| 03/05/2012 | 23 | ORDER ENLARGING TIME TO SERVE: It is ordered, good cause having been shown, that Plaintiffs' time to serve the complaint shall be further enlarged to extend through and inclusive of May 31, 2012.( Service due by 5/31/2012.) (Signed by Judge Paul A. Engelmayer on 3/2/2012) (jfe) (Entered: 03/05/2012) |
| 03/05/2012 | 24 | ORDER IN RE FILING A FIRST AMENDED AND SUPPLEMENTAL COMPLAINT: Shall not be deemed made pursuant to FRCP 15(a)(l), Plaintiffs retaining the right to file a subsequent, second amended complaint pursuant thereto as a matter of course as if such were a first amended complaint; and (2) Shall not be counted for any further purposes of FRCP 15(a)(2), thus any subsequent application by Plaintiffs for permission to file a third, fourth, etc. amended complaint shall be decided as if the first amended complaint were actually the complaint originally filed and the second amended complaint were actually the first amended complaint filed as a matter of course, and so on; and (3) Shall not preclude Plaintiffs from requesting permission to file subsequent supplemental complaint(s). (Signed by Judge Paul A. Engelmayer on 3/2/2012) (jfe) (Entered: 03/05/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/11/2012 20:36:58 | | |
| **PACER Login:** we2556 | **Client Code:** | 99998.01366 1366 |
| **Description:** | Docket Report **Search Criteria:** | 1:10-cv-03959-PAE |
| **Billable Pages:** 6 | **Cost:** | 0.48 |

# EXHIBIT E



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAYROCK GROUP LLC,                          No.

                Plaintiff,

      v.                                    COMPLAINT

JOSHUA BERNSTEIN,

                Defendant.

Plaintiff Bayrock Group LLC ("Bayrock"), for its complaint against defendant Joshua

Bernstein ("Bernstein"), alleges as follows:

### PRELIMINARY STATEMENT

1.     This is an action to remedy the damage caused by the unauthorized, disloyal and

fraudulent conduct of Joshua Bernstein, a former employee of Bayrock Group LLC from

November 2006 until his termination in September 2008.

2.     Unbeknownst to and without the approval of his superiors, Bernstein installed

spyware on Bayrock's computers that enabled him to view (even remotely, i.e., from outside the

Bayrock office), download and record the files, emails, website views and even keystrokes of

every Bayrock employee.  Then, upon his termination, Bernstein absconded with, in his own

sworn words, "thousands" of documents (both hard copy and electronic) – documents that he

retains possession of to this day.

3.     These documents included highly sensitive, confidential and proprietary

information of Bayrock, including not only financial and deal information, but privileged

attorney-client communications and even personal communications of Bayrock employees.

Indeed, among the documents stolen by Bernstein from the Bayrock premises are extremely

811480_2

sensitive documents related to a sealed criminal matter from the Eastern District (the disclosure of which in a publicly filed complaint led this Court to order its sealing).

4. Bernstein also took Bayrock computer equipment, including the hard drive from the computer in his office and a company Blackberry.

5. Not only has Bernstein refused all demands to return these documents and equipment, but he has compounded his illegal activity by using the information wrongfully obtained for his own purposes, and by disseminating these documents to third persons.

6. Bayrock, through this action, seeks the return of its property, equitable relief to prevent Bernstein and his agents from any further use or dissemination of the documents and information contained therein, and compensatory damages for the losses and damage caused by Bernstein's egregious misconduct.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, as a civil action arising under the laws of the United States, as well as supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as defendant Bernstein resides in this district, and under § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

9. Plaintiff Bayrock Group LLC is a limited liability company organized under the laws of the State of New York and having its principal place of business in Manhattan. Bayrock is a real estate investment and development firm specializing in luxury hospitality, residential, commercial and mixed-use projects.

811480_2

2

10.     Defendant Joshua Bernstein is a natural person and resident of Westchester County.  Bernstein is a former employee of Bayrock.

## FACTS

11.     Bayrock hired Bernstein as a full-time employee on or about November 11, 2006.

12.     Bernstein's primary responsibility was to serve as a financial analyst and to assist in the identification and procurement of potential real estate investment opportunities for Bayrock.

13.     As a secondary responsibility, Bernstein was also asked to serve as the primary contact to the outside firms hired by Bayrock to provide information technology (IT) support.

14.     The Bayrock computer system is used extensively by Bayrock employees for the conduct of its real estate business, including interstate and foreign commerce.

15.     At some time in mid-2007, Bernstein asked Bayrock's outside IT support vendor to install spyware on the Bayrock computer system.

16.     This spyware enabled anyone with administrator access – including Bernstein – to view (including remotely), download and record the screens, emails, files and keystrokes of any workstation.

17.     The installation of this spyware was neither authorized by Bayrock nor was management of Bayrock aware of its installation.

18.     Indeed, Bernstein himself signed the purchase order for this installation – the only time that Bernstein had ever authorized any work order – and did not copy any other Bayrock employee or management on his communications with the installing vendor.

19.     Bernstein knew he had no authorization to install the program and made efforts to conceal its installation from Bayrock management.

20.     Bernstein installed this spyware to gain information for his own purposes, not to further any interests of Bayrock.

21.     Bayrock terminated Bernstein's employment in or around early September 2008.

22.     As he has admitted under oath,[1] following his termination Bernstein retained or took with him from Bayrock "thousands" of emails and "hundreds" of paper documents belonging to Bayrock.

23.     Bernstein also removed the hard drive from the Bayrock-owned computer in his office and took it with him.

24.     Bernstein also took his company-issued (and owned) Blackberry device and has not returned it.

25.     Among the documents and information taken by Bernstein were documents that are highly sensitive, confidential, and proprietary, including but not limited to:

    a.   Bayrock financial information;

    b.   Information about potential deals or investments;

    c.   Private emails and other personal documents or information belonging to Bayrock employees; and

    d.   Privileged attorney-client communications.

26.     Bernstein has not only used this information for his own purposes, he has disseminated this information and/or documents to third parties and has publicly disclosed certain of the information.

---

[1] Bernstein brought suit against Bayrock in New York Supreme Court, Westchester County (Index No. 02579/09), alleging that Bayrock had failed to pay purportedly promised compensation. Bernstein's admission to taking Bayrock documents was made in a deposition in that case.

4

27.    Bernstein turned over documents and or information wrongfully taken from Bayrock to his then-attorney, Frederick Oberlander, who on behalf of former Bayrock employee Jody Kriss included excerpts from these documents in a complaint filed in this court (*Kriss, et al. v. Bayrock Group LLC, et al.*, No. 10 Civ. 3959 (NRB)) (the "Kriss Action").

28.    Oberlander also included in the Kriss Action complaint numerous excerpts from the depositions taken in the Westchester action – questioning that had no apparent relevance to the Westchester action but appeared to be nothing more than fishing for purposes of filing the Kriss Action.

29.    Indeed, Kriss and Oberlander have made public court filings in which they disclosed highly sensitive information and documents relating to a sealed criminal matter in the Eastern District.  When alerted to the fact that references to sealed criminal case documents had been quoted in and attached to pleadings in a civil case, this Court immediately ordered the sealing of the complaint and enjoined its further dissemination.

30.    Bernstein has refused all requests from Bayrock to return the information, documents, and equipment wrongfully taken.

31.    Bayrock did not discover the installation of spyware or Bernstein's taking of information and equipment until after the termination of his employment, towards the end of 2008 or beginning of 2009.

32.    Bayrock was unable to determine that it was Bernstein who had caused the spyware to be installed until earlier this year as it recovered documents in response to discovery requests that Bernstein had issued in his Westchester lawsuit.

5

33.     As a result of Bernstein's actions, Bayrock has suffered losses and damage, including but not limited to the loss of equipment and the costs to investigate and remediate the installation of spyware and other unauthorized alterations of Bayrock's computer system.

34.     In addition, Bayrock and its employees/principals have also been damaged by the disclosure of such highly confidential information.  The potential damage (from, for example, the disclosure or use of Bayrock's financial and deal information) of Bernstein's continued possession of the stolen documents is both enormous and irreparable, and Bayrock has no adequate remedy at law.

### FIRST CAUSE OF ACTION
### Computer Fraud and Abuse Act, 18 U.S.C. § 1030

35.     The allegations in paragraphs 1 - 34 are incorporated herein.

36.     The Bayrock computers accessed by Bernstein are all used in or affecting interstate or foreign commerce or communications, and are thus "protected computers" within the meaning of 18 U.S.C. § 1030.

37.     Bernstein intentionally accessed one or more Bayrock protected computers without authorization or in excess of his authorization, and thereby obtained information from those computers.

38.     Bernstein knowingly, and with intent to defraud, accessed one or more Bayrock computers without authorization or in excess of his authorization and thereby furthered his intended fraud and obtained items of value, including equipment, information and documents.

39.     Bernstein knowingly caused the transmission of a program, to wit, spyware, and as a result of such conduct intentionally caused damage without authorization to one or more Bayrock protected computers.

6

40.    Bernstein intentionally accessed one or more Bayrock protected computers without authorization and, as a result of such conduct, either recklessly caused damage or caused damage and loss.

41.    By the foregoing actions Bernstein violated 18 U.S.C. § 1030.

42.    These violations caused Bayrock and other persons loss aggregating at least $5,000 in value.

**SECOND CAUSE OF ACTION**
**Wiretap Act, 18 U.S.C. § 2510 *et seq.***

43.    The allegations in paragraphs 1-42 are incorporated herein.

44.    Bernstein intentionally intercepted or endeavored to intercept electronic communications of Bayrock as defined in 18 U.S.C. § 2510.

45.    Bernstein intentionally disclosed or endeavored to disclose the contents of electronic communications of Bayrock, knowing or having reason to know that the information was obtained through interception of such communications in violation of the Wiretap Act.

46.    Bernstein used or endeavored to use the contents of electronic communications of Bayrock, knowing or having reason to know that the information was obtained through interception of such communications in violation of the Wiretap Act.

47.    By the foregoing actions, Bernstein violated the Wiretap Act.

**THIRD CAUSE OF ACTION**
**Stored Wire and Electronic Communications Act, 18 U.S.C § 2701 *et seq.***

48.    The allegations in paragraphs 1-47 are incorporated herein.

49.    The Bayrock computer system is a facility through which an electronic communications service is provided.

50.     Bernstein intentionally accessed, without authorization or in excess of authorization, this facility and thereby obtained or altered electronic communications while in electronic storage.

51.     By the foregoing actions Bernstein knowingly or intentionally violated the Stored Wire and Electronic Communications Act.

## FOURTH CAUSE OF ACTION
### Recovery of Chattel, NY CPLR Art. 71

52.     The allegations in paragraphs 1-51 are incorporated herein.

53.     Bayrock is the owner and entitled to immediate possession of all documents (whether electronic or hard copy) taken from its offices by Bernstein.

54.     Bernstein took such documents wrongfully, illegally, without authorization from Bayrock, and he has no entitlement to possession thereof.

55.     The documents have no legitimately realizable value to Bernstein or ascertainable market value, but the value to Bayrock and its personnel is significant, and Bayrock would suffer enormous loss should the information be publicly divulged.  The value of the hardware on which the electronic versions of these documents are presumed to reside is expected to be no more than $500.00.

## FIFTH CAUSE OF ACTION
### Conversion

56.     The allegations in paragraphs 1-55 are repeated herein.

57.     Bayrock is the owner and entitled to immediate possession of all documents (whether electronic or hard copy) taken from its offices by Bernstein.

58.     Bernstein took such documents wrongfully, illegally, without authorization from Bayrock, and he has no entitlement to possession thereof.

8

59.    Bernstein assumed dominion and control over such documents to the exclusion of

Bayrock, and Bayrock has been damaged thereby.

### SIXTH CAUSE OF ACTION
### Trespass to Chattel

60.    The allegations in paragraphs 1-59 are repeated herein.

61.    Bernstein intentionally interfered with Bayrock's lawful possession of its chattels,

including but not limited to Bayrock's computer system and documents, files and other

information stored thereon.

62.    Bayrock was harmed as a result of such interference by Bernstein.

### SEVENTH CAUSE OF ACTION
### Breach of Fiduciary Duty / Duty of Confidentiality

63.    The allegations in paragraphs 1-62 are repeated herein.

64.    As an employee of Bayrock, Bernstein owed Bayrock fiduciary duties, including

an absolute duty not to divulge or use for his own benefit any confidential information learned

during his employment.

65.    The documents taken by Bernstein from Bayrock included information that was

confidential, proprietary, and trade secrets.

66.    Bernstein has divulged this confidential information to third parties and used such

information for his own interests, thus breaching his fiduciary duties, and Bayrock has been

damaged as a result.

67.    Any further dissemination of this confidential information will damage Bayrock

and its employees irreparably.

811480_2

WHEREFORE, Plaintiff Bayrock Group LLC demands judgment against defendant Joshua Bernstein as follows:

A. An order awarding possession to Bayrock of all documents, whether in paper or electronic form, taken by Bernstein and directing Bernstein and his agents to deliver such documents (and all copies thereof), including any devices on which such documents reside, to Bayrock;

B. Preliminary and permanent injunctive relief enjoining Bernstein and his agents from copying, disseminating or using the documents taken from Bayrock or the information contained therein;

C. Actual damages in an amount to be determined at trial;

D. Statutory damages;

E. Punitive damages;

F. An accounting of any profits earned by Bernstein through his use of the documents or confidential information wrongfully taken from Bayrock;

G. Reasonable attorneys' fees and costs; and

H. Such other and further relief as the court deems just and proper.

Dated: August 19, 2010
New York, NY

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____
Walter A. Saurack
Glenn C. Edwards
230 Park Avenue, 11th Floor
New York, NY 10169
(212) 818-9200
(212) 818-9606/7 (facsimile)
Attorneys for Plaintiff – Bayrock Group LLC

10

811480_2

# EXHIBIT F

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,            :      98-CR-1101

              v.                     :      U.S. Courthouse
                                            Brooklyn, New York
JOHN DOE,                            :
                                            June 14, 2010
              Defendant.             :      12:00 o'clock p.m.

- - - - - - - - - - - - - - - - - - X

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE I. LEO GLASSER
UNITED STATES SENIOR JUDGE

APPEARANCES:

For the Movant:                 KELLY MOORE, ESQ.
                                BRIAN HERMAN, ESQ.

For the Respondent:             RICHARD E. LERNER, ESQ.
                                LAUREN ROCKLIN, ESQ.

For Non-Party Movant:           STAMATIOS STAMOULIS, ESQ.

Court Reporter:                 Anthony M. Mancuso
                                225 Cadman Plaza East
                                Brooklyn, New York 11201
                                (718) 613-2419

Proceedings recorded by mechanical stenography, transcript
produced by CAT.

2

1          (Case called; both sides ready.)

2          MS. MOORE:  Kelly Moore and Brian Herman for the

3    movant, John Doe.

4          MR. LERNER:  Richard Lerner of Wilson Elser and

5    Lauren Rocklin for nonparty respondent Frederick Oberlander.

6          MR. STAMOULIS:  Stamatios Stamoulis for Jody Kriss

7    and Michael Ejekam, nonparty movants.

8          MS. MOORE:  Your Honor, we have received the letter

9    of this morning written by Mr. Lerner accusing me of an

10   ethical violation, based on a conversation that I had with

11   Mr. Stamoulis.  As an initial matter, I completely disagree

12   with the characterization of the description of that

13   conversation to which Mr. Lerner was not a party and I believe

14   that if the court were to inquire of Mr. Stamoulis he would

15   advise the court that that description is completely

16   inaccurate.  No threats whatsoever, implicit or explicitly,

17   were made during the course of that conversation.

18          THE COURT:  All right.

19          MR. LERNER:  I will withdraw it based on Ms. Moore's

20   representation to the court.

21          THE COURT:  What was the basis for making that

22   representation to begin with?

23          MS. MOORE:  An e-mail to me which indicated that

24   Ms. Moore had stated to Mr. Stamoulis that the Eastern

25   District attorney was watching this case and that quote there

3

1    may be indictments and coupled with the settlement proposal
2    offered by Ms. Moore.
3             MR. STAMOULIS:  Your Honor, if may speak to that?
4    I'm Mr. Stamoulis.  I had a very friendly conversation with
5    Ms. Moore that I initiated on behalf of my clients, Mr. Ejekam
6    and Mr. Kriss.  Actually, the reason why I called her is to
7    advise her that Mr. Ejekam was in Africa and there not be any
8    surprise that he was not going to be present to give any
9    testimony here today.
10            That led to a conversation and during that
11   conversation Ms. Moore just gave me information.  When I put
12   the information that she gave me into an e-mail, the tenor and
13   the tone of the conversation didn't translate and I can see
14   why my e-mail could have been misconstrued and it lacked the
15   context.
16            MR. LERNER:  So I apologize to Ms. Moore and the
17   court.
18            THE COURT:  Let me tell you, Mr. Lerner, I read your
19   letter.  I came in rather late this morning, after attending a
20   funeral.  But my recollection is that I have alerted the
21   United States Attorney to this proceeding.  I don't know
22   whether Ms. Moore did or didn't, although I have a
23   recollection of saying cc to Mr. Kaminsky who is an Assistant
24   United States Attorney because I was concerned with the
25   integrity of documents which were sealed and having read some

4

1   of the things which were annexed to the complaint which

2   clearly reflected that portions of presentence report was

3   divulged, that a cooperation agreement, portions of which may

4   have been divulged.  Those two documents, among others, which

5   were sealed, were documents which if divulged, that is the

6   contents, may seriously jeopardize not only the life of the

7   person who was the subject of those documents.  In this case

8   it might also significantly affect matters of national

9   interest.

10          Now, I received a letter from you on Friday.  It was

11  rather late in the afternoon.  I think it was approaching four

12  o'clock.  I didn't want to respond to you ex parte and I

13  wasn't about to sit down and start writing letters.  I tried

14  to communicate or had my law clerk try and reach Ms. Moore so

15  we could have a conference and that didn't happen.

16          Again, just as I was a little nonplused with the

17  first letter that I received from you, which I made some

18  comment about on Friday.  I don't think there's anything in my

19  order, that is, the Temporary Restraining Order, the order to

20  show cause, which would or could preclude a party to whom an

21  order to show cause was addressed from conferring with his

22  lawyer.  Nothing in my order which would even hint at

23  precluding Mr. Oberlander, or anybody else to whom that order

24  to show cause was addressed, from conferring with his lawyer.

25  The Sixth Amendment, whether it's applicable or isn't

5

1    applicable, is irrelevant. I don't know whether there would

2    have been any doubt about whether Mr. Oberlander can consult

3    with you and show you whatever it is that was relevant to the

4    order to show cause and that why you would need my consent for

5    that.

6         Now, with respect to your inquiries as to the order

7    which may have been issued, there is no formal order which I

8    believe is not issued by virtually any judge in this

9    courthouse with respect to sealing. I notice the letter I got

10   from you says facsimile under seal and to the extent that I so

11   ordered it, I have tacitly approved it.

12        What happened in this case from the very first

13   document that was filed, it was filed clearly indicating a

14   sealed case. And documents which are submitted to the court

15   from time to time are submitted in a white envelope and in

16   that envelope it says ordered sealed and placed in the clerk's

17   office and may not be unsealed unless ordered by the court.

18        The documents which are submitted to the court and

19   then placed in one of these envelopes are documents which by

20   virtue of their very content are documents which either affect

21   matters of national interest or would seriously endanger the

22   life of the object or subject of that communication or

23   significantly impede a significant criminal investigation.

24        So there is no formal order, and to the extent that

25   you want to know what that order said and to whom it was

6

1   addressed it's a request which has no merit.  I can't make an

2   order sealing a document and saying this document is sealed

3   and not to be looked at by Mr. Lerner, Mr. Stamoulis.  It's a

4   document which is placed under seal.  It's filed under seal.

5   And if anybody wants to see what it is that has been filed

6   under seal, the procedure is to make an application to the

7   court to unseal it.

8            I have applications such as that presented to me

9   from time to time but I have never had an application asking

10  me specifically to file this document under seal beyond the

11  sealed letter envelope in which it comes, which clearly says

12  it's filed under seal.

13           This case was filed under seal from the very first

14  day it came into this courthouse.  You can't look at the

15  docket sheet on ECF because it's sealed.  I can look at it

16  because I'm an exception.  So I can look at that docket sheet

17  and I looked at that docket sheet on Friday and the first

18  thing I saw was United States vs. John Doe, sealed case in

19  bold capital letters.

20           And then I looked down the docket sheet and I saw

21  about six docket entries which said these documents have been

22  docketed under seal.  They were docket numbers five through

23  eight, eleven, thirteen, sixteen and seventeen.  Filed under

24  seal.  I don't know as I talk to you what those documents say.

25  I undoubtedly knew about it at the time because a copy of it

7

1    must have been provided to me.  And to the extent that I agree

2    that it should be filed under seal I tacitly, implicitly

3    ordered it.  But all of that is irrelevant.

4           The documents which were annexed to that complaint

5    clearly reflected that they were sealed.  And by the way, your

6    reading of Charmer Industries leaves a little bit to be

7    desired, with all due respect.  You're correct in that Charmer

8    Industries dealt with a probation officer who sent a

9    Presentence Report with I believe the tacit approval of Judge

10   Sifton at the time, who was the judge in that case.  But if

11   you read United States vs. Charmer through to its conclusion

12   it would have been perfectly clear that Rule 32,

13   notwithstanding, the court of appeals very clearly said

14   presentence reports are not to be disclosed to anybody,

15   besides the defendant, for reasons which are very fully

16   explained in United States vs. Charmer.

17          All that aside, given a document which is plainly

18   indicated on its face, filed under seal, that comes into the

19   hands of a lawyer, at the very least that lawyer should have

20   very serious doubt about doing anything with that document

21   without first making appropriate inquiry about whether

22   disclosing this document that was sealed is appropriate and

23   should an order of unsealing or permission to use it be

24   obtained.

25          Now, as I read what was annexed to that complaint,

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

8

1   there's no doubt that Mr. Oberlander was aware of the fact

2   that these documents were sealed.  There's no order that needs

3   to be addressed to Mr. Oberlander and say, Mr. Oberlander,

4   this is a sealed document, don't publicize it.  It's obvious.

5   And the mere fact that the contents of those documents,

6   presentence report, cooperation agreement -- have you ever

7   seen the cooperation agreement?

8             MR. LERNER:  I have now, your Honor.

9             THE COURT:  You have now.

10            And looking at that cooperation agreement and having

11   looked at it now there's an awful lot of information in that

12   cooperation agreement which is very sensitive, isn't there?

13            MR. LERNER:  Yes, there is, your Honor.

14            THE COURT:  And you would have some serious concern

15   if you were the defendant -- if you were Mr. Doe, you would

16   have some serious concern about having the information in that

17   document sent out at large for anybody to see, wouldn't you?

18            And if you've ever have seen a presentence report --

19

20            And you would have only if you were representing a

21   defendant in a criminal case.  You would have no occasion to

22   have seen it otherwise, unless the defendant voluntarily

23   showed it to you.

24            -- you would know that that presentence report

25   contains an awful lot of information which is very sensitive

9

1   and shouldn't be disclosed by anybody.

2           So when your letter asks me to show you what order

3   is directed to Mr. Oberlander, there isn't any.  What was

4   directed to Mr. Oberlander was a clear declaration in writing

5   this document is sealed, just as you filed this under seal and

6   this will be filed under seal.  It will be placed in the vault

7   of the clerk's office and nobody will see that unless an order

8   is submitted to me for signature unsealing it.

9           Okay.  I hope that answers some of the questions

10  that you've asked in your letters.

11          MR. LERNER:  May I address that, your Honor?

12          THE COURT:  I beg your pardon.

13          MR. LERNER:  May I address your Honor?

14          THE COURT:  By all means.

15          MR. LERNER:  We have obviously spent a long time

16  discussing this and we would like to now agree to the relief

17  sought in the order to show cause, which is identify from whom

18  he received the documents and to whom he gave the documents.

19  He will agree to return them.  And that is the only relief

20  sought and we will consent to it.

21          THE COURT:  He will now.

22          MS. MOORE:  I believe we sought more relief than

23  that.  We sought a hearing to get a better understanding of

24  exactly from whom he got them, what his understanding was

25  about where that person got them from.  Everything else under

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1   oath. Where they came from. Everything we can do to further

2   plug up this hole and trace down who else may have these

3   documents.

4         I believe we also asked for attorneys' fees in

5   connection with having to make this motion in the first

6   instance. But we do want an opportunity to question

7   Mr. Oberlander and the other respondents under oath to get a

8   better understanding of just how this happened to make sure it

9   doesn't repeat itself.

10        Our concern is for the life of our client and for

11   his safety. We have a very murky picture right now and it may

12   require the court or us with a court order to subpoena

13   Mr. Bernstein so he can appear and take the stand and explain

14   how he obtained the documents.

15        I'm also concerned with the phrasing of Mr. Lerner's

16   comments just now in that I am concerned that Mr. Oberlander

17   fully intends to use the information contained in those

18   documents, even if he doesn't use the documents.

19        So I want to make it clear that our application also

20   includes information that was in those sealed documents that

21   also should not be further disseminated or used in any way

22   that we think could hurt our client.

23        MR. LERNER: May I respond?

24        There's no request in this order to show cause on

25   the face of the order to show cause for attorneys' fees. If

11

1    attorneys' fees are pursued, I simply cannot consent to that.

2    Mr. Oberlander certainly doesn't have the money to pay

3    Ms. Moore's attorneys' fees.

4            As far as use, I would suggest we take a short break

5    and discuss with Ms. Moore the issue that she's presented.

6            THE COURT:  I think I should take a minute,

7    Mr. Lerner, to emphasize how seriously I regarded what brought

8    this matter before me.  When Mr. Doe appeared before me for

9    sentencing, appearing before me also at that time on his

10   behalf were fairly significantly placed members of a national

11   law enforcement security agency.  I should say agencies

12   plural.  The disclosure of the information annexed to that

13   complaint was a disclosure of information which was reckless

14   and significantly endangered the life of the person to whom

15   that information related and that disturbed me no end because

16   it behooved any lawyer -- forgetting about a lawyer -- anybody

17   looking at a document which was clearly, clearly designed to

18   be kept very confidential, to be very, very careful with not

19   making that information and letting it float at large.  I want

20   to emphasize why it is that I have regarded and do regard this

21   very seriously.

22           I'll give you a couple of minutes to talk to

23   Ms. Moore.

24           (Recess.)

25           MS. MOORE:  Your Honor, I don't believe we're going

12

1   to reach a resolution short of a hearing that we initially

2   requested and we still would like to have the respondent

3   testify.  We would also like to have Mr. Bernstein directed to

4   appear in court to testify so that we can get to the full

5   bottom of where these documents came from and who exactly has

6   them and who else may have them.

7           THE COURT:  Okay.

8           MR. LERNER:  We have no objection to Mr. Oberlander

9   testifying as to the items set forth in the order to show

10  cause, that is, where he got the documents from and to whom

11  they were given.  Beyond that we will object as no further

12  inquiry is relevant in our opinion, your Honor.

13          THE COURT:  Are you ready to proceed today or do you

14  need an adjournment for that purpose?

15          MS. MOORE:  Your Honor, I would prefer to do it all

16  at once so we get Mr. Bernstein as well, on Friday, if

17  possible.

18          THE COURT:  I suppose you will issue a subpoena for

19  Mr. Bernstein.

20          MS. MOORE:  Yes, we will present one for the court.

21          THE COURT:  Do you have another date in mind?

22          MS. MOORE:  Friday would work for us.

23          THE COURT:  Does that work for you, Mr. Lerner?

24          MR. LERNER:  May I check my calendar?  I know it's

25  the court's preference to do it all at once, and Ms. Moore's.

13

1    Mr. Oberlander is prepared to testify right now. His

2    testimony would be very brief, in accordance with what was

3    ordered.

4              THE COURT: Why don't we do it all at once.

5              MR. LERNER: Allow me to check my calendar.

6              MR. STAMOULIS: I will say that I have trial in

7    Delaware on Friday. I'm admitted to the Eastern District but

8    I practice primarily in Delaware. Though my clients,

9    Mr. Ejekam and Mr. Kriss, it's going to be clear that they

10   were not the ones that obtained these documents or gave them

11   to Mr. Oberlander. And to the extent that they even saw them

12   it was only in connection with the complaint, after it was

13   written.

14             I don't know if movant is going to seek to have

15   testimony from my clients or if we can settle that with an

16   interview and affidavits, especially for Mr. Ejekam who is in

17   Africa and will not be able to be here for a hearing.

18             THE COURT: Why don't you work that out with

19   Ms. Moore. There's nothing for me to address in that regard.

20   If their testimony is not necessary, if they can provide the

21   information you need by affidavit, I don't have any problem.

22             MR. LERNER: My calendar is clear on Friday.

23             MR. STAMOULIS: I have trial on Friday.

24             MR. LERNER: Monday.

25             MR. STAMOULIS: If you insist on Mr. Kriss

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

14

1  testifying?

2       MS. MOORE:  I certainly insist on Mr. Kriss

3  testifying and, depending on affidavits, I may also insist on

4  Mr. Ejekam testifying.  But Mr. Kriss is here.  I do want him

5  to testify.  There seems to be a conflict in footnote two of

6  the letter that Mr. Lerner said.  Basically, what he's saying,

7  it was your client who was behind the documents being

8  published and we need to resolve that conflict.

9       MR. LERNER:  Ms. Moore is confusing who

10 Mr. Stamoulis represents.  Mr. Bernstein is not represented by

11 Mr. Stamoulis.

12      MR. STAMOULIS:  Let me get my calendar.

13      MS. MOORE:  Footnote two of the letter we just

14 received states:  Doe harps on a portion of the racketeering

15 complaint brought against him that Mr. Oberlander admitted the

16 documents are sealed.  The relevant allegation in the

17 complaint states no such thing as to the present or recent

18 past, but in any event the complaint is not Mr. Oberlander's

19 statement, it is his clients' statement.  It is a statement of

20 their allegations, not his, and if they are judicial

21 admissions they are theirs, not his.

22      Those clients referred to in footnote two are

23 Mr. Kriss and Mr. Ejekam.

24      THE COURT:  What letter are you referring to?

25      MS. MOORE:  The letter we received this morning

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

15

1    accusing me of misconduct.

2              THE COURT:  The letter dated June 14?

3              MS. MOORE:  Yes, your Honor.

4              THE COURT:  Reading from footnote two?

5              MS. MOORE:  Yes, your Honor.

6              THE COURT:  All right.  We have Monday.

7              MR. STAMOULIS:  Your Honor, I am available on

8    Monday.  I could be here.

9              THE COURT:  Ms. Francis.

10             THE CLERK:  10:30 works.

11             THE COURT:  The 21st.

12             MR. LERNER:  Thank you, your Honor.  He.

13             MS. MOORE:  Your Honor, we assume that the temporary

14   restraining order is still in place.

15             THE COURT:  Yes, it is.

16             MR. LERNER:  Can we address the contingency, if

17   Mr. Bernstein is not available via subpoena what we then do?

18             MS. MOORE:  We'll contact the court if we need to do

19   anything at that point.  We're hoping he is available.  We may

20   go forward without him.  We'll figure it out.

21             THE COURT:  There's nothing about these proceedings

22   I don't believe that requires the record of these proceedings

23   to be sealed, unless there's something I'm missing.

24             MS. MOORE:  Your Honor, his name is used.  If we can

25   substitute John Doe for his name throughout, then there's no

page

16

1    need.  I'm sensitive at this point to unsealing them until we

2    can possibly redact it or change it to make sure it's John Doe

3    throughout.

4            THE COURT:  Mr. Lerner.

5            MR. LERNER:  No objection as to referring to him as

6    Mr. Doe.

7            THE COURT:  So ordered.  Thank you.

8            MR. STAMOULIS:  Thank you, your Honor.

9                        oooooo0oooooo

# EXHIBIT G

1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2
        --------------------------------X
 3                                      :
        UNITED STATES OF AMERICA,       :   CR-98-1101
 4                                      :
              v.                        :   U.S. Courthouse
 5                                      :   Brooklyn, New York
        JOHN DOE,                       :
 6                                      :
                    Defendant.          :   TRANSCRIPT OF HEARING
 7                                      :   June 21, 2010
        --------------------------------X   10:30 a.m.
 8
        BEFORE:
 9           HONORABLE I. LEO GLASSER, U.S.D.J.

10
        APPEARANCES:
11
        For the Movant:            MORGAN LEWIS & BOCKIUS LLP
12                                 101 Park Avenue
                                   New York, New York 10178-0060
13                          BY:    KELLY A. MOORE, ESQ.
                                   BRIAN A. HERMAN, ESQ.
14                                 DAVID A. SNIDER, ESQ.

15      For the Respondent:        WILSON ELSER MOSKOWITZ EDELMAN
                                   & DICKER LLP
16                                 150 East 42nd Street
                                   New York, New York 10017-5639
17                          BY:    RICHARD LERNER, ESQ.
                                   LAUREN J. ROCKLIN, ESQ.
18
                                   STAMOULIS & WEINBLATT LLC
19                                 6 Denny Road - Suite 307
                                   Wilmington, DE 19809
20                          BY:    STAMATIOS STAMOULIS, ESQ.

21
        Court Reporter:            Mickey Brymer, RPR
22                                 Official Court Reporter
                                   United States District Court
23                                 225 Cadman Plaza East
                                   Brooklyn, New York  11201
24                                 (718) 613-2255

25           Proceedings recorded by mechanical stenography.
          Transcript produced by Computer-Assisted Transcription.
```

2

1          THE CLERK:  This is criminal cause for order to show

2     cause in docket number 98-CR-1101, U.S.A. versus Doe.

3     Counsel, please state your name for the record.

4          MS. MOORE:   Kelly Moore and Brian Herman from Morgan

5     Lewis for movant John Doe.

6          MR. LERNER:   Richard E. Lerner of Wilson Elser

7     Moskowitz Edelman and Dicker for nonparty respondent Frederick

8     M. Oberlander.

9          MR. STAMOULIS:   Stam Stamoulis on behalf of nonparty

10    respondents Jody Kriss and Michael Ejekam.

11         THE COURT:   Everybody is ready to proceed?

12         MS. MOORE:   Yes, your Honor.  Could I ask who the

13    gentlemen in the back row are?

14         MR. STAMOULIS:   He's my law partner.

15         AUDIENCE SPEAKER:  Good morning.

16         THE COURT:  Good morning.

17         MS. MOORE:  Your Honor, I would ask to proceed with

18    the testimony of Mr. Oberlander.

19         THE COURT:  I'm sorry.

20         MS. MOORE:   I would ask we proceed with the

21    testimony of Mr. Oberlander.

22         THE COURT:  Please.

23    F R E D E R I C K   M.   O B E R L A N D E R ,      called

24    as the witness herein, having been first duly sworn/affirmed,

25    testified as follows:

M. BRYMER, RPR, OCR

Case 1:16-mc-00706-BMC   Document 0   Filed 08/22/12   Page 84 of 230 PageID #: 393

1          THE CLERK:    Could you please state and spell your

2     name for the record.

3          THE WITNESS:    Frederick M. Oberlander, O-b-e-r-l-

4     a-n-d-e-r.

5          THE COURT:    You my be seated.    Thank you.

6          All right, Ms. Moore.

7     DIRECT EXAMINATION

8     BY MS. MOORE:

9     Q.    Mr. Oberlander, what do you do for a living?

10    A.    I'm an attorney.

11    Q.    How long have you been practicing law?

12    A.    For a living, approximately seven years.

13    Q.    For how long have you had a law license?

14    A.    Ten years.

15    Q.    And what type of law do you practice?

16    A.    Mostly commercial law and primarily transactional,

17    financial and taxation, but I do general work.

18    Q.    Do you handle any criminal matters?

19    A.    No.

20    Q.    You're admitted in the State of New York; is that right?

21    A.    Yes.

22    Q.    You practice in both Federal and State Court?

23    A.    Recently I started practicing in Federal Court.   I was

24    admitted a few months ago in Southern District.

25    Q.    Are you admitted anywhere else other than New York?

4

Oberlander-direct/Moore

1   A.   I was admitted pro hac in a couple of jurisdictions.   I

2   don't remember whether those expired or not.

3   Q.   Did that include Delaware?

4   A.   At one time.

5   Q.   Where is your practice located?

6   A.   In Montauk, New York.

7   Q.   That's where your office is located?

8        THE COURT:   Did you say Montauk?

9        THE WITNESS:   Yes, in the Hamptons.

10  Q.   What is the address of your office?

11  A.   The street address is 28 Sycamore Lane.

12  Q.   And is that a solo practice?

13  A.   It is.

14  Q.   Do you have any employees at all?

15  A.   Not full time, but I occasionally add staff depending on

16  needs.

17  Q.   Now, you filed a complaint in the Southern District of

18  New York captioned Jody Kriss, Michael Ejekam and Bayrock

19  Group versus Bayrock Group and various others; is that

20  correct?

21  A.   Yes, I did.

22  Q.   When did you file that complaint?

23  A.   I'm sorry, I didn't hear you.

24  Q.   When did you file that complaint?

25  A.   The 10th of May.

M. BRYMER, RPR, OCR

5

Oberlander-direct/Moore

1  Q.    Around the same time you sent an email to Ron Kriss

2  attaching a copy of that complaint; is that correct?

3  A.    I believe I sent that on May 12th.

4  Q.    And was the version that you sent to Ron Kriss the same

5  version that you filed in the Southern District of New York?

6  A.    The version of the complaint itself was.

7  Q.    What was different?

8  A.    The exhibits to the complaint that I filed, which was

9  physically filed in New York and not by ECF, had only limited

10  excerpts from some of the materials that you referred to in

11  the order to show cause as the sealed and confidential

12  documents, but the file attachments on email that went to Ron

13  Kriss I believe had additional pages in the PDF files on some

14  of those documents.

15          MS. MOORE:   Your Honor, may I?

16          THE COURT:  Sure.

17  Q.   Mr. Oberlander, let me show you a copy of the version you

18  sent to Mr. Ron Kriss on May 12th.  Is that the copy you sent

19  to Ron Kriss?

20  A.    It appears to be, but it is hundreds of pages.  It would

21  be impossible for me to tell for sure just glancing at it.  It

22  does appear to be.

23          MS. MOORE:   Your Honor, I offer that.

24          THE COURT:  Is there any objection to that?

25          MR. LERNER:    No objection.

M. BRYMER, RPR, OCR

6

Oberlander-direct/Moore

1    THE COURT:  Thank you.  It will be received as I
2  guess Plaintiff's 1.

3    Precisely what is that?  Would you identify that for
4  the record.

5    MS. MOORE:   Your Honor, Exhibit 1 is the SDNY
6  complaint captioned "Jody Kriss, et al. versus Bayrock
7  Group."

8    THE COURT:  Is that the document that you handed up,
9  somebody handed up to me?

10    MS. MOORE:   Yes, your Honor, that's Exhibit 1.

11    THE COURT:  Together with all the attachments?

12    MS. MOORE:   Correct.

13    MR. LERNER:   Your Honor, I think Ms. Moore may be
14  leading now with the topic.

15    THE COURT:  I'm having a little trouble hearing you,
16  Mr. Lerner.

17    MR. LERNER:   I think Ms. Moore may be leading into
18  areas of work product.  Now, the topic of this order to show
19  cause, as set forth in the order to show cause, is from whom
20  Mr. Oberlander received the purportedly sealed and
21  confidential documents and to whom he gave them, so, I would
22  like to object in advance to any questioning that may go to
23  why he did certain things and simply ask that the Court limit
24  it to what he did, not why he did it.

25    THE COURT:  Ms. Moore.

7

Oberlander-direct/Moore

1      MS. MOORE:   Your Honor, I mean objections can be
2  made to the questions asked.  We believe the order to show
3  cause --
4      THE COURT:  This is in the nature of a motion in
5  limine.  To avoid constant objections and so on, if there's no
6  objection to what it is that Mr. Lerner is suggesting would be
7  appropriate, then we'll proceed accordingly.
8      MS. MOORE:   Your Honor, I do intend to inquire as to
9  what Mr. Oberlander knew and what his intent was specifically
10  with respect to sealed documents.
11      THE COURT:  What is the relevance of that insofar as
12  this order to show cause is concerned?  I understand the order
13  to show cause in this proceeding is addressed to where these
14  documents came from, how he obtained it and not what his
15  intent was.  I don't know what the relevance of that is.  It
16  seems to me your concern was the unauthorized or seemingly
17  apparently unauthorized use and possession of sealed
18  documents.
19      MS. MOORE:   That's correct, your Honor.  To the
20  extent Mr. Oberlander knew they were sealed and acted anyway,
21  we believe it is relevant to our application.
22      THE COURT:  What is your application beyond that?
23      MS. MOORE:   Eventually our application, your Honor,
24  would be probably attorney's fees and sanctions related to his
25  conduct which typically under the law follow the elements of

M. BRYMER, RPR, OCR

8

Oberlander-direct/Moore

1  whether or not there was in fact civil contempt of a court

2  order.

3          THE COURT:  Well, Ms. Moore, it would be perfectly

4  proper to ask whether Mr. Oberlander was aware of the fact

5  these documents were sealed.  What his intent was I don't

6  think has any relevance to this proceeding.  Why don't you

7  proceed.

8          MS. MOORE:    Okay.

9  Q.   Mr. Oberlander, attached as Exhibit A are two proffer

10 agreements, a cooperation agreement and a pretrial statement;

11 is that correct?

12 A.   What you handed me you're referring to?

13 Q.   Yes.

14 A.   I think there's only one proffer agreement.

15 Q.   Oh, two, I'm sorry, you're right.  They are double-sided

16 pages and I didn't see that.

17          From whom did you obtain the documents that were

18 attached to the email you sent to Mr. Ron Kriss as Exhibits A

19 and C?

20 A.   Joshua Bernstein.

21 Q.   Who is Joshua Bernstein?

22 A.   He was a client of mine at one time.

23 Q.   In what matter did you represent him?

24 A.   In an action he had against Bayrock Group LLC in White

25 Plains Supreme Court, New York.

M. BRYMER, RPR, OCR

9

Oberlander-direct/Moore

1  Q.   Was there an engagement letter for that representation?

2  A.   There was.

3  Q.   Did he pay you for your legal services?

4  A.   No, he did not.

5  Q.   Were you paid by anyone else in connection with your

6  legal services in that matter?

7  A.   No.

8  Q.   Did you enter an appearance on his behalf in that matter?

9  A.   No.

10  Q.   Who entered an appearance on his behalf in that matter?

11  A.   I really don't know.  I know he was represented at all

12  times by a gentleman I would refer to as lead counsel.  I had

13  no personal knowledge who put in an appearance for him.

14  Q.   But you had a separate engagement letter with him?

15  A.   Separate from what?

16  Q.   That other individual's.

17  A.   It was my own engagement letter.  I wrote it.

18  Q.   When did you stop representing Joshua Bernstein?

19  A.   April this year, 2010.

20  Q.   What date?

21  A.   I have to check.  Towards the end of the month.

22  Q.   And was the termination of your attorney-client

23  relationship memorialized in any way?

24  A.   There is -- there are emails that confirm that he is a

25  prior or past client for purposes of rules and privileges and

M. BRYMER, RPR, OCR

10

Oberlander-direct/Moore

1  not a current client.

2  Q.    When did you obtain the Exhibits A and C to the SDNY

3  civil complaint from Josh Bernstein?

4  A.    It was the overnight of February 28th to March 1st.  It

5  was after midnight of February 28th, so that would be

6  technically March 1st this year.

7  Q.    And that was an overnight package?

8  A.    No.

9  Q.    How was it obtained?

10  A.    He handed them to me.

11  Q.    Where did he hand them to you?

12  A.    In his office.

13  Q.    Which is where?

14  A.    That particular office was in an apartment on the Upper

15  East Side.

16  Q.    Would the documents be part of a bigger group of

17  documents?

18  A.    He handed the documents to me in physical form and to my

19  recollection they were the only physical documents he handed

20  me.

21  Q.    What were the only physical documents he handed you?

22  A.    He handed me a proffer and a cooperation agreement and a

23  PSR.  And for avoidance of ambiguity as I'm not a criminal

24  lawyer, what he handed me had attached to the back of the

25  proffer what I understand to be or you referred to as a DOJ

M. BRYMER, RPR, OCR

11

Oberlander-direct/Moore

1   financial statement, but I would not know that is considered

2   as part of a proffer or not.  Maybe attached to a cooperation

3   agreement.  To me there were three documents.

4   Q.   Did he give you any other documents relating to my client

5   John Doe's criminal case?

6   A.   No.

7   Q.   Did he give you a complaint that was filed in that case?

8   A.   Not at that time.  If you'll excuse me, for clarification

9   I assume you're asking what he handed me at that time on March

10  1st.

11  Q.   So, he handed you nothing else on March 1st?

12  A.   Not as related to the criminal matter, the CR matter,

13  what is it, 1101.

14  Q.   Did he provide you with a complaint in that case on some

15  other date?

16  A.   Yes, he did.

17  Q.   When did he provide you with a complaint in that case?

18  A.   I believe it was March 3rd.

19  Q.   Was that once again in person?

20  A.   No.

21  Q.   In what form did he provide you --

22       MR. LERNER:   I'll object to the questioning about

23  the complaint in another unrelated matter.

24       THE COURT:   I'm about to inquire about that,

25  Mr. Lerner.  Complaint in what proceeding?

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1    MS. MOORE:   United States versus John Doe, your

2  Honor, sealed complaint.

3    MR. LERNER:   I'm sorry, I was confused.  I thought

4  you were refer -- Ms. Moore is referring to a different

5  document.  I withdraw my objection.

6    THE WITNESS:  Your Honor, may I just correct one

7  thing I said?

8    THE COURT:  Sure.

9    THE WITNESS:  To the best my recollection the

10  complaint was given to me-- I'm going on recollection -- on

11  March 3rd.  He sent me several documents and I'm certain the

12  complaint was there.

13    THE COURT:  Was that received by hand as well?

14    THE WITNESS:  No, no.  She asked me whether he ever

15  gave me a complaint and I'm saying I'm substantially certain

16  he did, and, if he did, it was in an email that was given to

17  me or I received on March 3rd.

18    THE COURT:  An email?

19    THE WITNESS:  It was attached to an email, yes.

20  Q.   In the email you received from him on March 3rd, did he

21  attach any other documents related to the criminal case

22  against my client in Federal Court in Brooklyn?

23  A.   The same ones he had given me physically on the first

24  were attached to that.

25  Q.   Was an indictment or information or draft information

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  attached as well?

2  A.    It may well have been, but I just simply don't recall.

3  It could very well have been, yes.

4  Q.    Have you in connection with this order to show cause gone

5  back and checked what was attached to that email?

6  A.    No.

7  Q.    So, as you sit here today, you don't know what else was

8  attached to that email?

9  A.    I answered you to the best of my knowledge.  I feel

10  substantially certain that a complaint was and that I don't

11  have any reason to doubt that the -- what you call an

12  information, I think, is that what you referred to it as?

13  Q.    A draft information I referred to it as.

14  A.    Draft information.  But I have no specific absolute

15  certain recall because those were not in the order to show

16  cause so I had no reason to check.

17  Q.    How many documents were attached to the March 3rd email?

18  A.    About four, five.

19  Q.    But you don't know what they were other than the

20  complaint and the one that was attached to the SDNY --

21  A.    As I continue to say, I know the same three he gave me

22  were attached to that email.  I'm reasonably certain the

23  complaint was attached to the email and I'm relatively certain

24  that the draft information was and I believe that's it, but it

25  is possible there may have been six -- four, five or six.

14

Oberlander-direct/Moore

1  This is the best information I can give you from

2  recollection.  I certainly don't deny that it was attached.

3  Q.   The March 3rd email, was that simply an email from Josh

4  Bernstein to you with attachments or was it forwarding an

5  underlying email to which those documents had been attached?

6  A.   May I ask for clarification, please?

7  Q.   Absolutely.

8  A.   Do you mean was there any message inside or just --

9  Q.   No, I'm asking whether aside from the email that

10  Mr. Bernstein sent to you, whether or not he was forwarding

11  another email that had attached these documents?

12  A.   You mean did I receive a forwarded email?

13  Q.   Correct.

14  A.   That had been primarily addressed to someone else and I

15  was getting it forwarded?

16  Q.   Correct.

17  A.   That's not correct.  It was addressed to me.

18  Q.   And, so, it was just the email to you plus the

19  attachments; is that correct?

20  A.   It was the email was primarily addressed to me.  There

21  were other addressees.

22  Q.   Who else was the email addressed to?

23  A.   That would be Arnold Bernstein and Jerry, spelled

24  J-e-r-r-y, I don't recall the last name, who was the gentleman

25  I refer to as Josh's lead attorney in the White Plains case.

15

Oberlander-direct/Moore

1      If I may, your Honor, for clarification, I'm saying I

2  didn't get forwarded somebody else's email.  The email was

3  addressed to three people and I was one of them.

4  Q.   Were there any CCs on that email?

5  A.   I don't recall.

6  Q.   In preparation for this hearing, you didn't review it?

7  A.   Probably a week or two, maybe three, when the order to

8  show cause came in to check the dates, I'm substantially

9  certain there were no cc's, but I will not say my memory is

10  infallible.  It would be highly unlikely there were any at all

11  other than the three of us.  I sincerely doubt there --

12  Q.   What did the email to you, Mr. Bernstein and other

13  lawyers say?

14  A.   The first sentence in the email said, as requested, here

15  are the Doe docs or the John docs.  There was an additional

16  sentence.  I'm not convinced revelation of that sentence is

17  within the very limited privilege waiver that Mr. Bernstein

18  gave me, so however you want to handle that, but I can't

19  testify to what else was in there.

20  Q.   Well, the email was addressed to Arnold Bernstein, who is

21  Mr. Bernstein's father, right, not his lawyer, correct?

22  A.   No, that is not correct.  He is always very much his

23  lawyer and always held himself out to me as his attorney and

24  Jerry as his lawyer.

25  Q.   In a recent conversation with us he did not hold himself

M. BRYMER, RPR, OCR

16

Oberlander-direct/Moore

1  out to be his lawyer, but putting that aside I don't believe

2  you can waive attorney-client privilege in a limited fashion

3  and your recent June 14th letter, is it your position you are

4  not waiving it or it is not waived?

5  A.    My counsel would know.

6        MR. LERNER:    I spoke to Mr. Bernstein who stated to

7  me he waived his privilege with respect to how Mr. Oberlander

8  received the documents.  So, that was the scope of the

9  waiver.

10       MS. MOORE:    Your Honor, I don't believe there can be

11  partial attorney-client privilege waiver.  I believe once you

12  waive with respect to certain things, it is waived.  Certainly

13  what the email said is passing these documents on to

14  Mr. Oberlander falls even within the waiver that they seem to

15  have received.

16       THE WITNESS:  Your Honor, I understand I am the

17  witness but he was my former client.  May I address the Court

18  briefly?

19       THE COURT:  Why don't you let your attorney do that.

20       THE WITNESS:  Can I consult with him for a minute?

21       THE COURT:  Absolutely.  It is rather unorthodox to

22  have a witness represented by a lawyer also act as his own

23  attorney.

24       THE WITNESS:  There's nothing I'm going to say that's

25  secret.

17

Oberlander-direct/Moore

1          THE COURT:  I don't know whether it is or isn't.  I

2    think you would be well advised to consult with your lawyer.

3          (Mr. Lerner and the witness confer.)

4          THE COURT:  Where were we?

5          MR. LERNER:   Your Honor, Mr. Bernstein in speaking

6    with me gave a limited waiver.  If that is to be interpreted

7    as a waiver for all purposes, then he gave no waiver at all,

8    so he can't -- Mr. Oberlander can't be asked further questions

9    regarding these conversations or communications with

10   Mr. Bernstein.

11         THE COURT:  Well, Ms. Moore, again, what is the

12   relevance of that question, or perhaps there's something I'm

13   missing?

14         My understanding was that the entire purpose or focus

15   of this proceeding from the very beginning that the order to

16   show cause was presented to me was a concern and a real

17   concern not only for your client but for the Court and the

18   integrity of the entire criminal proceeding as well as to how

19   documents which were clearly intended to remain sealed and

20   clearly intended not to be available for public distribution

21   or even public viewing by anybody unless by virtue of a court

22   order unsealing those documents.  So, the focus of this

23   proceeding, as I understand it, is how did those documents

24   which were sealed find its way into a complaint in a civil

25   action commenced in the Southern District of New York, how did

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  the persons who had possession of those documents, obviously

2  had possession of them, acquire them in some fashion because

3  they were attached to a complaint filed in the Southern

4  District?  How did those documents come into the possession of

5  the persons who attached them to a complaint?  That's the

6  concern which I believe was the focus of this proceeding and I

7  think that is what is at issue here.  How did you get them,

8  from whom, and then the question will be how did that person

9  get them and from whom.

10        If those documents were obtained in some fashion

11 other than by a voluntary delivery or disclosure of them by

12 Mr. Doe, then there is a very, very serious concern which this

13 Court has regarding that issue.

14        That is what is before me.  With respect to counsel

15 fees and all the rest of it, that's another matter.

16        MS. MOORE:    Fair enough, your Honor.

17 Q.    Mr. Oberlander, does the second sentence of the email

18 address how Mr. Bernstein obtained the documents?

19 A.    It does not.

20 Q.    Now, did he when he spoke to you either in person on

21 March 1st, or any other time, advise you of how he obtained

22 those documents?

23 A.    He did.

24 Q.    When did he advise you of how he obtained them?

25 A.    Every time, one time or you mean the first time, what?

19

Oberlander-direct/Moore

1   Q.    Let's start with the first time.

2   A.    The first time would be March 1st.

3   Q.    What did he say to you?

4   A.    He said Doe gave them to him but to be clear, the general

5   impression, because I can't recall the exact words, the

6   general impression was that Doe gave them many documents and

7   included among the documents were these.

8   Q.    Did he say whether or not Doe provided them in electronic

9   form or hard copy?

10  A.    Not at that time.

11  Q.    And did you credit his statement that Doe gave him these

12  documents?

13  A.    In the context of everything else that he told me during

14  the preparation of his White Plains case, yes, I did.

15  Q.    Why did he give you these documents?

16  A.    You have to ask him that.  They were unsolicited.  I

17  didn't say would you please give me these documents.  He

18  volunteered.

19  Q.    You described the first sentence of his email to be as

20  requested here are the documents.  What's the request you're

21  referring to?

22  A.    Because he gave them to me physically and I have a

23  scanner and I prefer to work with electronic records and I

24  probably March 1 or March 2 -- I mean I forgot which day it

25  was, asking if he could possibly send them to me in PDF form

20

Oberlander-direct/Moore

1   and it would be easier for me.  It was here, I'm sending you

2   PDF files.

3   Q.   And, so, beyond the first conversation that he told you

4   Doe gave them to him, what other conversations have you had

5   with him describing how he obtained them?

6   A.   Indirectly through third party, during the preparation of

7   an affidavit for this proceeding, Mr. Bernstein from my

8   understanding and this, of course, is hearsay, my

9   understanding Mr. Bernstein clarified that Mr. Doe had given

10  him several disks containing files and that these were among

11  them, but, as I said, that was told to me by someone who

12  claims that he said it to him and I can't say whether or not

13  it is true.

14  Q.   Who was it that claims that was said to him?

15          MR. LERNER:   That would be Richard Lerner.

16  Mr. Bernstein said to me when we were having a conversation

17  that he thought he gave them to Mr. Oberlander on -- or he

18  obtained them on a computer disk from Mr. Doe.

19  Q.   And, so, Mr. Oberlander, is it your understanding

20  Mr. Bernstein thinks that's how he obtained them or he knows

21  that's how he obtained them?

22  A.   I have absolutely no idea what relative state of

23  confidence he has in his memory.

24  Q.   And the document that was forwarded to you, it was not

25  part of a disk, right, it was not part of a set of a bunch of

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  documents; what he sent to you were five documents relating to

2  a criminal matter, right?

3  A.   He sent me to be specific five separate attachments to

4  one email.  Whether and what degree an attachment is a

5  document in the context of your question I'm not certain.

6  Q.   But it wasn't part of a bigger disk that contained a

7  whole bunch of documents; is that right?

8  A.   There is no difference.  He sent me an email.  I'm not

9  following your question.

10 Q.   My understanding is through a third party, namely,

11 Mr. Lerner, who had a connection with this hearing and advised

12 that Mr. Bernstein claims that my client gave him three disks

13 that contained a bunch of documents including these; is that

14 right?

15 A.   No.  First of all, nobody said there were three.  I

16 believe we said it is a few and that's indeterminate.  Yes, I

17 just answered that question.  It is my understanding that

18 Mr. Bernstein has some degree of confidence, more than zero or

19 less than 100, that the physical means by which he obtained

20 them from Mr. Doe was on disks.

21 Q.   But what you in turn received from Mr. Bernstein was not

22 the disk, you obtained the individual separate documents; is

23 that right?

24 A.   I received -- are we talking about ever, on the 3rd, in

25 that email?  What specifically are we talking about?

Oberlander-direct/Moore

1  Q.   We're talking about March 1st, the 3rd or any other time

2  you may have received these documents.

3  A.   I only received them twice and as I testified on March

4  1st I was given three what I call documents.  That's the way I

5  testified.  They were three successive papers stapled

6  together.  So to me that's three documents.  Then, on March

7  3rd I got an email that had five attachments.  You can say an

8  attachment is a document, it is perfectly acceptable usage,

9  but the term document there doesn't necessarily refer to

10  document in any other context.

11       I'm telling you as honestly as I can I got four, five

12  or six attachments on that email.  If you want to refer to

13  attachment as a document, that's okay with me.

14  Q.   Did it ever occur to you that Mr. Bernstein had stolen

15  those files?

16  A.   Work product privilege.

17  Q.   You're asserting the work product privilege to answer

18  that question as to whether or not it ever occurred to you you

19  may have been obtaining stolen documents?

20  A.   Any thoughts I had about the preparation of his case or

21  his case including materials given to me by anybody are work

22  product.

23  Q.   I'm concerned with your state of mind.  Did you think you

24  were obtaining stolen documents?

25  A.   Work product exception.

23

Oberlander-direct/Moore

1 Q.   You knew, did you not, that Mr. Bernstein upon being

2 fired from Bayrock had taken thousands of pages of documents

3 with him?

4        MR. LERNER:   Objection.

5        THE COURT:   I will allow it.

6 A.   I don't know any such thing.

7 Q.   You knew he was in possession at his home of thousands of

8 pages of documents of Bayrock; is that right?

9 A.   No.

10 Q.   Were you aware he was in possession of Bayrock documents

11 at his home?

12        MR. LERNER:   At what time, Ms. Moore?

13        MS. MOORE:   After he was fired from Bayrock.

14 A.   I'm sorry, I'm confused.  You're asking me if I'm aware

15 of what he possessed in his home on every day since the day he

16 was hired?

17 Q.   No.  On any day after he was fired are you aware that he

18 was in possession of documents of Bayrock's?

19 A.   If you can define, please, for me, clarify when you say

20 of Bay Rock's, are you specifically referring to documents by

21 which Bayrock would assert ownership of the intellectual

22 property of the contents.

23 Q.   Documents taken from the premises of Bayrock's offices is

24 what I mean by Bayrock documents.

25 A.   So, that would include his own personal property that he

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  took home with him.

2  Q.   Excluding his own personal property.

3  A.   Mr. Bernstein had documents in his office.  I didn't read

4  them, I don't know what they were.  I certainly have no

5  information as to what he did or didn't take.

6  Q.   But you knew that he was fired, right?

7  A.   He told me that he was fired, so I assume it is true.

8  Q.   As a practicing attorney, you are aware when people are

9  fired they are typically not permitted to take documents and

10  property of their employer with them, right?

11  A.   I'm sorry, I'm not aware of what's typical in the world.

12  Q.   So, when you obtained these documents, cooperation

13  agreement, proffer agreement and a PSR, you had no concern

14  these documents were stolen?

15  A.   Work product.

16  Q.   Are you familiar with the declaration that Thomas Hylan

17  submitted to the Court in connection with your opposition to

18  this motion?

19  A.   It's been a couple weeks since I've seen it, but, of

20  course, I did read it.

21  Q.   By the way, does Mr. Hylan still represent you?

22        MR. LERNER:   The law firm of Wilson Elser represents

23  Mr. Oberlander in this matter.  Mr. Hylan is my partner.

24  Q.   Did you draft the Hylan declaration?

25  A.   Did I draft it?

25

Oberlander-direct/Moore

1    Q.    Yes.

2              MR. LERNER:    Objection.

3              THE COURT:    Sustained.

4    Q.    Did you read it before it was filed?

5    A.    I'm sure I did.

6    Q.    Do you agree with its contents?

7              MR. LERNER:    Objection.

8              THE COURT:    Pardon.

9              MR. LERNER:    Objection as to relevance.

10             THE COURT:    Objection is sustained.

11             It would seem to me if Mr. Hylan was in effect the

12   agent of Mr. Oberlander and Mr. Oberlander had seen that

13   document, it seems to me 801(c) whatever subdivision in the

14   Federal Rules of Evidence might be applicable.

15             Why don't you move on.

16   Q.    Mr. Oberlander, if you knew at the time that that

17   declaration was filed that Mr. Bernstein said he got those

18   documents voluntarily from Mr. Doe, why is a good portion of

19   that declaration committed to an inquiry as to whether or not

20   my client had kept the documents under lock and key?

21   A.    You would have to ask Mr. Hylan.  I'm sure he would make

22   the work product objection, if you did.

23   Q.    It is your testimony at the time that declaration was

24   filed you had a good faith belief Mr. Bernstein obtained the

25   documents legally?

26

Oberlander-direct/Moore

1   A.    I told you that any belief or thoughts I had about the

2   documents with respect to what he said are work product.

3   Q.    There was a cross motion made in connection with your

4   opposition.  You submitted an affidavit in connection with

5   that and in that you say that you believe that permitted to

6   contact the client, who I assume is Mr. Bernstein, he would

7   submit an affidavit that described how he obtained the

8   documents; is that correct?

9   A.    Something like that.

10  Q.    That motion was granted by the court; is that right?

11  A.    So many words, yes.

12  Q.    And did you thereafter contact Mr. Bernstein?

13  A.    He --

14        MR. LERNER:    Your Honor, I contacted Mr. Bernstein.

15  I spoke with him about the issues.  He agreed to a, quote,

16  unquote, limited waiver to allow Mr. Oberlander to testify as

17  to his giving the documents to Mr. Oberlander.  I prepared an

18  affidavit based on what he had told me and then his father

19  intervened and said speak with me only, he's not submitting

20  any affidavits to the Court, he's represented by counsel.

21  Q.    In a follow-up letter to the Court in connection with

22  this matter, the other attorney, Mr. Lerner, submits a letter

23  on June 14th, and that letter very specifically says that you

24  obtained the documents from Mr. Bernstein and that

25  Mr. Bernstein told you he obtained them from Mr. Doe, but that

Oberlander-direct/Moore

1   any statements in that letter are not yours.  Specifically

2   states the statements in the letter are not yours.

3        Why is that?

4   A.   You would have to ask the author of that letter.

5   Q.   You stand by the statements that you obtained from

6   Mr. Bernstein and Mr. Bernstein told you he obtained them --

7        MR. LERNER:   May I address it?

8   Q.   -- from Mr. Doe?

9        MR. LERNER:   May I address the Court as to why I

10  made certain statements or should we move on?

11       THE COURT:   It seems that question has been answered,

12  Ms. Moore.

13  Q.   Do you know who would have been given or provided any of

14  the documents you were given either on March 1st or that you

15  obtained on March 3rd, 2010?

16  A.   I'm sorry, I missed the first few words of the question.

17       THE COURT:   So did I.

18  Q.   To whom have you given or provided the documents that you

19  obtained on March 1st and March 3rd from Mr. Josh Bernstein?

20  A.   As to everything other than the documents you referred to

21  in the order to show cause as the sealed and confidential

22  documents, it is my recollection that I never gave them to

23  anyone.  So, as to the sealed and confidential, actually, let

24  me amend that, I apologize.  I believe I forwarded the email

25  intact to my attorneys, so my attorneys received everything

28

Oberlander-direct/Moore

1   that was attached to that email.

2   Q.   Who are your attorneys?

3   A.   Wilson Elser.

4   Q.   When did you send it to them?

5        MR. LERNER:   I believe it was last Saturday.

6        THE COURT:   I'm sorry.

7        MR. LERNER:   I believe it was the Saturday before

8   this past Saturday.   I can check my Blackberry, if the Court

9   wants to know the precise date.

10  Q.   So, other than your attorneys, Wilson Elser, you did not

11  provide the March 3rd email in its entirety to anyone else; is

12  that correct?

13  A.   To the absolute best of my recollection, I did not

14  forward intact that email to anyone else.   That's to the best

15  of my recollection.   I could be mistaken.

16  Q.   Okay.

17       Now let's take it to the other documents, even if

18  they are not intact, any part of them.   The documents we

19  referred to as the sealed and confidential documents, to whom

20  have you provided those documents?

21  A.   The clerk of the Southern District, the cashier, the

22  in-take clerk, whatever her official title is who receives

23  physical filings was given the original complaint and attached

24  to there were I believe five pages from the PSR, the two

25  proffer agreements and the cooperation agreement, but not DOJ

Oberlander-direct/Moore

1  financial statement, and Mr. Kriss received those documents

2  electronically in the same form that Mr. -- I'm sorry, this is

3  a confusing answer.  Let me start it again.

4       Mr. Jody Kriss, my client, was given those documents

5  to the extent that they were given in the email to Ron Kriss.

6  In other words, as I testified, the attachments on the May 12

7  email to Ron Kriss had more pages in some of the sealed and

8  confidential documents, so those versions went to Ron Kriss on

9  May 12th at around 12:30 noon.  About an hour earlier I sent

10 the same email with slightly different text to John Elzufon,

11 who is an attorney representing Alex Solomon, one of the

12 defendants in the case, and I sent him the same attachments

13 Ron Kriss had.

14      Jody Kriss I believe was copied on one of those

15 emails and Stam Stamouilis, who is Mr. Kriss's attorney from

16 Delaware and local counsel for the prior Delaware matter,

17 received a copy of that email, and prior to that the only

18 other thing I can recall is that a couple of weeks before

19 filing the complaint I gave extracts of those documents

20 electronically to Mr. Kriss for his use and verification of

21 the complaint because he had to verify the complaint.

22      To the best of my knowledge, that's the absolute --

23 actually, no, let me just change that.  There was one other

24 person.  I believe I sent one or two of them to another

25 attorney sometime in March.

M. BRYMER, RPR, OCR

30

Oberlander-direct/Moore

1  Q.   Who is that attorney?

2  A.   The gentleman's name is David Schlecker.

3  Q.   He is an attorney of yours?

4  A.   Yes.

5  Q.   Could you spell John Elzufon's last name for us, please?

6  A.   E-l-z-u-f-o-n.

7  Q.   And Mr. Schlecker's last name?

8  A.   S-c-h-l-e-c-k-e-r.

9  Q.   So, besides Jody Kriss, Ron Kriss, John Elzufon, Stam

10 Stamoulis, Wilson Elser, David Schlecker, is there anyone else

11 you know of to whom you sent any part or portion of the

12 documents we have been referring to as the sealed and

13 confidential documents or any other documents relating to

14 Mr. Doe's criminal file?

15 A.   I don't know what documents related to his criminal file

16 means.   To the best of my recollection there isn't anybody

17 else I sent them to.

18 Q.   To your knowledge, do you know whether or not any of the

19 other people you sent them to sent them further to anyone

20 else?

21 A.   I have no knowledge that they did, no.  I have no

22 knowledge, sorry.

23 Q.   Did they ever advise you that they had it?

24 A.   Not specifically.  I'm not -- no, not specifically,

25 nobody said to me we sent these down here to somebody else.

31

Oberlander-direct/Moore

1  No.

2  Q.   Not specifically did they say they had --

3  A.   Mr. Elzufon, who is an attorney representing one of the

4  defendants, Alex Solomon, told me that he contacted Alex

5  Solomon's insurance carrier, CNA, to advise them of what was

6  going on.  So, I suppose one could presume he sent some or all

7  up there.  I really don't know.  I never asked.  It is not

8  unreasonable to assume he might have.

9            May I add something, your Honor?

10           THE COURT:  Sure.

11           THE WITNESS:  I believe it was on the 13th that Judge

12  Buchwald directed me to forward to several people who received

13  the complaint with the attachments an order advising them they

14  were not to disseminate it.  So, presumably whatever would

15  have happened by the 13th.  Nobody has spoken to me since then

16  about any of this.

17  Q.   Did you follow Judge Buchwald's order and contact

18  everyone to whom you had sent it?

19  A.   Indeed I did.

20  Q.   Besides providing the actual documents, the ones referred

21  to as the sealed and confidential documents, did you discuss

22  the information contained in any of those documents with

23  anyone?

24  A.   Yes.

25  Q.   With whom did you discuss the information contained in

Oberlander-direct/Moore

1  those documents?

2  MR. LERNER:  Objection.  This is beyond the scope of

3  the order to show cause.

4  THE COURT:  Sustained.

5  Q.  Who drafted the SDNY complaint?

6  A.  I did.

7  MR. LERNER:  Objection, that's also beyond the

8  scope.

9  THE COURT:  It is in the record.  It is part of the

10  evidence in this case.

11  Q.  Are you aware of who has reviewed that complaint?

12  A.  Would you be more precise about the phrase reviewed?

13  Q.  Read it.

14  A.  Mr. Kriss read it.

15  THE COURT:  There are several Mr. Krisses.

16  THE WITNESS:  Referring to my client Jody Kriss.  I

17  apologize.

18  A.  My client read it, I read it and I need to request

19  clarification -- actually, no, I will answer it directly.  I

20  have been told by my lawyers at Wilson Elser that two of them

21  have read it and beyond that nobody told me that they read it

22  and furthermore whether they read it -- whether they read part

23  of it, it is unclear from your question what you're asking.

24  Q.  Did you know at the time you filed the complaint in the

25  Southern District of New York Mr. Doe's entire criminal case

33

Oberlander-direct/Moore

1   was under seal in the Eastern District of New York?

2          MR. LERNER:   Objection.

3          THE COURT:   I will allow that.

4   A.   Truthfully, I don't know it now.  By that I don't mean to

5   contradict what the Court said.  I certainly respect the

6   Court.  And last week, if I'm not mistaken, the Court said and

7   I'll get the quote later on, I apologize to your Honor, that

8   there is no order.  At the beginning of the matter I had

9   everything filed in the case sealed.  Whatever the Court's

10  exact words were, certainly I was there, I heard that, I

11  assume it is true, and if that's knowledge, that's the first

12  time I ever had such knowledge.

13  Q.   That's the very first time you had knowledge?

14  A.   That's the very first knowledge -- first time, if it is

15  knowledge, that is the first time I had knowledge that the

16  entire record was sealed.

17  Q.   How about the exhibits that were attached to the SDNY

18  complaint, did you know that some of them were sealed?

19  A.   I still don't know that because when the Court said -- I

20  believe what the Court said last week in further comment was

21  that his Honor checked the computer files, found that the

22  general files, if I'm not mistaken, was marked sealed and his

23  Honor said that there were six documents listed without

24  description that were under seal and that he didn't look to

25  see what they were, but could if he wanted to.  My point being

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  that I actually have no knowledge that they're sealed.

2  Q.   Well, paragraph 96 of that complaint says because his

3  guilty plea to the criminal RICO proffer and cooperation

4  agreement were sealed.  When you drafted that portion, did you

5  know that they were sealed?

6  A.   I drafted more words after that.  You're moving them out

7  of context to distort the meaning.

8  Q.   Because his guilty plea to criminal RICO proffer and

9  cooperation agreement were sealed, as he was aiding the

10  prosecution of his Mafia and Russian organized crime

11  confederates, does that change your understanding of the

12  documents were sealed?

13  A.   Well, I know what I wrote.  Since it is not -- wait a

14  second.  I can check.  Can you hang on while I go look at

15  paragraph 96?

16  Q.   Absolutely.

17  A.   Please, since I'm confused, what is exactly your question

18  here?

19  Q.   When you wrote because the guilty plea to criminal RICO,

20  proffer and cooperation agreement were sealed, did you know

21  that those documents were sealed?

22  A.   I've already testified that I never have and still don't

23  know that they're sealed.

24  Q.   So, what is the meaning of that sentence when you say

25  were sealed?

Oberlander-direct/Moore

1  A.    It means I'm alleging on behalf of my clients that we can

2  prove, should there be any fact at all, an ultimate fact that

3  they were sealed, that doesn't mean I know it to be true nor

4  are those my words.  I wrote them on behalf of my clients.

5  Q.    When you wrote that it is your testimony you were not

6  under the belief the documents were sealed?

7  A.    I already testified what I believe to be the state of the

8  world with respect to how I represent them and what I chose to

9  aver on their behalf as work product.  This complaint is

10  Mr. Kriss' statement that he believes the following to be true

11  by the requisite level of pleading confidence.  If I'm not

12  mistaken, is it Rule 11?  Whatever it is in Federal Court.  It

13  is not an ultimate fact.  Nothing in the complaint depends on

14  it.  It is not judicial admission, and, even if it were, it

15  isn't mine.

16  Q.    It is your client's?

17  A.    I said it is not judicial admission and, but, even if it

18  were, it is not mine.

19  Q.    You disagree with the statement that the criminal

20  complaint, the proffer and cooperation were sealed?

21  A.    I couldn't very well do that because that would require

22  my knowledge of whether they are sealed and I still don't know

23  whether they are sealed.

24  Q.    Mr. Oberlander, did you yourself ever make any attempt to

25  obtain any portion of the criminal file from the courthouse

Oberlander-direct/Moore

1  here in the Eastern District of New York?

2  A.    Through my agent?

3  Q.    Through anyone.

4  A.    Yes.

5  Q.    And did you try to obtain any aspect of the criminal file

6  relating to my client in the document?

7  A.    I think it was the 10th was the date of the first hearing

8  here.

9  Q.    I'm sorry.

10  A.    It was the date of the first hearing here.  I believe

11  that is May 10th.

12        MR. LERNER:    June 11th.

13        THE WITNESS:  Oh, June 11th.  The date of the first

14  hearing.

15  Q.    But prior to filing the SDNY complaint, it is your

16  testimony you made no effort to actually obtain any portion of

17  the criminal case?

18  A.    That's correct.

19  Q.    Are you familiar with PACER?

20  A.    Oh, you mean the computer system?

21  Q.    Yes.

22  A.    I am.

23  Q.    Have you used it?

24  A.    Ever?

25  Q.    Yes.

Oberlander-direct/Moore

1  A.   Yes.

2  Q.   Did you attempt to use it to obtain information related

3  to the criminal case against my client in the Eastern District

4  of New York?

5       MR. LERNER:   Objection.   The question is too broad.

6  If you're asking the attempted use to find out any information

7  about the case --

8       MS. MOORE:   I am.

9       MR. LERNER:   Are you able to answer that?

10      THE WITNESS:   Yes.

11      MR. LERNER:   Okay.

12 A.   Yes, I did.

13 Q.   And when did you do that?

14      THE COURT:   Is that when or why?

15      MS. MOORE:   When.

16 A.   I would have to check.   My guess would be around the

17 20th, 25th of May.   I really can't be certain.   It is

18 certainly easy enough to check.   It would be sometime after

19 filing the complaint.

20 Q.   You're certain you never checked prior to filing the

21 complaint?

22 A.   Virtually certain because my credit card that I gave

23 PACER to bill long ago changed the number and I never updated

24 it.   I have no recollection of logging onto PACER.   I have no

25 recollection of logging onto PACER for anything prior to that

M. BRYMER, RPR, OCR

38

Oberlander-direct/Moore

1   time since 2008.

2   Q.   When you logged onto PACER in late May, what you pulled

3   up was a screen that says this case is under seal; is that

4   correct?

5   A.   Something like that, yes.

6   Q.   But as you sit here today it is still your testimony you

7   have no knowledge this case is under seal?

8   A.   I never testified to that.

9   Q.   What is the state of your knowledge as to whether or not

10  this case is under seal?

11  A.   That the Court said from the first date of the case, the

12  criminal matter, that he had all documents filed under seal

13  and I further testified that I have no knowledge that these

14  particular documents were filed under seal and I don't know

15  what the whole case under seal means, but I certainly respect

16  what the Court said a week ago and that's the sum total of my

17  knowledge.  I have absolutely no knowledge of what documents

18  are in fact filed under seal other than that I heard the Court

19  say there are six listed.  His Honor didn't know what they

20  were.

21  Q.   So, prior to filing the SDNY complaint you made no effort

22  whatsoever to verify the statement in the complaint that they

23  were under seal?

24  A.   I didn't say that.

25  Q.   Okay.

39

Oberlander-direct/Moore

1   Did you make any attempt prior to filing the

2  complaint to verify whether the documents you were attaching

3  them to or any part of Mr. Doe's criminal case was under seal?

4  A.   The basis for the allegation in the complaint are

5  contemporaneous press accounts from 2007 and which reputable

6  reporters list some parts as being under seal.  I believe the

7  exact phrase, for example, from an article I think December

8  17th, 2000, in the New York Times, within a day or two of that

9  said that a federal complaint remains under seal.  Based on

10  that and press coverage of Mr. Doe, it was eminently

11  reasonable to allege that at the time Mr. Kriss was hired in

12  2003 those documents were under seal, but, as I said, that's

13  an averment or allegation on behalf of Mr. Kriss, who

14  presumably had come to that conclusion from his verification

15  of the complaint and it is a reasonable complaint he had.  I

16  have not testified as to mine.

17  Q.   My question, Mr. Oberlander, was prior to filing this

18  complaint did you make any effort to verify whether or not the

19  documents you were attaching thereto or any other part of my

20  client's criminal file were under seal?

21       MR. LERNER:   Objection, asked and answered.

22       THE COURT:  Answer it again, you can answer it.

23  A.   I referenced the press accounts.  That's how I verified

24  it.

25  Q.   Anything besides press accounts that you went to to

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  attempt to verify whether the documents you were attaching or

2  any part of the criminal case were under seal?

3  A.   Anything else I did, I don't recall specifically, no.

4  Q.   You just referenced a New York Times article which

5  specifically states a federal complaint brought against him,

6  meaning my client, in a 1998 money laundering stock

7  manipulation case was filed in secret and remains under seal;

8  is that right?

9  A.   The question is whether I referenced that article?  Yes,

10  I just did.

11  Q.   Did you read that article?

12  A.   Many times.

13  Q.   Did you read it with utmost care before filing the

14  complaint in the Southern District?

15       MR. LERNER:   Objection.

16       THE COURT:   Sustained.

17  Q.   Did you read it before filing the complaint in the

18  Southern District?

19  A.   I read it in 2007, when it first came out.  That was

20  before filing the complaint.

21  Q.   So, you knew certainly that as of December 2007, when

22  that article was written, the complaint was still under seal;

23  is that right?

24  A.   No.  I must have testified at least six times, I still

25  don't know that and anybody that would believe necessarily

Oberlander-direct/Moore

1   anything they would read in the newspaper like that I'm not

2   among the set of.  I continually told you that I do not know

3   what documents are under seal, never have known what documents

4   are under seal and the fact that the New York Times says that

5   one document is under seal is sufficient for purposes of the

6   well pled complaint, but does not make me know anything is the

7   case.

8           THE COURT:  May I for purposes of clarification?  You

9   testified that at some point you accessed or attempted to

10  access the file in this case via PACER.

11          THE WITNESS:  That's correct.

12          THE COURT:  I don't recall hearing and if it was

13  mentioned I missed it, what date was that?

14          THE WITNESS:  Sometime in the last few days of May,

15  May 20 or 25.  It may -- sometime between May 20 and June

16  10th.  I would have to check.  It was after filing the

17  complaint.  It was after the order to show cause was served.

18          THE COURT:  Thank you very much.

19  Q.   The criminal complaint referenced in the New York Times

20  article as being under seal, you made no independent effort to

21  obtain that; is that right?

22  A.   Independent of what?

23  Q.   Independent of receiving it from Joshua Bernstein.

24  A.   I testified that my attorneys attempted to access the

25  court file on June 11th, so presumably the answer is I did on

Oberlander-direct/Moore

1   June 11th.

2   Q.    Any time prior to that?

3   A.    No.

4   Q.    You --

5   A.    Excuse me.  I went onto PACER.  Theoretically, if it had

6   been there and available, I guess that would be a constructive

7   attempt.  I'm not going to mislead.  Since nothing shows up

8   other than sealed --

9   Q.    You quote extensively from that complaint in your SDNY

10  complaint; is that right?

11          THE COURT:  Extensively from what?

12          MS. MOORE:    The criminal complaint.

13          MR. LERNER:    Objection.  This goes beyond the

14  scope.

15          THE COURT:  Mr. Lerner, that document is in

16  evidence.

17          MR. LERNER:   I understand, your Honor.

18          THE COURT:  If it is in evidence, it is in evidence

19  as to what it says and it is in evidence as to what it is that

20  may have been quoted.  It is part of the record.  It is a

21  rhetorical question.  It is a rhetorical one if it has been

22  quoted.  It is Mr. Oberlander's complaint.  I think the

23  assumption is a correct one, he quoted it, he signed the

24  complaint.

25  Q.    Mr. Oberlander, can you please turn to page 40 of that

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  complaint, paragraph 207.

2  A.   Yes.

3  Q.   The quote contained in paragraph 107 that is indeed from

4  the criminal complaint I have been referring to; is that

5  right?

6  A.   The complaint says it is.  I certainly wouldn't knowingly

7  misrepresent it.  Without the complaint in front of me, I have

8  to rely on what this says is right.  I wrote it; I assume it

9  is true.

10 Q.   Did you obtain that from the actual complaint, the

11 criminal complaint?

12 A.   I must have.  I mean if you're asking me do I recall

13 writing that paragraph 207, what day and time, no, but I must

14 have if this is in fact from the complaint.  If you don't show

15 me the complaint, I have to assume it speaks for itself.  If

16 you show me the complaint, then I will be able to tell you

17 whether I copied it.

18 Q.   Did you obtain the complaint from which you quoted from

19 Mr. Bernstein on March 3rd via email?

20 A.   Yes.  This must now mean what I assume was true is in

21 fact true.  It is one of the documents attached to the March

22 3rd email.

23 Q.   You did not attach that complaint as one of your exhibits

24 to the SDNY complaint.  Why not?

25 A.   Work product.

Oberlander-direct/Moore

1          MR. LERNER:    Objection.

2  Q.    Was it because you knew it was under seal?

3          MR. LERNER:    Objection.

4          THE COURT:    I will allow it.

5  A.    No.

6  Q.    Was it because you knew it was stolen?

7          THE COURT:    Sustained.

8  Q.    Exhibit C to Movant's Exhibit 1 is a presentence report.

9  Did you read the entire presentence report before filing the

10 SDNY complaint?

11 A.    Yes.

12 Q.    Did you read the sentence on page two that reads, "It is

13 the policy of the federal judiciary and the Department of

14 Justice that further re-disclosure of the presentence

15 investigation report is prohibited without consent of the

16 sentencing judge"?

17 A.    I did.

18 Q.    What did you understand it to mean?

19 A.    That further disclosure by employees of the Bureau of

20 Prisons is against the policy of the judiciary and the Justice

21 Department without the consent of the sentencing judge.

22 Q.    So, you did not think that that sentence applied to your

23 disclosure of the PSR; is that your testimony?

24 A.    That's correct.

25 Q.    Did you make any attempt to obtain permission from the

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  sentencing judge before filing the SDNY complaint?

2      MR. LERNER:   Objection.  He just answered.  It was

3  unnecessary.

4      THE COURT:   I think I can take judicial notice of the

5  fact, Ms. Moore, that no request was made of me by anybody

6  other than the Probation Department regarding this presentence

7  report.

8  Q.   Now, Mr. Oberlander, you cite an email to Ron Kriss on

9  May 12; is that correct?

10 A.   I may have sent more than one.

11 Q.   Let me show you what's been marked Movant's Exhibit 2.

12      MR. LERNER:   Your Honor, may I bring my client a cup

13 of water?

14      THE WITNESS:   Apparently I'm thirsty.

15      MR. LERNER:   Can we have the last question read

16 back?

17      MS. MOORE:   I think I just handed the witness an

18 exhibit.

19 Q.   Can you take a moment to review that exhibit, please?

20 A.   I did.

21 Q.   Is that in fact the email you sent to Ron Kriss on May

22 12?

23 A.   It looks like it.  I don't recall every word and how I

24 wrote it.

25      MR. LERNER:   Your Honor, I object.

46

Oberlander-direct/Moore

1    THE COURT:  I don't know what it is.  Have you seen

2 the email?  Do you know what is being referred to?

3    MR. LERNER:   Yes.

4    THE COURT:  What is the objection?

5    MR. LERNER:   Objection is it has nothing to do with

6 to whom Mr. Oberlander forward the documents or how he

7 received them.  It is beyond the scope.

8    THE COURT:  May I see the email?

9    MS. MOORE:   I'm sorry, your Honor.  I thought I

10 handed it up.  It is Exhibit 2.

11    MS. MOORE:   If I may, your Honor?

12    THE COURT:  I have it.

13    MR. LERNER:   There's nothing in this email...

14    THE COURT:  Ms. Moore.

15    MS. MOORE:   Your Honor, the document is in fact

16 forwarding the complaint with the exhibits asking that it be

17 re-forwarded.  It mentions possibilities with respect to

18 filing under seal.  I believe it is clearly relevant to

19 whether or not this witness knew that the attachments were

20 under seal to begin with.

21    THE COURT:  I will allow it.  There are some portions

22 of it which may not have any relevance to this proceeding, but

23 certainly paragraphs A, B and C attached to the first

24 paragraph are perfectly relevant to this proceeding and

25 perhaps the last paragraph is as well.  I'll receive it as

47

Oberlander-direct/Moore

1   Plaintiff's 2.  You can move on.

2          MS. MOORE:   Yes.

3   Q.   Mr. Oberlander, in this email you state there are three

4   objections I filed publicly today, I filed under seal.  I

5   arranged for an agreement with every defendant but Nixon

6   Peabody.

7          At the time you sent him the email you had already

8   filed it publicly, had you not?

9   A.   According to the court rules I had, but the -- yes.

10  According -- actually, seriously, I can't answer that only

11  because the terminology is confusing to me.  I had filed a

12  complaint already but it had not been public.

13  Q.   When you say you forwarded this to Julius, who is Julius?

14  A.   Ron Kriss would have understood that to be Julius

15  Schwartz.

16  Q.   Julius Schwartz is a principal of Bayrock?

17  A.   I have no idea what he is now, but at one time he was.

18  According to various testimony he gave title as executive vice

19  president, general counsel and considered himself de facto

20  chief executive officer of the company.

21  Q.   And he's a former law partner of Ron Kriss; is that

22  right?

23  A.   I think they called them shareholders, but, yes.

24  Q.   At the firm of Ackerman?

25  A.   Ackerman Senterfitt.

Oberlander-direct/Moore

1  Q.    And in this email you basically say there's three options

2  or pay the money back now; is that right?

3  A.    No.

4  Q.    Give the money back and now it is over.  What is the

5  meaning of that?

6  A.    It means Julius Schwartz personally in conspiracy with

7  other people, including Mr. Doe, stole in cash equivalent

8  about eight million dollars from my clients in terms of the

9  value of the partnership interest, they converted about

10  $30 million, probably tens of millions of dollars, depending

11  on the analysis from the Treasuries of New York State, New

12  Jersey and the United States, and I don't know how many

13  millions from people they defrauded when they were buying

14  condominiums and that they had plenty of time to rectify their

15  theft, embezzlement, larceny, fraud and tax evasion.

16  Q.    If in response to this email they agreed to pay back

17  millions of dollars you said were owed, would you have not

18  filed the complaint?

19  A.    I believe I testified I already had.

20  Q.    Would you have not served it?  Would you have retracted

21  it?

22  A.    If all defendants settled?  I don't know who they is.

23  You said if they had paid.  Who is the they in your question?

24  Q.    Julius.

25  A.    What about it?

Oberlander-direct/Moore

1  Q.   Well, the way I read this email, Mr. Oberlander, correct

2  me if I'm wrong, is that you're giving him three options in --

3  or demand for money.  You're saying I'll do this, this or this

4  unless you pay me the money back.

5        Am I reading that wrong?

6  A.   You are.

7  Q.   It was not your intent to make it a demand for money in

8  exchange for not filing it publicly?

9  A.   Of course it wasn't.

10 Q.   Explain to me the last paragraph.  I believe it is

11 possible to get this in under seal if Bayrock joins a joint

12 motion in Part One to seal the complaint pending redaction

13 agreement with the assignment judge.

14        What did you mean by that?

15 A.   What I meant by that is that this email was following up

16 on a telephone conversation I had with Mr. Kriss approximately

17 30 minutes earlier and during the course of that conversation

18 I informed Mr. Kriss that the best practices dictated that I

19 attempted to file the SDNY complaint under seal, which I had

20 attempted to do ex parte, and that I followed the procedures

21 to that and that the Part One Judge I was given to whom I

22 submitted a motion along with a brief in support of a motion

23 requesting a seal -- that would be Judge Kimball Wood --

24 declined without reason to seal it and because of the time it

25 took for her law clerks to go through everything and for her

Oberlander-direct/Moore

1   to then decline to seal it, it ran past the closing date for

2   the time for the cashier which I had to come back and file in

3   the morning and drop off the copy and within 24 hours upload

4   it to PACER.

5        So, I told Mr. Kriss that since best practices

6   covering me as plaintiff's attorney would indicate that I

7   attempt to file the complaint under seal and since I had

8   already been turned down by a Part One Judge that had not got

9   a spun wheel yet and an assigned judge, it was my belief that

10  if at least one defendant, ideally more than one, would join

11  with me in a stipulated motion to file under seal it would

12  then be reasonable to go to a new Part One Judge without judge

13  shopping and say, your Honor, we would like this filed under

14  seal by stipulated agreement.

15       So, my purpose in contacting Ron Kriss was the same

16  purpose I had in contacting John Elzufon an hour earlier, at

17  10:30, I think, that morning, which was to say to them that I

18  wanted to file the complaint under seal for reasons listed in

19  the sealing motion and that I was turned down, but that I

20  believed if someone stood next to me from the defendant's side

21  with a stipulated request to file under seal that perhaps that

22  would work.

23  Q.   Mr. Oberlander, why did best practices dictate that you

24  file a civil RICO complaint under seal?

25  A.   For one thing these companies of Bayrock are a

51

Oberlander-direct/Moore

1   partnership and the -- for tax purposes and the crux of the

2   complaint is that Mr. Doe, Julius Schwartz with the conspiracy

3   of professionals ran Bayrock through a pattern of rampant tax

4   evasion, tax fraud, money laundering, and when you play games

5   like that in a tax partnership you are propagating

6   consequences to every single one of the partners, including

7   the innocent minority partners, and it was my interpretation

8   that given the financial information that was in the complaint

9   even though nominally it would appear to be related to

10  Bayrock, it had sufficient impact on the tax partners of

11  Bayrock that it triggered, I think it's 21F, I'm not sure, of

12  the ECF filing that says while you don't have to file under

13  seal information, complaint or documents that contain the

14  following, you probably should, and, if I'm not mistaken, on

15  the list of those things that the court recommends attempted

16  to be filed under seal are documents containing personal

17  financial information.  That was one reason.

18  Q.   Were there any other reasons?

19  A.   Yes, there were.  There are emails in the complaint and

20  while I am certain that they are properly used and not subject

21  to objection and the reasons for that are stated in the moving

22  papers for filing under seal, I believe that best practices

23  requires in a case of this gravity that the opposing side in

24  the interest of justice be given a chance to examine the

25  complaint and see if they had, for example, privilege

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1   objections, in which case there could be a period of maybe a

2   week or two while the complaint stayed under seal pending a

3   redaction agreement.  That's what I was explaining to

4   Mr. Kriss, that's what I was explaining to Mr. Elzufon and

5   that's what is in my moving papers to put it under seal and in

6   fact that's what Morris and Cohen, representing Mr. Schwartz,

7   and I believe although it should be impossible conflict, also

8   representing Bayrock Group, specifically requested of me

9   within days of filing if I would agree to redaction.  So,

10  apparently they have the same view of it as I do.

11          The third reason for wanting to file under seal is

12  because this is a derivative action and while there are about

13  five or six known equity class members that are represented by

14  Mr. Kriss since Bayrock must be assuming even a fraction of

15  these complaints, claims in the complaint are true.  Since

16  Bayrock must be and must have been for sometime insolvent,

17  there are a staggering number of creditors who have quasi

18  equity standing to participate in a derivative action as

19  beneficiaries and to the extent that filing the complaint

20  prior to giving a chance for redaction would destroy what was

21  left of the company based on public reaction to it the

22  interest of my own derivative, albeit unknown clients, the

23  better part of the -- it was to attempt to redact and preserve

24  value of the company so that people out in the world reading

25  this wouldn't shoot against it.

53

Oberlander-direct/Moore

1  Q.   Were there any other reasons you made a motion to file it

2  under seal?

3  A.   Those were the three motions.

4  Q.   Does that motion exist in writing?

5  A.   Of course it does.

6  Q.   Do you still have a copy?

7  A.   Yes, I do.

8  Q.   Does that motion in any way contain any references to the

9  fact that there are sealed documents related to a criminal

10  case attached to the SDNY complaint?

11  A.   I'm virtually certain that it doesn't because 21F, in

12  fact, when you read it and it lists the documents -- rather,

13  the information which might give a reasonable attorney pause

14  to think about attempting to seal.  I believe the very last

15  one is if your document contains information about a

16  cooperation agreement with the government.  I presume from

17  reading that mine was not the only document ever filed that

18  contained a cooperation agreement that the government had.

19  Q.   I'm sorry, I'm confused and not familiar with 21F.  Does

20  21F permit you to file such a document or tell you to file it

21  under seal?

22  A.   Neither.  Actually, it simply says there's no restriction

23  whatsoever against filing it under seal, but you might want to

24  think about it.

25           THE COURT:  Excuse me.  What is 21F?

54

Oberlander-direct/Moore

1    THE WITNESS:  I apologize, your Honor.  There are ECF

2 rules published by EDNY and SDNY, jointly electronic filing

3 rules, and they refer to filing of all documents, not merely

4 complaints, and I'm pretty certain, it is funny -- again I

5 apologize, but there are two sets of rules, two so I'm

6 assuming it is 21E and -- whatever they are they are back to

7 back.

8    One says if your document contains any of the

9 documents you may not file it electronically or I guess

10 without court order or court permission.  So, that would be

11 according to Ms. Moore's questions you are prohibited from in

12 the absence of extenuation filing.  Following that I think is

13 21F, which contains a list of items which if your document

14 contains them you are perfectly free to file under seal, but

15 if I can paraphrase you probably ought to think about it

16 before you do that and consider attempting getting it sealed.

17    THE COURT:  Among the documents listed are

18 cooperation agreements?

19    THE WITNESS:  Indeed.

20    THE COURT:  Yes?

21    THE WITNESS:  Honestly, yes.

22    THE COURT:  Presentence reports?

23    THE WITNESS:  No.

24    THE COURT:  Cooperation agreements?

25    THE WITNESS:  Two-word phrase cooperation agreement,

M. BRYMER, RPR, OCR

55

Oberlander-direct/Moore

1  if it doesn't say that, it says something like -- evidence in

2  cooperation with the government.  May say cooperation

3  agreement.  Yes, it is very clear what it refers to.  It

4  does.

5           THE COURT:  Does it also refer to proffer agreements,

6  which are essentially almost synonymous with cooperation

7  agreements?

8           THE WITNESS:  No, it does not, no.

9           THE COURT:  You indicated earlier I believe you had

10 no idea, if I'm paraphrasing correctly, what a sealed case is,

11 what sealing encompasses and so on.  Do you recall that?

12          THE WITNESS:  No, I apologize.

13          THE COURT:  You never said anything like that?

14          THE WITNESS:  No, no.  The words are similar to what

15 I said, that I certainly would never have said more than I

16 mean to say, that I don't know what it means when a case is

17 put under seal.  Of course, I know what it means when a case

18 is put under seal.  I believe Ms. Moore was asking me what

19 documents I knew to be part of the sealed -- whatever you want

20 to call it.  There is a sealed, what is it, envelope?  However

21 your Honor wishes to refer to it.  Assume in an average case

22 there are some documents that are sealed and some that are

23 not.  In this case it may be all documents.

24          Ms. Moore has generally been asking me or in fact

25 entirely been asking me did you know this document was sealed,

M. BRYMER, RPR, OCR

56

Oberlander-direct/Moore

1   did you know that one and I said no, but if you're asking me

2   do I know what it means when a court orders a case sealed,

3   yes, of course I do and I apologize for any confusion.

4          THE COURT:  Do you understand that it means that the

5   case generically, meaning everything connected with that case,

6   is sealed?  The case is sealed, what does that mean?

7          THE WITNESS:  May I answer?  I would very much like

8   to answer that.

9          THE COURT:  By all means.

10         THE WITNESS:  All right.  In this particular case,

11  not having seen the sealing order, I certainly can't comment

12  on what any -- in general, my understanding is that when a

13  judge orders a case sealed that the order at a minimum directs

14  court personnel to remove the documents that are subject to

15  the sealing order from the publicly available file to keep

16  them sequestered somewhere, somewhere I guess in a safe of

17  some kind, to decline to release them to any member of the

18  public or anyone else asking for them who doesn't have a court

19  order and that a sealing order will typically, but not

20  necessarily, also include an order of the Court in the nature

21  of an injunction enjoining certain parties for that action

22  from disseminating some or all of the same documents.

23         That would be my generic understanding of what a

24  sealing order is.  It is not in rem, could not be in rem.  It

25  is directed to court personnel not to disclose and directed

Oberlander-direct/Moore

1    sometimes but not all the times the parties not to disclose.

2    It specifically is not a gag order nor could it purport to be,

3    but again for clarity I don't know what the order says.

4         If I may, there one case with which I'm familiar

5    that says it probably more eloquently than I can.  It is from

6    the Supreme Court of Kentucky.  It is in the June 14th letter

7    and it says that a sealing order of the type I described, what

8    we call generic in this question, is not to be interpreted to

9    be a global gag order, not to be interpreted as any form of

10   court order purporting to control the ability of somebody to

11   obtain the same information outside the court process.

12        THE COURT:  We're talking about two different things,

13   Mr. Oberlander.  If a case is declared to be a sealed case and

14   court personnel are instructed this case is to be kept under

15   seal, you understand that to mean that court personnel are

16   precluded from making any information pertaining to that case

17   available to anybody.  I don't know what the Kentucky court

18   was dealing with, nor do I particularly care, the fact of the

19   matter is that your understanding is correct, that when a case

20   is declared to be a case filed under seal it directs court

21   personnel that this case is not to be made available to

22   anybody except under court order, which means in effect that

23   it is globally unavailable to anybody unless a court orders

24   it, directs it to be unsealed.

25        So, when you went to PACER, whenever it is you did,

58

Oberlander-direct/Moore

1  you saw this was a sealed case and when Mr. Lerner went to the

2  Clerk's office and requested to see the file, he was told, as

3  he told me in a letter addressed somewhere along in this case,

4  that the Court Clerk said, "Sorry, this case is under seal and

5  we cannot disclose anything about this case to you."  That is

6  what you were told or at least you told me that in the letter.

7       MR. LERNER:   My letter said I went to the Clerk's

8  office to obtain a copy of the sealing order.  I was unable to

9  obtain a copy of the sealing order.

10      THE COURT:  You were told even that's under seal.

11 They couldn't show you that?

12      MR. LERNER:   That is correct.

13      THE COURT:  Because it is the entire envelope under

14 seal in the vault of the Court together with everything else

15 that's filed.  Now, it is true there were six documents which

16 were also specifically marked under seal, but when the court

17 is authorized, a Judge of the court would be authorized to

18 access that sealed case, there are many entries which are

19 ministerial which the Court is told a letter has been sent or

20 whatever it is, an adjournment has been granted, but there are

21 some documents which are specifically filed under seal, so

22 even the Court can't look at it unless it makes a request to

23 see what that document is and asks the clerk, Clerk of the

24 Court, to open the vault and let me see what docket number 36

25 is.

59

Oberlander-direct/Moore

1          In the course of the proceeding it may have some

2    specific value for the Court's information but it is globally

3    sealed.  It is not addressed to any particular person.  It

4    couldn't be.  The Court wouldn't know in advance who it is

5    that might want to look at this file.  The Clerk of the Court

6    is told this case is sealed and without permission of the

7    Court it shouldn't be disclosed to anybody.

8          Why don't you move on, Ms. Moore.

9    BY MS. MOORE:

10   Q.   Just to clarify, Mr. Oberlander, it is your understanding

11   when a document is under seal that doesn't happen on its own,

12   right, it is pursuant to court order?  Is it your

13   understanding the court needs to order a document to be under

14   seal?

15   A.   I would not technically -- because I believe once a court

16   orders generally documents filed it doesn't then order each

17   individual document.  You just -- as a matter of course as you

18   file it becomes sealed.  But generally at one time or another

19   somebody somewhere on behalf of the court with authority to do

20   so must have written that order directly to keep some or all

21   documents under seal in order for it to be true as a statement

22   that such and such a document is sealed.

23   Q.   It is not limited to court personnel.  Your order before

24   Judge Kimball Wood, you would understand it to mean you

25   couldn't further disseminate the document, could you, if it

M. BRYMER, RPR, OCR

60

Oberlander-direct/Moore

1  had been signed?

2  A.   You mean the proposed order?

3  Q.   Yes.

4  A.   I have to look at it.  I drafted the thing quite some

5  time ago, but, yes, the object of the court order could

6  variably be any party over whom the Court at the time of the

7  order had personal jurisdiction sufficient to justify -- we

8  don't need to go into a constitutional Rule 65 speech.  You

9  understand.  We both understand.

10  Q.   But it is your testimony that no part of your application

11  before Judge Wood related to the fact that you were attaching

12  documents that were under seal in the Eastern District of New

13  York?

14  A.   I haven't seen it in a few weeks.  I truly don't recall

15  that I did that.  If I did, it is my memory error, but

16  certainly that sealing order -- I mean it is easily -- you

17  know, I can find it when I get back to my office, but to the

18  best of my recollection I believe that the motion said --

19  actually, it doesn't -- it could be read possibly like that

20  because it does refer to information that is privileged and

21  confidential.  Let's rephrase it.  I will not quote from

22  something not in front of me.

23       It would be impossible to read it that way.  I didn't

24  necessarily intend to write it that way.  I don't recall

25  specifying that there were documents in there that would be

M. BRYMER, RPR, OCR

61

Oberlander-direct/Moore

1  under seal nor could I possibly have done so in any sense of

2  reality I have because I continue to testify that I still to

3  this day have absolutely no idea what documents are and aren't

4  under seal so I couldn't have said that, your Honor, meaning

5  whatever the Part One Judge says there are documents that are

6  under seal here because that would contradict what I'm

7  saying.  So --

8  Q.  Mr. Oberlander, how can you possibly still say that?

9  We've gone over the PACER report that says the case is under

10  seal repeatedly.  It is clear that every document connected

11  will be under seal.  How can you still sit there and say to

12  this day you don't know which documents are under seal or

13  aren't?

14  A.  Because I'm a mathematician, I'm an attorney, I listen to

15  your questions and those are the truthful, correct answers to

16  the way you're phrasing them.  I have no personal knowledge of

17  what documents are or are not sealed.  That would remain my

18  answer.

19  Q.  After Judge Wood denied your order, your application to

20  file the SDNY complaint and its attachment under seal, you

21  filed it anyway, didn't you?

22  A.  Yes.

23  Q.  You did so knowing it contained information that could

24  possibly endanger my client's life, did you not?

25      MR. LERNER:   Objection.

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1    THE COURT:  Sustained.

2    Q.   Well, based on the documents you attached you knew that

3    my client had cooperated against dangerous organized crime

4    defendants; is that correct?

5    A.   Documents attached to what?

6    Q.   To the complaint, the cooperation agreement and proffer

7    agreement attached to the complaint.

8    A.   I've continued to testify that anything I did or didn't

9    know is work product and that complaint represents the

10   allegations and averments of the clients that I represent.

11   Mr. Kriss, in principal, is the most aggrieved of all of

12   them.  Anything said in there cannot fairly be imputed to me.

13   It is, frankly, none of my business to believe or not

14   believe.  It is my business to advocate within the constraints

15   of Rule 11 foundation for pleading -- Rule 11 I think it is.

16   Q.   Mr. Oberlander, the Professional Rules of Conduct permit

17   you to waive work product and attorney-client privileges to

18   defend yourself against accusation of misconduct.  Let me make

19   it clear we are accusing you of misconduct in connection with

20   your actions in this case in filing these sealed documents and

21   doing so in a way that would endanger a man's life.

22        Do you wish to pursuant to the Rules of Professional

23   Conduct avail yourself of your ability to waive work product

24   to answer those questions?

25   A.   No.

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1    MR. LERNER:   Objection.

2    THE WITNESS:   Are you going to object?

3    MR. LERNER:   I object.   It is beyond the scope of

4    this order to show cause.

5    THE COURT:   Overruled.

6    MR. LERNER:   If Ms. Moore wishes to refer this to a

7    disciplinary committee, as to which Mr. Oberlander is

8    admitted, that would be the proper forum for such

9    allegations.

10   Q.   Mr. Oberlander, are you going to stand by your answer

11   that the answer to my question is work product privilege?

12   A.   Which question?

13   Q.   The question as to whether or not you knew that by

14   attaching the cooperation agreement to a civil RICO complaint

15   in the Southern District would potentially endanger my

16   client's life.

17   MR. LERNER:   Objection.

18   THE COURT:   I sustained an objection.

19   Q.   Mr. Oberlander, if you would take a look, please, at

20   Exhibit A to Movant's Exhibit 1, which is in fact the

21   cooperation agreement and I would like to direct your

22   attention to paragraph ten of that agreement.

23   A.   Yes.

24   Q.   That paragraph references the Witness Protection

25   Program.   Did you read that paragraph prior to filing this

Oberlander-direct/Moore

1    complaint?

2    A.    I did.

3    Q.    And you fancy yourself as somewhat of an authority in

4    criminal court; is that correct?

5    A.    No.  In fact, I told you I'm not a criminal lawyer.

6    Q.    Well, do you have any understanding whatsoever of when a

7    cooperation agreement might include provisions with respect to

8    Witness Security Program?

9    A.    Do I have any understanding of when it would include

10   one --

11   Q.    Yeah.

12   A.    Presumably when the parties negotiate it to include one.

13   Q.    Do you have an understanding of what that program is?

14   A.    From popular culture.

15   Q.    And you had no concern by attaching this cooperation

16   agreement, no concern whatsoever about doing that?

17   A.    Hypothetically I'm not waiving anything, but

18   hypothetically if I had my concerns it would have been limited

19   to the safety of Mr. Kriss, who Mr. Doe threatened with death,

20   would have been limited -- the answer to your question is

21   hypothetically if I had given it any thought the answer I

22   would have come up with would have been I'm not Mr. Doe's

23   guardian angel, I'm Mr. Kriss'.

24   Q.    When we first spoke to Judge Buchwald on May 13th, you

25   were represented on that telephone conversation by attorney

65

Oberlander-direct/Moore

1  named David Lewis; is that correct?

2       MR. LERNER:   Objection.

3       THE COURT:  I think it is referred to in the papers

4  that have been submitted, Mr. Lerner.

5       THE WITNESS:   Does that mean answer?

6       THE COURT:  Yes.

7  A.   Yes, I was.

8  Q.   When did you retain Mr. Lewis to represent you in

9  connection with the matter before Judge Buchwald?

10 A.   Mr. Lewis and I have been friendly for 45 years.  I

11 originally began consulting him in this matter in 2000 and --

12 2009.  I don't have a formal retainer agreement or engagement

13 letter.  A relationship of almost half a century, sporadic.  I

14 just can't answer that, but the point is that Mr. Lewis has

15 been with me in this matter for well over a year before that

16 phone call.

17 Q.   He's not still with you, is he?

18      THE COURT:  Ms. Moore, we're going kind of far

19 afield.

20      MS. MOORE:   Okay, your Honor.

21      THE COURT:  Excuse me.  We're going a little bit far

22 afield.  Not a little, perhaps a little bit more than a little

23 far afield here with respect to what this proceeding is about,

24 as I understood it when the initial order to show cause was

25 presented to me.  So, why don't we just stick with that.

66

Oberlander-direct/Moore

1      There are inferences which the Court can draw with

2  respect to what is specifically in the complaint and whether

3  Mr. Oberlander was aware of what it is he alleged in the

4  complaint.

5      MS. MOORE:   Yes, your Honor.

6      THE COURT:   That complaint specifically refers to

7  documents which were sealed.  Whether Mr. Oberlander

8  understood or didn't understand what that means or whether

9  that was his words or his client's words may be something for

10 me to deal with.

11     MS. MOORE:   Understood, your Honor.

12 Q.   Mr. Oberlander, Judge Buchwald did issue an order on May

13 13th ordering there be no further dissemination of the

14 complaint or the exhibits attached thereto.

15     Do you recall that order?

16 A.   I do.

17 Q.   And then the following day she issued another order, is

18 that correct, ordering that the entire complaint be placed

19 under seal and that it be redacted in a fashion to remove all

20 references to the sealed and confidential documents; is that

21 correct?

22 A.   No.  Not by my recollection, no.  That's distorted.

23 Q.   Why don't we take a look at that order.

24     MS. MOORE:   Exhibit 4, your Honor.

25 A.   If you're referring to sua sponte order of approximately

67

Oberlander-direct/Moore

1   three o'clock that Friday, I --

2          THE COURT:  Exhibit what?

3          MS. MOORE:   Four, your Honor.

4          THE COURT:  Four?

5          MS. MOORE:   Yes, Judge.

6          MR. LERNER:   May I have a copy?

7          MR. SNIDER:   Of course.

8   Q.   Directing your attention to the second page.

9   A.   I understand.  I misunderstood your original question.

10  If I can correct my answer or you can rephrase?  I understand

11  what happened here.

12  Q.   Did you understand that Judge Buchwald on the 14th

13  ordered the entire complaint to be sealed and that it be

14  redacted to remove any references to the sealed documents and

15  the documents themselves?

16  A.   To be precise, she ordered the original complaint sealed,

17  it says pending further order of the Court and a redacted

18  version.  My misunderstanding of your prior question was that

19  I assumed originally it would refer to redacted version.  I

20  was confused.  Yes, we are in agreement that's what she

21  ordered except that her sealing order is pending further

22  instruction.

23  Q.   There was another order from Judge Glasser on May 18th

24  that also enjoined you from disseminating the sealed and

25  confidential materials and the information therein; is that

68

Oberlander-direct/Moore

1  correct?

2  A.   I don't recall exactly what it said.  It was not served

3  on me personally, but I assume that's correct in sum and

4  substance.  You don't have to show it to me.  I will stipulate

5  to that.

6  Q.   Despite that, Mr. Oberlander, you intended to file

7  redacted versions of that complaint that in fact referenced

8  the information in those sealed documents; is that correct?

9  A.   I what?

10  Q.   You intended to file redacted versions of that complaint

11  that did reference the information that was in those sealed

12  materials; is that correct?

13  A.   I'm sorry, that's ridiculous.  You mean did I ever form

14  the intent to file a redacted version?  I formed the intent

15  the moment I received this order because I was told to.   I

16  held that intent all the way through until the time a few days

17  later when Mr. Lewis told me we may have a problem here

18  because this order may wind up in conflict with Judge

19  Glasser's order, so he would write to Judge Buchwald, which I

20  believe occurred that Tuesday or Wednesday following this and

21  he would write to Judge Buchwald and say maybe -- or maybe

22  call her and say maybe you ought to just stop any uploaded or

23  redacted version until Judge Glasser finishes what he's

24  doing.  And my recollection is that Judge Buchwald wrote back

25  and said I don't see why there would be confusion, but I

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1  certainly have no objection to extending my original

2  prohibition against uploading until Judge Glasser is done.   So

3  that to be absolutely clear here from the moment I received

4  notice of this order telling me to upload I had the intent to

5  do so and complying with it all the way through until the time

6  Judge Buchwald said never mind.

7  Q.   Let me back up a second, Mr. Oberlander.   The application

8  that Mr. Lewis actually made to Judge Buchwald stated Brian

9  Herman of Morgan Lewis in an email last night stated that

10  Judge Buchwald's and Judge Glasser's orders are much broader

11  than I understood them to be.   Further, Mr. Herman stated that

12  we will consider any reference to the exhibits or information

13  contained therein in any way to be a violation of the orders

14  and will seek immediate relief.

15       As a consequence, Judge Glasser's order is a change

16  in circumstances, such that complying with this court's order

17  to file a redacted complaint appears to violate a sealed order

18  of Judge Glasser.

19       The response to that, what Judge Buchwald actually

20  wrote was:   While I do not understand how you could have

21  interpreted my earlier orders to permit, quote, any reference

22  to the exhibits or information contained therein, I have no

23  objection to delaying the filing of a redacted complaint until

24  Judge Glasser rules on the sealed documents issue pending

25  before him.

Oberlander-direct/Moore

1    My question, Mr. Oberlander, is prior to receiving

2  that letter from Judge Buchwald, it was in fact still your

3  intention to file a redacted version of the complaint that

4  would still reference the information that was contained in

5  the sealed documents; is that correct?

6  A.    Of course it is not.  That's offensive.  You're asking me

7  if I formed the intent to violate this order.  I did not ever.

8  Q.    Mr. Oberlander, there was a courthouse news article that

9  went out after Judge Buchwald resealed this entire complaint.

10  Did you speak to the reporter who wrote that article?

11  A.    Never.

12    THE COURT:  I think the court reporter would like to

13  rest her fingers for a few minutes.  Why don't we do that.

14    (Recess taken.)

15    THE COURT:  Are we ready to proceed?

16    MS. MOORE:    Yes, your Honor.

17    THE COURT:  Mr. Oberlander.

18    (The witness resumes the stand.)

19    THE COURT:  Ms. Moore.

20    MS. MOORE:    Thank you, your Honor.

21    THE COURT:  Before you proceed, Mr. Oberlander, my

22  law clerk advises in the first place we have no rule in the

23  Eastern District which resembles 21F, we have no Rule 21.

24    THE WITNESS:  It is not a local rule, it is an ECF

25  rule.

71

Oberlander-direct/Moore

1          THE COURT:  I thought I heard you say the Southern

2     and Eastern District Rule 21F.  If I misheard, I would

3     apologize to you.

4          THE WITNESS:  Not necessary.

5          THE COURT:  But we have pulled down "Electronic Case

6     Filing Rules and Instructions" --

7          THE WITNESS:  It should be in there.

8          THE COURT:  -- "of the United States District

9     Court for the Southern District of New York."  There is

10    no Rule 21F.

11         THE WITNESS:  I have the number wrong.

12         THE COURT:  Just bear with me.

13         There is a rule, it is 21.4.  Certain sensitive

14    personal information should not be included, such as social

15    security number, names of minor children, dates of birth,

16    financial account numbers, home addresses.

17         Question:  Is there other sensitive information that

18    I should consider redacting?  The answer is yes.  Caution

19    should be exercised when filing documents that contain the

20    following:  And among the list is information regarding an

21    individual's cooperation with the government.  It doesn't

22    refer to cooperation agreement.  Information regarding an

23    individual's cooperation with the government.

24         There is no 21F and this is the only reference in

25    this document which is "Electronic Case Filing Rules and

M. BRYMER, RPR, OCR

72

Oberlander-direct/Moore

1  Instructions of the Southern District," August 1st, 2008

2  edition and apparently we have no comparable rules here.  But

3  it is information regarding an individual's cooperation with

4  the government, not restricted to a cooperation agreement.

5       Why don't you proceed, Ms. Moore.

6  BY MS. MOORE:

7  Q.   Mr. Oberlander, let me show you as a housekeeping matter

8  the version of the complaint that you offered, that you filed

9  in Southern District.

10      THE COURT:  I'm sharing this with Mr. Lerner.  He'll

11  share it with you, when he's finished.  Mr. Lerner, do you

12  want to look at this?  Do you have a copy of it?

13      MR. LERNER:   I will look at it after Ms. Moore looks

14  at it.

15      THE COURT:  It is 21.4, if it is the same document.

16      Go ahead, Ms. Moore.

17  Q.   Mr. Oberlander, I show you Exhibit 11, which is the

18  version of the complaint.

19      THE COURT:  I think the microphone has been turned

20  off.

21  Q.   I've handed you what is the version of the complaint that

22  was actually filed in the Southern District.  That's the

23  version that you signed; is that correct?

24  A.   If this is that version, I signed it.

25  Q.   Why don't you take a look, Mr. Oberlander.

Oberlander-direct/Moore

1  A.   Yes.  It has my signature page on it.  It is illegible.

2  I certainly signed whatever I handed in.  If this is in, yes.

3  Q.   Did you personally type this document?

4  A.   I mean enter it on a computer.  Did I type it?

5  Q.   Yes.  Every word?  Including the words relating to the

6  documents that were sealed?

7  A.   You're asking me did I have anyone else other than me

8  physically at the keyboard?

9        MR. LERNER:   Objection, it has been asked and

10 answered.

11        THE COURT:  Sustained.

12 Q.   Mr. Oberlander, as you sit here today, what is your

13 current understanding of whether or not you can or should use

14 the proffer agreements, cooperation agreement, presentence

15 report, criminal complaint, information or any other documents

16 that relate to the criminal case against my client in the

17 Eastern District of New York?

18        MR. LERNER:   Objection, your Honor.  It is outside

19 the scope of the order to show cause.  It is also irrelevant.

20        MS. MOORE:   Your Honor, I believe it is directly

21 relevant to what relief the Court should grant going forward

22 and what the order needs to say for Mr. Oberlander to

23 understand that he should not be using these documents or the

24 information contained therein.

25        MR. LERNER:   The only relief that is --

74

Oberlander-direct/Moore

1     THE COURT:  I believe, Mr. Lerner, that it is very,

2  very pertinent for the Court to know whether or not when

3  Mr. Oberlander filed this complaint in view of his testimony

4  that he was familiar with the ECF filing cautionary

5  instructions, that the question is appropriate and I will

6  permit him to answer it.

7     Do you want the question rephrased or reread,

8  Mr. Oberlander?

9     THE WITNESS:  If I ask what I'm confused -- may I

10  ask --

11     THE COURT:  Why don't we have Ms. Moore put the

12  question to you again.

13  Q.  Mr. Oberlander, as you sit there today, do you believe

14  that you in any way used the proffer agreements, cooperation

15  agreement, presentence report, complaint, information or draft

16  information or any other documents that were filed in

17  connection with the criminal case against my client in the

18  Eastern District of New York in any way, shape or form?

19     MR. LERNER:  Your Honor, I would just like to

20  clarify this, that there's presently an order to show cause

21  that bars him from doing just that.  So, if the question

22  presupposes there's no such order, I think that question can

23  be answered.

24     THE COURT:  I'm going to sustain an objection to

25  form.  It is not "did you."  At the time the complaint was

M. BRYMER, RPR, OCR

75

Oberlander-direct/Moore

1  filed.

2  Q.   Did you understand at the time the complaint was filed

3  that you should not have used the proffer agreements, the

4  cooperation agreement, the presentence report, the criminal

5  complaint that is referenced in the complaint, did you

6  understand that you should not have used those documents in

7  connection with drafting and filing that complaint?

8  A.   Of course I wouldn't have understood that because that

9  isn't the law.  There is no proscription the way you said

10 there is.  You're asking me if I understood that I was legally

11 prohibited from doing what I did.  Of course I did not.  The

12 reason I did not is to the best of my understanding in no way,

13 manner, shape or form were there any court orders of any kind

14 with jurisdiction over me prohibiting it at the time I filed

15 the complaint.

16 Q.   At this time, as you now know that the entire criminal

17 matter is under seal, which includes the court appearances,

18 and the documents filed in connection therewith, what is your

19 understanding as to whether or not you have a legal right or

20 ability to use any of those documents or the information in

21 those documents in any way?

22 A.   My understanding -- assuming that the order to show cause

23 with the encapsulated temporary restraining order reevaporated

24 tomorrow and no other orders were issued that I'm aware of,

25 that I'm not aware of now and my understanding of my legal

Oberlander-direct/Moore

1   right to, quote, use it, unquote -- first, for clarification,

2   may I presume by use you mean use the information, not just

3   the actual physical documents, is that what you meant by the

4   term use?

5   Q.    Yes.

6   A.    All right.  My understanding of my legal right would be

7   that I have the same right to speak or disseminate them

8   subject to any validly issued, served court order telling me

9   not to, and that I would have the right to object to such a

10  court order which, of course, I would respect to the extreme,

11  that there is no order in existence of any kind under Rule 65B

12  or any constitutional standard of due process, Fourteenth

13  Amendment, that restricts me from using them, the information

14  in it, and that there is no court order with which I could

15  have possibly been charged with -- it is coming out -- let me

16  rephrase that.

17          There are no court orders nor were there nor are

18  there now other than the temporary restraining order that

19  prohibits me from using the information I obtained.  That's my

20  legal right.  Otherwise, with respect to the information in

21  the PSR, I stand by what I just said, but it would be my

22  intention now to request formal permission to unseal certain

23  other documents which I presume are there and I would prefer

24  to use them.

25          So, if that's complex, I apologize, but my

Oberlander-direct/Moore

1  understanding is that there is no nor has there ever been any

2  court order with any in personam effect over me regarding any

3  of those documents.

4  Q.   Mr. Oberlander, you understand now, certainly, that there

5  is a court order that places this entire case under seal, do

6  you not?

7  A.   I understand that that court order doesn't run in rem.

8  There is no such thing.  That has been the law in this Circuit

9  for almost 70 years.  Supreme Court upheld that court orders

10 and such things don't run in rem, they run in personam and

11 constitutionally cannot apply or restrain activities of

12 persons who are not either parties of that action or legally

13 identifiable.  That's Rule 65D, as well as the First

14 Amendment.

15      So, to the extent that I presume the Court certainly

16 did order the files sealed, that order and its in personam

17 effect does not touch me.  It certainly would touch me if I

18 obtained them from the court improperly and aided and abetted

19 a court order in breaking a seal, but none of that happened.

20 Q.   Doesn't the order apply to the documents themselves?

21 A.   Of course not.  There is no in rem court order.  They are

22 in personam court orders.  I can give you cases to that effect

23 in the 2d Circuit.

24 Q.   What is it going to take in the form of an order for you

25 to understand that you cannot use the documents you obtained

M. BRYMER, RPR, OCR

78

Oberlander-direct/Moore

1   on March 3rd from Josh Bernstein --

2         MR. LERNER:   Objection.

3   Q.   -- or the information in them?

4         THE COURT:   The objection is sustained.

5         Ms. Moore.

6         MS. MOORE:   One more question, your Honor.

7   Q.   Mr. Oberlander, is it your position with respect to

8   whether or not you can or can't use documents ordered under

9   seal the same regardless of whether or not they were stolen?

10  A.   Are you asking me for a hypothetical legal opinion in my

11  capacity as an attorney on what the law would be?  My answer

12  would be that to the extent that the person receiving them

13  either, A, did not know that they were stolen; B, had no

14  reason to know; or, C, according to the latest Supreme Court

15  ruling actually did know, but was merely a passive recipient

16  of those documents.  There is a First Amendment and they may

17  be used certainly if they contain information in the public

18  interest.  And my understanding of such information pertains

19  to matters of criminal trials.  Is that the absolute foremost

20  heightened respected First Amendment right of access to

21  documents in criminal charges is to documents containing plea

22  agreements and sentencing arrangements.

23        MS. MOORE:   Your Honor, I have no further

24  questions.  I do have an application.  Mr. Oberlander

25  referenced a written motion he made to Judge Wood attempting

M. BRYMER, RPR, OCR

79

Oberlander-direct/Moore

1   to seal the SDNY complaint and I would like a copy of that

2   written application.

3        I also question whether or not the email of March 3rd

4   that forwarded those -- the documents was in fact

5   attorney-client privilege.  I would ask that it perhaps be

6   provided to the Court in camera for inspection as to what that

7   sentence says and whether or not that is relevant to these

8   proceedings.

9        THE WITNESS:  I have no problem.

10        THE COURT:  All right.

11        MR. LERNER:   No objection.

12        THE COURT:  So ordered.

13        MR. LERNER:   May we forward the motion -- we'll

14   discuss the logistics of the in camera inspection after.

15        THE COURT:  Do you want to inquire, Mr. Lerner?

16        MR. LERNER:   Yes, your Honor.

17        MR. LERNER:   May I approach?

18        THE COURT:  Please.

19   CROSS-EXAMINATION

20   BY MR. LERNER:

21   Q.   Mr. Oberlander, these are the documents that were

22   attached to the email we have been discussing, the March 3rd

23   email.

24        MS. MOORE:   Can I have a copy, please?

25        THE WITNESS:  You can have these.  I've seen them

80

Oberlander-cross/Lerner

1   enough now.  At least for purposes of what's going on here, be

2   my guest.

3   Q.   Mr. Oberlander, could you recite for the court reporter

4   what's in the materials?

5          THE COURT:  Can we mark these for identification as

6   Defendant's A.

7          MR. LERNER:   Correct, yes, your Honor.

8          THE COURT:  I don't know how many documents there

9   are.

10         THE WITNESS:  There are three.

11         THE COURT:  I'm sorry.

12         THE WITNESS:  Three, your Honor.

13         THE COURT:  Including the cover page of the email.

14         THE WITNESS:  No, no, these are just documents.

15         THE COURT:  Three documents that will be marked

16   collectively as Defendant's Exhibit A.

17         Go ahead, please, proceed.

18   Q.   Mr. Oberlander, these documents, they include the

19   document labeled proffer agreement, cooperation agreement, and

20   what we have been referring to as the PSR or presentence

21   investigation report.  I would like to hand you first the

22   proffer agreement and ask you simply whether there's anything

23   on that document that indicates that it is subject to a

24   sealing order of any sort?

25   A.   There is not.

81

Oberlander-cross/Lerner

1  Q.   I would like to hand to you the document that is labeled

2  cooperation agreement and pose to you the same question.   Is

3  there anything that indicates on that that it is subject to a

4  sealing order of any sort?

5  A.   May I just clarify that attached to this is what

6  Ms. Moore considers a separate document which is a DOJ

7  statement.   These three documents are what Mr. Bernstein gave

8  me as he gave them to me.   So, to me these will always be

9  three.   To her these are four.   So, I should interpret your

10 question as to referring to both parts of this?

11 Q.   Yes, please.

12 A.   There is not, no.

13 Q.   And just for clarification, Mr. Oberlander, these are the

14 documents that Mr. Bernstein handed to you rather than emailed

15 to you?

16 A.   These are the documents he emailed to me that are

17 identical to the ones he handed to me.   The ones he handed to

18 me I have in Montauk and was not able to go back, but I

19 compared them before and they're identical.

20 Q.   I will hand you what we call PSR, presentence

21 investigation report, and ask you if there's anything in it

22 that indicates that it is subject to a sealing order?

23 A.   No.

24 Q.   I would like you to look at page two and ask you to read

25 the language of that that has been -- that Ms. Moore quoted

82

Oberlander-cross/Lerner

1  previously and read it in full, please.

2  A.    Read it all?

3  Q.    Into the record, yeah.

4  A.    "Restrictions on use and disclosure of presentence

5  investigation report."   That's bold faced.   "Disclosure of

6  this presentence investigation report to the Federal Bureau of

7  Prison and re-disclosure by the Bureau of Prisons is

8  authorized by the United States District Court solely to

9  assist administering the offender's prison sentence, i.e.,

10  classification, designation, programming, sentence

11  calculation, previous planning, escape apprehension, prison

12  disturbance, response, sentence, commutation or pardon and

13  other limited purposes, including deprivation proceedings and

14  federal investigations directly related to terrorist

15  activities.   If the presentence report is re-disclosed by the

16  Bureau of Prisons upon completion of its sentence

17  administration function the report must be returned to the

18  Bureau of Prisons or destroyed.

19        It is policy of the Federal Judiciary and the

20  Department of Justice that further re-disclosure of the

21  presentence investigation report is prohibited without the

22  consent of the sentencing judge.

23  Q.   Now, Mr. Oberlander, you did not receive this document

24  from the Bureau of Prison, did you?

25  A.   No.

M. BRYMER, RPR, OCR

Oberlander-cross/Lerner

1    MS. MOORE:   No further questions.

2    THE COURT:   Anything further?

3  REDIRECT EXAMINATION

4  BY MS. MOORE:

5  Q.   Mr. Oberlander, you just testified that the documents you

6  obtained in person on March 3rd were identical to the ones --

7  that you got by email March 3rd were identical to the ones on

8  March 1st?

9  A.   To the extent if comparing them casually would show

10  that.  I will not testify some letter didn't change somewhere,

11  but they appear to be in the --

12  Q.   My only question is I believe I understood your testimony

13  to be the March 3rd email also included a sealed criminal

14  complaint and a draft or final information; is that correct?

15  A.   No, because I never stipulated the criminal complaint was

16  sealed.  Only the New York Times seems to believe that.

17  Q.   You never believe anything you've read in the New York

18  Times, right?

19  A.   Well, I believe there is a Santa Claus, but that's the

20  Herald, isn't it?

21  Q.   It is.

22  A.   No, The Sun.  New York Sun.

23  Q.   My question, Mr. Oberlander, is I'm trying to get the

24  universe of documents that are in fact under seal in the

25  Eastern District that are in your possession.

84

Oberlander-redirect/Moore

1        Do you have a complaint captioned "United States
2    versus Klopsman (ph.) and Doe" in your possession?
3    A.   I have a complaint.  I don't stipulate it is sealed.  I
4    certainly have it.
5    Q.   Do you have an information, either final or draft form?
6    A.   Same answer, same comment.
7    Q.   Do you have any other documents that relate to a criminal
8    case that is filed in the Eastern District?
9    A.   Define what you mean by related.  Do you mean documents
10   the same time that might possibly be under seal as opposed to
11   an article in the Daily News?
12   Q.   Yes.
13   A.   Not to my knowledge, no.
14        MS. MOORE:   Your Honor, I ask the Court's temporary
15   retraining order be extended to include the documents we
16   previously didn't know Mr. Oberlander also had but which are
17   in fact also under seal.
18        THE WITNESS:  No problem.
19        MR. LERNER:   We have no objection to continuing the
20   TRO.
21        THE COURT:  So ordered.  I'll entertain an
22   application to enjoin permanently.  TROs are good for ten days
23   unless extended for another ten days.  It would seem to me an
24   application you might wish to be made is to enjoin the
25   dissemination of those documents permanently.

Oberlander-redirect/Moore

1          MR. LERNER:   We'll object to that, your Honor.  We

2    prefer to do it on papers.

3          THE COURT:   I conducted a hearing with respect to

4    those papers that have been filed under seal and I'm prepared

5    to entertain an application with respect to that.  The TROs

6    are good for only ten days, as a general rule.  Of course,

7    they could be extended continually.

8          MR. LERNER:   May I consult with my client?

9          THE COURT:   By all means.

10         (Pause in proceedings.)

11         MR. LERNER:   Yes, we object to a permanent

12   injunction with respect to these documents.  The evidence has

13   shown that Mr. Oberlander came into possession of the

14   documents lawfully.  It is unrebutted.  There is no showing he

15   secured them from theft.  He did not obtain them from the

16   court, he obtained them from Mr. Bernstein.  That's

17   unrebutted.

18         He stands in the same position as a newspaper may

19   receive confidential or privileged documents, similar

20   documents such as these.  He is entitled to the same First

21   Amendment protection as, for example, the New York Times or

22   the Washington Post in the reported cases involving such

23   issues.

24         I refer the Court to Washington Post against

25   Honorable Debra Robinson, 935 F. 2d 282, wherein it was held

M. BRYMER, RPR, OCR

86

1    that the Washington Post which had come into possession of,

2    quote, unquote, sealed documents and came into them without

3    obtaining them unlawfully from the Court could use them as it

4    sees fit.

5          We object more specifically particularly to the

6    sealing of the cooperation agreement and the proffer

7    agreement.  There's nothing on the documents themselves to

8    indicate that they were under seal.  I refer the Court to

9    Alamite (ph.), where the 2d Circuit held an order which is

10   global, globally enjoins parties is of no force and effect.

11         So, your Honor, subject -- we have stated our

12   objections.  We rely on the argument set forth in our letter

13   of May 14th -- I'm sorry, June 14th.  There's no order that

14   was binding upon Mr. Oberlander.  To the extent it may be read

15   to be binding on the world, it is of no force and effect.

16         MS. MOORE:  We obviously disagree.  Whatever

17   Mr. Oberlander may have known or understood on May 10th, at

18   this point it couldn't be clearer that these documents are

19   under seal pursuant to court order.  The Court went out of its

20   way to impress upon the respondents the seriousness of the

21   case.

22         At every stage of this proceeding they have continued

23   to assert their right to use the information and the sealed

24   documents despite now knowing in no uncertain terms that all

25   of this has been sealed and they used the attorney-client

1    privilege with respect to Mr. Bernstein as a shield and a

2    sword.  They initially said they couldn't contact him because

3    they misunderstood the court's order.  He said it was

4    attorney-client privilege.  Then they're saying Mr. Arnold

5    Bernstein represents him.

6          When we called Arnold Bernstein he said I don't

7    represent him, good luck to you finding him.  When asked

8    whether or not Mr. Oberlander understood or believed they

9    could have been stolen, he asserted work product privilege.

10   These documents were stolen from my client and they have

11   no right to be using them, especially knowing they were

12   sealed.

13         We think a permanent order enjoining them from using

14   documents and the information they improperly obtained by

15   getting those documents from Josh Bernstein is entirely

16   appropriate under these circumstances.

17         MR. LERNER:   Mr. Doe has not testified these

18   documents were stolen and the implication that they were

19   stolen is just about foundation.  I object to the

20   characterization.

21         THE COURT:  Let me clarify some things.  There is no

22   evidence other than the fact that Mr. Oberlander received

23   these documents from Mr. Bernstein.  Mr. Bernstein, according

24   to Mr. Oberlander, represented to him he got documents because

25   Mr. Doe gave them to him.  I haven't heard any evidence one

88

1   way or the other with respect to that information.

2          With respect to the presentence report, I am issuing

3   a permanent injunction that the information contained in that

4   presentence report is not to be disseminated.  It is not a

5   question as to whether Mr. Oberlander knew or didn't know

6   whether they were or weren't stolen.

7          Charmer Industries, in this Circuit, makes it

8   painfully clear that presentence reports are not to be

9   distributed or disseminated or disclosed to third parties.  To

10  the extent Mr. Oberlander has possession of the presentence

11  report, I'm enjoining Mr. Oberlander from disseminating any

12  information contained in that presentence report.  The order

13  with respect to presentence reports is not directed to any

14  individual, it is directed to the presentence report itself.

15  It is that document which from the point of view of the

16  integrity of the criminal proceeding, the veracity of the

17  information contained in presentence reports, the willingness

18  of persons to freely provide information which finds its way

19  into presentence reports and all the other reasons given by

20  the 2d Circuit in Charmer Industries which make it vital that

21  presentence reports remain in the file in terms of public

22  disclosure which is what I'm basing my injunction on.

23          With respect to the cooperation agreement and the

24  proffer agreement, there is no authority which I'm aware of

25  similar to Charmer Industries with respect to cooperation

M. BRYMER, RPR, OCR

89

1  agreements and presentence reports, although by implication a

2  presentence report contains an awful lot of information which

3  is gleaned from a cooperation agreement.

4       There's another significant consideration:  To the

5  extent that Mr. Oberlander knew, and he obviously knew what

6  sealing the document entails and what its implications are,

7  having made an application to have a document sealed in the

8  Southern District of New York, and in addition to which there

9  was reference made to what appears to be a nonexistent Rule

10  21F, but what he was referring to quite clearly is that

11  caution should be exercised when filing documents that contain

12  information regarding an individual's cooperation with the

13  government which would clearly include a cooperation agreement

14  and would clearly include a proffer agreement.

15       It is not an order, but it is an advice to

16  attorneys.  It may be that if Mr. Oberlander continues, given

17  the information he has with respect to the significance of a

18  cooperation agreement and a proffer agreement and any other

19  information pertaining to the defendant's cooperation with the

20  government and continues to ignore the advice to use caution

21  and not disseminate it, it may be some appropriate proceeding

22  with the grievance committee or some other such proceeding

23  might not be inappropriate.

24       I'm not enjoining it, but I am making it very plain

25  that to the extent that a lawyer knows that the documents in

90

1    his possession came from a file which was sealed and knows

2    that the information contained in those documents is

3    information which might place the life of another at risk and

4    knows that there is a Southern District notice regarding

5    privacy and public access and advising him to exercise caution

6    in disseminating information relating to a person's

7    cooperation with the government, to the extent he will choose

8    to ignore that caution and proceed to expand on what he

9    believes is his First Amendment or Fourteenth Amendment right,

10   it is a matter which he may wish to have tested in some other

11   forum administratively or otherwise.

12          To the extent that I haven't been asked yet, this was

13   a suggestion I made that an application to that extent may

14   wish to be made but it hadn't been I don't think -- maybe it

15   has been with respect to cooperation agreements and other

16   documents.

17          I am issuing an order with respect to that

18   presentence report and I'm relying on Charmer Industries with

19   respect to that.

20          Insofar as the cooperation agreement and the rest of

21   it is concerned, I think I've made my position perfectly

22   plain.

23          MS. MOORE:   Your Honor, a number of other documents

24   in Mr. Oberlander's and possibly his client's possession are

25   in fact under seal and I will put my client on the witness

91

1  stand and say they were stolen, but -- and under the

2  circumstances I would ask the Court to reconsider having those

3  documents returned to the Court or the U.S. Attorney's Office

4  so they can be made use of.

5  　　　　　THE COURT:  Mr. Lerner, do you want to be heard on

6  that?

7  　　　　　MR. LERNER:   Well, I have no objection to Mr. Doe

8  taking the stand.

9  　　　　　THE COURT:  I'm not referring to Mr. Doe taking the

10 stand.  The question was an application to the Court to direct

11 that those documents be returned to the United States

12 Attorney's Office and to the Court to the extent that those

13 documents were obtained from a file which was marked under

14 seal and they were sealed documents which were not to be

15 disclosed absent a court order disclosing them.

16 　　　　　MR. LERNER:   They were obtained lawfully from

17 Mr. Bernstein, therefore, we object.

18 　　　　　MS. MOORE:   Your Honor, Mr. Bernstein did not obtain

19 them lawfully from my client.

20 　　　　　THE COURT:  Excuse me, Ms. Moore.  Stop the back and

21 forth colloquy.

22 　　　　　With respect to that I'll reserve.  I will entertain

23 a memorandum with respect to that and I will give both parties

24 an opportunity to do that.

25 　　　　　With respect to the presentence report I have

M. BRYMER, RPR, OCR

92

1   absolutely no hesitation in enjoining any further

2   dissemination and I'll direct the presentence report to be

3   returned.   To the extent that you have that in your

4   possession, return it immediately --

5               THE WITNESS:  Absolutely.

6               THE COURT:  -- to the United States Attorney's

7   Office.

8               With respect to the cooperation agreement, proffer

9   agreement and any other document which you know was obtained

10  from a file which was marked under seal, I will entertain a

11  memorandum with respect to that and I'll reserve.

12              Are we finished?  Why don't you have Mr. Doe

13  testify.  I think that issue is very, very much at the core of

14  this proceeding.

15              In view of the fact it is five after one, why don't

16  we recess for lunch and resume at two o'clock.

17              Two o'clock.

18              (Lunch recess.)

19

20

21

22

23

24

25

M. BRYMER, RPR, OCR

93

1                A F T E R N O O N   S E S S I O N.

2           THE COURT:  Is everybody present?

3           MR. LERNER:   Your Honor, with the Court's permission

4   Mr. Oberlander has a correction to make in his testimony and

5   would he be permitted to correct something?

6           THE COURT:  By all means.

7           THE WITNESS:  Thank you.

8           THE COURT:  What would you like to correct,

9   Mr. Oberlander?

10          THE WITNESS:  I don't recall the phrasing of the

11  exact question, but Ms. Moore asked me what were the grounds

12  that I put in my motion to seal when I went in front of Judge

13  Wood and I believe she asked me on one or two occasions did I

14  include in my motion notice that there were documents that she

15  says are sealed.  We all understand what she means.  And the

16  answer I gave was that no, I didn't, or I don't recall, and

17  that's correct, but it is incomplete, because I refreshed my

18  memory and what actually happened when I went to Judge Wood's

19  chambers was that her law clerk first read everything and then

20  he came out and asked me to show him the complaint and I

21  generally did.  Then he took the petition in.  Judge Wood came

22  back awhile later and said she wants to see the complaint and

23  I picked it up and showed it to him and I said would you

24  please make sure and tell Judge Wood this is a RICO case and

25  that there are allegations of extreme criminal behavior here

94

1   and that there are documents in here relating to plea

2   agreements.  I don't remember the exact phrase I used, but it

3   wasn't in the moving papers, but it was the equivalent of an

4   oral statement as to the law clerk.  I didn't want to mislead

5   the Court.

6        My complete answer is the written moving papers did

7   not include to my recollection that -- one of the bases for

8   the request to seal was that there was a proffer or a

9   cooperation agreement or PSR, but it was my oral request that

10  the clerk convey to her such similar documents were there and

11  she should take that into her determination.  That was it.

12  That's the only correction.

13        THE COURT:  Did you want to inquire on that,

14  Ms. Moore?

15        MS. MOORE:   No, your Honor.

16        THE COURT:  Are you ready?  Are you calling Mr. Doe?

17        MS. MOORE:  I am, your Honor.

18  J O H N   D O E ,      called as the witness herein, having

19  been first duly sworn/affirmed, testified as follows:

20        THE CLERK:  Would you please state and spell your

21  name for the record.

22        THE WITNESS:   John Doe, J-o-h-n D-o-e.

23        THE COURT:  Sir, be seated.  Go ahead, Ms. Moore.

24  DIRECT EXAMINATION

25  BY MS. MOORE:

95

Doe-direct/Moore

1   Q.   Mr. Doe, did you ever keep any documents in your office

2   that were part of a sealed file at Eastern District of New

3   York, a criminal case captioned 98-CR-1101?

4   A.   Yes, I did.

5   Q.   And did you keep them in a file?

6   A.   Yes, I did.

7   Q.   Was that file marked in any way?

8   A.   Yes, it was.

9   Q.   How was it marked?

10  A.   Personal and confidential.

11  Q.   Where did you keep that file in your office?

12  A.   Bottom left-hand drawer of my desk.

13  Q.   Did you keep it locked?

14  A.   Most of the time, yes.

15  Q.   Were there ever times it was not locked?

16  A.   Yes, there were.

17  Q.   Like when?

18  A.   During the day, if I had to go to the restroom or if I

19  ran to a meeting in the next office or if I stepped out for

20  lunch.   I locked my desk when I went home at night, but

21  sometimes during the day it would be unlocked.

22  Q.   Did that file contain documents along the lines of

23  proffer agreements, cooperation agreement, presentence report

24  information, criminal complaint?

25  A.   Yes, it did.   I did not remember how many of the items

M. BRYMER, RPR, OCR

Doe-direct/Moore

1   you just mentioned were in there.  It is possible all of them.

2   Q.   Way did you keep that file in your office?

3   A.   I was constantly speaking to my attorneys about my case

4   and I needed to have readily available files regarding that

5   case.

6   Q.   Did you also keep that file at your home?

7   A.   No, I did not.

8   Q.   Why not?

9   A.   I didn't want my family to see it.

10  Q.   Do you have children, Mr. Doe?

11  A.   Yes, I do.  I have three children.

12  Q.   Mr. Doe, who is Josh Bernstein?

13  A.   Josh Bernstein was an analyst who worked at Bayrock for

14  awhile.  I don't remember the exact dates of employment.

15  Q.   Was he fired?

16  A.   Yes, he was.

17  Q.   Why?

18  A.   He kept taking time off and kept submitting personal

19  expenses as business related expenses and eventually the

20  decision was made to terminate him.

21  Q.   Did you ever give Mr. Bernstein the file you just

22  described marked personal and confidential or any of the

23  documents in it that related to the criminal case

24  98-CR-1101?

25  A.   Absolutely not.

97

Doe-direct/Moore

1  Q.   Is there any reason you would have given Mr. Bernstein,

2  an analyst at Bayrock, those documents?

3  A.   Absolutely not.

4  Q.   Did you consider those documents to be highly sensitive

5  and personal?

6  A.   Highly sensitive, personal and dangerous to myself and my

7  family.

8        MS. MOORE:   No further questions, your Honor.

9        THE COURT:   Mr. Lerner, do you wish to inquire?

10       MR. LERNER:   With the Court's permission,

11  Mr. Stamoulis is going to question the witness.

12       THE COURT:   Sure.

13  CROSS-EXAMINATION

14  BY MR. STAMOULIS:

15  Q.   Good afternoon, Mr. Doe.   My name is Stam Stamoulis.

16  I'm counsel to Jody Kriss and Michael Ejekam.

17       Do you know who Michael Ejekam is?

18  A.   Yes, I do.

19  Q.   What do you understand to be his relationship with

20  Bayrock?

21  A.   He's a friend of Jody's from college and he was sourcing

22  -- looking for deals to introduce to Bayrock.

23       THE COURT:   Mr. Stamoulis, just to avoid any

24  objections which are going to be made, confine yourself to the

25  direct, okay.   The only issue on direct examination is whether

M. BRYMER, RPR, OCR

Doe-cross/Stamoulis

1  or not Mr. Doe had given consent to anybody specifically.

2        MR. STAMOULIS:   Yes, your Honor.  I would like to

3  inquire of the witness whether my two clients were ever given

4  the file.

5        THE COURT:  Okay.  I anticipated, I saw Ms. Moore

6  about to get up and, so, I was anticipating what might be

7  unnecessary colloquy.

8  Q.   In your involvement with Mr. Ejekam, whatever that may

9  be, at Bayrock, did you ever have occasion to give him any

10 aspect of that file that you described as being kept in your

11 desk draw?

12 A.   No.

13 Q.   In your involvement with Mr. Kriss while at Bayrock, did

14 you ever have occasion to give Mr. Kriss any aspect of that

15 file that was kept in your desk drawer?

16 A.   No.

17 Q.   Did Mr. Ejekam or Mr. Kriss give you any reason to

18 believe that they personally acquired the contents of that

19 file at any time?

20 A.   No.

21 Q.   Did you ever inquire -- let me take a step back.

22        You said that Mr. Bernstein was an analyst?

23 A.   I believe that was his official title.

24 Q.   What did his job responsibilities entail?

25 A.   Generally, to do the financial modeling when we would

Doe-cross/Stamoulis

1  look for a deal.  He would do the financial modeling on

2  certain things, he would do some follow-up phone calls,

3  follow-up letters, things of that nature.  It was a real

4  estate development shop and basically assistance to myself

5  or Jody Kriss or any of the other people employed at Bay

6  Rock.

7  Q.    Did any aspect of his responsibilities ever relate to

8  maintenance of data of Bayrock files?

9  A.    He was probably the most technologically advanced of the

10  group, so from time to time I'm sure I've asked and I'm sure

11  members of the firm had asked him to do something to do with

12  their Blackberries or something to do with emails or

13  computers, yes.

14  Q.    Do you remember the nature of any of those somethings

15  that you asked Mr. Bernstein to deal with with regard to

16  data?

17  A.    I was deposed in a case where Mr. Bernstein is currently

18  suing Bayrock in White Plains and that same question was asked

19  of me and I believe we're speaking of the hard drive.  If you

20  could clarify?  I may have asked him other things from time to

21  time.  If you'll refresh as to that?

22  Q.    I'm not there yet.  But, generally speaking, what was the

23  nature of the -- the specific nature of the projects that

24  Mr. Bernstein would be requested to do with regard to data at

25  Bayrock?

M. BRYMER, RPR, OCR

Doe-cross/Stamoulis

1  A.   In regard to a specific request I made of him we have a

2  server where all the emails and everybody's correspondence and

3  things of that -- files are stored.  Files are stored, things

4  of that nature, and I asked Josh Bernstein to buy a large

5  backup hard drive to make a backup of our files in case of a

6  crash, in case of a systems crash, so we could have a copy of

7  our files.

8  Q.   Did you ask Mr. Bernstein to keep that hard drive at his

9  home?

10  A.   Absolutely not.  In fact, I -- when Mr. Bernstein was

11  being asked to leave, I specifically remember myself and

12  Julius Schwartz asking him to return files and what later

13  came to be known is that there was a hard drive he never

14  returned.

15  Q.   Do you recall Mr. Bernstein purchasing that hard drive

16  out of his own personal funds?

17  A.   I don't remember the details.  I doubt Mr. Bernstein paid

18  for his own -- with his own funds.  He may have paid for it

19  and got reimbursed.  I'm sure he didn't pay for it from his

20  own funds without reimbursement.  Mr. Bernstein would like

21  reimbursement for everything, including water.

22  Q.   Do you know whether indeed he was reimbursed for

23  purchasing the external hard drive?

24            MS. MOORE:   Objection.

25            THE COURT:  You can answer.

M. BRYMER, RPR, OCR

101

Doe-cross/Stamoulis

1  A.   I'm not sure.  I don't remember.

2  Q.   These documents you maintained in your desk?

3  A.   Yes.

4  Q.   Did you ever have an electronic version of those

5  documents in your possession at any time?

6  A.   I may have had an electronic version of those documents.

7  My previous attorney in my case lived in Florida and it is

8  possible he emailed me or I emailed him those documents with

9  the caveat that obviously any communication between me and him

10  was always marked privileged and confidential.  It was between

11  me and my attorney and had nothing to do with Bayrock or any

12  type of real estate related deals.

13  Q.   Is it possible those electronic versions of the documents

14  made it onto the email server you asked Mr. Bernstein to copy

15  though this hard drive?

16  A.   Possible.

17  Q.   It is your sworn testimony that you did not ask

18  Mr. Bernstein to keep personal possession of that hard drive

19  and maintain it at his home for safekeeping?

20  A.   I don't believe I ever asked him to keep it at his home

21  for safekeeping.  I remember asking him to make a hard drive

22  backup and give it to me, if anything, not to keep for

23  himself.

24        MR. STAMOULIS:   I have no further questions, your

25  Honor.

M. BRYMER, RPR, OCR

Doe-cross/Lerner

1      THE COURT:  Thank you.  Mr. Lerner.

2   CROSS-EXAMINATION

3   BY MR. LERNER:

4   Q.   Mr. Doe, you have no reason to believe that Mr. Bernstein

5   told Mr. Oberlander that he stole documents from you, do you?

6   A.   I'm sorry, I don't understand the question.

7   Q.   Do you have any reason to believe Mr. Bernstein told

8   Mr. Oberlander that those documents were stolen?

9   A.   I don't know what he said to Mr. Oberlander.

10  Q.   Now --

11  A.   I'm sorry, no, I actually disagree with that.  I was

12  shown the transcript of -- Mr. Bernstein's transcript from

13  when he was deposed and he actually stated there, and

14  Mr. Oberlander was his attorney there or was sitting in on all

15  of his depositions where Mr. Bernstein said that he took

16  thousands of documents and brought them home.  Documents, not

17  emails or servers.  Physical documents he claimed he took and

18  brought home with him and kept there.

19       Mr. Oberlander should have easily understood he

20  wasn't asked to use his apartment as an off-site storage

21  facility for Bayrock.  Yes, he should have understood they

22  were stolen by Mr. Bernstein.

23  Q.   Aren't there emails from you to Mr. Bernstein discussing

24  him holding onto the documents at your request?

25  A.   I don't remember.  I don't remember having those emails

Doe-cross/Lerner

1  back and forth with Mr. Bernstein.

2  Q.   You would be surprised if there were such emails from

3  you?

4  A.   Depending on what they said.  I've asked Josh Bernstein

5  to make a backup.  I've asked Josh Bernstein.  There were many

6  times he held various documents in his possession and his

7  office.  He was an analyst.  I have never asked him to hold

8  personal documents of mine in his possession and I would be

9  extremely surprised if there was any emails or correspondence

10  between me and Mr. Bernstein asking him to hold my personal

11  privileged court documents.  Yes, I would be very surprised.

12  Q.   You said Mr. Bernstein is an analyst.  Wasn't his job

13  description to be a techie, somebody whose responsibility it

14  was to maintain backups?

15  A.   He did a bunch of tech related stuff around the office

16  from time to time.  He was the most technically capable.

17  Q.   At your direction?

18  A.   Either mine, his own or somebody else's direction.

19  Q.   Among the tasks that you directed him to undertake was

20  backing up emails and hard drives; isn't that correct?

21  A.   I asked him to buy a large hard drive and back up our

22  server which had a whole bunch of files on them, including

23  emails, yes.

24  Q.   You asked him to keep that backup drive at his home;

25  isn't that correct?

Doe-cross/Lerner

1  A.    I don't remember asking him to keep it at his home.

2  I remember when he was leaving I asked him to return

3  everything.

4  Q.    If you asked him, you understood he didn't have it on the

5  premises; isn't that correct?

6  A.    I didn't know what he has.  He had an office.  He had

7  things in his office and I don't know where he kept most of

8  those things.

9  Q.    You don't know if he had a backup hard drive in his

10  office versus at his home?

11  A.    No, I didn't.  He may have had it at his home or in the

12  office.  I don't remember which specifically.  I remember

13  Julius Schwartz specifically asking him to return everything

14  that was work related.  That was when he was terminated.

15  Q.    Can you describe for us your office?  How is it locked?

16  Is it a corner office?  If someone were to go into that office

17  during the daytime, would that person be seen by others?

18  A.    Not necessarily.  It was -- if the door was closed you

19  wouldn't know who was inside.

20  Q.    Does it have windows, external windows --

21  A.    No.

22  Q.    -- so one side could be seen from a secretarial station?

23  A.    No.  Door and wall.

24  Q.    So, you testified that you kept your office locked at

25  night.

M. BRYMER, RPR, OCR

Doe-cross/Lerner

1   A.   I kept my desk, not my office, because cleaning staff

2   would come onto the premises after we were all done.

3   Q.   So, if the documents were stolen, they were stolen during

4   the daytime; is that your testimony?

5   A.   I wouldn't know when they were stolen, if they were

6   stolen.   I know I didn't hand it to him in any way, shape or

7   form.

8   Q.   It could have been on an email server; isn't that

9   correct?

10   A.   It is possible, but I'm not 100 percent sure.

11   Q.   He was directed by you to keep backups of emails; isn't

12   that correct?

13   A.   He was directed to make a backup for me, not keep them.

14   Q.   It was not within his job description for which he was

15   hired to keep backups; isn't that correct?

16   A.   I'm sorry.  No, it was actually in his job description to

17   assist and help the members of Bayrock and the requests they

18   made of him which may have been whatever request they were

19   making of him.  In fact, many of the things he was creating

20   were in electronic form, so there may have been a time when he

21   was asked to do something in a tech capacity, yes.

22   Q.   You just referred to yourself as a member of Bayrock?

23   A.   I referred to myself -- yes, I was.

24          MS. MOORE:   Objection, your Honor.

25          THE COURT:   Overruled.

Doe-cross/Lerner

1  Q.   Please clarify, were you an owner of Bayrock?

2  A.   No.

3  Q.   What did you understand yourself to be when you referred

4  to yourself as a member of Bayrock?

5  A.   A member is one of the people who was at the firm.

6  Q.   Were you a partner?

7  A.   I was a partner in deals, yes.

8  Q.   What was the purpose of putting your personal emails on

9  the email of Bayrock; why did you do that?

10  A.   I don't believe I did, but in the course of sending and

11  receiving hundreds of emails that most people do in a week, is

12  it possible something may have made it in of a personal

13  nature?  Of course it is possible.  Was it my habit to use

14  Bayrock as my personal email?  No, it wasn't, but it is

15  possible it made it in there.

16        Again, I don't know the specifics.  I don't

17  understand the specifics that you're asking about, but, yes,

18  it is possible.

19  Q.   Do you know how to use a scanner?

20  A.   Yes, I do.

21  Q.   When you said you had these documents and referring to

22  the purportedly sealed and confidential documents --

23  A.   I didn't say they were sealed and confidential.  I said

24  the folder was marked personal and confidential.

25  Q.   Did you scan them in yourself or have someone else scan

Doe-cross/Lerner

1  them in?

2  A.    What do you mean?

3  Q.    You said you have them in electronic form?

4  A.    I didn't say -- I said may.  You said did you have them

5  in electronic form, or Mr. Stamoulis asked.  I said they may

6  have been.  My attorney was in Florida at the time and we may

7  have been communicating electrically.  It is possible.  I will

8  tell you I did not scan them in nor did I have anyone scan

9  them in.  If there was an electronic and written form, it

10  would have been from me printing them from an electronic form

11  but never scanning them into a scanner.

12  Q.    Why didn't you keep them in a locked safe?

13  A.    I did not have a safe.  I had a desk that was locked and

14  I believed that my desk was my desk and had personal things in

15  that desk.  I had pictures of my children which I believe

16  belong to me.  I kept my desk locked as often as possible, so

17  I didn't realize I had the need of a safe, especially in a

18  small office where pretty much everybody was very friendly.

19  It wasn't a large corporation with hundreds of people running

20  around.  I didn't think there was a need for a safe.

21        MR. LERNER:    Thank you.  No further questions.

22  REDIRECT EXAMINATION

23  BY MS. MOORE:

24  Q.    Mr. Doe, earlier today during the proceeding Mr. Lerner

25  represented in court that you had spoken to Mr. Bernstein and

Doe-direct/Moore

1  Mr. Bernstein had told him that these documents were part of

2  several disks that you had given him.

3      Did you ever give Mr. Josh Bernstein several disks

4  that contained these documents?

5  A.   I have never given Josh Bernstein disks, written

6  documents, electronic forms or anything to do with my case,

7  anything to do with the personal nature of my life, especially

8  things that I was afraid of, especially items and paperwork

9  which I believed to be very, very dangerous to my life and the

10  life of my children, my wife and my family.

11      Mr. Bernstein was one of amongst a few people working

12  at the firm and clearly he would be second-to-last person in

13  my life who I would give copies of documents like that to.

14      MS. MOORE:   No further questions.

15      THE COURT:  Anything further?

16      (No response.)

17      THE COURT:  Thank you.  You're excused.

18      Ms. Moore, do you have anything further?

19      MS. MOORE:   Your Honor, I believe respondent Jody

20  Kriss is here.  I would like to inquire of him if he's given

21  the documents to anyone else or knows anyone else may have

22  them.

23      MR. STAMOULIS:   No objection, your Honor.

24      THE COURT:  Ms. Moore, it is your case.

25  J O D Y     K R I S S        ,          called as the witness

1    herein, having been first duly sworn/affirmed, testified as

2    follows:

3         THE CLERK:   Would you please state and spell your

4    name for the record.

5         THE WITNESS:   Jody Kriss, K-r-i-s-s.

6         THE COURT:   Is that J-o-d-y?

7         THE WITNESS:   Yes.

8    DIRECT EXAMINATION

9    BY MS. MOORE:

10   Q.   Mr. Kriss, you've heard us referring to a number of

11   documents, including proffer agreements, a cooperation

12   agreement and a presentence report that were attached to a

13   version of a complaint that was emailed to your father on May

14   12th.

15        Are you familiar with this document?

16   A.   Yes.

17   Q.   When did you first see those documents?

18   A.   In connection with Mr. Oberlander sent them to me prior

19   to verifying the complaint.

20   Q.   Was that roughly early May or --

21   A.   Sounds right.

22   Q.   Have you provided those documents to anyone else?

23   A.   No.

24   Q.   Are you aware of anyone else who is in possession of

25   those documents beyond the individuals that Mr. Oberlander

Kriss-direct/Moore                                110

1  mentioned earlier today?

2  A.   I don't think so.

3  Q.   Earlier Mr. Oberlander testified that the statement in

4  the complaint that those documents were sealed was your

5  statement, not his.  You didn't draft that complaint I

6  realize, but you did verify it.

7       Did you know at the time the complaint was filed that

8  those documents were sealed?

9  A.   No.

10  Q.   Why did you verify a complaint that said they were sealed

11  if you had not in fact known that they were?

12       MR. STAMOULIS:   Objection, your Honor.

13       THE COURT:  Overruled.

14  A.   Same answer Mr. Oberlander gave.  I read about it, heard

15  about it, but didn't -- never saw anything that said that they

16  were.

17       THE COURT:  Speak into the microphone, please.

18  A.   Same answer Mr. Oberlander gave that I heard about it,

19  read about it, but hadn't personally seen anything to say they

20  were.

21  Q.   So, you had no personal knowledge they were sealed, but

22  you believed they were sealed?

23  A.   I think so.

24       MS. MOORE:   No further questions, your Honor.

25       MR. STAMOULIS:   No follow-up, your Honor.

M. BRYMER, RPR, OCR

111

1       THE COURT:  Mr. Lerner?

2       MR. LERNER:   No questions, your Honor.

3       THE COURT:  You're excused.  Thank you.

4       Anything further?

5       MS. MOORE:   Your Honor, I have been working with

6  Mr. Stamoulis on obtaining an affidavit from his client who's

7  in Africa.   I believe once I have the sworn affidavit that

8  states his other client never saw the version of the

9  complaint, never saw the attachments and never possessed them

10  and is not able to disseminate them any further and did not

11  know they were sealed, I believe there will be no further need

12  for his client's testimony.

13       His client is in Africa.   I'm waiting to get the

14  affidavit which I believe is on its way from Africa.

15       MR. STAMOULIS:   We sent it yesterday.  It is the sum

16  and substance.  He will sign it.  It is just a matter of

17  logistically getting it back.

18       MS. MOORE:   Your Honor, my only other application is

19  I would ask the TRO remain in place until we can file some

20  post-hearing briefs.

21       I would also ask the TRO be extended to two other

22  documents that are under seal in this District, the criminal

23  complaint Mr. Oberlander testified he obtained and what I

24  believe is a draft copy of an information that was also in

25  Mr. Doe's personal files.

M. BRYMER, RPR, OCR

112

1    I would further ask that my client's name, John Doe,

2  or any reference to him as John or Doe be replaced with John

3  Doe in this transcript and we would like an opportunity,

4  obviously, to brief our further application for an order

5  directing the return of all the documents that were taken from

6  Mr. Doe's personal files and an injunction preventing further

7  use and dissemination of the documents and the information

8  contained therein.

9    MR. LERNER:   We have no objection to continuance of

10  the TRO.   I think the Court already ruled on the PSR, so now

11  we're just discussing the cooperation agreement and proffer

12  agreement which are the subject of this order to show cause.

13  Subject to further briefing we will -- and the other documents

14  referred to by Ms. Moore, we would address these in further

15  briefing.   Of course, pending on the determination of the

16  Court, we'll not disseminate these documents in any way.

17    I would also like an opportunity -- your Honor, I

18  referred to in questioning Mr. Doe, I referred to some

19  emails.   I would like an opportunity to supplement these

20  briefings with emails that are referred to.   I don't have them

21  on hand, but I would ask for the opportunity to just submit

22  them to the Court.

23    MS. MOORE:   No objection to that, your Honor.   And

24  one other thing, your Honor --

25    THE COURT:   Excuse me.   These are emails from Mr. Doe

M. BRYMER, RPR, OCR

113

1 to Mr. Bernstein.

2      MS. MOORE: Your Honor, to the extent that we're

3 asking the TRO be extended to the two other documents in the

4 complaint and the information, we've had trouble serving

5 Mr. Josh Bernstein. We would ask to the extent respondents

6 have access to him, they let him know the order has been

7 extended to those documents as well.

8      MR. LERNER: I have access to Mr. Arnold Bernstein

9 via email. I think I also have access -- I think the email

10 that Mr. Arnold Bernstein sent to me may have John Bernstein

11 CC'ed. That's how I could contact him.

12      If the Court wishes to enter an order directing he be

13 served or that I disclose the email address, I'll do that.

14      THE COURT: By all means.

15      Anything further?

16      MS. MOORE: No.

17      THE COURT: Does anybody want to be heard further

18 with respect to what has transpired here this morning and part

19 of the afternoon?

20      MS. MOORE: I do have one further inquiry. As the

21 Court knows, there was a cross motion to be able to obtain the

22 affidavit of Mr. Bernstein. I'm assuming no such affidavit is

23 going to be forthcoming and there will be no evidence from

24 Mr. Bernstein.

25      MR. LERNER: As I indicated, I spoke with

114

1   Mr. Bernstein on the telephone.  I communicated by Arnold

2   Bernstein and was told by Arnold Bernstein that Joshua

3   Bernstein isn't going to cooperate and he's represented by

4   counsel.  I assumed that meant he was represented by Arnold

5   Bernstein.  If I was mistaken in that regard, that would just

6   be cleared up I suppose when I give over Mr. Josh Bernstein's

7   email address to Ms. Moore.

8              THE COURT:  Anything else?

9              MS. MOORE:  No, your Honor.

10             THE COURT:  Just so we're clear as to what I would

11  like to have some post-hearing briefs submitted on, I've ruled

12  with respect to the presentence report.  With respect to the

13  other documents which were part of a file that was marked

14  sealed that was pursuant to a court order, the first question

15  is whether that order is on its face clear to the extent that

16  it says -- I'm sorry, I don't have the sealing envelope in

17  front of me -- maybe I do.  Document placed in a sealed

18  envelope which provides it is ordered sealed and placed in the

19  Clerk's office may not be unsealed unless ordered by the

20  Court.  Whether that order is an order which is clear enough

21  on its face with respect to documents which are sealed would

22  be enough to inform anybody coming into possession of such a

23  document that it is what it purports to be, namely, a sealed

24  document conveying with a very clear message that it is not to

25  be for public or general disclosure.

M. BRYMER, RPR, OCR

1     To the extent there's some question as to whether it

2 is an in rem or in personam order, I think the law is pretty

3 clear that an order of the Court, assuming one is aware of the

4 fact or should be aware of the fact that an order of the Court

5 has been issued, I believe there's authority for the

6 proposition that orders of the Court are to be obeyed and are

7 disobeyed at one's risk.  I think that is the essence of civil

8 disobedience which needs no further elaboration.  That's a

9 matter for post-hearing briefing.

10     Also, the extent to which the Court does have some

11 authority to enjoin the dissemination of documents such as

12 cooperation agreements, proffer agreements is the language of

13 that Southern District informational cite that says caution

14 should be exercised, not a sufficient basis upon which one may

15 enjoin for information regarding a person's cooperation with

16 the government, and the purpose of not disseminating or

17 exercising caution need not be elaborated on.

18     If you want a briefing schedule, I will be happy to

19 provide one.  Give me an indication as to how much time you

20 think you need.

21          MS. MOORE:   One week, your Honor.

22          THE COURT:  Mr. Lerner.

23          MR. LERNER:   We'll need additional time.  Can we

24 have two weeks to respond?

25          MS. MOORE:   Will there be simultaneous briefs, your

116

1   Honor?

2          THE COURT:  No.  I prefer you can submit your brief,

3   Mr. Lerner will be given an opportunity to reply.  I will give

4   him one week to respond.  I don't think there will be anything

5   to reply to.

6          Mr. Stamoulis, I don't think that you have a dog in

7   this fight.

8          MR. STAMOULIS:   Happily not, your Honor.

9          THE COURT:  All right.

10         MS. MOORE:   Your Honor, if we could just receive the

11  additional email you intended to submit to the Court so we

12  have it.

13         MR. LERNER:   Sure.

14         THE COURT:  All right.  I suppose a collateral

15  question --

16         MR. LERNER:   My client wishes to know whether these

17  proceedings today are sealed?

18         MS. MOORE:   Your Honor, all I ask is the name be

19  redacted to change to John Doe.

20         THE COURT:  Ms. Brymer, wherever the name of John or

21  Doe appears substitute John Doe for John Doe.

22         MS. MOORE:   Your Honor, given the history, I would

23  also ask everyone present in the courtroom be directed that

24  they not advise anyone the John Doe referenced in the document

25  is my client.

1          MR. LERNER:   That's fine.

2          THE COURT:  Ms. Moore, there is I think an extent

3   even to which the broad enormous powers of Federal Courts do

4   not extend and I think the limit to which you're requesting

5   that power be extended is beyond the borders of Federal Court

6   power, which is quite enormous, but if exercised carelessly

7   can be quite inappropriate.  I'm not directing the court or

8   the world at large with respect to this proceeding, John Doe

9   or everybody here.

10          It seems to me that in addition to purely legal

11   issues there are issues of professional responsibility which

12   are quite significant.  There may be some DR, disciplinary

13   rule, with respect to the obligation of attorneys regarding

14   the use of documents which are marked sealed, whatever they

15   may be.  Whether that would provide a basis for injunctive

16   relief or not I don't know.  It is a matter which may be

17   explored.  I suppose if one thinks imaginably one may think of

18   a lot of reasons why an order may or may not be issued

19   providing for injunctive or other relief.  With respect to the

20   last request you made it is denied.

21          Anything further?

22          (No response.)

23          THE COURT:  I'll see you -- or if you want oral

24   argument -- I guess you do.  So, one week for a briefing from

25   you, Ms. Moore, one week thereafter from you, and why don't we

118

1   set it down for further oral argument a week thereafter.

2   Whatever those dates are.

3           Can you give me some dates?  Today is the 21st.  So,

4   the 28th from you.  Seven days thereafter, what day is that?

5           THE CLERK:  The 5th, which is a holiday.

6           THE COURT:  6th of July, that's going to spoil

7   somebody's Fourth of July weekend.  We can extend it another

8   day or two.  Give me a number.

9           MR. LERNER:   July 9th, Friday.

10          THE COURT:  You've gotten the two weeks you asked me

11  for.

12          Do you want another week, Ms. Moore?

13          MS. MOORE:   No.

14          THE COURT:  Give me a date for oral argument.  28th

15  of June for Ms. Moore, July 9th for Mr. Lerner and give me an

16  oral argument date.  What day of the week is July 9th?

17          THE CLERK:  Friday.

18          THE COURT:  Why don't we put it down for oral

19  argument the following Friday, which would be the 16th of

20  July.  Okay.

21          Am I interfering with somebody's vacation?  July

22  16th.  Okay.  We're finished today.  Thank you very much.

23          MR. LERNER:   Your Honor, would it be possible to

24  make the oral argument on the Tuesday of the following week,

25  which would be the 20th?

119

1    THE COURT:   Is that date all right?

2    MS. MOORE:   Fine, your Honor.

3    THE CLERK:   10:30.

4    MR. LERNER:   10:30, your Honor.   Thank you.

5    (Proceedings concluded.)

120

1                              I N D E X

2               F R E D E R I C K   M.   O B E R L A N D E R

3    DIRECT EXAMINATION

4    BY MS. MOORE:  ..........................................  3

5    Plaintiff's 1.............................................  6

6    Plaintiff's 2............................................. 46

7    CROSS-EXAMINATION

8    BY MR. LERNER:  ......................................... 79

9    Defendant's A............................................ 80

10   REDIRECT EXAMINATION

11   BY MS. MOORE:............................................ 83

12   REDIRECT EXAMINATION

13   BY MS. MOORE:........................................... 83

14                         J O H N   D O E

15   DIRECT EXAMINATION

16   BY MS. MOORE:  .......................................... 94

17   CROSS-EXAMINATION

18   BY MR. STAMOULIS:  ...................................... 97

19   CROSS-EXAMINATION

20   BY MR. LERNER:  ........................................ 102

21   REDIRECT EXAMINATION

22   BY MS. MOORE:  ......................................... 107

23                      J O D Y   K R I S S

24   DIRECT EXAMINATION

25   BY MS. MOORE:  ......................................... 109

# EXHIBIT H

1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - X
3                              :

4

5   IN RE:  JOHN DOE,
                                    CV 98-1101
6

7                              :
                                    United States Courthouse
8
                                    Brooklyn, New York,
9

10               :
                                    July 20, 2010
11  - - - - - - - - - - - - - X   10:30 o'clock a.m.

12                    TRANSCRIPT OF ORAL ARGUMENT
                 BEFORE THE HONORABLE I. LEO GLASSER
13                  UNITED STATES DISTRICT JUDGE

14  APPEARANCES:

15  For the Plaintiff:        MORGAN LEWIS & BOCKIUS, LLP
                              101 Park Avenue
16                            New York, N. Y.
                              BY:  KELLY MOORE, ESQ.
17                            LESLIE R. CALDWELL, ESQ.
                              DAVID A. SNIDER, ESQ.
18                            BRIAN A. HERMAN, ESQ.

19  For the Defendant:        WILSON ELSER MOSKOWITZ EDELMAN
                              & DICKER, LLP
20                            150 East 42nd Street
                              New York, N. Y. 10017
21                            BY:  RICHARD LERNER, ESQ.
                              LAUREN J. ROCKLIN, ESQ.
22
    Court Reporter:           Henry R. Shapiro
23                            225 Cadman Plaza East
                              Brooklyn, New York
24                            718-613-2509

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

HENRY SHAPIRO          OFFICIAL COURT REPORTER

2

1

2          THE CLERK:  Criminal cause for oral arguments, '98

3    CR 1101, United States versus John Doe.

4          State your names for the record

5          MS. MOORE:  Kelly Moore, Leslie Caldwell, Brian

6    Herman and David Snider for John Doe

7          MS. LERNER:  Richard Lerner of Wilson, Elser,

8    Moskowitz, Edelman & Dicker for respondent Frederick M.

9    Oberlander

10          MS. MOORE:  Your Honor, with respect to the relief

11    we seek, we rely on our brief, the arguments contained

12    therein and the authority contained therein.

13          Specifically Judge Jones' decision in the Visa case

14    and Judge Weinstein's decision in the Zyprexa case.

15          If anything, the facts of this case are more

16    compelling than those cases.  Visa and Zyprexa involved

17    sealed documents in civil litigation, which involved possible

18    commercial or economic harm to a business entity.

19          This case, as the Court is aware, involves potential

20    physical harm or death to an individual. With respect to the

21    First Amendment arguments, at the last court appearance the

22    Court did not ask us to specifically address that in our

23    briefs. We would like the opportunity to supplement our brief

24    with more detailed First Amendment analysis if that is okay

25    with the Court.

HENRY SHAPIRO        OFFICIAL COURT REPORTER

3

1          In the meantime, I would just note that the first

2     amendment is not absolute.  The facts of this case in no way

3     support the conduct of the respondent and the respondent's

4     First Amendment protection.  The respondents are not the

5     media, they are not a news gathering organization seeking to

6     write articles and publish them

7          Mr. Oberlander is an attorney.  As such, he has

8     additional ethical obligations to not disseminate or use

9     information that is secret, private and confidential, that

10    comes into his possession.

11         Moreover, in this case, the documents at issue were

12    clearly stolen and Mr. Oberlander, who represented the thief,

13    knew that they were stolen.

14         As the agent of a thief, receiving those stolen

15    documents, he doesn't deserve any greater protection-- First

16    Amendment protection-- than the thief himself would.

17         Additionally, the respondent knew that some of the

18    documents were sealed, as is clearly evident from paragraph

19    95 of the complaint in the Southern District.

20         As an attorney, once again, Mr. Oberlander knew what

21    that meant. He knew that documents don't seal themselves,

22    they are sealed only pursuant to court order.  And there are

23    also unsealed only pursuant to court order.

24         He was also aware of the Southern District

25    electronic filing rules, which compelled him to exercise

4

1   caution and care with respect to disseminating information

2   about cooperators.  That rule applies to all cooperators,

3   even those who testify publicly.  In this case the

4   cooperation and the cooperation agreement were sealed.  Mr.

5   Oberlander certainly should have exercised greater care.

6           The intended use of it in this case doesn't support

7   compelling First Amendment interest. I don't know if the

8   Court had the opportunity to review the Southern District

9   Civil RICO complaint. But the information about my client's

10  criminal case in no way supports any claims contained in that

11  case, and it's clearly being used to harass, embarrass,

12  intimidate and coerce my client.

13          Finally, as I mentioned before, this case unlike any

14  of the cases cited by the respondents involving potential

15  danger to human life.  Under the facts of this case the First

16  Amendment simply possess no bar to the imposition of the

17  relief we're seeking.

18          With respect to Mr. Oberlander's declaration filed

19  last Friday, I would note that the respondents throughout

20  this proceeding have engaged in a number of dubious

21  litigation tactics, that are arranged in an intentional

22  misinterpretation of the Court's order, without seeking

23  clarification along the lines of claiming that they didn't

24  know.  He contacted Mr. Bernstein for an affidavit that said

25  they didn't know the lawyers could review the documents in

 1   question in connection with representing the clients.

 2          And a previous meritless allegation of misconduct

 3   against me.  It was withdrawn, but nevertheless made and it

 4   was intended clearly to get me to do something that would

 5   have been unethical, to put my own interests ahead of my

 6   client's by accepting a settlement that wouldn't have been

 7   favorable to my client, just to get the unpleasant

 8   allegations against myself withdrawn.

 9          The declaration of Mr. Oberlander, in which he

10   accuses this Court of unconstitutional conduct and makes

11   application for recusal, is clearly in the same vain of that

12   litigation at that particular time.  It is clearly intended

13   to get the Court to do one of two things:  To either recuse

14   itself on the basis of a completely meritless application or

15   in the alternatively to get the Court to pull its punches, to

16   bend over backwards, to demonstrate a lack of bias, to issue

17   a ruling that would be favorable to the respondents than if

18   they had not made such a meritless unsupported application.

19          Those litigation tactics should be seen for what

20   they are and respondents and litigants engaging in them

21   should not be rewarded.

22          I thought long and hard about responding to some of

23   the other allegations and arguments contained in this

24   Oberlander declaration, the allegation that this Court has no

25   decency, that somehow it is beyond the authority of a federal

6

1   judge, upon application of United States Attorney's office,

2   to seal documents or files when doing so is in the interest

3   of protecting human life or national security, or that

4   somehow has a greater First Amendment right to put a man's

5   life in danger by publishing stolen and sealed confidential

6   documents then if he walked into a crowded theatre and

7   shouted fire.

8          In rereading Mr. Oberlander's declaration, however,

9   I was reminded of a comment that a former colleague of mine

10  used to make from time to time, which is that there really is

11  no percentage in arguing with crazy people, and so upon the

12  advise of another wise man I once got, I think, I will let

13  discretion be the greater part of valor and not dignify that

14  declaration or the rants contained therein with a response.

15         If the Court has no additional questions for us, we

16  will rest on our papers, but we would like to supplement them

17  with an additional First amendment analysis.

18         THE COURT:  I will come back to you.

19         Let me hear from Mr. Lerner.

20         MS. LERNER:  Your Honor has now had an opportunity

21  to read the case law --

22         THE COURT:  Before we get to that, I am not

23  altogether clear as to what Mr. Oberlander's notice of appeal

24  is all about. I do not quite understand what is it.

25         MS. LERNER:  It's a protective notice of appeal.  He

HENRY SHAPIRO        OFFICIAL COURT REPORTER

7

1    reserve his right to argue.  There is yet to be a formal

2    permanent injunction or that a TRO -- there is possibly a gap

3    period where it could be argued that the TRO lapsed and

4    became a permanent injunction.  It's merely protective.

5           THE COURT:  What does that mean, a protective notice

6    of appeal?

7           MS. LERNER:  If the TRO could be deemed converted to

8    a permanent injunction, we will appeal from that.

9           THE COURT:  Is not that kind of premature?  Is there

10   anything that prevents him from filing a notice of appeal

11   when that event occurs?

12          MS. LERNER:  If a permanent injunction is issued we

13   shall file a further notice of appeal.

14          THE COURT:  What's the purpose of a protective

15   notice of appeal?  Is that to preserve some limitation

16   period?

17          MS. LERNER:  Frankly, your Honor, the case law --

18          THE COURT:  To be perfectly candid --

19          MS. LERNER:  Candidly the TRO itself is appealable

20   because it restrains Mr. Oberlander's free speech rights.

21          THE COURT:  Then he could file a notice of appeal

22   with respect to what he believes is an order, which is

23   properly appealable.

24          MS. LERNER:  Yes.

25          THE COURT:  I don't understand what a protective

8

1    notice of appeal is.  I'm frank to say, I have never

2    encountered it before.

3         It may be that my knowledge of this process is a

4    little wanting, but I do not understand what it is.

5         MS. LERNER:  First of all, on June 21st your Honor

6    stated that there was a permanent injunction vis-a-vis the

7    PSR and ordered it returned. That is appealable.  The notice

8    of appeal refers to that.

9         But since your Honor stated further evidence would

10   be taken after it was stated that it's our position it could

11   fairly be argued that the Court did not actually render a

12   final determination as to that document.  If it did --

13        THE COURT:  The reason I am asking, Mr. Lerner, is

14   that it is very clearly established law that it may be that a

15   filing of a notice of appeal deprives this Court of

16   jurisdiction with respect to continuing in a matter.

17        I do not know whether a notice of appeal, if filed,

18   would have that effect here with respect to injunctive

19   relief.  I think that is something that is questionable.

20        But, in any event, it was that issue which caused me

21   to wonder what is this document about, is it in some way

22   affecting my continuing exercise of jurisdiction in this

23   matter?

24        MS. LERNER:  As we stated in the notice of appeal

25   itself, we reserve all of our rights.

9

1          THE COURT:  Neither here nor there.

2          Go ahead.

3          MS. LERNER:  Your Honor has read the case law, I

4    presume, that was cited in our papers and would perhaps now

5    agree that the arguments that we have been making are not

6    specious, which is the word that your Honor used at the first

7    hearing.  Perhaps your Honor having now read Bartnicki will

8    agree that the analogy to a misdirected check is inapt.

9          In Bartnicki the Court stated quite clearly that

10   while the interceptor of the phone call maybe guilty of a

11   crime, it by know means follows from that that punishing

12   disclosures lawfully obtained and in the public interest by

13   one not involved in the initial illegality is an acceptable

14   means of serving those ends.

15         You cannot punish someone who merely receives

16   allegedly stolen information.  It would be quite remarkable

17   if the United States Supreme Court continued to hold speech

18   by a law-abiding possessor of information can be suppressed

19   in order to deter conduct of a non-law-abiding third-party,

20   thus if Mr. Bernstein broke the law, you cannot punish

21   Mr. Oberlander for that.

22         Mr. Oberlander has independent free speak rights.

23   Your Honor, sealing the court file, I submit, was

24   unconstitutional in this case, because there is no signed

25   court order.

10

1      Hartford says there must be a court order. If your

2 Honor did sign an order, there is nothing in the docket

3 sheet, as far as we can tell, to indicate that prior notice

4 appearing was given prior to the sealing of the court file.

5      We have not had an opportunity to see that docket

6 sheet, therefore, we cannot note whether this case was

7 properly sealed.  If notice was given --

8      THE COURT:  Excuse me.

9      If you went to the docket you would find that this

10 case is under seal, correct?

11     MS. LERNER:  Yes.

12     THE COURT:  And in order to obtain documents, which

13 are part and parcel of that case, you would have to make an

14 application to a court to unseal that file.  That is what the

15 sealing order says.

16     MS. LERNER:  And if the sealing order was not signed

17 by your Honor and the requisite findings were not made, is

18 unconstitutional, and we have been deprived of the

19 opportunity to see the docket sheet and the United States

20 Supreme Court in Amidao held we cannot presume what is in the

21 docket sheet if we can't see it.  If notice was given, we

22 can't know that because the Court has declined to allow us to

23 see the docket sheet as stated in Hartford. We cannot make

24 any presumption about what it says.  The appellate court can

25 make no presumption and we cannot.  Therefore, we cannot

11

1   presume the documents were properly sealed, your Honor.

2         There was nothing on the record that the sealing --

3         THE COURT:  Excuse me.  Just a minute.  Is there

4   some presumption that an order -- assuming that there is an

5   order and you do not know whether the order was or was not

6   signed -- what you do know by looking at the docket sheet is

7   that this is a sealed file, sealed by order of the court.

8         Is there some presumption that the order is invalid

9   because it was not signed, is that what I'm hearing?

10        MS. LERNER:  I'm referring to the Hartford case--.

11        THE COURT:  Mr. Lerner, I am asking you what I am

12  understanding, is there is a presumption of the invalidity of

13  an order?

14        MS. LERNER:  I think, your Honor stated on the

15  record that this is just matter of factly and indicated as I

16  recall it wasn't even signed, it's docket said is sealed.  If

17  there is a signed order, let us see it, because without a

18  signed order this proceeding is unconstitutional.

19        THE COURT:  It may be, Mr. Lerner, that you are

20  correct.  You are not answering the question.

21        MS. LERNER:  I don't have to make any presumption.

22  The United States Supreme Court has held the appellate courts

23  do not have to presume there is a signed order in the file

24  when there is--.

25        THE COURT:  If there is an order or docket entry

HENRY SHAPIRO        OFFICIAL COURT REPORTER

12

1    that says this has been sealed by order of the court, any

2    person is free to ignore that order and if by some chance,

3    some document in that file becomes available to any person,

4    that person is free to assume that the order has no efficacy?

5              MS. LERNER:  First of all, the docket here is

6    sealed, therefore, Mr. Oberlander could not see any order in

7    the file and the answer to your question is, yes, anybody may

8    do it, whatever he wants with that document.  It is free to

9    be distributed, if it's a public of interest, criminal

10   proceeding are per se of public interest.

11             THE COURT:  It's true that criminal proceeding are a

12   matter of public interest.

13             Doesn't follow that every document that has been

14   created in the course of a criminal proceeding is a matter of

15   public interest available to the public upon request.

16             That is particularly true, as I'm sure you know --

17   Mr. Lerner --

18             MS. LERNER:  I apologize for that interruption.

19             THE COURT:  I understand your passion in connection

20   with this matter.

21             Let us talk one at a time.  Okay.

22             I take it you read Charmer Industries.

23             MS. LERNER:  Yes.

24             THE COURT:  And I take it that having read Charmer

25   Industries, you would agree that a presentence report is a

13

1   document which has some very specific confidentiality

2   concerns.

3         MS. LERNER: Your Honor, of course, I agree with

4   that. But the premise, you have asked whether a document

5   could be used for any purpose -- if it's from a criminal

6   trial -- criminal proceeding even if it's sealed, the

7   question is was it stolen from the court file. Was it stolen

8   or inappropriately unauthorized taken from the Court file as

9   in Charmer?

10         The answer is, the Court can order its return. If

11   it's obtained from other means, your Honor, has no

12   jurisdiction to stop it. You can not issue a prior restraint

13   order.

14         If I may continue?

15         THE COURT: Please.

16         MS. LERNER: There is nothing in the record, that we

17   are aware of, because we cannot see the docket sheet or the

18   sealing order. There is nothing on the order finding a more

19   fundamental interest in the First Amendment would be served

20   by sealing this court file. There is nothing on the record

21   finding this was the least restrictive alternative.

22         Your Honor, granting -- now we turn to the TRO

23   itself, as the Court granted a TRO, which constitutes a prior

24   restraint on speech without conducting any inquiry as to

25   whether the respondent's First Amendment rights would be

1    infringed.

2         Now, your Honor, ordered -- the order itself signed

3    by your Honor incorporates Ms. Moore's arguments and it says

4    for the reasons stated, but that is constitutionally

5    insufficient according to Amadao, you must make independent

6    findings to support a prior restraint.

7         It must be the order itself. The TRO is a nullity.

8    Failing to make the requisite findings in the order to show

9    cause, in as much it constitutes a prior restraint, renders

10   that prior restraint unconstitutional.

11        Your Honor failed to disclose to us on the docket

12   sheet that we requested, we cannot know whether these

13   documents are properly sealed --

14        THE COURT:  Have you made application to the Court?

15        MS. LERNER:  We requested it.

16        THE COURT:  Have you made application to me to

17   unseal whatever document you wanted?  That docket sheet

18   indicated there were, I think, four or five numbered

19   dockets -- docket entries which were sealed which were

20   unsealed and, I think, made available to you.

21        MS. LERNER:  They were not.  They were not.  Having

22   a dual docket sheet, your Honor stated at the second

23   appearance that there were thirteen items on the docket sheet

24   and six were sealed.

25        Your Honor, that is improper.

15

1          THE COURT:  What was improper?

2          MS. LERNER:  Your Honor, you sealed the entire

3    docket, yet you indicated there are thirteen items in the

4    docket, six of which are sealed, which means there are others

5    which are not sealed and yet the entire file has been sealed.

6          Your Honor, if the Court goes beyond the relief

7    sought in the order to show cause there will be a further

8    violation of Mr. Oberlander's constitutional rights for the

9    order to show cause did not seek permanent injunction, did

10   not seek a gag order, there is no basis for such leave.  He

11   cannot be gagged.

12         He returned, your honor, the original document that

13   he obtained from Mr. Bernstein.

14         Now, it may not be so clear in the record that he --

15   those were actually the originals obtained from Mr.

16   Bernstein.  If the Court would like a representation from Mr.

17   Oberlander to that effect, I would ask that he give it. But

18   those were the originals.

19         Your Honor can do nothing to stop the dissemination

20   of photocopies or electronic copies and the selective

21   enforcement or selective gag order directed only at Mr.

22   Oberlander and not, for example, Business Week, which as we

23   noted in our papers, has on its website an article which

24   states that it has a copy of the criminal -- the sealed

25   criminal complaint in this matter.

1        Your Honor, cannot selectively enforce a gag order

2   against Mr. Oberlander.  You cannot gag him and not gag

3   Business Week.

4        If you're going to take on a little guy you have to

5   take on a big guy. He'll not sit here and accept that,

6   neither will I.  We will fight this to the end.  A permanent

7   injunction cannot be granted.

8        Thank you, your Honor.

9        THE COURT:  Do you want to respond?

10       MS. MOORE:  Yes, your Honor.

11       I would note we'd like to sort of supplement our

12   brief with an additional Fifth Amendment analysis.

13       THE COURT:  Your application is granted to file a

14   supplemental brief.

15       There are a number of things, which are troublesome

16   in this case.  Going back to the original order to show

17   cause, that document was troublesome because it just said

18   that there was a significant breach in the processes of this

19   Court with respect to criminal dockets.

20       There was, as I think, indicated on that occasion, I

21   was very concerned about the integrity of the record of this

22   Court and that file.  It turns out that the first document on

23   that docket sheet is a notification by an assistant United

24   States attorney of the filing of an information, which

25   eventually evolved into an indictment.

17

1          There is no indication, that is docket number one,

2     which I obtained or had the clerk obtain from Kansas City or

3     wherever these files are shipped, because it was no longer

4     available in the courthouse.  There is not any indication in

5     that document or in a subsequent document that an application

6     was made or request was made in that document to seal that

7     file.  Nor have I been able to find any order signed by me,

8     which directed that this file be sealed.

9          Criminal cases such as the John Doe case and cases

10    in which by virtue of cooperation agreements and variety of

11    other matters either national interest, security interest, or

12    significant interest that one may have in his own safety,

13    which may be at risk.  Criminal files are sealed where that

14    is a significant consideration.

15          Let us assume for the moment that an order was

16    signed by me somewhere along the line, as it may have been,

17    directing that the file in this case be sealed.  That order

18    is directed to whom?  Who is bound by it?  That order, it

19    would appear, is directed to the clerk of the court who is

20    informed that this document or this file is sealed and is not

21    to be made available, except upon an order of the Court

22    unsealing it.

23          When the order to show cause was first brought into

24    this Court, it was a very serious concern as to whether

25    somebody in this courthouse unsealed that file or made

18

1    document which were sealed available to third parties.  That

2    was a very significant concern.

3          A hearing, which we held some weeks ago, makes it

4    plain and, I think, it is beyond dispute that these documents

5    were not removed by John Doe, he properly had them.  The

6    cooperation agreement was a document which was in the

7    possession of his then attorney.  His attorney had a perfect

8    right, as did John Doe, to have a copy of that cooperation

9    agreement, had a perfect right to have whatever document

10   pertained to his case, which may have been part of the file.

11         Assume that John Doe decided to make the cooperation

12   agreement, the proffer agreement available to a third-party,

13   would an order have been violated?  The answer is clearly,

14   no.  John Doe had these documents, so the testimony has thus

15   far revealed, Mr. Bernstein has not submitted an affidavit

16   nor has he testified.  You cannot find him for the purpose of

17   serving the subpoena.

18         What we have on the record is the testimony by John

19   Doe that he did not give those documents to Mr. Bernstein,

20   which gives rise to the legitimate inference that Mr.

21   Bernstein may have stolen them, may have improperly obtained

22   those documents.

23         What order of the Court was violated by that event?

24   Those documents then came into the hands of Mr. Oberlander.

25   Mr. Oberlander knew that those documents were sealed

19

1  documents, contained very, very serious information and his

2  assertion or testimony that, well, it wasn't his words, it

3  was his client's words, is remarkable for it's disingenuous.

4  To say that I am not a criminal lawyer and I don't know what

5  it meant, I have a sealed document, is preposterous.

6  Particularly, since he had the electronic filing information

7  from the Southern District that said if it's a cooperation

8  agreement, be very, very careful before you use it.

9        Now, what happened, assuming that the documents were

10  in John Doe's cabinet or in his desk, as they had a perfect

11  right to be, they were his documents, and the documents were

12  then wrongfully taken by Mr. Bernstein.  Mr. Bernstein is a

13  converter, Mr. Bernstein has no title to those documents, no

14  legal right to those documents, to that tangible document

15  whether it would be a piece of paper, whether it be a gold

16  ring or whatever it is, it was a tangible item which was

17  converted, given the testimony that I have by Mr.

18  Bernstein --

19        MS. LERNER:  John Doe, I believe.  Bernstein did not

20  testify.

21        THE COURT:  I am saying based on the testimony.  Mr.

22  Bernstein then analogizing these events to the fundamental

23  principle of conversion, or larceny, if you will, past it

24  onto Mr. Oberlander.

25        Mr. Oberlander had no better right to those

20

1   documents than Mr. Bernstein had.  If we were to describe

2   this change of events in terms of property rights, title, Mr.

3   Bernstein had no title and he had no title to give to Mr.

4   Oberlander.

5          Mr. Oberlander even if he were an innocent purchaser

6   for value, would not have acquired title to those documents,

7   because Mr. Bernstein had no title to give him. If requests

8   were made of Mr. Oberlander to return those documents and Mr.

9   Oberlander refused, it may be that an action for conversion

10  may be available against Mr. Oberlander.

11         It may be that there is some disciplinary rule,

12  which might be applicable to Mr. Oberlander, who had

13  documents which he knew or perhaps should have known may have

14  been improperly obtained by Bernstein and passed onto him.

15         It may be that there is some ethical principle,

16  which should have precluded Mr. Oberlander from using those

17  documents.  Because the sensitivity of those documents would

18  have been apparent to any reasonable person, particularly one

19  who is trained in the law ostensibly.

20         So the question is, yes, something bad was done,

21  something very bad and perhaps despicable was done by the use

22  of those documents annexed to a complaint in the Southern

23  District, in a civil case, but the question is what order was

24  violated?

25         You can certainty submit briefs on the First

21

1    Amendment issue.  I have some question about whether the

2    First Amendment is applicable here.  There was an opinion by

3    Judge Kahn in the Western District-- I did not bring my file

4    down. I thought this was on for 11:30.  What is the name of

5    the town -- I will be more than happy to give it to you.

6         LAW CLERK:  It was a Northern district case.

7         THE COURT:  Yes, it was by Judge Kahn, in which he

8    has a very interesting discussion in a case, which is not

9    this, but analogous in the sense that it involved a

10   confidentiality order that was part of a potential settlement

11   stipulation and that the documents in that confidentiality

12   agreement became available or was sought to be made available

13   to a newspaper upstate by the reporter of that newspaper and

14   the First Amendment argument was made in that case as well.

15        Judge Kahn didn't think it was applicable for a

16   variety of reasons.  I think, his reasoning might be quite

17   persuasive when dealing with a presentence report and

18   certainly Charmer, I think, leaves very little doubt that a

19   presentence report has a very, very special status.  So there

20   we are.

21        You want an opportunity to submit the supplemental

22   brief and I will give you that opportunity. I just received

23   Mr. Lerner's document this morning.  It was FAX'D or ECF'd at

24   four something last night. You don't request an adjournment

25   at 4:00 o'clock on the eve of a hearing.  If you look at my

22

1   local rules it require 48 hours notice for purposes of

2   adjourning a schedule hearing or a conference.

3          So I didn't get around to reading it because I left

4   before that document arrived and I looked at it this morning.

5          Ms. Moore called, I think, shortly after that

6   document was received, so my law clerk tells me, and asked

7   for an adjournment to respond to that letter.  I was not able

8   to respond to that because I was not here.  But I did call

9   her this morning and I asked her if she wanted to adjourn.

10  You indicated that you saw no purpose for this conference as

11  well, but she preferred to go ahead and make application for

12  a supplemental brief.

13         What I have just declared is not to be understood at

14  this moment as a determination that injunctive relief may not

15  be appropriate, but I am troubled by the issues as I have

16  outlined them as to whether an order signed by a judge on one

17  of those sealing envelopes, which says, not to be unsealed

18  except by order of the Court, is binding upon any third-party

19  person, is binding or is the procedure, which is intended by

20  that procedure, which informs any third-party who has notice

21  or will have notice by looking at a docket sheet, looking at

22  the ECF, this is a case under seal -- under sealed or filed

23  under seal-- make application to the Court to unseal the

24  document.

25         Whether having knowledge that the case was one,

23

1    which has been filed under seal, whether an order was issued

2    or not, it is a case which is filed under seal, and clearly

3    indicates the content of that sealed file is not to be

4    disclosed, except upon order of the Court, whether that can

5    be ignored, whether that is presumptively meaningless and has

6    no binding effect upon anybody.

7         It is an interesting question, Mr. Lerner.  Judge

8    Kennedy who I think you were quoting with all due respect,

9    may not have faced this specific issue at any given time, but

10   it is obviously an issue which is quite troublesome.  It is

11   quite troublesome in so far as Mr. Oberlander's use of that

12   document, which he knew was sealed, knew contained very

13   sensitive information.  It may be some other relief may be

14   available against Mr. Oberlander.  I am not sure.

15        In so far as injunctions are concerned, there is an

16   interesting observation in Charmer as well, if you read it

17   carefully, Mr. Lerner, and I'm sure that you have.  Normally

18   was is required, and Ms. Moore indicates what is normally

19   required before injunctive relief is obtained-- and by the

20   way in so far as the TRO is concerned-- I do not recall there

21   was any objection ever raised by you to the issuance of the

22   TRO.

23        It is my sense that you were consenting to it at

24   every stage of the TRO as it was initially issued and

25   renewed. We will leave that go for the moment.

24

1          MS. LERNER:  I can respond --

2          THE COURT:  I said, leave that go for the moment.

3    But normally, before a TRO-- injunctive relief, more

4    specifically should be issued, there are three prerequisites.

5    The leading case in this circuit is Jackson Dairy versus H.B.

6    Hood, I think, it is 570 2d or there abouts.  You have to

7    show irreparable alarm, likelihood of irreparable harm,

8    likelihood of success on the merits, or reasonable issues

9    going to the merits with the balance of hardships tipping in

10   favor of the movant.

11         In Charmer, you may recall-- it may be Judge Kearse

12   who said that the burden should not be on the person seeking

13   the injunctive relief, where the presentence report is the

14   document at issue, the burden should be upon the Attorney

15   General, the person who has that presentence report to

16   establish an overriding need for the use or possession of

17   that document.

18         The burden should be on the other side, not on the

19   movant, but the person seeking to be enjoined.

20         Having said all of that I will await further

21   briefing.  I do not think there is anything further that you

22   want to submit, Mr. Lerner.

23         MS. LERNER:  There are two cases I would like to

24   cite and just --

25         THE COURT:  Why don't you submit them to me.

HENRY SHAPIRO        OFFICIAL COURT REPORTER

25

1          MS. LERNER:  I don't have copies for --

2          THE COURT:  When I say submit them, submit the

3     citations to them.

4          MR. LERNER:  DiPietro against the United States of

5     America.

6          THE COURT:  I'm sorry --

7          MS. LERNER:  D I P I E T R O.

8          It is a Lexus cite, 2009, U.S. District --

9          THE COURT:  What are the names of the parties?

10         MS. LERNER:  DiPietro against the United States of

11    America.

12         THE COURT:  DiPietro is the plaintiff?

13         MS. LERNER:  Petitioner for the unsealing of the

14    Court file.  2009, US District, Lexus 30010.

15         THE COURT:  What court was it.

16         MS. LERNER:  Southern District.

17         And the second case is Nycomeds against Glen Parker

18    Generics, 2110 U.S. district, Lexus 20788.

19         It is a magistrate decision , Eastern District of

20    New York, Magistrate Mann.

21         THE COURT:  You want a week?

22         MS. MOORE:  Yes, your Honor.

23         THE COURT:  You are responding to Mr. Lerner's last

24    submission and I don't think any further submissions are

25    necessary.

HENRY SHAPIRO       OFFICIAL COURT REPORTER

1    MS. MOORE:  Your Honor, in light of Mr. Lerner's

2    last submission, I would seek clarification with respect to

3    the PSR that it's clear --

4    THE COURT:  Before you get to that.  Am I correct

5    that the documents, at least Mr. Lerner's last submission

6    says this whole proceeding now is moot because the documents

7    have been surrendered, turned over to you, is that correct?

8    MS. MOORE:  Not that I know of.  I think, as I

9    understand his position, which I don't agree with, he's

10   entitled to keep all copies of the documents, as long as he

11   returned the originals, so, I believe, in his letter he

12   states that if at the court proceeding he marked as exhibits

13   the original versions of those documents, but his client has

14   maintained both electronic and hard copies, so clearly the

15   intent was not to give back, as Judge Jones ordered in Visa,

16   all copies as well.  It doesn't get the originals back and

17   are free to disseminating copies.

18   THE COURT:  I think, I indicated Mr. Oberlander

19   should not do that. I think it was in the form of an order

20   and that order, I believe, if I have not done so, I am doing

21   it now and if you want it in writing until I resolve this

22   issue.

23   MR. LERNER:  You are issuing a further TRO?

24   THE COURT:  Yes, I am.

25   I'm issuing a further TRO for the reasons that I

1   have indicated.

2          I think there is irreparable harm, which is imminent

3   to Mr. John Doe, those documents contained information which

4   is highly, highly sensitive and if disseminated it is

5   discriminatively to a person that should not get the

6   information.

7          I think, it would put Mr. John Doe's safety at risk.

8   The likelihood of success is or is not present.  Again, if

9   Charmer Industies is being read correctly by me and, I think,

10  it is, I think, the burden with respect to whether or not

11  there is some need to maintain those documents or to keep

12  them should be shifted to you.  Until next week, okay.

13         I do not think we need any further hearing. You will

14  submit the briefs and I will make my determination. The TRO

15  is continued for another ten days.

16         Is there anything further?

17         MS. MOORE:  No, your Honor.

18         THE COURT:  Thank you.

19         MS. MOORE:  I do have one last application. With

20  respect to the transcript to have my client's name replaced

21  with John Doe.

22         THE COURT:  Yes.

23         MS. MOORE:  Thank you.

24                    * * * * * *

25

HENRY SHAPIRO       OFFICIAL COURT REPORTER