# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

# FACSIMILE

150 East 42nd Street
New York, New York 10017-5639

Telephone No.: 212-490-3000
Facsimile No.: 212-490-3038

The following facsimile has 59 pages, including this cover page.

If you have any difficulty, or if the transmission was incomplete, please advise.

|  |  |  |
|---|---|---|
| Date: | September 5, 2012 | |
| From: | Coleen Friel Middleton | Extension 5748 |
| Attorney No.: | 8039 | |
| File No.: | 99901.00238 | |
| Re: | United States v. John Doe, 98 CR 1101 | |

| RECIPIENT | FAX NUMBER | TELEPHONE NUMBER |
|---|---|---|
| The Honorable Brian M. Cogan<br>United States District Judge<br>Eastern District of New York | (718) 613-2236 | |
| Nader Mobargha, Esq.<br>Beys, Stein & Mobargha | (212) 387-8229 | (212) 387-8200 |
| Todd Kaminsky<br>United States Attorney's Office | (718) 254-6481 | (718) 254-6367 |
| The Honorable I. Leo Glasser<br>United States District Judge<br>Eastern District of New York | (718) 613-2446 | |
| Frederick M. Oberlander, Esq.<br>Frederick Martin Oberlander | (212) 202-7624 | (212) 826-0357 |

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us via postal service. Thank you.

Albany • Baltimore • Boston • Chicago • Dallas • Denver • Garden City • Houston • Las Vegas • London • Los Angeles
Louisville • McLean • Miami • New Jersey • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford
Washington DC • West Palm Beach • White Plains
Affiliates: Berlin • Cologne • Frankfurt • Mexico City • Munich • Paris

5187493v.1

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 East 42nd Street, New York, New York 10017   Tel: (212) 490-3000   Fax: (212) 490-3038

*Albany • Baltimore • Boston • Chicago • Dallas • Garden City • Houston • Las Vegas • London • Los Angeles • McLean*
*Miami • Newark • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford • Washington, DC • White Plains*
*Affiliates: Berlin • Cologne • Frankfurt • Munich • Paris*

—

www.wilsonelser.com

September 5, 2012

## FILED UNDER SEAL

The Hon. Brian M. Cogan
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:  EDNY Case No.  :  US v. Doe, 98-CR-1101 (ILG)
             Our File No.    :  99901.00238

Dear Judge Cogan:

        I submit this letter in behalf of Richard E. Lerner, in response to the various supplemental letters submitted by "John Doe" in connection with the pending civil contempt motion. As with previous submissions to this court, "John Doe" has failed to meet his burden of showing that Mr. Lerner engaged in contemptuous conduct in violation of various sealing orders issued by this Court and the Second Circuit through alleged contacts with members of the media.

        In fact, the information and documents referenced by "John Doe" could have readily been provided to the media by members of the public[1] and/or found by members of the media through their own investigatory efforts.

        Sater's letters incorrectly suppose that information that is *publicly* available has been subjected by the Second Circuit and Judge Glasser to prior restraint gag orders. To the contrary, both the Second Circuit and Your Honor – and now Judge Glasser, in his August 27, 2012 order unsealing the docket of 98-cr-1101 – have acknowledged that information in the public domain cannot be prior restrained. Indeed, the Second Circuit has expressly acknowledged that the March 2, 2000 press release, which is contained in the Congressional Record, may be used to

---

[1] One such member of the public is Brian Vodicka, who states in the affidavit submitted herewith (Exhibit "A") that he figured out on his own the true name of "John Doe," explains how he figured it out, and describes that he has been working with the Miami Herald to get the story out about Felix Sater.

- 1 -

Page 2

establish Doe's conviction, using his true name, of course, as the press release does not refer to him by his pseudonym.

> Because proof of Doe's conviction (as opposed to his cooperation) remains available from other public documents -- including a press release by the United States Attorney's Office for the Eastern District of New York -- and because the PSR is an incomplete and ultimately inadmissible document to which neither Doe nor the government will ever have the opportunity to object, *see Charmer Indus., Inc.*, 711 F.2d at 1170-71, the PSR is of dubious utility in the civil case except as a tool to intimidate and harass Doe by subjecting him to danger. Accordingly and in sum, disclosure of the report is not "required to meet the ends of justice," *id.* at 1175 -- indeed, quite the opposite.

Thus, it has already been determined that the press release may be used to prove the conviction of "John Doe." And if it may be used to prove his conviction, it may be freely circulated to whomever one wishes. There was no restrictive language in the Second Circuit's decision. That it may be used to prove *Doe's* conviction means that it may be used to prove that *Felix Sater* pled guilty to defrauding investors out of over $40 million. And if it may be freely disseminated, anyone who reads it will understand that Felix Sater, not "John Doe," pled guilty to defrauding investors out of over $40 million.

In *Butterworth v. Smith*, 494 U.S. 624 (1990), the United States Supreme Court held that information obtained outside of court process (in that case, grand jury proceedings) cannot be prior restrained absent a state interest of highest order. In *Butterworth*, the Supreme Court held that information cannot become subject to a gag order merely because it was uttered in front of a grand jury. So too, it could not possibly be held here that anyone was enjoined from revealing to members of the media the information contained in the Congressional Record, which information was learned entirely outside of court process. Similarly, the mere fact that the March 2, 2000 press release is included within the sealed joint appendix filed with the Second Circuit does not make the press release, *ipso facto*, subject to a gag order.[2] It was obtained outside of court process, and thus, according to *Butterworth*, may be freely disseminated.

The letters submitted by "John Doe" also discuss an April 29, 2002 letter contained in the docket of *U.S. v. Lauria* that was written by the United States Department of Justice to United States District Judge I. Leo Glasser, which letter became public on PACER in 2009, and remains public at the National Archives. Thus, it too was obtained outside of court process. As the court would no doubt recognize (and as Judge Glasser acknowledged in his August 27, 2012 order), a

---

[2] Otherwise, of course, Sater would have the ability to unilaterally gag Oberlander from prosecuting the civil RICO claims against him by introducing into these "sealed" proceedings all of the documents that show that he has been defrauding Bayrock investors for years.

document that becomes available to the public can be freely disseminated.[3] Sater's counsel apparently believes that the April 29, 2002 letter was properly resealed. However, resealing does not bar dissemination, as Judge Glasser recently acknowledged, citing *Gambale v. Deutsche Bank*, 377 F.3d 133, 144 [2d Cir. 2004]). In any event, it is also available from the National Archives, and thus outside of court process. Sater's counsel argues that the letter is not available from the National Archives. This statement is incorrect.

In Judge Glasser's decision and order unsealing the docket of 98-cr-1101, he acknowledged that these items were available to the public; it has been a matter of public record for years that Felix Sater pled guilty to RICO fraud and was a cooperator. Thus, Mr. Lerner could not have engaged in contemptuous conduct even if, assuming *arguendo*, he provided information to members of the media.

It is unclear what Sater believes was wrongfully disseminated to the media – and we do not concede that anything *was* disseminated to the media – but if it is Sater's belief that it was either of these two items, then such dissemination could not provide a predicate for a finding of contempt. The documents were in the public arena, and outside the equity jurisdiction of the court. Based upon these two documents, anyone has the right to say, "Felix Sater pled guilty to RICO fraud (as reflected in the press release) and Felix Sater was a cooperator (as reflected in the April 29, 2002 letter)."

Sater's counsel's letters are meritless. They cite no authority for the proposition that information that is publicly available and of public concern could have been gagged. The following is a list of documents that were publicly available before the time of the alleged contemptuous conduct on the part of Mr. Lerner.

1. March 2, 2000 Press Release contained in Congressional Record.

2. April 29, 2002 letter, obtained from National Archives, re: Lauria and Sater.

3. The Second Circuit's decisions of Feb 14, 2011 and June 29, 2011 that are available on Westlaw.

4. The docket and entries from the SDNY RICO case.

---

[3] No court has the power to bar dissemination of documents or information obtained outside of court process. See *Bridge C.A.T. Scan Associates v. Technicare Corp.*, 710 F.2d 940 (1983) (following *International Products Corp. v. Koons*, 325 F.2d 403 [2d Cir. 1963]), and *Parker v. Columbia Broadcasting System*, 320 F.2d 937 [2d Cir. 1963]). "[T]he court has inherent equitable power to prohibit a party from abusing ... process by disseminating information ... [*qua* judicial documents]; but, in light of First Amendment considerations, the court generally has no ... power to prohibit dissemination of the information itself, stripped of its judicial garb, if that information has been gathered independently of judicial processes ... the court's ... order infringed Bridge's First Amendment rights *and was contrary to historic principles of equity*."

Page 4

5. Pleadings and other documents contained in public docket of the Delaware case against Bayrock and Sater.

6. Transcript of proceeding dated February 2, 2001, in the matter of *U.S. v. Coppa*, CR-00-196, wherein Felix Sater is identified, in open court as a "cooperator."

*John Doe's May 1, 2012 letter*

Sater's counsel argues that information contained in the Newsweek/DailyBeast on-line article, "Inside Donald Trump's Empire: Why He Won't Run for President," written by investigative reporter Wayne Barrett, and published on May 26, 2011 contained information from the sealed complaint in the Southern District of New York Action, *Kriss v. Bayrock*, 10-cv-3959. However, the article identifies its sources; indeed, they are hyperlinked in the on-line article. The civil complaint referred to in the article is dated 2009, not 2010. That is, the author was referring to the 2009 complaint filed in Delaware by Jody Kriss against Bayrock, not the complaint in the 10-cv-3959 action.

*John Doe's July 10, 2012 letter*

In the July 10, 2012 letter, Sater's counsel alleges that "sealed" information was disclosed to the Miami Herald, resulting in their "outing" him as Felix Sater in the July 1, 2012 article, "Trump Tower Promoter's Criminal Record Was Concealed by Feds."

Sater's allegations are speculative at best and totally absent proof that Mr. Lerner was the source of the information in this article.

The following public sources of the information contained in this article may include: (1) the press release dated March 2, 2002, contained in the Congressional Record, (2) the April 29, 2002 letter, which indicates that Lauria and Sater were scheduled to be sentenced, but that an adjournment was requested because they were still cooperating, and (3) the docket in the United States Supreme Court proceeding.

For all of these reasons, the supplemental letters filed by John Doe in further support of his civil contempt motion are wholly without merit.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Coleen Friel Middleton

cc: Nader Mobargha
    Todd Kaminsky
    Hon. I. Leo Glasser
    Frederick M. Oberlander

# EXHIBIT  "A"

**Introduction**

1.   My name is Brian Vodicka. I have lived in Austin, Texas for 46 years. Except as otherwise stated, I make these statements on my personal knowledge. I have a degree in law, so while retired, I understand the gravity of this affidavit and the purposes for which it will be used.

2.   **Months ago, I determined on my own, through my own efforts using public information, without the assistance of Richard Roe, Richard Lerner, Frederick Oberlander, or anyone acting in concert with or related to any of them, to my own satisfaction and that of my counsels, that the "John Doe" in various actions, including without limitation 98-CR-1101 (EDNY), is Felix Sater, aka Felix Satter, aka "Lex Tersa." I will not hesitate to use "John Doe's" real name, at any time, in any forum, for any reason, including in the press and other organized media; for example, I gave my findings of Mr. Sater's to the _Miami Herald_ over six months ago, and so far as I know am the sole source responsible for that paper's publication of it.**

3.   I submit, or authorize the submission of, this affidavit in support of the motions to unseal that docket and the records listed on it, as I believe the unsealing will lead to evidence relevant to my lawsuit against those who defrauded me and my life-partner of our retirement savings, _infra_. And, I believe the unsealing will stop frauds being perpetrated against the federal district courts of at Florida and Texas and innocent victims litigating therein, and frauds that continue to be perpetrated against victims of Sater's State Street crimes.

4.   I also submit, or authorize the submission of, this affidavit to the Southern District of New York in 10-CV-3959, a RICO case where defendants include Felix Sater and Bayrock Group.

5.   I also submit, or authorize the submission of, this affidavit to the Eastern District of New York in respect of 98-CR-1101 and 12-MC-150 in respect of proceedings involving Felix Sater, Frederick Oberlander, and Richard Lerner.

6.   I also submit, or authorize the submission of, this affidavit to the Second Circuit Court of Appeals, and to any other court or juridical forum, in respect of any proceedings in such which involve or concern the preceding persons or matters.

7.   I also submit, or authorize the submission of, this affidavit to the U.S. Supreme Court, in respect of any proceedings there which involve or concern the preceding persons or matters.

### I Am a Federally Protected Victim of
### Russian Organized Crime

8.   I am a crime victim, in the commonly understood sense and as defined in 18 USC §3771, a person directly and proximately harmed as a result of the commission of a federal offense. In this case the offense(s), committed in Texas but orchestrated from "Little Russia," the Brighton Beach section of New York, ¶26, include violations of substantive and conspiracy provisions of federal racketeering law and concomitant violations of constituent predicate crimes including mail fraud, wire fraud, financial institution fraud, and money laundering.

9.   The United States Postal Inspection Service is investigating the case for violations of mail fraud and other statutes, so my *bona fides* in asserting CVRA standing is without question.

10.   I and my partner lost close to $1,000,000. But we are not the only victims. Others who lost life savings include retired Vietnam veterans, active duty personnel serving in Afghanistan and Iraq, their families, and the severely disabled. They, too, are federally protected crime victims. Together, we, the victims, including various institutions, lost about $10,000,000.

11.   And we are not alone. As I explain, the frauds perpetrated against all of us by, at least in part, persons known to New York law enforcement as members of ROC (Russian Organized Crime), are connected to similar frauds in Florida, also orchestrated from Brighton Beach. In all, total victim losses are about $100,000,000.

12.   It doesn't stop there: I have determined that these crimes are connected to Bayrock Group, a New York developer which has been sued for real estate fraud in Florida, Delaware, New York, and Arizona, and which began in, and had substantial connection to, Brighton Beach.

13.   Bayrock Group was, and perhaps still is, substantially owned and controlled by Felix Sater, a Russian racketeer secretly convicted in federal district court, EDNY, on racketeering charges for his role in State Street, an ROC and LCN (La Cosa Nostra) connected stock fraud.

14.   Sater's connections to Brighton Beach and its members of ROC begin at home, with his father, Mikhail Sheferofsky, also secretly convicted in EDNY, in his case for a 10-year Brighton Beach extortion conspiracy with the same member(s) of the Genovese family, e.g. one Ernest Montevecchi, who were involved with Felix in State Street (Mikhail's past includes conviction in England for counterfeiting with ROC, according to Sal Lauria, Felix's State Street co-defendant and another felon secretly convicted of racketeering in EDNY.)

**Sky Development**
**(The Texas/Florida / Brighton Beach Crimes)**

15.    As explained more fully in the attached *Miami Herald* article of February 5, 2012, Exh. 101,
from approximately 2004 through 2006 Russians Victor and Natalia Wolf, now fugitives
from justice after their indictment in Florida for this fraud, operated various real estate
swindles and rackets, including a fictitious title company, throughout Florida and Texas
under the umbrella name of Sky Development Group.

16.    The Wolfs and their Sky Development crimeswere well connected to Brighton Beach, often
holding "parties" there to recruit victims, including Dr. Alexandra Krot, mentioned in that
article as also a co-victim of mine in Sky Group, *infra*.

**Sky Group aka Wildhorse**
**(The Texas/Brighton Beach Crimes)**

17.    These crimes, which I call the "Sky Group" or "Wildhorse Ranch" fraud, took place
(approximately) between 2005 and 2008, although to the extent they include conspiracy or
concealment fraud they may well still be ongoing. It was the largest mortgage, banking,
money-laundering, bankruptcy, and tax frauds in Austin's history.

18.    As explained in the article, records obtained in discovery show that Sky Development was
used in the Wildhorse Ranch fraud: In or about 2005, the Wolfs, in concert with others,
including several with connections (e.g. offices, bank accounts, and other physical presence)
to Brighton Beach, formed Sky Group of Texas in Manor, Texas. This was the first of what
would become a rat's nest of dozens of interconnected companies in a structure of the type
experts on Russian organized crime term "a daisy chain of shells" (for example, in just one
small sub-parcel of the Wildhorse Ranch property, over thirty nominally distinct juridical
entities, usually limited partnerships, were used to obfuscate the illicit flows of money).

19.    According to testimony and records in related bankruptcy proceedings in Austin, Texas, ¶20,
and marketing web pages, the major activity of Sky Group was (ostensibly) to be the
acquisition and development of 3275 acres among 8 developments in or near Travis County,
which included 1665 acres known as the Wildhorse Ranch.

20.    But, as I have alleged in pleadings in Texas state court against North American Title, and
Austin federal court against unregistered mortgage-backed securities brokers and those

conspiring with them, Wildhorse was a massive mortgage Ponzi scheme, with: appraisers who overstated the value of land by 1200%; bankers and other lenders who lent $77 million of mortgage loans over an 8-month period, often induced to so by bribes or otherwise in honest services fraud on their shareholder owners for unsafe and unsound banking practices; the "developers"; the aforesaid title company, which operated as a money laundering artifice for the developers; and unlicensed mortgage brokers and securities dealers who sold worthless, private unregistered mortgages *per se* and mortgage-backed securities, the proceeds illegally diverted to bank accounts in Brighton Beach., who also prepared and disseminated falsified HUD-1 and other documents, sometimes signed *sub nomine* fictitious people; phony contracts and fake checks; and fraudulent, worthless liens and mortgages.

21.    The Wildhorse shell companies began collapsing into bankruptcy in March 2008, when $55,000,000 in fraudulently obtained mortgage indebtedness came due, and the principals could not continue taking ever more sums of money from new investors and lenders to pay off prior investors and lenders.

22.    Related bankruptcy proceedings began that month in Austin federal court, and shortly thereafter I (and my partner) began several federal and state civil litigations against those responsible for our losses, all of which remain currently active.

### Bayrock Group
### (The NY-Delaware-Texas-Florida-Arizona/Brighton Beach Crimes)

23.    My efforts to unravel the truth focused on control persons of Wildhorse, *viz.* the Wolfs; one Vitaly Zaretsky, a Russian American believed currently residing in New Jersey; one Eugene Borokovich, a Russian believed currently residing in New York; one Jeff Turner, former and current mayor of Manor, Texas; and the mortgage brokers.

24.    I learned that Zaretsky and Borokovich operated Wildhorse out of premises Borokovich owned in Brighton Beach, and that they operated, at least nominally, the bank accounts to which the proceeds had been diverted, ¶26.

25.    Importantly, a year ago, on June 21, 2011, to focus on activities of the Wolfs before they fled the country to escape prosecution for the Florida crimes, my attorneys deposed Turner in the course of the two ongoing federal litigations. Excerpting from the transcript, Exh. 108:

15 Q. What was your understanding of Mr. Zaretsky and
16 his father and Mr. Borokhovich and Mr. Wolff? Did they
17 represent themselves to be real estate developers?
18 A. You -- well, let me -- Vitaly and his father
19 were in the materials business. That doesn't sound
20 real good. But they were in the materials business and
21 that's what their dollar was. That's how they made
22 their money. Now, Vitaly had also told me that he had
23 a few apartments up in New York that he bought and
24 renovated, and that's what he did. So.
25 I don't know if they were professional real
Page 31
1 estate people, by all means. Now, Eugene Borokhovich,
2 I think he's a little different story. I think he had
3 dealt in some larger scale projects up in the New York
4 area. I think he worked for a company named Bay Rock.
5 And Bay Rock -- he was -- he was up in that -- you
6 know, I don't know if he was a principal, by all means,
7 but that's where they ran onto him at.
8 Q. Okay. And so someone represented to you that
9 Mr. Borokhovich had had some experience in larger
10 deals?
11 A. No, I rep -- I figured that out.
12 Q. You figured that out on your own?
13 A. Yeah. I mean, you research these guys all you
14 can because you don't know. As the mayor of a small
15 city, you don't want to get tangled up with the mob, if
16 you will, so you actually research that stuff.

26.    Investigating the connection with Bayrock, I looked it up online and found what appeared to
       be a legitimate company.

27.    It was possible of course that Turner was mistaken, or lying. However, subsequently I
       obtained Borokhovich's financial statement in discovery, and on that statement one property,
       Loehmann's Seaport Plaza in Brighton Beach, "leapt out" at me because the Emmons
       Avenue address of Loehman's Seaport was only a few blocks from the Emmons Avenue
       address that Borokovich and Zaretsky used in connection with Wildhorse[1].

28.    I found articles online that said Loehmann's was owned by Bayrock. Exh. 102. Clicking a
       hyperlink in that article took me to a December 17, 2007 *New York Times* article online about
       Felix Sater, his "unspecified" role at Bayrock, and his past involvement with the LCN and
       ROC in a 1990s stock swindle, called "State Street" or "White Rock," which he ran with co-
       conspirators Salvatore Lauria and Gennady Klotsman. Exh. 103.

---

[1] Indeed, I have recently obtained in disclosure bank records from Citibank and other documents, including
fraudulent HUD-1's prepared by North American Title, showing Brighton Beach bank accounts, registered to
Zaretsky and Borokovich's offices there, ¶9, to have been the "money laundering" nexus of Wildhorse

29.     Another online article about Loehmann's, in the August 12, 2008 issue of *The New York Real Estate Journal*, Ex. 104, mentioned one Joshua Bernstein of Bayrock as having "helped facilitate" the sale of Loehmann's for $24,000,000.

30.     Online searching on "Bayrock" and "Bernstein" revealed an August 26, 2010 *Courthouse News* article about a case against Bernstein, *Bayrock Group LLC v. Bernstein*, in the SDNY, 10-CV-06338 (Buchwald, J.). Exh. 105. I downloaded all the PACER entries for that case, and saw they referenced a New York State Supreme Court case, *Bernstein v. Bayrock Group LLC*.

31.     On February 11, 2012, I ordered the records in that action from the Westchester County clerk. Among the documents I received were transcripts of the March 9, 2010 deposition of Felix Sater taken by Bernstein's attorney Gerry Feinberg. In that deposition Sater admits his involvement in Loehmanns, and describes himself as having been "second in command" at Bayrock, and its chief operating officer, but pages 9, 10, and 11 were of particular interest:

| BERNSTEIN VS. BAYROCK GROUP LLC | |
|---|---|
| Page 9 | Page 10 |
| SATER | SATER |
| 1 ... telecommunications work. | 1 ...related to any sort of fraud, et cetera, it is |
| 2 Q. Were you ever convicted of a crime? | 2 relevant to your credibility as a witness in this |
| 3 A. Yes. | 3 case. |
| 4 Q. What was the crime you were convicted | 4 A. Probably not a very credible witness to |
| 5 of? | 5 begin with. |
| 6 A. I was convicted of assault one. | 6 Q. You're probably not a very credible |
| 7 Q. Were you ever convicted of any other | 7 witness — |
| 8 crimes? | 8 A. No. That is what you're saying, so — |
| 9 A. On the advice of counsel, I am not | 9 Q. No. I am asking you that. Are you |
| 10 going to answer that question as I don't have to | 10 refusing to answer the question — |
| 11 incriminate myself nor does this business | 11 A. On the advice of counsel. |
| 12 litigation have anything to do or bearing on | 12 Q. Is that your direction to him? |
| 13 whether I am convicted of any crimes or not. | 13 A. He is not my counsel on this particular |
| 14 On the advice of counsel, I won't | 14 matter. My counsel is Leslie Caldwell from Morgan |
| 15 answer past what I have already answered. | 15 Lewis. |
| 16 Q. You already answered you were convicted | 16 Q. Is that criminal counsel? |
| 17 of assault? | 17 A. She is many things. |
| 18 A. Yes. | 18 Q. Is she here today? |
| 19 Q. If you have actually been convicted, | 19 A. No. |
| 20 the fact that you have been convicted cannot | 20 Q. Did she know you would be asked this |
| 21 constitute any testimony against your own | 21 question? |
| 22 interests and goes to your credibility depending | 22 A. Yes. |
| 23 upon what the nature of the conviction was and if | 23 Q. Did she advise you not to answer this |
| 24 it goes to a conviction related to something | 24 question? |

Page 11

```
1    SATER
2  A. Yes.
3  Q. The grounds being again?
4  A. Not to incriminate myself and -- on
5     this issue and that I don't have to answer since
6     my convictions have -- or lack thereof have
7     nothing to do with what I am going to be
8     questioned about here.
9  ·   MR. FEINBERG: They are. I will take a
10     two-minute break. I will get a phone number
11     for the judge and we will call the judge's
12     chambers right now --
13         THE WITNESS: She will have an ex-parte
14     hearing with the judge --
15 ·   MR. FEINBERG: Off the record.
16     (Off the record discussion.)
17  Q. We will make application to the judge.
18     You will have your counsel come back at the
19     appropriate time. You understand that you're here
20     pursuant to a direction of the court to answer
21     questions.
22  A. Absolutely. I would never, ever --
23     MR. DOMB: Don't interrupt. Ask him a
24     question.
25  Q. You understand that --
```

32.    I thought, "If Sater had not been convicted of crimes besides the conviction for assault with
       a deadly weapon he admitted to, why he wouldn't he simply answer, "No?" But, if he had
       been convicted of other crimes, then refusing to answer "Yes" on Fifth Amendment
       grounds had to mean that he had been concealing that conviction in ways that were criminal,
       and that he and his lawyer knew the concealments were crimes.

33.    Searching on "White Rock" and "Montevecchi," mentioned in the 2007 *NY Times* article as
       well as the docket for Mikhail Sheferovsky, I found former SEC Director of Enforcement
       Richard Walker's September 13, 2000 testimony before Congress on organized crime on
       Wall Street. (See *Testimony Concerning the Involvement of Organized Crime on Wall Street, Exh. 106*),
       which confirmed that Montevecchi had been charged in the State Street racket.

SEP. 5. 2012  1:13PM

34. Meanwhile, I had by then bought a copy of Sal Lauria's autobiography, *The Scorpion and the Frog*, also referred to in the 2007 *NY Times* article. I noticed that the back of the book had excerpts from a government document I found to be a joint press release of the United States Attorney, EDNY; the New York FBI Office, and the NYPD, issued March 2, 2000 to announce the arrest of 19 individuals for their involvement in State Street.

35. In fact, that same press release was reproduced inside, on the first page of the prologue.

36. Indeed, the Lauria book jacket and Prologue versions of the press release are identical to the official version, public property in the Library of Congress, the sole differences that:

- The Lauria versions refer to State Street as a fraud run by Klotsman, Lauria, and "Lex Tersa," while the official version refers to State Street as a fraud run by Klotsman, Lauria, and Felix Sater, making obvious that "Lex Tersa" is Felix Sater's pseudonym.

- The Lauria prologue version states that Klotsman, Lauria, and "Tersa" had each pled guilty to racketeering charges (as of March 2, 2000), while the official version states that Klotsman, Lauria, and Sater had each pled guilty to racketeering charges, again making obvious that "Lex Tersa" is Felix Sater's pseudonym.

37. And, there are about a dozen other occurrences throughout the book where Lauria reproduces excerpts from the indictment in *U.S. v. Coppa*, 00-CR-0169, the case where he, Klotsman, and Sater were to be cooperating witnesses, and in each case the reproductions are exactly the same as the publicly filed version except for substitution of Sater for "Tersa".

38. I had no doubt that "Tersa" was Sater and that he had pled to racketeering.

39. In fact, it seems no one else doubts it either; as of this writing, for example, this is a true and correct result of a Google search on "Lex Tersa":

1. Felix Sater | Deep Capture
www.deepcapture.com/tag/felix-sater/
Sep 15, 2009 – ... a time when Felix (given the pseudonym Lex Tersa in the book) announced that he (Felix) might murder a man named Alain Chalem, who was ...

2. Bernard Madoff, the Mafia, and the Friends of Michael Milken | Deep ...
www.deepcapture.com/bernard-madoff-the-mafia-and-the-friends-of...
73 posts - 28 authors - Feb 3, 2009
... "The Scorpion and the Frog," which suggests that Sater (whom the author of the book gives a pseudonym, "Lex Tersa") cut a deal allowing ...

3.    Hey Hey FDA How Many Men Died Today? or The Milken-Madoff ...
      www.nowpublic.com/.../hey-hey-fda-how-many-men-died-today-or-...
      Jun 26, 2009 -- ... The Street Dot Com, Sol Steinhardt, Morty Davis the "king of penny stock" J. Morton
      Davis, Felix Sater pseudonym "**Lex Tersa**" Bayrock Group ...

4.    Felix Sater, Behind-The-Scenes Owner, Bayrock Group LLC ...
      www.zoominfo.com/#!search/profile/person?personId...targetid...
      ... states that there was a time when Felix (given the pseudonym Lex Tersa in the book) announced that
      he (Felix) might murder a man named Alain Chalem, who ...

5.    Jew Sapir: Billionaire's Boat Stuffed With Exotic Animals Seized ...
      www.vnnforum.com › ... › News & Discussion › This Just in
      17 posts - 11 authors - May 14, 2009
      ... pseudonym, "**Lex Tersa**") cut a deal allowing him to avoid prosecution if he helped the CIA set up a
      phony arms deal with Osama Bin Laden.

i.    [PDF] comment letter
      www.sec.gov/comments/s7-08-09/s70809-4614.pdf
      File Format: PDF/Adobe Acrobat - Quick View
      "**Lex Tersa**" -- is the son of a high level boss in the Russian Mafia. The name of Sater's father is Mikhail.
      Sater. Lauria also writes about the time when he believed ...

6.    mafia son pdf - P(8) - Search-Document.com
      www.search-document.com/pdf/8/mafia-son.html
      "**Lex Tersa**" -- is the son of a high level boss in the Russian Mafia. The name of Sater's father is Mikhail.
      Sater. Lauria also writes about the time when he believed ...

40.    I then downloaded the items in Lauria's docket, 98-CR-1102, from PACER, which
       confirmed his guilty plea and subsequent cooperation, just as the *NY Times* article said.

41.    Searching PACER for cases with a defendant named "Sater" yielded nothing for Felix Sater.

42.    It did yield, however, docket 00-CR-01005-NGG (EDNY) (Garaufus, J.) in which Mikhail
       Sater, aka Michael Sheferofsky, whom I later determined was Felix Sater's father, pled guilty
       to extortion and extortion conspiracy, in concert with the same Ernest Montevecchi,
       obviously the same Genovese crime family soldier that the *NY Times* article had identified as
       Felix Sater's organized crime "muscle" at White Rock (I have later learned that the Genovese
       family is intimately connected with Russian organized crime, often serving as its "muscle").

43.    Meanwhile, I learned online that Bayrock had been sued many times for real estate
       fraud, in Florida, Delaware, New York, and Arizona.

44.    While the exact involvement of Bayrock or any of its principals in Wildhorse is continuing to
       be determined through discovery in the civil case(s) I filed against Wildhorse principals and
       those in concert with them, it is clear that banks, investors, lenders, co-venturers, and others

in Wildhorse were induced to participate at least in part on representations that Bayrock's assets, skill, and reputation were behind it. Who is responsible, to what degree, and to what extent, if any, wrongdoing is attributable to Bayrock, remain under investigation.

### The Parallel Involvement of *The Miami Herald*

45.    While I was doing this research in support of my Texas litigations, one month after the June 2011 depositions of Turner, I began collaborating with a reporter for *The Miami Herald*, who was convinced there was "more to the eye" than currently understood about the connection of ROC between Brighton Beach, Florida, and Texas.

46.    Consequently, I walked him through the Sky Development frauds in Florida, and while I was doing that, my Texas lawyer was going through the public court records from the 2008 Austin bankruptcy proceedings, in particular *In re Waterfall Gallery of Austin LP*, 08-11016-CAG-11, one of the cascading bankruptcies I described earlier, ¶20.

47.    One of the documents he showed me was a July 11, 2008 motion made by New York attorney Frederick M. Oberlander in behalf of Borokovich, which described how Zaretsky perpetrated the Wildhorse Frauds, and I gave this to the reporter at the *Miami Herald*.

48.    The reporter then engaged his journalism class at Barry University to research various aspects of the Sky Development frauds in Florida, and this research resulted in the first of a series of articles about Victor Wolf, Natalia Wolf, and Trump Fort Lauderdale, this first one published on February 5, 2012, Super Bowl Sunday. Exh. 101.

49.    Right after that first *Miami Herald* article came out, the reporter told me about an article he had just found that evening in the *NY Times* about a secret racketeering case involving Oberlander and possibly involving ROC, which I then read.

50.    Then, on Monday, February 6, 2012, using the information in that *NY Times* article, I looked up Oberlander's May 2010 case and found it on PACER, 10-CV-3959.

51.    I noticed that Bayrock, Sater, and Lauria were among the defendants.

52.    I downloaded the publicly available documents in that case, including document 4, which refers to proceedings before Judge Glasser, as the *NY Times* article referred to proceedings before Judge Glasser. The document requested permission to send the complaint to Judge Glasser for those hearings. The letter was written on May 25, 2010, by the law firm Morgan

Lewis, the same firm Felix Sater had testified in his March 9, 2010, was representing him. ¶30

53.     Putting all this together, on February 8, 2012, I wrote the reporter and told him that Sater must be "our boy," that is, that the firm in question in the *NY Times* article must be Bayrock and that Sater must be the "businessman" with the hidden conviction.

54.     As it turns out, the *Miami Herald* reporter had already figured out the same thing on his own, because the very next day, February 9, 2012, he sent me the link to the actual Congressional Record of that September 13, 2000 hearing and Walker's testimony, ¶32, which on Page 194 contains that very same March 2, 2000 press release from the United States Attorney's office, joint with the New York FBI office and the NYPD, announcing the indictments of 19 persons in connection with State Street, which it described as being collectively controlled by, *inter alia*, Klotsman, Lauria, and Sater, noting in footnote 2 on its 2nd page, "Klotsman, Lauria, and Sater have previously pleaded guilty to RICO charges in connection with their activities at White Rock and State Street"). A true and correct copy of the press release as it is in the Congressional Record is attached. Exh. 107.

55.     As I testified, ¶35, the press release in the Congressional Record duplicates what is on the back of Lauria's book, and in the prologue, except substituting "Lex Tersa" for "Felix Sater," further confirming that "Lex Tersa" is Felix Sater and that Felix Sater did indeed plead guilty to racketeering in connection with State Street but apparently has no publicly available federal criminal record, just a hidden one. The following is a true and correct image of the back of *The Scorpion and the Frog* and the prologue.




56.    I realized this hidden racketeering conviction would explain why Sater had refused to answer those deposition questions as to whether he had a prior conviction: he must have known that he had concealed it in ways that would incriminate him. ¶31.

57.    I began investigating Bayrock's possible connections to various frauds in Florida and New York, learning, for example, that Bayrock has been sued or is being sued by scores of persons in southern Florida, in state and federal courts, for fraud in connection with one of its projects, Trump International Fort Lauderdale.

58.    *The Miami Herald* also investigated the Florida frauds, and incorporated the information I gave them, as well as what they had developed on their own, in several articles.

## For the Record

59.    I never saw, heard about, or otherwise was aware, and am not now aware, of any documents under seal in any of the actions referenced herein. No one has given, or offered to give me, any sealed documents, or their contents. I have never seen any document that in any way indicated it was sealed. Every document referenced herein was obtained exactly as described from public or otherwise legally accessed private sources. For example, I obtained the publicly available orders and other filings in Bayrock and Sater's SDNY RICO case and the publicly available filings in the Lauria and Coppa cases in EDNY directly from PACER, and I obtained the redacted motion and petition for writ of certiorari directly from the clerk's office in the U.S. Supreme Court by private messenger serve, and I obtained the records in *Bayrock v. Bernstein* directly from the Westchester Supreme Court County Clerk. All the above work I have described, in particular all the connections and searching and tracing, were done on my own initiative.

## Oath

I am a citizen of the United States and make this affirmation while in the United States under penalty of perjury, pursuant to 28 USC 1746, attesting that all things alleged herein are true and correct to the best of my knowledge:

Brian Vodicka        (date) Aug. 22, 2012

                     Austin Texas

# The Miami Herald

Posted on Sun, May. 27, 2012

## Florida swindlers' $77 million cow pasture

By Michael Sallah
msallah@MiamiHerald.com



The Wolfs, Victor and Natalia, at left, who fled the United States after fleecing customers.

During a lavish party for hundreds of guests, North Miami Beach developers Victor and Natalia Wolf unveiled their most ambitious project: a new city in the heart of Texas.

There, the couple envisioned a futuristic community known as Sky Station, featuring thousands of homes, luxury stores, hotels and office towers.

"A poster child for development," said one investor.

Now, with the Wolfs already indicted in a land scandal in Florida, federal agents are investigating the spectacular collapse of a Texas project — one of the largest of its kind, wiping out dozens of investors with millions of dollars still missing.

In the end, a plan that promised to be a model for the country is now covered by barbed wire, cattle and brush — not a single home built.

"These people destroyed lives," said Coral Springs businessman Peter Mazzarino, who invested with the couple in Florida.

The Wolfs are wanted by the FBI for concocting a massive land swindle on Florida's Gulf Coast, but little is known of their push into Texas that cost investors and lenders nearly $77 million.

The move was the last major venture by the couple to attract clients across the country before fleeing their stately waterfront home in Miami-Dade.

They set up a headquarters in a glass tower near Biscayne Boulevard in Aventura, boasting a new name: Sky Group of Texas — but in the end, it turned out to be an empty office with no working phones.

Even company letters showing luxury stores like Saks Fifth Avenue and Neiman Marcus coming to the project were bogus claims.

Years after the Wolfs fled the country, the failed project has caught the attention of federal postal inspectors and state agents in a widening investigation.

Texas regulators are moving to strip the license of the title company that performed the land deals — a subsidiary of Miami's Lennar Homes — saying the firm falsified records showing where the money was diverted.

Key records were just released in a federal lawsuit, prompting investors to accuse the Wolfs and others of running a massive Ponzi scheme that snared 31 investors, five banks and three other lenders.

Investors say millions moved through various bank accounts, including 30 separate companies, but just a fraction was put into construction.

"It's just staggering that millions of dollars got spent, and there's nothing there," said Brian Vodicka, a retired accountant who lost $915,000.

"This was supposed to be Austin's new stamp on the map for creating a living community. They were going to build a city. There should have been roads. There should have been homes. What do you see? A broken-down barn and a head of cattle."

Two other key partners in the project, Vitaly Zaretsky of New Jersey, and Eugene Borokhovich, 48, of New York, could not be reached for comment.

In earlier interviews, their lawyers said the partners didn't break any laws and that all their land deals were overseen by title companies.

But investors say state regulators have already found enough fraud with the title company's handling of the project to shut down the firm.

The FBI's Fort Lauderdale office refuses to comment on the Wolfs, now suspected of being part of a network of Russian nationals who preyed on investors during the housing boom.

For nearly a year, the couple jetted between Florida and Texas, touting what was considered one of the most unique projects in the country.

Sky Station was to include four developments — collectively known as the Wildhorse Ranch — featuring 9,200 lots spread around lakes, nature trails and trees along with 375 stores, hotels and restaurants.

Government leaders even jumped on board, pledging up to $25 million in utilities in the largest such deal ever struck by the city of Austin.

"People expected a lot of good things would happen," said Charles Heimsath, a local real estate analyst.

During a yacht party thrown by the Wolfs on the Floridian Princess, the couple bragged about their celebrated plans that featured stores like Gucci, Cartier and Macy's, guests recalled.

"They were looking to scam new people," recalled Alexandra Krot, a retired oncologist who invested in the deal. In addition to the project with the Wolfs, the other partners began attracting investors to jump into four other surrounding developments.

What followed was a series of moves by the Wolfs and their partners that would later reach law enforcement agents and state regulators.

First, the Wolfs were forced to flee the country in late 2006 after they were found fabricating bogus deeds on 256 lots they didn't own in Florida, selling them to unsuspecting buyers.

Then, two years later, the entire Texas venture collapsed when the other partners were forced into bankruptcy after failing to make payments on $55 million in loans, records show.

Investors said they discovered that nothing was ever built — no roads, sidewalks or even a home on the 1,665 acres.

Krot, 70, said she learned she was scammed after wiring $625,000 to invest in the deal, but the Wolfs ended up pocketing her money.

Then, another partner, Zaretsky tapped into more loan money — $1.4 million — to pay a debt to a Russian investor before taking the rest to Atlantic City, he swore in a statement.

Investors say the biggest surprise turned out to be the massive land flips orchestrated by the partners to squeeze more money from lenders.

After setting up different companies, the partners sold the same land to their own entities twice — to artificially pump up the value 188 percent, records show.

In just 38 days, land that once sold for $30,500 an acre was now flipped for $88,000. "A trifecta of fraud," said a New York lawyer representing Borokhovich.

The two remaining partners have since split over the land collapse, with Borokovich accusing

Zaretsky in a court filing of committing widespread fraud.

Another partner in the flips, Jeff Turner, a mayor of the nearby town of Manor, collected more than $189,000 in consulting fees from the project. Turner did not return repeated phone calls from The Miami Herald.

Four years after the demise of the plan, investors say they are still fighting for records to find the whereabouts of approximately $25 million.

"It's like one lie on top of the other," said Chet Tutor, 72, a Vietnam War vet who lost $600,000. "I'm one of the guys who really got ripped."

Vodicka said investors will continue to press for answers from the remaining partners, but the people who may know the most are now international fugitives: the Wolfs.

Natalia Wolf, 37, fled to Germany with the couple's infant daughter, but federal agents were unable to trace the whereabouts of Victor Wolf, 53.

"Just like the money, they vanished," said Vodicka.

A former Broward prosecutor who has been investigating the Wolfs for four years said the couple targeted Texas because the land boom was reaching a peak.

"It's not because they were running out of deals in Florida," said Roman Groysman, a Fort Lauderdale attorney who is fighting in court for a burned investor to win ownership of the Wolfs house.

"If they could have, they would have gone to all 50 states," he said. "But I think what they found in Texas was that America really was the land of opportunity. Where else can you find a mayor to work with? Where else can you work with developers who had been doing this all their lives? They broke into the top levels of society. It's not that [the Wolfs] ran out of money. They ran out of time."

© 2012 Miami Herald Media Company. All Rights Reserved.
http://www.miamiherald.com

Read more here: http://www.miamiherald.com/2012/05/26/v-print/2819509/florida-swindlers-77-million-cow.html#storylink=cpy

by Ned Berke on Jul 1st, 2008



In the largest Sheepshead Bay real estate deal of the last twenty years, Loehmann's Seaport Plaza on Emmons Ave. has reportedly been sold for approximately $24 million.

The three-story, 280,000 square foot retail center closed on Friday, with its former owner, the Bayrock Group, selling to a still unknown buyer. A source with knowledge of the deal provided the sale price of $24 million, but that number is still unconfirmed. He also said the buyer is a local Russian businessman. Observers of Sheepshead Bay real estate transactions are surprised by the deal, as the property was not known to be on the market. However, Bayrock Group may have been happy to unload the property when approached by the mystery buyer, given that the group probably has its hands full with the beleaguered Trump SoHo Hotel Condominium, which it is developing alongside the Trump Organization and the Sapir Organization. The site has recently been plagued by a number or controversies, including a lethal construction accident, accusations of misleading the public towards its final use, and mob ties. Of course, the mobster accusation is a given, considering one of Bayrock's own principals was revealed to have quite a shady past.

The Loehmann's Seaport Plaza deal marks the second largest sale in Sheepshead Bay history, coming just $1 million shy of breaking the record set in 1988, when the Atlantic Towers Apartment Corp. on Ave. Z and East 13th street was sold for $25 million. It's also notable for being the second record-breaking deal in less than a year; the first being last November's sale of the site at 1600 Sheepshead Bay Road and 1501 Voorhies Avenue for an all-cash transaction valued at more than $20 million. This means that two of the three largest deals in Sheepshead Bay history were ushered in within the last 8 months.

Tenants of the Loehmann's building are still unsure of the identity of the new owner, but expect to receive that information within the next two to three days.

# Real Estate Executive With Hand in Trump Projects Rose From Tangled Past

By CHARLES V. BAGLI
Published: December 17, 2007

It is a classic tale of reinvention, American style.



Chad Spinozzi/Patrick McMullen

Felix H. Sater, left, in September with Alex Sapir, a partner in the Trump SoHo condominium hotel project at Spring and Varick Streets.



Pierre Carotte-Vojteck/The New York Times

Sater is involved in the Trump SoHo project

Born in the Soviet Union in 1966, Felix H. Sater immigrated with his family to Brighton Beach when he was 8 years old. At 24 he was a successful Wall Street broker, at 27 he was in prison after a bloody bar fight, and at 32 he was accused of conspiring with the Mafia to launder money and defraud investors.

Along the way he became embroiled in a plan to buy antiaircraft missiles on the black market for the Central Intelligence Agency in either Russia or Afghanistan, depending on which of his former associates is telling the story.

But in recent years Mr. Sater has resurfaced with a slightly different name and a new business card identifying him as a real estate executive based on Fifth Avenue. And although he may not be a household name, one of the people he is doing business with is: Donald J. Trump.

Mr. Sater — who now goes by the name Satter — has been jetting to Denver, Phoenix, Fort Lauderdale, Fla., and elsewhere since 2003, promoting potential projects in partnership with Mr. Trump and others. In New York, the company Mr. Sater works for, Bayrock Group, is a partner in the Trump SoHo, a sleek, 46-story glass tower condominium hotel under construction on a newly fashionable section of Spring Street.

But much remains unknown about Mr. Sater, 41, and determining the truth about his past is a bit like unraveling the plot of a spy novel: Almost every character tells a different tale.

A federal complaint brought against him in a 1998 money laundering and stock manipulation case was filed in secret and remains under seal. A subsequent indictment in March 2000 stemming from the same investigation described Mr. Sater as an "unindicted co-conspirator" and a key figure in a $40 million scheme involving 19 stockbrokers and organized crime figures from four Mafia families.

The indictment asserted that Mr. Sater helped create fraudulent stock brokerages that were used to defraud investors and launder money. Mr. Sater and his lawyer, Judd Burstein, repeatedly refused to discuss in detail his role in the stock scam.

But a onetime friend, Gennady Klotsman, who is known as Gene and who was accused with Mr. Sater as a co-conspirator, contends that they both pleaded guilty in 1998, and that Mr. Sater began cooperating with the authorities. Prosecutors are unwilling to discuss either the 1998 complaint or the 2000 indictment.

"I'm not proud of some of the things that happened in my 20s," Mr. Sater said in an interview. "I am proud of the things I'm doing now."

SEP. 5. 2012  1:15PM                                                                   NO. 4626   P. 26

Mr. Sater, who has an untitled position at Bayrock, said he started spelling his name as Satter to "distance himself from a past" in an age when anyone can look up a name on Google. But he continues to use the name Sater on the deed to his house on Long Island.

Mr. Burstein added, "He does not hide his past, and difficulties he had, from anybody he does business with."

But Alex Sapir, president of the Sapir Organization, a partner in Trump SoHo, said he was "not happy" to have just learned of Mr. Sater's past on Thursday. "This is all news to me," he said.

Mr. Trump also said he was surprised to learn of Mr. Sater's past. "We never knew that," he said of Mr. Sater. "We do as much of a background check as we can on the principals. I didn't really know him very well."

Mr. Trump said that most of his dealings with Bayrock had been with its founder, Tevfik Arif, and that his son Donald and his daughter Ivanka were playing active roles in managing the project. Neither Bayrock nor Mr. Trump has been accused of wrongdoing.

Mr. Sater has generally kept a low profile on the Trump projects, although he mingled with guests and the owners at the September party introducing Trump SoHo. Mr. Trump and Mr. Sater were also together in Loveland, Colo., in 2005, where they were interviewed by a reporter for The Rocky Mountain News about potential development deals in nearby Denver. Mr. Trump said he did not recall Mr. Sater's being there.

"They seemed to get along just fine," said Justin Henderson, a Denver developer who worked with Mr. Trump and Mr. Sater on an ultimately unsuccessful deal to build the tallest towers in Colorado. "It seemed that Mr. Trump relied heavily on Mr. Sater's opinion on certain markets."

Mr. Sater's latest transformation could prove to be a cautionary tale for Mr. Trump, who has carefully molded his image into an international brand that has extended from real estate to bottled water, men's suits, steaks, vodka, a television show and, in his latest invention, the Trump Hotel Collection.

The hotel collection, a hotel management company, includes two projects with Bayrock: Trump SoHo and Trump International Hotel and Tower in Fort Lauderdale. A third joint project, in Phoenix, is also in the works.

"Trump is a name associated with a certain cachet and bravado, I suppose, that will attract certain kinds of people," said Rita Rodriguez, chief executive of the Brand Union, a corporate branding and identity agency.

"The brand is a strategic and financial asset," she said. "It has to be taken care of very similarly to any other asset you have on your balance sheet. Anything that would detract from that could jeopardize the brand impression the brand makes."

Mr. Sater was born in the Soviet Union, the son of Rachel and Mikhail Sater, according to public records, court testimony and the federal indictment. He has said his parents, who are Jewish, moved first to Israel, then to Baltimore and finally to New York in the early 1970s to escape "religious persecution."

Mr. Sater was born Haim Felix Sater, but he once testified in court that he "Americanized" his name to Felix Henry Sater in the early 1990s.

Mr. Sater took classes at Pace University but dropped out at 18 to work at Bear Stearns. Like Mr. Klotsman, he rose quickly, moving from firm to firm selling stock.

Mr. Sater's first brush with the law came in 1991. Mr. Sater and Mr. Klotsman were at El Rio Grande, a Midtown watering hole, celebrating with a friend and eventual co-conspirator, Salvatore Lauria, who had just passed his stockbroker's exam.

Mr. Sater later told a judge that he was in a good mood, having made a quick $3,000 in commissions that day. But he got into an argument with a commodities broker at the bar, and it quickly escalated. According to the trial transcript, Mr. Sater grabbed a large margarita glass, smashed it on the bar and plunged the stem into the right side of the broker's face. The man suffered nerve damage and required 110 stitches to close the laceration on his face.

"I got into a bar fight over a girl neither he nor I knew," Mr. Sater said in an interview. "My life spiraled out of control." Mr. Sater was convicted at trial in 1993, went to prison and was effectively barred from selling securities by the National Association of Securities Dealers.

Case 1:10-cv-00766-BMC   Document 44   Filed 09/06/12   Page 28 of 63 PageID #: 550

But according to the 2000 federal indictment in the fraud case, Mr. Sater, Mr. Klotsman, Mr. Lauria and their partners gained control in 1993 of White Rock Partners, which later changed its name to State Street Capital Markets. Although the companies "held themselves out as legitimate brokerage firms," the indictment states, "they were in fact operated for the primary purpose of earning money through fraud involving the manipulation of the prices of securities."

The trio would secretly gain control of large blocks of stock and warrants in four companies through offshore accounts, the indictment said. In an illegal "pump and dump" scheme, they would inflate the value of the shares through under-the-table payoffs to brokers who sold the securities to unsuspecting investors by spreading false information about the companies. Brokers were prohibited from acting on sell orders from investors unless they found another buyer, the indictment said.

The partners would then sell large blocks of stock at a steep profit. Investors suffered substantial losses as share prices plummeted. Despite the prohibition against selling securities, a subsequent complaint by regulators at the N.A.S.D. recounted how Mr. Sater "cursed, yelled and screamed" at the firm's brokers in an attempt to motivate them. He also offered cash rewards to brokers who sold the largest block of house stocks.

At the same time, Mr. Sater, Mr. Lauria and others sought protection and help from members of the Mafia in resolving disputes with "pump and dump" firms operated by other organized crime groups. In 1995, for instance, Edward Garafola, a soldier in the Gambino crime family, sought to extort money from Mr. Sater. Mr. Sater, in turn, got Ernest Montevecchi, a soldier in the Genovese crime family, to persuade Mr. Garafola to back off, according to the indictment.

The denouement of Mr. Sater's career on Wall Street began in 1998 at a locker at a Manhattan Mini Storage in SoHo, where investigators discovered two pistols, a shotgun and a gym bag stuffed with a trove of documents outlining the money laundering scheme and offshore accounts of Mr. Sater and his partners. According to a law enforcement official, as well as Mr. Klotsman and another defendant in the case, Mr. Sater had rented the locker and then neglected to pay the rent. Mr. Sater denied having anything to do with the locker or the guns.

At the time investigators opened the storage locker, Mr. Sater and Mr. Klotsman had gone to Russia, where their wheeling and dealing continued, they said. Their most interesting stories, however, are hard to assess.

Mr. Sater and Mr. Klotsman tried to cut a deal with the C.I.A., according to a book co-written by Mr. Lauria, "The Scorpion and the Frog: High Times and High Crimes." In exchange for leniency, the book said, they offered to buy a dozen missiles that Osama bin Laden had placed on the black market. The deal later collapsed.

Mr. Lauria has since renounced his book, which also details the false stock brokerage scheme, calling it largely a work of fiction. He even tried unsuccessfully to block publication. However, his co-author, David S. Barry, said he documented all the stories in the book with records and other interviews.

Mr. Klotsman said that Mr. Sater did obtain information for the United States about another set of black-market missiles, and that those efforts "bought Felix his freedom" from prison.

Mr. Sater, Mr. Klotsman and Mr. Lauria eventually returned to New York. Mr. Klotsman and Mr. Lauria agreed to cooperate with the United States attorney's office in Brooklyn and pleaded guilty to racketeering charges in connection with the fraudulent stock brokerages, other defendants and lawyers in Mr. Sater's case said. The information they provided helped prosecutors obtain guilty pleas from all 19 of their former cohorts, including six with ties to the mob.

Mr. Klotsman and his lawyer assert that Mr. Sater also pleaded guilty and cooperated. "Felix was one of the significant participants in the fraud," the lawyer, Alexi M. Schacht, said.

Mr. Klotsman, who grew up with Mr. Sater, now lives in a $600-a-month apartment in Moscow. In an interview, he said he was paying the American government $625 a month in restitution for the $40 million lost by investors. He questioned whether Mr. Sater was paying a dime.

But Mr. Sater and his lawyer, Mr. Burstein, avoided many questions concerning his legal problems involving the Wall Street scam, including whether he pleaded guilty and cooperated. "I challenge you to find any official government document anywhere

Case 1:10-mc-00706-BMC   Document 44   Filed 09/06/12   Page 30 of 63 PageID #: 558

demonstrating his indictment or conviction for any crime other than the assault," Mr. Burstein said.

Mr. Sater said he joined Bayrock in 2003 at the urging of the company's founder, Mr. Arif. A neighbor of Mr. Sater's in Sands Point, on Long Island, Mr. Arif is a former economist for the Soviet government who built a chain of five luxury hotels in Turkey and Kazakhstan after the collapse of the Soviet Union.

Within a stone's throw of the Manhattan Mini Storage building, the Trump SoHo is rising rapidly at the corner of Spring and Varick Streets, another new glass tower amid the somewhat grubby industrial buildings of what had been the city's printing district. The tower has generated opposition from some local residents and preservationists.

It is, for Mr. Sater, an emblem of his new life. "I'm trying to lead an exemplary existence," he said. "Old, bad luggage is not something anyone wants to remember."

## Yankelovich of GFI Realty Services closes $24 million sale: Loehmann's Seaport Plaza



2101 Emmons Avenue - Brooklyn, NY



2101 Emmons Avenue - Brooklyn, NY



Erik Yankelovich

**Brooklyn, NY** Erik Yankelovich, senior broker at GFI Realty Services Inc., recently closed the sale of Loehmann's Seaport Plaza located at 2101 Emmons Ave. in the Sheepshead Bay area for $24 million. This three-story retail property was sold by the Bayrock Group and purchased by a partnership of local and European investors. Josh Bernstein of Bayrock Group helped facilitate the transaction.

The retail center, anchored by Loehmanns, consists of 63,000 gross s/f of retail space and a 50,000 s/f self-serve parking garage with 186 parking spots. The property traded for a 6% cap rate and was purchased without any financing. The new owners plan on

maintaining the property as one of the most appealing retail and entertainment plazas in the borough.

"It took one phone call to sell this property. My clients immediately recognized this tremendous opportunity to acquire a trophy asset in South Brooklyn," said Yankelovich, who represented the buyers in the transaction. "The shopping center is extremely popular and Loehmann's lease, the anchor tenant, although not expiring anytime in the near future, is significantly below market, which presents future potential for the new owners. The average rent in the plaza is roughly $35 per s/f in a market that is around $60."

The retail plaza received a special variance, permitting it to be built in 1996. It is located on the major thoroughfare of Emmons Ave., facing the Sheepshead Bay canal, and close to public transportation.

# Courthouse News Service

Thursday, August 26, 2010 Last Update: 8:10 AM PT
## Company Claims Worker Snooped on It
By BARBARA LEONARD
ShareThis

MANHATTAN (CN) - Bayrock Group, a real estate development and investment firm, claims an employee installed spyware on company computers that gave him access to every workstation, then disclosed and disseminated "highly sensitive, confidential and proprietary information."

Bayrock sued Joshua Bernstein, whom it hired as a financial analyst in November 2006. Bayrock says Bernstein also provided it with tech support until he was fired in September 2008.

In its federal complaint, Bayrock claims Bernstein had an IT support vendor install the spyware, and that he signed the purchase order and concealed the installation from management.

"Unbeknownst to and without the approval of his superiors, Bernstein installed spyware on Bayrock's computers that enabled him to view (even remotely, i.e. from outside the Bayrock office), download and record files, emails, website views and even keystrokes of every Bayrock employee," according to the complaint (parenthesis in original).

"Then upon his termination, Bernstein absconded with, in his own sworn words, 'thousands' of documents (both hard copy and electronic) - documents that he retains possession of to this day."

Bayrock says Bernstein also took his computer hard drive, a company BlackBerry and other equipment, which he has refused to return.

Bayrock claims Bernstein obtained financial information, matters of attorney-client privilege and personal communications through his "unauthorized, disloyal and fraudulent conduct." It claims Bernstein has "disseminated information he obtained to third parties and has publicly disclosed information."

Bernstein sued Bayrock in Westchester Supreme Court last year, claiming it owed him money for his work. Bayrock says he revealed in a deposition that he took the documents.

"As he has admitted under oath, following his termination Bernstein retained or took with him 'thousands' of emails and 'hundreds' of paper documents belonging to Bayrock," according to the complaint.

Bayrock says Bernstein released the information to his then-attorney Frederick Oberlander, who sued Bayrock on behalf of two former employees and included excerpts from the documents in a 164-page complaint.

"When alerted to the fact that references to sealed criminal case documents had been quoted in and attached to pleadings in a civil case, this court immediately ordered the sealing of the complaint and enjoined its further dissemination," according to Bayrock's complaint.

Bayrock seeks statutory and punitive damages for conversion, breach of fiduciary duty and violations of the computer fraud and wiretap acts. It also wants its hardware and documents returned.

Bayrock is represented by Walter Saurack with Satterlee Stephens Burke & Burke.



**U.S. Securities and Exchange Commission**

### Testimony Concerning
### The Involvement of Organized Crime
### on Wall Street

**By Richard H. Walker**
*Director, Division of Enforcement*
*U.S. Securities & Exchange Commission*

**Before the House Subcommittee on Finance and Hazardous Materials,**
**Committee on Commerce**

**September 13, 2000**

Chairman Oxley, Ranking Member Towns, and Members of the Subcommittee:

I appreciate the opportunity to appear before this Subcommittee on behalf of the Securities and Exchange Commission ("SEC" or "Commission") to address the involvement of organized crime on Wall Street and the Commission's efforts to end this involvement. The Commission commends the Chairman, the Ranking Member, and the Members of the Subcommittee for holding hearings on this important topic. These hearings are particularly timely in light of the announcement this past June by the SEC, the United States Attorney's Office for the Southern District of New York, the FBI, and NASD Regulation of a major strike against organized crime on Wall Street. Over 100 individuals were indicted, including 11 members and associates of five different organized crime families.

### I. Executive Summary

The government has charged affiliates of organized crime families with securities law violations in several recent cases. While any unlawful activity by organized crime on Wall Street is cause for concern, the Commission believes such activity to be limited and not a threat to the overall integrity of our nation's securities markets. The Commission's experience shows that the activities of organized crime have been confined to the "microcap" securities market[1] and taint only a small fraction of that sector. Moreover, through joint prosecutions with various United States Attorney's Offices and state and local prosecutors, as well as the adoption of regulatory initiatives designed to safeguard the microcap market, the Commission has made significant strides in curtailing organized crime activity on Wall Street.

This testimony is designed to provide the Subcommittee with (i) a chronological account of enforcement actions by the SEC and other law enforcement and regulatory bodies in response to reported organized crime activity on Wall Street; and (ii) a summary of the recent regulatory initiatives designed to protect the microcap market from fraud.

## II. A Chronological Account of Reported Mob Involvement on Wall Street and the Response by Regulators

Mob involvement on Wall Street is not new. As organized crime advanced into the white-collar arena, the stock market became one of its targets.[2]Indeed, there is evidence that organized crime had made inroads on Wall Street back in the 1970's.[3] Then, as now, organized crime reportedly focused its efforts on the manipulation of microcap stocks.[4]

During the last 20 years, the government has brought a number of significant cases against organized crime figures operating on Wall Street. The SEC assisted criminal prosecutors in virtually all of the investigations leading to these actions. In some of these cases, the SEC did not bring separate civil actions in order to avoid the risk of impairing a parallel criminal proceeding.[5] The risk stems from the defendant's right to discovery in the SEC's civil action, which would be unavailable in a criminal proceeding. Criminal prosecution of organized crime figures takes priority over civil prosecution because most such defendants are not going to be deterred by civil sanctions alone. Rather, the threat of jail time is the most effective deterrent in this area.[6]

The most notable case brought during the 1980's that named defendants having alleged links to organized crime was a joint action by the SEC and the U.S. Attorney's Office for the District of New Jersey on October 2, 1986. This action, against Marshall Zolp, Lorenzo Formato, and others, alleged that the defendants manipulated the stock of Laser Arms Corp, a purported maker of a self-chilling can.[7] In fact, Laser Arms was a complete fraud. The company generated fictitious financial statements and the product was non-existent. Zolp was reportedly recruited by organized crime to conduct penny-stock manipulations, including the Laser Arms manipulation.[8] Co-defendant Formato testified in Congressional hearings that during the years he promoted and sold penny stocks, he was involved in organized crime.[9]Formato also testified to rampant penny stock manipulation by organized crime.[10] The Congressional hearings at which Formato testified led to passage of the Penny Stock Reform Act of 1990.[11]

Next, on December 13, 1988, the SEC sued F.D. Roberts Securities, Inc., a New Jersey boiler room, and four associated persons for manipulating a microcap stock, Hughes Capital Corp. At least one of the four individuals sued, Dominick Fiorese, an F.D. Roberts consultant, had reported ties to organized crime.[12]

Mob activity on Wall Street reportedly increased in the 1990's. On February 10, 1997, The New York Times reported that "Mafia crime families are switching increasingly to white-collar crimes" with a focus on "small Wall Street brokerage houses."[13] According to The New York Times story, the

Mafia's entry into the securities markets was spurred by its reported loss of $500 million a year in profits from the dissolution of its garbage-hauling cartels, and its reported loss of $50 million a year in profits following its eviction from the Fulton Fish Market.[14]

Around the time of *The New York Times* story, *Business Week* also ran a cover story entitled, "The Mob on Wall Street."[15] Several of the individuals and entities mentioned in the story were then the subject of SEC and criminal investigations.

A series of criminal indictments and civil prosecutions of several securities law violators with alleged connections to organized crime began in 1997.[16] In May 1997, a FBI sting operation led to charges by the U.S. Attorney for the Eastern District of New York against Louis Malpeso, Jr., a reported Colombo crime family associate, for conspiring to commit securities fraud.[17] The indictment alleged that Malpeso conspired with stock broker Joseph DiBella and Robert Cattogio, one of the heads of the Hanover Sterling brokerage firm, to inflate the price of a penny stock, First Colonial Ventures. The Business Week Article had reported that organized crime was manipulating First Colonial stock and warned legitimate market makers to steer clear of the stock. The indictment alleged that Malpeso offered an undercover FBI agent posing as a money manager a kickback of 25 percent in exchange for the agent purchasing $2.5 million of First Colonial stock. All three defendants pled guilty.[18]

A major strike against organized crime on Wall Street came on November 25, 1997 when the U.S. Attorney for the Southern District of New York indicted 19 persons, including four with alleged ties to organized crime, for racketeering. The charges stemmed from a year-long investigation by the SEC, the U.S. Attorney's Office, the FBI, and the New York Police Department with the assistance of NASD Regulation. The 25-count indictment outlined the infiltration of a brokerage firm, Meyers Pollock & Robbins, by the Bonanno and Genovese crime families for the purpose of manipulating the stock price of HealthTech International. Alleged Bonanno captain Frank Lino and alleged Genovese captain Rosario Gangi caused numerous Meyers Pollock brokers, through bribes and intimidation, to artificially drive up HealthTech's stock price. The brokers were paid excessive commissions for selling this stock, and often used high-pressure sales tactics and made misrepresentations about HealthTech. An associate of Lino and Gangi had received thousands of shares of HealthTech stock from HealthTech's CEO Gordon Hall in exchange for their efforts to inflate its price.

The SEC suspended trading in HealthTech on November 17, 1997. On January 21, 1999, Lino, Gangi, and Eugene Lombardo, an alleged Bonanno family associate, pled guilty to securities fraud.[19] John Cerasini, an alleged Bonanno soldier, pled guilty to an extortion conspiracy charge. On May 11, 1999, a federal jury found Hall guilty of racketeering.[20] In addition, in April 2000, Michael Ploshnick, Meyers Pollock's President, and 11 brokers were indicted for their role in the fraud.

At the time, the HealthTech case was the largest law enforcement action

taken against organized crime operating on Wall Street. Despite the size of the case, law enforcement officials cautioned that, based on their experience, they did not believe the problem to be widespread.[21]

Also during 1997, the Manhattan District Attorney's Office, working with the NASD, arrested 53 people in a broker licensing test-taking scandal. More than 50 stockbrokers were charged with paying two impostors to take their licensing tests. The brokers worked at several boiler rooms including some with alleged ties to organized crime.[22]

On April 23, 1998, the Commission sued Sovereign Equity Management Corp. and its president Glen T. Vittor for a scheme to manipulate the market price of two microcap companies, Technigen Corp. and TV Communications Network, Inc. Five days later, Vittor was separately charged by the SEC for his role in another microcap manipulation. The Business Week Article reported that Sovereign was controlled by organized crime.

On December 16, 1998, the U.S. Attorney for the Eastern District of New York charged seven people, including Robert Cattoglo and Dominick Froncilio, who was alleged in the indictment to be an associate of the Genovese crime family, with a multi-million dollar stock manipulation and money laundering scheme. The scheme was carried out through a New Jersey brokerage firm, Capital Planning Associates, Inc. According to the charges, Capital Planning was under the secret control of convicted stock swindler Catoggio, who used the firm as a vehicle to carry out a series of stock manipulations. Catoggio was barred from the securities industry by the SEC in 1995 as a result of securities fraud at another brokerage firm under his control.

The stock that was the subject of the manipulation was Transun International Airways, Inc. ("TSUN"), which traded on the Nasdaq OTC electronic bulletin board stock market. According to the indictment, TSUN purported to be a chartered airline; however, it never owned or operated any planes, never conducted any airline business, and never generated any revenues. The defendants were charged with gaining control of the company's stock at minimal cost, artificially inflating its price by touting it aggressively at Capital Planning and issuing spurious claims about the health of the fly-by-night company, and then unloading over $8 million worth of stock on unsuspecting customers. Froncilio, as well as four other defendants, plead guilty to the charges.[23]

The next major strike against organized crime on June 16, 1999 when the U.S. Attorney for the Eastern District of New York indicted 89 persons for engaging in microcap "pump and dump" manipulations at eight brokerage firms that defrauded investors out of more than $100 million. The SEC assisted in the investigation, including detailing a staff member to the Eastern District.

In one 23-defendant case, the three defendants who were charged with leading the scheme reportedly had ties to organized crime: Dominick Dionisio (Colombo family), Enrico Locascio (Colombo family), and Yakov

Slavin (associate of the Bor organized crime group of Russian immigrants). Each has pled guilty.[24]

The indictment alleges that "[t]he Colombo Organized Crime Family of La Cosa Nostra controlled boiler rooms at brokerage firms that engaged in fraudulent schemes to sell securities to the public on the basis of false and misleading statements and omissions." Specifically, the indictment charges that Dionisio, Locascio, and Slavin placed and supervised registered and unregistered brokers and cold callers at several boiler rooms. The criminal enterprise allegedly manipulated several microcap stocks.

The U.S. Attorney for the Eastern District of New York, with the assistance of the SEC, also brought criminal charges on June 16, 1999, against 55 defendants for their participation in fraud at a network of four related brokerage firms. The lead defendants, Robert Catoggio and Roy Ageloff, were alleged to be the heads of the Hanover Sterling firm, the Norfolk Securities firm, PCM Securities, and Capital Planning, which operated in New York, New Jersey and Florida, and employed hundreds of brokers.

The defendants were charged with securities fraud in connection with a vast "pump and dump" manipulation that involved at least 17 OTC Bulletin Board and Nasdaq Small Cap stocks and resulted in over $100 million in fraud losses. The charges included not just securities fraud and money laundering, but an unusual use of RICO charges in connection with Catoggio's and Ageloff's operation of this enterprise. Ageloff, who recently pled guilty to the RICO charge, was the focus of the Business Week Article, in which he and Hanover Sterling were alleged to have ties to the Genovese crime family. Catoggio was charged with running the RICO enterprise with Ageloff, and had pled guilty to conspiring with Malpeso, Jr., an alleged Colombo family associate, in connection with an FBI sting. To date, 48 of the 55 defendants charged have pled guilty, with seven awaiting trial.

The next day, June 17, 1999, in an unrelated action in federal district court in Tampa, Philip Abramo, a captain of the DeCalvacante organized crime family, Louis Consalvo, a member of the DeCalvacante family, and three others were criminally charged for their role in numerous microcap "pump and dump" frauds. The indictment alleged that the defendants, through a brokerage firm previously sued by the SEC, Sovereign Equity Management Corp., solicited corporations in need of capital to conduct initial public offerings and Regulation S offshore offerings. The defendants obtained discounted stock of the issuers. The stock was then manipulated in "pump and dump" schemes run through Sovereign. Brokers at Sovereign were paid excessive commissions to "push" the stock on investors and were instructed not to permit retail customers to sell the stock, thereby keeping its price artificially propped up.

In addition, the defendants would "short" the stocks once they instructed Sovereign brokers to cease their "pumping" efforts. This would allow the defendants to make an additional profit as the price of the stock declined. A short seller must borrow the shares that he is selling short. The indictment alleged that "[w]hen the defendants could not find stock to borrow and sell short" ... the defendants engaged in extortion of other brokers in order to

obtain the stock using their stated relationship to the mafia' and also using threats to commit bodily harm."

Violence turned the public's attention to possible organized crime involvement within the securities markets on October 26, 1999. Stock promoters Maier S. Lehmann and Albert Alain Chalem were found shot to death execution style in a home in Colts Neck, New Jersey. At the time, Lehmann and Chalem ran an Internet web site, Stockinvestor.com, which touted penny stocks. The SEC had previously sued Lehmann for his role in a penny stock manipulation. Chalem had been a broker at A.S. Goldmen, a now-defunct boiler-room operation that has been the subject of both civil and criminal securities fraud charges. While no one has been arrested yet in the murders, media reports have cited close ties between Chalem and organized crime.[25]

Another major strike against organized crime in the securities markets came on March 3, 2000 when the U.S. Attorney for the Eastern District of New York indicted 19 people, including six with alleged ties to organized crime. The indictment alleged that a broker-dealer, White Rock Partners (later renamed State Street Capital Markets), working with brokers at several notorious boiler rooms, including J.W. Barclay & Co., A.R. Baron & Co., and D.H. Blair, engaged in microcap "pump and dump" manipulations. The indictment also alleged that the defendants most frequently relied on fraudulent Regulation S offerings to obtain their inventory of stock to manipulate. The six alleged organized crime members in the criminal enterprise are as follows:

| Name | Position | Organized Crime Family |
|---|---|---|
| Frank Coppa Sr. | Captain | Bonanno |
| Edward Garafola | Soldier | Gambino |
| Eugene Lombardo | Associate | Bonanno |
| Ernest Montevecchi | Soldier | Genovese |
| Daniel Persico | Associate | Colombo |
| Joseph Polito Sr. | Associate | Gambino |

The indictment alleges that the organized crime defendants, among other things, (i) resolved disputes relating to the hiring and retention of brokers, (ii) halted attempts by other members of organized crime to extort members of the criminal enterprise, and (iii) halted efforts to reduce the price of securities underwritten by White Rock and State Street through such techniques as short selling.

The most recent law enforcement action against organized crime on Wall Street came on June 14, 2000. The SEC, U.S. Attorney for the Southern District of New York, FBI, and NASD Regulation jointly announced the results of a one-year undercover operation targeting microcap fraud, including organized crime operating in this market. The SEC sued 63 individuals and entities in five enforcement actions. The U.S. Attorney's Office indicted 120 defendants, including 11 members and associates of five

different organized crime families, in connection with several securities fraud scams conducted through various criminal enterprises. The indictments allege fraud in connection with the publicly traded securities of 19 companies and the private placement of securities of an additional 16 companies. The 11 alleged members and associates of organized crime are as follows:

| Name | Position | Organized Crime Family |
|---|---|---|
| John M. Black | Associate | Luchese |
| James F. Chickara | Associate | Colombo |
| Robert P. Gallo | Associate | Genovese |
| Michael T. Grecco | Associate | Colombo |
| James S. LaBate | Associate | Gambino |
| Vincent G. Langella | Associate | Colombo |
| Robert A. Lino | Capo | Bonanno |
| Frank A. Persico | Associate | Colombo |
| Salvatore R. Piazza | Associate | Bonanno |
| Sebastian Rametta | Associate | Colombo |
| Anthony P. Stropoli | Soldier | Colombo |

The indictments allege that the criminal enterprises engaged in the following illegal conduct:

- The manipulation of numerous microcap stocks.
- To further its manipulations, the enterprises infiltrated and gained control of certain brokerage firms, including Monitor Investment Group, Meyers Pollock & Robbins, and First Liberty Investment Group.
- To control the supply of stock that it was manipulating, the enterprises bribed brokers at other firms to "put away" (i.e, ensure their clients held) certain securities. The bribed brokers included a crew of brokers working for William Scott & Co., principals of a Meyers Pollock branch office, and a crew of brokers from Atlantic General Financial Group.
- The enterprises engaged in numerous private placement frauds, including offerings involving Ranch*1 Inc., World Gourmet Soups, and Jackpot Entertainment Magazine, Inc. Here, members and associates of the enterprise dominated and controlled each of the issuers. Brokers selling the securities were paid undisclosed exorbitant sales commissions of up to 50 percent. The enterprises profited by retaining a portion of the excessive sales commissions for itself.
- The enterprises engaged in a union pension fund fraud and kickback scheme. The enterprise devised two fraudulent investments that appeared to be suitable for the pension funds, but would secretly divert a portion of the investment proceeds. For example, in one corrupt offering, $2 million of every $10 million invested was to be

"kicked back" to the enterprises and corrupt union officials.
- The indictment also charged that the enterprise used extortion, threats and intimidation to further its securities frauds. Specifically, the enterprises instilled fear in brokers and other market participants who did business with the enterprises, in particular those brokers who agreed to "put away" stock.

Simultaneous with the filing of the criminal indictments, the SEC instituted civil administrative proceedings against several of the criminal defendants with alleged ties to organized crime, including Black, Gallo, Grecco, LaBate, and Piazza. NASD Regulation had previously filed a complaint against 18 persons and Monitor Investment Group for fraud-related activities arising out of Monitor's activities.

Organized crime often either infiltrates or otherwise employs the assistance of "boiler room" operations to commit manipulations. The SEC and other regulators have brought significant enforcement actions against a number of notorious boiler rooms in recent years. These include:[26] A.R. Baron & Co.; Baron's president Andrew Bressman, seven Baron registered representatives; Stratton Oakmont; three Stratton principals - Jordan Belfort, Daniel Porush, and Kenneth Greene; nine Stratton registered representatives; several Meyers Pollock registered representatives; Sterling Foster & Co.; over 20 Sterling Foster registered representatives, including its president Adam Lieberman; A.S. Goldmen & Co.; A.S. Goldmen's president, Anthony J. Marchiano and its financial and operations principal, Stuart E. Winkler; five A.S. Goldmen registered representatives; several D.H. Blair registered representatives; HGI Securities and 13 of its registered representatives; M. Rimson & Co. and several Rimson registered representatives including its president Moshe Rimson; Biltmore Securities and seven Biltmore registered representatives; F.N. Wolf & Co; Hibbard Brown & Co.; several registered representatives associated with J.T. Moran & Co. and its predecessor firms (First Jersey Securities, Inc. and Sherwood Capital Group); Blinder Robinson & Co. and its president Meyer Blinder; Rooney, Pace Inc. and its president Randolph K. Pace; First Jersey Securities, Inc. and its president Robert E. Brennan; Wellshire Securities and several of its registered representatives; Investors Associates, Inc. and its president Lawrence J. Penna; J.S. Securities and its president Jeffrey Szur; La Jolla Capital Corp. and several of its registered representatives; and several Barron Chase Securities Inc. registered representatives.

In addition, Hanover Sterling ceased doing business in February 1995 when it fell out of compliance with net capital requirements after a group of outside investors began aggressively short selling Hanover's house stocks. At the time, Hanover Sterling was the subject of regulatory investigation. Meyers Pollock closed down in 1997 in the face of regulatory investigation.[27] In July 2000, D.H. Blair & Co., already defunct, and 15 of its officers and directors were indicted by the Manhattan District Attorney's Office on charges that the firm was run as a criminal enterprise.

### III. Regulatory Initiatives Designed to Protect the Microcap Market

Existing evidence indicates that organized crime activity on Wall Street has

been limited to the microcap market. The reasons for this are several.
Effective market manipulations require control of the sell side of the market
and keeping the truth about the company from prospective investors. The
float and trading volume for securities of large-cap companies make it
almost impossible to control the sell side of the market, even with strong-
arm tactics. In addition, such companies tend to be more seasoned in
terms of public reporting and, as a result, it is more difficult to create
sudden, exciting hype about a company that would generate real buying
volume from innocent investors. In addition, analysts are more likely to
cover larger cap companies and regularly provide information on such
companies to the marketplace.

The most prevalent fraud in the microcap market is the "pump and dump"
manipulation. The scheme centers on the spreading of false information –
principally through either a "boiler room" or via the Internet – designed to
artificially inflate a stock's price. Investors often receive information that is
either exaggerated or completely fabricated. Those spreading the false
information typically hold large amounts of stock and make substantial
profits by selling after the price peaks. Upon selling their shares, the
promoters cease their manipulative efforts, the stock price plummets, and
innocent investors incur substantial losses.

Several rule and regulation amendments have been proposed and adopted
by the SEC. An effective "pump and dump" scheme requires that those
committing the fraud be able to quickly and cheaply obtain a supply of
stock that can then be manipulated. The rulemakings to date have focused
on creating obstacles for potential manipulators obtaining stock, while not
unduly hampering legitimate capital raising efforts by small businesses.
This section outlines these recent rulemakings which, we believe, have
proven successful in abating microcap fraud.[28]

**Regulation S** – Regulation S provides a safe harbor from SEC registration
for certain offshore offerings. Following the adoption of Regulation S, the
SEC found that some issuers were using Regulation S as a means of
indirectly distributing securities into the United States markets without
registration. SEC investigations suggested that organized crime was using
Regulation S offerings to obtain a cheap supply of stock to manipulate. In
light of these problems, on February 10, 1998, the SEC adopted
amendments to Regulation S. The amendments require, among other
things, that: (i) equity securities placed offshore pursuant to Regulation S
be classified as "restricted" securities, so that resales without registration
are subject to holding periods and quantity limitations; and (ii) Regulation S
securities cannot be resold into the United States for a period of one year,
as opposed to the prior 40-day period. Based on our experience in recent
investigations, our initial impression is that these amendments have been
effective in reducing Regulation S abuses.

**Rule 504** – This rule, known as the "seed capital" exemption, allows non-
reporting (generally start-up) companies to sell up to $1 million in
securities without registration or restriction. To curb microcap abuses, in
February 1999, the SEC modified Rule 504 to limit the circumstances where
general solicitation is permitted and unrestricted "freely tradable" securities

could be issued.[28]

**Form S-8** – Form S-8 is a short form available to register the offer and sale of securities to an issuer's employees as part of their compensation. These registration statements become effective automatically without SEC review. The staff has seen Form S-8 used improperly to raise capital, either by using the shares to pay broker-dealers or other consultants that assist in capital raising or by using employees or "consultants" as intermediaries to raise capital indirectly. The amendments adopted in February 1999 clarify that consultants and advisors can be treated as employees only if (i) they are natural persons, (ii) they provide bona fide services to the issuer, and (iii) their services are not related to capital-raising or the promotion of the issuer's securities.[30]

**Rule 701** – This rule allows private companies to sell securities to their employees without the need to file a registration statement. Amendments to the rule adopted in February 1999, among other things, harmonize the definition of consultant and advisor to that contained in Form S-8 and require specific disclosure from issuers that sell more than $5 million in 701 securities in a 12-month period.[31]

**Rule 15c2-11** – This rule is intended to deter the publication of stock quotations in the OTC Bulletin Board, the Pink Sheets and similar media that may be used in manipulative schemes. The current rule requires the first broker-dealer that publishes a quotation for a particular stock to review certain issuer information, including its most recent balance sheet, profit and loss, and retained earnings statements. Subsequent broker-dealers publishing quotations in that stock do not have to review this information; rather they are subject to a "piggyback" exception. To deter microcap manipulations, the SEC has proposed certain amendments to Rule 15c2-11 that would place greater information review requirements, and thus accountability, on broker-dealers publishing quotations and would provide greater investor access to information about those securities.

In addition, the Commission has recently approved two NASD rule proposals that are aimed at combating microcap fraud.

**NASD OTC Bulletin Board Eligibility Rule** – The Business Week Article reported, "[t]he Mob's activities seem confined almost exclusively to stocks traded in the over-the-counter Bulletin Board' and NASDAQ small-cap markets."[32] Bulletin board securities have traditionally been easier to manipulate than exchange traded securities because less public information was made available. NASD rule amendments, approved by the Commission on January 4, 1999, provide for enhanced disclosure of issuer information in this market. Specifically, the Commission approved the NASD's proposed amendments to NASD Rules 6530 and 6540. The amendment to Rule 6530 limits quotations on the OTC Bulletin Board to the securities of issuers that file reports with the Commission or banking or insurance regulators and are current in those reports. The amendment to Rule 6540 prohibits brokers from quoting a security on the Bulletin Board unless the issuer has made current filings.

**NASD Taping Rule** – On April 17, 1998, the Commission approved the NASD's proposed new rule requiring brokerage firms that employ a certain percentage of brokers who were employed by an expelled brokerage firm[33]within the last two years to tape record all of their brokers' telephone conversations with investors. The rule is designed to combat "boiler room" conduct. The threshold for triggering the taping requirement varies according to the size of the firm. In large firms, the rule applies if 20 percent of the firm's brokers were previously employed by disciplined firms, and in small firms the trigger is 10 percent.

Finally, a bill currently introduced in the Senate could also help combat microcap fraud. On June 9, 1999, Senator Susan Collins, Chairman of the Senate Permanent Subcommittee on Investigations, introduced the "Microcap Fraud Prevention Act of 1999" [the "1999 Bill"].[34] Among other things, the 1999 Bill would: (i) allow the SEC to bar fraudulent actors from participating in any securities offering, as opposed to only penny stock offerings; (ii) allow SEC enforcement actions to be predicated on state enforcement actions;[35] and (iii) allow the SEC to bar fraudulent actors from serving as officers or directors of any company, as opposed to only SEC reporting companies.

While the 1999 Bill enhances civil, and not criminal, remedies, it could still help deter organized crime involvement on Wall Street. Members of organized crime often need to recruit those in the securities industry, including brokers and promoters, to complete their schemes. The provisions of the 1999 Bill could make it harder to recruit these persons.

## V. Conclusion

The Commission will continue to implement a vigilant program to safeguard the microcap securities market from involvement by organized crime or anyone else aiming to commit fraud. We will also continue to work closely with the Justice Department to make certain that every instance of organized crime on Wall Street is prosecuted criminally. As always, the Commission and its staff will be pleased to assist the Subcommittee as it goes forward.

## Footnotes

[1]Although "microcap" is not a term defined in the federal securities laws, microcap companies are generally thinly capitalized companies whose securities trade in the over-the-counter market, primarily on the OTC Bulletin Board or in the pink sheets.

[2]James Cook, "The Invisible Enterprise," *Forbes*, Sept. 29, 1980 at 60 ("As its power, experience and cash flow have mounted, organized crime has advanced into increasingly sophisticated areas – into white-collar crime like ... the securities business.").

[1]One of the earliest reported securities fraud cases involving organized crime came on November 18, 1970 when the U.S. Attorney for the Southern District of New York and the SEC jointly announced indictments against Michael Hellerman, John Dioguardi, Vincent Aloi and others for securities fraud. Lit. Rel. No. 4826, 1970 SEC LEXIS 959 (Nov. 18, 1970). As reported in the 1980 Forbes article, Hellerman, who entered the witness-protection program, was a corrupt stockbroker manipulating several stocks, including Imperial Investments, with assistance from Dioguardi and Aloi, who allegedly had connections to organized crime. A 1977 book details the exploits of Michael Hellerman. Wall Street Swindler, 1977 at 2 ("I had been manipulating stocks for years. Some of Wall Street's biggest swindles, frauds that had ripped off millions of dollars from brokerage houses and banks, had been my brainchild. In most of those frauds, the mob and some of its most notorious members had been my partners.").

[4]Forbes, supra note 2 ("[O]rganized crime would logically move into areas where there is the least regulation – the over-the-counter market, shell companies, unregistered securities – companies with less than $1 million in assets and fewer than 500 stockholders.").

[5]addition, the SEC lacks the tools that Congress has given the Justice Department to fight organized crime. For example, the Justice Department has authority to conduct wire taps and engage in undercover operations. The SEC, on the other hand, is subject to the Privacy Act of 1978, which requires SEC staff to identify themselves when seeking information from witnesses. In addition, Federal Rule of Criminal Procedure 6(e) generally prevents the Justice Department from sharing grand jury materials with the SEC, though the SEC immediately notifies the Justice Department of a matter if we suspect organized crime involvement.

[6]See Bud Newman, Fraud, "Organized Crime Said Rampant in Penny Stock' Market," UPI, Sept. 8, 1999 (quoting Congressional testimony of Lorenzo Formato, an admitted penny stock manipulator with ties to organized crime: "Jail ... is one of the biggest deterrents to what is going on in the industry today.").

[7]U.S. v. Zolp, Lit. Rel. No. 11236, 1986 SEC LEXIS 635 (Oct. 2, 1986).

[8]"Securities Investigators Get a Handle on the Mob," The Toronto Star, Feb. 26, 1989 at F2.

[9]See "Witness Tells of Mob Influence in Penny Stocks", Los Angeles Times, Sept. 8, 1989 at B2.

[10]Id.

[11]Congressional passage of the Penny Stock Reform Act of 1990 helped curb fraud in the penny-stock market (a sub-group of the larger microcap market, and generally defined as stocks trading at $5 or less). Among other things, this Act requires a broker-dealer to disclose its compensation on all penny stock trades, provide a risk disclosure statement to all penny stock

customers, and provide a monthly statement to clients disclosing the market value of all penny stocks in their accounts.

[12]See Claire Poole, "Good-Bye, Fellas," *Forbes*, March 18, 1991 at 10 (stating that Fiorese had ties to the Gambino and Colombo crime families).

[13]Selwyn Raab, "Officials Say Mob is Shifting Crimes to New Industries," *The New York Times*, Feb. 10, 1997 at A1.

[14]Id.

[15]Gary Weiss, "The Mob on Wall Street," *Business Week*, December 16, 1996 [the "Business Week Article"]. The Business Week Article reported: (i) the mob had established a network of stock promoters, securities dealers, and boiler rooms to engage in "pump and dump" manipulations; (ii) four organized crime families (as well as elements of the Russian mob) controlled approximately two dozen broker-dealers; (iii) the mob was engaging in Regulation S scams; (iv) the mob's activities were confined to the OTC Bulletin Board and Nasdaq Small-Cap markets (the article found no indication of mob exploitation on the NYSE and AMEX); (v) the Hanover Sterling brokerage firm was under the control of the Genovese crime family; and (vi) mob-linked short sellers were associated with the Stratton Oakmont brokerage firm.

[16]Two notable law enforcement actions were taken in the early half of the 1990's. First, on November 15, 1993, Eric Wynn and four others were indicted in the District of New Jersey for conspiracy to commit securities fraud based on numerous penny stock manipulations. A jury found Wynn guilty and he was sentenced to 52 months imprisonment. Wynn was reportedly an associate of the Bonanno crime family.

Second, in 1994, the SEC sued a public issuer, Atratech, Inc., and several affiliated persons, including Anthony Gurino, for securities fraud. The Commission charged that: "Gurino secretly controlled Atratech to circumvent bars that were imposed on Gurino by New York City and the federal government prohibiting Gurino from bidding for municipal works contracts. In 1986, the City barred Gurino and his plumbing company, Arc Plumbing and Heating Co., because of their failure to disclose in a bid application that Gurino had been indicted for obstruction of justice in connection with an organized crime prosecution. During the hearing which led to the bar, Gurino was cited for failing to cooperate with the City and produce as a witness John Gotti, the head of the Gambino crime family and an alleged salesman' for Arc." *SEC v. Atratech*, Lit. Rel. No. 14201, 1994 SEC LEXIS 2631 (Aug. 22, 1994). A judgment by default has been issued against Atratech, Lit. Rel. No. 14862, 1996 SEC LEXIS 981 (April 4, 1996). Gurino settled the matter by agreeing to an injunction, $25,000 civil penalty, and a bar preventing him from serving as an officer or director of a public reporting company. Lit. Rel. No. 15529, 1997 SEC LEXIS 2129 (Oct. 7, 1997).

[17]See Helen Peterson, "Mafioso Held in Stock Fraud," *N.Y. Daily News*, May

3, 1997 at 12. Malpeso pled guilty on February 5, 1998.

[18]Malpeso was sentenced to 18 months imprisonment.

[19]Lino was sentenced to 49 months imprisonment, Gangi to 97 months imprisonment, and Lombardo to 96 months imprisonment.

[20]The SEC detailed a member of its staff to the U.S. Attorney's Office to assist in the prosecution of this action. Recognizing the value of criminal prosecution of organized crime efforts on Wall Street, the SEC has detailed members of its staff to U.S. Attorney's Offices in other cases as well. For example, one of the lead prosecutors in the Hall case was detailed from the SEC's Northeast Regional Office to the U.S. Attorney's Office for the Southern District of New York.

[21]See Sharon Walsh, "Mob Bust on Wall Street," *International Herald Tribune*, Nov. 27, 1997 at 3 (quoting Mary Jo White, U.S. Attorney for the Southern District of New York, as stating that attempts by organized crime to invade Wall Street were "relatively isolated and do not threaten the overall stability of the market"); Richard Tomkins, "Mob Linked to Pump and Dump Scheme," The Financial Post, Nov. 29, 1997 at 24 (quoting then-SEC Enforcement Director William McLucas: "I would be very cautious about coming to any conclusion to the effect that organized crime in the securities markets, including the small capitalization and micro-capitalization markets, is rampant. I do not believe that's the case.").

[22]See Barbara Ross & Douglas Felden, "Sting Nets Bad Stock," *N.Y. Daily News*, Jan. 9, 1997 at 6 ("The brokers worked at 17 small and medium-sized brokerage firms, including three companies that reportedly have links to the Genovese crime family. The firms include Stratton Oakmont; and Hanover Sterling & Co.").

[23]Froncillo was sentenced to 21 months imprisonment.

[24]Dionisio was sentenced to 97 months imprisonment, Locascio to 63 months imprisonment, and Slavin to 60 months imprionment.

[25]See Diana B. Henriques, "A Brutal Turn in Stock Frauds," *N.Y. Times*, Nov. 2, 1999 at B1.

[26]Most of these actions did not allege the involvement of organized crime.

[27]In March 1997, the Commission brought an antifraud action in federal district court against Meyers Pollock and its president Michael Ploshnick for their role in a fraudulent debt offering. *SEC v. Namer*, Lit. Rel. No. 15307, 1997 SEC LEXIS 666 (March 26, 1997).

[28]SEC staff is also working with the securities industry to develop other measures to reduce microcap fraud. For example, SEC staff is working with the NSCC/DTC, NYSE, NASD, and members of the SIA Clearing Committee on a data repository that will be used to store information that may be

useful in detecting on-going fraudulent activities. The repository, located at the NASD, will receive daily information related to the clearing process from a number of different sources, including clearing firms, the NYSE, the NASD, and NSCC/DTC. The clearing firms will send information on their correspondents' cancelled and "as-of" trades, proprietary account equity, and unsecured customer debits. The NYSE and NASD will send information on Regulation T extensions, and NSCC/DTC will send exception reports when a member dominates the market in a given security or holds a substantial amount of the DTC inventory in a given security. A pilot program using the NASD's INSITE software system is currently underway.

[29]Specifically, the amendments require registration under state law requiring public filing and delivery of a disclosure document to investors before sale, or reliance on an exemption under state law permitting general solicitation and general advertising so long as sales are made only to experienced (i.e. "accredited") investors. 1933 Act Rel. No. 7644 (February 26, 1999).

[30]Another amendment also intended to address enforcement concerns provides that offerings registered on Form S-8 will no longer be presumed to have been filed on the proper form if the Commission does not object to the form before the effective date. 1933 Act Rel. No. 7646 (Feb. 26, 1999).

[31]1933 Act Rel. No. 7645 (Feb. 26, 1999).

[32]The Business Week Article, *supra* note 14 at 94.

[33]The rule defined "expelled firm" as one that has been expelled from a self-regulatory organization in the securities industry or has had its registration revoked by the Commission for sales practice violations or telemarketing abuses.

[34]The 1999 Bill is co-sponsored by Senators Daniel Akaka, Max Cleland, and Judd Gregg.

[35]To date, the states have orchestrated two sweeps aimed at boiler rooms. In May 1997, 20 states accused 14 brokerage firms of violations including high pressure sales tactics. In July 1998, NASAA announced 100 enforcement actions against boiler rooms, including 64 actions involving brokers peddling microcap stocks.

*http://www.sec.gov/news/testmony/ts082000.htm*

Case 1:10-mc-00700-BMC Document 44 Filed 09/06/12 Page 50 of 63 PageID #: 378

194



U.S. Department of Justice

United States Attorney
Eastern District of New York

One Pierrepont Plaza
Brooklyn, New York 11201

Mailing Address: 147 Pierrepont Street
Brooklyn, New York 11201

Contact: Peggy Long                       March 2, 2000
      United States Attorney's Office
      (718) 254-6267

      Joseph Valiquette
      Federal Bureau of Investigation
      (212) 384-2718

      Marilyn Mode
      New York City Police Department
      (212) 374-6700

## PRESS RELEASE

### 19 DEFENDANTS INDICTED IN
### STOCK FRAUD SCHEME THAT WAS PROTECTED
### AND PROMOTED BY ORGANIZED CRIME

LORETTA E. LYNCH, United States Attorney for the Eastern District of New
York, LEWIS D. SCHILIRO, Assistant Director-in-Charge of the Federal Bureau of Investigation
in New York, and HOWARD SAFIR, Commissioner, New York City Police Department, today
announced the indictment of nineteen defendants, including six members and associates of various
Organized Crime Families of La Cosa Nostra, who are charged with participating in a large-scale
stock fraud and money laundering scheme between 1993 and 1996  Seventeen of the nineteen

Case 1:10-mc-00766-BMC Document 44 Filed 09/06/12 Page 51 of 63 PageID #: 579

195

2

defendants are charged with racketeering

The charges in the indictment center on the activities of two brokerage firms with offices in downtown Manhattan White Rock Partners & Co ("White Rock") and State Street Capital Markets Corporation ("State Street").[1] The indictment alleges that the principals of White Rock and State Street, together with other brokers and brokerage firms, planned and carried out a series of fraudulent securities schemes and then laundered tens of millions of dollars of illicit profits

As alleged in the indictment, the schemes were led by the defendants JOHN DOUKAS and WALTER DURCHALTER, together with Gennady Klotsman, Salvatore Lauria and Felix Sater, who collectively controlled White Rock and State Street ("the White Rock and State Street Partners").[2] The White Rock and State Street Partners secretly acquired large blocks of stock and warrants in the following four companies: Country World Casinos, Inc. ("Country World"), which was based in Colorado and was purportedly attempting to develop a casino in Black Hawk, Colorado; Holly Products, Inc. ("Holly"), which was based in Moorestown, New Jersey and was in the business of manufacturing tables and cabinets for the gaming industry and custom-built equipment for hospitals; U.S. Bridge of New York, Inc. ("USBNY"), which was based in Queens, New York and was a subcontractor on public infrastructure projects in the greater New York area, and Cable & Co Worldwide, Inc. ("Cable"), which had offices in New York and New Jersey and designed and imported men's footwear which was sold to department and specialty stores in the United States

The indictment alleges that the White Rock and State Street Partners were able to

---

[1] White Rock and State Street ceased operations in late 1996.

[2] Klotsman, Lauria and Sater have previously pleaded guilty to RICO charges in connection with their activities at White Rock and State Street.

196

3

acquire secret control of these securities through undisclosed financial arrangements with the following defendants  ABRAHAM SALAMAN, a stock promoter who provided the Country World Stock, LARRY BERMAN, Holly's chairman and chief executive officer, and JOSEPH POLITO, SR., an associate of the Gambino Organized Crime Family who was the president and principal shareholder of LSBNY

As alleged in the indictment, the White Rock and State Street Partners secretly acquired control of the securities in the name of various nominees including the defendant DANIEL LEV  Most often, the nominees were off-shore companies controlled by the White Rock and State Street Partners.  The price of the securities was then artificially inflated through the activities of brokers who fraudulently sold the stock to investors in return for received undisclosed cash payments from the White Rock partners.  These brokers included the defendants JACK BASILE, ROCCO BASILE and JOSEPH TEMERINO at White Rock, and ALFRED PALAGONIA and JOHN CIOFFOLETTI who were brokers at J.W. Barclay & Co., Inc., and D.H. Blair & Co., Inc., respectively [1]  Among the techniques used to artificially inflate and maintain the price of the manipulated securities, the indictment alleges that the defendants: (a) made false and misleading statements to persuade investors to buy and then not to sell the securities; (b) purposely failed to take and execute customer orders to sell the securities; and (c) only executed a sale of a security if the sale could be matched or "crossed" with a corresponding purchase of the same security by another investor

[1] JACK BASILE also has securities fraud and money laundering charges pending against him in United States v. Dionisio, et al., 99 CR 589 (EDNY).  ROCCO BASILE has securities fraud and money laundering charges pending against him in United States v. Catoggio, 98 CR 1139(S) (SDNY)

197

## 4

The indictment alleges that after the price of the stock was artificially inflated, the defendants sold their secretly held stock for a substantial profit. The proceeds from these then sales were then laundered through multiple transfers of funds to off-shore bank accounts by the defendant ALEKS PAUL, who then provided a corresponding amount of cash, less a money laundering fee, to the White Rock and State Street Partners.[4] Profits for other defendants were laundered through different schemes. For example, the indictment alleges that defendants JOSEPH POLITO, SR. and EDMOND NAGEL[5] secretly divided proceeds of approximately $380,000 derived from the sale of USBNY warrants that were deposited in an off-shore nominee's brokerage account controlled by NAGEL.

The indictment further alleges that the White Rock and State Street Partners enlisted the help of individuals affiliated with Organized Crime Families of La Cosa Nostra to protect and promote their criminal activities by resolving disputes and performing other services. Defendant FRANK COPPA, SR. was a captain in the Bonanno Organized Crime Family. Defendant ERNEST MONTEVECCHI was a soldier in the Genovese Organized Crime Family.[6] Defendant DANIEL PERSICO was an associate of the Colombo Organized Crime Family. Defendant EUGENE

---

[4]PAUL also has securities fraud and money laundering charges pending against him in United States v. Schwartz, et al., 99 CR 372 (EDNY), and United States v. Paul, et al., 99 CR 361 (SDNY).

[5]NAGEL also has bank fraud charges pending against him in United States v. Gangi, et al., 97 CR 1215 (SDNY).

[6]MONTEVECCHI is in custody based on his 1999 conviction in United States v. Gangi, et al., 97 CR 1215 (SDNY).

198

5

LOMBARDO was an associate of the Bonanno Organized Crime Family[1]. COPPA, MONTEVECCHI, PERSICO and LOMBARDO resolved and attempted to resolve disputes relating to the hiring and retention of brokers, the extortion and attempted extortion of participants in the scheme, and concerted efforts to reduce the price of securities underwritten by White Rock and State Street through short selling. In return for this assistance, COPPA, MONTEVECCHI, PERSICO and LOMBARDO received compensation in the form of securities and cash proceeds from the sale of securities.

The indictment also alleges that, in connection with the USBNY fraud scheme, the defendant LARRY RAY agreed to pay $100,000 to an executive of a bond brokerage firm to insure that USBNY would be granted bonding that would enable it to act as a general contractor on large-scale construction projects. Finally, the indictment alleges that defendants JOSEPH POLITO, SR., USBNY's president and an associate in the Gambino Crime Family, and EDWARD GARAFOLA, a soldier in the Gambino Crime Family, attempted to extort money from Felix Sater and others to recoup this $100,000 cash payment, but that defendant ERNEST MONTEVECCHI intervened on Sater's behalf, causing the extortionate demands to cease.

The charges in the current indictment carry the following maximum sentences: as to each RICO count, 20 years imprisonment, 3 years supervised release, a $250,000 fine (or twice the gross gain or loss) and an order of restitution; as to each money laundering count, 20 years imprisonment, 3 years supervised release, a $250,000 fine (or twice the gross gain or loss) and an order of restitution; as to each substantive securities fraud count, 10 years imprisonment, 3 years

---

[1] LOMBARDO is in custody based on his 1999 conviction in United States v. Gaoui, et al. 97 CR 1215 (SDNY).

SEP. 5. 2012 1:00PM                                                                    NO. 4626   P. 55

199

7

seized it   A recurrent theme in our investigations has been that organized crime goes where the money is   We intend to be there when they get there."

Commissioner SAFIR stated. "I am pleased to join with United States Attorney Loretta Lynch, and Assistant Director-in-Charge of the Federal Bureau of Investigation in New York Lewis Schiliro, in announcing the indictment of 19 individuals responsible for a 540 million dollar stock fraud ring.  We called this 'Operation Street Cleaner,' because it was designed to fight fraud on Wall Street, but it could just as well been titled 'Goodfellas Meet the Boiler Room.'  For those that seek to use these 'pump and dump' schemes to prey on unsuspecting investors, today's indictment should serve as a stark reminder that stock fraud is a serious crime and the law enforcement community is firmly committed to shutting down these and other illicit operations used to support organized crime."

Those defendants arrested in New York will be arraigned today by Magistrate Judge Joan M. Azrack at the United States Courthouse in Brooklyn.

·   The case is being prosecuted by Assistant U.S. Attorneys Jonathan S. Sack, Eric Corngold and Richard Molot.

200

8

**The Defendants**

FRANK COPPA, SR.
8 Brittany Ct.
Manalapan, NJ
DOB: 9/11/41
Counts: 1, 2, 3, 4, 13, 14, 15, 16


ERNEST MONTEVECCHI,
a/k/a "Butch"
Incarcerated
DOB: 6/18/45
Counts: 2, 13, 14


DANIEL PERSICO
6615 Wallaston, Ct.
Brooklyn, NY
DOB: 4/9/62
Counts: 2, 13, 14

JACK BASILE
1444 73d Street
Brooklyn, NY
DOB: 2/7/73
Counts: 2, 5, 6, 7, 8

ROCCO BASILE
150 Bay 8th Street
Brooklyn, NY
DOB: 2/21/68
Counts: 2, 5, 6, 7, 8

LARRY BERMAN
450 Merion Rd.
Merion Station, PA
DOB: 11/30/34
Counts: 1, 2, 3, 4, 5, 6, 7, 8

201

9

**JOHN CIOFFOLETTI**
27 Seagull Lane
Lincroft, NJ
DOB: 11/20/69
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**JOHN DOUKAS**
35 Briar Ct.
Cross River, NY
DOB: 2/19/48
Counts: 1, 2, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**WALTER DURCHALTER,**
a/k/a "Dutch"
63-57 84th Street
Middle Village, NY
DOB: 9/30/65
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**EDWARD GARAFOLA**
143 Lander Ave.
Staten Island, NY
DOB: 3/25/38
Counts: 19, 20

**DANIEL LEV**
149-05 Rockaway Beach Blvd.
Neponsit, NY
DOB: 7/12/66
Counts: 1, 2, 9, 10, 11, 12

**EUGENE LOMBARDO**
Incarcerated
DOB: 4/20/52
Counts: 1, 2, 3, 4, 9, 10, 11, 12

**EDMOND NAGEL**
New York, NY
DOB: 11/1/40
Counts: 1, 2, 9, 10, 11, 12

202

10

**ALFRED PALAGONIA**
18 Eastgate Rd.
Port Washington, NY
DOB: 12/31/66
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 15, 16, 17, 18

**ALEKS PAUL**
4 Ridgeway Drive
Kings Point, NY
DOB: 11/7/57
Counts: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12

**JOSEPH POLITO, SR.**
Boca Raton, Florida
DOB: 5/15/34
Counts: 1, 2, 9, 10, 11, 12, 19, 20

**LAWRENCE RAY**
2 Cedar Ridge Lane
Warren, NJ
DOB: 11/16/59
Counts: 9, 10

**ABRAHAM SALAMAN**
9728 Wynmill Rd.
Philadelphia, Pa.
DOB: 10/29/35
Counts: 2, 3, 4

**GIUSEPPE TEMPERINO,**
a/k/a "Joseph Temperino"
263 Avenue S
Brooklyn, NY
DOB: 8/27/74
Counts 1, 2, 5, 6, 7, 8

Page 29

1    Q.  And you had never practiced in real estate;
2  correct?
3    A.  No.  I had bought and sold stuff on my own, but
4  I had never done it as an agent.  I never --
5    Q.  Had you ever developed raw land as a -- as a
6  real estate developer up to that point in time?
7    A.  (Witness shaking head negatively.)
8    Q.  Did you have any experience in purchasing raw
9  land and getting all the entitlements, platting it, and
10 selling it over to consumers?
11   A.  The only part of that I've ever done was --
12 whenever I started as the mayor, we didn't have a city
13 manager.  So the mayor's role was to -- whatever it
14 took.  And we had these developers come in and they
15 would give us these dadgum, you know, plats and what
16 have you.  And it was really my job to -- you know,
17 kind of hard knocks way of doing it, but you had to
18 learn that stuff.  So I did learn it.  And I think I
19 got fairly good at it, of knowing what you had to do to
20 get your entitlements and just doing the entire
21 process.  Now, by far probably not an expert.  Probably
22 bad at it.  But I did not have a city manager and I had
23 to do that stuff.  So the first thing I did was hire a
24 city manager.
25   Q.  Let me ask the question a little bit different

Page 30

1  way.  When Mr. Zaretsky and his father approached
2  you --
3    A.  Yeah.
4    Q.  -- for your consulting --
5    A.  Yes.
6    Q.  -- was it your understanding you were -- you
7  were being retained because of your expertise in real
8  estate development?
9    A.  I would -- I don't know if I'd say expertise in
10 real estate development, no.  I am not an expert.  I
11 would say it was more my connections in this part of
12 the world.  Yeah, I would say it was more of my
13 relationships with -- with people in this part of the
14 world.
15   Q.  What was your understanding of Mr. Zaretsky and
16 his father and Mr. Borokhovich and Mr. Wolff?  Did they
17 represent themselves to be real estate developers?
18   A.  You -- well, let me -- Vitaly and his father
19 were in the materials business.  That doesn't sound
20 real good.  But they were in the materials business and
21 that's what their dollar was.  That's how they made
22 their money.  Now, Vitaly had also told me that he had
23 a few apartments up in New York that he bought and
24 renovated, and that's what he did.  So,
25     I don't know if they were professional real

Page 31

1  estate people, by all means.  Now, Eugene Borokhovich,
2  I think he's a little different story.  I think he had
3  dealt in some larger scale projects up in the New York
4  area.  I think he worked for a company named Bay Rock.
5  And Bay Rock -- he was -- he was up in that -- you
6  know, I don't know if he was a principal, by all means,
7  but that's where they ran onto him at.
8    Q.  Okay.  And so someone represented to you that
9  Mr. Borokhovich had some experience in larger
10 deals?
11   A.  No, I rep -- I figured that out.
12   Q.  You figured that out on your own?
13   A.  Yeah.  I mean, you research these guys all you
14 can because you don't know.  As the mayor of a small
15 city, you don't want to get tangled up with the mob, if
16 you will, so you actually research that stuff.
17   Q.  So prior to -- well, let me ask you this.  At
18 some point did you accept Mr. Zaretsky and his father's
19 offer to consult for them?
20   A.  You bet.
21   Q.  Basically, to be their eyes and ears on the
22 ground --
23   A.  Yeah.
24   Q.  -- in Manor, Texas?
25   A.  Sure.  Yeah.  But understand at that time it

Page 32

1  was not in Manor, Texas.  It was the outside of Manor
2  area.
3    Q.  Okay.  And the Exhibit A-1 to Deposition
4  Exhibit 17, the Wildhorse Ranch PUD there, do you
5  recognize that as a project that Mr. Zaretsky and his
6  partners and yourself eventually got involved in?
7    A.  Yes.
8    Q.  And where is that located?
9    A.  This is located just outside of Manor's ETJ.
10 It's solely in Austin's ETJ.  I want to say it's in
11 their 5 mile.  It may now be in their 2 mile.  But at
12 that time I want to say it was in their 5 mile ETJ.
13 And that's where it's located.
14   Q.  And what exactly is that?  Is that -- how many
15 acres are we looking at in that Wildhorse Ranch PUD?
16 Do you have any idea?
17   A.  Yeah.  I want to say you're looking at 1776. 78
18 acres.
19   Q.  Yeah.
20   A.  It's located in -- right off of 290.  130
21 splits it.
22   Q.  Splits down the middle of that tract?
23   A.  Uh-huh.
24   Q.  Okay.  And so does 290 split it too --
25   A.  No.

8 (Pages 29 to 32)