BEYS, STEIN & MOBARGHA LLP

Nader Mobargha

May 23, 2013

**BY FACIMILE (718) 613-2236 AND BY FEDERAL EXPRESS**

The Honorable Brian M. Cogan
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   Civil Contempt Proceedings v. Frederick M. Oberlander and Richard E.
> Lerner, 12 MC 557 (BMC); Amended Order To Show Cause for Leave-To-
> File Restrictions

Dear Judge Cogan:

        We represent John Doe in the above-referenced matter.  Pursuant to your order, dated May 22, 2013, requiring us to comply with Local Rule 83.6, enclosed please find the Affidavit of Nader Mobargha in Support of an Order To Show Cause and an Amended Order To Show Cause.

        Thank you in advance for your consideration.

                        Respectfully Submitted,

                        Nader Mobargha
                        *Counsel for John Doe*

Page 2 of 2

Cc:     The Honorable I. Leo Glasser

        The Honorable Lorna G. Schofield

        Frederick M. Oberlander, Esq.

        Richard E. Lerner, Esq.

        Stephen Green, Assistant U.S. Attorney, Northern District of New York

        Todd Kaminsky, Assistant U.S. Attorney, Eastern District of New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

v.

JOHN DOE

Defendant.

12 MC 557 (BMC)

**FILED UNDER SEAL**

## AMENDED ORDER TO SHOW CAUSE FOR FINDINGS OF CIVIL CONTEMPT

Defendant John Doe, by his attorneys Beys, Stein & Mobargha LLP, having moved this

Court for relief hereinafter described.

**NOW** upon the accompanying affidavit of Nader Mobargha, dated May 23, 2013, and its

attached exhibits ("May 23th Letter"), it is hereby

**ORDERED**, that Richard E. Lerner, and Frederick M. Oberlander, show cause before the

Honorable Brian M. Cogan, United States District Judge, at the United States Courthouse, 225

Cadman Plaza East, Brooklyn, New York 11201 on ____ ____, 2013 at ____ __, or as soon as

thereafter as counsel may be heard, why they should not be held in civil contempt of the Court of

Appeals' December 20, 2011 Summary Order (the "Order") for their filing of yet another

frivolous lawsuit on May 10, 2013 (*Kriss et al v. Bayrock Group LLC et al.*, 651715/2013)("May

Action"), in addition to the one they filed in March 2013 (*Estate of Ernest Gottdiener et al. v.*

*Felix Sater and Salvatore Lauria*, 13 Civ. 1824)("March Action").

**ORDERED**, that Messrs. Lerner and Oberlander show cause at the above hearing why

an order should not issue requiring an imposition on Oberlander and Lerner of (i) leave-to-file

restrictions and requirements of notice to other federal courts pursuant to the Court of Appeals'

Order, prohibiting them from filing any further actions without the consent of this Court; (ii)

leave-to-file restrictions and requirements of notice to other state courts, prohibiting them from

1

filing any further state actions against any of the defendants named in the March Action or the May Action; and (ii) monetary sanctions against Oberlander and Lerner under Federal Rule of Civil Procedure 11, including an order requiring them to pay Doe's attorney's fees and costs for this motion and for any potential contempt proceedings, and any other legal fees and costs that Doe has incurred, or will incur, as a result of the March and May Actions filed by Oberlander and Lerner.

ORDERED, that service by mail of a copy of this order and the May 23th Letter upon Lerner and Oberlander on or before May ___, 2013 shall be deemed good and sufficient service thereof;

ORDERED, that Messrs. Lerner and Roe's papers in opposition to Doe's motion, if any, shall be served by mail on Beys, Stein & Mobargha LLP, counsel for Doe, on or before June ___, 2013 at 5:00 p.m. (with courtesy copy hand delivered to the Court in Chambers), and that Sater's reply papers, if any, shall be served by mail on Lerner and Oberlander by no later than 5:00 p.m. (with a copy for Chambers) the day before the return date provided by this order;

ORDERED, that a copy of all papers shall be served on Assistant U.S. Attorneys Elizabeth J. Kramer and Todd Kaminsky of the United States Attorney's Office for the Eastern District of New York.

Dated: New York, New York
     May ___, 2013

_____
The Honorable Brian M. Cogan

2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 12 MC 557 (BMC) |
| Plaintiff, | |
| v. | **AFFIDAVIT OF NADER MOBARGHA IN SUPPORT OF ORDER TO SHOW CAUSE** |
| JOHN DOE | |
| Defendant. | |

State of New York )
              ) SS:
County of New York )

      Nader Mobargha , being duly sworn, deposes and says as follows:

1.      I am a member of the Bar of this Court and a partner and member of the law firm of Beys, Stein & Mobargha LLP.   My firm represents John Doe ("Doe"), the defendant in the above-referenced action.

2.      I have personal knowledge of the facts which bear on this motion.

3.      I respectfully submit this affidavit with the attached exhibits, in addition to the enclosed proposed Amended Order To Show Cause, in support of Doe's Amended Order To Show Cause why Frederick M. Oberlander ("Oberlander") and Richard E. Lerner ("Lerner") should not be held in civil contempt of the Court of Appeals' Final Order, dated December 20, 2011 (the "Order"), for filing two new frivolous actions within the last two months:  Namely, the (i) Estate of Ernest Gottdiener et al. v. Felix Sater and Salvatore Lauria, 13 Civ. 1824 (the "March Action") and (ii) Kriss et al. v. Bayrock Group LLC, et al., 651715/2013 (the "May Action").

(*See* Ex. 1, Summons and Notice of May Action; *see also* Ex. 2, April 18, 2013 Letter to the Court ("April 25th Letter") (discussing and attaching March Action).[1]

4.      Specifically, in our proposed Amended Order To Show Cause, we request that this Court (i) impose on Oberlander and Lerner leave-to-file restrictions and requirements of notice to other federal courts pursuant to the Court of Appeals' Order, prohibiting them from filing any further actions without the consent of this Court; and (ii) order monetary sanctions against Oberlander and Lerner under Federal Rule of Civil Procedure 11, including an order requiring them to pay Doe's attorney's fees and costs for this motion and for any potential contempt proceedings, and any other legal fees and costs that Doe has incurred, or will incur, as a result of the March and May Actions filed by Oberlander and Lerner.

5.      Oberlander and Lerner have ignored the Court of Appeals's Order prohibiting them from engaging in frivolous litigation and re-litigating issues already decided by the Court. In its Order, the Court of Appeals distinctly "warned" both Oberlander and Lerner "that any further attempts to re-litigate issues decided by this order, or other future filings of a frivolous nature, may result in *sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.*" (*See* Ex. 3, Order, at 3)(emphasis added). Not content with the frivolous litigation they have waged before Judge Glasser, this Court and the Court of Appeals during the last three years, Oberlander and Lerner have spread their frivolous litigation campaign to other federal courts and state courts. After filing their March Action, they raised the stakes this month and filed their May Action, this time naming numerous parties, including my firm, my partner Michael Beys and myself individually, and

---

[1] Although our April 25th Letter was a supplement to our previous Order To Show Cause, dated February 10, 2012, I am incorporating the contents of that letter in this affidavit for the Court's consideration for our latest Order To Show Cause, which specifically concerns Oberlander and Lerner's filings of frivolous lawsuits which lack merit and have no purpose except to intimidate, harass, and extort Doe and for publicity's sake.

2

Todd Kaminsky, one of the Assistant United States Attorneys in this case. (*See* Ex. 1). As with all of their other filings, the frivolousness of the action is apparent on its face, as are the damages of $1 Billion they are seeking. The May Action is based on the same set of facts and transactions as the illegal action they filed three years ago (Kriss v. Bayrock Group LLC et al., 10 Civ 3959)(the "2010 Action"), which jumpstarted the three years of sealing litigation.[2] Consequently, in addition to its frivolousness, the May Action is yet another attempt to re-litigate the same claims and issues in a different forum. (*See* Ex. 3, *supra*)

6.      Of course, the merits of their monthly actions and weekly letters to the courts are of no concern to Oberlander and Lerner; their focus is on abusing the judicial system for extortionate ends. On May 9, 2013, Lerner sent an email to Walter Saurack, counsel to Bayrock, warning him of the futility of trying to defend any action he and Oberlander might bring against Bayrock or any other defendant:

> [Our prior litigation efforts against co-defendant Sater] should convince you that this side of the equation has an unlimited ability to sustain the cost of a high stakes litigation, and great patience for a long fight. Your client will not possibly be able to long withstand it.

In this email, Lerner and Oberlander are admitting that the only purpose of their litigation is to wage a war of attrition against innocent parties, including attorneys who have done nothing but ethically represent their clients and the government in a litigation. The May Action is the latest battle in their war of attrition, with a June action sure to follow, absent sanctions and restrictions.

7.      In light of this abusive strategy in the federal (and now state) courts, we are seeking a pre-filing order prohibiting them from filing any actions without leave of court, a remedy that the

---

[2] Oberlander and Lerner filed their most recent action on May 10, 2013, the three-year anniversary of their first frivolous and illegal filing of the 2010 Action. For these two rogue attorneys, filing lawsuits is just an endless game, like putting quarter after quarter in a slot machine in Las Vegas, hoping to hit the jackpot and strike it rich.

3

Court of Appeals presciently permitted in its Order. (*See* Ex. 3, at 3). In addition, we would like to highlight the case of Martin-Trigona v. Lavien, 573 F. Supp. 1245 (D. Conn. 1983), which is squarely on point. *See* Martin-Trigona, 573 F. Supp. at 1255 (permanently enjoining Martin-Trigona from filing any new action or proceeding in any state or federal court without first obtaining leave of that court), *aff'd and vacated in part*, Martin-Trigona v. Lavien, 737 F.2d 1254 (2d. Cir. 1984).[3] The similarities between the sociopathic tendencies of Martin-Trigona, the professional Plaintiff in that case (and other cases), and Oberlander and Lerner, are striking, if not uncanny.

8.      First, like Oberlander and Lerner, Martin-Trigona used litigation as a tool for harassment and extortion. Martin-Trigona was prone to filing numerous frivolous lawsuits and appeals for no other purpose than the "multiplication of litigation and harassment of his imagined enemies (and remarkably, even those having any remote connection with these 'enemies')." Martin-Trigona, 573. F.Supp. at 1253. He was "stimulated by the prospect of drawn-out controversy and complex filings." *Id.* His "hope [was] that, by dragging out his litigation, he will force his creditors and those whom he claims are his debtors to submit to compromises they would normally have eschewed." *Id.* Put more bluntly, Martin Trigona shamelessly used litigation as tool for extortion and harassment. (*See* Ex. 3, Order, at 7 (the Court of Appeals notes that the PSR Oberlander illegally and publicly disclosed "is of dubious utility in the civil case (i.e., the 2010 Action) except as a tool to *intimidate and harass* [Sater] by subjecting him to danger.")(emphasis added). Indeed, like Oberlander and Lerner, Martin-Trigona saw nuisance value in suing innocent parties – such as lawyers and judges:

---

[3] Remarkably, Judge Cabranes, who presided over the Court of Appeals' February 14, 2011 hearing concerning Oberlander and Lerner's violations of sealing orders, was the district judge presiding over the Martin- Trigona case.

4

> [Martin-Trigona] is...prone to sue persons who have only the slightest connection with him and the legal tumult he has created. For such individuals, notice that they have been sued comes as a shock, as does the ensuing invective Martin-Trigona is apt to heap on them. Though such suits have, in the past, always been dismissed, usually at the pleading stage, defendants are nonetheless forced to go the expense of retaining counsel and are put to the trouble of worrying about their legal position.

Martin-Trigona v. Lavien, 573 F. Supp. at 1254; *see also* at 1249 (court notes that "suing attorneys who oppose him has been a favored device of Martin-Trigona for some time," one which includes "the usual allegations" of "insanity, unethical conduct, and criminal activity."). Martin-Trigona's litigation tactics – which the district court and the Court of Appeals eventually stopped - are *identical* to the ones employed by both Oberlander and Lerner.

9.      Second, like Oberlander and Lerner, Martin-Trigona ignored court orders, instead choosing to violate them. Martin-Trigona's dilatory and contemptuous litigation tactics were not lost on the Second Circuit Court of Appeals, which noted that:

> his tour through the court system is marked by a persistent refusal to cooperate with court orders and purposeful efforts to delay and jaundice court proceedings. His distinctive brand of...advocacy has reached us after a barrage of procedural and jurisdictional challenges which have frustrated the court below and have caused these [court] proceedings to advance at a snail's pace...

737 2d at 1257. It is almost as if the Court of Appeals were writing about the present day litigation tactics of Oberlander and Lerner. Again, their brand of litigation is identical: question court orders, violate court orders, and then challenge them procedurally without any foundation or basis for the sole purpose of delaying and obfuscating court proceedings and orders.

10.     Third, like Oberlander and Lerner, Martin-Trigona would publicly file actions solely for media attention, without regard to the merits or elements of any of his claims. The district court in Martin-Trigona held that "[t]he necessity of an extraordinary remedy is emphasized by the remarkably, vicious, derogatory, and personal character of the suits that Martin-Trigona files

and *the manner in which [he] publicizes them.*" *Id.* at 1254. Indeed, "[it] has become [his]

practice to forward copies of such pleadings to the press, where they are often given currency."

*Id.* To say that Oberlander and Lerner have employed these very same tactics is to state the

obvious. In his recent order, dated May 15, 2013, Judge Glasser highlighted Oberlander and

Lerner's tactics by noting how Oberlander and Lerner filed a Motion for Reconsideration

without regard to the rules or standards concerning such a motion:

> Having made reference to the relevant Local Rule and blatantly ignored it, they manifest
> as well an indifference to the certification required by Rule 11(b)(1), Fed. R. Civ. P., that
> their motion was not presented "for any improper purpose." Their "Joint Motion to
> Reconsider" is a transparent *pretext for airing, yet again, arguments they have repeatedly
> made and scurrilous charges they have leveled at judges, courts, prosecutors and other
> lawyers.*

(*See* Ex. 4, Judge Glasser's Order, dated May 15, 2013 (emphasis added). Judge Glasser then

noted how Oberlander and Lerner accuse of him of "violating civil rights…intellectual

dishonesty…[and] judicial hubris." (*Id.* at 2-3) Their motion papers consist of nothing more

than publicly hurling insults at the court, lawyers, and defendants, without the slightest

consideration for the standards of the motion they are filing. *See e.g.* Ex. 1, at 3, 1st ¶

(Oberlander and Lerner call the attorneys "corrupt" and accuse them of "us[ing] fraudulent and

sham court processes to hide….frauds for their own gain…"); *see also* Martin-Trigona, 573 F.

Supp. at 1253 ("[I]t is clear that Martin-Trigona is not interested in the vindication of some legal

right; he does not present the court with a case of a litigant whose claims…derive from an

eccentric but good faith interpretation of the law."). And just like Oberlander and Lerner ignored

the standards for their Motion for Reconsideration before Judge Glasser, they have completely

ignored the standards and elements for the claims in their March and May Actions. (*See* Ex. 1, at

4 (none of Oberlander and Lerner's claims have any relevance to the facts they allege); *see also*

Ex. 2, April 25th Letter)(Oberlander and Lerner do not even attempt to satisfy the elements of a

civil RICO in their March Action (annexed as Exhibit 1 to the April 25th Letter), let alone address the fact that their allegations concern events almost 20 years old). Consequently, the time has come to curtail their ability to file lawsuits that are designed to have no merit.

11. Finally, like Oberlander and Lerner, Martin-Trigona was referred for criminal prosecution. See Martin-Trigona v. Lavien, 573 F. Supp. 1237, 1240 (D. Conn. 1983)(noting that the court appointed the United States Attorney for the district of Connecticut to prosecute the charges of criminal contempt against Martin-Trigona). Unfortunately, like the case here, the threat of criminal prosecution failed to deter Martin-Trigona. In fact, the threat of criminal prosecution only seems to embolden these litigants as they convince themselves that they are on some kind of legal crusade, in which they are pitted against judges, lawyers, and other professionals. See, e.g., Martin-Trigona v. Gouletas, 634 F.2d 354, 362 (7th Cir. 1980)(noting Martin-Trigona's "tendency...to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him."); Martin-Trigona v. Underwood, 529 F.2d 33, 34 (7th Cir. 1975)(quoting a psychiatric evaluation of Martin-Trigona as "a moderately-severe character defect manifested by well documented ideation with a paranoid flavor of grandiose character").

12. When confronted with the Oberlanders, Lerners, and the Martin-Trigonas of the world, "only extraordinary relief is appropriate." Martin-Trigona 573 F. Supp. at 1254. That is because they "represent an unusually broad threat to the rights of these defendants and future defendants, as well as to the sound administration of justice." Id. at 1255. Considering the similarities between these litigants, we believe the Court should order the same remedy here as the court did in Martin-Trigona.

13.     Consequently, we request that the Court (i) impose leave-to-file sanctions on Oberlander and Lerner and requirements of notice to other federal courts pursuant to the Court of Appeals Order, prohibiting them from filing an further actions without consent of this Court;[4] and (ii) order monetary sanctions against Oberlander and Lerner under Federal Rule of Civil Procedure 11, including an order requiring them to pay Doe's attorney's fees and costs for this motion and for any potential contempt proceedings, and any other legal fees and costs that Doe has incurred, or will incur, as a result of the March and May Actions filed by Oberlander and Lerner.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 23, 2013

Nader Mobargha
Beys, Stein & Mobargha LLP
The Chrysler Building
405 Lexington Avenue
7th Floor
New York, NY 10174
T: (646) 755-3603
F: (646) 755-3599
nmobargha@beysstein.com

*Counsel for John Doe*

---

[4] Although the Court of Appeals in <u>Martin-Trigona</u> held that a federal pre-filing order does not necessarily extend to the state courts, it permitted the district court, on remand, to "fashion an injunction prohibiting Martin-Trigona from bringing new actions in any tribunal without leave from the district court *against persons who have encountered him in any capacity in litigation.*" <u>Martin-Trigona</u>, 737 F.2d at 1263. Applying the Court of Appeals' holding here, Oberlander and Lerner should be subject to a blanket injunction preventing them from filing *any* action, in federal or state court, against the defendants in the 2010 Action, the March Action, or the May Action.

# EXHIBIT 1

FILED: NEW YORK COUNTY CLERK 05/10/2013

NYSCEF DOC. NO. 1

INDEX NO. 651715/2013

RECEIVED NYSCEF: 05/10/2013

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| J. KRISS and MICHAEL EJEKAM alone and for BAYROCK MERRIMAC LLC; BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; BAYROCK WHITESTONE LLC; and BAYROCK CAMELBACK LLC; and E/O ERNEST and E/O JUDIT GOTTDIENER; ERVIN TAUSKY; and SUAN INVESTMENTS **Plaintiffs,**<br><br>v.<br><br>BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ; FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA; ALEX SALOMON; JERRY WEINRICH; SALOMON & CO. PC; AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN; DUVAL & STACHENFELD LLP; BRUCE STACHENFELD; DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT; ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL; MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC; BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.TAMIR SAPIR; ALEX SAPIR; "SAPIR DOES" 1-100;<br>**Group I Defendants**<br><br>WALTER SAURACK; SATTERLEE STEPHENS BURKE & BURKE LLP; KELLY MOORE; MORGAN LEWIS & BOCKIUS LLP; NADER MOBARGHA; MICHAEL BEYS; BEYS STEIN & MOBARGHA LLP;<br>**Group II Defendants**<br><br>TODD KAMINSKY;<br>**Group III Defendants**<br><br>CIM GROUP; ISTAR FINANCIAL; "LENDER INVESTOR DOES" 1-100; DONALD TRUMP; IVANKA TRUMP; "TRUMP DOES" 1-100; NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.;<br>**Group IV Defendants** | INDEX NO.<br><br><br><br><br>**SUMMONS**<br>**WITH**<br>**NOTICE** |

**DEFENDANTS PLEASE TAKE NOTICE** YOU ARE HEREBY SUMMONED TO APPEAR in this action by serving a notice of appearance on Counsel for Plaintiffs, address below, within 20 days after service of this summons (not counting the day of service), or within 30 days after service is complete if the summons is not delivered personally to you within New York State.

May 10, 2013

/s/ Frederick M. Oberlander, Esq.
The Law Office of Frederick M. Oberlander, P.C.
*Counsel for Plaintiffs*
28 Sycamore Lane (Post Office Box 1870)
Montauk, New York 11954
Tel 212-826-0357 Fax 212-202-7624 Email fred55@aol.com

/s/ Richard E. Lerner, Esq.
The Law Office of Richard E. Lerner, P.C.
*Co-Counsel*

## NOTICE

Plaintiffs seek relief against those directly and vicariously responsible for the perpetration of perhaps a billion dollars or more of fraud based on the illegal concealment of Felix Sater's 1998 $40 million federal racketeering conviction, and subsequent 2009 sentencing, as well as related and other unrelated relief, and declaratory relief against those persons, primarily financial institution, insofar as to affix by liquidating judgment thereof such liability is owed to them.

* * * * *

"Bayrock," as used herein, refers to that certain association of juridical entities including, for example and without limitation, Bayrock Group LLC, Bayrock Camelback LLC, Bayrock Whitestone LLC, Bayrock Spring Street LLC, and Bayrock Merrimac LLC, in the last ten years variously engaged in the businesses of financial institution fraud, tax fraud, partnership fraud, insurance fraud, litigation fraud, bankruptcy fraud, mail fraud, wire fraud, money laundering, human trafficking, child prostitution, statutory rape, and, on occasion, real estate.

One of the overarching, dominant themes of those Bayrock lines of business has been the fraudulent concealment of the substantial degree to which it was owned directly or equitably by Felix Sater, who was represented at various times at least during the period 2002 to 2008 to be its Chief Operating Officer and at times as its Managing Director.

Another overarching, dominant theme of Bayrock's lines has been the fraudulent concealment of Felix Sater's conviction for racketeering, to which he secretly pled guilty in 1998, admitting to participating in the operation of a pump-and-dump stock fraud, along with members of Russian and Mafia organized crime, which defrauded investors, many of them senior citizens, including Holocaust survivors, of at a minimum $40,000,000, now in today's dollars some $150,000,000 of stolen wealth as measured by the "well managed account" theory.

The Estates of Ernest and Judit Gottdiener, Ervin Tausky, a natural person, and Suan Investments, a Gottdiener family holding company, are some of those victims, survivors of the Nazi extermination of the Jews of Hungary and federally protected crime victims of Mr. Sater's racketeering, as such his creditors. They were defrauded of their rights to restitution and, because the government illegally concealed Sater's entire case, their rights to sue him. The Gottdieners claim damages for the fraud on them against everyone responsible for the 15-year delay and deprivation of their civil rights.

Insofar as Sater used Bayrock as a personal piggybank to skim millions upon millions of its assets and hide them out of the reach (for now) of these and all the other hundreds if not thousands of victims to whom he now is liable over $500,000,000 in RICO damages, and would not have been able to do so without the facilitation of his concealment frauds by others, the Gottdieners sue all those for the damage they caused.

Among those are corrupt attorneys who used fraudulent and sham court processes to hide Sater and his frauds for their own gain, as many of them did so with the specific intent, *inter alia*, of raking in fees from him, essentially taking the Gottdiener's and all the others' money for themselves by keeping it out of the hands of the victims, where it should have gone; they are sued, inter alia, for vicarious liability of all damages caused and for forfeiture of all such fees.

Plaintiffs seek relief against those directly and vicariously responsible for the fraud in the three years of litigation on dockets 98-CR-1101, 12-MC-150, and 12-MC-557, EDNY, and 10-CV-3959, SDNY, such litigation was in bad faith, purportedly to protect the safety of Sater by maintaining under legal seal and closure information of and concerning the nature and existence of his conviction, cooperation and sentence which had in fact been public for up to a decade, as was known to those defendants involved, that had in fact never been legally sealed, as was known to those defendants involved, where there was no actual threat and in fact presentation of evidence of actual threat later claimed was a pure fraud on the court including by subornation, such fraud actionable statutorily as well as at common law: *Inter alia*, insofar as they committed divers frauds and deceits in the context of those litigations, they are sued under Jud. Law §487.

Kriss and Ejekam are natural persons who claim damages, including without limitation in respect of their rights as members and creditors of, as to Kriss, Bayrock Group LLC, Bayrock Spring Street, LLC, Bayrock Whitestone LLC, Bayrock Camelback LLC, and Bayrock Merrimac, as to Ejekam Bayrock Spring Street LLC and Bayrock Whitestone LLC. Kriss and Ejekam also claim damages derivatively, in behalf of those same limited liability companies.

Finally, as Sater admitted at his sentencing he knew no banks would lend to Bayrock if they knew about his concealed conviction, a judicial estoppel and admission against penal interest, lenders and investors who were fraudulently induced to provide $1,000,000,000 or so to Bayrock by this concealment ought to get their money back, so they are sued in declaratory judgment to fix the liability of Bayrock and all those liable to them through Bayrock to them.

All defendants except as noted are sued for all liability, that is, for example only, Kelly Moore, who stood in Sater's sentencing as his attorney knowing it was illegally hidden, hearing him admit that he had been using that illegal concealment to perpetrate bank fraud, and without privilege to do so committed fraud and other actionable wrongs in maintaining sham litigation to stop those who learned of this from revealing it for years, thus knowingly facilitating the cover-ups, shall expect to have plenary liability asserted against her by every Plaintiff in every theory for every cause in the scope of the overarching conspiracy. It is the express intent of Plaintiffs to assert all liability to the fullest scope of the state law vicarious liability equivalent of civil federal *Pinkerton* liability against everyone participating in any identifiable and well-pled conspiracy. Those who thought nothing of helping Sater and his co-conspirators defraud, the littlest senior citizens and Holocaust survivors or the biggest banks and lenders, who thought nothing of helping him and others steal those victims' money, must be made to pay with their own.

And, in that Bayrock was used to commit, or was the mediating agent as, or the victim of, various and divers other wrongs for which Plaintiffs have standing to sue, Bayrock itself as well as those in conspiracy or aid and abettance therewith, will be claimed liable for such, including without limitation fraud on partners as well as third parties, breach of contract.

The above notice is a courtesy only; it is not limiting in any way the claims to be asserted. It is certainly accurate, but is not limiting. Plaintiffs reserve the right to make any and all claims in which the minimal notice of simply listing the causes of action would enable them to make.

In addition, Plaintiffs seek relief for causes of action in and related to the underlying facts of the above but where liability is or may be predicated on less than the scienter of intent or recklessness, thus claiming in gross negligence, negligence, and breach of fiduciary duty; and where liability is or may be predicated on contract or quasi-contract, for example and without limitation, where one defendant shall have failed to perform contractual obligations to Plaintiff, causing economic injury, by reason of his participation with another defendant in fraud, whether directed at a Plaintiff or at a third party but proximately injuring Plaintiff, thus entitling Plaintiff to claim in contract against the one and in fraud against the other.

Plaintiffs, demanding $1billion in damages, and all other relief as is just and proper in law or equity, will allege the following and related state law causes of action in the complaint, whether concomitant liability be found directly, vicariously, or by reason of aid and abettance,

**Group I Defendants:**

Liability in fraud, negligence, gross negligence, recklessness, quasi-contract, conversion, breach of fiduciary duty, negligent misrepresentation, Jud. Law §487, disgorgement, restitution, constructive trust, defamation, contribution, indemnification, state securities fraud, breach of contract, rescission, declaratory relief, tortious interference, unjust enrichment, prima facie tort, trespass to chattel, interference with contract, abuse of process, and malicious prosecution.

**Group II Defendants:**

Liability in any or every theory, cause, or right of action listed under Group I Defendants, whether direct or vicarious, as well as liability under Judiciary Law §487 as herein.

**Group III Defendants:**

Liability in Jud. Law §487.

**Group IV Defendants:**

Declaratory relief, as to National Union including for declarations of coverage and as to all declarations of liability of all those in respect of which Kriss and Ejekam have the direct or derivate standing to assert and adjudicate as due such defendants from other defendants.

WHEREBY, DEMAND IS HEREBY MADE OF SUCH DEFENDANTS FOR $1 BILLION. SHOULD DEFENDANTS NOT APPEAR, JUDGMENT MAY BE ENTERED IN DEFAULT IN THE AMOUNT SPECIFIED, OR SUCH AS MAY BE PROVEN.

## VENUE

Plaintiffs designate New York County as the place of trial. The basis of this designation is CPLR § 503(a), to wit, Plaintiff J. Kriss now, at time of commencement, resides in the county.

## DEFENDANTS

DUVAL & STACHENFELD LLP
BRUCE M. STACHENFELD
CRAIG L. BROWN

Bruce M. Stachenfeld
Duval & Stachenfeld LLP
555 Madison Avenue 6th Floor
New York, NY 10022
212-883-1700
bstachenfeld@dsllp.com

NIXON PEABODY
ADAM GILBERT

Adam Gilbert, Esq.
Nixon Peabody
437 Madison Avenue
New York, NY 10022
212-940-3000
agilbert@nixonpeabody.com

ROBERTS & HOLLAND LLP
ELLIOT PISEM

Elliot Pisem, Esq.
Roberts & Holland LLP
825 Eight Avenue, 37th Floor
New York, NY 10019
212-903-8700
episem@rhtax.com

AKERMAN SENTERFITT LLP
MARTIN DOMB

Martin Domb, Esq.
Akerman Senterfitt LLP
335 Madison Avenue, 26th Floor
New York, NY 10017
212-880-3800
martin.domb@akerman.com

NATIONAL UNION FIRE INS. CO.
Alexander S. Lorenzo Esq.
Alston & Bird LLP
90 Park Avenue
New York, NY 10016
212-210-9528
alexander.lorenzo@alston.com

FELIX SATER
NADER MOBARGHA
MICHAEL BEYS

Nader Mobargha Esq.
Beys, Stein & Mobargha LLP
405 Lexington Avenue 7th Floor
New York, NY 10174
212-755-3603
nmobargha@beysstein.com

SALOMON & COMPANY PC
ALEX SALOMON
JERRY WEINRICH

Stephen Jacobs, Esq.
Landman Corsi Ballaine & Ford PC
120 Broadway
New York, NY 10271
(212) 238-4810
sjacobs@lcbf.com

TEVFIK ARIF
JULIUS SCHWARZ
BRIAN HALBERG
BAYROCK GROUP LLC
BAYROCK WHITESTONE LLC
BAYROCK SPRING STREET LLC
BAYROCK CAMELBACK LLC
BAYROCK MERRIMAC LLC
WALTER SAURACK

Walter Saurack, Esq.
Satterlee Stephens Burke & Burke LLP
230 Park Avenue, Suite 1130
New York, New York 10169
(212) 404-8703
wsaurack@ssbb.com

KELLY MOORE

Morgan Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
212-309-6000

TODD KAMINSKY

United States Attorneys Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201

CIM GROUP

515 Madison Avenue
New York, NY 10022
646-783-4602

ISTAR FINANCIAL
1114 Avenue of the Americas
New York, NY 10036
(212) 930-9400

DONALD TRUMP
IVANKA TRUMP

The Trump Organization
Trump Tower
725 Fifth Avenue
New York, NY 10022
212-832-2000

MEL DOGAN

Mel Dogan, Esq.
Dogan & Associates
5 East 59th Street, Suite 750
New York, NY 10022
212-755-1550

V. DAVID GRANIN

V. David Granin
445 Eastgate Road
Ridgewood, NJ 07450
201-652-9091

BAYROCK GROUP INC.

The Company Corporation
2711 Centerville Road Suite 400
Wilmington, Del 19808
For Delivery to File #4385369

MICHAEL SAMUEL

Michael Samuel
1000 South Pointe Drive
MTH #1
Miami Beach, FL 33139

SALVATORE LAURIA

Salvatore Lauria
91 Georgetown Road
Weston, CT 06883

# EXHIBIT 2

BEYS, STEIN & MOBARGHA LLP

Nader Mobargha

646.755.3603 (Direct)

nmobargha@beysstein.com

April 25, 2013

BY FACSIMILE (718) 613-2236 AND BY FEDERAL EXPRESS

The Honorable Brian M. Cogan

United States District Judge

U.S. District Court for the Eastern District of New York

225 Cadman Plaza East

Brooklyn, New York 11201

Re:   12 MC 557 (BMC)

Dear Judge Cogan:

We are writing to supplement John Doe's Order to Show Cause, dated February 10, 2012 ("Civil Contempt Motion") to include a recently filed frivolous complaint by Frederick M. Oberlander ("Oberlander" ) and Richard E. Lerner ("Lerner") against Doe and Salvatore Lauria ("Lauria"),[1] *See* Ex. 1 (Complaint in Estate of Ernest Gottdiener et al. v. Felix Sater and Salvatore Lauria, 13 CIV 1824)(the "Complaint")[2]  We believe this recent frivolous filing is relevant to our Civil Contempt Motion because it defies the Court of Appeals's "warn[ing]" to Oberlander, and by extension, to his counsel Lerner, that "the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principle legal dispute…and that any further attempts to re-litigate the issues decided by [its] order, or further attempts to re-litigate the issues decided by this order, *or other future filings of a frivolous nature, may result in sanctions…and monetary penalties.*" (December 20, 2011 Final Order)(emphasis added)  In our Civil Contempt Motion, we also contend that Oberlander and Lerner have abused the federal judicial system through all of their frivolous filings, unnecessarily driving up legal costs for Doe and wasting the Court's resources for no other purpose than to extort money from Doe. (*See, e.g.,* May 1, 2012 Letter, at 2 ("[W]e believe that both [Oberlander] and Lerner should be accountable for their two year pattern of…engaging in frivolous motion practice, which has cost Doe hundreds of thousands of dollars in legal fees…");

[1] Lerner and Oberlander have not served the complaint on Doe or Lauria yet.

[2] Due to the size of the Complaint's exhibits, which include hundreds of irrelevant pages concerning Doe's entire criminal history, we have omitted to include them in the attachment, but they are publicly available on PACER for the Court's review.

The Chrysler Building, 405 Lexington Avenue, 7th Floor, New York, NY 10174

Main: 646.755.3600 • Fax: 646.755.3599

www.beysstein.com

*see also* Ex. 2, *New York Law Journal* article, dated November 15, 2012, entitled "Judge Finds 742-Page 'Stew' Irrelevant to Unsealing Issues," (Judge Glasser quoted as saying that Lerner and Oberlander submitted an enormous file "having no relevance to the very discrete issue pending before the Court" and ordering Lerner and Oberlander to show cause why they should not be sanctioned for flooding the court with "vexatious" and oppressive" 742-page "documentary stew")). Oberlander and Lerner's most recently filed complaint, with hundreds of irrelevant pages of exhibits concerning Doe's entire criminal history attached to it, is yet another example of a frivolous "documentary stew" that has little relevance to the allegations in their Complaint except to harass, embarrass, and ultimately extort Doe.

While we understand that, under normal circumstance, the merits of Oberlander's and Lerner's "lawsuit" is not an issue for Your Honor to consider or assess, here the frivolousness of their Complaint is apparent on its face and consistent with both Oberlander's and Lerner's conduct underlying our Civil Contempt Motion. Oberlander and Lerner's primary purpose for filing the Complaint is to to use it as a basis for a media campaign against Doe to ensure that the media's attention in Doe does not wane. (*See, e.g.,* Ex. 3, *New York Post* article, dated April 1, 2013, entitled "Suit hits rip-off snitches")(discussing the frivolous complaint Oberlander and Lerner filed). When Oberlander and Lerner do finally file their other extortionate complaint against Doe, legitimate law firms, their insurance carriers, accounting firms, and the legitimate businesses (*see, e.g.,* Kriss et al. v. Bayrock Group et al., 10 Civ. 3959), they want the media firestorm to be in full force so that these legitimate businesses named as defendants will settle the claims against them, regardless of their merit. Oberlander's and Lerner's latest filing shows that there are no boundaries or limits to their abuse of the federal judicial system to further their extortionate goals. The following aspects of their Complaint underscore this point.

First, all the allegations in the Complaint concern events that took place almost *twenty years ago*. (*See* Ex. 1, at ¶ 1; *see also* ¶ 74 (admitting that the events took place between 1995 "through and into 1998"). The statute of limitations for Civil RICO is 4 years from the date plaintiffs discovered, or should have discovered, their RICO injury. *See, e.g.,* Agency Holdings Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987)(statute of limitations for RICO action is four years); Koch v. Christie's Inter. PLC, 699 F.3d 141, 148 (2d. Cir. 2012)(same); Rotella v. Wood, 528 U.S. 549, 554 (2000)(stating that a cause of action for civil RICO accrues when a defendant commits an act that injures the plaintiff, not when the plaintiff has both suffered an injury and discovered the pattern of alleged RICO activity). Defendants conveniently omitted alleging in their complaint any facts relevant to the statute of limitations issue. Most likely, the Gottdieners discovered their injury back in the 1990s when they lost their money investing with the broker dealer D.H. Blair & Co. ("Blair") (*see* Ex. 1, at ¶ 35), or when Blair was indicted on criminal charges, which upon information and belief, was in 2000.

Page 3 of 5

Second, although Oberlander and Lerner name Lauria and Sater as Defendants in the
Complaint, their Complaint barely alleges a single relevant factual allegation against them.
Indeed, the entire complaint concerns the alleged misdeeds of Alfred Palagonia ("Palagonia")and
Blair. Palagonia was a "registered representative" of Blair, which in turn was a "registered
broker dealer of securities." (*Id.* at ¶¶ 33 & 34) The Gottdieners opened their account with
Blair. (*Id.* at ¶ 35). The Complaint alleges that (i) the "Gottdieners sustained [trading] losses of
$2,100,000" (ii) [commission] losses of $5,000,000; and (iii) "$800,000 in legal fees and
expenses" – all "as a result of *Palagonia's* unlawful conduct and participation in the conduct of
one or more of the racketeering enterprises set forth herein." (*Id.* at ¶¶ 75-77) While the
Complaint alleges that Doe and Lauria worked for White Rock and that White Rock were "co-
fraudfeasors" with Palagonia in a "fraudulent scheme to manipulate the price" (*Id.*, at ¶ 60) of
two securities, there is no allegation that the Gottdieners opened an account with or were
customers of White Rock, or ever spoke to or met either Lauria or Sater. The remaining
allegations concerning Sater and Lauria are background smear meant for the eyes of the media.
Finally, underscoring the frivolousness of the Complaint is the glaring fact that all the allegations
concern Palagonia and Blair, but Palagonia and Blair are not named as defendants. Only Doe
and Lauria are, even though barely any factual allegations concern them.

Oberlander and Lerner's reckless disregard of the relevancy of their allegations is never
more apparent than when they disparage Mikhail Sheferofsky, Sater's recently deceased father,
who has no connection to Blair, Palagano, Lauria, or Sater (except as Sater's father), and no way
of defending himself. They accuse Shererofsky of "running an extortion racket" and "preying on
his fellow Russian Jewish Immigrants in Brighton Beach." (*Id.* at ¶ 13)   Again, this has
nothing to do with the Gottdiener's purchase of stock from Blair and Palagonia. But that is no
matter. Oberlander and Lerner will take any opportunity, ethical or not, to make irrelevant
allegations to further their ongoing conspiracy to extort Doe and destroy his reputation in the
press despite his many years of cooperation in which he risked his life for his country to
rehabilitate himself and repay his debt to society.

Third, Oberlander and Lerner continue to disparage the federal courts in this circuit,
including the Court of Appeals itself, in publicly filed court documents.[3]  Despite this Court's
order, Judge Glasser's order, and the Court of Appeals' order, all confirming the existence and
validity of a sealing order, Oberlander and Lerner refuse to recognize the sealing order, even
going so far as calling the sealing of Sater's record – which was done *to protect his life* - as "part
of a pattern and practice of maintaining a covert judicial system of secret trials, *falsified* records,
and *unlawful* judgments..." (*Id.* at ¶ 5)(emphasis added) Lerner and Oberlander were not

---

[3] Oberlander and Lerner also insult the United States Attorney's office, as they have done so often done
in the past, by claiming that it acted "under color of pretextual judicial authority." (*Id.* at ¶ 4).

Page 4 of 5

finished: "The government and courts, at least in the EDNY, simply decided that to win the war on organized crime there would have to be sacrifices, including sacrifices of the civil rights of the public and the victims." (*Id.* at ¶ 6) They further accuse the "secret [Second Circuit] courts" of engaging in "secret injustice." (*Id.* at ¶ 8) And finally, despite the fact all the courts have clearly articulated the bases for sealing Doe's record in both their findings and rulings, they claim that the "rule of law [does not] prevail" in the Second Circuit.[4] (*Id.*)

Fourth, given their numerous breaches of legal ethics during the past three years, it is doubtful whether the Gottdieners, who are deceased (*See id.* at ¶ 21), or the representatives of their estate, ever gave Lerner and Oberlander authority to represent them in litigation. We respectfully request that the Court order Oberlander and Lerner to present evidence that they had authority to act on behalf of the Gottdieners or their estate. We believe that Oberlander and Lerner are patrolling funeral parlors for deceased people so that they can file frivolous contingent cases on behalf of their estates against Doe. In short, Lerner and Oberlander are looking to represent figurehead Plaintiffs for the sole purpose of having the media cover the litigations and quote their scurrilous allegations in their Complaint, notwithstanding their irrelevance to their claims.

Finally – and perhaps most egregiously – in the Complaint, Oberlander and Lerner made false representations about what Judge Glasser's December 10, 2012 order in United States v. Coppa et al., 00-CR-0196 (the "Order") mandates. (*Id.* at ¶ 79) Oberlander and Lerner claim that Judge Glasser "found that the Gottdieners ...were entitled to restitution of $1,300,000 *in respect of their Holly and USBNY losses* on account of Palagonia's criminal conduct in the conduct of, or participation in the conduct of, the *White Rock Blair Criminal Enterprise.*" (*Id.*) This was a blatant misrepresentation of the Order. While Judge Glasser did order restitution in the amount of $1.3 million in his Order, he stated that the Gottdiener's "losses [were] caused by *Alfred Palagonia's* conspiracy to commit securities fraud." (*See* Ex. 4, Order). Judge Glasser made no mention of Lauria, Doe, or White Rock. Not surprisingly, Oberlander and Lerner, as "officers of the Court," falsely represented the position of a respected judge to further their own ends.

In sum, Oberlander and Lerner show that they have no intention of stopping their extortion and smear campaign against Doe, and are willing to resort to lying and manipulation to accomplish this. We believe their latest abuse of the judicial system is related to their frivolous

---

[4] Curiously, Doe's record in 98-CR-1101, mostly, has recently been unsealed by Judge Glasser, with the exception of a few discrete categories of information, such as the specific details of Doe's cooperation. Consequently, Roe and Lerner's current diatribe against the courts in this circuit is puzzling. Oberlander and Lerner have gotten what they wanted. Their continued campaign against Doe and the courts shows that their case was never about a First Amendment right of access. It was and always will be about money and publicity.

Page 5 of 5

letter writing campaign and disregard for judicial procedures and protocols that is currently the
subject of the current contempt proceeding before Your Honor.  Consequently, we respectfully
request that their recent bad faith filing of the Complaint be considered as part of our motion for
civil contempt against them.

Respectfully Submitted,

Nader Mobargha
*Counsel for John Doe*

Cc:    The Honorable I. Leo Glasser

       The Honorable Lorna G. Schofield

       Frederick M. Oberlander, Esq.

       Richard Lerner, Esq.

       Stephen Green, Assistant U.S. Attorney, Northern District of New York

       Todd Kaminsky, Assistant U.S. Attorney, Eastern District of New York

# EXHIBIT 1

JS 44C/SDNY
REV. 7/2012

CIVIL COVER SHEET

# 13 CV 1824

MAR 18 2013

RECEIVED

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Estate of Ernest Gottdiener et al. | Felix Sater and Salvatore Lauria |

2013 MAR 18  P II: 44

U.S. DISTRICT COURT SDNY

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Frederick M. Oberlander | |
| 28 Sycamore Lane (PO Box 1870) | |
| Montauk, NY 11954          212 826 0357 | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Racketeering violations of 18 USC 1962(c) and 1962(d) as to fraud in connection with the purchase and sale of securities.

Has this or a similar case been previously filed in SDNY at any time?  No ☐  Yes ☒   Judge Previously Assigned  Engelmayer

If yes, was this case  Vol. ☐  Invol. ☐  Dismissed.  No ☐  Yes ☐   If yes, give date _____   & Case No. 10 CV 3959

Is THIS AN INTERNATIONAL ARBITRATION CASE?   No ☒   Yes ☐

(PLACE AN [x] IN ONE BOX ONLY)                    NATURE OF SUIT

TORTS

ACTIONS UNDER STATUTES

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 610 AGRICULTURE | [ ] 422 APPEAL 28 USC 158 | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 620 OTHER FOOD & DRUG | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 410 ANTITRUST |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY | | [ ] 430 BANKS & BANKING |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | PROPERTY RIGHTS | [ ] 450 COMMERCE |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | | | | | [ ] 460 DEPORTATION |
| | [ ] 340 MARINE | PERSONAL PROPERTY | [ ] 630 LIQUOR LAWS | [ ] 820 COPYRIGHTS | [x] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 151 MEDICARE ACT | [ ] 345 MARINE PRODUCT LIABILITY | | [ ] 640 R.R. & TRUCK | [ ] 830 PATENT | |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL. VETERANS) | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 650 AIRLINE REGS | [ ] 840 TRADEMARK | [ ] 480 CONSUMER CREDIT |
| | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 660 OCCUPATIONAL SAFETY/HEALTH | | [ ] 480 CABLE/SATELLITE TV |
| | | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 690 OTHER | SOCIAL SECURITY | [ ] 810 SELECTIVE SERVICE |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | LABOR | [ ] 861 HIA (1395ff) | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| | | | [ ] 710 FAIR LABOR STANDARDS ACT | [ ] 862 BLACK LUNG (923) | [ ] 875 CUSTOMER CHALLENGE 12 USC 3410 |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 720 LABOR/MGMT RELATIONS | [ ] 863 DIWC/DIWW (405(g)) | |
| [ ] 190 OTHER CONTRACT | | PRISONER PETITIONS | | [ ] 864 SSID TITLE XVI | [ ] 890 OTHER STATUTORY ACTIONS |
| [ ] 195 CONTRACT PRODUCT LIABILITY | ACTIONS UNDER STATUTES | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT | [ ] 865 RSI (405(g)) | [ ] 891 AGRICULTURAL ACTS |
| | CIVIL RIGHTS | [ ] 530 HABEAS CORPUS | [ ] 740 RAILWAY LABOR ACT | FEDERAL TAX SUITS | [ ] 892 ECONOMIC STABILIZATION ACT |
| [ ] 196 FRANCHISE | [ ] 441 VOTING | [ ] 535 DEATH PENALTY | [ ] 790 OTHER LABOR LITIGATION | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| | [ ] 442 EMPLOYMENT | [ ] 540 MANDAMUS & OTHER | [ ] 791 EMPL RET INC SECURITY ACT | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 894 ENERGY ALLOCATION ACT |
| REAL PROPERTY | [ ] 443 HOUSING/ ACCOMMODATIONS | | | | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 210 LAND CONDEMNATION | [ ] 444 WELFARE | PRISONER CIVIL RIGHTS | IMMIGRATION | | [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE |
| [ ] 220 FORECLOSURE | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 550 CIVIL RIGHTS | [ ] 462 NATURALIZATION APPLICATION | | |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | [ ] 555 PRISON CONDITION | [ ] 463 HABEAS CORPUS- ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 240 TORTS TO LAND | [ ] 448 OTHER CIVIL RIGHTS (Non-Prisoner) | | [ ] 465 OTHER IMMIGRATION ACTIONS | | |
| [ ] 245 TORT PRODUCT LIABILITY | | | | | |
| [ ] 290 ALL OTHER REAL PROPERTY | | | | | |

Check if demanded in complaint:

CHECK IF THIS IS A CLASS ACTION  NO
UNDER F.R.C.P. 23

DEMAND $ 100,000,000   OTHER _____

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.?
IF SO, STATE:

JUDGE _____   DOCKET NUMBER _____

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

**13 CV 1824**

RECEIVED

2013 MAR 18 P 11: 44

U S DISTRICT COURT SDNY

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ESTATE OF ERNEST GOTTDIENER,
ESTATE OF JUDIT GOTTDIENER,
ERVIN TAUSKY, and SUAN INVESTMENTS
*Plaintiffs*

vs.

FELIX SATER and SALVATORE LAURIA
*Defendants*

13-CV-____ ( ____ )

**COMPLAINT**

18 U.S.C. §§196 *et seq.* S.

**JURY TRIAL DEMANDED**

MAR 18 2013
S.D. OF N.Y.

### INTRODUCTION

1.      **ERNEST** and **JUDIT GOTTDIENER** were Holocaust survivors who emigrated here after the war, became citizens, and made a new life. Sadly, in their final years they became the victims, almost 20 years ago, of criminals who, supported by members of Mafia and Russian organized crime, carried on together a scheme of securities fraud by which they bilked the **GOTTDIENERS** alone out of some $7,000,000, and all victims together at least $100,000,000.

2.      Non-party **ALFRED PALAGONIA** was one of these criminals. He was caught, pled guilty to federal and state racketeering charges, admitted his wrongdoing, served time in prison, has paid some restitution, and for the most part can be said to have accepted responsibility.

3.      **FELIX SATER** and **SALVATORE LAURIA** were another two of these criminals. But not only have they not accepted responsibility, they were protected from it *for almost 20 years* protected from all responsibility, protected from all accountability, and protected from all liability for all that they did to cause so much harm to so many victims. Who protected them?

4.      The United States Attorney, Eastern District of New York, under color of pretextual judicial authority.

5.      **SATER** and **LAURIA**, too, were caught and pled to racketeering charges. But they did so as cooperators. They cut a deal. In return, not only their convictions, *but their entire federal judicial records*, were hidden, so they avoided prison, avoided mandatory forfeiture, avoided mandatory restitution, and for almost 20 years until now avoided civil liability, part of a pattern and practice of maintaining a covert justice system of secret trials, falsified records, and unlawful judgments, where cooperators are allowed to commit crime and keep the proceeds while their victims, if they even find out, are ordered to stand mute and threatened with prison if they don't.

6.      How could such secrecy develop in the United States? The government and courts, at least in the EDNY, simply decided that to win the war on organized crime there would have to be sacrifices, including sacrifices of the civil rights of the public and the victims.

7.      You can't put a price on civil rights. But you can on their loss. Here, it's $500,000,000, by "well managed account theory," what victims' accounts would be worth today had they not been looted. The **GOTTDIENERS** share is $35,000,000 of that. That's damages computed *qua* securities fraud. But this isn't securities fraud, it's racketeering *predicated on* securities fraud, with trebling. That's $1,500,000,000 for the victims, $100,000,000 for the **GOTTDIENERS**. *That's the economic cost to their victims of protecting SATER and LAURIA all these years.*

8.      Resolution of the problem of secret courts and secret (in)justice must await another day. What will *not* wait another day is that, though **ERNEST** and **JUDIT** passed a few years ago, having lived their last years never knowing the government of their adopted country, supposedly where the rule of law prevails, was hiding from them that **SATER** and **LAURIA** were main culprits in the fraud on them and were being protected and allowed to keep what they stole, the **GOTTDIENERS**, through their estates and survivors, and by this action, *now demand justice.*

## SUMMARY

### RUSSIAN ORGANIZED CRIME AND THE NEW YORK MAFIA

9.      During the late 1970s and 1980s a great many Russians were able to emigrate to the United States. Many, primarily Ukrainians, primarily Jewish, came to Brooklyn, New York and settled in and around Brighton Beach, in an area that has come to be known as Little Odessa.

10.     Many criminals were among them, including members of Russian organized crime, for example the Mogilevich syndicate, infamous for arms-for-drugs deals with al Qaeda.

11.     In the 1980s, many of these Russian mobsters formed alliances with the Mafia, or La Cosa Nostra ("LCN"). The Genovese Family, one of the "Five Families" of the New York Mafia, for example, was, and remains, particularly involved with Russian organized crime.

12.     Initially, these alliances focused on "plain vanilla" racketeering, so not surprisingly, like organized criminals in every culture, these mobsters immediately set to prey upon their own, the Mafia "getting its beak wet" (that is, getting a cut) by providing collateral support.

13.     For example, one Mikhail Sheferofsky, whose involvement with Russian organized crime as a boss in, reportedly, the Mogilevich syndicate, goes back years, including a conviction in Europe for counterfeiting, emigrated here in the influx and began running an extortion racket in which he, with Ernest Montevecchi, a Genovese soldier, as enforcer ("leg breaker"), preyed on his fellow Russian Jewish immigrants in Brighton Beach for a decade before he was charged by the U.S. Attorney, Eastern District, with extortion and extortion conspiracy. Exh. A. Plaintiffs provide Sheferofsky's example for several urgent reasons, to explain the case at bar:

## SECRET CASES, SECRET INJUSTICE

14.     First, for reasons we can only imagine, *but shouldn't have to*, see ¶qqq, on his guilty plea Sheferofsky was sentenced to probation and assessed $150. Exh. B. Speeding tickets cost more. We shouldn't have to imagine why because when he was sentenced it was, and remains, the will of Congress, expressed by statute, 18 USC §3553, that *no federal judge can sentence anyone but in open court, at least as to pronouncement of sentence and statement of reasons*, and it was, and remains, the law in this circuit that sentencing hearings may not otherwise be sealed (not legally, anyway) without public notice and a hearing (and never as to reading aloud the sentence and reasons), as *the public has a First Amendment right of access to attend them*.

15.     Yet Sherferofsky's docket shows that he was sentenced in secret, in fact shows that the whole docket was kept sealed *for six years*. Exh. C. What it doesn't show is any evidence that any order exists by which that was a *legal* sealing, as sealing a docket, in some circuits like the 11th *per se* illegal, here in the 2nd at least public notice and a hearing is required.

16.     Second, though he pled to extortion and the charge names a victim[1], his docket has no other mention of victims. But at sentencing the court was *required* to impose restitution and ensure the government attorneys had found all the victims and told them of their rights, including restitution, *rather unlikely to have occurred since the whole case was hidden* (the same law that requires open sentencing pronouncements requires a statement of reasons why if such be the case

---

[1] His extortion conspiracy charge names none, so we're to believe he and Montevecchi were the most inept mobsters since *The Gang That Couldn't Shoot Straight*, conspiring for 10 years to extort "Brighton Beach...restaurants, food stores, and a medical clinic," Exh. A, but only managing to get one to pay and not otherwise harming anyone?

5

there is no, or only partial, restitution). As the judgment, Exh. B, shows no restitution ordered in his secret sentencing when clearly it was due at least that one victim, what can we conclude?

17. __Third__, apparently (i) this was an unlawfully secret case, especially as to victims; (ii) the secrecy hid an unlawful sentence; and (iii) there was likely no justification for that (even if the law allowed it), as but weeks after sentencing the judge unsealed the case, making it doubtful that sentencing had to be secret to protect the defendant's safety, unless once it was over (and with it the chance for victims to appear and object), amazingly, any threat to his safety vanished.

18. __Fourth__, Mikhail Sheferofsky, aka Michael Sater, is **FELIX SATER'S** father. And at the same time his extortion case was being hidden, especially from his victims, he apparently allowed to keep their money, SATER's racketeering case was being hidden, especially from *his* victims, he, too, apparently allowed to keep their money. Such are victims' rights in the EDNY.

## THE MOB ON WALL STREET

19. By the 1990's, this association of Russian and Mafia organized crime had reached Wall Street. The Mafia would infiltrate small (and not-so-small) brokerage firms and cause the brokers to defraud thousands, primarily the Genovese family providing the backing and all Five Families the muscle, while the Russians provided money laundering and other offshore expertise.

20. This case is about one firm, **WHITE ROCK**; two who ran it, **SATER** and **LAURIA**; how they defrauded victims, most, like the **GOTTDIENERS**, elderly, of $40,000,000; and how, after they were caught and confessed, they became cooperators, flipping on their co-conspirators in return for having their entire cases, even their sentencings, unlawfully hidden, apparently to

6

stay hidden forever, letting them evade restitution and emboldening them to commit new crime, SATER and LAURIA going on to defraud new victims, SATER of hundreds of millions, allowed all this time to keep the money he stole from Plaintiffs nearly 20 years ago. Until now. Time's up.

## THE PARTIES AND NON-PARTIES

### PLAINTIFFS

21.   **ERNEST** and **JUDIT GOTTDIENER** were naturalized United States citizens. They passed some years ago. **ERVIN TAUSKY** is **JUDIT's** brother. **SUAN INVESTMENTS** is a family business. Plaintiffs are referred to collectively as "the **GOTTDIENERS**."

22.   As to **JUDIT** and **ERNEST**, this action is brought by their estates, but for convenience, they may be referred to as if they were living souls.

### DEFENDANTS

23.   **FELIX SATER** is a natural person, a twice convicted felon, his first in 1992 for assault with a deadly weapon and his second in 1998 (guilty plea; the conviction became final in 2009 on sentencing without appeal) for racketeering in connection with White Rock, as shown on docket 98-CR-1101 EDNY (Glasser, J.), *U.S. v. Felix Sater* (aka *John Doe*).

24.   **SALVATORE LAURIA** is a natural person, a felon convicted for racketeering in connection with White Rock, as shown on docket 98-CR-1102 EDNY (Glasser, J.), *U.S. v. Salvatore Lauria.* (guilty plea in 1998, final conviction in 2004).

### NON-PARTIES

25. **ALFRED PALAGONIA** was a registered representative at **BLAIR**. See ¶34 *et seq.*

8

## JURISDICTION

26.      Jurisdiction is original, per 28 U.S.C. §1331, arising under the laws of the United States, e.g. the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et seq.

## VENUE

27.      Venue is pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in New York County, which is in this district.

## ALLEGATIONS
## AND
## PRELIMINARY RICO STATEMENT

### COLLATERAL ESTOPPEL BY PRIOR CRIMINAL CONVICTION
### AND INCORPORATIONS

28.     This case is brought pursuant to 18 USC §1964(c) for damages caused by **SATER** and

**LAURIA's** violations of §1962 by their conspiracy to operate, and operation of, enterprises, as

defined in §1961(4), through a pattern of racketeering activity, as defined in §1961(5), for the

common purpose of perpetrating fraud in connection with the purchase and sale of securities.

29.     Both **SATER** and **LAURIA** pled guilty in 1998 to federal racketeering charges based

on informations attached to this complaint, Exhs. E, F. SATER was sentenced on October 23,

2009, **LAURIA** on February 25, 2004. Exhs. G, H. Neither appealed.  Their convictions final,

they are preclusively estopped to deny the allegations in their charging instruments (and other

consistent statements as made during their plea hearings in compliance with Fed. R. Crim. P. 11).

(And final judgments are admissible to prove all facts essential to sustain them. FRE §803(22).)

30.     The contents of their charging instruments, without limitation to the extent matters of

preclusive estoppel, are deemed incorporated herein as allegations as if fully set forth herein.

31.     The contents of the indictment in *U.S. v. Coppa* et al., 00-CR-0196 EDNY (Glasser, J.)

are deemed incorporated herein as allegations as if fully set forth herein. Exh. I.

32.     The contents of the indictment in *People v. D.H. Blair* et al., No. 3282/2000, Supreme

Court, NY County, see 2002 NY Misc LEXIS 317, 2002 NY Slip Op 50152U, are deemed

incorporated herein as allegations as if fully set forth herein. Exh. J.

## BACKGROUND

33.     D. H. BLAIR & Co. Inc. ("BLAIR") was a registered broker dealer of securities, licensed by the NASD, with an office at 44 Wall Street, New York, New York. Blair commenced operations in or about April 1975 and ceased doing business in or about August 1998.

34.     Non-party ALFRED PALAGONIA was a registered representative of BLAIR from approximately January 1990 to February 1998. Typically BLAIR's top producer, earning more than $1,000,000 per month, he was the head of the PALAGONIA GROUP of brokers[2].

35.     ERNEST GOTTDIENER opened his first account with BLAIR in late 1992. Additional accounts for JUDIT, TAUSKY,; and SUAN, were opened thereafter. Due to the transfer of most of the securities in TAUSKY accounts to SUAN and the deaths of ERNEST and JUDIT, and pursuant to a litigation agreement among Plaintiffs, the losses for each must be viewed together and Plaintiffs will be considered in the aggregate as "the GOTTDIENERS."

36.     At all relevant times herein, the GOTTDIENERS were customers of PALAGONIA.

### §1961(4) RICO ENTERPRISES 1 AND 2

1.   THE D. H. BLAIR CRIMINAL ENTERPRISE
2.   THE PALAGNOIA GROUP CRIMINAL ENTERPRISE

37.     By 1990, BLAIR, a well-known, national investment firm registered with the NASD and the NYSE, had transformed itself into a securities operation set up for the fraudulent sale of

---

[2] ALFRED PALAGONIA, Robin Breitner, Alex Dewar, John DiBella, Steven Frantz, Richard Gaydos, Raymond Hernandez, Richard Molinsky, Darren Orlando, Andrew Schandler, and Richard Smith.

new issues and their manipulation in the aftermarket, unconstrained by any concern for its customers' best interests, securities regulations and the criminal law. This continued without interruption through to the firm's demise. To do this, **BLAIR** principals[3] utilized their staff of corrupt brokers, especially if not almost exclusively the **PALAGNOIA GROUP**, who were trained in high-pressure sales tactics, as vehicles for unloading large positions in essentially speculative small-cap securities, without disclosing material information. Acting under the guise of an apparently law-abiding broker-dealer, they began fraudulently manipulating the market for multiple speculative small-cap stocks, with each individual defendant performing an integral function specific to his or her position in the enterprise.

38.     The mechanics of the scheme, often described as a "pump and dump" operation, are summarized as follows, with detailed allegations contained in the indictment, see *People v. D. H. Blair* et al., Exh. J, to which **PALAGNOIA** and others pled guilty.

39.     The corrupt brokers, again especially if not exclusively members of the **PALAGNOIA GROUP** acting under the supervision of **PALAGONIA**, himself coordinating with **BLAIR** principals, would use **BLAIR** to obtain secret control over large blocks of securities then artificially inflate and maintain the price of these securities by means of material misrepresentations and omissions and manipulative sales practices. After inflating the price of the securities, they would sell their secretly controlled securities to the public, generating millions of dollars illicit profits.

---

[3] Chairman Kenton Wood, Vice-Chairman Alan Stahler, and Vice-Chairman Kalman Renov.

40.     When dealing with the investing public, the brokers in the **PALAGONIA GROUP**
engaged in high-pressure sales tactics by which they aggressively solicited customer
commitments to purchase or hold on to these securities through false and fraudulent
representations concerning their financial viability. In doing so, they aggressively recommended
stocks to their clients with little regard to their suitability, routinely omitting risks in their sales
presentations. They also made unfounded predictions about upcoming events and falsely claimed
to possess inside information regarding the security as a result of their fictitious meetings with
the management of these companies and privileged status as an underwriter. Moreover, they
made false claims that the firm's principals and **PALAGONIA** were invested in the security.

41.     If these sales tactics proved futile, the brokers in the **PALAGONIA GROUP** marketed
the promise of future allocations of its new issues to their customers as an easy way to make
money quickly without any risks. This enabled the brokers to induce prospective customers to
open an account with **BLAIR**, paving the way for future broker solicitations of more risky
investments. It was also used as a mechanism for fraudulently inducing the customer to hold on
to his or her portfolio of securities at **BLAIR** despite their investment losses. These broker
solicitations of customer trades were concealed from the regulators by the broker's attachment of
a non-solicitation letter to the customer trade even though the trades were indeed solicited.

42.     Once the customer made the commitment to purchase a security through a broker in the
**PALAGONIA GROUP**, the broker was thereafter prohibited from selling the security despite
the client's instructions, unless it was executed in accordance with the firm's "no net-sales
policy." In other words, the broker was only allowed to sell when directed if he was able to
match the order of the selling customer with that of a buy order, thereby avoiding any negative

impact that the sales transaction may have had on the market value of the security. In an effort to conceal this "no net-sales policy" from the regulators, the trading department, at the instruction of BLAIR head trader Vito Capotorto, delayed the time stamping of the customer's buy ticket until after that of the sell ticket to avoid the appearance of a crossing transaction.

43.     It must be emphasized that since the whole concept of a "pump and dump" scheme is to push up securities prices to artificial highs, then keep them there long enough for the fraudfeasors and their associates to get out, the allegations herein that customers who had bought the securities were given false and fraudulent material information, as well as having true and correct material information withheld from them, as part of this scheme. That is, the allegations herein a tactic of "fraudulently inducing customers to hold," are made strictly in the context of, and as part of, the unitary fraudulent scheme, that while there were individual cases of course of implementing the tactic of fraudulently inducing this or that customer to hold, at all times those tactics were used strictly as part of the single, intentionally fused scheme of fraudulently inducing both the purchase and the hold as one coherent objective.

44.     This "no net-sales policy" did not, however, apply to Wood, Stahler, and Renov and the firm's favored customers, who were allowed to freely sell their securities holdings at any time. The brokers in the PALAGNOIA GROUP never disclosed to their customers, prior to their purchases, that they would be prohibited from selling their security, despite, on occasion, their acceptance of the customers' purchase order, which contained pre-set sell instructions. Wood, Capotorto and Palagonia enforced this "no net-sales policy" through their refusal to allocate future new issues to any broker, who sold their customer's stock in violation of the policy. Additionally, Capotorto threatened to decrease the price on the stock of any customer, who

insisted on selling in violation of the policy. Once the brokers in the **PALAGONIA GROUP** ceased their manipulative efforts and allowed the customers to freely sell their securities holdings, the artificially inflated stock prices began to plummet, causing the unsuspecting investors to incur substantial financial losses.

45.       In doing these things, the fraudfeasors – that is, Wood, Stahler, Renov, Capotorto, and the members of the **PALAGONIA GROUP** – operated **BLAIR**, that is, the legal entity D. H. Blair & Co. Inc., as an enterprise of course legally distinct from themselves. Therefore, for this action, the legal entity which was **BLAIR** was a RICO enterprise, as defined in §1961(4), known herein and referred to in this context as the **D. H. BLAIR CRIMINAL ENTERPRISE.**

46.       The **D. H. BLAIR CRIMINAL ENTERPRISE** maintained a hierarchical structure, which enabled the fraudfeasors to use the legitimate enterprise of **BLAIR** as a vehicle to commit the pattern of criminal activities alleged in the indictment, engaging in a pattern of criminal activity throughout the enterprise's hierarchical structure with the common purpose of fraudulently selling securities to the investing public and manipulating the pricing of such securities in the aftermarket, itself and in combination, *infra*. The enterprise, as a freestanding corporate juridical person, had ascertainable structure, with the top of the structure planning the objectives of the enterprise and directing how the objectives would be achieved, and the middle and bottom levels engaging in activities to carry out the scheme. And, although old members left and new members joined, the structure of **BLAIR** remained constant throughout the time period alleged and continued throughout scores of criminal acts. The structure of the enterprise furnished the means and method for the commission of the crimes, a "system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses."

47.     Again, for the avoidance of ambiguity, although these criminal acts may be otherwise identified as their own crimes, for example of necessity there were thousands of acts of mail and wire communications crossing through interstate commerce to support the scheme, each thus an act of mail and wire fraud, nevertheless those acts were subordinate to and in furtherance of the scheme itself, to earn money through fraud in the purchase or sale of securities.

48.     In addition, for the same reasons except for juridical personhood, the **PALAGONIA GROUP** was an association-in-fact RICO enterprise.

## §1961(4) RICO ENTERPRISES 3, 4, 5

3.   THE WHITE ROCK CRIMINAL ENTERPRISE
4.   THE WHITE ROCK PARTNERS CRIMINAL ENTERPRISE
5.   THE WHITE ROCK BLAIR CRIMINAL ENTERPRISE

49.     White Rock Partners & Co., Inc. ("**WHITE ROCK**"), a registered broker-dealer of securities, commenced operations in 1994, in New York, N.Y. In 1995, the firm was renamed State Street Capital Markets Corporation ("State Street"). The firm ceased operation in 1996[4].

50.     White Rock / State Street was owned and operated by **LAURIA, SATER**, and others, collectively the.**WHITE ROCK PARTNERS**. It employed brokers and cold callers.

51.     The business of **WHITE ROCK** consisted primarily of the sale of stock and warrants in small or start-up companies. **WHITE ROCK** frequently underwrote initial public offerings ("IPOs"), by which stock and warrants in formerly privately owned companies were first sold to

---

[4] For convenience, the firm may be referred to herein as White Rock regardless of the date in question.

the public. WHITE ROCK also participated extensively in trading securities after they were first sold to the public (referred to herein as "aftermarket" or "aftermarket trading"). WHITE ROCK also took part in public offerings of stock and warrants subsequent to an IPO, commonly known as "secondary offerings" of securities.

52.     WHITE ROCK held itself out as a legitimate brokerage firm, though it was in fact operated throughout its life for the primary purpose of earning money through a "pump and dump" scheme to defraud in connection with the purchase and sale of securities involving the manipulation of the price of securities pursuant to the same form of, and indeed often involving the same securities as, the BLAIR "pump and dump" scheme, as set forth in further detail below.

53.     In doing these things, the WHITE ROCK PARTNERS, along with the firm's brokers from time to time, operated WHITE ROCK, that is, the legal entity White Rock Partners & Co., Inc. as succeeded by the legal entity State Street Capital Markets Corporation as an enterprise of course legally distinct from themselves. Therefore, for this action, the legal entity which was WHITE ROCK was a RICO enterprise, as defined in §1961(4), known herein and referred to in this context as the WHITE ROCK CRIMINAL ENTERPRISE.

54.     The WHITE ROCK CRIMINAL ENTERPRISE maintained a hierarchical structure, which enabled the fraudfeasors to use the (occasionally) legitimate enterprise of WHITE ROCK as a vehicle to commit the pattern of criminal activities alleged in the indictment, engaging in a pattern of criminal activity throughout the enterprise's hierarchical structure with the common purpose of fraudulently selling securities to the investing public and manipulating the pricing of such securities in the aftermarket itself and in combination and affiliation, *infra*. The enterprise, as a freestanding corporate juridical person, had an ascertainable structure, with the top of the

structure planning the objectives of the enterprise and directing how the objectives would be achieved, and the middle and bottom levels engaging in activities to carry out the scheme. And, although old members left and new members joined, the structure of **WHITE ROCK** remained constant throughout the time period alleged and continued throughout scores of criminal acts. The structure of the enterprise furnished the means and method for the commission of the crimes, a "system of authority beyond what is minimally necessary to effectuate individual substantive criminal offenses."

55.     In addition, for the same reasons, except for juridical personhood, **WHITE ROCK PARTNERS** was an association-in-fact RICO enterprise, the **WHITE ROCK PARTNERS CRIMINAL ENTERPRISE.**

56.     **WHITE ROCK** would perpetrate its scheme through one, some, or all of (i) on its own, with its own brokers; (ii) by agreement with other firms and brokers within those firms, such agreements for the most part with **BLAIR** and **PALAGONIA**, respectively; and (iii) by collusion and cooperation with insiders of the companies whose securities were manipulated.

57.     For example, among the securities fraudulently sold by **WHITE ROCK** to the public were those of Holly Products, Inc. ("HOLLY") and U.S. Bridge of New York, Inc. ("USBNY").

58.     **HOLLY**, in Moorestown, New Jersey, was in the business of manufacturing tables and cabinets for the gaming industry and custom-built equipment for hospitals and long-term care facilities. **HOLLY's** chairman and chief executive officer, also a substantial shareholder of **HOLLY**, colluded and cooperated with the **WHITE ROCK PARTNERS.** ¶62.

59.     USBNY, a construction company in Queens, New York, was a subcontractor on public infrastructure projects in the New York area. Its president and principal shareholder, an associate of the Gambino Family, colluded and cooperated with the WHITE ROCK PARTNERS. ¶62.

60.     From in or about March 2003 to October 1996, THE WHITE ROCK PARTNERS, by means of using WHITE ROCK, and their co-fraudfeasors there, together and by agreement with PALAGONIA, by means of using BLAIR with his co-fraudfeasors there, and with others, devised, implemented, and oversaw fraudulent schemes to manipulate the price of HOLLY and USBNY securities and fraudulently induce investors to buy and hold them (as a unitary buy-and-hold schemes of fraudulent inducement). Each of the schemes followed a similar pattern.

61.     THE WHITE ROCK PARTNERS and PALAGONIA, by means of using WHITE ROCK and BLAIR with their co-fraudfeasors in each, and with others, secretly acquired ownership and control of substantial blocks of securities of HOLLY and USBNY through various methods, including the private sale of securities to off-shore and domestic nominees prior to public offerings who then concealed their ownership and control by, among other means, depositing the securities in brokerage accounts at WHITE ROCK and other firms that had been opened in the name of nominees, including off-shore shell companies created for this purpose.

62.     In furtherance of these efforts, THE WHITE ROCK PARTNERS entered into undisclosed agreements with individuals associated with HOLLY and USBNY. Pursuant to these agreements, THE WHITE ROCK·PARTNERS secretly agreed to compensate such individuals, including company officers, by allocating to them a portion of the profits from the fraudulent sale of securities.

63.     After they gained secret control over the securities of **HOLLY** and **USBNY**, **THE WHITE ROCK PARTNERS**, with others, created artificial market demand for the securities. One technique used to create such artificial demand was the payment of substantial undisclosed commissions, as much as 50 percent of the price of the securities, to induce brokers to recommend and sell **HOLLY** and **USBNY** securities to investors. Brokers at **WHITE ROCK**, **PALAGONIA** at **BLAIR**, and brokers at other firms received such payments, which payments, and the resulting creation of artificial market demand, were not disclosed to the public.

64.     When the price of **HOLLY** and **USBNY** securities rose as a result of artificial demand, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sold their secretly held or controlled securities to unwitting customers of **WHITE ROCK**, **BLAIR**, and other firms. **THE WHITE ROCK PARTNERS**, **BLAIR**, and others, obtained tens of millions of dollars in proceeds through these schemes.

65.     **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sought to maintain the artificially high price of the **HOLLY** and **USBNY** securities, among other companies, so that (i) they could continue to sell the securities they secretly controlled at these inflated prices, (ii) their unlawful schemes would go undetected, and (iii) a large number of customers at **WHITE ROCK**, **BLAIR**, and other brokerage firms could be tapped for future sales of artificially inflated securities. **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, artificially maintained the inflated price of securities by various techniques designed to insulate the securities from regular market forces, which would ordinarily cause the price of the stock and warrants to collapse due to the lack of genuine demand. These techniques included (i) false and misleading statements to persuade customers not to sell the securities; (ii) purposely

falling to take and execute customer orders to sell the securities; and (iii) executing a sale of the securities only if the sale could be matched, or "crossed," with a corresponding purchase of the same securities by another investor. None of these techniques was disclosed to investors.

66.     Again, it must be emphasized that since the whole concept of a "pump and dump" scheme is to push up securities prices to artificial highs, then keep them there long enough for the fraudfeasors and their associates to get out, the allegations herein that customers who had bought the securities were given false and fraudulent material information, as well as having true and correct material information withheld from them, as part of this scheme, that is, the allegations herein a tactic of "fraudulently inducing customers to hold," are made strictly in the context of, and as part of, the unitary fraudulent scheme, that while there were individual cases of course of implementing the tactic of fraudulently inducing this or that customer to hold, at all times those tactics were used strictly as part of the single, intentionally fused scheme of fraudulently inducing both the purchase and the hold as one coherent objective.

67.     When **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, sold their **HOLLY** and **USBNY** securities at artificially inflated prices, their profits were laundered through various domestic and off-shore bank accounts. The proceeds were typically electronically transferred from domestic brokerage accounts to various off-shore nominee bank accounts, and in turn transferred to other off-shore bank accounts designated and controlled by members of the Enterprise, who in return provided a corresponding amount of cash, less a money laundering fee, to **THE WHITE ROCK PARTNERS**, a portion of which was used to make undisclosed payments to brokers who sold **HOLLY** and **USBNY**. By means of these off-shore

companies and accounts, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, and others, concealed and promoted fraudulent securities transactions.

68.     Again, for the avoidance of ambiguity, although these criminal acts of money laundering may be otherwise identified as their own crimes, as for example of necessity there were thousands of acts of mail and wire communications crossing through interstate commerce to support the scheme, each thus an act of mail and wire fraud, nevertheless the money laundering, mail and wire fraud, and all similar acts were subordinate to and in furtherance of the scheme itself, to earn money through fraud in the purchase or sale of securities.

69.     Accordingly, between approximately March 1993 and October 1996, **THE WHITE ROCK PARTNERS** and **PALAGONIA**, with others including **BLAIR**, constituted an association-in-fact RICO enterprise, the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE**.

70.     Others associated with or employed by the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE** included:

70.1.    Brokers and cold callers at other firms who fraudulently sold stock to investors.

70.2.    Persons who, through their affiliations with **HOLLY** and **USBN**, provided "product," i.e. securities for **WHITE ROCK** and other firms to sell fraudulently.

70.3.    Persons who acted as nominees by whom **THE WHITE ROCK PARTNERS** and others concealed their ownership of and interest in **USBNY** securities, which were fraudulently sold to the public, who laundered the proceeds of fraudulent securities sales through, among other means, the transfer of funds to off-shore bank accounts, and conducted secret transactions which furthered the fraudulent sale of **USBNY** securities.

70.4.  Members of the Bonanno, Genovese, and Colombo Families, including Colombo associate Daniel Persico, a close friend of **LAURIA's**, and Genovese soldier, Montevecchi, who, at the same time, was providing muscle to **SATER's** father's extortion ring, ¶13, and to Rosario Ganji, a Genovese captain orchestrating similar frauds at broker Meyers Pollock. These members of La Cosa Nostra (the "Mafia") employed by or associated with the Enterprise resolved disputes as to hiring and retaining brokers, as to extortion and attempted extortion of employees or associates of the Enterprise, and as to concerted efforts to reduce the price of securities underwritten by **WHITE ROCK** through techniques like "short selling." In return, persons employed by or associated with the Enterprise paid them in securities and cash proceeds of the fraudulent sale of securities.

## ALLEGATIONS COMMON TO ALL RICO ENTERPRISES

71.  Each RICO enterprise hereinabove defined operated in the Southern District of New York, elsewhere in the United States, and abroad, and engaged in, and its activities affected, interstate and foreign commerce.

72.  The chief purpose of each RICO enterprise was to obtain money for its members and associates by perpetrating related pattern acts of fraud in connection with the sale of securities, including unitary schemes of fraudulent inducement to buy and hold, and to accomplish this by acquiring secret control over large blocks of securities, then artificially inflating and maintaining the price of these securities by means of material misrepresentations and omissions and manipulative sales practices. After inflating the price of the securities, individuals employed by

and associated with the Enterprise sold their secretly controlled securities to the public, generating millions of dollars illicit profits. These profits were then laundered through numerous off-shore and other nominee accounts.

## PLAINTIFFS' INJURIES

73.     PALAGONIA so often traded the GOTTDIENERS' accounts without authority, refused to trade when ordered to, and caused others in his firm to do both, that he, and through him BLAIR, became fiduciaries to the GOTTDIENERS by exercising discretionary control.

74.     The frauds below, and individual predicate acts a part thereof, began in or about 1995 and continued occurring again and again through and into 1998.

75.     Trading Losses. The GOTTDIENERS sustained trading losses of $2,100,000 as a result of PALAGONIA's unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were fraudulently induced, caused, and led to unitarily purchase and hold securities, the losses they thereafter suffered the direct proximate result thereof such fraud.

76.     Commission Losses. The GOTTDIENERS sustained losses of $5,000,000 as a result of PALAGONIA's unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were unknowingly caused to pay that amount as (undisclosed) commissions so outrageously marked up as to be *per se* fraud pursuant to SEC regulations and the "shingle rule."

24

77.     Fees and Expenses Losses. The GOTTDIENERS sustained losses of $800,000 in legal fees and expenses ("legal fees as damages") incurred as a direct and proximate result of PALAGONIA's unlawful conduct and participation in the conduct one or more of the racketeering enterprises set forth herein, in that they were caused to incur those expenses or liability therefor, even if non-recourse, in earlier attempts to vindicate their rights.

78.     These securities included stocks, warrants, and other securities of HOLLY, USBNY, and other issuers including Advanced Aeronautics, Advanced Tissue Sciences, Amerigon, Applied Laser Systems, Aquacare Systems, Bradley Pharmaceuticals, Cypros Pharmaceuticals, Digital Transfer Systems, Digital Video Systems, Ecocath, Food Court, Infosafe, Innovir Labs, Interactive Flight, Interneuron Pharmaceuticals, Intgo Processing Equipment, Lightpath Technologies, Linda's CHK, Microcarb, Mountbatten, Monaco Finance, Natural Earth Technologies, San Siro, Oncorx, Paperclip Imaging, Premier Laser Systems, Skysat Communications, Sulberger & Graham, Supervision, Telepad, Titan Pharmaceuticals, US China, US Diagnostic Labs, US Home & Garden, Video Update.

79.     On December 10, 2012, on application and with the agreement of the U.S. Attorney, EDNY, in *United States v. Coppa et al.*, 00-CR-0196, the Hon. I. Leo Glasser found that the Gottdieners, having previously been determined to be federal crime victims, were entitled to restitution of $1,300,000 in respect of their HOLLY and USBNY losses on account of PALAGONIA's criminal conduct in the conduct of, or participation in the conduct of, the WHITE ROCK BLAIR CRIMINAL ENTERPRISE and Ordered such. Exh. D.

80.     At various times and dates, the Hon. R. Owen, SDNY, has ordered the GOTTDIENERS due judgments totaling about $2,200,000 in losses, including such fees.

81.   The **GOTTDIENERS** have received, directly or indirectly, payments in excess of $1,000,000 by third parties which offset certain of their losses.

82.   The **GOTTDIENERS** claim money damages to be determined at trial by the paradigm that they should be entitled to recover treble their entire directly and proximately caused losses, brought forward from the time incurred to date of judgment herein to compensate for the time value of money, less amounts received to date (the subtraction to be performed after trebling) to the extent, if at all, the law demands such offsets be made as opposed to applying the collateral source rules, and then such offsets to be made only and to the extent such amounts received have been earmarked, for example, denoted and accepted as so much on account of fees, etc.

83.   As to the time value of money, the **GOTTDIENERS** claim entitlement to the use of the "well managed account theory" for trading and commission losses incurred, that is, for losses which depleted their accounts at **BLAIR**, and prejudgment interest for all other losses, including legal fees as damages, (in all cases as well as trebling) given the egregious delays in obtaining justice and the time in which **SATER** and **LAURIA** have had use of their money. As to interest and the computation thereof, the **GOTTDIENERS** request such be given the jury to determine.

84.   The **GOTTDIENERS** claim punitive damages in an amount not less than $15,000,000, or $1,000,000 per year of concealment, separate and apart from trebling, in that trebling is to be deemed primarily compensatory and thus not to replace punitive damages in appropriate cases.

85.   The **GOTTDIENERS** claim the costs of and legal fees for and in respect of bringing this action, either by multiplying the total recovery by 1.67 to reflect the contingency fee therefor or by applying a rate of $750 multiplied by a contingency factor of 2.5.

86.   The **GOTTDIENERS** claim all other remedies and relief of kind and nature, whether equitable or legal, and in such amounts, as may be determined by this court insofar as such are deemed just and proper, provided, however, that the **GOTTDIENERS** wish to give maximum possible effect to delegate the determination of such questions of fact as may exist to the jury.


## CLAIMS


87.   Plaintiffs repeat and reallege the contents of ¶21 through the paragraph preceding this paragraph as if fully repeated and thereupon set forth herein.

88.   Defendants **SATER** and **LAURIA** are liable, and each of them jointly and severally, for all damages and other relief according to these alternative pleadings:


**Alternate A – Violation of Substantive RICO**

89.   Plaintiffs were proximately injured as set forth above by **PALAGONIA's** conduct or participation in the conduct of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE** in violation of 18 USC §1962(c).

90.   These losses include not only losses on **HOLLY** and **USBNY** but on all other securities in respect of which Plaintiffs were proximately injured, the frauds causing those injuries committed within the scope of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE**.

91.     Defendants are thus liable to Plaintiffs for violation of §1962(c) in that they, and each of them, alone or in common action in concert, conducted or participated in the conduct of the **WHITE ROCK BLAIR CRIMINAL ENTERPRISE.**

92.     That is, in other words, Defendants engaged in a pattern of securities frauds in aid and abettance of and common enterprise and concert with **PALAGONIA**, conducted by enterprise corruption, and are liable. But be clear, this is not a claim for violation of 10(b) or 10(b)5 per se, rather for violation of RICO in that the co-racketeers operated the RICO enterprise to perpetrate fraud in connection with the purchase and sale of securities in such fashion that they are liable for such behavior in RICO regardless whether they would be in securities fraud.

### Alternate B -- Violation of Conspiracy RICO

93.     Plaintiffs were proximately injured as set forth above by **PALAGONIA's** conduct or participation in the conduct of either or both (i) the **D. H. BLAIR CRIMINAL ENTERPRISE**; or (ii) the **PALAGONIA CRIMINAL ENTERPRISE**; in violation of 18 USC §1962(c).

94.     The Defendants, and each of them, alone or in common action in concert, agreed to further the operation of the **D. H. BLAIR CRIMINAL ENTERPRISE** or the **PALAGONIA CRIMINAL ENTERPRISE.** ¶63.

95.     The Defendants, and each of them, alone or in common enterprise, committed at least one overt act of racketeering which was a predicate crime, indeed many of them, in their actions in concert with the enterprise in pumping and dumping at least the securities of **HOLLY** and **USBNY**, causing injury to Plaintiffs.

28

96.    That is, the Defendants did conspire together with at least PALAGONIA not only in furtherance of, but in actual implementation of, PALAGNOIA's racketeering.

97.    Wherefore, liability is asserted against both Defendants for violation of §1962(d), and for all Plaintiff's losses to the **D. H. BLAIR CRIMINAL ENTERPRISE** or the **PALAGONIA CRIMINAL ENTERPRISE.**

98.    That is, in other words, Defendants agreed to (and did, see Alternate A) aid and abet **PALAGONIA's** securities frauds, which PALAGONIA committed through enterprise corruption, and in doing so Defendants committed numerous predicate crimes, their commission of which injured Plaintiffs. See ¶92 for emphasis that this is not a claim in securities fraud for conspiracy to commit same, but is a claim for conspiracy to violate RICO laws where the existing RICO enterprise is engaged in fraud in connection with the purchase and sale of securities.

## AD DAMNUM

99.    Wherefore, Plaintiffs pray damages in the amount of $100,000,000, plus costs and attorneys' fees, plus all such other relief at law or in equity this court may decide just and proper.

100.    Plaintiffs respectfully notice the court of the significant possibility they will seek to modify this pleading into a class action in behalf of all victims everywhere similarly situated, especially who were never told of **SATER** and **LAURIA's** liability, in which case the common issues predominating are likely to create claims into the billions.

## SIGNATURE BLOCK

Dated March 18, 2013

**THE LAW OFFICE OF FREDERICK M. OBERLANDER P.C.**

by Frederick M. Oberlander
Attorneys for Plaintiffs

Post Office Box 1870
28 Sycamore Lane
Montauk, NY 11954
212.826.0357  Tel.
212.202.7624  Fax.
fred55@aol.com

**THE LAW OFFICE OF RICHARD E. LERNER P.C.**

by Richard E. Lerner
*Of Counsel*

# EXHIBIT 2

# New York Law Journal

VOLUME 248 — NO. 95 | $3.60 | WWW.NYLJ.COM | THURSDAY, NOVEMBER 15, 2012

## Judge Finds 742-Page Stew Irrelevant to Unsealing Issues

## Unsealing

# EXHIBIT 3

Case 1:16-mc-00706-BMC   Document 89   Filed 05/24/13   Page 62 of 80 PageID #: 1232

## Suit hits rip-off snitches

# THANK YOU MOOCH, NYC!

> People pay $3,000 for an apartment here, and I get to live here for free!

— Michal Jablonowski (right), 25, of Poland, who returned to New York three years ago and lives at this shelter partly on The Bowery, courtesy of the city's taxpayers

## Out-of-towners live large at free shelters

**EXCLUSIVE**

## Museum's tent pitch

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       *-against-*

       **ORDER**

ALFRED PALAGONIA,

       00-CR 196 (ILG)

            Defendant,

    NOW, upon reading and filing the motion for restitution on behalf of the Estate of Ernest and Judit Gottdiener, Ervin Tausky and Suan Investments, Inc. (the "Victims") (Doc. No. 528) and having considered the United States of America's initial opposition, made by the United States Attorney, via letters dated February 17, 2012 (Doc. No. 533) and March 16, 2012 (Doc. No. 534), and having held oral argument on July 30, 2012, and considering the parties' joint submission filed on August 6, 2012 (Doc. No. 545), wherein the Victims and the United States of America stipulated and agreed for purposes of this proceeding only that the Victims' losses caused by Alfred Palagonia's conspiracy to commit securities fraud total $1.3 million dollars; it is hereby

    ORDERED, ADJUDGED AND DECREED that the Estate of Ernest and Judit Gottdiener, Ervin Tausky and Suan Investments, Inc. will be entitled to restitution in the amount of $1.3 million dollars which shall be payable to their attorney's trust account, Mark A. Tepper, P.A. IOLA Trust Account.

    It is FURTHER ORDERED that the Clerk of the Court shall distribute the money to the extent that funds have been collected within 45 days of the signing and filing of this order.

    It is FURTHER ORDERED that as additional money is collected it should be distributed

in accordance with the above.

It is FURTHER ORDERED that this order supersedes and replaces the Court's previous

order dated November 2, 2012.

Dated: Brooklyn, New York
        December 2012

THE HONORABLE L LEO GLASSER
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# EXHIBIT 3

10-2905-cr
Roe v. United States

MANDATE

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

## SUMMARY ORDER

Rulings by summary order do not have precedential effect. Citation to summary orders filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 29th day of June, two thousand eleven.

PRESENT:

JOSÉ A. CABRANES,
ROSEMARY S. POOLER,
DENNY CHIN,
    *Circuit Judges.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

RICHARD ROE, an attorney,

    *Appellant,*

JANE DOE AND JOHN DOE II, clients of Richard Roe,

    *Pro Se Appellants,*

    v.

UNITED STATES OF AMERICA,

    *Appellee,*

JOHN DOE,

    *Defendant-Appellee.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Nos. 10-2905-cr, 11-479-cr, 11-1408-cr, 11-1411-cr, 11-1666-cr, 11-1906-cr, 11-2425-cr

**FOR APPELLANT RICHARD ROE:**

Richard E. Lerner, Wilson Elser Moskowitz Edelman & Dicker LLP (David A. Schulz and Jacob P. Goldstein, Levine Sullivan Koch & Schulz LLP; Paul G. Cassell, S.J. Quinney College of Law at the University of Utah, *on the brief*), New York, NY and Salt Lake City, UT.

1

## MANDATE ISSUED ON 12/20/2011

FOR APPELLEE UNITED STATES OF AMERICA:

Todd Kaminsky, Assistant United States Attorney (Peter A. Nortling and Elizabeth J. Kramer, Assistant United States Attorneys; Loretta E. Lynch, United States Attorney, *on the brief*), United States Attorney's Office for the Eastern District of New York, Brooklyn, NY.

FOR DEFENDANT-APPELLEE JOHN DOE:

Nader Mobargha, Beys, Stein & Mobargha LLP, New York, NY.*

Appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order issued by the United States District Court for the Eastern District of New York (I. Leo Glasser, *Judge*); appeal also from orders of April 1, 2011, April 4, 2011, and May 13, 2011 of the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*).

UPON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court permanently enjoining the dissemination of John Doe's Pre-Sentence Report is AFFIRMED.

The appeal in Docket No. 10-2905-cr is DISMISSED in part, and the appeal in Docket No. 11-1408-cr is DISMISSED in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

The appeal in Docket No. 11-1411-cr is DISMISSED because appellant has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

The appeal in Docket No. 11-1906-cr is DISMISSED for want of jurisdiction.

With respect to Docket No. 11-2425-cr, the order of Judge Cogan is AFFIRMED.

The appeal in Docket No. 11-1666-cr by *pro se* appellants is DISMISSED in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is AFFIRMED.

The Clerk of Court is DIRECTED to close Docket Nos. 11-1408-cr, 11-1411-cr, 11-1906-cr, and 11-2425-cr upon entry of this order. The Clerk of Court is also DIRECTED to close Docket No. 11-479-cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

The remainder of this cause (Docket Nos. 10-2905-cr, 11-1666-cr) is REMANDED to the District Court (I. Leo Glasser, *Judge*) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding

---

* Pursuant to our order of February 14, 2011, John Doe was not invited to brief this appeal, nor has he moved to submit a brief. However, Doe has filed various letters and opposition papers in response to Roe's motions throughout the course of the appeal.

the dissemination of the other sealed documents does not result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal by the government to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is **ORDERED** to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

It is further **ORDERED** that, pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

It is hereby **ORDERED** that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), over any appeals from any orders or judgments entered by Judge Cogan.

Finally, it is **ORDERED** that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *post*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

The Clerk of Court is **DIRECTED** to transmit a copy of this order to Judge Cogan.

## INTRODUCTION

Appellant Richard Roe ("Roe"), an attorney, and two of his clients, *pro se*, appeal from a May 18, 2010 temporary restraining order, a June 21, 2010 permanent injunction, a July 20, 2010 temporary restraining order, and a March 23, 2011 scheduling order entered by Judge Glasser. Because the *pro se* appellants incorporate Roe's arguments as their own and make no other independent legal claims, our legal conclusions apply to all appellants, though our order refers principally to Roe.

## BACKGROUND

### A. The SDNY Complaint and Judge Glasser's Initial Rulings

On May 10, 2010, Richard Roe publicly filed a civil RICO complaint against John Doe ("Doe") and other defendants in the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *Judge*). Attached to the complaint were exhibits that included sealed materials from Doe's criminal case in the Eastern District of New York. The complaint itself explicitly referenced the confidential information in the exhibits, including the fact that Doe had cooperated with the government.

On May 18, 2010, upon an application by Doe, Judge Glasser issued an order to show cause why a preliminary injunction should not be entered against Roe's dissemination of the sealed materials from Doe's criminal case. He also temporarily restrained Roe and his clients from "disseminating the Sealed and Confidential Materials or [the] information therein." The materials in Roe's possession included a 2004 Pre-Sentence Report ("PSR"), two proffer agreements, Doe's cooperation agreement, a criminal complaint, and a criminal information. The TRO was later extended multiple times without objection (and, on some occasions, at Roe's request) until a hearing could be held on June 21, 2010.

3

At the June 21, 2010 hearing, Judge Glasser heard testimony from Roe before issuing a permanent injunction against dissemination of the 2004 PSR, pursuant to *United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir. 1983). He also directed Roe to return the PSR to the United States Attorney's Office (Roe eventually returned the PSR directly to the court). With respect to the other sealed documents, Judge Glasser extended his temporary restraining order until July 20, 2010, with Roe's consent, and requested that the parties brief whether the court had the authority to permanently enjoin the dissemination of those documents.

On July 9, 2010, Roe filed a notice of appeal concerning Judge Glasser's May 18, 2010 and June 21, 2010 orders.

On July 20, 2010, Judge Glasser held another hearing at which he recited his factual findings, including: (1) that Roe knew the documents at issue were sealed prior to his public filing of those documents; (2) that one of Roe's clients had "wrongfully taken" and had "no legal right to those documents"; and (3) that dissemination of the documents would cause "irreparable harm, which is imminent to Mr. John Doe . . . [and] would put Mr. John Doe's safety at risk." Over Roe's objection, Judge Glasser re-affirmed his ruling of June 21, 2010 regarding the permanent injunction against dissemination of the PSR and extended his TRO with respect to the other sealed documents for another 10 days. He further ordered that the permanent injunction and TRO should cover all copies of the documents at issue, and that all originals and copies of such documents were to be returned or destroyed until Roe met his "burden with respect to whether or not there is some need to maintain those documents or to keep them." The TRO was subsequently extended to August 13, 2010, by request of the parties, while they negotiated a possible settlement.

On August 10, 2010, Roe filed a notice of appeal concerning the July 20, 2010 order that re-affirmed the permanent injunction and extended the TRO.[1] Judge Glasser has not since issued a final ruling regarding the disclosure of the non-PSR sealed documents.

## B. Our February 14, 2011 Order and Judge Cogan's Assignment to Enforce Our Mandate

On February 14, 2011, we heard oral argument on the government's motion for a temporary stay of the unsealing of the appeal. In an order issued that day orally and later in written form, we granted the government's request to keep the appeal under seal and temporarily enjoined Roe and his associates from distributing or revealing in any way any documents or contents thereof subject to sealing orders in Doe's criminal case or on appeal. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011). We also remanded the cause to the District Court for the Eastern District of New York for the limited purpose of allowing the Chief Judge to assign a District Judge to "implement[] and oversee[] compliance with our orders and the orders previously entered by Judge Glasser." *Id.* Pursuant to our order, then-Chief Judge Dearie referred the case to Judge Brian M. Cogan for enforcement of this limited mandate.

---

[1] On February 7, 2011, Roe also filed a petition for a writ of mandamus requesting that we order the District Court to withdraw its various injunctive and temporary restraining orders and publicly docket Doe's criminal case. We denied this petition in our order of February 14, 2011. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

On March 1, 2011, Roe submitted a letter requesting "clarification" from Judge Cogan that, notwithstanding our order of February 14, 2011, he was permitted to disseminate certain information within the sealed documents because that information was allegedly public knowledge. On April 1, 2011, Judge Cogan held a hearing regarding Roe's request. At that hearing Judge Cogan learned that Roe had not yet destroyed or returned certain electronic and paper copies of the original PSR and other sealed documents, in violation of Judge Glasser's July 20, 2010 order. Accordingly, by oral order on April 1, 2011, and by a subsequent written order of April 4, 2011, Judge Cogan ordered Roe to destroy or return any remaining electronic or paper copies of the PSR and other sealed documents, without prejudice to his ability to seek the documents if any of the various sealing orders were vacated by our Court. *See* Order, *United States v. Doe* (E.D.N.Y. Apr. 4, 2011).

On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011.

On May 13, 2011, Judge Cogan issued a written order denying Roe's March 1, 2011 request to release certain information contained within the sealed documents. After opining that information "available to the public" was not covered by our injunction, Judge Cogan nevertheless ordered that Roe could not "extrapolate from sealed documents . . . [which] could easily be combined with and thereby tainted by Roe's knowledge of non-public sealed information." Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon a review of the specific statements and information that Roe intended to release, Judge Cogan further concluded that "[i]t seems obvious that Roe is seeking to fatally undermine the purpose of the injunctions by publicizing information that would render them ineffective." *Id.*

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011.

## C. Recent Events before Judge Glasser

On March 17, 2011, after learning that Doe's criminal conviction had been disclosed in a press release by the U.S. Attorney's Office for the Eastern District of New York, the government moved before Judge Glasser for a limited unsealing of the docket and certain documents in Doe's underlying criminal case. The government explicitly sought to unseal only those docket entries and documents that did not refer to Doe's cooperation with the government.

On March 23, 2011, Judge Glasser issued a scheduling order in which he stated that he was "uncertain of [his] continuing jurisdiction to address the controversy presented by [Roe's February 4, 2011 'demand' that the case be docketed and the government's March 17, 2011 motion for a limited unsealing of the case]." Scheduling Order, *United States v. Doe* (E.D.N.Y. March 23, 2011). Accordingly, he requested that "the government, Richard Roe and John Doe [] brief the issue of the Court's jurisdiction and submit their briefs simultaneously on April 8th, 2011." *Id.*

In addition to setting the briefing schedule, the order reflected Judge Glasser's factual finding that Roe had "knowingly and intentionally flouted a Court order" by "unilaterally deciding" to disclose information in Doe's sealed criminal case. *Id.*

5

On May 11, 2011, Roe filed a notice of appeal concerning Judge Glasser's March 23, 2011 order.

On April 19, 2011, upon requests from both Roe and the government, we issued an order confirming that Judge Glasser retained jurisdiction "to decide the government's motion to unseal, as well as to decide any other pending or future motions to unseal that would not result in the public disclosure of docket entries or underlying documents that reference John Doe's cooperation with the government." Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Apr. 19, 2011) (emphasis in original).

Judge Glasser has not yet acted on the government's March 17, 2011 motion to unseal.

We assume the parties' familiarity with the remaining facts and procedural history of the case.

## DISCUSSION
### (i)

On appeal, Roe argues that the District Court violated his First Amendment rights in permanently enjoining the dissemination of Doe's PSR and requiring him to return it to the government. We review a district court's grant of a permanent injunction for abuse of discretion. *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006); *see also Sims v. Blot*, 534 F.3d 117, 132 (2d Cir. 2008) (explaining "abuse of discretion").

Under *United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir. 1983), third parties must satisfy a heightened standard in order to obtain access to a PSR, which is a sealed "court document designed and treated principally as an aid to the court in sentencing." *Id.* at 1176. Specifically, a third party seeking access to a PSR bears the burden of making a "compelling demonstration that disclosure of the report is required to meet the ends of justice." *Charmer Indus., Inc.*, 711 F.2d at 1175.

Here, Judge Glasser, who had presided over Doe's criminal case and was therefore familiar with the extent of Doe's cooperation and his assistance in obtaining the convictions of myriad violent criminals, explicitly entered a finding that releasing proof of Doe's cooperation would cause him irreparable harm and would put his safety at risk.

Judge Glasser also found that Roe had improperly refused to submit an application to the Court to unseal the report, despite his knowledge that the report was sealed and came from a sealed criminal case. *See id.* at 1170 ("[T]he presentence report is a court document and is to be used by nonjudicial federal agencies and others *only with the permission of the court*." (emphasis supplied)); *see also In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 417 (E.D.N.Y. 2007) (enforcing a preliminary injunction requiring the return of sealed documents pursuant to the court's "inherent authority to enforce [its] orders"), *aff'd*, 617 F.3d 186 (2d Cir. 2010). Judge Glasser found, instead, that Roe had determined unilaterally that he was entitled to publicly disclose the report.

Judge Glasser balanced his findings of physical danger to Doe and the intentional defiance of a sealing order by Roe—findings that we hold were not clearly erroneous—against Roe's asserted need to use the PSR in the SDNY civil case to establish that Doe had defrauded investors and others by not revealing his

6

conviction. Because proof of Doe's conviction (as opposed to his cooperation) remains available from other public documents—including a press release by the United States Attorney's Office for the Eastern District of New York—and because the PSR is an incomplete and ultimately inadmissible document to which neither Doe nor the government will ever have the opportunity to object, *see Charmer Indus., Inc.,* 711 F.2d at 1170-71, the PSR is of dubious utility in the civil case except as a tool to intimidate and harass Doe by subjecting him to danger. Accordingly and in sum, disclosure of the report is not "required to meet the ends of justice," *id.* at 1175—indeed, quite the opposite. The District Court did not err, much less abuse its discretion, in imposing a permanent injunction against dissemination of the PSR. *See, e.g., United States v. Charmer Indus., Inc,* 711 F.2d at 1177 (stating that a "central element in the showing required of a third person seeking disclosure is the degree to which the information in the [PSR] cannot be obtained from other sources").

(ii)

Doe argues that the District Court violated his First Amendment rights by temporarily restraining his continued possession and dissemination of the other sealed documents from Doe's criminal case.

A TRO, which is appropriate when "speed is needed . . . to prevent irreparable harm," *Garcia v. Yonkers Sch. Dist.,* 561 F.3d 97, 106 (2d Cir. 2009) (internal quotation marks omitted), is not a final judgment and is not ordinarily appealable. *See Gen. Motors Corp. v. Gibson Chem. & Oil Corp.,* 786 F.2d 105, 108 (2d Cir. 1986). To the extent we may, in our discretion, exercise pendent jurisdiction over the order pursuant to *Swint v. Chambers Cnty. Comm'n,* 514 U.S. 35, 45 (1995), we decline to do so here. Accordingly, Roe's appeal is dismissed insofar as it challenges the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010.

(iii)

On April 8, 2011, Roe filed a notice of appeal with respect to Judge Cogan's orders of April 1 and April 4, 2011. Roe did not raise any arguments with respect to that appeal in his reply brief of April 18, 2011, nor has he filed a motion for leave to submit supplemental briefing.[2] Accordingly, we hold that Roe has waived his right to challenge Judge Cogan's orders of April 1 and April 4, 2011. *See, e.g., In re Wireless Data, Inc,* 547 F.3d 484, 492 (2d Cir. 2008) (deeming arguments not raised on appeal waived).

His appeal from those orders is hereby dismissed.

(iv)

Roe appeals from Judge Glasser's scheduling order of March 23, 2011, insofar as it reflects Judge Glasser's factual finding that Roe "knowingly and intentionally flouted" a court order. Scheduling Order, *United States v. Doe* (E.D.N.Y. Mar. 23, 2011).

---

[2] Although arguments raised for the first time in a reply brief are generally deemed waived, *see Connecticut Bar Ass'n v. United States,* 620 F.3d 81, 91 n.13 (2d Cir. 2010), Roe's opening brief was filed on March 28, 2011, and therefore could not have raised any arguments with respect to Judge Cogan's orders of April 1 and April 4, 2011. Accordingly, we do not base our finding of waiver on Roe's failure to discuss Judge Cogan's orders in his opening brief; rather, our holding is based on his failure to discuss them in his reply brief or in a motion for leave to submit supplemental briefing.

7

We do not have jurisdiction over Roe's claim because the March 23, 2011 order was not a final order pursuant to 28 U.S.C. § 1291, nor are any of the exceptions to the "final judgment rule" applicable in the circumstances presented. *See generally Reiss v. Societe Centrale Du Gruope Des Assurances Nationales*, 235 F.3d 738, 745 (2d Cir. 2000) (discussing the "final judgment rule" and its exceptions).

Accordingly, Roe's appeal from the March 23, 2011 order is dismissed.

(v)

On June 15, 2011, Roe filed a notice of appeal with respect to Judge Cogan's order of May 13, 2011. We review Judge Cogan's interpretation of our February 14, 2011 order and his interpretation of the sealing orders of Judge Glasser *de novo*.

After an item-by-item review of the specific information that Roe wished to publicly release—including (a) John Doe's real name, linked with his criminal docket number, (b) the specific nature of the predicate acts leading to his criminal conviction, and (c) the sentence imposed by the District Court—Judge Cogan concluded that the information either was not public at all or was not public to the extent and with the level of detail that Roe intended to disclose. Accordingly, he denied Roe's request for permission to release the information. Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon our own independent review, we agree with Judge Cogan that Roe's proposed disclosures would have violated our temporary injunction of February 14, 2011 and the sealing orders of Judge Glasser. Judge Cogan's order of May 13, 2011 is affirmed.

## CONCLUSION

To summarize:

(1) The judgment of the District Court permanently enjoining the dissemination of John Doe's Pre-Sentence Report is AFFIRMED.

(2) The appeal in Docket No. 10-2905-cr is DISMISSED in part, and the appeal in Docket No. 11-1408-cr is DISMISSED in full, insofar as they challenge the District Court's temporary restraining orders of May 18, 2010 and July 20, 2010 and insofar as they challenge any related orders that may have been entered or re-affirmed on May 28, June 11, June 14, or June 21, 2010.

(3) The appeal in Docket No. 11-1411-cr is DISMISSED because Roe has waived his opportunity to challenge Judge Brian M. Cogan's orders of April 1, 2011 and April 4, 2011.

(4) The appeal in Docket No. 11-1906-cr is DISMISSED for want of jurisdiction.

(5) With respect to Docket No. 11-2425-cr, the order of Judge Cogan is AFFIRMED.

(6) The appeal in Docket No. 11-1666-cr by *pro se* appellants is DISMISSED in all respects except insofar as it challenges the District Court's permanent injunction against the dissemination of Doe's PSR; with respect to that claim, the judgment of the District Court is AFFIRMED.

(7) The Clerk of Court is DIRECTED to close Docket Nos. 11-1408-cr, 11-1411-cr, 11-1906-cr, and 11-2425-cr upon entry of this order. The Clerk of Court is also DIRECTED to close Docket No. 11-479-cr to the extent it was not already closed upon entry of our February 14, 2011 order. *See* Order, *Roe v. United States*, Docket Nos. 10-2905-cr, 11-479-cr (2d Cir. Feb. 14, 2011).

(8) The remainder of this cause (Docket Nos. 10-2905-cr, 11-1666-cr) is REMANDED to the

8

District Court (I. Leo Glasser, *Judge*) for proceedings consistent with this order and with instructions (i) to rule upon the government's unsealing motion of March 17, 2011, (ii) to issue a final determination regarding whether the dissemination of the other (non-PSR) sealed documents in John Doe's criminal case, particularly those that refer to Doe's cooperation, should be enjoined, and (iii) in the event that a final determination regarding the dissemination of the other sealed documents does not result in an injunction against the dissemination of documents referring to Doe's cooperation, to enter an order temporarily staying the unsealing of any documents referring to Doe's cooperation pending an appeal to our Court. In the event that the government elects not to appeal the unsealing of any documents that may be unsealed by the District Court, the government is ORDERED to notify the District Court and our Court of its decision not to pursue the appeal within the otherwise applicable time for taking the appeal.

(9) It is further ORDERED that, pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), this panel shall retain jurisdiction over any further appeals from proceedings in the District Court, including any further petitions for extraordinary writs.

(10) It is hereby ORDERED that Judge Cogan shall retain jurisdiction for the limited purpose of enforcing our February 14, 2011 mandate—that is, to ensure the parties' compliance with the orders of this Court and any that have been, or may hereafter be, entered by Judge Glasser. Our panel retains jurisdiction pursuant to *United States v. Jacobson*, 15 F.3d 19 (2d Cir. 1994), over any appeals from any orders or judgments entered by Judge Cogan.

(11) Finally, it is ORDERED that appellant Richard Roe is hereby warned that the Court's patience has been exhausted by his filing of six separate notices of appeal regarding the same principal legal dispute—including the filing of an appeal from a March 23, 2011 scheduling order that obviously was not a final order nor subject to any of the exceptions to the "final judgment rule," *see* Part (iv), *ante*—and that any further attempts to re-litigate the issues decided by this order, or other future filings of a frivolous nature, may result in sanctions, including the imposition of leave-to-file restrictions, requirements of notice to other federal courts, and monetary penalties.

(12) The Clerk of Court is DIRECTED to transmit a copy of this order to Judge Cogan.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

# EXHIBIT 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------x      ORDER

In the Matter of the Motion to Unseal      12 MC 150 (ILG)
Docket No. 98-1101

------------------------------------------------------x

GLASSER, United States District Judge:

    In a letter dated March 27th, 2013, Docket No. 108, Frederick Oberlander and intervenor Lorienton Palmer requested the Court to docket the sealed Memorandum and Order (M&O) of March 15, 2013, mistakenly referenced the "March 14 Order" and for permission to move for a reconsideration of that M&O within 14 days thereafter pursuant to Local Rule 6.3, mistakenly referred to as 16.3. In an Order issued the following day, March 28, 2013, learning that the sealed M&O, Docket No. 106, was inadvertently sealed, it was unsealed and the requested enlargement was granted, Docket No. 109.

    In a letter dated April 11, 2013, Docket No. 110, which the movants requested partially sealed, they requested an additional enlargement to file their motion for reconsideration which the Court granted, Docket No. 112.

    Local Rule 6.3 of the United States District Courts for the Southern and Eastern Districts of New York captioned "Motions for Reconsideration or Reargument," provides in relevant part:

> There shall be served with the Notice of Motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked. (emphasis mine).

    On April 19, 2013, a nineteen page Joint Motion for Reconsideration was filed,

Docket No. 113.[1] That submission contains not a sentence, a word or even a syllable which smacks of a matter or controlling decision which counsel doesn't even purport to believe the Court overlooked to require reconsideration of its March 15, 2013 Memorandum and Order.

In a letter response dated April 26, 2013, Docket No. 115, to their motion to reconsider, the government opposed it for essentially the same reasons.

Having made reference to the relevant Local Rule and blatantly ignored it, they manifest as well an indifference to the certification required by Rule 11(b)(1), Fed. R. Civ. P., that their motion was not presented "for any improper purpose." Their "Joint Motion to Reconsider" is a transparent pretext for airing, yet again, arguments they have repeatedly made and scurrilous charges they have leveled at judges, courts, prosecutors and other lawyers. Those include, for example, "discussion must be made of the intellectually dishonest EDNY history of attempting to restrain the speech of the 'little people' who don't buy info by the barrel, most infamously in the context of Zyprexa," at p. 5; referring to the opinion in Zyprexa,[2] "we assume the court knew perfectly well what was the law and what it was doing and made a bet that the individuals whose civil rights it was violating wouldn't or couldn't, pay to appeal. *That's* intellectual dishonesty. Or

---

[1] On April 22, 2013, they filed a corrected version of their joint motion which they represented made no substantive changes but merely fixed typographical errors and added or removed a few words. This version is docketed as #114-2. Page references made infra are to the pages in the corrected version.

[2] No citation is provided to this case nor is the "court" named. I provide just one citation in the body of which the history of that litigation is given as "Appendix B, History of the Zyprexa Products Liability Litigation, Case No. 04-MD-1596." In re Zyprexa Products Litigation, 260 FRD 13 (E.D.N.Y. August 17, 2009) (Weinstein, J).

2

judicial hubris. Either works." at p. 6-7, "We assert that U.S. v Doe, the 1995 2d Circuit case around which too many judges in this district seems to have built a cottage industry of sealing whatever the government or cooperator wants on the mere 'possibility' of a threat is unconstitutional per se." at p. 10; this Court "illegally hid a felony conviction" at p. 9.

The tenor of that submission and of countless others to which the few excerpts above give barely a hint, magnify the failure to obey the Local Rule and require, if not compel, that their Joint Motion be and it is, hereby denied. Their Joint Motion also respectfully demands (emphasis mine), that the caption to case numbered 98 CR 1101 (ILG) be changed to read United States v. Felix Sater, instead of v. John Doe. To that extent only, their motion is granted. Referring to Sater as "John Doe" no longer serves any useful purpose since his role as the defendant in this case is now a matter of public record. The Clerk of Court is to make the necessary change accordingly.

In a letter dated May 10th, but not filed until May 13th, Docket No. 117, the movants "request a one week extension of time to reply to the government's letter of April 26th." The government's letter is plainly a mirror reflection of my denial of their motion and to which a reply is neither wanted nor warranted. Their request is denied.

SO ORDERED.

Dated:        Brooklyn, New York
              May 15, 2013

I. Leo Glasser

3