United States District Court
For the Eastern District Of New York

|  |  |
|---|---|
| IN RE MOTION FOR CIVIL<br>CONTEMPT BY JOHN DOE | ) <br>) Misc. Action No. 12-MC-0557 (BMC)<br>)<br>) **Emergency Expedited Relief Sought**<br>)<br>) |

### Notice of, and Memorandum of Law in Support of, Movant-Respondent Richard E. Lerner's Motion for Clarification

1. Movant-respondent Richard E. Lerner, *pro se,* moves for emergency clarification of this Court's July 16, 2015 Order (the "Order"), entered July 28, 2015 as ECF 117, and related issues. The reason for this motion is that a Movant has been requested by a mainstream media publication to publish tomorrow, *i.e.*, before the August 6, 2015 Republican debate, a 10,000 word article that I have written concerning, *inter alia*, Felix Sater and Donald Trump. Notably, in an article published in today's Washington Examiner, entitled "Will Donald Trump's Ties to a Criminal [Felix Sater] Hurt his Campaign?" Ryan Lovelace, Washington Examiner, August 4, 2015, Mr. Sater himself is quoted discussing his cooperation.[1] If Mr. Sater may speak with the media, so too may the Movant, without fear of prosecution.

### Background

2. On April 1, 2015, this court signed but did never docketed an order to show cause brought by petitioner-respondent Sater, requiring that I show (1) why I should not be held in civil contempt of purported court orders; and (2) why the court should not charge me with criminal contempt for some or all of the same acts complained of, pursuant to Fed.R.Cr.P. 42(a).

---

[1] See http://www.washingtonexaminer.com/will-donald-trumps-ties-to-a-criminal-hurt-his-campaign/article/2569496?custom_click=rss.

3.      On June 23, 2015, Mr. Oberlander and Movant responded, raising legal and factual objections, the latter necessarily limited by the need to preserve their testimonial privilege.

4.      On June 29, 2015, respondent Sater filed, without leave, a supplement to the OTSC, ECF 112.

5.      On June 30, 2015, at conference, this court ordered, and in response on July 7, 2015, respondent Sater filed a proposed form of "Referral Order" [sic], and on July 14, 2015, Mr. Oberlander and Movant filed their respective objections.

6.      On July 28, 2015, this court entered its own "Referral Order," incorporating by reference the entire docket,[2] thus including the June 30, 2015 conference transcript, the OTSC, and the supplement.

### Précis

7.      A prior restraint may be, indeed must be, well defined as a court order, rather than a statute or other rule of law, which prohibits future speech not yet made. It is important to maintain this strict definition, because what sets a prior restraint apart from a mere statute or regulation that does the same thing is the "collateral bar" doctrine, which states that while such a statute or regulation may be freely violated if it is unconstitutional, said unconstitutionality an absolute defense to any attempt to enforce the statute or regulation after the speech is made, where a court order prohibits the same speech and is thus unconstitutional, that

---

[2] The court should recall that for 18 months it took submissions on Judge Glasser's docket 98-CR-1101, and dozens of judicial records in this case are on that docket, but many judicial records aren't entered on it because Judge Glasser declined to do so.

unconstitutionality may not be used as a defense against a charge of criminal contempt, unless it rises to the level of transparent invalidity.

8. Accordingly, for nearly a century, since the doctrine was established in *Near v. Minnesota*, 283 U.S. 697 (1931), because of just that special risk, when (injunctive) prior restraints come to court they do so cloaked in the mantle of near per se unconstitutionality. This is particularly so where what is restrained is core, protected speech, such as political speech.

9. Closely related is the doctrine of chilling effect. A chilling effect occurs when individuals seeking to engage in activity protected by the First Amendment are deterred from so doing by governmental prohibition not specifically directed at that protected activity. So, if a statute or injunction directed at hard-core pornography has the actual effect of deterring an individual from publishing *The Decameron* or *Lady Chatterley's Lover*, that effect is properly deemed a chilling effect.

10. The relatedness is important because a chilling effect may present even in the absence of a formal statute or court order. Even informal court action that sufficiently inhibits, by instilling the fear of prosecution for criminal contempt, may create a chilling effect. And if it does, then it is deemed to be a prior-restraint injunction, and thus is subject to attack for vacatur and the like (but, interestingly, because it is not an actual injunction, merely a deemed one, a legal fiction, not a factual fiction, the collateral bar rule cannot apply).

## Summary

11. Movant avers that the Referral Order, especially in full context, instills in him the reasonable fear that he will be prosecuted or otherwise punished for future dissemination of core, protected speech in violation of his First and Fifth Amendment rights, and so has a chilling effect and thus is legally cognizable as, and susceptible to attack as, an unconstitutional prior restraint.

12. Because (1) Movant will publish on the same topic as constitutes the gravamen underlying the Referral Order – *viz*. Sater, Loretta Lynch, and the Eastern District and its significance to the presidential election, clearly core protected speech;[3] (2) the topic has not moved off the national stage for a month, and is growing in coverage; making it obviously a matter of national concern; and (3) Movant and has been requested by mainstream media to publish on a schedule which must run before the August 6, 2015 Republican debate, time is of the essence and Movant seeks emergency relief.

13. If the Referral Order were in form an actual prior restraint injunction, the remedy sought would be an emergency stay to allow publication while the issues are further analyzed, especially because prior restraints of core protected speech are unheard of, virtually *per se* unconstitutional.

14. In this case, however, the Referral Order is not itself decretal as to Movant; rather, it is the facts and circumstances of how it came to be and what it does – namely, expose Movant to an unconstitutionally high fear of criminal contempt prosecution by purporting to enforce or interpret, without due process, certain court orders in ways that are, if not transparently illegal, then transparently invalid.

15. And while the Referral Order deals with speech already made in the past, it is obvious, since the Referral Order expressly invites this, that similar criminal investigations

---

[3] "There will never be a President Trump," Carl Hiaasen, Miami Herald, July 11, 2015, http://www.miamiherald.com/opinion/opn-columns-blogs/carl-hiaasen/article27059140.html; "Rick Santorum Hits Donald Trump: 'All That Glitters Is Not Gold'," U.S. News, July 13, 2015, http://us-news.us/rick-santorum-hits-donald-trump-all-that-glitters-is-not-gold/; Why Donald Trump Would Make the Worst President Ever," Gabriela Motroc, Austrialian National Review, July 14, 2015, http://www.australiannationalreview.com/donald-trump-worst-president/; "Donald Trump: A Different Shade of Green," Russia Today, August 1, 2015, http://www.rt.com/op-edge/311346-trump-polls-republican-money/; "Will Donald Trump's Ties to a Criminal Hurt his Campaign?" Ryan Lovelace, Washington Examiner, August 4, 2015, http://www.washingtonexaminer.com/will-donald-trumps-ties-to-a-criminal-hurt-his-campaign/article/2569496?custom_click=rss.

carrying with it the court's imprimatur, if not overt threat, that the government had better institute charges against Movant, which will carry forward for every instance of Movant's future speech on the same or related topics.

16. Thus, as this court has now made clear that it is following an unlawful and uncharted course through the field of criminal contempt, and will continue to do so by repeated wrongful enforcement of purported orders, Movant asserts his constitutional rights and respectfully asks the court do the equivalent of issuing a stay *sine die* such as will protect Movant from the chill, which can only be done by issuing clarifications that will estop all wrongful enforcement *in futuro sine die*.

17. Also on an emergency basis, Movant respectfully asks this court to "unseal" that which is, but cannot lawfully be, under seal as this is written – *viz.,* the content of the docket, save for the PSR, for all filings after the October 2015 conference. It is globally newsworthy and should be globally published that Movant has been threatened with criminal contempt in that a federal judge has said that there is probable cause to prosecute him for the "crimes," *inter alia*, of disseminating a press release out of the Congressional Record and writing an editorial critical of Loretta Lynch using public information.

18. For those are among the "crimes" petitioner Sater has charged movant with, and thus, in this court's own words, are among the crimes this court has said it thinks may be prosecuted.

19. These materials are unlawfully under seal because (1) they appear to be sealed; (2) they are for the most part, well over 80% anyway, newspaper articles widely available to the public since their publication, and this court itself recognized years ago that it lacks the authority to place or maintain under seal newspaper articles available to the public; (3) to the extent this

court believes there are any orders actually prohibiting dissemination of anything under seal even though it's also publicly available, it would produce the absurdity that not only can none of the case participants discuss again publicly anything about Sater, it means that Ms. Lynch – who was covered by those orders because she was the government lawyer in the Second Circuit or lower court case when they were issued – committed contempt when she discussed Sater with the Senate.[4]

## Argument

### The Referral Order has a Chilling Effect on Prospective Core Protected Speech, and at the Very Least to that Extent is an Unconstitutional Prior Restraint.

20. Underlying temporal urgency prohibits full discussion of the "chilling effect" doctrine. For our purposes, the following defines the doctrine, as limited to First Amendment affirmative rights:

> A statute making criminal the publication of the collected works of Shakespeare, an ordinance prohibiting the advocacy of socialism, or a common-law principle imposing civil liability for the criticism of government officials would each deter individuals from participating in constitutionally protected activity. But we do not need any notion of a chilling effect to tell us that statutes which punish the unpunishable are unconstitutional and the Supreme Court does not need the chilling-effect doctrine to so hold. In these instances of direct prohibition, the chilling effect adds nothing to the analysis; it is merely a truism to say that a statute which unconstitutionally penalizes protected speech also chills such speech. If the chilling effect is to have any significance as an independent doctrine it must refer only to those examples of deterrence which result from the indirect governmental restriction of protected expression…. A chilling effect occurs when individuals seeking to engage in activity protected by the First Amendment are deterred from so doing by governmental regulation not specifically directed at that protected activity. Thus, if a statute which is directed at hard-core pornography has the actual effect of deterring an individual from publishing *The Decameron* or *Lady Chatterley's Lover*, that effect is properly deemed a chilling effect. Similarly, if a common-law sanction aimed at punishing the publication of defamatory factual falsehood causes the suppression of truth or opinion, chilling-

---

[4] By *reductio ad absurdum*, it also means that your honor, an employee of the government with actual knowledge of those orders and so covered by them, too, would be in criminal contempt if you discuss any of this in public, including in open court.

effect reasoning is again applicable. The same analysis is also appropriate where a statute designed to curb incitement to riot has the additional effect of inhibiting the advocacy of political change. The danger of this sort of invidious chilling effect lies in the fact that something that "ought" to be expressed is not. Deterred by the fear of punishment, some individuals refrain from saying or publishing that which they lawfully could, and indeed, should.[5]

21. Importantly, if there is a chilling effect, there is usually a prior restraint, even if there is no statute or court order instilling the fear. As Justice Kennedy said in *Multimedia*[6] [Emph. add.]:

> [I]nformal procedures undertaken by officials and designed to chill expression can constitute a prior restraint…. Warnings from a court have added weight, and this too has a bearing on whether there is a prior restraint.

22. The Referral Order, especially with its incorporations, instills in Movant the reasonable fear that he will be prosecuted or otherwise punished for future acts of expression, even core protected expression. To show this, Movant uses *Multimedia* for didactic value and factual similarity.

23. In *Multimedia*, a state trial court discovered that copies of grand jury testimony had been released to members of the press and others by the State Attorney's Office and did three things:

24. First, determining that Fla. Stat. §905.27 apparently prohibited that release and any subsequent dissemination by anyone who had received it, the court sent a letter to Governor Bush asking him to appoint a special prosecutor to investigate and as appropriate prosecute the

---

[5] "Fear, Risk and the First Amendment: Unraveling the Chilling Effect, Schauer," *B.U. Law Rev.* 58:685 (1978).

[6] *Multimedia Holdings v. Circuit Court of Florida*, On Application for Stay, 04A773 (2005) (Opinion in Chambers).

State Attorney who had released it and Multimedia / First Coast, one of the press which had received it.[7]

25. <u>Second</u>, the court issued an order directing, as relevant here, that

> No party shall further disclose the contents of the transcript of testimony before the Grand Jury to any person not authorized by F. S. 905.27(2).… All persons who have obtained a copy of the transcript are placed on notice that any broadcast, publication, disclosure or communication of the contents of this transcript is a violation of F. S. 905.27, punishable as a misdemeanor in addition to constituting grounds for Criminal Contempt of Court.

26. <u>Third</u>, First Coast, alleging it had received a copy of the order directly from the court, moved to intervene and set it aside as an unconstitutional prior restraint, causing the court to order:

> At no point in the Court's [first order] is [First Coast] precluded or restrained from publishing matters which are public record, nor is [it] enjoined or restrained from broadcasting matters in this case. The [first order] clearly provides that the parties to this action are enjoined from further disclosing the contents of the transcript of testimony before the Grand Jury to any person not authorized by F. S. 905.27(2). The parties to this action are the State of Florida … and defense counsel.
>
> [T]he Court's [first] order does not enjoin [First Coast] from publishing or broadcasting materials that it wishes to publish or broadcast, but rather solely points out that so to do might constitute further violations of criminal law.

27. The court denied applicant's motion to intervene and its motion to set aside the first order.

28. Applicant sought review in the Court of Appeal of Florida, which denied, without comment, applicant's "Emergency Petition for Writ of Certiorari." On the basis that the Fifth District Court of Appeal's denial was not appealable to the Florida Supreme Court, First Coast

---

[7] Multimedia was a joint media enterprise including the Gannett papers, doing business as First Coast News.

asked Justice Kennedy for a stay of the orders pending a petition for certiorari to the U.S. Supreme Court, urging that they operate as a prior restraint in violation of the First and Fourteenth Amendments.

29. Justice Kennedy denied the application, finding it had not sufficiently established on the record that First Coast had been enjoined by or otherwise subject to the orders in question or that any threat to it was real or substantial; hence it was unlikely that, despite indications that a prior restraint may have been imposed at the time of the first order, the Supreme Court would grant certiorari.

30. However, in all three respects Justice Kennedy's analysis supports Movant's position because exactly that which Justice Kennedy found insufficient in *Multimedia* is fully present here.

**I of III: Actual or Ostensible Restraining Orders**. Justice Kennedy observed:

> [First Coast] argues that the orders operate as a prior restraint because they threaten prosecution for future disclosures of the transcript and for contempt of court for any future publication. Specifically, the [first order] places "[a]ll persons who have obtained a copy of the transcript … on notice that any broadcast, publication, disclosure or communication of the contents of this transcript … constitutes grounds for Criminal Contempt of Court." This would apply to applicant, as it fell within the class of persons who had obtained a copy of the transcript.
>
> A threat of … criminal contempt against a specific publication raises special First Amendment concerns, for it may chill protected speech much like an injunction against speech by putting that party at an added risk of liability.

31. In this case there are – ostensibly are – actual, decretal orders directed at Movant. So here the issue is not merely that there is a threat of criminal contempt "in the air"; Rather, the threat is concretized by the existence – ostensible existence – of those orders. At least as far as

this court is concerned, it is enforcing actual decretal orders which bind Movant and restrict his speech.

32. But Movant did not bring this motion because those (ostensible) orders exist, *but because of the illegal and invalid way in which this court has decided to enforce them. That's the real chill.* Because Movant (figuratively) published *Lady Chatterly's Lover* and is facing the threat of prosecution for it because this court has decided to punish him in response for violating ostensibly actual orders which could never lawfully and legally do more than punish child pornography, he is chilled if not frozen as he wishes to immediately publish *The Escaped Clock* and is facing the same result.

### II of III: Invalid or Illegal Enforcement of Vampire Orders.

33. Justice Kennedy added:

> The court's first order was not accompanied by notice or hearing or any other of the usual safeguards of the judicial process….

34. Again, it is imperative to distinguish between the lack of notice or hearing or any other of the usual safeguards which is related to the entry of the (ostensible) orders themselves, as opposed to one related to the enforcement of them. For example, the fact that the Second Circuit's (ostensible) orders were issued *ex parte* without notice, without hearing, without findings, and in response to fraudulent misrepresentations made by the government and are otherwise and further in complete repudiation of Rule 65 (which as a mere codification of common law applies to appellate courts) and thus unenforceable on that account, **as well as because as temporary orders *pendente lite* they lapsed four years ago with the issuance of the Second Circuit's December 20, 2011 mandate,** is not the only or even worse chill here.

35. No, isn't the worse chill the fact that this court refused to acknowledge any of those arguments, refused to acknowledge even the issue, even when raised in papers twice,

refused to hold an evidentiary hearing which would have established that some of Petitioner's allegations were pure fraud, and instead plowed ahead, going so far as to announce that the court had found probable cause to believe criminal prosecution "at least" was warranted for violating orders that had long ago evaporated?

36.     Remember the issue in this motion is whether Movant's **fear** of writing more literature only to have this court treat it as swill is reasonable under the circumstances. The fact that the court is insistent upon dragging the United States into this for criminal investigation and prosecution after the unexplained and inexplicable apparent revival of a dead order – "*pendente lite*" – refusing to even acknowledge that argument (fact, really), telling the government, "Well, on the record I have no opinion what you should do <wink> but FYI, I've already decided there's probable cause, check the transcripts so don't worry about demurrers and don't worry that the order which was unenforceable *ab initio* for lack of process doesn't even exist anymore." That ought to suffice, as an example of a chill. Arctic chill.

37.     Petitioner brought an order to show cause asking this court to prosecute for criminal contempt by issuing a Rule 42 charging instrument and then referring to the government to conduct the actual prosecution. That is how Rule 42 works. There is no other way by which a court may commence criminal contempt proceedings. None.

38.     If Petitioner had wanted to he could have gone to the U.S. Attorney and sought a "normal course" Fifth Amendment executive-initiated prosecution. He did not. He came to this court to seek judicially-initiated prosecution, and the only way to do that is to charge pursuant to Rule 42. Full stop.

39. Upon signing that order to show cause, the court gave itself exactly one binary valued choice: Grant it by issuing a Rule 42 charge or deny it, for example for lack of probable cause. But this court didn't do that.

40. Yet this court stuck onto the record its statement – not once, but twice – that it found probable cause for criminal prosecution "at least." Then where's the charging instrument? Why didn't the court grant their petition? Obviously, the court well knew there was no probable cause (for one thing, it's been held unconstitutional for decades to base probable-cause findings solely on non-evidentiary affiant submissions that don't establish a foundation for personal knowledge) and that the moment it issued such an instrument Movant would so demur (and case law says that the court must hear that demurral before finding probable cause in criminal contempt contexts).

41. Perhaps, the court knew that Petitioner Sater et al. (including his counsels, who would be called as witnesses for verifying under oath and claiming personal knowledge of facts), would not survive it.

42. And respectfully it is strictly illegal, for this court to suspend ruling on the private petition for criminal contempt and then violate separation of powers by recruiting the FBI and the DOJ to do fact-finding and possibly find things to plug the evidentiary gaps – chasms– in Petitioner's allegations.

43. Imagine this: Would the court, after receiving a petition like the one in this case utterly devoid of evidentiary support, allow discovery to develop facts? Of course not, it could not, or rather could not allow it beyond the scope of Fed.R.Crim.P. 16.

44. But what did this court do instead?

45. It asked the government if it wouldn't mind using its resources to do the factual development for Petitioner. Like hiring a Special Master to help a party rather than the court.

46. That may sound offensive. It's not meant to be anything more than an expression of Movant's chill. Reasonable chill. Why is it reasonable? Consider this:

> I will also note that I think it's very unusual that the government is allowing a party that the government might seek to protect to protect himself. I know the U.S. Attorney's Office is quite busy. I have not yet met an Assistant that doesn't work really hard, but I will say I can't think of anything going on there that is more important than letting actual and potential witnesses know that the government will protect them…Now I want the movants, particularly [Sater's counsel], but obviously he is consulting with the government…. – *Cogan, J. 02.27.12 Tr. pg. 9-10*

47. Respectfully, no one in Movant's position would look at that and not think that even back then the court was imploring the government to "carry the water" for Petitioner. (And it bears mentioning that this runs to animus, see immediately below, because one might feel that a judge who doesn't also think that perhaps it's also important to let cooperating witnesses know that if they abuse the secrecy of their convictions to perpetrate a billion dollars of fraud they're going to spend a long time in jail and pay huge fines after paying restitution and let them know that – cooperator or not – they aren't going to be paid for cooperating with the victims' money.

48. Perhaps this is why the court refused to dismiss the civil contempt charges when it appears clear that it should have. True, it would be unfair to force Movant to defend the civil contempt in such way as would prejudice his rights – for example, as to his testimonial privilege – but nothing stopped the court from dismissing the civil aspect of the petition for its failure to supply evidentiary material as well as its obvious legal insufficiency. For just one example, you can't commit contempt of a dead "*pendente lite*" order.

49. In any event the issue is not whether any of this is true as to the court's motives or intentions; rather, the issue is whether Movant is reasonably chilled for fear of them, of the

court's animus. Animus, as a reasonable Movant might find expressed in the court's insinuation that the Eastern District best follow its "order," notwithstanding the doctrine of separation of powers, and expeditiously apprise the court of its intention, or not, to prosecute.

50. Recruiting the Department of Justice to serve as the court's permanently established official investigator on an open-ended, retrospective and prospective basis, to "send a message" to cooperators that the government will terrorize under color of court order anyone who dares complain that they or their clients were the victims of cooperators who were emboldened into billion dollar crime by the same courts and government?

51. Finally, even though, as Judge Glasser noted, the powers of a federal judge are awesome, as they clearly cannot raise the dead (orders), Movant presumes that they cannot create life either, that they cannot will orders into existence and can only bring them about the old-fashioned way.

52. Yet willing them into existence is what this court has done by not dismissing, but rather impleading the government into the case in respect of allegations that Movant violated orders that nevermind dead, were never even alive to begin with.

53. We refer to Judge Glasser's orders. The ones written in invisible ink. What other than chill should be the reaction of one in Movant's situation who sees that orders Judge Glasser himself stated on the record had never been issued, written, or docketed, and that in any event as he confirmed were not directed at Mr. Oberlander (and so could not have been directed at Movant), in a circuit which ruled over a decade ago that such unwritten orders can never be the basis for a contempt charge, *U.S. v. Cooper*, 353 F.3d 161 (CA2 2003), somehow "work" here?

54. Finally, even assuming the Second Circuit's orders weren't long dead with a stake through the heart but were enforceable, for this court to propound their enforcement by

interpreting them to mean that any fact anywhere, no matter how publicly available, is something forever prohibited to Movant to speak of simply because it wound up in a document under seal is simply unlawful.

55.     The Second Circuit could not have intended to, for example, let courts like this one simply repeat some imprecation like "blanket sealed" and all of a sudden every document filed is lawfully sealed, and then operates as a lifetime perpetual unchallengeable prior restraint on the same subject matter, even if previously known or readily discoverable or inferable from other publicly or privately available information. That would be bizarre and cannot reflect reality.

56.     Otherwise, the situation would be to turn ECF into a virtual lockbox so that anytime someone like Sater wanted to threaten his adversary with prosecution, he could just file something on ECF "under seal," and that would instantly become a prior restraint.

57.     So for example since a headline article in today's Washington Examiner discusses Trump's involvements with Sater and Movant's filings in the United States Supreme Court all Petitioner has to do now is write a letter ostensibly to "call it to the court's attention" and then attach a copy and mirabile dictu, we're now enjoined from ever mentioning Sater or the Supreme Court again.

### III: Animus; Discriminatory, Retaliatory, and Selective Enforcement.

58.     Justice Kennedy closed his opinion and ultimately declined to issue the stay because:

> The first order is of further concern because it singles out this applicant and could be interpreted to place it on notice that publication could place it in contempt....
>
> [I]nformal procedures undertaken by officials and designed to chill expression can constitute a prior restraint. Warnings from a court have added weight, and this too has a bearing on whether there is a prior restraint. If it were to be shown that even

> the second order might give a reporter or television station singled out earlier any real cause for concern, the case for intervention would be stronger.
>
> To the extent the court's orders might suggest a particular animus toward applicant that, too, has abated by virtue of the fact that the judge who entered them has retired from judicial service. It appears, however, that any threat once implicit in the court's first order is much diminished….
>
> Applicant argues that aside from the possibility of being held in contempt, it fears prosecution by virtue of the orders. Although it is true that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings," Bantam Books, supra, at 68, there is no suggestion that the judge who entered
>
> Although the State has not guaranteed applicant immunity from prosecution for future publication of the transcript, it has suggested that further publication will not be prosecuted.

59. Movant has already addressed Justice Kennedy's inclusion of judicial animus as a factor in determining the existence of a prior restraint by reason of the creation of a chilling effect. And similarly Movant has discussed, sufficiently for this emergency, the issue of selective prosecution (as in, why isn't the court referring United States Attorney General for criminal investigation for her public comments, including in and to the Senate, about Sater and his conviction and cooperation? (Surely it can't be some form of privilege to tell Congress things that Movant and his client were ordered not to tell Congress or we'd be back to square one with discriminatory enforcement.)

60. Thus without wasting time Movant supplies only this one additional extract from the transcripts in this case:

> I also think there are limitations in the context of civil contempt with regard to the remedy sought. It is true that if there is a civil contempt, the movant is entitled to recover their attorneys' fees, but so what. If what is being sought here is to stop violations, I think we can all be assured, based upon the conduct of Mr. Roe and Mr. Lerner, that the attorneys' fees incurred on this motion aren't going to do anything. – *Cogan, J. 02.27.12 Tr. pg. 9*

61. Movant suggests, again, that if this is not sufficiently indicative of discriminatory, retaliatory, and selective enforcement as the product of judicial animus, predisposition, and bias,

where's the referral for investigation of obstruction, for using the contempt power through fraudulent filings to attempt to convict Movant of attempted murder, and why is this court intent on describing Sater as a "witness" rather than as a "convicted felon with an illegal sentence who was allowed to commit hundreds of millions of dollars in fraud later on and keep all that money too?"

## Relief Requested

62. Movant stresses that this motion is limited entirely to requesting the following relief and so respectfully reserves the right to seek other relief by such other means, whether reconsideration or appeal or application for writ. No disrespect is intended; to the contrary, Movant merely wishes to focus on the emergency time factor and such relief as will protect him.

63. The only relief that can work here in the emergency interim seems to be an order similar to the second order in *Multimedia* which Justice Kennedy found helped to defuse the emergency:

> At no point in the Court's [first order] is [First Coast] precluded or restrained from publishing matters which are public record, nor is [it] enjoined or restrained from broadcasting matters in this case. [T]he … order does not enjoin [it] from publishing or broadcasting materials that it wishes to publish or broadcast, but rather solely points out that so to do might constitute further violations of criminal law.
>
> Perhaps something of the form:
>
> It is ORDERED, that (1) the Court finds that the orders of the Second Circuit underlying the allegations of contempt ceased to be in force on December 20, 2011 upon issuance of the appellate mandate; and (2) there is no decretal language with respect to any order of Judge Glasser complained of; and (3) therefore neither any orders of the Second Circuit nor of Judge Glasser described in (1) or (2) shall be enforced; and (3) Movant is not enjoined in any way from publishing any material whatsoever unless it is material contained *solely* within documents filed lawfully under seal in a case in which Movant has been a case participant and has had notice and an opportunity to be heard with respect to the sealing of each such document; and (4) the Court lacks jurisdiction whatsoever as

       to any orders of any court other than (a) the Second Circuit, to the extent any orders shall have existed; (b) Judge Glasser; to the extent such orders exist in tangible, decretal form; and (c) Judge Bucwhald, to the same extent.

       64.     This *does* embody the state of the law and the permissible scope of sealing orders or protective orders.

       65.     Of course, Movant has no alternative to propose this, though he still insists that this court has no jurisdiction to enforce anything, but can only take evidence and report as a Special Master pursuant to FRAP 48.

                                                      Respectfully submitted,
                                                         */s/ Richard E. Lerner*
                                                          Richard E. Lerner