

**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Secret Prosecutions And The Erosion Of Justice

Law360, New York (August 12, 2015, 2:09 PM ET) -- Republican presidential front-runner Donald Trump is increasingly the subject of headline controversy[1] about his billion-dollar development deal with secretly convicted RICO felon Felix Sater.



Sater is infamous for using — and being *allowed* by the government to use — the illegal concealment of his racketeering conviction to evade millions of dollars of mandatory restitution he owed to the victims of his organized crime stock fraud. By itself this is no surprise, as it occurred in the Eastern District of New York, home to Jordan Belfort, the "Wolf of Wall Street," and other cooperators who, like Sater, got to keep the money and live in luxury while their victims were left to rot.[2]

Richard E. Lerner

But what hasn't been explained before is that Sater also used — and was *allowed* by the government to use — the concealment of his conviction to fraudulently induce banks, partners and investors into parting with nearly a billion dollars to finance Trump-branded projects which, if successful, would have paid the Trump Organization a hundred million dollars and laundered a quarter billion dollars of the share of profits expected by Bayrock Group LLC (Sater's company) outside of the country to evade taxation.[3]

Much of the fraud took place between 2003 and 2010, with the chargeable knowledge and facilitation of Loretta Lynch, now U.S. Attorney General;[4] Leslie Caldwell, now Assistant U.S. Attorney General for the Criminal Division; and her now designated second-in-command Marshall Miller, all of whom came out of the EDNY U.S. Attorney's Office,[5] and with the knowledge and facilitation of the federal judges of the Eastern and Southern Districts of New York and the Court of Appeals for the Second Circuit.

It's bad enough that Sater and others acting with him committed — and were *allowed* to commit — hundreds of millions of dollars of bank, real estate, mail, wire and tax fraud, and money laundering and extortion as a reward for his ostensible cooperation in other cases.

How much worse is it that, even after 2010, by which time the government admits Sater's usefulness as a cooperator had ended, he was allowed to continue to get away with it, insofar as the author, his client, his client's clients, and others who learned the truth of all this almost *six years ago* have been threatened ever since with criminal prosecution if we tell anyone what we learned, even though we learned it lawfully, from private records Sater had kept at his firm and then abandoned when he left, and from public records which couldn't be made to disappear because they were in the custody of Congress?

Indeed, one such order, a "hyper-injunction" issued against us *ex parte* by the Second Circuit, not only without a hearing but literally without findings, *forbad us from telling Congress what we knew and from telling Congress (or anyone else) of that order itself.*[6]

In sum, for years Trump partnered with Sater, through The Trump Organization and Bayrock Group LLC, respectively, while Sater, a secretly convicted racketeer, used the illegal concealment of his record to defraud banks into financing Trump projects, from which Trump would have taken enormous sums and the U.S. Treasury would have been defrauded of like amount by profits laundered overseas. The crimes committed, then covered up, are staggering. Take one example: Trump SoHo, a monument to organized criminal activity protected by federal courts and attorneys even though:

- It was financed by hundreds of millions of dollars of loans procured from banks that were deceived because of Sater's fraudulent concealment of his conviction.[7]

- Sater admitted his criminal *mens rea*, confessing to the FBI, the U.S. Attorney, and Judge Leo Glasser, EDNY, that he'd defrauded banks for years via Bayrock, expressing only regret that he couldn't keep doing it after rumors spread about his conviction.

- Sater admitted this at his Oct. 23, 2009, sentencing[8], which the government says was in open court, and the transcript of which shows he used his real name, yet all record of his sentencing then disappeared. Until forced public by the author and his client, all judicial records of the sentencing, *required* to be public, in which he confessed that he'd committed years of crimes even while ostensibly cooperating in other cases, thus violating his cooperation agreement, were illegally hidden.

- This wasn't the first time the courts and government knew Sater was using the secrecy of his case to defraud; five years earlier, for example, his initial pre-sentence report disclosed that he was hiding his conviction from Bayrock and that the probation officer had joined with the courts and U.S. attorney in the concealment.

- Before it collapsed financially in 2010, perhaps two hundred million dollars of condominiums had been sold, and every sale was felony fraud under New York law (the Martin Act) for failure to disclose that Sater owned most of the co-developer (Bayrock Group LLC) and was a convicted racketeer.

- Those sales were a violation of covenants in the $300 million construction loan, which provided that real estate sales fraud would make both Tevfik Arif, Bayrock's chairman, and the Sapir family, its financial partner in Trump SoHo, jointly liable for the entire, otherwise non-recourse $300 million loan.

- When, in late 2010, Trump SoHo did collapse, and iStar, the public company which had lent the $300 million, was about to foreclose on the loan, Bayrock bailed out Arif and the Sapirs by arranging for CIM, an investment firm, to buy the loan for $250 million by concealing from CIM and iStar the truth about Sater and the above crimes, though by then Bayrock had admitted knowing the truth in sworn documents, filed under seal in Sater's case.

- By then, dozens of buyers were suing for unrelated fraud in an action before SDNY Judge Wood, as buyers of Trump International were suing for fraud in an action before a federal judge in Florida. None knew till too late that they had rights of rescission based on New York's Martin Act and Florida laws providing such remedies for concealment frauds like Sater's.

- Bayrock, Sater, Sapir and iStar escaped the consequences of the fraud, while settling plaintiffs received tens of millions less than they should have, while CIM paid tens of millions more, *because pleas of the author, his client and his client's clients, who'd learned the truth but had been gagged for months, to judges involved to let us tell it were ignored and instead we were threatened — and still are — with prosecution if we told what we knew.*

- And, had the project not failed, the Trump Organization would have received a fortune, while federal, state and city governments would have been defrauded out of a fortune because up to $225 million of its profits were set to be laundered overseas.

That's a lot to absorb. But this is a presidential election, the debates have started, and the leading Republican candidate is implicated in a conspiracy of massive fraud — *and whether he's implicated as a victim or as a beneficiary is not yet known*. There is no evidence that Trump was aware of Sater's conviction, upon his guilty plea in 1998 of engaging in a $40 million RICO fraud. Trump would have had no reason to know, because the court and the government illegally hid Sater's prosecution behind a "John Doe" docket for 15 years. For all that is now known, Trump was as much a victim of Sater, and thus a victim of the court and the government, as those who loaned or invested almost a billion dollars in Sater's company Bayrock Group without knowing that he had pled guilty to defrauding investors of $40 million.

### *Why Did the Government and Courts Facilitate the Cover Up?*

Why were the government and courts facilitating, and covering up for, organized criminals and billion-dollar frauds, let alone by using illegal secrecy and threats of prosecution against this author and his client?

One answer is, it's the result of concerted efforts of Second Circuit courts and prosecutors to protect their decades-long operation of a covert criminal justice system of secret dockets, hidden convictions, and protected cooperators allowed to commit crime with impunity, so long as they earn their keep. But that's

no answer, only a restatement.

Perhaps you're thinking they really believe what they're doing is legal. Then consider this: In 2010, Loretta Lynch revoked the cooperation agreement of another stock fraudfeasor and requested a severe sentence because — though he'd cooperated for a decade — he'd used the secrecy of his conviction to defraud his partners and investors by hiding it. Lynch's papers filed in the district court, and then in the Second Circuit, explain that the sealing of a criminal case is no justification for fraudulently hiding one's conviction.[9]

Unless you're a really good cooperator, like Sater. Did they think *his* concealments were somehow legal? Ask Caldwell, now Assistant Attorney General of the United States, Criminal Division. As a partner at Morgan Lewis & Bockius LLP, she represented Felix Sater at his 2009 sentencing and heard him confess his years of bank frauds at Bayrock.[10] Six months later she was representing him when he was deposed in yet another suit against Bayrock. Read this excerpt from Sater's deposition and decide for yourself if she knew that concealing his conviction while at Bayrock was criminal:

> Q. Were you ever convicted of a crime?
>
> A. Yes.
>
> Q. What was the crime you were convicted of?
>
> A. I was convicted of assault one.
>
> Q. Were you ever convicted of any other crimes?
>
> A. On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself … On the advice of counsel, I won't answer past what I have already answered … My counsel is Leslie Caldwell from Morgan Lewis.
>
> Q. Did she know you would be asked this question?
>
> A. Yes.
>
> Q. Did she advise you not to answer this question?
>
> A. Yes.
>
> Q. The grounds being again?
>
> A. Not to incriminate myself …

Unless Sater was perjuring himself, Caldwell told him that answering the question, "Were you ever convicted of anything besides assault," could incriminate him. Of course, she knew the truthful answer was "yes," so if she was advising him in good faith, she had to think that the fact of his RICO conviction could incriminate him. And that could only mean that she thought he had committed a crime by denying

it, which would now be revealed. For example, if he lied on an application for a gun permit that he had no such conviction, admitting that he did would expose him to perjury. The same with lying on applications to banks for hundreds of millions of dollars in loans. His lies would be exposed. And she knew about the bank frauds from his admission at his sentencing.

But wait … If that sentencing was really in open court, why did Caldwell let him open his mouth and admit it there? He was admitting that he'd committed bank fraud while cooperating, in violation of his cooperation agreement which prohibits criminal conduct. Why would she allow him to admit the crime in "open" court, in front of a judge, two U.S. Attorneys and four FBI agents? Didn't she risk his immediate arrest and termination of his cooperation? And, if it really was a public proceeding, wasn't a public transcript going to come out soon showing all this?

So obviously it really wasn't public, because clearly she can't have had good faith belief that he'd be prosecuted for admitting it at a deposition after she'd sat six months earlier and watched him admit it publicly in open court, right? One can only conclude that what she was really worried about was the exposure that he had a hidden conviction, an illegally secret sentencing, and an illegal sentence for avoidance of restitution.

She's the head of United States criminal justice. She should be made to explain.

* * *

The full story may remain hidden. As mentioned, courts have threatened the author and his client with prosecution if we "talk," a threat now into its fifth year, because we had the temerity to challenge secret prosecutions in the Second Circuit and the secrecy that keeps it, and continuing cooperator crime, covered up.

Just recently, for example, the author, his client, and his client's clients were ordered by a federal magistrate, who acknowledged he was doing so without findings, to turn into court the originals, obliterate all copies, then never speak of, most of the documents and all work product and privileged communications derived therefrom which prove all this, even papers that had been filed publicly in the U.S. Supreme Court. (The order has been stayed).[11]

Secret Prosecutions and the Fourth Branch of Law
Case 1:16-mc-00706-BMC  Document 121-1  Filed 08/18/15  Page 6 of 32 PageID #: 2570
8/5/15, 10:01 PM

## The Illegal Concealment of Criminal Cases in the Second Circuit

There is no public list of sealed cases and documents within the Second Circuit; so one can present only anecdotes. (But consider that one recent study estimated that 469 cases over five years were hidden off the public dockets in the D.C. District Court alone.)[12]

### *A Long-Standing Culture of Secrecy*

In the Second Circuit, the secrecy is treated so matter-of-factly, just the way business is conducted, it's even discussed in open court. For example, at the sentencing of hacker Hector Monsegur, his counsel, federal defender Cross-Goldenberg said in the presence of Judge Kimba Wood:

> [I]n many cases, because most cases are resolved with a guilty plea the cooperation is never publicly revealed and some sentencing proceedings and even some complete dockets remain under seal. This could have been such a case, because all of Mr. Monsegur's co-conspirators, all of the co-conspirators, pled guilty without a trial.[13]

Noted defense attorney and Professor of Criminal Law Gerald Shargel said of the Second Circuit's regime of secrecy:

> In a system that celebrates transparency, I do not think that sealing is appropriate in the case of cooperators … I cannot imagine that there can be a blanket rule where courts were permitted to make generalized findings that all records are sealed in the cases of cooperating witnesses. It would never pass constitutional muster … We have open court proceedings in this country, and it cannot be a policy to take a particular class of defendants and say, in those cases, we are going to seal.[14]

How can one say the problem of secrecy is openly discussed? Isn't that a contradiction? No. Criminal law is different. It's an open secret, indeed. The defense bar, dependent upon the goodwill of the government, doesn't raise a fuss, because the secrecy benefits their clients. No one demands

accountability, unless it rises to the level of Whitey Bulger.

So when, incredibly, weeks ago another EDNY judge, John Gleeson, held in *Doe v. U.S.,* 14-MC-1412, that he had the inherent power to obliterate all federal judicial records of a criminal case via an "expungement" order, nevermind seal them, and the power to order the executive branch to do so too — that is, to order the executive branch to defy statutes requiring it to do just the opposite, to maintain and report accurate records — if the general public thinks anything, it's probably "Good for him. Judicial independence." [15]

What they don't think, unless they're constitutional lawyers, is, "Wait, he held that he could do this for humanitarian reasons? But he can't, it circumvents 40 years of Supreme Court and appellate precedent on the public right of access to court records, and 226 years of the Supremacy Clause, and is in direct repudiation of a 9-0 Supreme Court case[16] absolutely prohibiting it? What is a judge doing on the bench deciding he has the equity jurisdiction to order the country to nullify lawful acts of Congress?"

Sure enough, Judge Gleeson did it for a cooperator. The woman who's receiving this largesse, and others, were convicted of fraud on EDNY docket 00-CR-01274. But don't bother looking for it. It doesn't exist. PACER will only tell you it's "sealed." A whole docket containing the convictions of a half-dozen persons is hidden in a circuit which held a decade ago in *Hartford Courant v. Pellegrino*, 380 F. 3d 83 (2d Cir. 2004), that the public has a First Amendment right to access accurate court dockets.

Judge Gleeson even admitted in his decision that a year ago, in another hidden case he's maintaining, **at the request of Loretta Lynch**, he facilitated the continued work as a tax return preparer of a felon he'd secretly convicted of a tax crime by ordering that he could hide his conviction from his employers. In other words, he admitted there's a secret case in the EDNY wherein the U.S. Department of Justice asked for and received leave for a convicted tax felon to continue preparing tax returns while defrauding clients by concealing the material fact of his conviction. Gleeson's opinion reads like a dare — *Don't appeal this decision, because I know where all the bodies are buried*.

So, for so long as Trump is news the corruption that produced Sater will be news, but the corruption that may obliterate the conviction records of Jane Doe and who knows how many after her (and could just as well produce platoons of secretly convicted doctors, lawyers and teachers all allowed to remain in their

professions despite statutory bars) will go on unseen.

At least until some future news cycle when someone finds a secretly convicted child pornographer teaching at a school because he cooperated so was allowed to hide his record.

* * *

Consider the docket of *United States v. Shereshevsky,* 94-cr-248 (SDNY). On May 5, 1994, he was arraigned on a charge of bank fraud, pled not guilty and was released on bail. That was what the ***public*** docket reflected — until June 26, 2002.

Today, the docket reflects that on that date, June 26, 2002, it was "entered" that eight years earlier, ***also on May 5, 1994*** (the same date as the not-guilty plea), Shereshevsky ***had actually pled guilty***. The SDNY kept false information on a public docket for eight years, defrauding the public. One judge, on Sept. 24, 2001, even issued a "speedy trial" ruling on the docket, to keep up the appearance Shereshevsky had pled not guilty.

Presumably, Shereshevsky was given the gift of secrecy because he was a cooperator, and sure enough he got leniency — time served, supervised release, and restitution of $39,000. And what did he do with himself while he was, presumably, "cooperating?" Like Sater at Bayrock, he perpetrated the multi-hundred-million dollar WexTrust Ponzi scheme, according to the U.S. Securities and Exchange Commission raising $255 million from 1,196 investors without disclosing that he was a convicted felon. [17]

Meanwhile, the judge who entered the fraudulent speedy trial ruling, Michael Mukasey, like Lynch, went on to become U.S. Attorney General.

### *Open Proceedings; Open Sentencings; Mandatory Restitution*

Judicial proceedings and documents are presumptively open under common-law and First Amendment

principles. The sentencing of a defendant, to which there is a First Amendment right of access, must be conducted in open court.[18] 18 U.S.C. § 3553(c) *U.S. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005). The Mandatory Victims Restitution Act (MVRA) requires that defendants in certain crimes, including racketeering, pay restitution to the victims.[19] The Crime Victims Rights Act (CVRA) says:

> In any court proceeding … the court shall ensure that the crime victim is afforded the rights described in subsection (a). The reasons for any decision denying relief under this chapter shall be clearly stated on the record.

These rights include the right to notice of and to be heard at public court proceedings involving the crime; the right to confer with the attorney for the government in the case; the right to full and timely restitution; and the right to proceedings free from delay.[20]

Be assured: when a federal judge refuses to impose a mandatory sentence, unless it's on Eighth Amendment grounds, it is illegal. *Ex Parte United States*, 242 U.S. 27 (1916). And in *Dolan v. United States*, 103 S.Ct. 2553 (2010), the Supreme Court held that Congress meant what it said in the MVRA, that restitution **shall** be imposed at sentencing **notwithstanding any other provision of law**.[21]

This is a copy of the "public notice" of Sater's sentencing — 11 years after he was charged:

**United States District Court**

**Eastern District of New York**

**Judge GLASSER , I. LEO**

Friday, October 23, 2009

**Courtroom 8B S**

10:00 AM

Criminal Cause for Sentencing

**98cr01101**

*Deft.* - DOE JOHN

**On Bond**

*

Does that public calendar notice of a "John Doe" sentencing give actual notice to the public and to his victims that "Felix Sater"

was to be sentenced in public, considering the whole case "didn't exist?" That notice was available at the EDNY website, along with the daily calendars for every judge going back 15 years, until the author told Judge Glasser that it was public. It then disappeared off the public docket.

Meanwhile, the now public transcript of his sentencing (98-cr-1101, No. 202) shows (1) he was sentenced under his **real** name, obviously linked with his criminal docket number, as the transcript contains the caption and index number; (2) the specific nature of his criminal acts were discussed; and (3) his sentence was read aloud there.

And, within the last few years, the government and Judge Glasser have maintained that this sentencing **was** conducted in open court.

Then where were the victims? What's the excuse for the EDNY U.S. Attorney and the court not telling them of the case and the open-court sentencing? Even if the court thought restitution was excused, it repudiated its obligation to tell the victims and let them come forward in objection. Rights, and the standing to enforce them, given them by Congress. They are property for Fifth Amendment purposes. Yet they were denied them by the court. If this denial was legal, why wasn't it a compensable judicial taking? If it was illegal, why isn't everyone involved indicted or impeached?

### *All for One and One for All: Restitution in a Criminal Scheme or Conspiracy*

Where multiple defendants are convicted of a conspiracy or scheme crime, their liability in restitution should be joint and several.[22] It would be odd if defendants A, B and C — having pled guilty to the same RICO crimes — wound up with restitution imposed on C in one amount, on B in another, and on A not at all because "no one could find victims."

Felix Sater (98-cr-1101), Salvatore Lauria (98-cr-1102) and Gennady Klotsman (98-cr-313; 98-cr-1069; 02-cr-1313) all pled guilty to the same RICO crimes, according to a press release from the EDNY U.S. Attorney's Office on March 2, 2000.[23]

According to April 10, 2004, and May 10, 2004, letters from Klotsman's counsel, Klotsman was already serving a 71-month sentence, and had been "ordered to pay [$40 million] in restitution by [Glasser]," as confirmed by his judgment and conviction order.[24]

Meanwhile, Lauria was sentenced on Feb. 5, 2004. From page 5 of the transcript:

> THE COURT: Who are all of these people that you say he settled with, who are they?

> MR. STAHL: They were investors that filed lawsuits.

> THE COURT: How many were those?

> MR. STAHL: I would say about between 15 and 20.

> THE COURT: That's just a minuscule percentage of the number of investors who were defrauded, who suffered substantial losses as a result of Mr. Lauria's activity. Fifteen to 20 is not even a drop in the bucket.

But when Sater was sentenced (supposedly in open court), how come no one could notify victims? AUSA Miller, there representing the government, now Caldwell's chief deputy, was at the time the EDNY CVRA compliance officer. He couldn't at least have told Probation Services to notify these known 15 to 20 victims?

It's time to meet Myron Gushlak. In *U.S. v. Gushlak*,[25] the defendant, who'd been cooperating, had had his docket sealed, so like Sater could and did hide his conviction and defraud new investors and partners. Eventually when he was sentenced, the government (Lynch as U.S. Attorney) revoked his cooperation and asked for denial of acceptance-of-responsibility credit as he had been cooperating only to be able to use the concealment to defraud again.

Judge Garaufis sentenced him to six years, a fine of $25 million, and restitution of $17 million, the court agreeing with Lynch that it's criminal fraud to use a sealed case this way (unless they really, really like you, like Sater). The Second Circuit affirmed.

Now, Gushlak had, like Sater, been pumping-and-dumping stocks. And he had two equal co-conspirators, Romano and Appel, who attested to that.[26]

All three pled guilty to the *same* securities fraud conspiracy, and admitted equal responsibility, so the victims and losses had to be the same.

But when Romano came up for sentencing, the AUSA told the judge, Carol Amon, that there couldn't be restitution because no one knew who the victims were, and in any event Romano had been a wonderful cooperator, so would the judge please enter an order finding that no one could find the victims, so no restitution could be awarded, and she did.

Meanwhile, Appel was sentenced by yet a third judge, with the victims being awarded $2.9 million in restitution. The difference between Appel and Gushlak's restitution can be explained by the two judges disagreeing in methodology. What can't be explained though is why Appel's docket 04-cr-505 has a list of the known victims and the amounts they lost dating back to 2008 when Romano was sentenced, and Gushlak's docket shows that that was considered in fixing his restitution, yet in Romano's case, the same government, same U.S. Attorney's office, "didn't know who the victims were," so asked for an order to that effect, cutting off all victims' rights, by coincidence (no doubt) sparing the "wonderful cooperator."

Isn't that weird? All these cases where everyone else gets an order of restitution payable to an existing known list of victims, but the really good cooperator is always spared, the government claiming that "no one knows who the victims are," and so no victims are told about the sentencing proceeding, though the prosecutor is statutorily obligated by the CVRA to tell them, and thus the victims are thereby deprived of their right to register their position at sentencing that they are entitled to restitution. Pure fraud.

### *Schrödinger's Courtroom*

In 2010, the *Huffington Post* reported unusual events in the courtroom of EDNY Judge Brian Cogan.[27] According to the story, on Dec. 1, 2010, mobster "Sebby" Saracino pled guilty in open court to immigration fraud. The next day, two reporters saw a "John Doe" case with the same indictment number as Saracino's on Judge Cogan's docket. They went to Cogan's courtroom and saw the same defense lawyer and same AUSA Elizabeth Geddes from the day before.

When Judge Cogan took the bench — apparently unaware that there were reporters in the courtroom — he announced that the government's motion to seal the proceedings was deficient. However, the AUSA asked for a sidebar, and Cogan then announced that the courtroom would be sealed, to prevent risk of harm to the defendant.

This is to say, the proceedings were to be "public" so long as no members of the public were actually present. As soon as the prosecutor brought to the judge's attention that there were reporters in the courtroom, the courtroom was sealed. Of course, contrary to Supreme Court precedent, there was no prior public notice of a motion to seal.

What went on there? We now know that Sebby was back, now "John Doe," this time pleading to a half dozen acts of racketeering, like arson, murder and so on. Why? Because this hid from "bad guys" that Sebby had flipped against the Colombo family. But read what Colombo boss Tommy Gioeli said soon after in his blog: (Emph. added)

> The number one rat in my case Dino Calabro is all over facebook without a care in the world. His children are unafraid and unbothered. His wife has a clear head. Why do you ask are they not afraid of the big bad man like me?? Why do they announce their new address on facebook? Because they know that this big, scary, mean face that the government paints me with is all a charade designed by our government. Why did AUSA Elizabeth Geddes not consider it a mistake to seal the courtroom for the plea deal with Sebastian Saracino where he committed to rat on his own brother? Because she knew that no danger to Sebastian or Dino or any other government criminal witness exists. The last time a criminal witness died a violent death was in episode 14 of the Sopranos on HBO. Mikey "Scars" DeLeonardo (Rat) shops on 18th Avenue in Brooklyn. Joe Campanella (Rat) still lives in the same home where he has lived before he became a criminal witness. Over a thousand of these criminal witnesses go about their lives unmolested in any way. The government knows the truth that I am a danger to no one, unlike their star witnesses who are psychotic killers …

> By the way Joe [Massino], keep all of the millions that you robbed and killed for. ***Oh, I forgot you already get to keep it because when you join Team America all forfeitures, fines, and restitution stops.***

The point is, part of the fraud is the concept of "superimposed" courtrooms. The government and judiciary will claim, as needed, that the same courtroom was closed or open at the same time, depending upon whom they're lying to. Unless you think, "We don't put a lock on the door, we just shut it down when anyone walks in" is what "open court" means.

### *Collateral Effects*

Nor are the consequences of this limited to New York. A criminal conviction in the Ninth Circuit, *U.S. v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993), was reversed because of an SDNY cooperator, who was not disclosed to the defendants. Note how the Ninth Circuit excoriated the entire U.S. attorney's office, not just a single AUSA, and then ask why the Second Circuit emboldens what the Ninth condemns:

> Troubled as we are by the prosecutor's conduct, we're more troubled still by the lack of supervision and control exercised by those above him. The AUSA's superiors seem to have been unaware that anything at all was amiss until after oral argument in this court. It was during that argument that the government first disclosed Nourian's status:

> [Q]: Was there a cooperation agreement?

> AUSA: Well, your honor, that is not something that's in the record.

> [Q]: I understand. Was there a cooperation agreement?

> AUSA: There was an agreement with the Southern District of New York and [Nourian], yes.

> How can a serious claim of prosecutorial misconduct remain unaddressed until oral argument in the Court of Appeals? Surely when such a claim is raised, someone in the United States Attorney's office will take an independent, objective look at the issue. …

The prosecutorial misconduct in this case deprived the defendants of due process of law … In a situation like this, the judiciary — especially the court before which the primary misbehavior took place — may exercise its supervisory power to make it clear that the misconduct was serious, that the government's unwillingness to own up to it was more serious still and that steps must be taken to avoid a recurrence of this chain of events. …

### *Structural Error Should Compel Vacatur of Sentences for Failure to Disclose Information Regarding Cooperators*

Typical cooperation agreements stipulate that the defendant will have to make restitution and keep the government apprised of his assets. So did Sater's. The ramifications of allowing him to keep the money he stole while accumulating further millions, and transferring them into trusts as he did, are staggering. If the government knew that he was doing that with the millions he skimmed from Bayrock, and allowed it, that's serious. Obtaining his 2009 pre-sentence report, which Congress can force, should tell that tale.

But relatedly, the due process rights of dozens of co-defendants in the underlying and related cases were almost surely violated, and this case may be only one of many such. Each of those co-defendants may well have a right to seek vacatur of their pleas.

The author assumes familiarity with *Brady*, *Giglio* and *Jencks,* harmless versus prejudicial error, and that structural error is *per se* prejudicial, that a defendant's due process rights also include the right to a trial presided over by a judge who has neither *actual* prejudice, bias or conflict, or the *appearance* of such, violation of which is a *structural* error.[28] Indeed, the Supreme Court has held that a defendant's due process rights include the right to a trial presided over by a judge as to whom there is not even the "unconstitutionally high probability of bias."[29]

In 1998, a Tenth Circuit panel held in *U.S. v. Singleton*[30] that a prosecutor's promise of leniency for a cooperator's testimony violated a federal statute prohibiting giving anything of value in return for testimony.[31] The remedy was exclusion of the testimony. The case was reversed after *sua sponte en banc* review. Scores of other district and appellate courts chimed in,[32] holding that when a prosecutor offers a plea bargain or leniency, while it's something of value, he hasn't violated the statute *so long as*

*what he offers is not illegal or ultra vires*.

But a sentence that wrongfully does not include mandatory restitution by means calculated to hide that fact from victims is *per se* illegal and *ultra vires*. A sentence that wrongfully does not include mandatory forfeiture is *per se* illegal and *ultra vires*. The promise of such a sentence must also be *per se* illegal and *ultra vires*.[33] With respect to Sater, it is evident (at the least to a standard of unconstitutional probability) that he was promised that, in exchange for cooperation, he could keep the money he stole and hide his conviction. If so, the law was broken, because, as his now-public docket shows, he did receive that.[34] This might explain why Glasser, the prosecutors and Sater's counsel engaged in secret *ex parte* court proceedings to discuss maintaining the secrecy.[35] In that case the reason given for maintaining secrecy, Sater's safety, was all the more pretextual, given that his identity and cooperation were made matters of public record a decade ago, when Lynch issued the press release on March 2, 2000, saying that Sater, Lauria and Klotsman had pled guilty to the $40 million RICO fraud.

The author suggests, in sum, that Sater was offered, and accepted, illegal gratuities for his cooperation — *viz.*, he was allowed to keep the money he admitted stealing. Of course, evidence of this is likely to be circumstantial; don't expect a *Perry Mason* moment of admission. But it is curious that neither Lauria's nor Sater's informations include a forfeiture charge, and the voluntary forfeiture they admit was an insignificant fraction of what it should have been. But it is most curious, because the 2000 *Coppa* indictment — *i.e.*, the indictment of Sater's and Lauria's 19 co-conspirators — includes a forfeiture charge and the DOJ knows perfectly well, and knew in 1998, that without such a charge a subsequent attempt to get a criminal forfeiture order as part of sentencing would fail, even though the DOJ's attempt to obtain such is required by the mandatory sentencing laws embedded inside the RICO statutes.

It's almost certain this is no accident, that absence of such a charge in criminal informations is a backdoor way for prosecutors to arrange with a cooperating defendant, "We'll foul your information so you won't suffer forfeiture."[36] If so, or if it's so in other cases, that too must be structural error *if not disclosed per Brady/Giglio/Jencks*.

### *Precluding Evidence to Prevent Revelation of Illegal Deals in Exchange for Cooperation*

*U.S. v. Basciano*[37] is illustrative. There, the court barred Basciano's introduction of evidence of

notoriously lenient sentences EDNY cooperators had received, even through cross-examination of cooperators testifying against him, as "likely to create confusion":

> The defendant has moved for the Court to permit cross-examination of cooperating witnesses about the sentences that Salvatore Vitale, Sammy the Bull Gravano, and other cooperating witnesses have received as a result of cooperating with the government, defendant's motion is denied. The Court finds that such questioning about cooperators' impressions of the benefits of other specific cooperators, that other specific cooperators have received, is not essential to effective cross-examination for bias.

> The Court further finds that such examination is both prejudicial and likely to create confusion … .

> [For] the same reasons, the defense will not be permitted to reference the sentences specific cooperating witnesses have received during their opening statement … .[38]

Would the same hold where the defendant would introduce evidence of promising *illegal* sentences to cooperators? Shouldn't the defense be told? Shouldn't defendants know that some defense lawyers, especially those, like Sater's, who are former prosecutors, can make such "special" deals?

### *How Did the Second Circuit Go Astray?*

Sometime within the last 50 years, the Second Circuit began experimenting with "expedient constitutional analysis," an experiment authorized by no one, certainly not by the Framers, characterized by a determination to do whatever the DOJ says is necessary to fight organized crime.

This could be seen as far back as the 1970s, in decisions allowing anonymous juries, and soon after could be seen in the ease with which EDNY and SDNY courts "disappeared" entire cases and dockets of cooperators. Interestingly, when this was first "outed," the DOJ claimed that it was ***not*** done to protect cooperator safety.[39]

As to sealing and closure, this seems to have hit its nadir (one could hardly call it a zenith) of lawlessness with the Second Circuit's decision in *U.S. v. Doe*, 63 F.3d 121 (2d Cir. 1995),[40] wherein the court circumvented the Supreme Court's decades-long development of the *Richmond* line of constitutional access jurisprudence.[41] *Doe* held that, yes, the Supreme Court required detailed findings of compelling interest capable of appellate review before closure of a proceeding to which there was a qualified First Amendment right of access, but then added, to paraphrase: Well, the Supreme Court never said whence those findings may come, so as far as this circuit is concerned, it's OK by us if a cooperating defendant asks to hide his entire criminal case because he feels — ***subjectively*** feels — he ***might*** be at risk. No corroboration is required in this circuit, even if it's all in secret, so long as the government doesn't object. And the ***absence*** of evidence of risk could be all the district judge needs to support a finding of necessity of closure.[42]

This repudiates 85 years of First Amendment law, which requires particularized findings of otherwise unavoidable, near-certain grave imminent harm.

It is a contrivance, for there is no one in such a courtroom speaking out for the public objecting to closure, if these "sealing" proceedings are not even publicly docketed. And that this could purport to enable such secret *blanket* sealing, let alone of decades-long duration, as here, is beyond comprehension. When *Doe* closures occur, there is no one who knows about it to object, no one who speaks for openness. And it is provable that many district court judges don't care.

### *Secrecy Ineluctably Leads to Fraud*

In the Second Circuit's June 29, 2011, decision in *Roe v. USA*, an appeal handled by this author, the court stated:

> The remainder of this cause … is REMANDED to the District Court (I. Leo Glasser, Judge) for proceedings consistent with this order and with instructions to rule upon the government's unsealing motion … .

Case 1:16-mc-00706-BMC   Document 121-1   Filed 08/18/15   Page 19 of 32 PageID #: 2583

Binding Circuit precedent holds that such motions are to be taken up expeditiously.[43] So how should the public feel about the fact, revealed after the docket of 98-cr-1101 was finally, albeit inadvertently, unsealed in August 2012, that after the Second Circuit issued its instructions to Glasser to take up the March 17, 2011, motion to unseal the government made a secret *ex parte* application to withdraw that motion? (98-cr-1101 No. 120). Glasser's secret order granting the motion states:

FILED UNDER SEAL

ORDER

A letter motion, dated August 24, 2011, has been made by the government seeking an Order that would permit it to withdraw an unsealing motion made on March 17, 2011, without prejudice and with leave to re-file that motion at a later, unspecified date.

The motion is hereby granted.

SO ORDERED.

/s/ I. Leo Glasser

Sent by Fax to:

Todd Kaminsky,[44] AUSA 718-254-6669

Michael Beys, Esq., 212-387-8229

What compelling interest was served by keeping secret from this author that the government was withdrawing its motion to unseal the case? Isn't it like *Shereshevsky*, where the public docket showed "not guilty" but the secret docket showed "guilty"? How could the district court have believed it proper to have kept from parties and counsels for eight months that the March 17, 2011, motion had been

Case 1:16-mc-00706-BMC Document 121-1 Filed 08/18/15 Page 20 of 32 PageID #: 2584

withdrawn, a motion that the government had advised the Second Circuit and district court that it was ethically bound to make?

Consider carefully this statement in the Second Circuit's June 29, 2011, decision [Emph. add.]:

> After an item-by-item review of the specific information that Roe wished to publicly release— including (a) John Doe's real name, linked with his criminal docket number, (b) the specific nature of the predicate acts leading to his criminal conviction, and (c) the sentence imposed by the District Court—Judge Cogan concluded that the information either was not public at all or was not public to the extent and with the level of detail that Roe intended to disclose. Accordingly, he denied Roe's request for permission to release the information. Order, *United States v. Doe* (E.D.N.Y. May 13, 2011). Upon our own independent review, we agree with Judge Cogan that Roe's proposed disclosures would have violated our temporary injunction of February 14, 2011 **and the sealing orders of Judge Glasser**. Judge Cogan's order of May 13, 2011 is affirmed.

When the docket of this 1998 case was finally made public by the EDNY in August 2012, and only then because it was "inadvertently" made public by the clerk of the court, it confirmed what Judge Glasser had said on the record two years earlier in open court, that he had never issued any sealing order in the case, that there were none signed by him.[45]

The Second Circuit could not possibly have conducted an independent review of "the sealing orders of Judge Glasser," unless it can read invisible ink. And how could Judge Cogan have concluded, and the Second Circuit have affirmed, that this information was *not* public? And how could the Second Circuit have agreed it was non-public, based upon its own "independent" review?

## And What of the Rule of Law?

A government of laws exists to uphold justice, and not merely to sell it to the highest bidder[46] How much did Sater "pay" for his deal? How much would a convicted racketeer "pay" to hide the conviction, keep the money, and know he will be protected, emboldened to commit future crimes because if anyone finds out he can drag them into secret court proceedings to shut them up?

As this is written, Roy Ageloff, a former associate of Sater's (they pumped stocks together, he at Genovese-connected Hanover Sterling, Sater at Genovese-connected State Street) is in, or was recently released from, federal prison for money laundering because beginning in 1998, when he decided to plead guilty in the EDNY to crimes similar to Sater's, he had his friends, family and lawyer hide $3.5 million of criminal proceeds to evade restitution and forfeiture.[47]

Now, Sater's cooperation agreement provided that he would inform the government of his assets, and that 100 percent could be taken to pay any restitution order the court were to impose. So how is it that for Ageloff to hide proceeds of illegal activity (stock fraud) to evade restitution is money laundering and a ticket to prison, yet the same thing done by Sater, hiding proceeds of illegal activity (restitution fraud on his victims and concealment fraud on Bayrock, not to mention the multimillion-dollar skims that he took from the firm), is not? He stuffed much of it into trusts before his sentencing (they all do) to try to protect it, just in case. And how is it that the author and his client were restrained from reporting that he did so? "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs *and to petition for a redress of grievances*." [48] That is, the right to report crime is an inalienable, natural right, preceding the existence of the Constitution.

What Sater got from the government in exchange for his cooperation — the "right," if you will, to keep the money he stole[49] — is of utmost importance, since — at the time of sentencing (and thereafter) — he was represented by Leslie Caldwell, who is now the Assistant Attorney General of the United States, Criminal Division, and Caldwell appointed Marshall Miller of the EDNY U.S. Attorney's Office to be her second-in-command. At Sater's sentencing, they were both present in the courtroom.

Caldwell was also the head of Morgan Lewis's white collar practice group when it moved in May 2010 to gag my client from revealing information showing that Sater had been convicted of RICO fraud and that in exchange for his cooperation he had been allowed to keep the money he stole. Caldwell appeared in court in Sater's behalf in front of Glasser to shut down any public mention that Sater had actually been convicted of participating in a $40 million RICO fraud.

Yet his sentencing transcript (which was not made public until March 14, 2013) — and remember the sentencing was Oct. 23, 2009, only eight months before Caldwell asked for a gag order — shows that his real name was used throughout, and as the government and Judge Glasser now maintain that it was held

in open court, then one must presume that either the government and Judge Glasser are lying, or it *was* in open court. Either way, Caldwell would have to have known whether she was in open court or closed court.

So, assuming it was in open court (as the law required), why was Caldwell in court in 2010 arguing that any public mention of Sater's sentencing must be enjoined? Since that sentencing occurred in open court, it was indeed officially and publicly acknowledged that Sater was a cooperator. The belatedly unsealed transcript of this allegedly "open" court proceeding shows the following:

MS. CALDWELL (counsel for Sater): Unless the court has any questions about the DWI.

THE COURT: Does the government want to comment on it now?

MR. KAMINSKY: No, Your Honor, other than the fact that we think this incident, while unfortunate, does not reflect in any way on the extraordinary cooperation Mr. Sater provided, starting in 1998 and continuing nearly up to the present day.

\* \* \*

Mr. Sater … flew to the United States to surrender to the FBI. He began to cooperate, pled guilty in 1998, and he's been cooperating ever since.

His cooperation has included the type of cooperation that the court often sees, which is against traditional criminals, including people who worked at the brokerage firm where Mr. Sater worked. Again, he surrendered in 1998. No one had yet been prosecuted in connection with the State Street brokerage firm where he worked. But the government was able to prosecute more than 19 people at various levels of that operation, ranging from the brokers, to the people who were transferring money ...

\* \* \*

MS. CALDWELL: … In any event your Honor I think Mr. Sater is really deserving of the full measure of leniency that this court can impose given the extraordinary circumstances of his cooperation and the fact he has really rehabilitated himself in these last — really since 1996. Thank you.

* * *

[MR. KAMINSKY]: Time and again all agents here, and numerous others who couldn't be here today, have told the government Felix Sater was one of the best cooperators we worked with. There was nothing he wouldn't do. No task was too big. …

FBI Agent Taddeo testified at the now publicly docketed Oct. 23, 2009, sentencing, again in open court, as to Sater's cooperation:

AGENT TADDEO: … [H]e was instrumental [in] bringing Frank Coppa in, and as a result of his cooperation, caused further damage to the Bonnano family. Without his cooperation, it would have been a few more years where the F.B.I. would have effectively removed La Cosa Nostra from the penny stock business. …

Marshall Miller, who was then *the AUSA responsible for victim restitution*, next stated:

MR. MILLER: Your Honor, I don't want to try the court's patience by repeating what has already been said by Ms. Caldwell, Mr. Kaminsky, and Agent Taddeo, but I did want to underline two things. One was Mr. Sater's cooperation with the office and the many investigations he participated in. The length of his cooperation is extraordinary. And I wanted to be here to express from the office's perspective just how capable a cooperator he was, how important a cooperator he was, and how effective he was.

Miller failed to request that an order of restitution be imposed upon Sater or at the least that the victims be told what was going on, though it was his duty as the Crime Victims' Rights ombudsman in the EDNY

Case 1:16-mc-00706-BMC   Document 121-1   Filed 08/18/15   Page 24 of 32 PageID #: 2593

prosecutor's office to do so.

And, inasmuch as the sentencing was "open" to the public, Caldwell, by seeking eight months later to gag information that was publicly disclosed in open court — *viz.* Sater's conviction and cooperation — had engaged in an actual fraud upon the courts.

* * *

In Loretta Lynch's response to Senator Orrin Hatch's written inquiry, requesting that she detail her office's compliance with the MVRA and CVRA, she stated that the information as to Sater's restitution remains under seal.

This should be impossible, because the victims are entitled, under the CVRA, to be told of their restitution rights. Unfortunately it's almost certainly a lie, as the author and his client have definitive orders from Glasser supposedly listing everything still under seal, and nothing like that is on the list, not even remotely close.

Then, trying to distance herself from the Sater matter, Lynch stated in her written response to Sen. Hatch that "[t]he initial sealing of the records related to Sater — which pre-dated my tenure as United States Attorney — occurred by virtue of a cooperation agreement under which Sater pled guilty and agreed to serve as a government witness." What she evaded is the fact that she signed Sater's criminal information in her capacity as "Acting United States Attorney." (98-cr-1101, No. 18).[50]

And now, Lynch, whose AUSAs spent five years fighting to keep this story from being told, has become the United States Attorney General, joining former EDNY Assistant U.S. Attorneys Leslie Caldwell, Marshall Miller and Andrew Weissmann, all of whom have participated — in concert with the judges of the EDNY and the Second Circuit — in the conduct and cover-up of Sater's prosecution, conviction and sentencing, whereby he was allowed to keep the money he stole.

**Conclusion**

The "official" unsealing of the docket on Aug. 27, 2012, should have ended any justification for continued secrecy, as it was "official" that "Doe" was Sater. Yet the government has continued to this day to repudiate its obligations to tell Sater's victims of the case, their rights, and that they've been deprived of them. And the district court and Second Circuit continue to repudiate their obligation to ensure that the government does.

The author challenges the United States Court of Appeals for the Second Circuit and the district courts within the circuit to acknowledge that they have created an unconstitutional regime of judicial nullification of the Constitution and statute by the illegal concealment of criminal cases and with it the imposition of illegal sentences, with rippling effects that have caused billions and billions of dollars of harm to the public.

The author challenges them, and the DOJ, to explain why Sater's cooperation agreement was not revoked on the spot, and why he was not denied acceptance-of-responsibility credit, when at his sentencing he confessed to having used the secrecy of his conviction to commit bank fraud for years at Bayrock. Why was he treated differently than Gushlak? What of the rule of law?

There will be no apology for the tone of this article; attorneys have the same right to criticize the judicial branch as the other two, bluntly without fear of reprisal. In fact they have special obligations to do so when they observe misconduct. Any notion that berobed judges merit unbounded deference, that lawyers must treat judges as a higher order of being than legislators and executives, is rejected. As John Milton wrote, "Assuredly we bring not innocence into the world, we bring impurity much rather; that which purifies us is trial, and trial is by what is contrary." Judges *should* understand — unless they have been far too cloistered, far too long — that criticism of them, "not without dust and heat," serves to purify them, so to speak, and is presented for the good of the public, and indeed for their own good.

—By Richard E. Lerner, The Law Office of Richard E. Lerner PC

*Richard E. Lerner is a New York-based attorney, formerly a partner with Wilson Elser Moskowitz Edelman & Dicker LLP, where he practiced for more than 20 years. The author would like to thank attorney Frederick Oberlander for uncovering much of the judicial and prosecutorial misconduct discussed in this article.*

*DISCLOSURE: The author represents attorney Frederick Oberlander in efforts to expose secret criminal cases in the EDNY. Through these efforts, Sater's "John Doe" docket and most of the documents in it were made public. The author also represented Mr. Oberlander on petition for a writ of certiorari (Supreme Court Docket 12-112), which petition, unsealed by the High Court, made public that the EDNY had let this "John Doe" use the secrecy of his case to commit further frauds for a decade. Mr. Oberlander represents parties seeking restitution in the matters discussed in this article.*

*The opinions expressed are those of the author and do not necessarily reflect the views of Portfolio Media Inc., or any of its affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] See, *e.g.*, "There Will Never Be a President Trump," Hiaasen, *The Miami Herald*, July 11, 2015 (Trump's role in fraud in Trump International, a Florida project on which he'd partnered with Sater, where investors weren't told it was not Trump's as he'd only sold his name); "Under Oath, Donald Trump Shows His Raw Side," Barbaro and Eder, *The New York Times*, July 28, 2015 (similar).

[2] Such cooperator "deals" is not just a Second Circuit problem; DOJ Inspector General Horowitz just released a report finding that the government has provided illegal assistance to drug informants. See "Drug Traffickers who Cooperate with the Government Have it Pretty Good – Too Good," Watchdog Says, *Washington Post*, July 27, 2015, http://www.washingtonpost.com/blogs/federal-eye/wp/2015/07/27/drug-traffickers-who-cooperate-with-the-government-have-it-pretty-good-too-good-watchdog-says/.

[3]The Trump Organization was not a participant in this tax fraud.

[4] Others have noted problems in Lynch's office: "Federal prosecutors in New York's Brooklyn-based Eastern District pursued cases against secret, unnamed 'John Doe' defendants 58 times since Loretta Lynch became head prosecutor in May 2010. Two of the 58 are terrorism cases." *Loretta Lynch's Secret Prosecutions*, Johnny Dwyer, February 26, 2015, http://www.nbcnews.com/news/us-news/loretta-lynchs-secret-prosecutions-n294666.

Case 1:16-mc-00706-BMC   Document 121-1   Filed 08/18/15   Page 27 of 32 PageID #: 2591

[5] Andrew Weissmann, now the Chief of the Criminal Fraud Section in the U.S. Attorney's Office, was one of the original prosecutors in the EDNY case against Felix Sater, discussed *infra*.

[6] This may be the first case in history where a court directed American citizens not to report prosecutorial and judicial misconduct to the public, the media or Congress. (The order itself remains under seal, though its contents were disclosed by the Supreme Court in 2012.)

[7] Facts set forth in this bullet-point list are from a document that Felix Sater himself made public as an exhibit to a lawsuit he filed in Israel, see https://www.scribd.com/doc/272670738/Sater-Tel-Aviv-Exhibit, as well as from Sater's sentencing transcript and the U.S. Supreme Court's public docket of the case, and other public documents, discussed *infra*.

[8] EDNY docket 98-cr-11, entry 202 (unsealed on March 14, 2013). *infra*.

[9] See "Stock Promoter Myron Gushlak Gets 6-Year Prison Term," http://www.bloomberg.com/news/articles/2010-11-18/stock-promoter-myron-gushlak-gets-six-year-prison-term-for-manipulation. See also discussion of *U.S. v. Gushlak*, *infra*.

[10] See Sater's Oct. 23, 2009 sentencing transcript, EDNY docket 98-cr-1101, entry 202 (unsealed March 14, 2013). https://wiselawny.files.wordpress.com/2013/09/sater-sentnce-transcrpt.pdf, and PDF page 75, et seq. of the Petition for a Writ of Certiorari in the 14-676 filed in the U.S. Supreme Court in Palmer and Oberlander v. Doe, http://c10.nrostatic.com/sites/default/files/Palmer-Petition-for-a-writ-of-certiorari-14-676.pdf

[11] See April 30, 2015 order of Magistrate Maas, 10-cv-3959. http://ia800301.us.archive.org/10/items/gov.uscourts.nysd.362805/gov.uscourts.nysd.362805.142.0.pdf, and pages 41-43 of the transcript of April 14, 2015 proceedings, http://ia600301.us.archive.org/10/items/gov.uscourts.nysd.362805/gov.uscourts.nysd.362805.140.0.pdf

[12] "Disappearing Dockets," *The News media & The Law*, Winter 2006.

[13] http://cryptome.org/2014/05/monsegur-sentencing.htm. Pp.7-8.

[14] *Cooperation and Plea Agreements,* 79 Fordham L. Rev. 65 (2011). pp.69-70.

[15] http://ccresourcecenter.org/wp-content/uploads/2015/05/Doe-v-US.pdf :

[16] *Ex Parte United States*, 242 U.S. 27 (1916).

[17] See http://www.sec.gov/litigation/complaints/2008/comp20678.pdf.

[18] 18 U.S.C. § 3553(c); *U.S. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005).

[19] 18 U.S.C. § 3663A

[20] 18 U.S.C. §3771, (b)(1).

[21] 18 U.S.C. §3663A. The only exception is if the number of victims is so large or the calculation of losses would complicate the proceedings. Even then, the government must give each victim notice of proceedings so they can object by suing for it. See in *In re WR Huff,* 409 F. 3d 555 (2d Cir. 2005) (government had duty to notify tens of thousands of victims of Rigas frauds.)

[22] 18 U.S.C. §3663A(a)(2).

[23] *Organized Crime on Wall Street*, House Committee on Commerce, Sep. 13, 2000, p.199 fn.2. http://www.gpo.gov/fdsys/pkg/CHRG-106hhrg67115/pdf/CHRG-106hhrg67115.pdf

[24] The judgment on the docket was sealed until March 13, 2015, on application of victim Brian Vodicka; however, it was docketed on a related case docket. The main Klotsman docket, 98-cr-1069, remains sealed. And it is sealed even though the information is public, readily available in archives of the Coppa

case, but also reported in the December 17, 2007 New York Times article, "Real Estate Executive With Hand in Trump Projects Rose From Tangled Past." How could a man have been sent to prison, yet no member of the public would even know because his docket remained sealed? How was he sentenced in "open" court? How are his victims receiving restitution? And given that there was a restitution order, doesn't that mean that the government has a list of the victims, and it would not be unduly complicated to calculate the losses caused by Sater and Lauria?

[25] 495 Fed. Appx. 132 (2d Cir. 2012).

[26] See 03-cr-833, Nos. 70-1 and 70-3.

[27] "Wiseguy Flips; Blunder by US Attorneys' Office Gives It Up."

[28] A judge's involvement in a scheme of illegal sentencing is obviously necessary to its fulfillment: only a judge can impose sentence. Where, as here, the illegality is not extrinsic (e.g. the defendant bribes the prosecutor for a downward departure recommendation), but intrinsic (the sentence imposed is facially illegal), the judge's involvement and *mens rea* must be presumed. And leniency conferred under a plea agreement is subject to the approval of the district court. Fed R.Crim.P. 11.

[29] *Caperton v. A. T. Massey Coal Co*., 556 U.S. 868 (2009).

[30] 144 F.3d 1343 (10th Cir. 1998), *rev'd en banc* 165 F.3d 1297.

[31] The case(s) presumed the absence of corruption; thus, the term is "payment of an illegal gratuity." 18 U.S.C. 201(c) does not require corruptness, but only the "in return for" exchange.

[32] *Courts Rush to Extinguish Singleton, but Are the Embers of the Panel's Decision Still Glowing?,* 27 Fl. St. L.Rev. 325 (1995).

[33] 18 U.S.C. 201(c) criminalizes giving, promising, or offering. The result here would be the same even

if only the performance of the promise were illegal.

[34] *U.S. v. Kinlock*, 174 F.3d 297 (2d Cir. 1999).

[35] See, *e.g.*, EDNY 98-cr-1101 docket entry of January 10, 2012: "A Status Conference as to Felix Sater was held on 1/10/2012 before Senior Judge I. Leo Glasser: AUSA Todd Kaminsky and Evan Norris appeared on behalf of the Government. Michael Beys and Jason Berland appeared on behalf of John Doe. The Court directed the government and John Doe to provide a detailed chronological account with transcripts, of what the core issues involving this case *and how it evolved into a First Amendment issue.* The Court will issue an Order on Notice to Mr. Lerner directing the parties to brief the issues before the Court. The parties agreed to submit a Scheduling Order to the Court to be 'So Ordered'." That is, Glasser held an *ex parte* conference to discuss the core issues raised by the author in behalf of Mr. Oberlander, and it is only because the clerk accidently made the docket public that such misconduct became known, which inadvertence was discovered by reporter Dan Wise. See https://wiselawny.wordpress.com/2012/09/11/the-john-doe-back-story-a-reporters-dilemma/

[36] Lauria's tell-all-account of his RICO conspiracy, *The Scorpion and the Frog*, discusses quite explicitly his illicit negotiations with the government, and about how much of the proceeds of his crimes he would get to keep if he were to cooperate.

[37] EDNY Docket No. 05-CR-00060 (EDNY).

[38] *Id*., Trial Tr. at 4507-08 (Apr. 11, 2011).

[39] "Secret Pleas Accepted by U.S. Attorney in City," *New York Times*, April 23, 1982; "Audit Criticizes U.S. Prosecutor on Secret Pleas," *New York Times*, July 4, 1983.

[40] Naturally, the archive file of this Second Circuit case is non-existent.

[41] *Richmond Newspapers v. Virginia*, 448 U. S. 555 (1980); *Press-Enterprise Co. v. Superior Court of*

Case 1:16-mc-00706-BMC Document 121-1  Filed 08/18/15  Page 31 of 32 PageID #: 2595

*Cal*, 464 U.S. 501 (1984); *Press-Enterprise II*, 478 U.S. 1 (1986).

[42] This is how the Second Circuit put it: "[I]n some circumstances it might be within a district court's discretion to grant closure without evidence of a direct threat or other evidence corroborating a defendant's subjective fears. The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations, such as the one in which Doe allegedly participated. Hence, a district court in such a case might attribute the lack of a direct threat to the very confidentiality that the defendant or witness seeks to preserve.… The district judge also might recognize that a direct threat may not always be forthcoming. In any event, the lack of a specific evidentiary configuration need not constrain the district court's discretion." 63 F.3d at 130.

[43] *Lugosch v. Pyramid Co.*, 435 F.3d 110 (2d Cir. 2006) ("[T]he district court erred…in failing to act expeditiously…the district court must make its findings quickly. Our public access cases and those in other circuits emphasize the importance of immediate access where a right to access is found.")

[44] Former AUSA Kaminsky was recently elected to the New York Assembly, representing southern Nassau County, and may run for the New York Senate.

[45] See 98-cr-1101; transcript of July 20, 2010, p. 17.

[46] *United States v. Singleton: A Warning Shot Heard 'Round the Circuits?* 40 B.C.L.Rev. 897 (1999).

[47] *U.S. v. Ageloff*, 08-cr-32 (MDFL).

[48] *United States v. Cruikshank*, 92 U.S. 542, 552 (1876).

[49] Given that we now know that Sater was not sentenced until October 23, 2009, and that an updated PSR was drafted by the Probation Office a month prior thereto, it is rather curious that he was only ordered to pay a $25,000 fine, and no restitution; after all, Sater's W-2's for 2007 show he had an income of $6 million. Of course, they were completely falsified, part of the rampant tax fraud at Bayrock,

Case 1:16-mc-00706-DMC Document 121-1   Filed 08/18/15   Page 32 of 32 PageID #: 2596

but Sater would not have admitted that to Probation Services. Then again, if he did and they said nothing about it to anyone, that's another issue, isn't it?

[50] See, "Loretta Lynch Caught in Deceptive Disclaimer," New York Observer, Sydney Powell, March 3, 2011,  http://observer.com/2015/03/breaking-loretta-lynch-caught-in-deceptive-disclaimer/  and  note Lynch's signature on Sater's criminal information: http://ia600300.us.archive.org/10/items/gov.uscourts.nyed.166709/gov.uscourts.nyed.166709.18.0.pdf

All Content © 2003-2015, Portfolio Media, Inc.