**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NY**

| | |
|---|---|
| JODY KRISS and MICHAEL EJEKAM, directly and derivatively on behalf of BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; and BAYROCK WHITESTONE LLC; <br><br> Plaintiffs, <br><br> v. <br><br> BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ; FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA; ALEX SALOMON; JERRY WEINRICH; SALOMON & COMPANY PC; AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN; DUVAL & STACHENFELD LLP; BRUCE STACHENFELD; DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT; ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL; MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100; BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC: BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.; and NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.; <br><br> Defendants <br> and <br><br> BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC, and BAYROCK WHITESTONE LLC <br><br> Nominal Defendants (Derivative Plaintiffs) | **VERIFIED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**Plaintiffs** Jody Kriss ("Kriss") and Michael Ejekam ("Ejekam"), through their counsel, allege:

## INTRODUCTION

1.      Plaintiffs, members in and creditors of Bayrock limited liability companies, directly and derivatively seek relief from Arif, Satter, Schwarz, for violations of substantive and conspiracy provisions of the Racketeer Influenced and Corrupt Organizations Act; from Halberg, Salomon, Weinrich, Salomon & Co., Roberts & Holland, Pisem, Duval & Stachenfeld, Stachenfeld, Granin, Brown, and Dogan for violations of its conspiracy provision; and variously from all Defendants for violations of substantive, aid and abettance, and conspiracy provisions of state law.

2.      The Bayrock Organization ("Bayrock") is a New York-based group of real estate businesses claiming to have developed, owned, or operated $5,000,000,000 of projects globally.

3.      Generally, Bayrock is a hierarchy of commonly controlled, but not wholly owned, limited liability companies. Bayrock Group LLC is the top of the hierarchy, control parent of the lower-tier companies. Since 2002, Arif and Satter, joined by Schwarz in 2005, have owned most of Bayrock, have controlled Bayrock Group LLC, and through control of Bayrock Group have controlled most of the entities in the hierarchy.

4.      Bayrock does conduct legitimate real estate business, but for most of its existence it was substantially and covertly mob-owned and operated. Arif, Satter, and Schwarz operated it for years through a pattern of continuous, related crimes, including mail, wire, and bank fraud; tax evasion; money laundering; conspiracy; bribery; extortion; and embezzlement.

5.      Almost everything they took from Bayrock, the $8,000,000 Satter took, the $4,000,000 Schwarz took, and the $15,000,000 Arif took, came from crime rather than legitimate profit.

6.      Thus, Arif, Satter, and Schwarz are not only organized businessmen, they are organized criminals, operating Bayrock through acts of racketeering as, or at least in, its normal course.

7.      Satter is an organized criminal and racketeer by career choice, with a history of felonies including convictions for violating federal racketeering law and for assault with a deadly weapon.

8.      Arif made Satter Bayrock"s covert majority owner and co-control person even while Satter was awaiting sentencing on a prior federal racketeering conviction, then immediately began crimes with him, committing tax fraud and obstructing justice in that sentencing by hiding Satter"s near $1,000,000 a year unreported and untaxed cash skim from, and ownership in, Bayrock from his presentencing Probation Officer, letting Satter fake poverty to evade restitution.

9.      Arif and Schwarz are organized criminals and racketeers by definition, their participation in and facilitation of the predicate crimes making them the kind of defendants RICO was meant to capture, what the ABA RICO Task Force calls "persons who regularly commit such crimes."

10.     Regularly commit crime they did. They evaded up to $20,000,000 of their tax liabilities; conspired to evade $100,000,000 tax; and defrauded, embezzled, and extorted millions of dollars from Plaintiffs, repudiating their Bayrock membership interests, then worth over $30,000,000.

11.     Concrete example of their crime, Trump SoHo, stands 454 feet tall at Spring and Varick, where it also stands monument to spectacularly corrupt money-laundering and tax evasion:

12.     Using artifices to defraud architected by Roberts & Holland and Duval & Stachenfeld in conspiracy with them[1], Arif, Satter, Scwharz arranged for up to $250,000,000 of Bayrock″s profit as the co-developer[2] ofTrump SoHo to be laundered, untaxed, through a sham Delaware entity to Iceland (and reportedly then Russia), intending to evade up to $100,000,000 of U.S. taxation.

13.     Despite the promises of tax revenues Trump SoHo would bring the city, nearly half its profits were years ago fixed to evade taxes. Ten cents of every dollar of condominium sales was set to be siphoned, untaxed, out of the country through this Delaware tax laundromat, testament to corrupt professionals who put obeisance to a racketeering client before ethics, honor, and the law.

14.     Plaintiffs thus sue for conspiracy to violate RICO attorneys and accountants who agreed to knowingly facilitate the racketeering, in doing so committing crimes: Roberts & Holland (and attorney Pisem) and Duval & Stachenfeld (and attorneys Stachenfeld, Brown, and Granin), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud and tax evasion; and Salomon (and accountants Salomon and Weinrich), who conspired with them to commit money laundering to evade tax and conspired with them to and did commit mail and wire fraud, tax evasion, tax perjury, and tax obstruction.

15.     Indeed, tax evasion and money-laundering are the core of Bayrock″s business model:

---

[1] There is no evidence Trump took any part in, or knew of, their racketeering. Any contrary inference would be unjust.

[2] Arif, Satter, and Schwarz intentionally omitted any mention of Satter, his shared, substantial ownership in and control of Bayrock Group LLC, Exh. D, his majority ownership of the whole Bayrock Organization, Exh. D, and his conviction for racketeering predicated on securities fraud, Exh. A, from the offering documents, falsely stating Arif "owned" Bayrock Group LLC when he owned little more than half, and only about 18% of the entire Bayrock Organization.

**TAX EVASION AND MONEY LAUNDERING**

16.  **Substantive Crimes**. Arif, Satter, and Schwarz, variously, in operating Bayrock did:

A.  <u>Tax Evasion</u>. Attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by Bayrock tax partners, creating a material tax deficiency of as much as, or more than, $20,000,000, in violation of 26 UC §7201.

B.  <u>Failure to Pay</u>. Fail to collect and pay over tax, in violation of 26 USC §7202.

C.  <u>Failure to Make Returns</u>. Fail to supply information and make returns, in violation of 26 USC §7203.

D.  <u>Failure to Make a Statement</u>. Fail to make a statement (W-2) as required by law, in violation of 26 USC §7204.

E.  <u>Tax Perjury</u>. Subscribe perjurious returns, and aid and assist with the preparation of documents known materially false, in violation of 26 USC §§7206(1) and 7206(2).

F.  <u>Tax Obstruction</u>. Corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the IRS, in violation of 26 USC §7212(a).

G.  <u>Money Laundering</u>. Knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 derived from specified unlawful activity, in violation of 18 USC 1957.

H.  <u>Money Laundering</u>. Conduct and attempt to conduct financial transactions involving proceeds of specified unlawful activity, said proceeds known to be from unlawful activity

I.  with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(1)(A)(i).

II.  with the intent to evade taxation, in violation of 18 USC §1956(a)(1)(A)(ii).

III.  knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(1)(B)(i).

4

I. <u>Money Laundering</u>. Transport, transmit, and transfer funds from a place in the United States to a place outside the United States and to a place in the United States from a place outside the United States

    I. with the intent to promote the carrying on of specified unlawful activity, including further acts of racketeering, in violation of 18 USC §1956(a)(2)(A).

    II. knowing the transactions were designed to conceal or disguise the nature, source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 USC §1956(a)(2)(B)(i).

J. <u>Fraud and False Statements</u>. Make materially false statements and representations in matters within the jurisdiction of the executive branch, in violation of 18 USC §1001.

K. <u>Obstruction of Justice</u>. Corruptly endeavor to impede a U.S. court officer, making false statements and representations to a Probation Officer, in violation of 18 USC §1503.

17. **Conspiracy Crimes**. Arif, Satter, and Schwarz, together[3], with each other and others known and unknown, in operating Bayrock unlawfully, willfully, and knowingly conspired:

A. *Klein* Conspiracy. To defraud the IRS by impeding its lawful function in the evaluation, assessment, and collection of income taxes, in violation of 18 USC §371.

B. <u>Offense Conspiracy</u>. To commit the offenses enumerated in ¶16.A through ¶16.F and ¶16.J through §16.K, in violation nof 18 USC §371.

C. <u>Money Laundering Conspiracy</u>. To commit the offense(s) enumerated in ¶16.G through ¶16.I, in violation of 18 USC §1956(h).

18. **Private Rights of Action**. Plaintiffs″ causes of action arise from these Defendants″ commission of these tax, and other, crimes, at the interplay of federal racketeering law and state business organizations law and concomitant laws fiduciary, of contract, and of tort.

---

[3] While Schwarz joined Bayrock in 2005, his *Pinkerton* liability extends back to the conspiracy origins in 2002.

**BAYROCK GROUP LLC AND THE BAYROCK ORGANIZATION**

19.     Bayrock is a New York-based group of real estate businesses which develops projects globally. Most of Bayrock's U.S. entities are contained in a hierarchy (the "Bayrock Hierarchy"):

A.     **Bayrock Group LLC**, is, and was at all times relevant, a duly organized and existing New York limited liability company. It is the top tier of the hierarchy, Bayrock's ultimate control parent. Who controls it controls the hierarchy, as it is the sole manager or managing member, and majority, plurality, or sole owner of membership interests in...

B.     A dozen or so commonly-controlled but not wholly-owned first-tier subsidiary limited liability holding companies ("Subs"), one Sub per real estate or similar project, each Sub in turn the majority, plurality, or sole owner of membership interests in...

C.     Second-tier (and sometimes lower-tier) limited liability companies developing the real estate projects, these companies almost always exclusively managed (sometimes co-managed) by Bayrock Group LLC and often having non-Bayrock members, typically outside partners and investors.

20.     Subs are passive holding companies, their only assets membership interests in lower tiers, their only function as conduits taking contributions from Bayrock Group LLC, contributing them further downstream to lower tiers, and receiving distributions from lower tiers, and distributing them further upstream to Bayrock Group LLC and other members. This action most concerns these five Subs, and in particular the first four (the "Four Subs").

A.     **Bayrock Spring Street, LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Trump SoHo hotel condominium project in New York.

B.     **Bayrock Camelback, LLC** is, and was at all times relevant, a duly organized and existing Arizona limited liability company. It is the holding company for Bayrock insider interests the Trump Camelback hotel condominium project in Phoenix.

6

C. **Bayrock Merrimac, LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump International hotel condominium project in Fort Lauderdale.

D. **Bayrock Whitestone LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Waterpointe mixed use project in New York City.

E. **Bayrock Ocean Club LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump Ocean Club hotel condominium project in Fort Lauderdale.

THE BAYROCK RICO DEFENDANTS

21. **Tevfik Arif** is a natural person residing in New York. Arif, a native Russian, started Bayrock as a party *apparatchik* in Moscow in 1989 at the fall of communism, backed by oligarchs and money they stole from the Russian people. He came to the United States in 2000 to establish a presence for Bayrock, forming Bayrock Group LLC in 2002. Until Satter joined, Arif had sole, if nominal, direct or indirect ownership and control of Bayrock Group LLC. He has always been a member and has always participated in its operation with the title "Chairman".

22. **Felix Satter** ("Satter") aka Felix Sater, is a natural person residing in New York, a native Russian who emigrated to the United States in the 1970s. He joined Bayrock in 2002 with an organized crime history. By 2003, Arif had given him majority ownership in, and shared control of, Bayrock. He is been a member of all five Subs and of Bayrock Group LLC and has always participated in its operation, with the title "Chief Operating Officer" or "Managing Director".

23. **Julius Schwarz** ("Schwarz") is a natural person residing in New Jersey. Bayrock hired him as Executive V.P. and General Counsel in early 2005, and since November 2005 he has been a member of all five Subs and of Bayrock Group LLC, and has always participated in its

operation, with dual roles as an attorney and an executive managing its normal operations; he considers himself *de facto* CEO.

PLAINTIFFS

24.     **Jody Kriss** ("Kriss") is a natural person residing in New York. He performed services for Bayrock from 2003 to 2007 and in 2008 as Director of Finance. Since no later than 2004 he has been a member of Bayrock companies and is a member of Bayrock Group LLC and all five Subs.

25.     **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen. Ejekam performed services for Bayrock from 2003 through 2006. Since 2005 Ejekam has been a member of two of the Four Subs, Bayrock Spring Street LLC and Bayrock Whitestone LLC.

ORGANIC LAW

26.     In all cases, specifically and without limitation in the cases of Bayrock Group, Bayrock Spring Street, Bayrock Camelback, Bayrock Merrimac, Bayrock Whitestone, and Bayrock Ocean Club, such default fiduciary duties apply among and between managers, officers, members, and the limited liability companies as exist under the applicable state law of their states of formation.

27.     Any minor variations in these states" default limited liability company fiduciary duty laws are immaterial to the core of this action. Arif, Satter, and Schwarz"s malfeasance, especially fraud and defalcation, by their illegal operation of Bayrock Group LLC, alone or as the mediating agent for their further operation of the Subs or lower tiers to perpetrate fraud and defalcation.

28.     The private organic rules in the limited liability company agreements do not eliminate, materially enhance, or materially modify those status duties and liabilities for breaches thereof.

TAXATION

29.     Bayrock Group, Spring Street, Merrimac, Whitestone, Ocean Club, and all other Bayrock companies at all relevant times were and are tax partnerships unless otherwise stated.

8



Projects are owned by lower-tier companies. Outsiders are members of, contribute to, and get distributions from project lower tier companies. Bayrock's interests in lower tier companies are held in Subs, basically "special purpose Outsiders" conduiting Bayrock's money in and out of projects. Bayrock Insider Sub members are usually service providers who in return for services received compensatory membership interests entitling them to distributions, so typically do not contribute cash.

Arif, Satter, and since 2005 Schwarz control Bayrock Group LLC, which in turn is sole managing member of, and controls, the holding company SUBS, and is sole or co-managing member of, and controls or co-controls, the lower tiers as well.

FIGURE 1

9

**THEORY OF THE CASE**

30.     Plaintiffs bring this action primarily on account of Arif, Satter, and Schwarz's years of operating Bayrock companies for purposes including the continuous, related commission of criminal and civil frauds, largely but not entirely tax frauds, to wrongfully benefit themselves.

31.     **Mediating Agents**. Plaintiffs were direct and derivative <u>victims</u> of these frauds because of these Defendants' use of Bayrock companies, especially Bayrock Group LLC, as the mediating agents with which to commit them, whether or not Plaintiffs were also <u>targets</u> of the frauds.

32.     Stripped of visual complexity, Bayrock is a hierarchy of commonly controlled but not wholly owned limited liability companies taxed as partnerships. Arif, Satter, and Schwarz control the ultimate parent, Bayrock Group, and through control of Bayrock Group control all subsidiary and related lower-tier companies in the hierarchy. FIGURE 2.



FIGURE 2

33.     **Convergence**. From the standpoint of alleging injury caused by these Defendants' wrongful use of Bayrock companies as the mediating agents through which they committed these frauds in their own self-interest, the state law case and the RICO case are substantially the same:

34.     At the tax fraud core of this action, Plaintiffs have standing to sue Arif, Satter, and Schwarz, directly, derivatively, or both, depending on who suffered the injury:

A.     <u>Under state law</u>, on account of their wrongful operation of Bayrock Group LLC for their personal benefit, in an effort to evade their own taxes, and for their fraudulent concealment of it, which causally injured Plaintiffs; and

B.     <u>Under federal racketeering law</u>, on account of their operation of Bayrock Group LLC, in an effort to evade their own taxes, through a continuous pattern of related mail and wire fraud perpetrated against governments in an effort to defraud those governments of tax revenue and their opportunity to collect it, which causally injured Plaintiffs.

10

35.     There are two sovereigns. One makes illegal the betrayal of the Plaintiffs *qua* principals to whom fiduciary duties run and were breached and one makes illegal committing predicate acts the commission of which harmed the Plaintiffs and also breached those fiduciary duties.

36.     **State Law**. Without limitation, in each of Bayrock Group and the five Subs the managers and officers of owed the companies and members fiduciary duties, including duties of loyalty (including the duty to disclose) and care, and contractual duties of good faith and fair dealing.

37.     <u>Doing Wrong</u>. When Arif, Satter, and Schwarz used their control of Bayrock Group to act in their self-interest, whether by operation of Bayrock Group alone or by using Bayrock Group to operate other companies in the hierarchy, they breached their fiduciary duties of loyalty.

38.     <u>Concealing It</u>. When after wrongfully acting in their self-interest they concealed their own wrongdoing, they breached their fiduciary duties of disclosure and so also committed fraud. For example, when they used Bayrock companies to commit fraud to benefit themselves, then concealed their intent to defraud (their scienter), they breached fiduciary duties <u>and</u> committed fraud by concealment on the company and the members, because the principal is not deemed to "know" of his agent's deceit when the knowledge is concealed in the hands of that agent.

39.     <u>Doing Wrong by Committing Tax Crimes</u>. Arif, Satter, and Schwarz used their control of Bayrock companies to evade tens of millions of dollars of their personal income tax liabilities.

40.     One way they did this was to use Bayrock to skim millions of dollars of cash, giving Satter a million dollar a year unreported income and causing Bayrock Group to execute a sham "note" with him, a note Arif and Schwarz have admitted on MP3 was never meant to be repaid

41.     Another way they did this was to cause Bayrock companies to intentionally understate partnership taxable income, by at least $50,000,000 to as much as $100,000,000, causing Bayrock to prepare and file knowingly false K-1's and partnership tax returns as part of the fraud.

42.     These companies were tax partnerships, and partnerships do not pay tax, their partners pay tax on the partnerships' income, based on the distributive shares of income allocable to them.

43.    By intentionally understating Bayrock taxable income, since between them they owned the vast majority of Bayrock (most of it covertly by Satter), they captured the vast majority of the "benefit" of the understatement, and personally evaded tens of millions of dollars of tax.

44.    Thus they used Bayrock Group as the mediating agent to commit these tax crimes for their own benefit. They committed tax <u>crimes</u>, not tax mistakes. They acted with intent to evade.

45.    The causal injuries those companies and members suffered were not caused by any personal tax deficiency of Arif, Satter, or Schwarz's, but were caused by these Defendants" wrongful use of Bayrock to commit their personal tax evasion. The companies and members are thus <u>victims</u> of the tax frauds, or more precisely are victims of the companies" being hijacked to commit the tax frauds, even though they were not the primary <u>targets</u> of the tax frauds.

46.    For example, when Arif, Satter, and Schwarz caused Bayrock companies to underreport Bayrock taxable income in 2007 by $45,000,000 or more, and so underreported their own distributive shares of that income by almost all that much in the aggregate in order to evade their own taxes, there was causal injury to the companies and to the members whether or not any or all of these Defendants woke up the next day to find they inherited a $200,000,000 net operating loss wiping out all their illegally unreported Bayrock income and with it any tax deficiency.

47.    Even if such fortuitous elimination of tax deficiency had eliminated criminal liability for certain substantive tax crimes,, these Defendants would still be liable for Plaintiffs" injuries because the injuries are not created by the "success" of the tax crimes, but by the wrongful use, or hijacking, of Bayrock companies in the effort to commit them. The effort completes the wrong.

48.    <u>Concealing the Tax Fraud</u>. They committed tax fraud through Bayrock. Whether or not they hid the transactions they used to do it, they hid their scienter, their knowledge that what they were doing was fraud, from the company and from the members. Thus they not only breached fiduciary duty against Bayrock and its members by committing the tax fraud, they also then committed concealment fraud against Bayrock and its members by hiding the fact of their fraud.

49.   **Federal Law (RICO)**. The same principles apply in RICO. Importantly, Plaintiffs do not base their RICO case solely on federalization of state law breaches of fiduciary duty bootstrapped through honest services fraud, but on Arif, Satter, and Schwarz's pattern commission of predicate crimes for which RICO liability lies even if all fiduciary duties had been consensually eliminated.

50.   Those predicate acts are (i) that subset of the tax crimes, ¶16 *et seq.*, which are RICO predicates, e.g. money laundering to evade taxation; and (ii) their mail and wire fraud RICO analogs. Each of those tax tax crimes shares two facts which create that RICO analog liability:

A.   Each crime was committed with the intent to deprive the United States and other taxing authorities, by fraud, of tax revenue or the opportunity to collect it.

B.   Each crime was committed with the jurisdictionally significant use of mail or wire communications, even if ordinary course communications.

51.   It is settled federal law that schemes to defraud governments of tax revenue or the opportunity to collect it may be prosecuted under mail and wire fraud statutes, that tax and the opportunity to collect tax are property for purposes of mail and wire fraud, and that no tax deficiency is necessary, the mail and wire fraud statutes punishing the scheme and not its success.

52.   It has been settled law in this circuit for 20 years that a scheme to defraud governments of tax or the opportunity to collect it may be prosecuted under RICO with mail and wire fraud predicates, even where the predicates, such as filing false state tax returns, were not state crimes.

53.   Thus, Arif, Satter, and Schwarz's operation of Bayrock Group LLC to commit tax fraud; plus use of mail or wire; plus pattern; would support their criminal prosecution for RICO.

54.   It is now settled law that, as to predicate crimes of mail and wire fraud, a <u>victim</u> may have causal injury and thus RICO standing even if the victim was not the <u>target</u> of the fraud.

55.   Since both the companies and Plaintiffs suffered causal injury by reason of Arif, Satter, and Schwarz's operation of Bayrock Group LLC through this pattern of predicate crime (the common law "hijacking" concept, ¶45, as expressed in RICO terminology), alleged *infra*,

Plaintiffs, directly and derivatively can privately prosecute Arif, Satter and Schwarz for violating federal racketeering law by, *inter alia*, operating Bayrock Group LLC through a years-long pattern of mail and wire fraud intended to deprive victim governments of up to $100,000,000 or more of tax, whether or not the crimes "succeeded" in creating any tax deficiency.

56.     Concealing It. In addition, these Defendants" concealments of the tax frauds and related information in the presence of duties to disclose it are related predicate crimes, as in state law.

57.     **Injury**. These Defendants proximately caused the same or similar direct and derivative injury by their violations of state law as they did by their violation of federal racketeering law.

58.     Plaintiffs" Derivative Injury. As members of Bayrock limited liability companies, Plaintiffs have the standing to sue on behalf of those companies for their causal injuries.

59.     Derivative injuries includes legal and accounting fees Bayrock victim companies spent defending audits due to the frauds, like the 2007 audit of sham "loans" to Satter, ¶127; Bayrock funds misappropriated and illegally spent on fees paid to corrupt attorneys and accountants for their facilitation of these frauds, including as applicable money spent on bribing them to breach their fiduciary duties; partnership level penalties; and nonrefundable FICA, FUTA, and sate unemployment taxes never due but paid as part of the OWNERSHIP FRAUDS, *infra*.

60.     In addition, the companies themselves suffered injury when Arif, Satter, and Schwarz caused them to make illegal distributions or other dispositions of the proceeds of these crimes.

61.     Plaintiffs" Direct Injury I. When Arif, Satter, and Schwarz caused Bayrock companies to intentionally understate partnership income and issue fraudulent K-1"s (or to fail to issue required K-1"s), they fraudulently underreported all the partners" distributive shares of income, not just theirs. The expense the innocent partners incur in unwinding this, as such partner level penalties and legal and related fees as damages, is direct injury.

62.     Plaintiffs" Direct Injury II. Plaintiffs" membership interests in Bayrock companies entitle them to tax distributions equal to a percentage of these companies" partnership taxable income.

63.     Payment of this distribution is mandatory, automatic, and non-discretionary. The amount is computed mechanically as a fixed, objectively determinable function of partnership income. It is computed without regard to a member's individual tax circumstances. It is positively correlated with taxable income, so the greater the partnership taxable income the greater the distribution.

64.     This tax distribution provision is like a huge pendulum. Every time it realizes partnership income on an arc to the left, it must inexorably deposit a predetermined portion of that income as a tax distribution to Plaintiffs on its next arc to the right. It cannot be reasoned with. It does not think. It does not feel. It simply is. There is no "off" switch. It is eternal. It cannot be stopped.

65.     When Arif, Satter, and Schwarz executed schemes to fraudulently understate partnership income, causing the pendulum to pick up too little income on its arc left, Plaintiffs' tax distributions were illegally diminished, the pendulum foreseeably depositing too little to Plaintiffs on its arc right. Plaintiffs' failure to receive their due distributions is direct, not derivative, harm.

66.     Moreover, the diminutions in distributions were deliberate, not just foreseeable: Kriss recorded Schwarz and Arif admitting to him that they had used their control of Bayrock <u>both</u> to avoid tax by making it look like there were no profits when there really were <u>and</u> to cheat him and other minority members, who, Schwarz bragged, would as a result of their schemes never get any distributions. Arif even went on to praise Schwarz on that recording for fixing it so he, Satter, and Schwarz could keep all the money and not have to share it. In other words, they intended the schemes to defraud to encompass the loss of these distributions as well as their own tax evasion.

67.     Such intentional failure to make distributions is oppressive conduct. The harm is direct.

68.     <u>Plaintiffs' Direct Injury III</u>. In addition to causal injury by reason of the deprivation of their tax distributions, Plaintiffs have causal injury by reason of the deprivation of their opportunity to collect it, their chose in action. Plaintiffs have been injured by these Defendants' fraudulent concealment of the information needed to determine the existence and amount of taxable income and the existence and amount of due tax distributions and their need to sue for it.

15

69.    As part of their tax frauds, Arif, Satter, and Schwarz not only caused Bayrock companies to file dozens of fraudulent partnership returns and K-1″s, they also caused Bayrock companies to fail to file dozens more returns and K-1″s, sometimes pretending companies were disregarded entities so the transactions underlying the tax frauds could be buried on the wrong returns of other companies, and they failed to distribute required K-1″s to Plaintiffs and other members.

70.    Then, they illegally refused Kriss″s demands for access to Bayrock tax information, though state limited liability company statutes entitle Kriss to access them on demand and the limited liability company agreements of every company allow him the right to audit its books.

71.    As a result, Plaintiffs are unable to report their distributive shares and pay any tax due, and Kriss has had to sue for this information, suing Bayrock Spring Street LLC and Bayrock Whitestone LLC, Delaware companies, in a books and records action per 6 Del. Code §18-305.

72.    Plaintiffs″ legal (and related) fees in bringing that and subsequent books and records action(s), motions, or orders to obtain the wrongfully withheld tax information, and for dealing, as a partner, with partnership-level IRS examinations and partner-level defenses are direct, not derivative, §1964(c) injury, legal fees as damages.

73.    **Causation Is Direct and Proximate**. Arif, Satter, and Schwarz had statutory and contractual duties to truthfully compute and report certain numbers, and the duty to pay Plaintiffs, without intervening decision, fixed, determinable, non-discretionary percentages of those numbers. For years they have operated Bayrock Group LLC through schemes to fraudulently under-compute those numbers. Whether those numbers were to be computed by reference to Fiji″s annual sugar exports or by reference to the number of sunspots each July 4th or by reference to partnership items of income and loss is irrelevant; there is but one step from fraud, the knowing under-computation of those numbers, to injury, the diminished distributions as a result.

74.    "One step from fraud to injury" satisfies the causation requirement of §1964(c), and so also satisfies the causation requirements of state law breach of fiduciary duty and fraud.

16

75. **Standing**. Plaintiffs are not sovereign entities. Paradigmatically, Plaintiffs privately "tax" these companies by their right to receive these information reports and tax distributions, so are essentially private attorneys general suing Arif, Satter, and Schwarz because their frauds deprived Plaintiffs of their private "tax" revenue and their private opportunity to collect it.

76. Plaintiffs are quintessential RICO persons who suffered quintessential RICO injury to their quintessential RICO property by reason of quintessential RICO violations. Whether New York or any sovereign entity also suffered RICO injury *qua* lost tax or the opportunity to collect it and if so has standing to sue Defendants using RICO as a tax collection device is not at issue.

77. **Vicarious Liability**. Plaintiffs assert vicarious liability under both state law and RICO.

78. Under state law, Plaintiffs assert liability for aiding and abetting and civil conspiracy.

79. Under RICO, Plaintiffs assert liability against those who agreed to knowingly facilitate Arif, Satter, and Schwarz's racketeering. As such claims are made pursuant to its conspiracy, §1962(d), not substantive, §1962(c), provisions, those Defendants, though accountants and attorneys, cannot hide behind *Reves*.

THE STORY

80. **Bayrock Becomes a Mob-Owned Business**. The story began when Satter, a mobster and ex-convict (assault with a deadly weapon) infiltrated Bayrock in 2002. At the time, Satter was awaiting sentencing on federal racketeering charges for running a securities fraud syndicate in collaboration with the New York Mafia and Russian mob that deprived its victims of $40,000,000. By 2003 Satter had attained majority Bayrock ownership and shared control with Arif. From then, at all relevant times, Bayrock was largely a mob-owned and operated business.

81. Running a mob-owned and operated business offered Arif and Satter a lot of difficulties, number one being they were running a mob-owned and operated business. No bank would lend for any project, no money partner would join any venture, no professionals would do any work.

82.     In addition, Satter's sentencing for racketeering was approaching. Most of the Russian and Mafia mob co-defendants he had testified against had been sentenced to incarceration and as much as $50,000,000 of restitution, and Satter, who in early 2003 began skimming what would become almost a million dollars a year from Bayrock, did not want to give it all up to his victims.

83.     **Concealing Bayrock's Owners**. Arif and Satter agreed to conceal Satter's majority ownership of the Bayrock Organization. They concealed it from Plaintiffs and others at Bayrock, including Plaintiffs. They concealed it, and his million dollar skimmed income, from his ███████████████████████████ They concealed it, and his million dollar skimmed income, from the IRS. They concealed it from their partners. They concealed it from their lenders. They concealed it from their buyers, filing false condominium offering documents.

84.     It wasn't just Satter's ownership they concealed. For example, Arif and Satter had Bayrock Group LLC sell a mutual neighbor, Elizabeth Thieriot, some of its membership interests in Bayrock Ocean Club LLC, a holding company Sub, but never disclosed that she was an owner, omitting it from every document they showed any lender or partner. They did the same with everyone else who acquired ownership in any Bayrock company, including Plaintiffs, almost always concealing it from partners, lenders, and the IRS, and fraudulently representing that Arif owned 100% of everything, everywhere when that was almost laughably far from the truth.

85.     As alleged in detail in the OWNERSHIP FRAUDS section *infra*, for most of the relevant time in this action, especially from the 2006 filing of the fraudulent condominium offering documents for Trump SoHo on into 2008, not only did Satter own over 63% of the entire Bayrock Organization, but Arif was a far distant second, owning only about 18%. Not that anyone would know it from those condominium offering documents, which omit all mention of Satter entirely.

86.     **Concealing From Bayrock's Owners**. Their concealment ran to more than hiding the existence and identity of Bayrock owners from others; it also encompassed concealing material information <u>from</u> Bayrock owners, to whom they had fiduciary duties of disclosure, ¶36.

18

87.    For example, after Thieriot bought her membership interest in Ocean Club, it realized $1,500,000, which it distributed to its members. Rather than tell Thieriot and distribute her share to her, they hid this from her and embezzled her money. When she sued for access to Ocean Club's books and records, they denied she was a member, though they knew she was and were concealing what they knew was conclusive proof of her ownership from her, and from the Court.

88.    These examples pale in comparison with their concealment from Plaintiffs and other minority owners of the facts and circumstances of the 2007 taxable exchange, for $50,000,000 to $100,000,000, of 2/3 of the assets of a certain four holding company subsidiaries, the Four Subs.

89.    For months Arif, Satter, and Schwarz negotiated this as the sale for tax purposes that it really was, in which Plaintiffs and other minority owners should have shared millions of dollars.

90.    At the last minute, for two criminal purposes they well concealed from Plaintiffs, they purported to change the form to a sham "loan" and arranged it to exclude Plaintiffs and the others.

91.    The first purpose was to deprive Plaintiffs and others of their multi-million dollar share. Their mens rea became apparent later, in the form of spoken admissions, which Kriss recorded.

92.    The second purpose was to perpetrate a $250,000,000 scheme of money-laundering for purposes of tax evasion. Documents only recently surfaced evidencing their criminal mens rea.

93.    **Relatedness**. It is helpful to visualize the non-tax related concealment frauds and crimes in this action grouped according to:

    A.    Those which concealed Satter's majority ownership of Bayrock.

    B.    Those which concealed the identity of other, minority, owners of Bayrock.

    C.    Those which concealed information from Bayrock itself, as a matter of law (that is, where a duty of disclosure ran to a Bayrock company).

    D.    Those which concealed information from Bayrock's owners, as a matter of law (that is, where a duty of disclosure ran to one or more owners of a Bayrock company).

    E.    Those which concealed information other than ownership of Bayrock.

19

94.     These five categories all mutually overlap, because one illicit transaction typically involved multiple concealments. Superimposed is the overarching theme of tax fraud, since tax frauds dominate this action and by themselves, given the 15 year forward money laundering tenor of that $250,000,000 scheme, ¶92, satisfy both closed and open continuity and relatedness. FIGURE 3.



**FIGURE 3**

95.     Not every concealment was of ownership. Not every concealment of ownership was for tax fraud[4]. Not every tax fraud relied on concealed ownership[5]. Not every concealment of ownership involved Satter, or only Satter. But, as the diagram shows, all the frauds were related to each other, and all satisfy *Daidone* relatedness, all related to the enterprise and all with the common goal of lining the pockets of Arif, Satter, and Schwarz with the proceeds of their racketeering.

96.     **<u>The Story (cont'd)</u>**. When Plaintiffs joined Bayrock in 2003, Arif and Satter told them Satter had a "nominal" interest in the firm, only in subsidiaries, and while he had a prison record for assault, he was turning his life around. Because his guilty plea to criminal RICO, proffer, and cooperation agreement, Exh. A, were sealed as he was aiding the prosecution of his Mafia and Russian organized crime confederates, Arif and Satter were able to hide his history of securities fraud, money laundering, ███████████████████████ from Plaintiffs and

---

[4] For example, as alleged, ¶84, the Bayrock RICO Defendants often concealed all the owners other than Arif from lenders, to hide Satter and to hide their perpetual violation of loan covenants which required certain Bayrock Subs to be bankruptcy remote single purpose entities, which they were not.

[5] However, every tax fraud impacted every partner. By partnership taxation, Bayrock''s criminally fraudulent tax accounting harmed all the partners, even the innocent, who received either fraudulent K-1''s, or no K-1''s at all as part of the concealment of their status and identity from the IRS, and who received illegally diminished tax distributions, or no tax distributions, as a proximate result of the illegally understated Bayrock partnership taxable income.

others for almost five years, though Schwarz, who joined in 2005, learned the truth by 2007 and used it in an attempt to extort Arif and Schwarz, *infra*.

97.     Plaintiffs agreed to join Bayrock, as did others, because Arif and Satter promised them "sweat equity", with comparatively modest, or no, regular additional cash compensation.

98.     This meant these service providers" ultimate compensation would be heavily dependent on the entrepreneurial success of Bayrock operations; this was the essence of all their bargains.

99.     Sometimes, as with Ejekam, the sweat equity was limited in scope to depend on the success of specific projects, and sometimes, as with Kriss and Schwarz, it was broadly scoped to depend on the success of almost every project in the Bayrock Organization.

100.    Sweat equity rights were encapsulated in, and conveyed to service providers by having Bayrock companies issue them, membership interests, making them members.

101.    Those service providers whose sweat equity was limited in scope received membership interests in one or more Subs. For example, referring to the EQUITY CASH FLOW diagram, Pg. 2, Ejekam, whose sweat equity was limited in scope to the Trump SoHo and Waterpointe projects, received membership interests in Bayrock Spring Street LLC and Bayrock Whitestone LLC.

102.    Those service providers whose sweat equity was broadly scoped, like Kriss and Schwarz, received membership interests in all five Subs, plus membership interests in other companies, including Bayrock Group LLC itself. Satter"s membership interests were also broadly scoped, while Arif has had membership interests only in Bayrock Group LLC.

103.    Thus, as the projects paid off and cash flowed up from the lower-tier companies, what remained after Bayrock outsiders got their distributions from lower tiers would eventually flow upstream to the Subs, and once there, the limited scope and broad scope service providers and Satter would get their distributions, the remainder distributed upstream to Bayrock Group LLC, where Arif, Satter, and the broad scope service providers would get additional distributions.

104.    At least this is what was supposed to happen. It did not.

105.    What Plaintiffs did not know as they joined and worked there, and could not have known, was that, far from turning his life around, Satter, had joined with Arif, and later also with Schwarz, to run ran Bayrock as their private piggy bank, with no regard for the fiduciary and contract duties they owed Plaintiffs and others, in contempt of criminal law as well, operating Bayrock Group LLC, an evolving joint criminal enterprise, through a pattern of racketeering to line their pockets with as much as possible, especially with the proceeds of crime.

106.    They began to find out when things went well and their membership interests were worth over $32,500,000 and Arif, Satter, and Schwarz stole it from them, and millions from other minority members, as part of a conspiracy to evade $100,000,000 of tax, the crimes tainting not only Trump SoHo, ¶11, but Trump International, Trump Camelback, and Waterpointe as well.

107.    How they, conspiring with other Defendants, did this is but one of the criminal subplots in this case which make clear Plaintiffs″ RICO standing and together tell the rest of the story.

THE SUBPLOTS

108.    **The Satter Frauds I**. By 2003 Satter infiltrated, owned and controlled most of Bayrock, even while still awaiting sentencing for his racketeering conviction. Most of his 20 Russian and Mafia mob confederates in that case, against whom he gave evidence, by then had been convicted of racketeering and sentenced to incarceration plus multi-million dollar restitution orders, so Arif let Satter skim nearly $1,000,000 a year from Bayrock, illegally unreported and untaxed, not only to evade tax by pretending they were "loans" but also to obstruct justice by defrauding the U.S. Probation Officer in the preparation of Satter″s presentencing investigation report, concealing Satter″s income from Bayrock and majority ownership, then worth millions of dollars, in an effort to evade a heavy restitution order. The skims continued for years, reaching almost $5,000,000.

109.    **The Cayre Frauds** Using artifices to defraud designed by Defendant Akerman Senterfitt in conspiracy with them, Arif, Satter, and New York developer Michael Samuel defrauded the

Cayre family by hiding the fact that in breach of Samuel″s agreement with the Cayres prohibiting such, for years Arif, Satter, and Samuel used Bayrock Group LLC to front all the money for, and covertly own 90% of, Samuel″s 50% interest in a condominium project he owned 50:50 with the Cayres. When the project succeeded and paid off, to evade taxes Arif, Satter and Schwarz had Bayrock intentionally fail to report its share of its millions of dollars of profit from that project.

110. **The Thieriot Frauds**. Arif and Satter had Bayrock Group LLC sell membership interests Bayrock Ocean Club LLC to Elizabeth Thieriot at almost $1,000,000 profit, then to evade tax had Bayrock intentionally fail to report it. When Ocean Club later realized $1,500,000m Arif, Satter, and Schwarz had it distribute all the money to Bayrock Group, embezzling Thieriot″s share. She sued Ocean Club in New York. Bayrock and Akerman Senterfitt deceived her, and the Court, by arguing she was not a member and Ocean Club was not subject to New York jurisdiction, though they knew Ocean Club″s only office was in New York and they knew she was a member, having found proof in their files (they kept asserting she was not a member until she showed up in court with her own copy of that proof; only then did Akerman told Arif, Satter, and Schwarz to give up the deceit since Thieriot had introduced in court the proof they already had and knew to be true).

111. **The Ownership Frauds**. Plaintiffs and others, including Satter and Schwarz, were partners in Bayrock companies, ¶100, for general, and specific tax, reasons. Arif, Satter, and Schwarz committed tax fraud treating partners as employees, taking millions of dollars of illegal deductions and capitalizations and evading hundreds of thousands of dollars of unincorporated business tax. Bayrock″s accountant, Alex Salomon of Salomon & Co., was key in this and the other tax frauds, knowingly preparing dozens if not hundreds of fraudulent returns and schedules.

112. **The FL Frauds**. In 2007, Arif, Satter, and Schwarz estimated the Four Subs might soon receive distributions of $227,000,000 from the lower tier entities for the Four Projects.

113. By then, because of the conveyances of compensatory membership interests in the Subs to Plaintiffs and other service providers, ¶97, Bayrock Group LLC owned only about 33% of the

23

membership interests in the Four Subs, Plaintiffs and others the others 67%, and Plaintiffs'' share of that expected $227,000 was about $32,500,000.

114. Arif, Satter, and Schwarz stole this by converting most of Plaintiffs'' and the others'' membership interests in the Four Subs and exchanging them, along with most of Bayrock Group LLC''s membership interests, to co-conspirator FL Group ehf ("FL") for $50,000,000, keeping all the money and repudiating what little of Plaintiffs'' and others'' membership interests were left.

115. The exchange was part of a larger deal whereby FL became Bayrock''s new partner. The new partners agreed to work together on the existing Four Projects and on so much of $2,000,000,000 worth of new projects as they might "agreed to agree" to develop together.

116. All this was to the exclusion of Plaintiffs and other minority members in the Subs, who should have shared millions of dollars of the $50,000,000 and a share of the new projects.

117. Knowing he and others would be sued for this, Schwarz had Bayrock purchase a $5,000,000 D&O policy from AIG before the FL sale closed to try to stick AIG with the liability, submitting a fraudulent application which concealed that he and others had been sued only weeks earlier for racketeering, fraud, and breach of fiduciary duty in connection with Trump Camelback.

118. Arif, Satter, and Schwarz made the deal with FL even though they had better offers.

119. Part of the reason was FL''s willingness to conspire in the theft of Plaintiff''s interests.

120. Part of the reason was the new business: because Bayrock Group would contribute 25% of the capital but get 50% of the profits, the value to Arif, Satter, and Schwarz *qua* Bayrock Group was that of a "free ride" profits interest on that $2,000,000,000 worth of new projects.

121. And part of the reason was a side deal, where Arif, Satter, Schwarz, and FL agreed to perpetrate $100,000,000 of money laundering and tax evasion, benefitting Arif, Satter, and Schwarz by allowing them to evade $20,000,000 of their personal income tax liabilities immediately and in return benefitting FL by allowing it to evade $80,000,000 of tax over time.

24

122.    Roberts & Holland, facilitated by Duval & Stachenfeld, built the artifices to defraud, illegal money laundering and tax shelter structures for Bayrock and FL to use with FL whereby:

A.    They formed a sham domestic tax partnership as a mere conduit between Bayrock in New York and FL in Iceland, to pretend this sham partnership, not FL, was Bayrock′s new partner to evade $80,000,000 of foreign partner withholding. Roberts called this a "domestic holding partnership". Plaintiffs call it money laundering to evade taxation.

B.    They disguised FL as a "lender", not a partner, to pretend the $50,000,000 was nontaxable "loan" proceeds rather than taxable proceeds of a sale of partnership interests. Arif, Satter, and Schwarz thus evaded up to $20,000,000 of their personal tax liabilities[6].

C.    They agreed to disguise $200,000,000 of effectively connected income FL expected to realize in respect of its partnership interests as "contingent interest" on the "loan" so Bayrock could fraudulently deduct, and FL fraudulently exclude, it from income, evading $80,00,000 of FL′s tax liability (thus the need for foreign partner withholding evasion).

123.    When Kriss objected to all this, Satter made him an offer he couldn′t refuse: either take $500,000, keep quiet, and leave all the rest of his money behind, or make trouble and be killed.

124.    Given Satter′s criminal history of kidnapping, illegal possession of assault weapons, assault with a deadly weapon, and recent threats to torture, kill, and dismember another Bayrock partner, Ernest Menes, if he didn′t stop complaining that Satter was skimming from Trump Camelback, this was no idle threat. Kriss took leave from Bayrock after the extortion.

125.    **The Satter Frauds II**. By late 2007, Satter′s $1,000,000 skims had reached $3,750,000. Pursuant to a "note" he executed in 2006, with "interest" he "owed" nearly $5,000,000, but Arif, Satter, and Schwarz always understood and considered the note to be a sham; Kriss even recorded

---

[6] Disguising the sale as a "loan", Arif, Satter, and Schwarz had Bayrock understate income by $42,000,000, automatically understating all partners′ distributive shares of income by $42,000,000 and eliminating $20,000,000 of tax distributions. This one step, Arif, Satter and Schwarz understating partnership income to evade their own tax, as a result automatically caused understatement of other partners′ income and loss of their tax distributions, a RICO injury.

Schwarz in 2008 admitting that to him, personally, in the presence of Arif, and implying they had withheld material information from the IRS during a 2007-2008 audit concerning that skim.

126.    Schwarz encouraged the New York Times to run a story about Satter′s mob ties, Exh. B, then used the negative publicity in an attempt to extort Arif and Satter into giving him Bayrock.

127.    Schwarz "suggested" Arif let Bayrock Group LLC redeem his membership interests for $6,000,000 and "suggested" Satter let Bayrock Group LLC use $5,000,000 to pay his personal tax debt and abandon his membership interests, or Schwarz would turn them in to the IRS, which was then auditing Bayrock Group LLC′s 2004 return and was very interested in the sham "loan".

128.    Arif refused to submit to extortion, and Satter, who knew about extortion, proffers, and cooperation agreements, knew Schwarz would not turn anyone in because Schwarz was up to his eyeballs in tax fraud and other crime and would never get immunity, so he also refused to submit.

129.    Bayrock′s audit problems tripled when iStar, $275,000,000 Trump SoHo lender, unhappy the article made them seem to be financing Mafia and Russian mobs, demanded to audit Bayrock, followed by the Sapirs, Bayrock′s Trump SoHo partner, demanding a forensic fraud audit.

130.    In response, Schwarz told Salomon to give misleading information to the auditors, telling him to disguise the $5,000,000 Satter "loan"; conspired with Halberg to conceal Satter′s Bayrock ownership from iStar; then retained Defendant Nixon Peabody to convince Arif Satter had to go.

131.    Arif, Satter, Schwarz, Salomon, and Nixon conspired to, and did, defraud the IRS, filing false schedules and returns saying Satter was a Bayrock Group LLC employee "paid" $4,200,000 of "loan cancellation" wages in 2007, paying the IRS $1,600,000 of "withholding" on his behalf.

132.    This was fraud. There was no "debt" and if there had been its cancellation could not have been wages because it has been black letter law for forty years that payments by a partnership to a partner are not wages for federal income tax purposes, and Nixon knew this and knew Satter was a partner, bemoaning the fact in emails and hand-wringing how to get away with it.

133.    An email from the same Nixon partner strongly suggests that some or all of Arif, Satter, Schwarz, and Salomon obstructed the United States Government Department ofTreasury by making false statements to the IRS in a 2007 audit of the 2004 partnership return and $3,750,000 Satter "loan", apparently testifying that Satter was an employee, which they knew was false.

134.    The sham $1,600,000 "withholding" was a pretext to pay Satter′s personal tax debt with misappropriated Bayrock money, so was $1,600,000 of unreported taxable income to him, and they knew it, and knew the amount was $1,000,000 low, that he owed more like $3,000,000, and knew they were evading $600,000 of interest and penalties, and the made-up $4,200,000 salary was a pretext to wipe the "loans" off the books, yet they filed the returns and schedules anyway.

135.    They filed the returns and schedules even though a tax partner at Nixon Peabody warned that if they did they risked years in prison for criminal tax avoidance.

136.    The Nixon partner responsible for Bayrock told them to ignore his tax partner′s warning of prosecution, saying if there were criminal charges they should all claim to have relied on Salomon′s advice in filing the fraudulent returns and schedules.

137.    Nixon and Akerman then went on to assist with the Satter cover-up and sham agreement to "separate" from Bayrock, which let Satter keep the $5,000,000 he "owed", the unpaid "principal" and accruing "interest" never to be spoken of; gave him $52,000 a month; let him transfer his Bayrock membership interests into a trust so he could pretend not to be an owner; and paid him $1,500,000 misappropriated from Bayrock, also illegally untaxed and unreported, disguised as an "investment" in a sham Delaware corporation, Bayrock Group Inc., Bayrock had never used since its formation, which Satter would purportedly use for some kind of "business".

138.    He also got an agreement to be paid millions of dollars to help the Cayres buy back Bayrock′s interest in a joint project he himself had insisted Bayrock buy into in 2007, to be paid to a Netherlands Antilles shell, just as he hid income and assets in his prior racketeering crimes.

27

THE CONSPIRATORS

139.    Arif, Satter, and Schwarz didn't commit these crimes and other wrongful acts alone. In their direct or derivative capacities Plaintiffs allege the following Defendants are liable for, variously, conspiracy to violate federal racketeering laws; civil conspiracy in the commission of or aid and abetment of Arif, Satter, and Schwarz's state law wrongs; and their own violations of substantive state law, including breaches of their own fiduciary, contract, and professional duties.

140.    **Akerman Senterfitt** conspired with Arif and Satter to perpetrate mail and wire fraud on the Cayres, aided and abetted Michael Samuels" breach of fiduciary duty he owed the Cayres, by doing so aided and abetted Arif and Satter's breach of fiduciary duty they owed Bayrock, and conspired with Arif, Satter, and Schwarz to deprive Elizabeth Thieriot of her member rights, aiding and abetting the breach of fiduciary duties they owed her and Bayrock by corruptly filing deceptive court papers and withholding documents to frustrate her proper exercise of those rights, and have suborned perjury in a scheme to fraudulently conceal Satter's Bayrock ownership.

141.    **Roberts & Holland** joined with Arif, Satter, Schwarz in conspiracy to commit money laundering to evade tax, counseling them to form the sham tax laundromat entity and to disguise the sale, for tax purposes, of partnership interests as a sham "loan" and effectively connected income as sham "contingent interest" all while tortiously interfering with Plaintiffs" contracts and aiding and abetting Arif, Satter, and Schwarz in embezzling from their minority partners and oppressing them to the point of repudiating their membership interests. Moreover, Roberts intentionally inflicted this harm on their own client Kriss. They engaged to be in attorney-client relationships with Bayrock entities and also, simultaneously, with Arif, Satter, Schwarz, and Kriss, yet never obtained conflict waivers or advised Kriss of conflict. They obeyed Schwarz's direction to ignore his interests, so were bribed to deprive him of their honest services.

142.    **Duval & Stachenfeld** joined in conspiracy with Roberts & Holland and the other FL Fraud conspirators, drafting the documents for the FL Fraud and issuing knowingly or recklessly

false "safety" opinions while knowing the transactions and consequences that would ensue would violate civil and criminal law, in so doing tortiously interfering with Plaintiffs' contracts and aiding and abetting Arif, Satter, and Schwarz in breaching their fiduciary duties to Plaintiffs and others and in their embezzlement, oppression, and repudiation of Plaintiffs and their rights.

143. **Alex Salomon and Salomon & Co.**, Bayrock's accountants, participated in planning and executing almost every if not literally every one of their tax frauds, as an accountant by preparing numerous fraudulent Bayrock returns and schedules and as more than an accountant, as a trusted business advisor, breaching his concomitant fiduciary duties to Bayrock entities as well as aiding and abetting the breach of others' duties to Plaintiffs.

144. **Nixon Peabody** conspired with Arif, Satter, Schwarz, and Salomon in the commission of the tax crimes associated with the cover-up of Satter's millions of dollars of skims and the preparation and filing of fraudulently returns and schedules falsely characterizing him as an employee, aiding and abetting their breaches of fiduciary duty to the company by facilitating the misappropriation of its assets, including without limitation the $1,600,000 illegally disguised as withholding and used to pay Satter's personal tax liabilities.

145. **Mel Dogan**, an attorney representing both Bayrock and Arif, conspired with Arif, Satter, and Schwarz in the FL Frauds by participating in the negotiation and translation of all the documents for Arif and counseling him to go ahead with the transaction even while knowing from his knowledge of Bayrock and its ownership structure that Arif's agreement would breach Arif's fiduciary duties to Plaintiffs and others, including Bayrock itself, Dogan's own client.".

146. **Brian Halberg**, who like Schwarz is both a general executive as well as in-house attorney at Bayrock, conspired with Arif, Satter, and Schwarz in defrauding auditors and lenders by giving them false or misleading information and conspired with them in their continuing tax frauds by wrongfully refusing Kriss's rightful demands for tax information, including without limitations K-1's and tax returns, depriving him of his opportunity to collect his tax distributions.

AD DAMNUM

147.     Plaintiffs unwittingly became minority members in and creditors of an organized criminal enterprise operated through perjury, embezzlement, tax evasion, extortion, bribery, and fraud.

148.     They did not bargain for this. That they were induced to associate with criminality is a renouncement of the essence of their bargain, that the parties consensually bound themselves in relationships mutually understood to be governed by the rule of law, not the rule of the Mafia.

149.     Plaintiffs seek monetary and equitable relief in two overarching alternate sets of theories:

A.     **Rescissory**. Plaintiffs acquiesce to the renouncements. Regardless of label, rescission for repudiation or anticipatory breach, forced buyout for majority oppression and squeeze-out, or voidance for fraud in the inducement, and regardless of jurisprudence in law or equity, Plaintiffs seek judgment that Defendants abrogated the relationships. Plaintiffs" chiefly plead the FL Frauds were repudiations of their memberships and pray for lost profit damages in an amount determined at trial, likely in excess of $25,000,000.

B.     **Remedial**. Alternatively, Plaintiffs hold Defendants to their bargains, and seek to remedy the direct and derivative harm done them. They seek to recover the distributions they failed to receive; the imposition of constructive trusts; the voidance of distributions from all Bayrock limited liability companies and other fraudulent transfers; declaratory judgments, and judicial dissolution of every juridical entity in the Bayrock Organization.

150.     Plaintiffs in addition, seek relief in RICO:

A.     **Legal**. Pursuant to §1964(c), Plaintiffs seek treble damages for their causal injury as pled subsequently *infra*, plus attorneys" fees and costs.

B.     **Equitable**. Pursuant to §1964(a), Plaintiffs seek equitable relief, including judgments from the Court divesting each Defendant of all interests in Bayrock; ordering each Defendant to disgorge the amount by which he was unjustly enriched; and ordering the dissolution, winding up, and terminal liquidation of all Bayrock entities.

## JURISDICTION AND VENUE

151.    This Court has jurisdiction pursuant to 28 USC §1331, the action arising under the laws of the United States; and 28 USC §1367(a), all other claims not arising under the laws of the United States so related to claims in this action that they form part of the same case or controversy under Article III, including claims that involve the joinder of additional parties.

152.    Venue is proper pursuant to 28 USC §1391(b)(2), a substantial part of the events or omissions giving rise to the claims occurring within this district, and a substantial part of property the subject of the action situated within this judicial district; and 28 USC §1391(b)(3), Defendant Bayrock Group LLC found within this district and Defendants not all residing in the same state.

# RULE 23.1 STATEMENT

**PLAINTIFF KRISS ATTESTS:**

153.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Group LLC, Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFF EJEKAM ATTESTS:**

154.    I am now and have been a member of, owning membership interests in, derivative Plaintiffs Bayrock Spring Street LLC, and Bayrock Whitestone LLC continuously from the earliest relevant date herein and at all times thereafter, including without limitation at the time of each and every transaction I complain of in the derivative claims.

**PLAINTIFFS KRISS AND EJEKAM BOTH ATTEST:**

155.    This action is not a collusive one to confer jurisdiction the court would otherwise lack.

156.    Demand would be futile. This is stated this with the following particularity:

157.    Defendants Arif, Satter, and Schwarz control Bayrock Group LLC, and have controlled it each alone, and together in combination, since no later than 2002 in the case of Arif, 2003 in the case of Arif and Satter, and 2005 in the case of Arif, Satter, and Schwarz.

158.    During those periods, they have not only controlled it, but dominated it to the extent they are and have been the sole f persons having *de jure* or *de facto* control over it. There are no other persons in the nature of independent managers or directors who could contest or overrule them. In particular, throughout these times Defendant Arif has been the only member of Bayrock Group LLC, which is member managed, whose membership interests have voting rights.

159. Through their control of Bayrock Group LLC they exercise both *de jure* and *de facto* control over all other Bayrock entities relevant to this action, including without limitation Spring Street and Whitestone, of which Bayrock Group LLC is the sole manager.

160. This Complaint in general and the derivative causes of action in particular are predicated on the continued, wrongful operation of these three derivative Plaintiffs for the personal benefit of (i) Arif, Satter, and Schwarz, as to Bayrock Group LLC; and (ii) Bayrock Group LLC, Arif, Satter, and Schwarz, as to Bayrock Spring Street LLC and Bayrock Whitestone LLC.

161. The acts complained of include not just civil wrongs but criminal acts of money laundering, tax evasion, perjury, obstruction of justice, mail fraud, wire fraud, bribery, honest services fraud, extortion, and embezzlement of a degree and nature and in respect of amounts so large that federal sentencing guidelines for a comparable criminal action would be in the decades.

162. None of Arif, Satter, or Schwarz can be expected to adequately pursue civil action against themselves which could result in such possible subsequent criminal liability, particularly where liability would depend on their own culpable mental state (mens rea or scienter).

163. Moreover, these acts complained of, for example the tax evasion, were acts whereby these Defendants used these derivative Plaintiffs as mediating agents to commit the crimes and related wrongs predominantly by engaging in transactions with third parties, many named as conspiracy Defendants in this action, in which they stood on both sides of the transaction, either directly, for example in the FL transactions whereby they stripped tens of millions of dollars of assets from Bayrock subsidiaries, including Spring Street and Whitestone, in order to gain access to $50,000,000 cash for the direct benefit of Bayrock Group and themselves personally, or constructively, because of conspiracy with the "other side", and so they are self-interested.

164. Moreover, no reasonable persons controlling these entities would, in the exercise of proper business judgment, commit these crimes and related civil wrongs, let alone on such terms.

165.    Finally, Kriss has made attempts to gain access to the books and records of Spring Street and Whitestone by proper demand and has been refused, and there is no reason to believe demand for action would meet with any different result other than refusal.

## PARTIES AND PERSONS OF INTEREST

**DEFENDANTS**

BAYROCK GROUP LLC AND CERTAIN SUBSIDIARIES

166.     Most of Bayrock's U.S. entities are contained in a hierarchy (the "Bayrock Hierarchy"):

A.     **Bayrock Group LLC**, is, and was at all times relevant, a duly organized and existing New York limited liability company Its principal place of business is New York.

167.     Subsidiaries ("Subs"), each controlled by Bayrock Group LLC as sole managing member, but none wholly owned by Bayrock Group, are passive holding companies, their only assets membership interests in lower tiers. Each has its principal place of business in New York.

A.     **Bayrock Spring Street, LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Trump SoHo hotel condominium project in New York.

B.     **Bayrock Camelback, LLC** is, and was at all times relevant, a duly organized and existing Arizona limited liability company. It is the holding company for Bayrock insider interests the Trump Camelback hotel condominium project in Phoenix.

C.     **Bayrock Merrimac, LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump International hotel condominium project in Fort Lauderdale.

D.     **Bayrock Whitestone LLC** is, and was at all times relevant, a duly organized and existing Delaware limited liability company. It is the holding company for Bayrock insider interests in the Waterpointe mixed use project in New York City.

E.     **Bayrock Ocean Club LLC** is, and was at all times relevant, a duly organized and existing Florida limited liability company. It is the holding company for Bayrock insider interests in the Trump Ocean Club hotel condominium project in Fort Lauderdale.

35

THE BAYROCK RICO DEFENDANTS

168.   **Tevfik Arif** ("Arif") is a natural person residing in New York.

169.   **Felix Satter** ("Satter") aka Felix Sater, is a natural person residing in New York.

170.   **Julius Schwarz** ("Schwarz") is a natural person residing in New Jersey.

THE RICO CONSPIRACY DEFENDANTS

171.   **Brian Halberg** ("Halberg") is a natural person residing in New York.

172.   **Salomon & Company, PC** ("Salomon & Co.") is, and was at all times relevant, a duly organized New York professional corporation.

173.   **Alex Salomon** ("Salomon") is a natural person residing in New York.

174.   **Jerry Weinrich** ("Weinrich") is a natural person residing in New York.

175.   **Roberts & Holland, LLP** ("Roberts") is, and was at all times relevant, a duly organized New York limited liability partnership.

176.   **Elliot Pisem** ("Pisem") is a natural person residing in New York.

177.   **Duval & Stachenfeld, LLP** ("Duval") is, and was at all times relevant, a duly organized New York limited liability partnership.

178.   **Bruce Stachenfeld** ("Stachenfeld") is a natural person residing in New York.

179.   **Craig Brown** ("Brown") is a natural person residing in New York.

180.   **David Granin** ("Granin") is a natural person residing in New York.

181.   **Mel Dogan** ("Dogan") is a natural person, residing and in New York.

OTHER DEFENDANTS

182.   **Akerman Senterfitt LLP** ("Akerman") is, and was at all times mentioned herein, a duly organized Florida limited liability partnership.

183.   **Martin Domb** ("Domb") is a natural person residing in New York.

184. **Nixon Peabody, LLP** ("Nixon") is, and was at all times relevant, a duly organized New York limited liability partnership.

185. **Adam Gilbert** is a natural person residing in New York.

186. **Bayrock Group, Inc.** is, and was at all times relevant, a duly organized Delaware corporation.

187. **Michael Samuel** is a natural person residing in New York and Florida.

188. **Salvatore Lauria** is a natural person residing in Connecticut and Florida.

189. **National Union Fire Insurance Co. of Pittsburgh, PA.** is, and was at all times relevant, a duly organized Pennsylsania corporation.

190. **John Does 1-50** are "Company Entities", as defined in ¶425, their identity unknown.

191. **John Does 51-100**. Are a certain trust settled by Satter in 2008 and such other juridical entities, as defined herein, through which he has participated in Bayrock activities.

**PLAINTIFFS**

192. **Jody Kriss** ("Kriss") is a natural person residing in New York.

193. **Michael Chudi Ejekam** ("Ejekam") is a natural person and United States citizen.

**NON-PARTIES OF INTEREST**

194. **Beau Woodring** is a natural person residing in Arizona.

195. **FL Group ehf** is an Icelandic investment company, since 2008 known as Stodir.

196. **Elizabeth Thieriot** is a natural person residing in California.

197. **Cayres** are a family of natural persons, investors and developers residing in New York.

198. **Maria Simonchy** is a natural person residing in New York. She has always been at all relevant times Arif's email agent, unless otherwise stated all emails addressed to her are alleged to have been received by Arif and all emails sent by her are alleged to have been sent by Arif.

# ALLEGATIONS

### THE SATTER FRAUDS I

##### SATTER'S INFILTRATION INTO BAYROCK

199.    Soon after Arif formed Bayrock Group LLC in 2002 as the ultimate control parent of the Bayrock Hiearchy, Satter joined Bayrock. He had been working as a commission broker, trying to raise money for development companies; one of his few successes was a deal on a Florida project to be done jointly by New York developer Michael Samuel and a New York family, the Cayres.

200.    As a success fee for brokering that deal, called Midtown Miami, Satter was paid in kind in the form of a personal option to buy a membership interest, conveying a 5% profit interest, in one of the project limited liability companies (a Midtown Miami "Sub") for $450,000.

201.    Claiming not to have the cash, Satter got permission for his neighbor Arif to have Bayrock pay the $450,000 for 50% of Satter's 5%. They formed Bayrock Midtown LLC, one of the first Subs. Bayrock Group LLC took 100% of the membership capital interests in Bayrock Midtown and Bayrock Group LLC and Satter each took 50% of the membership profits interests, then Bayrock Group LLC contributed $450,000 to Bayrock Midtown which contributed it on to the Midtown Miami Sub, receiving in return 5% of its membership interests.

202.    Meanwhile, between 2000, when he had just come to the United States, and that time in 2002, Arif, using the progenitor of what was becoming Bayrock, had started several development projects and, most prominently, had acquired a large income project, Loehmann's Plaza in Brooklyn, for which he paid about $16,000,000 and would sell in a few years for $23,000,000.

##### PRIOR CONVICTION FOR CRIMINAL RICO

203.    When Satter infiltrated Bayrock in 2002, he was awaiting sentencing for his guilty plea for violating criminal RICO, ████████████, Exh. A., revealing his participation in securities fraud, money laundering, ████████████████████

████████ ██ ████ ██ ██ ████ ███ ██ ████ ██ ████ ██
████████████████

204.    Satter committed these crimes in connection with his founding (with several partners in crime, one of whom, Sal Lauria, he would take with him to Bayrock) and operation of a Russian and Mafia stock brokerage "pump and dump" operation variously known as "White Rock Partners" and "State Street Capital Markets", which defrauded its victims of $40,000,000[7].

205.    Although he proffered and agreed to cooperate in 1998, Exh. A, Satter was not convicted until 2004, Exh. C, well within the 10-year window of FRE 609(b), and the nature and degree of his crimes, the number of victims and the amount they were defrauded of, about $40,000,000, would qualify for the 609(b) exemption in any event.

206.    His criminal activities eventually attracted the attention of the FBI's Russian organized crime squad, largely because he and a Russian mob confederate, Gennady Klotsman, who has since returned to Russia after serving his term for these crimes, left a locker full of incriminating documents and TEC-9 assault weapons without paying the rent and it was eventually broken into by the owner. Their ensuing investigation culminated in a 1998 Complaint and Affidavit in

---

[7] Satter was deposed Marcy 9, 2010 in *Bernstein v. Bayrock Group LLC*. Here is his testimony about his racketeering:

Q.        Were you ever convicted of a crime?

A.        Yes.

Q.        What was the crime you were convicted of?

A.        I was convicted of assault one.

Q.        Were you ever convicted of any other crimes?

A.        On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself nor does this business litigation have anything to do or bearing on whether I am convicted of any crimes or not. On the advice of counsel, I won't answer past what I have already answered.

Q.        You already answered you were convicted of assault?

A.        Yes.

Q.        If you have actually been convicted, the fact that you have been convicted cannot constitute any testimony against your own interests and goes to your credibility depending upon what the nature of conviction was and if it goes to a conviction related to something related to any sort of fraud, et cetera, it is relevant to your credibility as a witness in this case.

A.        Probably not a very credible witness to begin with.

Support of Arrest Warrant issued against Satter and Klotsman, resulting in Satter"s proffer, guilty plea, cooperation agreement, and sentencing on federal racketeering charges (Klotsman pled guilty and was sentenced to 71 months in jail and $49,999,999 in restitution).

207.    His frauds ████████████████████████, include:



The securities frauds conducted through White Rock, commonly referred to as "pump and dump" schemes, went essentially as follows. ████████████ Sater secretly acquired large blocks of stock of publicly traded companies, including Holly Products Inc. ("Holly Products"). To control this sock, Klotsman and Sater put shares in the brokerage accounts of foreign corporations ████████████████████████████████ Sater then used White Rock to underwrite initial public offerings for Holly Products and enlisted brokers at White Rock and other firms to hype the stock to retail customers. To inflate the demand, ████████ ████ Sater made secret payoffs (in cash or securities) to brokers at White Rock and other firms based on the sales they generated. As brokers generated demand for the stock, ████████████ Sater sold the shares ████ secretly controlled, generating more than $10 million in profits which were then laundered through various offshore and domestic accounts.

208.    The Complaint describes frauds besides Holly Products, and the money laundering Satter used, including 30 foreign shell companies and corresponding bank accounts in Switzerland, Luxembourg, the Netherlands, Ireland, the Channel Islands, and the Netherlands Antilles[8].

---

[8] There is remarkable similarity between method of operation of State Street and the methods of operation of Bayrock, including ████████████████████████ the frauds on partners and on the public, Satter"s use or planned use of shell companies ████████████████ e.g. ¶138, and the use of dummy companies like Bayrock Group Inc. through which Bayrock funneled at least $1,5000,000 of unreported, untaxed income to Satter so he and Bayrock could pretend he had separated from Bayrock, his membership interests transfered into a "trust" for his wife for additional plausible deniability of his Bayrock ownership.

209.    Twenty of Satter's White Rock confederates, including members of the Bonanno, Gambino, and Colombo Mafia organized crime families, were also convicted, many on racketeering charges. Most were sentenced to prison terms and multimillion dollar restitution.

210.    This was Satter's second felony conviction; he was convicted in 1993 of first-degree assault with intent to cause serious injury with a weapon and imprisoned for 1-1/2 to 4-1/2 years.

211.    On his release from prison, Satter was perpetrating his crimes at White Rock <u>even while still on parole</u> for that assault conviction.

212.    And, █████████████████████████████████, he ran White Rock even though he had been barred by the NASD from working in a significant capacity in the securities industry[9]:

213.    In short, while still on parole from his previous felony conviction for assault with a deadly weapon, Satter defrauded the NASD; hid his active role in the operation of a Mafia and Russian mob securities broker/dealer racketeering enterprise through a pattern of predicate crimes including threats of violence; hid his partnership in the firm; failed to report millions of dollars of taxable income; defrauded investors; and laundered the proceeds of its illegal activities.

214.    So it is no surprise that in late 2002, while not even sentenced yet for these racketeering crimes and still cooperating with the US Attorney's Office, Satter proceeded to do the same thing right under the nose of the U.S. Probation office, commencing his next racketeering crimes while still involved with, in fact while not even yet sentenced for, his last.

---

[9] ██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

SATTER INFILTRATES BAYROCK AND THE RACKETEERING STARTS

215.    Satter infiltrated Bayrock in 2002, soon becoming Arif's covert majority partner, hiding his partnership in Bayrock[10], then proceeded to skim off and fail to report millions of dollars of taxable cash income; hide his participation in the operation and management of all aspects of Bayrock Group LLC, including through a pattern of predicate crimes including threats of violence; defrauding investors, lenders, and partners; laundering the proceeds of Bayrock"s illegal activities; and defrauding and deceiving the U.S. Judiciary, obstructing justice by giving false, misleading, and incomplete information to a U.S. Probation Officer.

216.    At this time, late 2002 to early 2003, Satter still had not yet been sentenced for his State Street racketeering, and he knew in the presentence investigation he would be required to disclose complete, accurate information about his income, assets, and ability to pay restitution, and he knew that his near million dollar a year income and ownership of more than half the company would subject him to significant restitution order, like his Mafia and Russian mob co-defendants.

217.    So in February 2003 Arif conspired with Satter to, and did, hide his ownership of, and income from, Bayrock, allowing Satter to skim the better part of a million dollars a year in cash, unreported and untaxed, the money sometimes wired to Satter"s wife or third parties. The pretext was that these were "loans", but Arif and Satter never took that seriously, as shown *infra*.

218.    Satter obstructed justice by giving false or misleading information to a U.S. Probation Officer, in violation of 18 USC §1503. ███████████████████████████

███████████████████████████████████

---

[10] Details and documentation, including a signed, witnessed, and notarized Bayrock document explicitly confirming that since no later than January 1, 2003, Satter owned very substantial, approximately 50%, membership interests in each and every one of Bayrock Group LLC and related companies, Exh. D., are alleged in the OWNERSHIP FRAUDS section. Satter owned about 50% of the equity in each and every Bayrock company, not just Bayrock Group LLC but also all the subsidiaries and lower-tier companies and so mathematically owned about 62% of Bayrock overall, having a 50% of all the distributions at each and every level of the hierarchy as they "bubbled up" from the lower tiers, are in the COMPENSATION FRAUDS allegations *infra*)



219.    This was also mail or wire fraud, 18 USC §1341 or 1343: He defrauded the Probation

Office in order to deprive his racketeering victims of restitution by understating his ability to pay.

220.

    A.

B.   Satter's "advances" ███████████████; by the scheduled time of his sentencing, █ ████████████████████ in July 2004, ████ were $822,000:

| | |
|---|---|
| 02.14.2003 | $250,000 |
| 12.03.2003 | $100,000 (Bayrock paid this to Satter's wife Viktoria) |
| 03.09.2004 | $ 77,000 (Bayrock paid this to his landlord for 7 months rent) |
| 03.19.2004 | $100,000 |
| 05.13.2004 | $175,000 (Bayrock paid this to attorney escrow for his house) |
| 07.02.2004 | $ 14,000 (Bayrock paid this to Satter's mortgage company) |
| 07.08.2004 | $106,000 |

C.   These "advances" were sham "loans" never intended to be repaid, a pretext to let him skim what would total $3,750,000 cash by 2007, almost $1,000,000 per year, without paying tax. This scheme is detailed *infra*. Of course he gave no documentation of the advance; there wasn't any to give, and wouldn't be for years until a sham "note" in 2006.

D.   ████████████████████████████████████████████████████
████████████████████████████████████████████

E.   Satter didn't have a monthly income of $0, he had the equivalent of an over $1,000,000 salary because he skimmed $50,000 to $100,000 month after month, tax-free.

F.   ████████████████████████████████████████████ he was in contract on a $1,750,000 Sands Point mansion, but he delayed the close until the report was done. When he closed in July 2004, Bayrock paid his $175,000 down payment and he took mortgages of $1,600,000. Disclosure should reveal his mortgage applications told the lenders a story quite different from the "██████████████████████████ ████████████████████████" story he gave the Probation Officer.

221.   At the time of his sentencing █████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ he

44

owned most of Bayrock, his membership interests were worth millions of dollars, he had the equivalent of a million dollar a year salary, was committing millions of dollars of tax fraud by hiding income skimmed from Bayrock, and had just purchased a $1,750,000 mansion.

SKIMMING ALMOST $1,000,000 A YEAR

222.    From 2003 Arif and Satter, then from 2005 with Schwarz, arranged for and participated in Satter's skimming almost $1,000,000 per year of unreported and untaxed cash from Bayrock Group LLC. By 2007 Satter had skimmed off the following amounts, counting amounts Bayrock paid for his personal American Express bills:

| Year | Amount Skimmed | Cumulative Amount Skimmed | With Interest (Approx.) |
|------|----------------|---------------------------|-------------------------|
| 2003 | $ 355,000.00 | $ 355,000.00 | $ 372,750 |
| 2004 | $ 578,201.29 | $ 933,201.29 | $ 1,017,136 |
| 2005 | $ 673,160.25 | $ 1,606,361.54 | $ 1,825,668 |
| 2006 | $ 654,965.20 | $ 2,261,326.74 | $ 2,695,948 |
| 2007 | $ 1,475,085.05 | $ 3,736,411.79 | $ 4,514,382 |

223.    That's almost $5,000,000 Satter "owed" by the end of 2007, or $1,000,000 a year.

224.    Bayrock Group LLC's monthly dashboard books, kept by Bayrock bookkeepers Maria Simonchy and Sofia Kontorovich, showed these skims as "loans" to Satter; there's a whole cash sub-account dedicated just to these recurring "loans", showing Arif, Satter, and Schwarz's intent to keep them going month after month, year after year, but there is never a dime of principal repayment recorded, and the dashboard spreadsheets don't include provision for interest accrual.

225.    And, while they were on the cash ledgers as "loans", not one penny of these "loans" were properly reported on the Bayrock Group LLC partnership tax returns[11].

---

[11] True "loans" from Bayrock Group LLC, would be balance sheet assets, but the balance sheets on the 2004, 2005, and 2006 partnership returns as prepared by Alex Salomon and physically delivered by common carrier to Bayrock for subscription and filing show no corresponding entries. Excerpts, These "loans" continued to foul the Bayrock Group LLC returns until they got audited for 2004 by the IRS in 2007 and, with the complicity of Nixon Peabody, decided the best way to handle these "loans" was to commit tax fraud, perjury, and obstruction and pretend they were "employee loans" and subscribe and file fraudulent returns and schedules to cover this up; this is alleged in detail *infra*.

226.     Arif, Satter, and Schwarz never respected the skims as "loans", for good reason: When he joined Bayrock, supposedly his only asset was his Bayrock interest. No creditor would have lent him millions as he had nothing ex Bayrock to repay it with. Nothing he would admit, anyway. His presentencing report says



227.     It′s possible his "couple million dollars" of racketeering proceeds survived his conviction and sentencing and that he showed Arif he had it stashed overseas so was a good credit risk, and this knowledge reassured Arif; this cannot be known until disclosure, though it is unlikely Satter or Arif will actually testify Satter had these illegally obtained millions to support his "credit."

228.     Meanwhile Schwarz, Bayrock′s general counsel, knew all along these "loans" were shams and were tax evasion. Evidence of that comes from a Schwarz himself:

229.     One example is Schwarz′s recent deposition testimony in an unrelated case that he was aware of those constant, month after month, continuing payments of cash to Satter and that he believed they weren′t "loans", but compensation[12].

---

[12] From Schwarz″s March 5, 2010 deposition in *Bertnstein v. Bayrock Group LLC* (for brevity slightly redacted):

Q.     Felix Sater was given money by Bayrock group LLC in exchange for his services?  True or false?

A.     Yes.

Q.     What did Felix Sater do or promise to do in return for the money?

A.     His job was to source and obtain transactions for the company.

Q.     Was the money paid to him in consideration for his doing that or was it lent to him in consideration for his repaying [it]?

A.     I would stay it was -- I guess in my view he was paid for him in consideration of doing that.

Q.     Then it was not a loan; it was pay?

A.     I would say that is probably correct.

230.    But the best example was in May 2008, when Kriss recorded Schwarz admitting the Satter "loan" was always a sham. Understanding the context of that recording requires these facts:

231.    In 2006, when Satter's skim ("loan") exceeded $2,000,000, climbing with no end in sight, Satter executed a sham "note"; before that there was nothing, no documentation at all, which is why Satter never showed documentation to the Probation Officer, ¶218.

232.    By late 2007, Satter's "loan", with sham "accrued interest", was near $5,000,000. ¶223.

233.    Then, in late 2007, the IRS commenced an audit of Bayrock Group LLC for the tax year 2004. The major issue was the failure of Bayrock Group LLC to accrue interest on that "loan".

234.    At the same time, a major Trump SoHo lender, iStar, and a Trump SoHo money partner, the Sapir Organization, demanded their own audits of Bayrock Group LLC, so Bayrock faced a triple audit nightmare scenario with the $5,000,000 Satter "loan" (and far more) fouling its books.

235.    As alleged, fn. 11, their response to the audits was to engage in criminal conspiracy to paper the skim, subscribing and filing false returns and schedules and misappropriating millions of dollars of Bayrock's cash, itself the proceeds of illegal activity from the FL Frauds, *infra*, to pay Satter's personal tax liability, by doing so giving him more intentionally unreported income.

236.    Details of this cover-up are in the SATTER FRAUDS II section *infra*. Important now is the recording Kriss made in May 2008. Kriss had left Bayrock before the IRS and other audits and had not been involved in Satter's compensation other than being told it was a "loan" and not his business, so when he was again at Bayrock briefly in 2008 and asked Arif and Schwarz in that meeting why they used Bayrock's money to pay Felix's personal taxes, Schwarz admitted, in front of Arif, that they did it because he (Schwarz, their general counsel) knew Arif faced serious legal liability for having paid Satter millions of dollars off the books all those years, adding:

> But...he [Satter] also has a note separate from that...a promissory note...**we could have kept the fallacy going that he was paying off the note**...we got worried about the IRS so we paid his payroll taxes because he had an employment agreement at the same time as the note...so the IRS could have seen both and made a determination he was an employee...[Bracketed text and emphasis added]

47

237.    That is a smoking gun. That is Schwarz, Bayrock's $720,000-a-year counsel, admitting that the "note" was a sham, never meant to be repaid, and that he, Arif, and Satter always knew it.

238.    That is the *scienter* of criminal tax fraud (and mail and wire fraud), letting Satter skim millions of dollars year in and year out in unreported cash on the pretext that these were "loans".

239.    If there were any doubt of Satter's own *scienter* that the "loans" were shams, recall that Sands Point mansion Satter bought for $1,750,000 in 2004 but ███████████████████ ████████████████████████████████████.

240.    Satter paid for that mansion from three sources, a first mortgage for $1,400,000; a second mortgage for $200,000, and the remaining $175,000 with another skim from Bayrock, that $175,000 wired directly from Bayrock to the attorney's escrow account to avoid detection.

241.    There is little doubt that in disclosure, production of Satter's mortgage application will reveal he did not tell his mortgage lenders, that he had no assets, a negative ██████ net worth, no salary, no income, had "borrowed" the down payment, and was living hand to mouth dependent on "advances" from Arif, but rather gave them a very different story about his assets, liabilities, income, and occupation.

242.    And how did Satter think he could service the principal, interest, taxes, and insurance on the mortgages if the money he had got from Bayrock had really been *ad hoc* "advances", how did he think he could pay about $15,000 per month, plus the █████ monthly household expenses he ████████████████████████████ – that's a monthly nut ██████ after tax, for which he would need a $400,000 annual pre-tax income – unless he knew his $50,000 to $75,000 a month skim from Bayrock would go on indefinitely, which of course is the point, that these were not "loans" and that he and Arif always intended the skims to go on indefinitely, as they did.

243.    There's email evidence of that, too. In 2007, when things were going well and Bayrock companies realized income of $45,000,000 (the companies didn't report any of that income, but rather criminally disguised it as non-taxable "loan" proceeds in order to evade $20,000,000 of

tax; this is alleged in detail in the FL FRAUDS section, *infra*), there were email exchanges discussing what "bonuses" should be given out in respect of this good fortune.

244. These emails show the employees were slated for bonus salary payments of varying amounts and how the partners were slated for bonus distributions in respect of their partnership interests of varying amounts (of course, the distributions to the partners weren't treated properly for federal income tax purposes as distributions, but were criminally disguised as "salary" payments and fraudulently deducted or capitalized; this is alleged in detail in the OWNERSHIP FRAUDS section, *infra*), Satter $500,000, Kriss $500,000, and Schwarz $300,000).

245. Notice this email exchange, in which Satter says, as an aside, since this was par for the course at Bayrock, "...and my bonus isn't a bonus. It's a „loan". Add it onto my „loan" balance)." That is, another smoking gun: Satter felt free when there was taxable income coming his way to just take it and simply say, "Call it a „loan", don't report it for tax purposes, just put it on my tab."

> From: Maryellen Breen [at Salomon & Co.]
> Sent: Friday, June 8, 2007
> To: Felix Satter
> Subject: Bonus
>
> Dear Felix:
>
> I received an e-mai l from Jody indicating a bonus to you of $1 million. When I met with Tevfik, he said that you weren't taking this. Let me know what the situation is.
>
> From: Felix Sater
> Sent: Tue June 26, 2007
> To: Alex Salomon
> Subject: Bonus
>
> I told Tevfik it was too much and had only $500K transferred to me. And its not a bonus it should be added to my debt. Are you available for a call today.

246. Arif approved it, and after he joined Bayrock in 2005 so did Schwarz, who knew all along it was payment for services and thus tax fraud but approved it anyway, intending to use it against Arif and Satter in his own interests, which he did in 2007 when he tried to extort them.

**THE CAYRE FRAUDS**

247.    The last section alleged Arif, Satter, and Schwarz's use of sham "loans" in the context of compensation fraud, illegally disguising taxable transfers of money from a partnership, Bayrock Group LLC, to a partner, Satter, as such a "loan". This section alleges another of their uses of sham "loans", in the context of debt/equity fraud, illegally disguising a partner as a "lender".

248.    These and subsequent allegations employ the following standard conventions:

249.    **Membership Interest** means the totality of a member's interests in a limited liability company. By definition, membership interests are contain two disjoint subsets of rights, *viz*:

  A.    Governance Components of membership interests convey the right to participate in management of the company, *e.g.* by voting, consent, or access to information.

  B.    Financial Interest Components convey the right to distributions from the company. It may convey a capital or a profits interest, but not both, as they are mutually exclusive.

  I.    Capital Interest means an interest that would give the holder a share of the proceeds if the partnership's[13, 14] assets were sold at fair market value and then the proceeds were distributed in a complete liquidation of the partnership. This determination generally is made at the time of receipt of the partnership interest.

  II.    Profits Interest means "[A] partnership interest other than a capital interest."

250.    These examples illustrate the important concepts used in subsequent allegations.

Hypothetical 1. A and B form limited liability company AB, a tax partnership. Each contributes $50. The business of AB is to invest $100 in project X for some indefinite term, then liquidate and distribute the residual equity, after all liabilities, to each 50:50.

Each of A and B has an identical 50% capital interest, capital not profits because if they were to liquidate instantly after formation each would receive a liquidating distribution.

---

[13] By tradition, "partnership", "partnership interest" and "partner" are used in the federal income taxation of limited liability companies taxed as partnerships and their members, and in context refer to the appropriate equivalents of membership, membership interest, and member

[14] Rev. Proc. 93-27, pursuant to the Internal Revenue Code of 1986 ("IRC" or "Code") and its regulations ("Reg.").

Hypothetical 2. The same as Hypothetical 1, but at liquidation A will receive 100% of the distributions until she has received $50, then B will receive the next $50, thereafter each will receive 50:50 to exhaustion.

A and B each have a capital interest, but not equal. A″s interest at receipt (and after) is worth more than B″s because of the possibility the liquidating distribution will total less than $100, so A″s return priority makes her interest worth more than B″s, so A owns more than 50% of the equity; equivalently A owns more than 50% of the membership interests.

Hypothetical 3. The same as Hypthetical 1, but at liquidation A″s "accreted amount" will be the future value of $50 accreted at a preference return of 8.5% annually. B″s "accreted amount" will be $50. At liquidation they will share each dollar of distribution *pro rata* by accretion amount until each has received such amount, then 50:50 thereafter.

If liquidation occurs in 5 years, A″s accreted amount will be $76.48. A and B will share each dollar of distribution in the ratio 76.48:50 for the first $126.48 and 50:50 thereafter. A″s preference return makes her interest worth more than B″s, thus A owns more than 50% of the equity.

Hypothetical 4. A, B, and C form limited liability company ABC. A and B contribute $50, C contributes his services. At liquidation A will receive 100% of all distributions until she has received the then-future value of her $50 accreted at 8.5%. B will receive 100% of the next $50. Thereafter C will receive 66.67%, and A and B each 16.67%. The business of the company will be to invest in a fixed index of U.S. value stocks for 5 years and then liquidate. There will be no interim distributions before termination.

A and B have capital interests. C, who would get nothing in an instantaneous liquidation immediately upon receipt of his interest at formation, has a compensatory profits interest.

Assuming that the stock index is well modeled by standard Black Scholes option pricing, assuming no dividend yield, a risk free rate of 5%, and 25% volatility: The net present value at formation of A, B and C″s interests are $60, $28, and $12, so at formation they each own 60%, 28%, and 12% of equity in the company, respectively.

Hypothetical 5. The same as Hypothetical 4, but ABC will invest in an index of extremely risky small-cap technology stocks with 80% volatility, and for 10 years, not 5.

The net present value at formation of A, B and C″s interests are $27, $18, and $55, so at formation they each own, respectively, 27%, 18%, and 55% of the company.

251. Membership interests are contingent, residual claims on the company″s equity, so like all forms of equity are call options on the partnership″s terminal wealth. Typically, profits interests as call options are struck "at the money" or "out of the money" relative to the fair market value of the partnership on receipt of the interest, conveying a "stake" in some part of future wealth accretion only, but that need not be the case. Moreover, the present expected value of a profits interest can exceed, sometimes greatly exceed, the value of even all the capital interests together.

51

FRAUD ON THE CAYRES

252.    In late 2002, shortly after Samuel and the Cayres engaged in the Midtown Miami project together, ¶199, the Cayres bought a building near the site to convert to condominiums and offered Samuel a 50% straight up (both capital and profits interests) share of the project, his role in the project to include shared management and operational authority, as it did in Midtown Miami.

253.    Figure 4 shows the Banyan Bay structure as the Cayres thought it was, one lower-tier entity, Sobay Partners LLC, developing the project and two holding company Subs, Samuel Banyan LLC for Samuel″s 50% of the Sobay membership interests and Cayre Banyan LLC for the Cayres″. It was a condition precedent to Samuel″s partnership that he and related parties own at least 50% of the membership interests in Samuel Banyan LLC. This is common in the industry; partners often want to be sure each has "skin in the game". The prohibition is in the limited liability agreement for Sobay Partners LLC[15].



FIGURE 4

254.    That″s the structure the Cayres thought it was, but not what it really was, because Arif, Satter, and Schwarz, with the knowing facilitation of Akerman Senterfitt, defrauded them.

---

[15] The relevant provisions provided:

"Samuel Owners" means those Persons who own the membership interests of [Samuel Banyan LLC]. At the time of this Agreement, Samuel represents that the Samuel Owners consist of Michael Samuel and _____, however, at any time, Michael Samuel may, at his sole discretion, transfer all, or any part, of such membership interests to members of his immediate family, to the Samuel Family Foundation, and/or to his employees...Samuel Owners shall obtain Cayre″s written consent prior to effectuating any transfer(s) of their membership interests in Samuel to Persons who are not Michael Samuel Affiliates if such transfer(s) would reduce the Percentage Interest in the Company owned by Michael Samuel Affiliates (as a result of their ownership of Samuel) to less than 25%).

"Transfer" means any transfer, assignment, sale, or conveyance, hypothecation, license, lease, partition, pledge or grant of a security interest...

Except as otherwise provided in this Agreement, no Member may Transfer the whole or any part of its Membership Interest without the prior written consent of the Members holding, in aggregate, at least 80% of the Percentage Interests ... which consent may be given or withheld in the sole and absolute discretion of such other Members.

255.    To enter this partnership, Samuel Banyan had to make a $750,000 initial contribution to Sobay, plus future capital calls. Samuel estimated he would need $2,000,000, but he had no cash.

256.    He "solved" this by covertly, and illegally, giving Bayrock 80%, and Satter 10%[16], of the Samuel Banyan membership interests. In return Bayrock agreed to put up all the money for him.

257.    They concealed from the Cayres that mob-infiltrated, owned, and operated Bayrock, not Samuel, was their true, 90% partner in Banyan Bay, Samuel merely the "beard", with a 10% cut.

258.    First, Satter formed Alarga Banyan LLC, a shell company owned by his wife as part of the ongoing concealment of his Bayrock ownership and assets (this was in late 2002, when Satter was still awaiting sentencing for his prior racketeering crimes and was still facing a potential $80,000,000 restitution order; in fact this was happening just weeks before the time that Satter's near million dollar a year skim would start); Alarga Banyan would hold Satter's 10%.

259.    Second, Arif and Satter had Bayrock Group LLC form Bayrock Banyan LLC to serve as a holding company conduit subsidiary (a "Sub") for Bayrock's 80%.

260.    Then they employed two artifices to defraud, the first their own, the second Akerman's, the result of which was to make Bayrock Banyan an 80% member, and Alarga a 10% member, in Samuel Banyan LLC, legally, equitably, for tax purposes, in every way but the label.

261.    **The "Option" Fraud**. They had Samuel Banyan LLC issue a sham "option" to Alarga entitling it to acquire, for $1, 10% of the Samuel Banyan membership interests. Alarga paid nothing for it. The pretense that this didn't transfer the 10% to Alarga, just the right to acquire it for $1, is so clearly a sham, the "option" having no optionality, the transaction the legal, equitable, and tax equivalent of ownership, it's laughable anyone would try to get away with it.

---

[16] Of the Banyan Bay proceeds distributed upstream from Sobay into Samuel Banyan, Bayrock would get a priority return of its capital, a 9% preference return, an 50% thereafter. Satter would get 25%. Based on the then-expected contributions and profits, Bayrock would own about 80%, and Satter 10%, of the equity in Samuel Banyan. For example, if Bayrock contributed $2,500,000 and the project paid off in 3 years with $10,000,000, Samuel Banyan's share would be $5,000,000, of which Bayrock would get its accreted $3,200,000 plus 50% of $1,800,000; Satter would get 25% of the $1,800,000; and Samuel 25% of the $1,800,000, or $450,000, less than 10% of all the distributions.

262. **The "Convertible Note" Fraud**. This is the artifice to defraud that Akerman built, which made Bayrock Banyan LLC an 80% member in Samuel Banyan LLC in every way but the label.

263. First, Akerman wrote a "new" limited liability company agreement for Samuel Banyan.

264. The existing, "old" agreement was a single member agreement, Michael Samuel the only member; that's the Samuel Banyan LLC limited liability company agreement the Cayres saw.

265. The "new" agreement had Bayrock Banyan and Michael Samuel both members. In return for its membership interests, Bayrock Banyan contributed $750,000 initially, plus more capital as needed to match capital calls Sobay made on Samuel Banyan, possibly millions of dollars.

266. The financial interest components of Bayrock Banyan's membership interest conveyed the right to distributions of a priority return of capital, then a 9% preference, then 50% thereafter.

267. The governance components of Bayrock Banyan's membership interest conveyed veto, management, and access rights.

268. But they didn't execute it. If they had, Samuel would have only 10% of the membership interests in Samuel Banyan LLC, a breach of the Sobay proscription, ¶253. Instead they concealed it from the Cayres and privately agreed among themselves to "deem" it executed; how they perpetrated that deceit (not execute it but "deem" it executed) is at the heart of this section:

269. Then they had Samuel Banyan issue Bayrock Banyan a sham "note". According to its terms, Bayrock Banyan would "lend" $750,000 to Samuel Banyan and would make further "loans" equal to whatever capital calls Sobay made on Samuel Banyan, up to millions of dollars.

270. In return, the "note" obligated Samuel Banyan to "repay" the money at "interest" (to match the preference return in the "deemed" agreement), payable at the back end.

271. The "note" had an "option". At any time, Bayrock Banyan could convert it into the same membership interest in Samuel Banyan conveying the priority return, preference return, and 50% of distributions after, defined in the "new" Samuel Banyan limited liability company agreement, and if and when Bayrock Banyan did "convert", the "new" agreement replaced the "old" one.

272.    The "note" replicated the economics of Bayrock Banyan''s membership interest''s priority return as defined in the "new" agreement, and the economics of its membership interest''s preference return as defined in the "new" agreement, together about ¾ of its value; then, after that money was realized, the "note" would be "converted" into the membership interest in the "new" agreement it really always was, to let Bayrock Banyan pick up the remaining 50% trailing share of any subsequent distributions, about ¼ of its value.

273.    This was debt/equity fraud. First, the sham "note" replicated ¾ the economic substance of the membership interest it was designed to substitute for explicitly, and ¼ the economic substance implicitly, through the "option".

274.    "Deemed". Second, the "new" Samuel Banyan limited liability company agreement was "deemed", but not literally, executed, ¶268. This is the smoking gun:

275.    Incredibly, the "note" provided that even before "conversion", while Samuel Banyan and Bayrock Banyan were still pretending to be debtor and creditor, <u>Bayrock Banyan could exercise every one of the rights it could exercise as a member of Samuel Banyan pursuant to the hidden, "new" limited liability company agreement after a conversion, the "note" thus intentionally replicating not only the financial interest component of membership interest, but the governance component, too.</u>



FIGURE 5

276.    In short, they gave 10% of the partnership interests in Samuel Banyan to Satter, disguised as a "penny warrant", and 80% to Bayrock Banyan disguised as a sham "note", and the only reason for these disguises in label was to circumvent the proscription in the Sobay agreement and defraud the Cayres. Figure 5 shows the Banyan Bay structure as it really was, from the very start.

FRAUD ON BAYROCK

277. What goes around, comes around. It can be no surprise that if Michael Samuel would defraud his own partners the Cayres, he would defraud Arif, Satter, Schwarz, and Bayrock, as well. Or steal from them, which he did, embezzling a total of over $4,000,000 in 2004 and 2005.

278. By 2004, Bayrock Banyan LLC had "lent" about $2,500,000 to Samuel Banyan LLC. It made no more "loans", and by 2006 was "owed" about $3,200,000, with the "interest".

279. Or in the real, not sham, version, by 2004 Bayrock Banyan had contributed $2,500,000 in capital to Samuel Banyan, and by 2006 its accrued preference return was about $700,000.

280. Pursuant to the "note", so long as it was still a "note" (i.e., so long as it had not been "converted"), Samuel Banyan had to pay Bayrock Banyan, as "principal" and "interest", 50% of any distributions Samuel Banyan received from Sobay until "principal" and "interest" were paid.

281. Pursuant to the "new" limited liability company agreement for Samuel Banyan LLC that Akerman wrote, if Bayrock Banyan were a member, it would be entitled to distributions in respect of its membership interest from Samuel Banyan of 100% of any distributions Samuel Banyan received from Sobay until it received entire contributed capital plus its preference return.

282. So if in 2006 Samuel Banyan received a $1,000,000 distribution from Sobay, if Bayrock Banyan were a "lender" receiving payment on the "note", it would get $500,000, but if it were a member receiving distributions in respect of its membership interest, it would get $1,000,000.

283. Thanks to Akerman, there is conclusive evidence that Bayrock knew perfectly well that it was really a member, not a "lender", thanks to the "new" agreement and its "deemed "execution.

284. In mid 2006, the Banyan Bay project had finished, or largely finished, at a significant profit. After protracted haggling, Michael Samuel produced limited financial records, including the Sobay 2005 tax returns and some K-1″s, including K-1″s for the Midtown Miami project.

285. This information led to the discovery that in 2004 Samuel Banyan LLC had received distributions from Sobay of $2,000,000, but concealed that fact from Bayrock and distributed all

the money to Michael Samuel, and that in 2005 Samuel Banyan had constructively received distributions from Sobay of $2,025,355 but at the request of Michael Samuel Sobay paid $200,000 of it into a Samuel family private foundation and paid the other $1,825,355 to Midtown Partners LLC, a Midtown Miami project entity, from which it was immediately transferred to Samuel Midtown Miami LLC, a company wholly owned by Michael Samuel[17]. It also led to the discovery that another Michael Samuel entity, Samuel & Company LLC, illegally received about $100,000 in payments from the closings of the condominiums as some kind of "servicing fee".

286.     After many email discussions with Arif, Satter, Schwarz, and Salomon, Akerman drafted a "lawyer's letter" to Samuel. It is most astonishing for a variety of reasons, because with one letter Akerman managed to indict not only Samuel but its own clients and itself as well.

287.     On page 2, Akerman reproduces Paragraph 9 of the "note" as amended in February 2004. Paragraph 9 is the "deeming" provision; its key provisions:

> The Payee [Bayrock Banyan LLC] shall be entitled to exercise such rights as it would be permitted to exercise as a member in the Company [Samuel Banyan LLC] whether or not it has converted the Note into a Membership interest in the Company ...

> To the extent that any distributions are received by the Company in respect of its membership interest in Sobay ... prior to the conversion of the Note into a membership interest in the Company, the Company shall give notice of such distributions to the Payee and shall pay 50% of such distributions to the Payee within ten (10) business days ...

288.     Immediately next, the letter makes the following blandishments and demands:

> In accordance with said Paragraph 9, Bayrock Banyan is entitled to its percentage share of all distributions received by Samuel Banyan from Sobay Partners LLC...According to Section 5.01(a) of the ["new"] Operating Agreement, Bayrock Banyan is entitle to receive 100% of all distributions of cash or other property until it shall have received its entire npaid "Priority Capital Return" (which term is defined as the product of (x) the Unreturned Priority Capital Amount and (y) nine percent (9%) per annum...

> Bayrock Banyan hereby demands the payment of $1,825,355, being the amount of Sobay's converted distribution.

---

[17] In what can only be called delicious irony, in an email on June 19, 2006, Salomon reports that Samuel insisted that the $1,825,355 was not really a distribution, but was, you guessed it, a "loan", to which Salomon observes that there is no evidence, no documentation, that anyone really thought of it as a "loan". What goes around, comes around.

> In addition ... Samuel Banyan received a distribution from Sobay of $2,000,000 in 2004. Notwithstanding Samuel Banyan′s unequivocal obligation to pay Bayrock Banyan its share of the distribution, to date, Samuel Banyan has refused to provide said distribution ... Bayrock Banyan ... demands the $2,000,000 distribution which ... Samuel Banyan received from Sobay in 2004.

289.   The "note" had not been "converted", yet even though as a "lender", pursuant to the "note", Bayrock Banyan was entitled to only 50% of the distributions, ¶280, ¶282, ¶287, Bayrock Banyan still demanded the same percentage, 100% of the distributions, it would have a right to as a member in Samuel Banyan  in respect of its membership interests, ¶282, because even as a "lender" pre-"conversion" Bayrock Banyan had all the rights it would have as a member, ¶287.

290.   This isn′t the enforcement of a "lender′s" ancillary legal rights, this is the demand for the identical <u>distributions</u> a member would have, in disregard of the "note" schedule of payments.

291.   The letter accuses Samuel of breaching a "new" limited liability company agreement that had never taken effect, since it could not take effect until the "note" was converted. Breach would have been impossible ... were it not for the provision in the "note" giving Bayrock Banyan, before "conversion", all the same rights it would have after "conversion". In brief, the parties always had <u>deemed</u> the "new" agreement to be in force, so Bayrock Banyan was able to allege the breach.

292.   <u>The only thing "conversion" did was change the labels, all the rights already existed</u>.

293.   The Akerman lawyer who wrote that letter knew the "new" agreement was deemed in force, Bayrock Banyan was a member of Samuel Banyan, so the Sobay proscription had been breached: Look at this on Page 6: when do non-member "lenders" benefit from fiduciary duties?

> Michael Samuel, individually, has breached his fiduciary duty and legal duty of good faith and loyalty to Bayrock Banyan as managing member of Samuel Banyan...all of which makes him individually liable for the obligations of Samuel Banyan to Bayrock Banyan under the Note and the Operating Agreement.

294.   Bayrock Banyan was a member of Samuel Banyan in every way but the label, and the only reason for the "note" was to defraud the Cayres by concealing its membership. This was concealment, not misrepresentation, but Samuel a fiduciary to the Cayres, was obligated not to

conceal material information, including his own fraud; thus he, Arif, Satter, Schwarz, and Akerman committed mail, wire, and common law fraud together, and Arif, Satter, Schwarz and Akerman, in doing so, aided and abetted his breach of fiduciary and contract duties.

295.    And Akerman memorialized this in that self-indicting writing, making it clear they knew well their client was legally and equitably a member notwithstanding what the Cayres thought.

296.    Particularly ironic is Akerman˝s warning on Page 6 that Samuel Banyan and Michael Samuel could be accused of fraud, wire fraud, and violating federal racketeering law.

297.    Plaintiffs don˝t dispute this; Akerman ought to recognize common law fraud, wire fraud, and RICO substantive and conspiracy violations when they see them. Especially in a mirror.

298.    In any event, what they didn˝t tell Samuel in this letter was that Arif, Satter, Scharz, and Akerman had already agreed among themselves they couldn˝t risk suing Samuel and this letter was a bluff, because if they sued him their artifices to defraud, their crimes, would be revealed.

299.    Banyan Bay produced a total of about $17,000,000 in proceeds, about $8,000,000 of it Bayrock Banyan˝s, and Bayrock couldn˝t get most of it for fear of suing and revealing their own crime in the matter, taking only a small partial payment from Samuel in response to their threats.


FRAUD ON THE IRS

300.    **Option Fraud**. Satter˝s "option" to buy 10% of the Samuel Banyan partnership interests for $1, substantially likely to be exercised, is ownership for tax purposes, making Alarga a partner in Samuel Banyan (as added complication, sometime after 2003 Samuel refused to  honor the "option", claiming Satter forged the document containing it and no "option" ever existed).

301.    **Debt/Equity Fraud**. The sham "note" was a partnership interest for federal income tax purposes by any number of analyses; moreover, Bayrock and Alex Salomon knew it, ¶304.

302.    Objective Tests. The "borrower", Samuel Banyan, was a special purpose entity created for the sole purpose of holding 50% of the membership interests in Sobay Partners.  Other than

that, Samuel Banyan had no assets, income, capital, or any other thing of value, so this sham "note" purported to be a multi-million dollar unsecured "loan" to a zero-asset start-up company with no equity (thus an infinitely large "debt" to equity ratio) in which capital was a material income producing factor, a company with no hope of "repaying" it other than from the entrepreneurial success of its operations and the underlying venture, where "repayment" would be in an amount dependent upon that success of the venture. By definition this is equity, not debt.

303. <u>Subjective Tests</u>. None of Arif, Satter, Schwarz, Samuel, or Akerman ever contemplated Bayrock and Samuel be in a debtor/creditor relationship and only papered it to look like one to circumvent the Sobay proscription. Bayrock and Salomon never thought this was debt for federal income tax purposes and always thought it was equity, a partnership interest in Samuel Banyan.

304. That″s how they prepared the Bayrock Group LLC tax returns, that Samuel Banyan was a partnership and Bayrock Group LLC a partner (through disregarded Bayrock Banyan).

305. Consistent with what they did do, report it as a partnership interest, is what they didn″t:

306. By early 2004, Bayrock Banyan had "lent" over $2,500,000 to Samuel Banyan.

307. It this sham "debt" were really debt, it would have been original issue discount (OID) debt, and Bayrock Group LLC would have OID portfolio interest income in the amount of the accruing (even though unpaid) interest, about $175,000 for 2004 and $225,000 for 2005, from 2003 through 2007, the total OID income on this "note" would have been close to $1,000,000.

308. None of the 2004, the 2005, or 2006 Bayrock Group LLC partnership tax returns includes that (or any other) OID portfolio interest income, nor do any K-1″s issued include it.

309. So the fraud on the IRS Plaintiffs allege was not that they illegally reported it as "debt", because they didn″t, they reported it correctly as a partnership interest; it was something much simpler, the intentional failure to report millions of dollars of partnership income.

310. Akerman″s letter and emails like this show they all knew Sobay Partners realized millions of dollars of taxable income from Banyan Bay, and allocated 50% of it to Samuel Banyan.

**From:** AdrienneRodriguez mailto:arod@salomoncpa.com] **On Behalf Of** Alex Salomon
**Sent:** Wednesday, June 21, 2006 11:54 AM **To:** rk@akerman.com; js@bayrockgroup.com; fs@bayrockgroup.com; Jerry Weinreich

Gentlemen:

We looked at the 2005 Federal tax return of Sobay Partners LLC. and have the following comments:

1. The tax return is incomplete. The tax return that was emailed yesterday did not have any K-1's. However, previously we were provided a K-1 issued to Samuel Banyan LLC. for 50% interest. We therefore assume that the other 50% represents the Cayre Banyan Bay LLC interest. I would like to have a complete set of the returns including the State returns.

2. The tax return reflects gross profit of $8.7 million. Against this profit they deduct two expenses: commissions of $3,656,628 and legal fees of $1,215,891. I would like a further understanding of both of these costs to make sure that they are related to the business and to determine what portion, if any, is paid to related parties.

3. The tax return shows a charitable contribution made to a unnamed institution (on the tax return they call it "cash") of $200,000. I think we should find out greater details about this contribution.

4. The tax return shows a distribution made during 2005 of $1,555,201 - none of which came to Samuel Banyan LLC. By process of elimination I assume it went to the Cayre group. We need to understand further why a distribution was made only to one of the parties.

5. We were able to obtain a closing statement for one of the buyers at Sobay (a copy of which is attached). Please note, there is a consulting fee was paid to Samuel & Company of $300. This is not a significant sum of money but nonetheless, given the number of units, it could be significant. Furthermore, there are $9,000 of commissions paid to each of Majestic Properties and SBI Realty. The initials of SBI lead us to wonder whether this is related to Samuel Banyon, SoBay, etc.

311. Given their statements on the tax returns that Samuel Banyan LLC was a tax partnership and Bayrock Group LLC a partner in it, their consistent treatment of the sham "note" as a partnership interest as evidenced by their failure to report any OID income, Plaintiffs allege Bayrock Group LLC filed fraudulent returns knowingly prepared by Salomon for some or all of at least 2004, 2005, and 2006 intentionally understating partnership taxable income by an amount between (estimated) $2,000,000 and $5,500,000, depending on Bayrock″s share of the estimated $17,000,000 of Banyan Bay proceeds (Samuel Banyan″s allocation of income to Bayrock Banyan would occur without regard to whether Bayrock Banyan actually got the cash; partnership income is allocable to the partners without regard to what distributions are, or are not, made).

**THE THIERIOT FRAUDS**

312.    In previous sections, Plaintiffs alleged that Arif, Satter, and Schwarz used sham "loans" in the context of compensation fraud, illegally disguising taxable transfers of money from a partnership, Bayrock Group LLC, to a partner, Satter, as such a "loan", committing primary fraud targeted both at the IRS and at the federal judiciary (defrauding a U.S. Probation Officer).

313.    Plaintiffs also alleged that Arif, Satter, and Schwarz used sham "loans" in the context of debt/equity fraud, committing primary fraud targeted at the Cayres and secondary, related fraud targeted at the IRS (failure to report income).

314.    Plaintiffs now allege Arif, Satter, and Schwarz again used sham "loans" in the context of debt/equity fraud, committing primary fraud targeted at the IRS (a disguised sale of partnership interests) and secondary, related fraud targeted at a partner and at the New York State judiciary.

315.    Specifically, Arif and Satter defrauded a partner, Elizabeth Thieriot, lying to her about the value of the membership interest in a Bayrock company they had Bayrock Group LLC sell her, defrauded the IRS by not reporting the $920,000 gain on the sale, which they disguised as a sham "loan", then with Schwarz, embezzled all the distributions due Thieriot in respect of her membership interest and conducted bad faith litigation to frustrate her legitimate exercise of her rights, knowingly facilitated by Akerman Senterfitt, which perpetrated fraud on the court.

FRAUD ON THIERIOT

316.    From April through August 2003, Arif contributed $2,000,000 to Bayrock Group LLC for use in the Trump International Beach Club project in Fort Lauderdale. Bayrock Group then contributed it downstream to Bayrock Ocean Club LLC, holding company Sub for the project, which contributed it further downstream to 550 Seabreeze Development LLC, the lower-tier company owning and developing the project; Ocean Club owned 50% of 550 Seabreeze and outsiders owned the rest.$2,000,000 was then Ocean Club"s entire capital.

62

317.     Ten weeks later, Arif and Satter swindled Elizabeth Thieriot into buying 4% of Bayrock

Group″s Ocean Club membership interests for $1,000,000, 12 times what they had just paid for it.

318.     Thieriot was Arif″s friend and Satter″s landlord; she owned the house he lived in while

Bayrock paid his $11,000 rent to her as part of the tax fraud and obstruction of justice Arif and

Satter were engaged in to hide his million dollar skim and multimillion dollar ownership, ¶220.

319.     They never told her that weeks earlier they had capitalized Ocean Club at $2,000,000 and

were making an 1125% profit on her, or that Satter was a convicted mobster with a history of

criminal securities fraud and racketeering[18], and they lied to her about the value of her 4%.

320.     They made these representations to her in a Memorandum of Understanding:

> 1. BG [Bayrock Group LLC] is currently the sole member of Bayrock Ocean Club LLC
> (“BOC”). BOC owns a 50% membership interest in 550 Seabreeze Development LLC.
> 550 Seabreeze Development LLC owns the 35,000 square foot parcel of land located at
> 550 Seabreeze Blvd, Ft Lauderdale, FL on which it is developing a condo-hotel to be
> known as Trump International Beach Club.
>
> 2. ET [Thieriot] shall purchase from BG a 4% membership interest in BOC for $1 million
> cash. ET shall receive a credit to her capital account in BOC in the amount of $1 million.
> BG represents that the price ET is paying (1% = $250,000) is no higher than that paid by
> any other passive investor investing a comparable dollar amount in BG. This price was
> calculated, based on BOC″s projections, which it believes to be conservative, to return to
> ET at last a 25% p.a. return on her investment.
>
> 3. For a period of 60 months from the date of this Agreement, ET shall have an option[19]
> to invest up to $2,000,000 to acquire additional membership interests in BOC and other
> BG projects. The price for additional interests in BOC shall remain fixed at $250,000 per
> 1% membership interest. The price for an equity investment in other projects shall be
> priced so that, based on BG″s projections, ET can reasonably anticipate at least a 25%
> p.a. return on her investment.
>
> ***
>
> 6. Whenever cash is distributed to the investors in BOC and other BG projects, it shall be
> distributed to the investors at the same time and in proportion to their relative ownership
> interests.

---

[18] She was reassured by Akerman Senterfitt″s lending its reputation to this fraud on her by authoring most of the
documents, including this memoraundum and the private placement memorandum. As alleged, she would come to
regret her belief in Akerman as a bellwether when they helped Bayrock commit fraud on a court to deny her rights.

[19] Thieriot″s $1,000,000 should have been apportioned between the Ocean Club interests and the option, but was not.

321.     Salomon saw the fraud , and wrote to Arif and Satter warning them they had cheated her and would be sued on account of it; he was right, and in two years Thieriot was suing for fraud.

322.     He didn't resign the account or refuse to participate in the crimes, but he was kind enough to create this record of his, Arif, and Satter's knowledge and notice of the sale's legal and tax consequences.

> From: Alex Salomon [mailto:Alex@salomoncpa.com]
> Sent: Wednesday, January 21, 2004 11:22 AM
> To: Maita Szrebrodolszki
> Cc: Joe Bencivenga
>
> Dear Maita:
>
> Joe gave me a copy of the memorandum of understanding with Elizabeth Thieriot regarding investment in Bayrock Ocean Club.
>
> Based upon this memorandum, Ms. Thieriot is a four percent owner of Bayrock Ocean Club.  The tax returns for BOC will need to reflect this ownership.
>
> Was this agreement reviewed by your attorneys?[20]  As an accountant, I think that there are many "holes" in this agreement and can potentially subject Bayrock Group to a lawsuit.  Based upon the purchase price of $250,000 for one percent, BOC would have to have an equity of $25 million for this to be equitable.  In all fairness, I have not seen the "conservative projections" referred to in the memorandum, but if this deal doesn't work out, there is no question in my mind that lawyers will have a field day with this agreement. [Bracketed information added].

323.     Of course it didn't require any remarkable insight for Salomon to see that Satter, at the time, late 2003, awaiting sentencing on federal racketeering charges predicated on five schemes of Mafia and Russian mob connected securities fraud which cheated victims out of $40,000,000, would happily defraud his own partner Thieriot, since Satter was a recidivist criminal.

324.     (Salomon by then already had much material covert information on that subject, as he had been for months papering Arif and Satter's million dollar a year Satter skim and its related tax frauds and was about to commit tax evasion in respect of the Thieriot swindle. He knew with whom he was conspiring and whom he was aiding and abetting, and it wasn't the Boy Scouts.)

---

[20] It was "reviewed" by a senior partner at Akerman Senterfitt, the same one responsible for the Cayre sham "note".

FRAUD ON THE IRS

325. The $1,000,000 didn''t come to rest in Ocean Club. Arif and Satter didn''t intend it to; it went to Bayrock Group LLC, where it was used to for other purposes, including Satter''s skim.

326. This is consistent with the deal structure, which is documented as Thieriot''s purchase of some of Bayrock Group LLC''s existing membership interests in Ocean Club rather than as a contribution to Ocean Club in return for her receipt of newly issued membership interests.

327. Akerman Senterfitt represented Bayrock on the deal, and Thieriot was well represented, and counsel scrutinized the documents as would any reputable firm in such a placement; there is no doubt the parties and counsel knew what they were doing, and the facts match the documents..

328. **Ocean Club Was a Tax Partnership**. In spite of Arif and Satter''s representation to Thieriot that Bayrock Group LLC was the sole member of Ocean Club, ¶319, Bayrock Group was not the sole member and Ocean Club was a tax partnership[21], not a disregarded entity.

329. **A Disguised Sale of Partnership Interests**. No later than January 2004, Bayrock Group LLC closed the sale to Thieriot and realized taxable income of about $920,000[22].

330. To evade paying any tax they had Bayrock Group LLC fail to report the partnership level income, employing an artifice to defraud commonly known as a "disguised sale of partnership interests". Here''s how it worked:

---

[21] By January 1, 2003 Satter owned membership interests in Bayrock Ocean Club LLC, **Error! Reference source not found.**, the financial interest components conveying about a 50% profits interest. In addition, as the Ocean Club partnership tax returns for 2003 show, RIF International, a corporation wholly owned and controlled by Arif and used for the purpose of being a minority member in a limited liability company to ensure it was not a disregarded entity for tax purposes, owned 1%.

[22] Bayrock Group had a basis of $80,000, in the 4%.Part of the $1,000,000 should have been allocated to the optiont, ¶320, which was an open transaction, closed in 2006 when it was extinguished, unexercised, as part of settlement of the fraud litigation. That amount should have been reported in 2006 but is not on the 2006 Bayrock Group 2006 tax return. Because the value in late 2003 or early 2004 of investing in any of these projects at $250,000 per 1%, as Salomon put it, was nil, the portion of the $1,000,000 allocable to the option was small enough that it can be ignored for this instant allegation. Still, while the amount of tax deficiency in 2006 due to failure to report premium income on the option lapse, may be too small to support a substantive tax crime, its size is irrelevant to the mail and wire tax fraud analogues in RICO, so the intentional failure to account for and report the gain on lapse of the option is a predicate crime separate from the intentional failure to account for and report the gain on the sale of the membership interests.

331.    This diagram shows the only two ways, as a matter of tax law, that Thieriot could agree with Bayrock Group to exchange $1,000,000 for 4% of "its" Ocean Club membership interests:



**FIGURE 6**

332.    <u>Taxable Sale (Scenario 1)</u>. Thieriot pays $1,000,000 to Bayrock Group, which transfers a portion of its Ocean Club membership interests to Thieriot and realizes $920,000 in taxable income.

333.    <u>NonTaxable Contribution (Scenario 2)</u>. Thieriot contributes $1,000,000 to Ocean Club which issues her membership interests, diluting only Bayrock Group's ownership; the $1,000,000 comes to rest in Ocean Club for its proper use.

334.    That only Bayrock suffers an ownership decrease is not determinative; <u>what determines whether this is a taxable sale or nontaxable capital contribution is where the money comes to rest.</u>

| Partner | Before | Scenario 1 | Scenario 2 |
|---|---|---|---|
| **Bayrock** | X % | X − Y % | X − Y % |
| | | **TAX** | **NO TAX** |
| [Ocean] | | $1,000,000 | $ 0 |
| | | $ 0 | $1,000,000 |
| **Others** | 100 − X % | 100 − X % | 100 − X% |
| **Thieriot** | ----- | Y % | Y % |
| | | ($1,000,000) | ($1,000,000) |

66

335.   Intent matters too, but what's important is that the parties not disguise a taxable sale as a

non-taxable contribution, and like most of tax fraud, to find it, one need only <u>follow the money</u>.



**FIGURE 7**

336.   <u>Disguised Sale (Scenario 3)</u>.

Combining Scenarios 1 and 2, Thieriot

contributed $1,000,000 to (Step 3a)

and got her membership interests from

(Step 3b) Ocean Club, Bayrock Group

| Partner | Before | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|---|
| Bayrock Group | X % | X − Y % | X − Y % | X − Y % |
| | | **TAX** | **NO TAX** | **TAX FRAUD** |
| [Ocean] | | $1,000,000 | $ 0 | $1,000,000 |
| | | $ 0 | $1,000,000 | $0 |
| Others | 100 − X % | 100 − X % | 100 − X% | 100 − X% |
| Thieriot | ----- | Y % | Y % | Y % |
| | | ($1,000,000) | ($1,000,000) | ($1,000,000) |

alone suffering dilution, then Ocean Club transferred the $1,000,000 to Bayrock Group (Step 3c).

337.   Substance over form and step transaction doctrines also give the same result: this was a

sale of Bayrock Group's partnership interests in Ocean Club for $1,000,000, yielding $920,000 of

income and $400,000 of tax evasion by Arif and Satter, Bayrock Group's two partners (then).

67

338.    Scienter in a Sham "Loan". Disguised sales became such common abuse that decades ago they got their own statutory prohibition, IRC §707(a)(2)(B). This is detailed in a subsequent section, the FL FRAUDS, where Plaintiffs allege Arif, Satter, and Schwarz did the same thing in 2007, but 50 times larger, causing Bayrock Group LLC to disguise a $50,000,000 sale of Bayrock subsidiary partnership interests to evade $20,000,000 of their personal tax liability, ¶542 *et seq*.

339.    To try to circumvent §707, Arif and Satter, with Salomon''s help, decided to pretend that the upstream transfer of $1,000,000 was not the related distribution it really was, which would be too obvious a badge of fraud, pretty much a neon sign proclaiming, "Disguised sale over here".

340.    So they pretended the $1,000,000 was another "loan". Nothing to see, no disguised sale here, keep moving please. This being Bayrock, that meant another sham "loan" on which no one paid "principal", no one paid "interest", no one intended to, no one accrued OID "interest", no one reported OID "interest", and no one believe they were in a "debtor/creditor" relationship.

341.    That shows scienter, because other than to try to get away with a disguised sale there was no reason to call it a "loan": either they would treat the "loan" with respect, and have to pay principal and interest, or they would disrespect it as the sham it really was, and look even worse.

342.    Furthermore, Bayrock Group had a basis in its Ocean Club membership interests exceeding $1,000,000. It could have taken a $1,000,000 distribution from Ocean Club without realizing income from the distribution *per se*, because it wasn''t an excess distribution, so again, there was no reason to call it a "loan" other than to try to bury the disguised sale.

343.    The effort they undertook calling it a "loan" thus shows their intent to defraud, to use the Ocean Club partnership as a ruse, a mere conduit to pass the purchase money from buying partner (Thieriot) to selling partner (Bayrock Group LLC) to disguise the sale. This is tax fraud.

344.    The Bayrock Group LLC 2004, 2005, and 2006 partnership tax returns show this, showing $1,000,000 of "debt" owed to Bayrock Ocean Club LLC; this is confirmed by the Bayrock Ocean Club LLC partnership tax returns, which show $3,000,000 of "capital",

$2,000,000 of it Bayrock's and $1,000,000 Thieriot's, the latter "on loan" to Bayrock Group LLC. Of course, Ocean Club never reported or accrued any "interest" on that "loan".

345.   Miscellaneous Notes. It may be the $1,000,000 never even made it into Ocean Club for its quick trip right back out as a "loan" to Bayrock Group; that cannot be known until disclosure.

346.   Those Ocean Club tax returns do not reflect Satter's membership interests, or Kriss's or Woodring's, who had received membership interests by mid-2004. This is part of the pattern of continuing, related mail and wire tax fraud, and it may well be almost if not literally true that all, if not then almost all, of the hundreds of returns and schedules filed were, every one, fraudulent.

347.   Even if Ocean Club had been a single member entity at the time, the result would have been the same, a disguised sale by Bayrock Group LLC to Thieriot[23].

FRAUD ON THIERIOT AND ON THE NEW YORK SUPREME COURT

348.   In 2005 Ocean Club realized income of $1,500,000. Arif, Satter, and Schwarz had Bayrock Group use its control as sole managing member of Ocean Club to distribute that entire $1,500,000 to itself, embezzling Thieriot's rightful share and hiding their defalcation from her.

349.   On December 8, 2005, Thieriot, infuriated at the theft, which she learned of by reverse engineering the Ocean Club K-1's given her and then making inquiries, pursuant to the rights afforded her by her membership interests demanded access to Ocean Club's books and records.

---

[23] Thieriot's acquisition of partnership interests in Ocean Club would have converted Ocean Club to a tax partnership. R Rev. Rul. 99-5, on such a conversion of a disregarded entity to a partnership, contains these examples:

Situation 1. B, who is not related to A, purchases 50% of A's ownership interest in the [single member] LLC for $5,000. A does not contribute any portion of the $5,000 to the LLC. A and B continue to operate the business of the LLC as co-owners of the LLC.

Situation 2. B, who is not related to A, contributes $10,000 to the LLC in exchange for a 50% ownership interest in the LLC The LLC uses all of the contributed cash in its business. A and B continue to operate the business of the LLC as co-owners of the LLC.

These are like Situation 1 and Situation 2 in the text. The only difference is in this Situation 1,Thieriot (B) is deemed to buy 4% of the assets of, not the partnership interests in, Ocean Club, then A (Bayrock Group) and B are deemed to contribute their respective ownership of those assets into the new tax partnership, Ocean Club, in return for partnership interests. The tax results would be the same.

69

350. Bayrock Group and Ocean Club refused to give her any information, even though Arif, Satter, and Schwarz knew perfectly well she was a member, that they had stolen from her, and that she was entitled to what she was demanding, as the following allege in detail:

351. In 2006, she sued in New York State Supreme Court, New York County, bringing actions for an accounting, to compel production of the books and records, and for pre-action disclosure.

352. Akerman Senterfitt was Bayrock″s main outside law firm since at least 2003. Akerman lawyers drafted, co-drafted, or approved, *inter alia*, the Thieriot Memorandum of Understanding, the private placement memorandum, Satter″s lease of Thieriot″s house, the documents effecting the $1,500,000 sale of Ocean Club″s interests in Seabreeze, and the Florida formation documents for Bayrock Ocean Club LLC, and many more, and was intimately familiar with Bayrock in general and Ocean Club in particular. He was also responsible for the design and execution of the Cayre frauds, including the shame "note" and covert limited liability company agreements.

353. Martin Domb, an Akerman partner in its New York office, appeared in court for Bayrock in these actions. Through him, Akerman corrupted itself and perpetrated a fraud on the court.

354. Akerman had formed Bayrock Ocean Club LLC, <u>and knew at and at all times after its formation its only office was at Bayrock″s offices in Trump Tower in New York City</u>, as shown in this extract from in its Florida Articles of Organization, available free online 24x7:

**ARTICLE II**
**ADDRESS**

The mailing address and street address of the principal office of the limited liability company is 725 Fifth Avenue, 24th Floor, New York, NY 10022.

355. Akerman also knew that the original Theriot negotiations for her purchase of membership interests were conducted in New York, as they were seated at the (virtual) table next to Bayrock.

356. Nevertheless, Akerman filed responsive documents with the court in Theriot″s action arguing that New York courts "may not" have personal jurisdiction over Bayrock Ocean Club because it was a Florida limited liability company whose only business project is in Florida.

357.     This was not mere attorney incompetence. This was fraud. This was deceit. This was collusion with Arif, Satter, and Schwarz, who simply had no intention of honoring Theriot's membership rights, as they would soon reveal with respect to the rights of other partners as well.

358.     And this was a crime, a violation of New York Judiciary Law §487. Evidence of Domb's criminal *mens rea* shows in his email to Schwarz the day before he disgraced himself and his firm by perpetrating that fraud on the court:

> From:                    Domb, Martin [Martin.Domb@akerman.com]
> Sent:                    Thursday, April 27, 2006 12:57 PM
> To:                      Julius Schwarz; Felix Satter, rk@akerman.com
> Subject:                 Thieriot
>
> Gentlemen, I attach a proposed memo of law to be submitted to the court tomorrow morning.  I would appreciate your comments and suggestions.  In addition, please note the following:
>
> 1. The initial point challenges the court's personal jurisdiction over BOC (as discussed with Felix yesterday), but I'm troubled by the facts that (a) the OSC states that the principal place of business of BOC is the Fifth Avenue office of Bayrock -- there may be a lot of BOC letterhead out there using that address, which would indicate that it has a New York office or presence, and (b) the Schedule K-1 sent to Thieriot and attached to her papers was sent on BOC letterhead at "c/o Salomon & Co." in an East Rockaway, NY address.

359.     This is not the work of an officer of the court. This is the work of a criminal co-conspirator who crossed the line and became as corrupt, and as liable, as his client, one of whose managers, Schwarz, was and is a licensed attorney himself. Domb is "troubled" by the fact that he might get caught in the fraud, because of the letterhead that might surface revealing Bayrock Ocean Club has its office in New York? That "troubles" him, not that he deceived the court?

360.     Not only did Arif, Satter, and Schwarz know Theriot was a member, Akerman knew too, yet continued to help them frustrate her exercise of her rights. Domb filed papers in court suggesting Theiriot had no member rights because it wasn't clear Bayrock had signed the private placement memorandum (the subscription agreement) they gave her, even though they took her $1,000,000 and gave her her membership interests and reflected such on their books an records.

361.    Plaintiffs do not allege this was a meritless argument. That speaks for itself. Plaintiffs allege Domb, Akerman, and Arif, Satter, and Schwarz, themselves knew and believed it was a meritless argument and made it anyway in bad faith to keep Thieriot from her property.

362.    This is clear from the following email. From late April through late May Akerman left that action *sub judice* while knowing there was personal jurisdiction in spite of their deceit and while knowing that she was a member in spite of their bad faith argument, and only on May 24 when Thieriot submitted a Reply Affirmation with a signed copy of the Memorandum of Understanding attached did Akerman tell Bayrock to give up, as this email that same day shows.

> **From:** Domb, Martin [mailto:Martin.Domb@akerman.com]
> **Sent:** Wednesday, May 24, 2006 2:10 PM
> **To:** Felix Satter; Julius Schwarz; rk@akerman.com
> **Subject:** Thieriot v. Bayrock
>
>  Gentlemen,
>
> I attach the Reply Affirmation of Alexander Sklavos, including its Exhibits A through D, in further support of Thieriot's motion for pre-action discovery. I have the following comments:
>
> 2. Thieriot is a member of BOC. **Sklavos has produced a fully signed copy of the Memorandum of Understanding (Sklavos Aff. Ex. D) (which Bayrock also found, signed by both sides, in its files)**. We also admitted that Thieriot invested $1 million in BOC. Thus, although we still don't know whether the Subscription Agreement was signed by Bayrock, there is no doubt that Thieriot is a member of BOC...

363.    Here is Akerman telling them that since they took her $1,000,000, which everyone knew, and since she signed the Memorandum of Understanding, which they knew all along because they had it in their files, she was a member, <u>and now that she had found and produced her signed copy of the Memorandum the jig was up,</u> because the subscription agreement argument was meritless.

364.    There is no doubt that had she not found her copy they would have continued to refuse her the benefit of her bargain, the exercise of her rights. They didn't they call her or counsel the minute they found the signed copy. The minute they found the copy and knew she was a member was the moment they knew, these were lawyers and they <u>knew</u>, that Arif, Satter, Schwarz, and Bayrock owed her fiduciary duties <u>including the duty not to conceal those facts from her</u>.

365.   That's fraud by concealment in the context of a fiduciary duty to disclose, fraud on Thieriot by Schwarz, a licensed attorney, Arif, Satter, Bayrock Group LLC, Bayrock Ocean Club LLC, perpetrated with the specific intent of depriving her of her property (her distributions, her information, her chose in action, her derivative right *qua* Ocean Club to the honest services of company management and its attorneys), with the participation of Domb and Akerman.

366.   It's not the fraud on the court, which would have been an obstruction of justice predicate had this been federal litigation, that's of concern in this action, it's the fraud on Thieriot.

367.   Even if they had forgotten Thieriot was a member, which besides being illegal, since limited liability companies must maintain a list of their members, would have been some neat trick given the K-1's they sent her every year, by their own words, since their counsel opined that the signed Memorandum of Understanding plus her performance (paying the $1,000,000)  was conclusive proof of her membership, not for one day, not for one minute, after they found that signed Memorandum of Understanding in their files and concluded she was a member did Bayrock or its counsel have the right to conceal such from her and maintain litigation posture or non-litigation posture that she was not a member, but then this can hardly be surprising given their litigation posture that there was no personal jurisdiction over Ocean Club in New York, a posture they decided on while sitting in Ocean Club's 5th Avenue New York office at the time.

368.   Attorneys, especially those representing the company itself, have no right to knowingly facilitate the managers of the company when they wrongfully deny or conceal the existence of membership or the assertion by a member of her membership rights, and are guilty of breach of fiduciary duty, conspiracy, an aid and abetment of breach of fiduciary duty and fraud, if they do.

369.   And it wasn't just Thieriot; Arif, Satter, and Schwarz would go on in the case of other members, including Plaintiffs, to deny, elude, or evade their exercise of their membership rights, on equally ridiculous pretextual grounds, especially, like Thieriot, their rights to distributions and

their rights to access the books and records, understandable given the financial corruption permeating Bayrock.

370.     Finally, when they knew they could delay no longer and told Salomon to ready the Ocean Club books for her, they found them "incomplete". Bayrock had never allocated any expenses to the project and was now going to, ahem, "reconstruct" them. Either there were no expenses properly allocable to the project, and they were about to defraud her again, or there were, which meant by not allocating them to that project they must have improperly allocated them to other projects and all those years defrauded all their other partners and lenders in those other projects.

| | |
|---|---|
| **From:** | Liz F. Curtis [liz@salomoncpa.com] on behalf of Alex Salomon |
| Sent: | Wednesday, May 24, 2006 4:47 PM |
| **To:** | Felix Satter; Jody Kriss; Julius Schwarz |
| Cc: | Marisa Pershad |

Gentlemen:

I spoke to Marty Domb and I need to provide him with a set of books and records for Bayrock Ocean Club. My understanding is there is a hearing set for June 1st and Marty wants the information in his office well prior to that date. We have no problem in complying with this request. However, we need you to make a decision in regard to the Bayrock expenses that are allocable to BOC. The general ledger that is currently in our possession has no allocation of any Bayrock expenses. Obviously, to the extent expenses can be allocated to this project, our position will improve.

However, given the potential scrutiny under discovery as well as IRS requirements, it is important that the allocation of expenses be reasonable and methodical. It needs to be based upon a reasonable method such as allocation of time spent by various employees.

Please let me know if you want us to include any allocated expenses into the BOC numbers. If yes, I need to have the details.

**THE OWNERSHIP FRAUDS**

371.     In the previous section, Plaintiffs alleged Arif and Satter had Bayrock Group LLC convey part ownership of a Bayrock subsidiary company to Elizabeth Thieriot by selling her some of its membership interests in the company, then later, with Schwarz"s participation, and in conspiracy with Akerman, fraudulently concealed their knowledge and documentary proof of her part ownership of that company in a scheme to deprive her of the benefit of her membership interests.

372.     In this section and subsequent sections, Plaintiffs allege Arif, Satter, and Schwarz had Bayrock companies give themselves, Plaintiffs, and others part ownership of those companies by issuing them membership interests, then engaged in criminal conspiracies to, and did, defraud the IRS and state and local governments, lenders, condominium buyers, the town of Riverhead, New York, Plaintiffs, and others by fraudulently denying and concealing these ownerships and their knowledge and documentary proof of them.

373.     They also engaged in schemes to conceal material information from Bayrock owners, to whom they owed fiduciary duties of disclosure, in order to deprive them of money as well.

374.     The following paragraphs will allege in detail that:

A.     Satter had received memberships in many Bayrock companies by January 2003. Kriss had received memberships in many Bayrock companies by February 2003.

B.     In November 2004, Bayrock obtained tax advice that there were two ways to compensate with sweat equity, as an employee or as an owner (member).

C.     Schwarz joined Bayrock in April 2005. He asked to be a member of Bayrock Group, LLC and sent proposed documents granting him a membership interest. Mel Dogan refused and said he could only be an employee with a bonus (deferred compensation) tied in some way to Bayrock success. So Schwarz rewrote the documents and made himself an employee with such a deferred compensation "economic interest" instead of a membership interest. These were executed on April 21, 2005.

75

D.   Salomon objected. As did the lawyer that November, he warned if Schwarz were employee with a vesting "economic interest" there would be bad tax consequences.

E.   Schwarz, who insisted on vesting, did all he could to go under, around, or behind Salomon, implying he was incompetent, or wrong,. Salomon did not relent.

F.   Bayrock hired three more tax lawyers. All said the contract as executed, making Schwarz an employee with a vesting "economic interest" rather than a member with a vesting membership interest would be a tax disaster, and the only way to give Schwarz a vesting right to future payments dependent on success was to make him a member (partner) with membership (partnership) interests that were profits interests.

G.   Mel Dogan relented and let Schwarz become a member, and in November 2005 Schwarz signed an agreement which changed "economic interest" back to membership interest, causing him to become a member of Bayrock companies. Kriss and Satter signed similar agreements, reaffirming their long-existing membership interests and granting them such new interests in Bayrock companies as they didn't already own them.

H.   These November 2005 documents show that ever since 2003 Satter owned most of the entire Bayrock Organization, about 67%, almost five times what Arif owned.

I.   At about the same time, Woodring liquidated or modified his already-existing membership interests, and Ejekam received new membership interests as well.

375.   Arif, Satter, Schwarz, and others have RICO principal and conspiracy liability, and state law principal, conspiracy, and accomplice liability, by reason of their, or others'', commission of acts they knew, were reckless in not knowing, or should have known were illegal <u>because</u> of Arif, Satter, Schwarz, Plaintiffs'', and others'' ownership and creditor status in Bayrock companies.

376.   Defendants knew of these memberships and the laws concerning their conveyance, receipt, or ownership; not only did they know, they relied on their knowledge in deciding to convey them in the first place. Thus in breaking those laws these Defendants acted with scienter:

76

KRISS, SATTER, AND OTHERS ARE MEMBERS OF BAYROCK COMPANIES EARLY ON

377.    **Arif**. From its formation in 2002 until Satter joined shortly thereafter, Arif owned 100% of the membership interests in Bayrock Group LLC[24].

378.    **Satter**. Satter joined Bayrock as Arif″s partner in 2002. By 2003 Arif had covertly given him membership interests in virtually all Bayrock companies, including Bayrock Group LLC. These interests were often held in his wife″s name in shell companies or trusts as part of the effort to hide his ownership. He was never an employee of any Bayrock entity.

379.    There is documentation of his legal or beneficial ownership of membership interests in Bayrock companies from 2003, a letter where he and his wife promise Kriss 10% compensatory membership interests[25] in Bayrock companies or Bayrock Group LLC and to "gross him up" with membership interests in Satter companies that own Bayrock membership interests.

> [W]e have granted you interests in entities formed or to be formed by either or both of us, which in turn held interests in the Bayrock projects. In the future, you may receive **membership interests** directly from Bayrock Group or one of its affiliated entities.

380.    Later witnessed, notarized, authenticated documentation attests to Satter″s ownership, as of January 1, 2003, of membership interests in virtually every Bayrock company, Exh. D.

381.    **Kriss**. Kriss joined Bayrock in 2003, on the condition that he be paid "sweat equity", meaning his ultimate compensation would over time depend significantly on the entrepreneurial success of Bayrock operations. By 2004 Kriss had received compensatory membership interests in Bayrock companies, and was a member of, without limitation, Bayrock Ocean Club, Bayrock Merrimac, and Bayrock Camelback. This is from a 2004 services agreement, pursuant to which Kriss provided services to Bayrock Group LLC for a brief period starting in June 2004.

---

[24] RIF International, the corporation wholly owned and controlled by Arif and used for just such purpose, owned 1%. For convenience this Complaint generally attributes RIF International″s membership interests to Arif.

[25] "Compensatory membership interest" means a membership interest given for services or the promise of services.

> WHEREAS, the Employee [Kriss] is also an unsalaried **member** of certain affiliated limited liability companies to wit: a) Bayrock Ocean Club LLC (10% **membership**) b) Bayrock Merrimac LLC (10% **membership**) c) Bayrock Camelback LLC (5% **membership**) in which entities the Employer [Bayrock Group LLC] is also a **member**.

382.     **Woodring**. Woodring, not a party, joined Bayrock in 2003, on the condition that he be paid "sweat equity". By 2004 Woodring had received compensatory membership interests in Bayrock companies, and was a member of, without limitation, Bayrock Ocean Club, Bayrock Merrimac, and Bayrock Camelback. This is excerpted from a 2004 services agreement, pursuant to which Woodring provided services to Bayrock Group LLC from 2004 to 2005.

> WHEREAS, the Employee [Woodring] is also an unsalaried **member** of certain affiliated limited liability companies to wit: a) Bayrock Ocean Club LLC (**5% membership**) b) Bayrock Merrimac LLC (**5% membership**) c) Bayrock Camelback LLC (**10% membership**) in which entities the Employer [Bayrock Group LLC] is also a **member**.

383.     **Ejekam**. Ejekam joined Bayrock in 2003 on the condition that he be paid "sweat equity", receiving compensatory membership interests in Bayrock Spring Street and Bayrock Whitestone 2005. He was never an employee of any Bayrock entity.

THE 2005 PROTOCOL FORMALIZES USE OF COMPENSATORY MEMBERSHIP INTERESTS

384.     **Compensation Planning**. In late 2004, Arif and Satter had Kriss research "sweat equity" compensation. Kriss consulted Don Duffy, a tax attorney at Akerman Senterfitt, who advised:

> [T]here are two ways for the sweat-equity employees to document their entitlement ... First, it can be done by a contract between Bayrock Group LLC and each separate employee. Second, it can also be done by having each sweat-equity employee **admitted as a member of Bayrock Group LLC** ... [A]n LLC operating agreement (i.e., a contract) between the members defines everyone's rights and Bayrock Group LLC and their members are treated as a partnership. A partnership is not a taxable entity for federal income tax purposes, and the members report their share of the partnership's income, losses on their own tax returns -- and the operating agreement or contract defines the members' share. If the principal ... of Bayrock Group LLC does not want ... employees as **members** ... have Bayrock transfer its wholly-owned project LLCs to a new LLC and cut employees into the new LLC.

385. <u>Employee or Owner</u>. Duffy said service providers could have "sweat equity" either, but not both, as employees with deferred compensation contracts; or as owners whose rights to share in the success of the business were inherent in and thus conveyed by their ownership. In a limited liability company (tax partnership) its owners are members (partners) and their form of ownership is membership interest (partnership interest), so Duffy's two methods were:

| Conveyance Method | Fiscal Nature | Receipt Taxable? | If So, When? |
|---|---|---|---|
| (1) <u>Owner (Member)</u> | | | |
| (2) <u>Employee</u> | | | |

386. Method (1), ownership, was how Bayrock had always given sweat equity to Kriss *et al.* all along, by conveying membership interests. ¶379, ¶380, ¶382, and it was how Bayrock had given equity to Thieriot, selling her membership interests in Bayrock Ocean Club LLC, ¶317, so membership and membership interests were hardly novel concepts to any Defendant.

387. <u>Profits Interests and Capital Interests</u>. Recall federal income tax law divides membership (partnership) interests in two mutually exclusive sets, *viz.* capital interests and profits interests. ¶249. The determination whether a membership interest is capital or profits is made at receipt.

388. Duffy's two methods of conveying (receiving) sweat equity in a limited liability company context can be restated as three methods, conveying (i) membership via a profits interest; (ii) membership via a capital interest; or (iii) employment with a deferred compensation agreement.

| Conveyance Method | Fiscal Nature | Receipt Taxable? | If So, When? |
|---|---|---|---|
| (1) <u>Member</u> | Profits Interest | | |
| (2) <u>Member</u> | Capital Interest | | |
| (3) <u>Employee</u> | --- | | |

389. Duffy did not discuss taxation, but noted membership would make service providers tax partners and a new law (§409A) imposed tax burdens on employees with deferred compensation.

390.    **Schwarz Joins Bayrock as a Member**. Soon after Duffy''s note, in early 2005 Bayrock offered Schwarz, an Akerman attorney, a position as Bayrock Group''s in-house general counsel.

391.    During negotiations, Schwarz demanded his compensation, too, include sweat equity, like the others wanting his ultimate compensation heavily dependent on Bayrock''s success.

392.    Schwarz, still at Akerman and still Bayrock''s attorney during the negotiations, also gave Kriss personal legal advice[26] by email on March 24, 2005, telling Kriss while he (Schwarz) was negotiating his service agreement with Bayrock, Kriss should redo his service agreement with Bayrock in the same form as Schwarz''s, and after Schwarz''s contract was agreed on, which took months, Kriss did redo his agreement to match Schwarz''s substantially, in reasonable reliance that, as his Akerman attorney for the matter, Schwarz had given him good advice to do so.

393.    On April 7, 2005, Schwarz sent Bayrock this proposed language for his agreement, providing his sweat equity would be conveyed to him by giving him part ownership, by giving him a membership interest in Bayrock Group LLC.

> THIS AGREEMENT ("Agreement") dated as of April __, 2005 is entered into by and among Bayrock Group, LLC (the "Company"), Felix Satter and Tevfit Arif (collectively, the "Principals")[27] and Julius Schwarz ("Executive").
>
> 5. EQUITY COMPENSATION.  The Company additionally agrees that **Executive shall be a 1.5% member of the Company** and, accordingly, shall be entitled to 1.5% of all Company Proceeds (as hereinafter defined) ...

394.    Six days later, Mel Dogan, representing both Bayrock and Arif, emailed back refusing to allow Schwarz to be made a member of Bayrock Group LLC, saying:

> **[N]o membership interest** – because he may leave after 2 months – better to grant him a percentage on a clearer formula and based on performance incentive ...

---

[26] Schwarz was simultaneously representing himself, Bayrock as their lawyer at Akerman, and Kriss, who was, independent of this, also a client of Akerman; then, after Schwarz joined Bayrock in April 2005 and disputes arose over his contract, Akerman represented him against Bayrock in those disputes as well as representing Bayrock against him.

[27] Akerman well knew Satter was running Bayrock with Arif, but Arif and Satter had told them not to say so, and when they caught Schwarz''s *faux pas* in subsequent versions he was told to remove Satter''s name from the contract.

395.    Schwarz and Akerman, still unconcerned with representing everyone everywhere in this matter, revised the contract, substituting "economic interest" for "membership interest".

> 5. EQUITY COMPENSATION.  The Company additionally agrees that Executive shall receive a 1.5% economic interest in the Company and, accordingly, shall be entitled to 1.5% of all Company Proceeds (as hereinafter defined), subject, however, to the Vesting Schedule (as hereinafter defined), which Company Proceeds shall be paid...

396.    This made Dogan happy, and on April 21, 2005, Schwarz's agreement, containing this language, was executed and he began his work as Executive Vice President and General Counsel.

397.    Almost immediately Alex Salomon, Bayrock's accountant, got hold of this agreement for the first time (he hadn't been consulted during its negotiation) and went ballistic.

398.    Salomon knew "economic interest" wasn't a membership interest: Dogan wasn't stupid, "economic interest" obviously meant something other than membership interest or why accept the substituted language, and since there were only two choices, employee or member, by process of elimination, since it didn't mean membership interest, "economic interest" meant Schwarz would be an employee with deferred compensation rather than a member with a membership interest.

399.     Knowing the tax and valuation mess deferred compensation could cause, he emailed:

> 12. Taxation matters.  The 1½ percent equity participation presents a major taxation issue as it would require the valuation of the Executive's 1½ percent interest at the termination of each of the vesting periods.  This can be extremely costly and subject to significant variations. There would be also significant phantom income generated to the Executive without availability of cash.  This issue should be further discussed.

400.    **Taxation of Compensation**. Understanding why he was upset and what he and others did next, and why they did it, requires knowing what they understood to be, the applicable law of the federal income taxation of non-cash "sweat equity" compensation. The relevant principles are reduced to chart, ¶401. Detailed allegations of the law *qua* fact, Plaintiffs' allegations of some or all of what these Defendants correctly understood the law to be, which form part of the basis for subsequent allegations of their scienter when they subsequently violated it, are in Fn. 28.

81

401.    This is a sufficiently complete summary of the tax consequences of all three alternative contemplated conveyances, as Defendants and others correctly understood[28]:

| Conveyance Method | Fiscal Nature | Receipt Taxable? | If So, When? |
|---|---|---|---|
| (1) Member | Profits Interest | No | --- |
| (2) Member | Capital Interest | If Vesting | On Receipt or Vesting |
| (3) Employee | --- | If Vesting | On Vesting |

[28] **Taxation of Non-Cash Compensation.** Until 2005, a service provider receiving a "mere promise to pay" unsecured and not backed by note did not recognize income, but a service provider receiving property, with few exceptions no matter what kind of property, a car, boat, banana, etc., recognized income equal to its actual value unless the property was not vested, in which case the service provider realized income when it vested at its actual value at that future time of vesting, or could elect to realize income upon receipt equal to its actual value as if it had been vested on receipt.

The exception was where the property was a partnership profits interest. The interest was property, and its value surely was more than zero, but for tax purposes it was treated as if its value was zero, so its receipt was not a taxable event regardless of vesting, (to be safe, certain safe harbor rules had to be followed.) So before 2005 the taxation of compensation for services, based on what was received, could be summarized:

  **Property other than a partnership profits interest.** If the property was vested on receipt, the service provider had income on receipt equal to its value; if not vested, the service provider had income if and when it did vest equal to its value at the time of vesting, or could elect to realize income on receipt as if vested.

  **Partnership profits interest.** The service provider has income deemed equal to $0 regardless of vesting.

  **Mere promise to pay.** The service provider recognizes no income.

This changed as of 2005 with new IRC §409A, which made nonqualified "mere promises to pay", called nonqualified deferred compensation (NQDC), where a service recipient promised to pay a service provider in future years for work done in the present, taxable income. The income was recognized and became taxable at very high rates at the time such nonqualified promise to pay vested, with no opportunity to elect immediate inclusion on receipt as if it had been fully vested all along. So as of 2005, the taxation of compensation for services, base on what was received, was:

  **Property other than a partnership profits interest.** If the property was vested on receipt, the service provider had income on receipt equal to its value; if not vested, the service provider had income if and when it did vest equal to its value at the time of vesting, or could elect to realize income on receipt as if vested.

  **Partnership profits interest.** The service provider has income deemed equal to $0 regardless of vesting.

  **Mere promise to pay.** If §409A violated (a nonqualified promise to pay in future years), the service provider has highly taxed income if and when the right vests, otherwise the service provider has no income.

In this action, the only alternatives considered were membership (partnership) interest or nonqualified deferred compensation (NQDC). There were only two kinds of partnership interests, capital and profits, so the only "property other than a partnership profits interest" being considered was a partnership capital interest. Rearranging gives a simplified list of the tax consequences of the non-cash compensation being considered for Schwarz.

  **Membership Interest.** Schwarz acquires ownership as a member of one or more Bayrock companies receiving an incrementally vesting membership interest conveying either a:

    Profits interest, and Schwarz, a partner, could have taxable income deemed equal to $0; or a

    Capital interest, and Schwarz, a partner, would have taxable income equal to the value of the capital interest as it periodically vested or, if he elected, all at once on receipt as if fully vested.

  **Deferred Compensation.** Schwarz, an employee whose right to future proceeds violates §409A, would incur potentially ruinous tax liability, and expense for Bayrock, on the occurrence of each incremental vesting.

402. <u>Vesting Is the Problem</u>. Salomon was upset because the contract they had signed used Method 3, a tax disaster. Schwarz″s sweat equity, remuneration based on Bayrock success, wasn″t the problem. The problem was the way he wanted it. Bayrock success, its project profits, would not show up for years, but Schwarz wanted his sweat equity to be portable, so if he left Bayrock after, say, only a year he would take with him at least some rights to those still-future profits.

403. He wanted his rights to future payments to incrementally <u>vest,</u> becoming nonforfeitable, and as of January 1, 2005, effective date of IRC §409A, that made his sweat equity toxic waste.

404. Summarizing footnote 28, pursuant to §409A, since Schwarz″s "economic interest" was nonqualified deferred compensation (NQDC), a "bad" promise to pay an employee in the future for work done in the present, as each portion vested its value would be includible in Schwarz″s taxable income, requiring Bayrock to keep doing valuations, a mess of risk, expense, withholding.

405. The income inclusion would also expose Schwarz to ruinous unfunded tax liability, what Salomon called "phantom income". For example, in 2007 Schwarz received an additional share of future profits. Bayrock then estimated its near-term profits would exceed $200,000,000, making his additional share worth well over $10,000,000, and while that valuation was subject to debate, it wasn″t subject to delusion. As vested NQDC, its conveyance would give Schwarz an immediate mult-million dollar unfunded tax liability at extremely high rates.

406. Salomon would not let Schwarz have "sweat equity" that subjected Bayrock to valuation and withholding problems, while Schwarz would not accept "sweat equity" that didn″t vest and that created a tax disaster.

407. <u>The Dogan-Schwarz Dilemma</u>. So long as (i) Dogan would not let Schwarz have a membership interest; and (ii) Schwarz wanted incrementally vesting rights to future payments; there was a deadlock. The chart, ¶401, shows the only way to receive a compensatory vested or incrementally vesting right to future payment without current or incremental income recognition was where such right was encapsulated within a membership interest that was a profits interest.

83

408.     Emphasizing, the tax problem had nothing to do with whether the <u>fiscal nature</u> of the "economic interest" was related to Bayrock profit, and everything to do with the fact that the rights would <u>vest</u>. Once the decision was made to convey either NQDC or a membership capital interest, rather than a membership profits interest, <u>vesting</u>, not profits, created the tax problem.

409.     Whether a vesting NQDC or capital interest conveyed the right to be paid in amounts computed by reference to Fiji″s sugar exports, the sunspot count on July 4th, or Bayrock″s profits, if it vested, its receipt would be subject to valuation and present or deferred income inclusion.

410.     The fiscal nature only mattered if the right were conveyed via membership interest, not NQDC. Then §409A would not apply (as of early 2005), and the fiscal nature of the membership interest would determine whether it was a profits interest or a capital interest, which in turn would determine whether there was a tax problem with vesting.

411.     In the next allegations, the persons quoted correctly understood this and when they used the term "profits interest" they did so referring to, in the context of, a membership (partnership) interest that is a profits, not a capital, interest, contemplating Rev. Proc. 93-27 definition, ¶249.B.

412.     <u>Resolution</u>. Since Dogan wouldn″t let him have a membership interest, Schwarz had a disaster, a contract that would bankrupt him in unfunded tax liability unless it were rescinded, but in that case he would have to accept non-vesting NQDC to avoid §409A income inclusion. He was highly motivated to preserve his deal, and tried to push Salomon into letting him have his NQDC and ignore §409A, and sought help from Akerman, by then long Bayrock″s handmaiden.

413.     His first attempt was a variant of the "convertible instrument" Bayrock and Akerman had used in the CAYRE FRAUDS. Akerman, recall, wrote a sham "convertible note" to perpetrate fraud on the Cayres, ¶262 *et seq.*, a "note" that maybe could look a little like a "note" in the dark, at least if you wanted it to and you squinted hard and crossed your eyes, and was "convertible" into a partnership interest yet even without conversion still "miraculously" conveyed every right of a partner so Arif and Satter could have it both ways. Akerman emailed:

84

Julius added a provision that by mutual agreement with the Company [Bayrock Group LLC], he may get a **1.5% membership interest in lieu of a 1.5% economic interest**...if a situation comes along ... by mutual agreement, they may agree to give Julius a 1.5% **membership interest instead** ...

414.    The significance of this email is that <u>Schwarz and Akerman understood then, along with everyone else, that an "economic interest" is not the same thing as a "membership interest"</u>.

415.    Neither Dogan nor Salomon would go along. Salmon was by then more than a mere accountant, having taken on the role of trusted advisor to Arif and to Bayrock, and was looking out for them as would any fiduciary. His response was to consult Ed Baker, a tax attorney.

416.    Not surprisingly, Baker agreed with Salomon that the vesting "economic interest" was an NQDC §409A disaster. This set off a month-long war between Salomon and Schwarz, which Salomon won; the table summarizes the email exchanges that occurred over that time, with Schwarz trying everything he could think of to get Salomon to budge [bracketed text added]:

| Date | From | To | Text |
|------|------|------|------|
| 04.27.2005 | Salomon | Satter, Schwarz, Maita, Arif, Kriss | I have spoken to a tax lawyer, Ed Baker from Epstein, Becker & Green, about the 1.5% [economic interest] in Julius' contract. He agrees...the [409A] deferred comp rules may have an impact...they impose a 20% excise tax for noncompliance...The good news is that it may be possible to structure the deal so as to avoid current taxation and deferred comp rules. |
| 05.18.2005 | Ed Baker | Salomon, then forwarded to Kriss, Maita | Alternatively, there is a line of authority that receipt of a **profits interest in a partnership**...would not ordinarily be currently taxable to the recipient **partner** upon the receipt of the **profits interest**...to qualify as a **profits interest** the recipient could not receive [a distributive share in a theoretical instantaneous fair market value liquidation, i.e. not receive a capital interest]... |
| 05.20.2005 | Schwarz | Salomon, Kriss, Maita, et al. | The definition of Company Proceeds for which I receive the 1.5% is by definition a profits interest. Therefore the deferred comp rules should not apply. Frank Cordero [Akerman tax partner]...I believe did not see any issues because of this. |
| 05.20.2005 | Salomon | Schwarz, Kriss, Maita, et al. | That's fine with me. To cover my own ass (and Bayrock's), if Frank believes that the deferred comp rules do not apply to your contract, let him advise so in writing. |
| 05.24.2005 | Salomon | Schwarz, Satter, Kriss, Maita | I just spoke to Frank Cordero and Peter Solomon...There is consensus that the current provisions [economic interest] present a tax problem ... the only solution is to change the economics...or the structure of the existing LLCs by dropping [Arif's] interest into a new LLC in which you would be a **partner**... |
| 05.25.2005 | Schwarz | Salomon, Kriss, Satter, Simonchyk | Please confirm...that you are ok with converting the "economic interest" to a nonvoting **membership interest** subject to the same vesting...schedule so I can redraft the agreement...and start working on [Satter and Kriss's documents]. |

417.    04.27.2005. Ed Baker advised Salomon that what Julius had written was a mess, and a tax disaster, and that the only way to give a vesting right to future payments without a current tax problem would be to do so by conveying a partnership interest that was a profits interest.

418.    05.18.2005. Bayrock then retained Ed Baker formally, and he produced a report a couple of weeks later, again concluding, now in formal writing, that what Julius had done was a tax disaster and that the only way to do this was by conveying a profits interest in a partnership.

419.    05.20.2005. Schwarz tried something new, now saying his "economic interest" was a "profits interest" and claiming that Frank Cordero, a tax partner at Akerman, agreed with him, too. Since everyone understood "profits interest" to mean a membership (partnership) interest that is a profits interest, this meant Schwarz was now saying, and claiming Cordero agreed, that his "economic interest" now was a membership interest and not NQDC, even though weeks earlier he and Akerman had written that email acknowledging they were completely different, ¶413.

420.    05.20.2005. Salomon wouldn´t buy it, or any second-hand reassurance from Akerman, and, implying Schwarz was a liar, demanded Codero say so in writing. Not surprisingly, no such writing ever materialized, so then Salomon "called" Schwarz on it, and spoke to Cordero himself.

421.    05.24.2005. Predictably, Cordero and another tax lawyer, Peter Solomon, wanted nothing to do with what Schwarz had claimed they said, and the told Salomon, as all the other lawyers had written and said too, that the "economic interest" was a §409A problem and this could only work as a membership interest (unless Schwarz gave up vesting, and he would not).

422.    05.25.2005. Mel Dogan finally relented, Schwarz could have membership so long as its governance interest component did not have a vote. Limited liability companies allow that flexibility on an individual member basis, so Schwarz rewrote his agreement, executed it in November 2005, and became a member, not just of Bayrock Group LLC but of many companies.

423.    Schwarz also drafted similar agreements for Kriss and Satter, which they also executed roughly at the same time, in November 2005, with respect to the same Bayrock companies.

424.   Recall all important service providers to Bayrock got "sweat equity", some broadly scoped and some narrowly scoped. ¶102. Scharz, Satter, and Kriss′s were all broadly scoped.

425.   To the extent they weren′t already members, Schwarz, Satter, and Kriss became members in Bayrock Group LLC, each of the five Subs, and other Bayrock companies ("Company Entities"). To the extent they were already members, their memberships were being reaffirmed.

426.   And that meant the limited liability company agreements, the expression of the private organic rules governing the internal affairs of those companies and the rights of their members, of all these Bayrock companies had to be modified to reflect the governance and financial rights of all these membership interests created or reaffirmed by these three November 2005 agreements.

427.   **The 2005 Protocol.** To minimize the work, the following method of making all those modifications became standard at Bayrock for conveying compensatory membership interests:

A.   Subscription Agreement. There was a subscription agreement to express the contract of services for membership. This specified the services the recipient had performed, or was promising to perform under what terms and conditions, what membership interests in what companies, and other consideration (cash, "fringe benefits", etc.), he would receive in return, and obligated the granting company(ies) to issue and convey those membership interests immediately (in other words, even where consideration of services was a mere executory promise, the grant of the membership interests was always immediate).

B.   Incorporation Agreement. There was an incorporation agreement to amend the limited liability company agreements of the issuing companies. On its execution, this agreement caused non-operative specimen language listed therein to be amended into the limited liability company agreements of those companies, where it operatively expressed the governance and financial rights running with the issued membership interests.

C.   The subscription agreement, and incorporation agreement were combined into one single document with one simultaneous execution, for convenience.

428.   With this "2005 Protocol" Schwarz, with Akerman′s help, drafted three nearly identical "employment" agreements. Each expressed the terms and conditions of "employment" and created or reaffirmed many contractual relationships, since execution of each agreement amended all the issuing company limited liability company agreements,and those companies were not onlyBayrock Group LLC, and the five Subs, but all the "Company Entities", *q.v. infra.*

429.   <u>Others</u>. At about the same time, Ejekam, who had "limited scoped" equity, received compensatory membership interests in Spring Street and Whitestone, and Woodring, who had "broadly scoped" equity but was leaving Bayrock, exchanged all his membership interests in Bayrock companies except Camelback for immediate vesting of his Camelback interest.

430.   Pursuant to the "2005" Protocol, each of Ejekam′s and Woodring′s transactions was done by a single, combined subscription and amendment agreement, though in less formal letter style.

431.   These are the provisions of these "2005 Protocol" agreements important in this action:

| | Consent Rights | Voting Rights | Manager | Partner Draw | Guaranteed Payments | Special Tax Distributions | Percentage Owned | SUB |
|---|---|---|---|---|---|---|---|---|
| **BAYROCK GROUP LLC** | | | | | | | | |
| Arif | Y | Y | --- | N | N | Y | 100.00% cap 38.50% prof- | --- |
| Satter | Y | Y | --- | ($80,000 skims) | | Y | 50.00% prof+ | --- |
| Schwarz | Y | N | --- | N | $30,000 | Y | 1.50% prof+ | --- |
| Kriss | Y | N | --- | $10,000 | N | Y | 10.00% prof+ | --- |
| **THE FOUR SUBS (SPRING STREET, WHITESTONE, CAMELBACK, MERRIMAC)** | | | | | | | | |
| Bayrock Group LLC | Y | Y | Y | N | N | Y | 100.00% cap 28.50% to 38.50% prof- | S,W,C,M |
| Satter | Y | Y | N | N | N | Y | 50.00% prof+ | S,W,C,M |
| Schwarz | Y | N | N | N | N | Y | 1.50% prof+ | S,W,C,M |
| Kriss | Y | N | N | N | N | Y | 10.00% prof+ | S,W,C,M |
| Ejekam | Y | N | N | N | N | Y | 2.00% prof | S,W |
| Woodring | Y | N | N | N | N | Y | 10.00% prof | C |

432. **Membership Interests**. There was only one kind of membership interest that was a capital interest, but there were two kinds of membership interests which were profits interests:

    A. <u>Capital</u>. For convenience limited just to Bayrock Group and the Four Subs:

        I. **Bayrock Group LLC**. Arif had the only capital interest. He had "Tier 1" distributions, a priority 10% return of his equity (capital contributions[29]); then Satter, Schwarz, and Kriss had "Tier 2" distributions; then Arif had a residual "Tier 3" distribution of to whatever was left after the Tier 2 distributees got theirs.

        II. **The Four Subs**. Bayrock Group had the only capital interest. It had "Tier 1" distributions, a priority 10% return of the equity (capital contributions) Arif had made; then Satter, Schwarz, and Kriss had "Tier 2" distributions while Ejekam and Woodring had "Tier 2a" distributions; then Bayrock Group LLC had a residual "Tier 3" distribution of whatever was left after the Tier 2 distributees got theirs.

    B. <u>Profits+</u>. Satter, Schwarz, and Kriss had membership interests in Bayrock Group and the Subs conveying rights to "Tier 2a" distributions based on Bayrock <u>proceeds</u>, not profits[30]. After Arif had actual or constructive receipt of his 10% return of his equity, they received distributions of, respectively, 50%, 1.5%, and 10% of all cash and non-cash proceeds, including from sale, refinance, insurance recovery, disposition, and exchange.

    C. <u>Profits</u>. Ejekam and Woodring had membership interests which were "plain vanilla" profits interests with corresponding "Tier 2b" distribution rights.

---

[29] The capital contributions he made is an ultimate fact, but is almost surely between $2,000,000 and $8,000,000.

[30] If a company found a dollar or a goose laid a golden egg on premises or a diamond fell out of the sky and landed on Arif"s desk or there was a non-recognition exchange or a taxable exchange, the "Tier 2a" members got "a cut".

This did not preclude it from being a profits interest. In that sense, "profits" doesn"t mean accounting profit, but a claim with a present value <u>uncertain</u> enough that it is deemed worth zero. For administrative convenience, ignoring sham, step, substance over form, and abuse doctrines, the present value of a partnership interest which would not share in distributions in a fair market value liquidation occurring at the time of receipt is uncertain enough that it is a profits interest. For example, a partnership that admits a service partner when its sole asset for which it paid $10,000,000 is worth $5,000,000 and gives her a partnership interest entitling her to 10% above $5,000,000, has given a profits interest even though if it liquidates in two years for $8,000,000 her $300,000 share is payable without any accounting "profit".

433.  **Multi-Level Distributions**. Satter, Schwarz and Kriss's broadly scoped equity paid distributions from two sources: from an individual project's success, as proceeds flowed from lower tiers into the Sub for that project, from which they would receive distributions; and from the overall success of the Bayrock Organization, as residual profits flowed up to Bayrock Group.

434.  For example, if profits flowed from Trump SoHo up to Spring Street, Spring Street memberships gave them Tier 2a distributions. Then, after Spring Street distributed Tier 3 residual profits upstream to Bayrock Group, their Bayrock Group memberships would give them Tier 2 distributions from portions of those profits as well. The arrows show these multiple distributions:



435.  Multi-level equity is common in such firms, such as "fund of funds" companies, where partners have equity in individual fund companies, to give them a share of that fund's success, and in the top management company, to give them a share of the whole firm's success.

436.    Arif and Satter always used multi-layered equity. In the CAYRE FRAUDS, ¶276, for example, before Schwarz joined Bayrock and wrote these agreements, Satter had a double cut of Banyan Bay, through Alarga, his wife's shell, and through Bayrock Group, as the arrows show.



437.    Satter's Majority Ownership. One of the chief advantages of multi-layered equity was that it enabled Satter to have majority ownership of the entire Bayrock Organization yet still hide that fact "in plain sight".

438.    Considering only the top two levels, Bayrock Group and the Subs, after Arif's Tier 1, Satter owned 67% of Bayrock[31], Arif 14%, Plaintiffs 15%, and Schwarz 2%.

439.    For example, Bayrock's invested a total of about $8,000,000 in the Four Projects and estimated it would realize $227,000,000 on that $8,000,000. For ease of example, assuming when the projects paid off Arif had Tier 1 priority of $10,000,000, of the remaining $210,000,000 net of obligations, all of which had to flow through the Four Subs, Satter's share would be about $140,000,000, Arif's $30,000,000, Plaintiffs' $32,000,000; and Schwarz's $5,000,000.

440.    In short, for expectations of profit sufficiently large relative to invested capital, usually the case in real estate development and the case with Bayrock from its inception through at least 2007, the vast majority of the value of the firm is embodied in its profits, not capital, interests;, measured by such value, because of the multi-layering, Satter owned most of Bayrock since 2003.

---

[31] No profits or proceeds could flow into Bayrock Group LLC without first flowing into, then out of, a holding company subsidiary. Once the Tier 1 distributions were satisfied, Satter owned 50% of the proceeds ("profits+"), not just the profits, of each subsidiary, as well as 50% of the proceeds, not just the profits, of Bayrock Group.

Since Bayrock Group owned the residual 28.5% to 38.5% of the Subs, Satter owned between 64% and 69% of the profits+ interests in the whole Bayrock Organization, or about 2/3.

441.    **Distributions**. Each member had the right to receive both general distributions and special tax distributions.

442.    General Distributions. Plaintiffs have alleged the financial substance of their distribution rights, and those of the other members, esp. ¶432 *et seq*, that is, how they were computed.

443.    All such computations of distributable amounts were by done by merely ministerial application of fixed formulae, and all proceeds were distributable with minor adjustments for operating reserve set asides from otherwise distributable proceeds.

444.    General distributions were to be paid when proceeds were "available for distribution to the Members".

445.    Special Tax Distributions. In addition to their rights to general distributions as alleged, all members had rights to special tax distributions.

446.    The tax distribution provisions were identical for all members[32]. No matter any loss, carryforward, deduction, or other tax status a member might have, even if a Member were tax exempt ("... accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation").all Members with the same distributive shares of income got the same tax distribution, subject to individual variance only by their history of prior distributions and tax allocations. Its payment was absolutely mandatory ("shall" means shall), and non-discretionary.

---

[32]   [T]he Company"s and the Company Entities" Managing Members shall make a distribution (a "Special Tax Distribution") to the Members ... Special Tax Distributions (i) shall be distributed to the Members regardless of a Member"s individual tax situation and regardless of when a Member became a Member of the Company ... The Company"s and the Company Entities" Managing Members shall use best efforts to make the Special Tax Distributions prior to the dates for making estimated tax payments for each year (the 15th of April, June, September and January).

"Cumulative Tax Amount" means a cumulative amount separately calculated with respect to each Member as follows ... the total amount of ... income ... of the Company allocated to the Members ... shall be multiplied by the Assume Tax Rates ... the total amount of ... loss ... of the Company allocated to the Members ... shall be multiplied by the Assumed Tax Rates ... the Cumulative Tax Amount is equal to the remainder of [the first computation based on income minus the second computation based on loss] ...

"Assumed Tax Rate" means the sum of the maximum federal and state tax rates ... [t]he federal tax rates shall be determined by rates applicable to individuals who are residents of the United States ... The maximum state tax rate shall be determined by reference to the tax rates of the State of New York ... accordingly, the Assumed Tax Rate is the same for all Members, irrespective of their actual tax situation.

447.     Therefore, because the only inputs into the computation of each member's tax distribution were (i) partnership items of income and loss; (ii) the distributive share thereof of each member; (iii) the same Assumed Tax Rate for each member; and (iv) the trailing history of distributions and prior distributive shares of each member; absolutely all of this information was available to the management of each company at all times without input from any member.

448.     **Each Partner Has a "Sleep Number"**. Like the adjustable mattress firm that advertises everyone can have their own "sleep number", by combining those four items, at any time, for every partner $P$ there was a fraction $X$ between 0 and 1 such that for every dollar of partnership taxable income, $P$ was entitled to a special tax distribution, without any intervening decision and with no more than mechanical computation, of $X_P \cdot \$1$. That fraction X might change from time to time as trailing tax allocations and distributions changed, but it was always there.

449.     More simply, by mere ministerial computation, every time the company realized $100 of net taxable income, every member became entitled to a certain share of it as a special tax distribution. One member might get $12 per $100, another $18, but whatever it was, each had his own "sleep number" based solely on current and trailing tax allocations and trailing distributions.

450.     Moreover, all tax distributions were not only subject to mere ministerial computation, but were payable absolutely, without any discretion, hold back, or reserving.

451.     Comparing the general distribution and special tax distribution provisions:

| Type | Based on | Adjusted for | Payable |
|------|----------|--------------|---------|
| General | Tier 1, Tier 2, Tier 2a, Tier 2b waterfalls; occurrence of profits+ (proceeds), profit,or profits- | Operating reserves. | When proceeds are available for distribution to the members. |
| Special Tax | Current and trailing allocated items of partnership income and loss and trailing distributions. Not dependent on presence or absence of proceeds or profits. | NOTHING. | Quarterly estimated tax payment dates. |

452. **Effective Dates**. After months of discussion throughout 2005, what started out as a business decision to grant Schwarz and others, including Plaintiffs, membership interests in Bayrock companies (to the extent they didn't already own them), detoured for months through repeated analysis, lawyer after lawyer, of every conceivable alternative, most of it concerned with tax consequences, after failing to find a workable alternative at the end of the year all returned back to the beginning and by the end of the year Schwarz, Satter, Kriss, Ejekam, and Woodring became new members of Bayrock companies or ratified their existing memberships.

453. Importantly, because Satter had been at Bayrock for years and had been all that time a member of Bayrock companies, his agreement has an effective date of January 1, 2003:

<u>EMPLOYMENT AGREEMENT</u>

THIS EMPLOYMENT AGREEMENT ("Agreement") dated ~~September~~ _November 10th_, 2005 but effective as of January 1, 2003 (the "Effective Date") is entered into by and between Bayrock Group, LLC, a New York limited liability company (the "Company"), Tevfik Arif solely for purposes of Section 4 hereof, and Felix Sater ("Executive").

454. Schwarz's agreement had an effective date of April 21, 2005, Kriss's February 1, 2003.

455. To recap the prior 20 pages:

A. Satter received memberships in many Bayrock companies by January 2003. Kriss received memberships in many Bayrock companies by February 2003. ¶378, ¶381.

B. In November 2004, Bayrock got tax advice that there were two ways to compensate with sweat equity: as an owner (member); or as an employee, which had tax issues. ¶384.

C. Schwarz joined Bayrock in April 2005. He asked to be a member of Bayrock Group, LLC and sent proposed documents granting him a membership interest, ¶393. Mel Dogan refused and said he could only be an employee with a bonus (deferred compensation) tied in some way to Bayrock success. ¶394. So Schwarz rewrote the documents and made himself an employee with such a deferred compensation "economic interest" instead of a membership interest, ¶395. These were executed on April 21, 2005. ¶396.

D.    Salomon objected. As did the lawyer that November, he warned if Schwarz were employee with a vesting "economic interest" there would be bad tax consequences, ¶399.

E.    Schwarz, who insisted on vesting, did all he could to go under, around, or behind Salomon, implying he was incompetent, or wrong, ¶413 *et seq*. Salomon did not relent.

F.    Bayrock hired more tax lawyers. All said the contract as executed, making Schwarz an employee with a vesting "economic interest" rather than a member with a vesting membership interest would be a tax disaster, and the only way to give Schwarz a vesting right to future payments dependent on success was to make him a member (partner) with membership (partnership) interests that were profits interests, ¶415 through 421.

G.    Mel Dogan relented and let Schwarz become a member, and in November 2005 Schwarz signed an agreement which changed "economic interest" back to membership interest, causing him to become a member of Bayrock companies. Kriss and Satter signed similar agreements, reaffirming their long-existing membership interests and granting them such new interests in Bayrock companies as they didn't already own them ¶425.

H.    These November 2005 documents show that ever since 2003 Satter owned most of the entire Bayrock Organization, about 67%, almost five times what Arif owned. ¶438.

I.    At about the same time, Woodring liquidated or modified his already-existing membership interests, and Ejekam received new membership interests as well, ¶429.

FRAUDULENT CONCEALMENT OF BAYROCK OWNERSHIP

456.    It could hardly be more clear that (i) as of November 2005 Satter, Schwarz, and Kriss were members of many Bayrock companies including Bayrock Group LLC, in some cases (Satter and Kriss) having been members for years; and (ii) Arif, Satter, and Schwarz, Dogan, Salomon and others not only knew this, that these three and others were owners of Bayrock companies, but also knew the legal, and especially tax, consequences that arose by reason of these memberships.

457. Accordingly, it is no surprise that in May 2009 Arif, Satter, Schwarz, Dogan, and other "Bayrock Defendants" made court filings[33] describing Schwarz's Bayrock status as

> Julius Schwarz, Bayrock Group's Executive Vice President and former General Counsel and **a member of Bayrock Group and certain Company Entities**. [Emphasis added.]

458. Of course Schwarz was then, and had been since 2005, a member of Bayrock Group and certain Company Entities. That was the intended result of all the planning throughout 2005.

459. These service providers were not the only owners of membership interests in this action:

460. Elizabeth Thieriot had bought membership interests in Bayrock Ocean Club LLC; recall her Memorandum of Understanding, provided, ¶138:

> BG [Bayrock Group LLC] is currently the sole member of Bayrock Ocean Club LLC ("BOC"). BOC owns a 50% membership interest in 550 Seabreeze ... [Thieriot shall purchase from BG a 4% membership interest in BOC for $1 million ... ET shall have an option to invest up to $2,000,000 to acquire additional membership interests in BOC and other BG projects. The price ... shall remain fixed at $250,000 per 1% membership interest...Whenever cash is distributed ... it shall be distributed to the investors at the same time and in proportion to their relative ownership interests.

461. Accountant Salomon, upon reading the Memorandum of Understanding, wrote:

> Based upon this memorandum, Ms. Thieriot is a four percent owner of Bayrock Ocean Club. The tax returns for BOC will need to reflect this ownership.

462. And when Arif, Satter, and Schwarz embezzled her money and she sued and they kept up the fraud that she wasn't a member, Akerman attorney Domb wrote Satter and Schwarz:

> Thieriot is a member of BOC. Sklavoshas produced a fuly signed copy of the Memorandum of Understanding. We also admitted that Thieriot invested $1 million in BOC. Thus...there is no doubt that Thieriot is a member of BOC...

---

[33] *Kriss v. Bayrock* et al., C.A. No. 4154-VCS, Del. Ch. 2008, Opening Brief in Support of the Bayrock Defendants' Motion to Dismiss, Pg. 4

463.   Arif and Dogan knew what it meant to convey membership interests and make people members. Dogan knew because he was the one who held Schwarz up for months precisely because he didn''t want Schwarz to be a member, before relenting.

464.   Not only was Arif a signatory to every one of those agreements, Satter insisted they be first translated into Russian, Arif''s native language, because he rightly suspected Arif would one day try to claim he hadn''t understood what he was signing; these was done, and Arif read them.

465.   Furthrmore, As Satter anticipated, Arif decided he forgot how to read and write not only English but his native Russian as well, and was balking at signing, pretextually claiming he didn''t understand, as this email from Schwarz on November 11, 2005 shows, and below it is a sample from Kriss''s Novemer 2005 agreement, showing how Arif had Dogan translate every page for him and then he signed after confirming his understanding.

> Fyi, Tevfik still has our agreements.  He wants Mel to come back and approve him
> initialling each page of the agreements before he does it because he says he does not
> understand what the agreements say.  After telling me this I told him before he releases
> the documents he better understand what they say and Mel needs to translate for him.  I
> know this is a real pain for us all but I certainly don't want him to claim later that he did
> not understand what he signed.

> (a)     Subject to the provisions of this Section 4 and Section 5, the Company and the Company Entities agree that, in consideration for Executive's Services, Executive shall receive Executive's Membership Interest.  Executive shall have the right, no more than once per year, to audit the books and records of the Company Entities.  Such audit rights for any particular Company Investment shall expire following one hundred eighty (180) days after the final distribution of Company Proceeds with respect to such Company Investment.  Such audit shall further be paid for by the Company in the event that the results of such audit reveal the existence

{M2248368;3}                    3

466.   **Fraud on Lenders**. Nevertheless, from then on, Bayrock submitted, per Schwarz who personally prepared and submitted, and ordered others to prepare and submit, what Schwarz, Arif, and Satter knew were fraudulent documents to lenders hiding members'' ownership.

467.     Capmark. For example, mere weeks after the November 2005 agreements were executed, and mere days after the December, 2005 agreement which accelerated the vesting on Woodring′s 10% membership interest in Bayrock Camelback LLC, Schwarz perpetrated a fraud on Capmark.

468.     Schwarz had a pre-existing relationship with Capmark from his time at Akerman, and wanted them to lend $12,000,000 loan on the Trump Phoenix, later increased to $17,000,000.

469.     To conceal Satter′s majority ownership in Bayrock in general and his 50% ownership of Bayrock Group LLC and Bayrock Camelback LLC in particular, Schwarz wrote a fraudulent limited liability company agreement for Camelback, which until that time had been operating without a limited liability agreement except for the amendatory provisions incorporated into the statutory default rules by the November 2005 and December 2005 agreements.

470.     He backdated it to January 21, 2004, and wrote it to fraudulently misstate that Bayrock Group was the only member and there would be no other members without GMAC′s permission. Right above his signature it says "Executed as of the date first above written", which is January 21, 2004, and you would only know the backdating if you knew that Schwarz wasn′t at Bayrock until 2005, or if you read carefully and saw "Loan Agreement" defined in Article I as "that certain Loan Greement, dated January 31, 2006, between the Borrower and GMAC.

471.     He invalidly executed it alone on behalf of Bayrock Group as its purported sole member, instantly breaching its representations provision Section 9.9 that he had the authority to do so; and he had to know as a $720,000 a year attorney with an Ivy League law degree and stints at Wachtell Lipton that it was invalid, void, and illegal to misrepresent his authority like that.

472.     Attorney Steven J. Young at Snell & Wilmer prepared this document with Schwarz, along with attorney opinions. Plaintiffs will determine in disclosure whether Attorney Young was duped by Schwarz or was culpable in this fraud, but Young had to know it was backdated.

473.     This, however, was not the sole objective of the concealment fraud on Capmark.

474.     The loan documents, primarily Article 7, contain extensive covenants, representations, and warranties as to Bayrock Camelback LLC, which the loan agreement referred to as the "SPE Equity Owner". Basically, Bayrock Camelback was required to be a "Single Purpose Entity", either a single member limited liability company or a multi-member limited liability company whose sole managing member was itself a "Single Purpose Entity".

475.     Bayrock Group LLC was the sole managing member of Bayrock Camelback, and was not a "Single Purpose Entity" by any means, since, for example, it engaged in business activity and owned assets other than the Phoenix project, both disqualifiers.

476.     Therefore, Schwarz "had", that is, chose, to cause Bayrock to defraud Capmark into thinking that Bayrock Camelback was a single member limited liability company, omitting himself, Satter, Kriss, and Woodring, as the rules applicable in that case were far less onerous.

477.     Schwarz perpetrated the same fraud on Capmark again when the loan was modified later that year.

478.     Schwarz perpetrated the same fraud on Capmark yet again in connection with an unrelated loan, this time to finance the Waterpointe project, where instead of a backdated limited liability company agreement for Bayrock Whitestone LLC Schwarz submitted a fraudulent amendment to its limited liability company agreement (fraudulent because it had not been adopted by all the members, in fact had been concealed from Plaintiffs, and thus was a nullity).

479.     Schwarz did this for the same reason as he did with Bayrock Camelback, to defraud Capmark into believing that Bayrock Whitestone was a single member limited liability company, this time omitting himself, Satter, Kriss, and Ejekam, as the loan agreement for Waterpointe had the same covenants and conditions.

480.     iStar Financial. Lest there be any doubt that Arif, Satter, and Schwarz were defrauding their lenders to hide Satter's ownership, and threatening others to go along, not long after he defrauded Capmark, Schwarz supervised the submission of fraudulent loan documents to

successfully induce iStar Financial to lend what would turn out to be a $275,000,000 to the Trump SoHo project, a loan which is now hopelessly underwater with multi hundred million dollar company-ending losses for iStar, a loan they never would have made but for the this fraud:

481.    For example, Arif, Satter, and Schwarz hid Satter's near 50% ownership in Bayrock Group LLC, and 62% ownership in the whole Bayrock Organization, from iStar. Then, in late 2007 when the story about Satter's mob ties Schwarz planted or encouraged in the New York Times, Exh. B., circulated and caused significant blowback and audit demands from iStar, Schwarz, as part of his conspiracy to falsify that and a related audit by the Sapir Organization, the money partner in Trump SoHo, planned with Defendant Halberg the pretext with which to continue the concealment fraud:

> From: Julius Schwarz
> Sent: Thursday, January 24, 2008 3:37 PM
> To: Brian Halberg
>
> Subject: Tell me please asap whether Felix's interest in the company is a breach of our soho lender reps
>
> From:    Brian Halberg
> Sent:    Thursday, January 24, 2008 4:42 PM
> To:      Julius Schwarz
>
> Subject: RE: Tell me please asap whether Felix's interest in the company is a breach of our soho lender reps
>
> There is a rep that the org chart attached to the PLA correctly identifies each person owning directly or indirectly owning an "ownership interest" in the Borrower and the Carveout Guarantor.  Bayrock Group is a Carveout Guarantor.  Felix's employment agreement initially characterized his interest as a profit interest, not a capital interest (no risk of loss).  However, there is an addendum to the agreement that requires Felix to fund the capital requirements of Bayrock.  It is not triggered, however, until repayment of all of the Tevfik's "Total Principal Company Contribution plus 10% thereon."  Assuming that has not happened, **I would argue that the rep has not been violated since a profit interest is not an ownership interest because there is no risk of loss**.  Checking Lowe.

482.    By this time, as of January 1, 2008 the governance interest components of Satter's membership interests in all Bayrock companies had automatically acquired voting rights, not just the consent and other rights they had always had, and because of the membership interests of

Schwarz and Kriss, in every single Bayrock company other than Bayrock Group itself Satter had total voting control, because the limited liability company laws applicable to those companies provided for voting by percentage of profits and by percentage of profits Satter was first at 50%, followed by Bayrock Group LLC at about 33% to 38%, depending on the company, and only Satter and Bayrock Group LLC could vote.

483.    This isn't just Plaintiffs'' allegation; one of the Bayrock attorneys consulted about Satter after reading the documents observed a few weeks earlier (mdny@att.net is Dogan):

> From: Gilbert, Adam <agilbert@nixonpeabody.com>
> To: Julius Schwarz <js@bayrockgroup.com>; mdny@att.net <mdny@att.net>; Alex Salomon
> Sent: Sat Dec 22 11:47:01 2007
> Subject: RE: Felix
>
> I am not privy to all that is going on at the current time.
>
> But about this I am certain -- something needs to be done with Felix before year end. If the Company does not take affirmative action to terminate, then, come January 1, Felix has a 50% membership interest in Bayrock LLC and various affiliates, with voting rights. If Tevfik and Felix want to be 50/50 partners going forward, then all is well. But if they are speaking about a separation, then time is not on the Company's side.

484.    Gilbert was referring to this automatic "kick in" of Satter''s voting rights; the only difference between his memberships before and after January 1, 2008 was voting.

485.    Gilbert was warning that if they didn't want Satter to have *de jure* control (he had aways had shared *de facto* control) they had better buy him out before December 31.

486.    They did not, they only pretended to, but Satter was able to use this to illegally extract many millions of dollars from Bayrock, which had no business using its funds to "pay him off".

487.    <u>Halberg''s Conspiracy Liability</u>. Halberg knew for a long time about Satter''s ownership; he knew from before he joined Bayrock, when he was at Kramer Levin, because he was part of the team that filed the fraudulent condominium documents for Trump SoHo that hid Satter.

488.    Moreover, the idea that he actually believed what he wrote cannot be taken seriously. He is paid $500,000 a year by Bayrock for legal skills and either is heroically incompetent and

believes that equity given for services "doesn't count" as ownership because there is no risk of loss of money, which will be news to the hundred million or so workers throughout the United States who received equity as part of their compensation and now will learn they don't "really" own equity because they didn't pay cash, or he knows it is pretext for continuing the fraud and falsifying the audit iStar had just demanded.

489.    The overwhelming likelihood, particularly given the facts and circumstances of their attempts to hide Satter and the tone of the letter, show that Halberg had the same criminal scienter as Arif, Satter, and Schwarz, and knew very well this was fraud on iStar.

490.    This is not his only overt act in knowing support of their crimes of concealment, nor was his knowledge confined to concealment of Satter from iStar.

491.    For example, on September 15, 2009 he personally refused, by interstate email, Kriss's demand for access to Bayrock books and records, primarily its tax returns and records, as of right, and he did so to further the concealment of those records from Kriss and from the IRS to continue to maintain and cover-up the tax frauds.

492.    In any event, it would have been impossible to explain to iStar how Satter had owned 50% of Bayrock Group LLC all this time yet was intentionally excluded from the condominium offering documents, the penalty for which would have been forced offered refunds of sales, so there was ample motivation to continue the fraud.

493.    As further example of these audit frauds, here is Schwarz falsifying financial statements:

From: Julius Schwarz
Sent: Tuesday, April 29, 2008 12:03 PM
To: Alex Salomon; Maria Simonchyk
Subject: RE: Financial Statements

 Thanks Alex.

 Please change the item "Due from Felix Sater" to include it in "Due from Related Parties".  I do not want Felix's name included anywhere in the report.

494.    Probably the best example of Schwarz's attitudes towards audits and financial fraud and his casual indifference to betraying Bayrock partners is this email sequence. Bayrock had a project accountant / examiner working at their offices, his salary charged to the Trump SoHo project. This was to accommodate the Sapirs, who had a long history of (understandable) suspicion of financial fraud at Bayrock.

495.    Julius fired the man (David), but to cover this up so the Sapirs would not be enraged that they once again had no financial controls over the project, Schwarz ordered the staff to defraud the Sapirs by continuing to use David's email account to send and receive messages pretending to be David so the Sapirs would think he was still working there. And remember, all emails to and from Simonchyk are always given to Arif [Emphases added]:

> From: Maria Simonchyk
> To: Julius Schwarz
> Cc: Ray Lee; Daniel J. Ridloff
> Sent: Mon May 19 10:40:12 2008
> Subject: David
>
> Julius,
>
>  I don't know how this happened, but obviously somebody already told a few people that David is not working here any longer.   Rubenstein called me today and they were told on Friday that David left the company. News spread quickly and I won't be surprised if Sapir people   already know too. So I don't know if we should keep using his e-mail to communicate with Sapir. Please, advise.

> From: Julius Schwarz
> Sent: Monday, May 19, 2008 10:41 AM
> To: Maria Simonchyk
> Cc: Ray Lee; Daniel J. Ridloff
> Subject: Re: David
>
> No don't

> From: Maria Simonchyk
> Sent: Monday, May 19, 2008 10:59 AM
> To: Julius Schwarz
> Cc: Ray Lee; Daniel J. Ridloff
> Subject: RE: David
>
>  Should I tell Sapir that he has left or you want to do it yourself?

From: Julius Schwarz
Sent: Monday, May 19, 2008 11:00 AM
To: Maria Simonchyk
Cc: Ray Lee; Daniel J. Ridloff
Subject: RE: David

Why tell them?

From: Maria Simonchyk
Sent: Monday, May 19, 2008 11:07 AM
To: Julius Schwarz
Cc: Ray Lee; Daniel J. Ridloff
Subject: RE: David

Julius, I said: "I don't know if we should keep using his e-mail to communicate with Sapir." And you replied "No don't". I thought you meant not to use his account anymore. But it looks like you really meant not to tell them anything yet. Please confirm.

From: Ray Lee
To: Maria Simonchyk; Julius Schwarz
Cc: Daniel J. Ridloff
Sent: Mon May 19 11:36:01 2008
Subject: RE: David

Cat is out of bag.   Let's stop before it get's out of control.

Let's just say he quit, and we didn't fire him.

From: Julius Schwarz
To: Maria Simonchyk; Ray Lee
Cc: Daniel J. Ridloff
Sent: Mon May 19
Subject: RE: David

Sure.

496.    Finally, when the Sapirs found out about Satter from the New York Times article, Exh. B, they exercised their audit rights and demanded access to Bayrock's books and records. They chose to send in a team of forensic fraud specialists in money laundering and financial fraud.

497.    If there were ever a response that spoke volumes, it was the email exchange between Schwarz, Halberg, and others at Bayrock expressing terror at the idea of having the books examined by people who would obviously find out all about the money laundering and tax fraud,

104

so the response they decided on was to threaten the Sapirs, claiming that by demanding to have fraud examiners audit the books instead of "plain vanilla" CPA´s the Sapirs, not Arif, Satter, and Schwarz, the financial criminals, but the Sapirs were in bad faith and thus would not be permitted to examine the books, at least by anyone who knew what they were doing; these are excerpts:

> [T]hey [Sapirs gave us no notice...they interested in caching us by surprise. They don´Υ¨ want us to have time to prepare and get our books in order. This does not seem to be  pain audit...James F. Galvin bills himself as "Certified Fraud Specialist" and "Certified Anti Money Laundering Specialist"...
>
> I think we say that the so called auditors are not CPAs and based on their resume are not being retained for legitimate partnership purposes but to go on a fishing expedition for purposes of harassment and intimidation, and as such we do not recognize their right to audit.
>
> Agreed

498.    This is completely in pattern with all their other pretexts for their fraudulent concealments of their financial crimes from their own partners, to whom they owe fiduciary duties of disclosure, as they two years earlier did to Thieriot by fraudulently denying she was a member and Bayrock Ocean Club did business in New York, and as they did a year later to Kriss when he demanded books and records, in particular tax records, and Halberg refused.

499.    **The Fraud I**. Although Satter, Schwarz, and Kriss were members of Bayrock Group, Bayrock Group illegally treated them as employees for federal, state, and local income tax purposes. As a result:

A.    About $10,000,000 of non-liquidating partner distributions, most paid to Satter, were illegally classified as wages and illegally deducted by Bayrock Group, or illegally capitalized into projects, knowingly understating Bayrock Group taxable income.

B.    Satter and Schwarz were personally able to evade about $500,000 in New York City Unincorporated Business Tax and about $100,000 in FICA they should have paid.

C. Bayrock Group was caused to waste about $200,000 in FICA and FUTA and similar payments it made but never should have.

D. The tax accounting books and records of any Bayrock projects, subsidiaries, and stakeholders to which Bayrock charged these payments as wages were corrupted.

500. These crimes are alleged with specificity in the section SATTER FRAUDS II. When the fraudulent Satter "loans" caught up wth them and Bayrock Group LLC"s 2004 return was audited, and the examiner questioned the obviously fraudulent "loans", they conspired to and did lie, claiming he was an employee and not a partner, concealing from the examiner this November 2005 agreement that showed he had been a partner since 2003. Then they misappropriated millions of dollars from Bayrock to pay Satter"s personal tax liability, using a fraudulent $5,000,000 W-2 to make it look like the fraudulent "loans" were current wages, in doing so creating millions of dollars of further unreported income to Satter

501. **The Fraud II**. As part of this scheme, they conspired to obstruct the administration of the IRS, and conspired to and did, give knowingly false information to one or more IRS examiners in the course of an audit of Bayrock Group"s 2004 tax return[34], and file over a hundred fraudulent federal, state, and local tax returns and schedules and failed to file dozens more.

502. **The Law**. A member of a limited liability company that is a tax partnership, as Bayrock Group LLC was, can never be its employee for tax purposes, only a partner[35]

---

[34] These crimes are alleged with specificity in the section SATTER FRAUDS II. When the fraudulent Satter "loans" caught up wth them and Bayrock Group LLC"s 2004 return was audited, and the examiner questioned the obviously fraudulent "loans", they conspired to and did lie, claiming he was an employee and not a partner, concealing from the examiner this November 2005 agreement that showed he had been a partner since 2003. Then they misappropriated millions of dollars from Bayrock to pay Satter"s personal tax liability, using a fraudulent $5,000,000 W-2 to make it look like the fraudulent "loans" were current wages, in doing so creating millions of dollars of further unreported income to Satter.

[35] It has been black letter law for 40 years: a partner who provides services to a partnership is not an employee for tax purposes, such person not subject to withholding, FICA, or FUTA:

> Bona fide members of a partnership are not employees of the partnership within the meaning of [the Code]. Such a partner who devotes his time and energies in the conduct of the trade or business of the partnership or in providing services to the partnership as an independent contractor, is, in either event, a self-employed

503.   **The Scienter**. Young laymen like Plaintiffs did not, and had no reason to, know this, but Schwarz, Salomon, Baker, Cordero, and the Akerman lawyers had to have known this by reason of their accounting and legal professional degrees and partnership experience, it is so basic a matter of partnership law. It is inconceivable they knew the tax law of the conveyance of compensatory partnership interests, as their correspondence and actions show they did, *supra*, but not the tax law of what life after the conveyance, that the service providers own those interests.

504.   The idea that Schwarz, Dogan, Salomon, experts in taxation, alternative entity law, and accounting, and all those tax lawyers at two firms didn″t know exactly what they were doing in deliberately choosing to make Schwarz, Satter, and Kriss members of and tax partners owning profits interests in various Bayrock limited liability companies, and somehow thought they were employees, rather than knew they were committing fraud, is ridiculous.

THEY BAYROCK HOLDINGS FRAUD

505.   The Bayrock Holdings Fraud. In 2004 Bayrock Group LLC began receiving what would total, in two years, $10,000,000 in equity contributions. A Confidential informant told Plaintiffs this money came from Arif″s brother in Russia, who had access to cash accounts at a chromium

---

individual rather than an individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee. (Rev. Rul. 69-184).

This is true regardless of vesting. Even if their membership interests in Bayrock Group LLC hadn″t been fully vested on receipt, even if they had been incrementally vesting at the slowest rate, 1/36[th] per month, on execution of the November 2005 agreements the membership interests of each of Satter and Kriss were over 90% vested and Schwarz 20% vested so they were tax partners no matter what further vesting ever occurred.

Moreover, since the whole point of making Satter, Schwarz, and Kriss members (to the extent they weren″t already) was to be sure they could have incrementally vesting "sweat equity" without current or incremental income inclusion and valuation problems, and the only way they could have that was to have incrementally vesting membership interests that were profits interests, to avoid incremental inclusion they had to follow safe harbor rules (Rev. Rul. 2001-43) which required that on the grant of a substantially non-vested partnership profits interest the partnership and service provider had to treat the service provider as the owner of the partnership interest, and the service provider had to recognize the distributive share of partnership items associated with that interest for the entire time he owned it.

refinery in Kazakhstan, but wherever it is from, Bayrock Holdings LLC is a mere conduit hiding that source, because this is equity, not debt.

506.    Month after month, for two years, in fact more frequently, whenever Bayrock ran out of cash, Bayrock Holdings would magically show up with a wire from "somewhere" just large enough to keep the company going. Without those wires, Bayrock could not have turned the lights on, literally. No sane, let alone reasonable, lender would have lent money to Bayrock, particularly unsecured, in these conditions, and of course this being Bayrock, no interest was ever paid or accrued that shows, at least clearly, anywhere on the books.

507.    The 2005 partnership returns for Bayrock Holdings do reflect income of $315,000, but they also show Arif as 100% owner (with RIF) and that income as ordinary operating income, not interest, which would mean if this is really "debt" it is at an absurdly low rate of interest which is being illegally converted into operating income, in other words, Bayrock Holdings would then be in the business of lending just to Bayrock, which is impossible as a matter of tax law.

508.    But, again by common tax principals, this kind of hand-to-mouth "keep the lights on" funneling of cash into Bayrock in its early stages when it was losing money hand over fist cannot be considered debt.

**THE FL FRAUDS**

510. **Bayrock's New Business Partner**. In January 2007 Bayrock began negotiations with FL Group ehf, an Icelandic firm, which culminated in Bayrock and FL becoming co-developers. In their words, from a non-binding Memorandum of Understanding circulated in February 2007:

> The Parties have entered into negotiations with the intention of jointly forming a partnership either through a current or new company for the purpose of developing four property projects (the "Properties") being Trump Soho, Trump Fort Lauderdale, Trump Phoenix and Whitestone New York (the "Joint Venture"). The Parties also intend to explore new projects other than the Properties through each other's network of contacts.

511. Bayrock and FL formed and operated a new venture together, hierarchically structured like Bayrock. The ultimate parent was Bayrock/FL Holdings LLC ("BFL"), a Delaware limited liability company formed for this purpose. FL, participating through FL Group USA Ltd., owned about 60% of BFL. Bayrock, participating through Bayrock Development Partners LLC, 40%.

512. Bayrock and FL understood that if they worked well together as development partners this would be a short-lived step to an eventual merger, whether *de jure* or *de facto*, and indeed within months Bayrock and FL were in active negotiation to accomplish just that.

513. These merger plans never matured because of FL's 2008 bankruptcy, precipitated by the discovery that FL was one of the now-infamous companies looting Iceland through the exercise of a corrupt hegemony over its banking system., but in 2007 that was not known or foreseeable.

514. <u>Governance</u>. Bayrock and FL had equal ownership rights and shared authority over major decisions. FL had veto rights. Ministerial or day to day operations were handled by Bayrock.

515. <u>First Refusal</u>. For a period of up to two years, Bayrock had to offer BFL first refusal on any new development projects it found before being permitted to develop them on its own.

516. Importantly, Bayrock wasn't obligated to do any new projects, and so had no obligation to put any money into BFL, but if it wanted to do any new projects it had to offer them to BFL first, plus a large share of the proceeds it expected to receive from certain existing projects.

517. <u>Finance</u>. For new projects, they agreed to split profits 50:50 and capital contributions 75:25 LF:Bayrock, FL″s total contribution capped at $75,000,000 and Bayrock″s at $25,000,000.

518. This gave Bayrock a free carry: Bayrock had profits from 50% of the capital for putting up only 25%, but it wasn″t really free, when viewed as part of the financial structure of the whole deal, which also gave Bayrock $50,000,000 and other consideration and gave FL interests in Trump SoHo, Waterpointe, Trump Phoenix, and Trump Merrimac, the "Properties", ¶510.

519. For those Four Projects, Bayrock gave FL about 62% of the proceeds from not going to outsiders. Bayrock″s hierarchical structure dictated that all such proceeds would be distributed upstream in the Bayrock hierarchy from lower-tier companies into the corresponding four holding company subsidiaries for those projects (the Four Subs), so this was the equivalent of giving FL about 65% of all the distributions flowing into the Four Subs from those lower tiers. FIGURE 1.

520. Since the Four Subs were mere passive conduits that existed only to receive those distributions and in turn distribute them right back out to their members, this was the equivalent of giving FL about 62% of all the distributions flowing out of the Four Subs to their members.

521. Inconveniently, by this time in 2007, because of the grants of compensatory membership interests in the Four Subs, Bayrock owned little of the membership interests conveying those distributions, the rest long since conveyed to service providers as compensation.

522. Notwithstanding this, Bayrock and FL consummated their deal, and Bayrock transferred the promised 62% of those project distributions to FL, even though FL knew Bayrock didn″t own most of it, that service providers owned most of it (FL knew because Kriss told them on several occasions during negotiations, in reply each time FL telling Kriss it was up to Bayrock to "fix" the problem, presumably by buying back from those service providers what it didn″t own).

523. That was prophetic, because the crimes and civil wrongs Bayrock committed giving FL what was not Bayrock″s to give entitle Plaintiffs to a forced sale remedy, or lost profits damages, in either case <u>the $32,500,000 Bayrock knew those interests were worth at the time of its breach</u>.

FOLLOW THE MONEY

524. **Plaintiffs' Interests Were Valued at About $32,500,000**. At the start of negotiations in January 2007, Bayrock estimated the Four Projects would yield projected profits of $507,000,000 in the coming two years, of which outsiders would get $280,000,000 and insiders $227,000,000.

525. Bayrock put these estimates in a brochure prepared for FL in the expectation it would induce FL, in reasonable reliance on the estimates, to join in partnership. It did.

526. This is how the $507,000,000 would have flowed. It shows by Bayrock''s own estimates it gave FL to rely on, Plaintiffs would receive distributions of $32,500,000 within two years.



FIGURE 8

527. According to the limited liability company agreements, amended by the 2005 Protocols, once Arif actually or constructively got a small priority return, the Subs and Bayrock Group, were required to make multi-level distributions to Satter, Schwarz, and Kriss from proceeds, and the Subs were required to distribute to Woodring and Ejekam from profits.

111

528.     Arif already had received that return when Samuel paid about $2,000,000 in or after June 2006 in response to the Akerman letter, ¶286, if not all of it then enough that the amount left doesn't materially alter these computations, and almost all the $227,000,000 would be profits as well as proceeds, e.g. Spring Street expected to get $69,000,000 while only investing $200,000. Amounts carved out for operating reserves, ¶443, also wouldn't much alter these computations.

529.     If sufficient cash flows occurred close enough in time to the allocations of partnership income upstream from lower tiers, the general distributions would eliminate the need for separate tax distributions. The tax distribution provisions were to protect the partners against unfunded tax liability, but here the tax liabilities would be funded by the general distributions.

530.     **Satter Owned Bayrock**. These are the general distributions that would have come from

| | Level 1 | Level 2 | Total | Pct |
|---|---|---|---|---|
| Arif | | 38,100,000 | 38,100,000 | 17% |
| Bayrock Group LLC | 76,300,000 | | 76,300,000 | 34% |
| Satter | 103,500,000 | 29,500,000 | 143,000,000 | 63% |
| Schwarz | 3,400,000 | 1,100,000 | 4,500,000 | 2% |
| Kriss | 22,700,000 | 7,600,000 | 30,300,000 | 13% |
| Ejekam | 2,200,000 | | 2,200,000 | 1% |
| Woodring | 8,900,000 | | 8,900,000 | 4% |

$227,000,000: Multi-level distributions to Satter, Schwarz, and Kriss meant the Subs would distribute ⅔ of the $227,000,000 to those and other service providers in respect of their membership interests, ⅓ to Bayrock Group, where those service providers would get ½ of that, too, leaving only ½ of that for Arif, who only participated in Bayrock through that residual interest in Bayrock Group. Service providers owned about ⅔ plus ½ of the remaining ⅓, or 84% of Bayrock

531.     These percentages would be similar whether the projects yielded as little as $100,000,000, or as much as $900,000,000.

532.     Thus Plaintiff Kriss and the other two aggrieved minority members, Plaintiff Ejekam, and Woodring, owned more of Bayrock than Arif did, 18% to 16%.



533.     <u>And Satter owned most of Bayrock</u>, about ⅝ of it.

112

534.    The terms of FL's partnership and "trial merger" with Bayrock called for FL to transfer $50,000,000 and other consideration in return for, *inter alia*, a partner's share of the distributions expected to flow up from the Four Projects into the Four Subs, ¶518.

535.    FL wanted a partner's share with a preference return, ¶250, *viz.* 100% of all the distributions until such time as it had received $50,000,000 accreting at 7.5% per year, then 50% of all the distributions after that. Assuming, as Bayrock and FL did, the $227,000,000 came in by 2009 and comparatively little thereafter, which would give FL about $143,000,000.

536.    But, other than Arif's 13% share, about $29,400,000, ¶530, even with 100% of the (nominal) voting control over member-managed Bayrock Group LLC, there was nothing Arif himself *qua* sole voting member, or Satter or Schwarz as officers, could do to get 62% into FL's hands without the service providers taking a hit.

537.    Combining the Four Projects into one "project" and the Four Subs into one "sub", FIGURE 9, which is how Bayrock and FL were negotiating, not by project, shows the three-fold problem.

538.    First, as a flat dollar amount, most of the $143,000,000 would have to come at the expense of the service providers, who had $197,600,000 of the $227,000,000, and it had to attach at the Four Subs, since only $76,300,000 would flow into Bayrock Group.



FIGURE 9

539.    Satter could have satisfied that himself, transferring his membership interests to FL, with the permission of all the other members, but that would not have solved the second problem:

540.    So long as it conveyed a preference return, 100% of the first $60,000,000 or so, jointly and severally from the Four Projects, FL's interest again had to attach at the Four Subs, and would have to hit all the service providers, not just Satter, because, for example, Schwarz, Kriss, Ejekam, and Woodring had 20% of the first $60,000,000.

113

541. Bayrock Group had to reduce its partnership interests in the Four Subs by some **X**, the service providers by some **Y**, and FL acquire **X+Y** partnership interests in the Four Subs, such partnership interests conveying $143,000,000, including the preference return. In return FL would convey $50,000,000 and other consideration.



FIGURE 10

542. **Elizabeth's Revenge**. Bayrock and FL solved this with a <u>disguised sale of partnership interests</u> tax fraud as in the THERIOT FRAUDS, but 50x to 100x bigger, designed by Defendant Roberts & Holland as part of its conspiracies with Arif, Satter, and Schwarz to violate RICO and to commit money laundering for tax evasion.

543. Recall Bayrock Group sold Thieriot membership interests in Ocean Club for $1,000,000, ¶317. Arif and Satter evaded $400,000 of tax, claiming she transferred $1,000,000 to Ocean Club, which issued her membership interests, reducing Bayrock Group's interests, and transferred the



FIGURE 11

$1,000,000 to Bayrock Group as a "loan". The transfer to Ocean Club by buying partner Thieriot and related transfer from Ocean Club to selling partner Bayrock Group were a disguised sale.

114

ROBERTS & HOLLAND ADVISES MONEY LAUNDERING AND TAX EVASION



FIGURE 12

544.    To understand how a venture of two new partners became a quarter billion dollars of money laundering and tax fraud requires first assuming a fiction, that the compensatory membership interests did not exist in 2007 and the state of the world was "Bayrock Group owns 100% of the Subs and Arif (and RIF) owns 100% of Bayrock Group".

545.    That simplified the deal. FL would be a partner in the Subs, turning FIGURE 12[36] into FIGURE 13. In fact, this is how Bayrock and FL ran negotiations from the start, all the drafts stating Bayrock Group owned all the membership interests in the Four Subs[37].

546.    As with Thieriot, the question was how to convey partnership interests in the Subs to FL. Bayrock Group could sell FL some of its partnership interests in the Subs, or the Subs could issue interests to FL, diluting Bayrock Group"s. Bayrock Group and FL would end up with the same partnership interests; the difference was where the $50,000,000 would end up, and whether a tax bill came with it.



FIGURE 13

547.    If Bayrock Group sold, the $50,000,000, and a tax bill, would be in Bayrock Group, **S1**. If the Subs issued interests, the $50,000,000 would be in the Subs, **S2**, with no tax. If the Subs then made a related transfer of the $50,000,000 back Bayrock Group, it would be a disguised sale, and the $50,000,000 would be in Bayrock Group, and a tax bill, **S3**.

---

[36] The thick gray arrows indicate flows that are fictitious, and assumed for purposes of this temporary assumption.

[37] At the time it was plausible Arif, Satter, and Schwarz intended to make it true, presumably by buying back all, or enough of, the service providers" compensatory membership interests. Kriss complained the deal couldn"t close because Bayrock didn"t own all the membership interests, but FL said it was Bayrock"s problem to fix and when he complained to Arif, Satter, and Schwarz, they told him to shut up, it would be taken care of before the deal closed.

548. **Bayrock Group Needs the Cash**. Since from their perspective, as would be revealed later, the point of the deal was to get $50,000,000 to Bayrock Group, and from there directly or indirectly into the hands of Arif, Satter, and Schwarz, *infra*, from the start the deal was structured as a sale, **S1**. FL would transfer $50,000,000 plus other consideration to Bayrock Group, and Bayrock Group would assign FL financial interest components of its membership interests in the Four Subs.



FIGURE 14

549. This was the form of this part of the deal from January 2007 through April 2007, Bayrock was selling and FL was buying (the joint venture part will be alleged shortly).

550. <u>Spent Before It's Even Received</u>. Even from the start of negotiations, much of the $50,000,000 was spoken for:

551. There was $7,500,000 of debt encumbering some of Bayrock Group LLC's membership interests in the Four Subs, and that had to be paid back or the deal couldn't close.

552. $500,000 would go for legal fees.

553. $2,500,000 would go for commissions. $800,000 would be paid as a success fee to Alfa Consulting in Reykjavik, which was two 20-year-olds with no credentials fronting for board members of FL for them to get kickbacks from FL deals. $1,700,000 would be paid as a success fee to Defendant Sal Lauria, an organized crime confederate from Satter's days running State Street, who like Satter had been barred from the securities industry for life as a result of a felony conviction and whose chief claim to the money seems to have been as courtesy Satter gave him on Bayrock's dime, in gratitude for Lauria's serving a prison sentence for racketeering while Satter avoided prison by testifying against 20 Mafia and Russian mob associates.

116

554. Arif announced he wanted to pocket $8,000,000. Since he had at least nominal control as the only voting member of member-managed Bayrock Group, that was that.

555. Next, Arif insisted the $10,000,000 that came in from Bayrock Holdings, ¶505, had to go back where it came from, whatever and whoever that was. Since Schwarz perjured himself claiming he knew nothing about Bayrock Holdings, determination of whose money this was will have to await disclosure, but regardless of its source, according to Arif it all had to back. <u>Then</u>.

556. Bayrock's basis in its membership interests in the Subs was about $8,000,000, so selling part for $50,000,000 meant a gain of $42,000,000 after sales expenses, ordinary income pursuant to IRC §751, which meant combined federal, state, and local income tax of almost $20,000,000.

557. Someone had to pay that tax, and with the fictive assumption that Arif was the only member (with RIF), that someone would be Arif, so he would need a tax distribution of almost $20,000,000 with which to pay it (as a member he was covered by the tax distribution provision).

558. That's now almost $48,500,000 spoken for, leaving $1,500,000.

559. At the time, given Bayrock's burn rate of about $250,000 per month and its other cash, that $2,000,000 would be consumed by the end of 2007, and there went the whole $50,000,000.

560. So all through January, February, March, and April, Arif, Satter, and Schwarz were negotiating a deal that would repay hidden interests in Russia and Kazakhstan on behalf of Arif, would give Arif $8,000,000, millions more than he had in personally given what he had already taken out from Michael Samuel's payment and other withdrawals, would pay Arif's taxes, would pay an old Mafia buddy of Satter's, possibly do other things for Satter with or without kickback from Lauria, but otherwise do nothing for Bayrock or anyone else, particularly Schwarz.

561. This was not acceptable to Schwarz, who realized with his 1.5% membership interest in Bayrock Group LLC he would have little to show for his "sweat equity", as he complained in this email he wrote Kriss on January 24, 2007 when the ramifications of the sale became clear:

> I want to send this to Felix. Do you agree?
>
> I am sitting here thinking about what I can expect if for some miracle the Iceland deal goes through. 25 million up front mostly goes to Tevfik and for deal cash... I basically get zero. That's fucked up...All I can say is thanks but no thanks...That means Tevfik and Felix get everything and Jody and I get shit except for the unpleasantness of having to share the burden of past sins that are not ours. I don't know about him but that is definately [sic] not worth my time. I would just assume move on but leave on friendly terms. Akerman has once again asked me to take over their NY office. I am thinking that may be best. In any event please do not call me about this tonight as I am wound up just thinking about it. Better to talk tomorrow[38].

562.     In response to this "injustice", Schwarz planned the hostile takeover of his own client, which he tried in December 2007 by attempting to extort Arif and Satter into selling Bayrock to him cheaply using Bayrock's own cash or, he threatened, he would expose Satter's Bayrock ownership and mob ties and report Arif and Satter to the IRS for their years of tax evasion.

563.     This is alleged in detail in the next section, the SATTER FRAUDS II, but it is important to note that when he attempted his extortion that coming December, he did so using $8,000,000 of excess cash from the FL deal, and he knew well before that that he would need a lot of cash to attempt it, so he was highly motivated to find a way to have significant excess cash from FL deal.

564.     More important to him, and to Arif and Satter, was the lost business opportunity. Since as part of their new co-equal partnership and trial merger together Bayrock and FL would be doing new projects together through Bayrock/FL Holdings LLC, and FL would contribute $3 in capital for every $1 Bayrock contributed to a total of $100,000,000, having no cash left after Arif got his, the hidden partners behind Bayrock Holdings got theirs, and the IRS got theirs meant that there would be no new projects together because Bayrock wouldn't have a dime to use for them.

565.     Interestingly, all the drafts even at the beginning restricted Bayrock Group LLC's uses of the $50,000,000 to (i) giving Arif his $8,000,000; (ii) giving Bayrock Holdings $10,000,000; (iii)

---

[38] Assuming Akerman Senterfitt did ask him to take over its New York office, it is a Pygmalion syndrome explanation why Akerman would file deceptive court documents at Schwarz's request, aid and abet Scharz's breach of fiduciary duty, help cover up Satter's ownership, and just recently in 2010 suborn Schwarz's perjury.

paying off the $7,500,000 encumbrance on the membership interests in the Subs and specifically required that $25,000,000 be set aside to use for the new venture, or for operating expenses.

566.    This meant if the deal ever consummated, Bayrock Group would be prohibited from making any tax or general distributions from the FL proceeds other than those allowed to Arif.

567.    Yet, over a year earlier, the 2005 Protocol had amended the Bayrock Group LLC operating agreement (and the agreements of all the other Company Entities), to include tax and general distribution provisions, and in particular the tax distributions were rigidly required.

568.    And pursuant to New York law, the contract with FL could not be deemed to have amended any tax allocation provisions or tax or general distribution provisions, or anything else, in the Bayrock Group operating agreement, because Kriss, for one, never gave his written (or any other) consent, which would have been required.

569.    So from January through April 2007 Satter, and Schwarz were negotiating an agreement which if it had ever gone in force would have bankrupted Arif if he didn't get a $20,000,000 tax distribution or could have been instantly breached if he did[39] (such breach by the contract terms entitling FL to restitution of the whole $50,000,000), and would have been an anticipatory breach and a repudiation of the limited liability company agreement at its most basic level of good faith.

570.    It is thus no surprise that Arif, Satter, and Schwarz never let this deal go in force, and never could, unless (i) Arif agreed to pay his $20,000,000 tax bill personally (and he did not have the means),  leaving that money in Bayrock Group; or (ii) the taxes could be made to disappear.

571.    Even then, they couldn't commit the deal because of the reality vs. the fictive assumption of who owned the membership interests in the Four Subs, not just Bayrock Group.

---

[39] This is on the fictive assumption Arif, with RIF, owned all of Bayrock Group and so would have allocated to him the entirety of the $42,000,000 taxable gain. In reality the other members of Bayrock Group, the service providers holding their compensatory membership interests, would have allocations of income, most prominently Satter, nearly 50%.

572. According to the deal as it stood in draft all those months, Bayrock Group would assign FL enough of the financial interest components of its membership interests in the Four Subs so that FL would receive, jointly and severally, 100% of all the proceeds received by the Four Subs from the lower tiers until its preference return of $50,000,000 accreting, then 50%.

573. But Bayrock Group didn't own sufficient membership interests in the Four Subs to make this work. Even if Satter and Schwarz made their members interests in the Four Subs available, it would not be sufficient because of the preference return; all members would have to be hit, ¶540.

574. Putting all these problems together and discarding the fictive assumption, confronting the reality of all those service provider compensatory membership interests, which accounted for 67% of all the ownership of the Subs and 62% of the ownership of Bayrock Group, Arif, Satter, and Schwarz could never commit to this deal unless :

    A. One of these things occurred:

        I. All partners in Bayrock Group waived tax distributions and paid their $20,000,000 aggregate tax bill personally, leaving that money in Bayrock Group; or

        II. The taxes could be made to disappear.

    B. And one of these things occurred:

        I. All partners in the Four Subs, not just Bayrock Group, took a hit, reducing their partnership interests by, in the aggregate, the partnership interests FL would get; or

        II. Their partnership interests in the Four Subs could be made to disappear.

575. Moreover, there was a ticking bomb, Satter's organized crime history. FL knew of it (Satter told them), but, having been in trouble with Icelandic regulators before (its former chairman had been convicted of accounting fraud and had to resign), they were constantly worried that before a solution was found, the regulators would demand a due diligence report on Bayrock, and his majority ownership in the company along with his racketeering and assault convictions would be revealed, and the deal would not consummate.

576.     After four months, out of frustration Satter sent this email from London, where he was

sitting next to Orvar Kaernested, FL″s executive running the deal, to Schwarz in New York:

> From: Felix Satter
> Sent: Thursday, April 26, 2007 1:07 PM
> To: Julius Schwarz; Jody Kriss; Receptionist; Marina Gorboul
> Subject:
>
> You have a bad attitude and its extremely insulting. I am sitting next to Orvar who is
> telling me that if we connect Bayrock then they want to do a full dd and backrounds on
> all the individuals. And you tell me I will do it like I always do it and hang up the phone
> on me HOW DARE YOU ACT AP POMPOUS WITH ME.

577.     To which Schwarz replied less than ten minutes later [emphasis added]:

> HOW DARE YOU. **DO YOU REALIZE THAT WE ARE TALKING ABOUT
> LOOSING 50 CENTS ON THE DOLLAR**? I HAVE BEEN WORKING MY ASS
> OFF TO GET US THERE, AND THEN YOU GIVE ME UNSUBSTANTIATED
> CONCLUSORY STATEMENTS? I HATE WHEN YOU DO THAT. ITS LIKE
> SAYING I WANT THIS JUST BECAUSE. I HEAR WHAT ORAVAR IS SAYING.
> PLEASE HAVE HIM CALL KRAMER. WE WILL WORK IT OUT.
>
> REMEMBER I AM DOING THIS, TRYING TO FIX CHANGES BEING MADE TO
> THE DOCUMENTS AT LIGHT SPEED BY OUR LAWYERS WHO ARE SCREWING
> SOME THINGS UP, BEGGING EVERYONE FOR CONSENTS, DEALING WITH
> EGOS AND DOCUMENTS AND A WHOLE HOST OF MATTERS ON SOHO (DO
> YOU KNOW THE RESTRICTIVE DEC IS NOW DONE?), MIDTOWN ON BOTH
> THE CAYRE AND NITIN SIDE, NEW DEALS, FETTAH,ETC. I HAVE NO TIME TO
> PAY LIP SERVICE. I HEAR THE POINT AND WILL REACT ACCORDINGLY.

578.     "Kramer" is Kramer Levin Naftalis Frankel. They were one of Bayrock″s most-used law

firms. In fact, a few months before this they prepared the Trump SoHo condominium offering

documents that illegally omit all mention of Satter and his 62% ownership of Bayrock.

579.     Now, however, they were representing FL, on the other side of the table. This came about

at the beginning of the deal, when the Kramer partner in charge of Bayrock″s matters hosted a

poker party, and Satter told him that they were beginning negotiations on a partnership with FL,

and he (Satter) was worried that the deal would fall apart if his criminal background became

known, and the Kramer partner said he could probably "control" such things if Bayrock would

convince FL to use Kramer Levin as their attorneys on the deal, to which FL agreed.

580.    The "50 cents on the dollar" was the tax hit. In fact just that day, on the recommendation of Duval & Stachenfeld, Bayrock's transaction lawyers on the FL deal, Schwarz had just had Bayrock retain Elliot Pisem, a partner at Roberts & Holland, to "make the taxes disappear."

581.    Pisem engaged to represent Bayrock Group and each of Arif, Satter, Schwarz, and Kriss, simultaneously[40]. But Pisem never met with Kriss, or obtained conflicts waivers from him or even warned him of conflicts. Instead Pisem took his fee and instructions from Bayrock and betrayed Kriss, his own client, even to the extent of hiding his existence and representation from Kriss, who never knew of Pisem's representation, concealment of it, and betrayal until late 2008.

582.    Pisem knew, and had a duty to know, who Kriss was, that he was a principal and so his client, and the nature of his membership interests in Bayrock companies. Even before his engagement letter he had gone over this with Schwarz, as this and subsequent emails show:

> From: Elliot Pisem
> Sent: April 24, 2007 1:09 PM
> To: Julius Schwarz;
>
> ...I'd like to know a bit more about the "principals'" interests in Bayrock (likely including a review of any "nominee letters" or other documentation), the portion of the proceeds that they were receiving as "draws," and the capacity in which they were receiving those proceeds before expressing a view. When would you like to talk?

583.    Pisem had proposed a tax fraud using a sham non-recourse "loan" to Arif to pretend there was no disguised sale of partnership interests, alleged *infra*, and Schwarz had asked him, in a prior email, whether he and others could get in on the fraud, too:

> From: Julius Schwarz
> Sent: April 24, 2007 12:43 PM
> To: Elliot Pisem, Bruce Stachenfeld, Craig Brown, Nathan Tasso
>
> Question: is there a way for FL to make non-recourse loans to the other principals secured by our company interests to defer taxes for our draws from the company?

---

[40] "1. *Scope of Representation*. Initially, we will provide Bayrock Group LLC and its principals with legal advice relating to tax matters in connection with FL Group ehf. Also clients frequently ask us in the course of our representation to become involved in new and anditional matters on their behalf or on behalf of affiliated entities. This engagement letter relates to such additional matters as well."

584. Before alleging details of that tax fraud, which was not consummated but led to a larger fraud, Plaintiffs first allege Pisem′s related advice to commit a racketeering predicate crime.

585. **Pisem Issues a Should Opinion on Money Laundering to Evade Taxation**. As part of the regime of United States taxation, federal income tax law imposes withholding requirements on domestic partnerships with foreign partners, requiring the domestic partnership to withhold against the foreign partner′s distributive share of partnership income effectively connected with the operation of a business in the United States, even if there is no cash distributable to the foreign partner (i.e., even if there is an unfunded tax liability), and imposes personal liability on those responsible who fail to perform that withholding.

586. This is not optional. There is an exception where a domestic partnership has a partner which is a legitimate, non-abusive upper-tier domestic partnership which itself has a foreign partner, in which cases the two domestic partnerships can agree which will withhold, but it is illegal to create a sham tax partnership for no appropriate business purposes (let alone for no other purpose at all) but evasion of this withholding obligation. Yet that′s exactly what Pisem did, advise them to create a sham upper tier partnership to evade foreign withholding obligations.

587. As Pisem himself put it in an email he sent Schwarz, Duval, and Salomon April 25, 2007:

> II. "WITHHOLDING" OBLIGATIONS
>
> Following consummation of the transaction, FL, a foreign corporation, will be a member of Bayrock Group, an LLC treated as a partnership for Federal and New York tax purposes that will earn income from the conduct of a business in New York (and elsewhere in the United States). Under section 1446 of the Internal Revenue Code, Bayrock Group will have an obligation to pay over to the Internal Revenue Service, on a quarterly basis, FL's Federal income tax on FL's share of Bayrock Group's income from Bayrock Group's US business.
>
> Two important observations: (1) Bayrock Group's documentation with FL should state explicitly that Bayrock Group is permitted to withhold this tax (as well as any amounts required to be withheld under any other Federal tax provisions, such as "FIRPTA," and under any state income tax laws) from any amounts distributable to FL; but (2) this tax payment by Bayrock Group on FL's behalf is likely to be required even if distributions are not actually being made to FL (or if the amount to be distributed to FL is insufficient to satisfy FL's tax obligations), so the documentation should also require that FL fund any shortfall (between the tax payment obligation and the amounts otherwise distributable to

FL) on Bayrock Group's demand. These sorts of provisions are common in partnerships involving foreign partners, and we can send you models if you would like. (Section 8.2 of the current draft Operating Agreement of [FL-Bayrock] Real Estate Holdings, LLC covers some, but not all, of these points.)...

**One way to mitigate the burden on Bayrock Group might be for FL to hold its interest in Bayrock Group through a partnership formed in the United States (for example, a partnership formed under New York or Delaware law, in which FL held a 99% interest and an Icelandic corporate subsidiary of FL held a 1% interest). In such a case, since the direct partner in Bayrock Group would be a "domestic holding partnership," neither section 1446 nor the New York withholding rules *should* apply, and the burden of complying with those rules vis-a-vis FL would be shifted up to the "domestic holding partnership" level.** [Emphases added].

588.   That is a "<u>should</u>" opinion from Roberts & Holland that creating an abusive, sham tax partnership to evade foreign partner withholding, their "domestic holding partnership", can opt out of the law. That′s a should opinion that it′s legal to commit money laundering to evade taxation by hiding foreign partners behind abusive, sham, "domestic holding partnerships", whatever those might be (the phrase appears nowhere in tax literature.)





FIGURE 15

589.   When the crimes went beyond laundering to planned evasion of $100,000,000 of tax, Roberts & Holland continued to recommend this artifice to defraud, which Bayrock and FL used, forming Delaware limited liability company FLG Property I LLC ("FLG′) to be a "Midco" conduit sham interposed between them to pass money back and forth between New York and Iceland so FL could hide behind it and Bayrock could pretend it, not FL, was its partner. (Not only did FLG Property I not conduct business, it didn′t even pay franchise fees.)

590.   Roberts & Holland can call their Delaware laundromat a "domestic holding partnership"; Plaintiffs call it an artifice to commit mail and wire tax fraud and call its plan and use conspiracy and substantive money laundering for the purpose of tax evasion, violations of 18 USC §1956.

124

591. **Pisem Advises Disguised Sales of Partnership Property and of Assets**. Disguised sales occur where enough of the benefits and burdens of ownership change hands that as a matter of tax law ownership changed hands. In partnerships, there are two kinds of disguised sales (simplified):

    A. <u>Partnership Interests (Sale of Interests Between Partners)</u>. Partner A obtains new, or additional, partnership interests from the partnership and transfers property to it; the partnership makes a related transfer of property to partner B, whose interests diminish.

    B. <u>Property (Sale by or to a Partnership)</u>. A partner transfers property to a partnership and receives back a related transfer of property and the circumstances indicate a sale.

592. Pisem advised them to avoid the $20,000,000 tax with two disguised sales, a $42,000,000 sale of partnership property, for 84% and an $8,000,000 sale of partnership interests, for 16%.

593. <u>An 84% Disguised Sale of Partnership Property</u>. For months of negotiations there was no idea of FL as a partner in Bayrock Group.

594. Yet, Pisem advised instead of giving FL *qua* FLG partnership interests in the Subs. FLG should get "preferred equity" partnership interests in Bayrock Group itself;



FIGURE 16

the financial interest components of these "preferred" partnership interests designed to give FL the same financial substance as 84% of the partnership interests in the Four Subs FL intended to buy all along.

595. Pisem said moving FLG up a level, FIGURE 16, would kill $16,800,000 of tax, though the substance was the same and Bayrock Group a mere conduit. That was nonsense, and malpractice.

596. This was a disguised sale of partnership property, Bayrock Group's partnership interests in the Subs, ¶591.B. Instead of transferring rights to distributions from the Subs *via* interests in the Subs, Bayrock would transfer 84% of the <u>same</u> rights to distributions *via* interests in Bayrock.

125

597.    The transaction form negotiated for four months had FL and Bayrock exchanging $50,000,000 for the rights to certain distributions from the Subs. This new last minute form, with one day of "thought", had FL and Bayrock exchanging $42,000,00 for 84% of the rights to the same distributions from the Subs. The substance was the same, *pro rata*, the benefits and burdens of ownership of the same distributions from the Subs were exchanged for the same $42,000,000.

598.    Either way Bayrock Group monetized an appreciated asset, its partnership interests in the Subs. The only reason for changing the form from sale to "contribution plus special allocation" was avoidance of taxation, and it was an abusive transaction, the "preferred interests" in Bayrock Group designed not to expose FLG to the entrepreneurial risks of Bayrock Group, but to the entrepreneurial risks of the Subs, since they specified FLG would receive in distributions from Bayrock Group, without regard to Bayrock Group's failure or success, exactly what Bayrock Group received in distributions from the Subs in respect of those interests, another conduit sham.

599.    The parties never consummated this form, but the history is important for what it reveals of scienter, particularly Pisem's. Consider these paragraphs from an email Pisem sent April 25, 2007, with his advice for moving the transaction up a level to avoid $20,000,000 in tax.

> This memorandum summarizes a proposed structure for the acquisition by FL Group hf ("FL") of a 49% ***indirect*** interest in certain investments now held by Bayrock Group, LLC ("Bayrock"). [Emphasis added].

600.    Compare this with the statutory language, §707, of which Pisem, a tax lawyer expert in that statute, ¶735, was aware (he discussed "disguised sale" risks in emails to Bayrock, fn.42):

> If (i) there is a ***direct or indirect transfer of money or other property by a partner to a partnership***, (ii) ***there is a related direct or indirect transfer of money or other property by the partnership to such partner (or another partner)***, and (iii) the transfers described in clauses (i) and (ii), when viewed together, are properly characterized as a sale or exchange of property, such transfers shall be treated either as a transaction described in paragraph (1) or as a transaction between 2 or more partners acting other than in their capacity as members of the partnership. [Emphases added.]

601.    He knew he was underlying transferring distributions from the Subs for $42,000,000.

602.     Further evidence of scienter, that he knew he was violating §707 and §701, is his companion suggestion that Bayrock Group make a related indirect transfer to Arif, adding a 16% disguised sale of partnership interests to the 84% disguised sale of partnership property.

603.     First, maintaining the fictive assumption that Bayrock Group was 100% owned by Arif (with RIF), Arif's partnership interests in Bayrock Group would be diminished by the exact same amount as these new, abusive partnership interests in Bayrock Group that FLG was getting.

604.     Thus, if there were a related direct or indirect transfer to Arif, along with the reduction in his partnership interests matching the newly acquired interests of FLG, that transfer would complete a disguised sale of Arif's partnership interests in Bayrock Group to FLG, ¶591.A[41].

605.     Tevfik was supposed to clear, after taxes, $8,000,000 from Bayrock Group after it got its $50,000,000. So far, Pisem's plan got $42,000,000 into Bayrock Group for 84% of the desired distributions from the Four Subs; here's how Pisem "filled the gap" *in re* the $8,000,000 an 16%.

606.     <u>A 16% Disguised Sale of Partnership Interests</u>. What Pisem advised in full was:

    A.     FLG should contribute $42,000,000 (84% of $50,000,00) to Bayrock Group;

    B.     FLG should receive partnership interests in Bayrock Group conduiting 84% of the distributions FLG would have bought from the Four Subs before Pisem (FLG would receive distributions from Bayrock Group of 84% of everything Bayrock Group received as distributions upstream from the Four Subs)

    C.     Arif should receive new partnership interests in Bayrock Group conduiting the other 16% of the distributions FLG would have bought from the Four Subs before Pisem (Arif would receive distributions from Bayrock Group of 16% of everything Bayrock Group received as distributions upstream from the Four Subs).

---

[41] Again, all this is really a disguised sale of partnership interests in the Four Subs themselves, as the substance is the paired indirect transfers of distributions from the Four Subs disguised as distributions from Bayrock Group.

127

D.   FLG should make a personal, non-recourse $8,000,000 "side loan" to Arif, secured only by these new "16%" partnership interests[42].

E.   Arif would repay the "side loan" in amounts conveniently equal to the distributions he received in respect of his new 16% partnership interest in Bayrock Group.

F.   When FLG"s distributions from Bayrock Group and "loan" payments from Arif hit $50,000,000 accreting at 7.5%, Bayrock Group"s distributions to FLG reset from 84% to 50% of what Bayrock Group got from the Four Subs and Arif's "loan" payments to FLG reset from 100% to 50% of his distributions from Bayrock Group ex the Four Subs .

607.   This is more than malpractice, this is tax fraud. Knowing as he clearly did, ¶735, that disguised sales included related <u>indirect</u> transfers, Pisem still advised that FLG, which never in four months of negotiating ever had a thought of having contractual privity with Arif , should transfer $8,000,000, 16% of the purchase price, to Arif, bypassing Bayrock Group,



which was the indirect transferor for purposes of §707, for no reason other than tax evasion.

---

[42] Arif and Scwharz insisted the "loan" be secured only by Arif"s distributions from the Four Projects, i.e. Arif"s new 16% interest in Bayrock Group. They overruled Pisem , who had had said it would look better if the "loan" were secured by Arif"s rights to distributions from all projects for a few years until the disguised sale risk abated, at which point Bayrock could strip the other deals out of the company, leaving the "loan" *de facto* secured only by the Four Projects. This window dressing was indicative of Pisem"s scienter, as shown by this note to one of his memos:

> Although FL's security interest would relate to [Arif"s] entire interest in the profits, losses, and distributions of Bayrock, [Arif] would be required to apply only distributions from Bayrock with respect to the Properties in prepayment of the loan...[Arif] might also be permitted to receive distributions of assets other than Bayrock's interest in the Properties from Bayrock ... prior to maturity of the loan, and any assets so distributed to [Arif] would not be subject to FL's security interest.

In other words, paint it to look like FL might have some vague interest in something other than the *res* of the disguised sale, but don"t worry because Arif will never pay more (or less) than what he receives from the Four Subs.

608.     Confirming no intent Arif be a "debtor", just intent to evade tax, Bayrock the real "debtor", Salomon emailed Schwarz April 25 that Bayrock must "reimburse" Arif for the interest.

609.     Further, the "side loan" was scrubbed from deal documents, conspiratorially never once mentioned except in side papers hidden out of sight. That secretiveness, that "side deal" construct,  is a classic badge of fraud, the same as Akerman′s conspiracy with Bayrock hiding the covert limited liability company agreement in the CAYRE FRAUDS, ¶247.

610.     That caught the attention of an attorney representing a CBRE investor in Trump International. When she was asked to consent, she emailed from California on April 25, 2007:

> From: Rabassa, Maria M.
> Sent: Wednesday, April 25, 2007 6:30 PM
> To: 'David Granin'
> Cc: 'Gilb, John @ CBREInv LA'; Frank, Douglas B.
> Subject: Bayrock Transfer
>
> David, I have reviewed the transfer documents you sent today and I have the following concerns:
>
> SALE-PURCHASE AGREEMENT:
>
> 1. Section 2 - One of the documents you sent was an $8,000,000 promissory note executed by Tevfik Arif in favor of the purchaser. ***You mentioned that a portion of the purchase price is being paid by execution of a note for tax reasons. I am still not clear as to why an interest holder in the Seller is executing a promissory note in favor of the purchaser in payment of part of the purchase price. In addition, this mechanism is not set forth in the Purchase Agreement***. [Emphasis added]

611.     In other words, "Why are you pretending a purchase is a ‚loan′, and if this isn′t tax fraud why isn′t that ‚loan′ mentioned anywhere in the deal documents and just hidden off somewhere?"

612.     Pisem advised using two shams, two conduit frauds, two abusive partnership devices, or, most directly, two disguised sales. Plaintiffs allege shortly, *infra*, that as a tax attorney expert in disguised sales, ¶735, Pisem had to know he was violating §707, so this is tax fraud, not tax error.

613.     The first disguised sale used Bayrock Group as a conduit, making FLG a sham partner in Bayrock Group "contributing" 84% of the sales price for a partnership interest replicating 84% of what FLG would have had on purchase of the partnership interests. The tax result would have

been that FLG would have bought, albeit by indirect transfer, that 84% portion of partnership interests in the Four Subs and would have been a partner in the Four Subs, not in Bayrock Group.

614. The second fraud was using Arif as a conduit, making an indirect transfer of 16% of the purchase price to him as a sham "loan", then conduiting to FLG through Arif as "loan" payments the other 16% of what it would have had had it bought the interests. The tax result would have been that FLG would have bought, by indirect transfer, sham partnership interests in Bayrock Group that were really partnership interests in the Four Subs, making FL a partner in the Four Subs and a deemed $8,000,000 distribution to Arif.

615. These frauds would have given the same $20,000,000 tax liability to Arif, on the fictive assumption Arif and RIF owned 100% of Bayrock Group, which owned 100% of the Four Subs.

616. **The 49% Fraud**. Bayrock and FL didn't consummate this form, but one far worse in illegality, using this form as a point of departure. Before alleging that, there is a component fraud not significantly tax-related that begins to show in all the emails and so must be alleged now.

617. FL's Preference Return. FL originally wanted partnership interests in the Four Subs with a preference return of 100% of all the distributions received by the Four Subs until such time as FL received $50,000,000 accreting at 7.5% per year, then 50% of the distributions after that.

618. That would be a claim on more than 50% of the distributions. Since the capital base in the Four Subs totaled about $8,000,000, that would be a claim on more than 50% of all the profits (defined as distributions in excess of members" paid-in equity) the Four Subs would receive.

619. During negotiations, FL sent word that under Icelandic accounting rules, they couldn't own (have a claim on) more than 49.9% of these companies (or more than 49.9% of Bayrock Group, during the time the sham 84% partnership interest scheme was being discussed).

620. Only a few years earlier, FL"s chairman had been convicted of accounting fraud, so FL was at least for a while appearing honest (until a year and a half later when it blew up in scandal, along with Iceland, and Iceland"s former Prime Minister referred to FL as "another Enron").

130

621.     At the same time, Bayrock had covenants with lenders and partners in the lower tiers requiring it to maintain at least 51% ownership of the Four Subs.

622.     Since by Bayrock's own estimates, FL would expect to receive about 62%, or $143,000,000 of the $227,000,000 in distributions expected to hit the Four Subs within two years, ¶535, the only solution would be to "dial back" the deal so that FL in fact did own only 49%.

623.     Instead, Bayrock and FL, with the knowing facilitation of others, conspired to and did defraud FL's auditors and partners, and Bayrock's lenders and partners, by restructuring the deal so FL owned the same 62% but Bayrock and FL would deceitfully state in various documents that FL only owned, or was acquiring, 49%.

624.     They did this by tasking a Bayrock analyst, Dan Ridloff, to determine what accretion rate on its $50,000,000 preference return, obviously greater than 7.5%, would produce a total return to FL if, after its preference return, it received only 49% instead of 50% of all further distributions.

625.     More formally, at what rate $X$ would 100% of $50,000,000 accreting at $X$, then 49% after that, equal 100% of $50,000,000 accreting at 7.5%, then 50% after that.

626.     Ridloff's computations, based on the mutual assumption of Bayrock and FL that Bayrock's estimate of a two year return of $227,000,000 or more was likely, determined that an accretion rate of 8.4% would work. Interestingly, Ridloff estimated FL would receive $159,000,000 by May 2009, exceeding Plaintiffs' estimate of $143,000,000.

627.     Thereafter, while some documents such as Pisem's proposed "double disguised sale", refer to 49% at 7.5% with an extra 1% side return, typically as some kind of "bonus" interest, and those were done to get FL to the same return as 50% at 7.5% but hide the extra 1%, soon after the parties simply wrote their documents as 49% at 8.4%.

628.     Since the parties knew $50,000,000 accreting at 8.4%, then 49%, would give FL the same return as $50,000,000 accreting at 7.5%, then 50%, and the latter itself is greater than 50%, it was fraud to report to those to whom it would be material that FL was acquiring no more than 49%.

131

629.     Nevertheless, they reported it as 49%. Disclosure will  undoubtedly reveal such reporting by FL to its auditors, while as to Bayrock, there are many documents they disseminated with the fraudulent representation, such as a request for Trump″s consent re Trump SoHo, excerpted:

> Pursuant to the Transaction, Bayrock will transfer a profit participation interest of up to 49% in certain of its existing investments, including Bayrock Spring Street LLC.

630.     **$100,000,000 of Tax Evasion**. When Pisem″s "double disguised sale" tax fraud proposal circulated, a comment attached to one of the drafts mentioned the "interest" Arif would "pay" might not be taxable to FL pursuant to a now-obsolete tax treaty.

631.     That is, if they got away with pretending the stream of profits from condominium sales bubbling up from lower tiers through the Four Subs into Bayrock Group, and from there 16% of it out to Arif as a "distribution" in respect of his new partnership interests, which "distribution" he would immediately flip over to FL as "loan repayments", was somehow converted from taxable effectively connected income into "loan interest", it might not be taxable in the United States.

632.     This hit home at Kramer Levin. Why stop at 16%? If FL was getting back $143,000,000 (Plaintiffs estimate) or $159,000,000 (Bayrock″s) within two years, all of it taxable at near 50% rates, thus a tax bill of up to $80,000,000 or so, why stop at "disappearing" 16% of it, why not call it all "interest", or at least all but $50,000,000 of it "interest", the $50,000,000 "principal".

633.     Barry Herzog, a tax attorney at Kramer Levin, and Elliot Pisem talked about this on the phone the day after that April 25, 2007 disguised sale proposal, ¶599. Plaintiffs do not know the language Herzog used, but they do  know the language Pisem used to write about it: Incredibly, he wrote and circulated an email in which he suggested they change the <u>form</u> of the deal from equity ownership (partnership interest) in Bayrock Group LLC to a "loan" to Bayrock Group LLC, while making sure to leave the economic <u>substance</u> the same, and thus permanently, and illegally, remove not just the $143,000,000 to $159,000, but as much as $250,000,000, from the tax base of the United States, *infra*. In Pisem″s own words [emphases added]:

From: Elliot.Pisem [mailto:EPisem@rhtax.com]
Sent: Thursday, April 26, 2007 10:30 AM
To: Julius Schwarz; cbrown@DSLLP.COM; dgranin@dsllp.com;
Alex@salomoncpa.com Cc: cfriedman@DSLLP.COM
RE: New York State and City Taxes (and Some Important Federal "Withholding" Issues)

I just got off the phone with Barry Herzog. He professed to have just been brought into the transaction and to be familiar with neither the structure nor his client's expectations regarding US tax consequences. He pointed out, correctly, that **the suggestion in our memorandum that FL own, *in form*, a partnership interest in Bayrock Group made it certain as a practical matter that FL would be subject to US taxation on its share of the profit of Bayrock Group.** He did not indicate whether this result would be surprising to FL, and he stated that he did not know whether FL would be entitled to a foreign tax credit in Iceland that would offset the US tax liability. He also conceded that there was at least a material risk in the original "profits interest" structure that FL would be subject to the same US tax.

Herzog threw out, as a tentative suggestion, that, **in lieu of FL's acquiring a preferred equity interest in Bayrock Group, FL make a "participating loan" to Bayrock Group *on substantially the same economic terms*. If the loan were respected as "debt" for tax purposes, my initial reaction is that there should be no withholding obligation on the part of Bayrock Group**, under current law and the current version of the US Tax Treaty with Iceland, and **FL ought to have no US tax liability on receipt of either fixed interest or "contingent interest" under the participating loan. We could also probably <u>shift at least a portion of Bayrock Group's withholding risk to FL by requiring FL to form a "domestic holding partnership"</u> as discussed in our prior emails**. In order for this idea to "have legs" for tax purposes, however, FL is likely to feel that it is **necessary for there to be an outside date on the loan; Herzog suggested 15 years**.

"From 30,000 feet" and with ten minutes of thought, the tax consequences to Bayrock Group of the proposed participating loan don't seem much different from the tax consequences of the preferred equity investment. Two issues that do come to mind are: (1) **protecting Bayrock Group against withholding liability**, including possible changes in law or in the terms of the Treaty (consider use of "domestic holding partnership" (to which Herzog did not seem averse), indemnities, etc.); and (2) determining the timing of Bayrock Group's interest deduction for the "contingent interest" under the complex rules governing "contingent payment debt instruments" and **comparing that timing to when income would be allocated to FL if FL were, *in form*, a partner**.

634. Pisem reveals the intent to make the <u>form</u> of the transaction a "loan", but keep the <u>substance</u> a partnership: "...if FL were, in form, a partner". He knew they would be partners in substance, that for four months, no one thought or meant to be in a debtor/creditor relationship, but in one day "from 30,000 feet" slapped together with "ten minutes of thought" it′s going to be made to look like a "loan", and purely to evade tax.

133

635.     Pisem then worries about the devastating foreign partner withholding liability if they don"t get away with the fraud, because he knows at least Arif will be personally liable for the $80,000,000 of unpaid United States taxes should this get caught and the "loan" be recast as the partnership equity it really was, and FL as the foreign partner it really was.

636.     <u>Intermediary Transaction Tax Shelter Fraud</u>: Thus, though it is abusive and illegal to form a partnership as a transaction intermediary where (i) the principals already intended to make a deal before the intermediary; (ii) the intermediary is controlled by one of the principals; (iii) the intermediary assumes no risk and is a mere conduit); (iv) the intermediary was brought into the transaction at the behest of the taxpayer; and (v) there is no non-tax avoidance business purpose to the intermediary"s participation in the transaction; back again is Pisem"s advice to money laundering the transaction through a sham partnership (his "domestic holding partnership") created for the illegal purpose of removing foreign partner withholding obligations from Bayrock.

637.     Plaintiffs aver there is substantial evidence by which they reasonably believe Pisem and Roberts & Holland are in the business of promoting the use of sham domestic tax partnerships as illegal and abusive transaction intermediaries formed for the tax avoidance purpose of shifting foreign partner withholding obligations away from the proper partnership. Pending disclosure, Plaintiffs may amend to include as an additional basis for liability Pisem"s operation of Roberts & Holland as a RICO enterprise engaged in the pattern crimes of mail and wire tax shelter fraud.

638.     In any event, if they got away with calling the (now back to $50,000,000) transfer from FLG to Bayrock a "loan", Bayrock Group (its tax partners), fictively assumed to be Arif and RIF, would evade $20,000,000 in tax liability by fraudulently disguising the sale, this time as a "loan".

639.     This is the form of the deal they consummated a month later, except in an even "worse" (far more blatantly illegal) structure:

640.     <u>Making a Bad Situation Catastrophic</u>. So far all the tax fraud was nominally occurring at the Bayrock Group LLC level of the hierarchy, under the fictive assumption that Bayrock Group

owned 100% of the Four Subs. Of course this wasn't true, as Pisem and Duval knew, and can be charged with knowing given their professional duties, which in Pisem's case also ran to his client Kriss, not just to his client Bayrock[43]. The fiction let Pisem shift FL's attachment point from a partnership interest in the Four Subs up a level to an economically identical partnership interest (now "loan") in Bayrock Group by assuming the $227,000,000 coming into the Four Subs would be distributed up to Bayrock Group, but Bayrock could not commit to a deal like because the $227,000 would never get there.



FIGURE 17



FIGURE 18

641.    In reality, because of the service providers' membership interests in the Subs, at most $76,300,000 of the $227,000,000 could ever get to Bayrock Group. FIGURE 18.

642.    So while they "solved", at least until they got caught, part one of the two-part problem, ¶574.A.II, disappearing $20,000,000 of tax, there remained the second part, how to get into the $150,700,000 of the $227,000,000 going to the service providers, ¶574.B.

643.    As the first part could have been solved honestly by Bayrock Group partners waiving tax distributions, or giving up the deal, the second part could have been solved honestly by buying membership interests from service providers, or making some deal with them.

644.    Instead, Arif, Satter, and Schwarz chose to fraudulently "disappear" those membership interests, just as they decided to fraudulently disappear their tax liabilities on the disguised sale.

---

[43] Many emails show all the attorneys were reviewing all the limited liability company agreements of all the Subs, which agreements had long since been amended by the 2005 Protocol to include all the provisions effectuating the compensatory membership interests. Moreover, there were several emails to Pisem which refer not only to the other principals, but do so by number, repeating that besides Arif there three other principals (Satter, Schwarz, and Kriss).

135

645.   To make $150,700,000 worth of membership interests disappear, they abandoned the fiction that Bayrock Group LLC owned 100% of the membership interests in the Subs and lowered the deal back down where it had started, back down where it belonged by its substance: they transacted the disguised sale tax fraud at level of the Four Subs, not Bayrock Group.



FIGURE 19

646.   They had FLG make a $50,000,000 "joint and several loan" to the Four Subs pursuant to a "loan" agreement almost the exact duplicate of the contribution agreement it replaced, which <u>required</u> the Four Subs to immediately <u>distribute</u> the entire $50,000,000 up to Bayrock Group:

647.   In fact, they never even bothered allocating the $50,000,000 among the Four Subs, and didn't even bother having the money actually transit the Four Subs at all, just having it wired on May 18, 2007, directly into Bayrock Group's account.

648.   The following paragraphs allege how they, at least pretextually, "disappeared" the service providers" membership interests in the Subs. To understand this, it's necessary to separate the membership interests of Satter and Schwarz, co-conspirators in this scheme for reasons of personal motivation[44], from the membership interests of Plaintiffs Kriss and Ejeakm and non-

---

[44] Arif, Satter, and Schwarz"s shared the goal of fully funding the $100,000,000 new venture entity with FL, for which Bayrock Group needed $25,000,000, ¶564, the benefits of which they intended to wrongfully keep all for themselves, personally, ¶, and they shared the common goal of personal tax evasion. Arif had a personal goal of taking $8,000,000 (later reduced to $5,000,000) out of the company, ¶554, and getting $10,000,000 back to whomever it came from in Russia or Kazakhstan, ¶565. Schwarz had a personal goal of using excess cash from the FL deal to buy (extort) the company from Arif and Satter, ¶554. Satter had a personal goal of going into a side business with FL; they had promised him to set him up in business in Switzerland, his favorite money laundering location from his State Street

party Woodring, who not involved in this scheme, and from whom all details of the tax and related frauds, including the existence of scienter, were concealed.

649.    Satter, and Schwarz didn''t care about their membership interests in the Four Subs because of what they would get from the $50,000,000 once it got to Bayrock Group. That left these three minority members in the Four Subs, who did care about their membership interests.

650.    <u>"Disappearing " All the Profit</u>.  Ejekam and Woodring had membership interests in the Subs entitling them to distributions from venture profits, ¶432.C, and expected to receive about $11,100,000 of distributions out of the $227,000,000, since most of that would be profit, ¶530.

651.    But under the terms of the "loan" agreement, supposedly there would not be profits for years, if ever, as it was written intentionally to eliminate them. That is, Bayrock intended to eliminate profits and "disappear" Ejekam and Woodring''s membership interests by eliminating their distributions, but they did not eliminate profits, only cash, which was actually even worse.

652.    <u>The "Loan" That Wasn''t</u>. Until some future time $T$ when FLG had received $50,000,000 accreting at 8.4%, which might never come, the Four Subs were required to take 100% of all cash available for distribution to their members and "step in front of it" by intercepting the money, putting a yellow sticky on it saying "loan payment", and flipping it over to FLG in Delaware, which as a sham money-laundering conduit it was would then flip it over to FL in Iceland. After time $T$, they would keep doing this with 49% oand distribute the other 51% to the members.

---

racketeering,with some venture called "Swiss Capital", which Bayrock Group would fund with FL''s money.First, Satter got FL to agree that the first project in their new venture with Bayrock would be to buy out, at a profit so ridiculous every professional investor Bayrock had first gone to with the deal laughed it off, the interests of Michael Samuel in a large Miami project, Midtown Miami. Samuel, recall, was Satter''s old confederate who had "helped" Arif, Satter, and Schwarz commit tax evasion by never reporting their income from Banyan Bay, and who Satter expected would help him again with kickbacks from the $20,000,000 windfall profit Satter was arranging for him courtesy of Bayrock and FL''s new venture together. All in, Arif, Satter, and Schwarz needed the entire $50,000,000 available to Bayrock Group for their own purposes. There are email exchanged between Scharz and FL confirming a conspiracy to exclude Kriss from all new deals by having Bayrock Group LLC transfer all its assets to a new company in which Kriss would have no interest.

653. So intent were they on replicating the economic substance of partnership, the exposure to the entrepreneurial success of the venture, they deliberately wrote a so-called "loan" expressly defined as a residual claim on the equity available for distribution to the members, and subordinate to all other claims and liabilities. The language speaks for itself:

> **"Borrower Available Cash"** shall mean ... the cash receipts ... less the portion thereof used ... to pay all Borrower unaffiliated third party ... expenses and obligations.
>
> **Available Cash Payment**. [T]o the extent that a Borrower received Borrower Available Cash, then Borrowers shall pay all accrued ... interest to Lender, then ... shall pay to Lender a payment (an "Available Cash Payment") equal to (i) [until time *T*] 100% of such Borrower Available cash; and (ii) [from and after time *T*] ... 49% of such Borrower Available Cash. ***The amount of the Available Cash Payment to be paid on any given date shall be calculated by reference to the amount of Borrower Available Cash determined to be available for distribution to the members of Borrower on the date immediately preceding the date of the proposed Available Cash Payment***...For the avoidance of doubt, Lender and Borrowers acknowledge and agree that the ***remaining 51% of Borrower Available Cash under clause (ii) ... shall be permitted to be distributed to the members of Borrower***. [Emphases added]

654. This is nothing more than making FLG a partner with an initial preferred return followed by a 49% co-equal return.

655. Moreover, after the so-called 15 year term of the "loan" runs out, at and after its "maturity date", did the payments stop, as you might expect in the case of any kind of real "loan"? No. In form they did, but not in substance.

656. Recall Pisem's warning that to have any chance of getting away with calling this a "loan", payments to FLG would have to end after 15 years ("In order for this idea to "have legs" for ta purposes ... FL is likely to feel that it is necessary for there to be an outside date on the ‚loan"; Herzog suggested 15 years."). ¶633.

657. He was wrong. FL refused to end the payment stream. As far as they were concerned, they were buying 62% of the proceeds of the Four Projects (but telling everyone it was 49%), and while they believed as did Bayrock that the $227,000,000 would all come in within two years, they insisted that they were buying profits in perpetuity and would have profits in perpetuity.

658.    The "solution" they came up with speaks volumes about their intent not to be "debtor/creditor", for they decided that in year 16, instead of continuing to receive 49% of the distributions in respect of their partnership interests in the Four Subs masquerading as a "loan", the parties would at that time (May 2022) hire an appraiser to decide how much, in 2022, was the then-present value of all the future 49% distributions into perpetuity FLG would have, by agreement computed according to a theoretical liquidating distribution method, and to monetize that and have the Four Subs make a "Maturity Payoff Amount" of that amount.

659.    In other words, the parties did not even make it look like a "loan" beyond the labels, and expressed their intention to give FLG a partner′s share of the distributions, defined as a residual claim on equity from day one, with "payments" defined exactly as a 100%/49% co-equal fraction of interim distributions to members, and with a buyback in 15 years at a price equal to the value at that time of FLG′s residual claim on equity. This is the exact same contingent claim method of valuation on membership interests that Plaintiff have used herein[45], which is the whole point, that even Bayrock and FLG and their lawyers knew they were giving FLG a membership interest. This is the language for the "Maturity Payoff Amount".

660.    And the supposed "loan" was not guaranteed, not by Arif, and not by Bayrock. There was a contingent guarantee on performance in the event of a premature termination by change of control, but there was no guarantee of payment.

661.    That matters because by 2007 the holding company "borrowers" were not just thinly capitalized, but zero capitalized, with no ability whatsoever to service this "debt" in whole or in part other than insofar as the underlying projects succeeded. In other words, the return to FLG of one dime of its money, let alone one dime of profit on its money, was deliberately designed to be

---

[45] ¶251, "Membership interests are contingent, residual claims on the company′s equity, so like all forms of equity are call options on the partnership′s terminal wealth.."

entirely married to the entrepreneurial success of the venture, and thus of the companies, exactly the position they had always intended to be in, that of a partner. Only the label was different.

662.     Finally, the implied annual "interest rate" on the "loan" was 72%, hardly lender risk.

663.     This was no "loan". This was a partnership interest. FL was a partner in the Four Subs.

664.     <u>Disappearing all the Profit (cont"d)</u>. As alleged, ¶651, they (Arif, Satter, Schwarz, Roberts, Duval, Salomon, and the others who agreed to knowingly facilitate these crimes) intended to eliminate profits to "disappear" Ejekam and Woodring"s membership interests by eliminating their distributions, but they did not eliminate profits, only cash, which was far worse.

665.     Consider what would have happened six months after the deal closed, on November 18, 2007, assuming on that day for the first time ever the Four Subs received distributions from lower tiers. Assume the total of those distributions was $25,000,000.

666.     According to the terms of the "loan", the entire $25,000,000 would be immediately flipped over to FLG, which would immediately flip it out of the country to Iceland[46], about $2,000,000 of that "interest" and $23,000,000 "principal".

667.     By financial (not tax) accounting, assuming the "interest" was a proper business expense and not a deemed distribution, there would be profit of $23,000,000, otherwise $25,000,000.

668.     There would be profit, but no cash. Ejekam and Woodring would be entitled to general distributions of about $2,500,000 from this profit, but there would be no cash to make them with.

669.     This would be obviously likely to happen, not just foreseeably possible, from the "loan" terms themselves: By causing Bayrock Group to "debt" out the future stream of distributions from lower tiers, these Defendants caused Bayrock Group to take the cash ahead of the profits,

---

[46] During the early FL negotiations, Bayrock was approached by Novator, an Icelandic competitor of FL"s, which promised to go into the same partnership with Bayrock as FL was contemplating, and at better terms. Arif and Satter told Kriss that this would not be possible, because the money behind these companies was mostly Russian and the Russians behind FL were in favor with Putin, but the Russians behind Novator were not, and so they had to deal with FL. Whether or not this was true and what further Russian involvement existed must await disclosure.

creating a timing distortion. They did not eliminate profits, as they intended to, they eliminated the cash that would normally have come with them, reaching into the future and stealing it.

670. Even if that first distribution from the lower tiers had been $52,000,000, it all would have gone to FLG, $2,000,000 as "interest" and $50,000,000 as "principal", and the Subs would have had $50,000,000 of profit with no cash. Mathematically, the $50,000,000 "principal" could only ever be "repaid" from profit, and so borrowing $50,000,000 was simply reaching into the future and stealing $50,000,000 from the Subs, $6,000,000 of it from Ejekam and Woodring.

671. Simply, they created a $50,000,000 temporal discrepancy between cash flow and profits, a divergence between cash flow and income statements, to the harm of Ejekam and Woodring, whose rights depended on income but whose real ability to receive cash depended on cash flow.

672. In other words, they perpetrated an <u>earnings stripping fraud</u>, or tried to (see *infra*).

673. **Four Badges of Fraud**. Four indicia compel the conclusion this was fraud, this was intentional, not merely grossly negligent or negligent.

     A. Schwarz"s predisposition and knowledge of this kind of fraud.

     B. Schwarz"s recorded admissions of his scienter, and that of Arif.

     C. Certain language in the "loan" agreement.

     D. Schwarz"s companion insurance fraud against AIG.

674. *Schwarz's Predisposition and Knowledge*. Back in 2005 when what would become the 2005 Protocol agreements were being negotiated, Schwarz inserted the following language, which survived negotiations and so by 2007 had been amended into the limited liability company agreements of Bayrock Group LLC and the Four Subs [Emphases added].

> "Executive"s Membership Interest" means a non-dilutable 10% non-voting membership interest in the Company and each of the Company Entities, pursuant to which ... Executive shall be entitled to 10% of all Company Proceeds ...
>
> "Company Proceeds" shall mean ... the cash and other proceeds of the Company and all Company Entities, including Capital Proceeds [including proceeds from borrowing],

reduced by (i) payment of ... debts ... exclusive of loans made by the Principal or any other Company Member, (ii) the Total Principal Company Contribution ...

"Total Principal Company Contribution" means the total capital contributions made to the Company and/or the Company Entities by the Principal, together with Principal Capital...

"Principal Capital" means the principal (***but not interest***) of any loans to the Company and/or the Company Entities made by the Principal ***to the extent such loans were necessary to finance the day-to-day operations of the Company and/or the Company Entities in lieu of capital contributions to the Company and/or the Company Entities***.

675.    Schwarz, at the time still at Akerman simultaneously representing himself, Bayrock, and Kriss, explained this provision to Kriss in this email recently recovered:

From: Schwarz, Julius [julius.schwarz@akerman.com]
Sent: Tuesday, April 12, 2005 11:22 AM
To: Jody Kriss
Subject: RE: our agreement

3. The language re Company Loans means that the Principals can't loan to the llc unless it is necessary to make expenses (i.e., they can"t loan $10 million at 30% in order to suck funds out of the carry).

676.    Schwarz was protecting himself from an earnings stripping fraud just like this, someone making a purported "loan" to the company at a huge rate of "interest" to "suck the profits" out.

677.    Two years later Schwarz (and the others) did exactly that, call the sale to FLG a "loan" and place it down one level in the Subs where it was intended, with its 72% effective interest rate, ¶662, to wipe out any profits and thus "disappear" Woodring and Ejekam"s distributions.

678.    The damage done to Kriss and Woodring, for example, was far more than immediately visible, and understanding it makes the more complex damage done to Plaintiffs readily apparent.

679.    By treating the Four Subs as one joint and several "borrower", during time ***T***, when FLG had a preference return of 100% of distributions, whichever Sub received distributions first was the "loser". For example, if no distributions came in to any Sub until two years later on May 18, 2009, and then $58,000,000 came in to Bayrock Camelback, the Sub for the Phoenix project ($90,000,000 was roughly the entire amount estimated from that project), the whole $58,000,000

142

would be flipped to FLG, paying off $18,000,000 of "interest" and $50,000,000 of "principal". And it was expected that Camelback would be the first to realize profit, hence to be the loser.

680. Woodring, whose membership interests entitled him to 10% of the Camelback profit, would have a right to 10% of $40,000,000, or $4,000,000 (assuming the "interest" was properly deducted from gross profit, by no means clear). However, there would be no cash with which to pay him, as it would have been sucked out of Camelback and sent to Iceland by way of Delaware.

681. Before the FL deal, Woodring would have got $5,800,000, now he would get nothing.

682. Kriss, whose membership interests entitled him to 10% of the Camelback proceeds, not profit, ¶432.B, would get nothing, because the definition of proceeds required subtraction of amount paid in debt service, and ostensibly the whole $58,000,000 was "debt" service.

683. Before the FL deal, Kriss would have got $5,800,000, now he would get nothing.

684. That giant sucking sound you hear in this case isn't Mexico sucking away jobs, it's Schwarz's intentional use of a sham "loan" construct to suck money from Plaintiffs and others.

685. *Schwarz and Arif's Recorded Admissions*. Airf was right beside Schwarz, fully aware of this. He and Schwarz showed scienter on May 27, 2008: Kriss recorded this in-person conversation between himself, Schwarz, and Arif. All doubt Arif participated in the racketeering, fraud, and fiduciary and contract breaches can be put aside hearing him describe in his own words how this fraud worked, particularly how Schwarz combined the Four Subs into one "joint and several" lender so the "loan" would be paid first, from Camelback, to cheat Woodring:

> Schwarz  It was done [as a loan] for our tax purposes...it wasn't a payment it was a „loan", which you could deduct the interest on and was not taxable...if you're selling an interest in the company it would be subject to tax...
>
> It helps in terms of, if you thought that Phoenix was going to be a successful project, by structuring it this way, it took care of the Beau [Woodring] issue. The Beau issue was that when Felix insisted that Beau settle, that we settle with Beau and give Beau everything, he wanted to leave Beau with a 10% profits interests. That infuriated me because he didn't deserve it. So by characterizing the deal with FL as a „loan", now, he's never going to get

143

|  | anything, if I don't want him to get anything, because it's not equity, it's a „loan" that has to be paid back first before he gets anything. |
| <u>Arif</u> | Listen it doesn't matter for a deal you can borrow money from a bank, you can take equity, it doesn't matter... |
| <u>Schwarz</u> | It does matter, I did a good job, I protected you guys [Arif and Satter] |
| <u>Arif</u> | You protected us with how now we have a profit without sharing the money. |
| <u>Schwarz</u> | I understand. But in Phoenix there will be a profit. Standing alone there will be a profit. If I sell it now I will have a profit...There is a profit, except there's not a profit, because of the way I've structured the deal with FL, it will not be a profit. There will be no profit. If we did it the original way, it would have been a profit. |
| <u>Arif</u> | That was the idea...put the projects all together because he [Schwarz] doesnt want to pay him [Woodring] his 10%...so now we have to pay first the „loan"[47]. |
| <u>Schwarz</u> | That's the right way to look at it |
| <u>Kriss</u> | The thing with beau does the same thing apply to Chudi [Ejekam]? |
| <u>Schwarz</u> | I guess technically it could. |

686.    *Language in the Loan Agreement*. In addition to the language quoted above which makes clear this is no "loan" but a residual claim on member's equity (i.e. a partnership interest), ¶653, the "loan" agreement prohibits the use of "loan" proceeds for distributions to anyone other than (i) Bayrock Group LLC (from the Four Subs); and (ii) Arif (from Bayrock Group LLC).

687.    This completely contravenes the limited liability company agreement of Bayrock Group LLC, and while it is legally ineffective in terms of eliminating Kriss's rights to distributions from Bayrock Group LLC, he can still enforce the limited liability company agreement, nevertheless by agreeing not to honor its obligations to Kriss and the other members of Bayrock Group, this is a complete repudiation of every statutory, fiduciary, and contractual duty existing with respect to that limited liability company agreement, the members, the company, and its managers.

---

[47] Thus at the least Arif knew what Schwarz was doing, in particular how by making the "loan" joint and several he had loaded most of the "debt" service onto Camelback. Arif's failure to stop Schwarz and his concealment of this from Plaintiffs and Woodring were breaches of fiduciary duty and concealment frauds.

688.     It is also a *per se* act of oppression. Not only does it constructively dilute Kriss in the Four Subs and in Bayrock Group itself, even though his membership interests are specified in the limited liability company agreements as non-dilutable, it turns his membership interests in particular, and those of Ejekam and Woodring, ino toxic waste because of tax consequences.

689.     When Schwarz was boasting to Kriss in that May 2008 conversation about how brilliant he was to pretend it was a "loan" because, for one, the "interest" would be deductible, ¶685, that was the first of two grave tax errors which caused incalculable damate.

690.     As the Four Subs, the "borrowers", were all tax partnerships, the $50,000,000 distribution they made upstream to member Bayrock Group LLC was a "debt financed distribution".

691.     While the rules for that are complex in the partnership context, they can be simplified as, "Unless the partnership (each of the Four Subs) had certain expenses during the year of distribution (2007), in which case some of the debt proceeds can be allocated to those expenses, then standard interest-tracing rules apply."

692.     Since the Four Subs were passive holding companies and had no operating expenses other than franchise taxes, there would be no such allocations possible.

693.     That meant that standard interest tracing rules would apply, Reg. §1.163-8T, and that meant the entire $50,000,000 would have to be traced to the ultimate distributees, first Arif, and then all the hidden partners in Russia and Kazakhstan participating through Bayrock Holdings, every dime of it to see what their proceeds were spent on, every dacha, and then that would determine how the "interest" on the "loan" is treated for tax purposes.

694.     In simple terms, if Arif took his $5,000,000 (that was the final amount he took net of tax and net of Bayrock Holdings, not $8,000,000) and bought a yacht, then at least 10% of all the "interest" paid by the Four Subs would be nondeductible, and would have to be shown on their K-1″s as "interest expense allocated to debt-financed distributions" and then broken down by category, so much for personal use (non-deductible), so much for investment use, and so on.

695.    Schwarz was wrong, the "interest" would not be deductible at the partnership level at all, and very likely not be deductible, or subject to complex limitations, at the partner level.

696.    And that meant that Schwarz's idea of using a "loan" to steal the earnings from the Four Subs would be exactly wrong, as it would not reduce earnings, at least not earnings in the sense of taxable income at the partnership level, and this would lead to disaster:

697.    Because the "interest" payments (again, all this is on the pretense that this really was a "loan") were contingent on distributions from the lower tiers, and this was an OID ("original issue discount") "debt" instrument[48], the amount and timing would be determined by a schedule prepared in 2007, and would very likely not match reality, meaning there would be possibly huge timing distortions to begin with, on top of the fact that the "interest" itself would not be deductible at the partnership level.

698.    As a consequence of all this, the prohibition against making any distributions from the Four Subs for an indefinite period and the prohibition against ever making any distributions from Bayrock Group from the "loan" proceeds, Bayrock realistically never could make any tax distributions, as doing so would breach the "loan" and force an immediate acceleration, and that left Kriss and the other members with potential massive unfunded tax liabilities separate from the real tax problems associated with the intentional failure to report the $42,000,000 of income.

699.    Under state law, the intentional termination of tax distributions from an S corporation or partnership to harm the minority is a "squeeze out" or other oppressive conduct for which Plaintiffs can and do elect the remedy of a forced sale.

700.    And that's only the first serious tax error Schwarz made. The second one was horrific.

---

[48] One of the indicia of scienter on the parties" intentions to fulfill their tax obligations occurred in May 2007 when, in an email exchange, Kramer Levin, representing FL, refused to allow Roberts & Holland, representing Bayrock, to place an "OID legend" on the "note", which is required so if "notes" are exchanged, the new holder understands the tax consequences, including of phantom income (unfunded tax liabilities). One can imagine why FL didn"t want that legend on the note. The interesting part is that Kramer offered to include it if Roberts could show they ever had actually included it on any of their work, and Roberts could not.

701.    Recall Bayrock Group LLC did not unconditionally guarantee the "loan". This was deliberate, there were many emails on the subject, but Bayrock Group did not want the "loan" to have any chance of taking away from or having claims on income from other projects.

702.    As a result, for tax purposes, pursuant to §752 the allocation of the "loan" was in accordance with the profits interests of the partners in the Four Subs, and since those partners accounted for about about 65% of the profits interests, Satter alone 50%, then $32,000,000 of the $50,000,000 "loan" was allocated to Satter, Schwarz, Kriss, Ejekam, and Woodring.

703.    That meant only $18,000,000 was allocated to Bayrock Group LLC.

704.    That meant Bayrock Group′s outside basis in the Four Subs was about $26,000,000.

705.    That meant that the "debt"-financed $50,000,000 distribution upstream to Bayrock Group created a $24,000,000 income realization by Bayrock Group LLC, all of it taxed as ordinary income, a disproportionate non-liquidating distribution in respect of hot assets, pursuant to §751.

706.    That income had to be allocated among the partners of Bayrock Group, and it never was, nor were any tax distributions made, the responsible partners evading about $11,000,000 of tax.

707.    This is the motive and opportunity for the fraud that the Four Subs were disregarded entities, so the debt-financed distribution would not be taxable income. Sure enough, since the end of 2007 Salomon prepared fraudulent financial statements on what he said was an "income tax basis" of accounting that showed Bayrock Group, not the Subs, as the $50,000,000 "debtor".

708.    Pisem had to have known this, that unless these service providers, some his own clients, were fraudulently relabeled "not partners" and "not members", there would be a tax disaster.

709.    *Schwarz's Companion Insurance Fraud on AIG*. When Schwarz began to plan these crimes, he insisted Bayrock buy a Director′s and Officer′s Liability Policy. He harangued Satter, Kriss with emails insisting that even though Bayrock had almost no cash left, even if it had to finance the premium, the policy "had" to go in force before the closing date of the FL transaction.

710.    He knew he would be, Arif, and Satter would breaching fiduciary duties and hoped the inevitable lawsuits would be covered by AIG (Defendant National Union).

711.    He was so intent on "coming to the risk", he defrauded AIG by submitting a seriously fraudulent application on February 8, 2007. Where the application asked whether the company (Bayrock) or any insured had been sued for wrongs committed in their capacity as a manager or director, (Question 15), Schwarz answered "no", even though mere days earlier, on January 11, 2007, he, Satter, Arif, Bayrock, and others had been sued for breach of fiduciary duty and racketeering in Phoenix, CV2007-000117, in connection with their management of Camelback Partners LLC, a lower-tier of Bayrock Camelback LLC, and he had hired lawyers already.

712.    He also failed to disclose Satter's 2004 convictions for racketeering predicated on securities fraud (Question 14). And he wildly understated Bayrock's assets at $18,000,000, this mere days after Bayrock told FL the membership interests in the Four Subs alone were worth $227,000,000 He submitted the false application on February 8 2007. rExh. E.

713.    Schwarz concealed all this from AIG to induce them to issue the policy, which they did, and Bayrock has already made claims against it.

714.    **<u>Final Word on the Disguised Sale and Debt/Equity Frauds</u>**. The whole business of pretending FLG was a "lender" to the Four Subs was the only way to avoid §707 disguised sale treatment, because disguised sale treatment presupposes that the buying partner is a partner.

715.    Even if it were a "loan", it created a tax disaster because of the allocations of 2/3 of the "debt" to the Four Subs and thus a huge tax bill to Bayrock Group (and ultimately its responsible partners) for the "debt"-financed distribution, as well as a smaller disaster because of the non-deductibility of "interest" and the complexity and timing distortions of contingent OID "interest".

716.    The terms of the "loan" were crafted to replicate the substance of partnership, and if one were to compare the "loan" agreement with the "contribution" agreement before it and compare

148

those with the "assignment" agreement before that (before Pisem and the tax frauds, they would be seen virtually identical, almost literally nothing changing but the lables.

717.     <u>Half a Billion Dollars Is a Lot of Money</u>. There was one small change, one little piece of "fluff", a talismanic shibboleth, or window-dressing, adopted in the vain hope it will make a pig look like a swan. In this case, at the last minute, they put a cap of $250,000,000 on the distributions FL could receive in respect of its newly purchased membership interests "loan".

718.     For FL to realize that amount, the Four Subs wold have had to receive almost $500,000,000 in proceeds from the Four Projects.

719.     This was clearly ridiculous, there was no conceivable chance such could happen; it would require, for example, condominium sales of $6,000 per foot in a sub-$1,000 market. The mere outrageousness of it itself is evidence of no intent to have any real kind of serious cap, not that a cap would have made it a "loan" anyay.

720.     Nevertheless, Plaintiffs will plead two alternate repudiation damage theories:

721.     First, that the $250,000,000 cap was ridiculous, never any substantial possibility. Plaintiffs" repudiation damages remain at $32,500,000.

722.     Second, that the $250,000,000 cap was indeed substantially possible to be hit, and a real "cap". In that case, since the Four Projects would have paid off nearly $500,000,000, Plaintiffs" repudiation damages must be approximately $60,000,000.

723.     **<u>Final Word on Pisem's Scienter</u>**. Pisem and the others perpetrated these frauds in May 2007, less than nine months after the 2nd Circuit decided *Castle Harbour*, on-all-fours controlling authority on debt/equity partnership tax controversies, according to which FL"s interests in the Four Subs were clearly equity, not "debt".

724.     The idea that Pisem did not well know of *Castle Harbour* is ridiculous, it is one of the most important appellate decisions in partnership taxation in the one hundred year history of tax

law, particularly for its incorporation of debt-equity analysis in applying the *Culbertson* totality of the circumstances test to determine the existence of partnership equity and therefore partnership.

725.    But the smoking gun, the unavoidable proof of his scienter, is on the disguised sale side, which itself is motivation for him and others to insist that this was "debt", not equity.

726.    Disguised sales became such common methods of abuse that decades ago they got their own statutory prohibition, §707(a)(2)(B). Then, in November 2004, Treasury published proposed regulations (Reg-149519-03), which adopted a "but for" test: there would be a disguised sale only if the transfer of consideration to the selling partner (Bayrock Group LLC) would not have been made "but for" the transfer of consideration from the purchasing partner (FL).

727.    The regulations attracted comment. The author of the ABA Section of Taxation″s 2005 *Comments Concerning Disguised Sales of Partnership Interests*, for one, felt the "but for" test too broad, proposing a "double but for" test: there would be a disguised sale only if each transfer, to the selling partner and from the purchasing partner, would not have been made but for the other.

728.    The author of the 2005 *Report on Disguised Sales of Partnership Interests* of the New York State Bar Association ("NYSBA") Tax Section also felt the regulations too broad, and said there should be a disguised sale only if the two transfers were "directly related".

729.    The author of that report opined that the transfers would be *per se* "directly related" if the agreement between the partners required the transfer to the selling partner be made in return for the transfer from the purchasing partner.

730.    This is what was done here, FLG requiring the Four Subs to transfer the $50,000,000 upstream to Bayrock Group in return for FLG″s transfer of the $50,000,000 into them.

731.    The author of that report opined that otherwise, the transfers should be "directly related" if some of these factors were present: (i) there were negotiations between seller and purchaser; (ii) they entered into an agreement relating to the transfers; (iii) the time and amount of the transfer to the seller were known by the time of the transfer from the purchaser; (iv) the seller

could assert a right to the transfer; and (v) partnership distributions effectuated an exchange of the benefits and burdens of ownership of the interests.

732.  Every one of those factors is present here.

733.  The author of that report is on the Executive Committee of the NYSBA Tax Section.

734.  The author of that report is co-chair of the Section′s Committee on Pass-Thru Entities.

735.  The author of that report is Elliot Pisem.

736.  <u>The author of that report advised Bayrock and FL to do what he himself believed illegal.</u>

737.  In disguising this sale of partnership interests, they duplicated the total dependence of FL′s return <u>of</u> their money, let alone <u>on</u> their money, on the entrepreneurial success of partnership operations, and they duplicated the economic substance of partnership; yet, staring at the sun and calling it the moon, they called FL a "lender", not a partner; they called the payments to FL ostensibly nontaxable "interest", not profits distributions in respect of partnership interests; they told Subchapter K, §1001, and §1446 to go to hell, *et voila*, they took $100,000,000 of U.S. tax on $250,000,000 of effectively connected Bayrock income and wished it away into the cornfield.

738.  <u>What Did Schwarz and Salomon Think?</u> Everyone at Bayrock, got bonusessalary to employees and distributions to partners, except Satter′s would be "added to his ‚loan′". ¶245.

> From: Julius Schwarz [mailto:js@bayrockgroup.com]
> Sent: Thursday, June 07, 2007 5:28 PM
> To: Alex Salomon
> Subject: Re: Withholdings on Bonus
>
> ***How is it being treated for tax purposes? Can't it be a capital gain from distribution of profits?***
>
> From: Alex Salomon <Alex@salomoncpa.com>
> To: Julius Schwarz
> Sent: Thu Jun 07 17:26:53 2007
> Subject: Withholdings on Bonus
>
> The law requires a minimum of 25% federal withholdings. Your actual tax will be more, which means that you will owe at end of year. Do you want to withhold more now?

From: Alex Salomon <Alex@salomoncpa.com>
To: Julius Schwarz
Sent: Thu Jun 07 17:43:54 2007
Subject: RE: Withholdings on Bonus

I am open to suggestions. Cannot think of a way to do it.

From: Julius Schwarz [mailto:js@bayrockgroup.com]
Sent: Thursday, June 07, 2007 5:45 PM
To: Alex Salomon
Subject: Re: Withholdings on Bonus

***We have al given up 50 percent of our rights to profit distributions. That seems worth something***.

From: Alex Salomon <Alex@salomoncpa.com>
To: Julius Schwarz
Sent: Thu Jun 07 17:51:22 2007
Subject: RE: Withholdings on Bonus

The whole purpose of involving Elliot was to avoid current taxation.

The transaction was not structured as a sale of a partnership asset. If we recognize cap gains for you, it would have be done for everybody including Tevfik. ***Perhaps, it can be structured as a loan against future profits. Then annual interest would have to be paid***.

739.    The first email shows Schwarz knows he is a partner, that partners get distributions, not salary, and that the distributions pass through their character, in this case capital gain from the sale of partnership interests (except he didn't know, or care, that it would still be taxed at ordinary income rates anyway, as the gain related to unrealized inventory appreciation, "hot assets" per §751). When it suits him, Schwarz wants to be treated properly, like the partner he is, thus he knows that al the years and millions of dollars of "salary" payments to him were tax fraud.

740.    The third email speaks for itself. "We have all given up 50 percent of our rights to profit distributions" means "We sold 50% of the partnership profits interests in the Four Subs to FL".

741.    If there were any doubt Salomon was "in on" all the "loan" frauds disguising taxable transfers, this will end it. It's interesting how Salomon knows interest has to be paid, except apparently in the case of Satter, where interest was never accrued, which triggered an IRS audit, and in the case of the Thieriot $1,000,000 "loan", and in the Banyan "loan" that wasn't, etc.

152

742. But the best email of all is directly on point. Did Schwarz think that FL″s position in the Four Subs was really as a "lender" and that the last-minute conversion made their $50,000,000 a "loan" rather than equity? Let Mr. Schwarz tell us he _really_ thinks, when Kriss was told it had been changed from equity to "debt" and that doing so would make their balance sheet terrible, because it would not increase net worth; here is Schwarz ordering Kriss to show it as equity, not because it would be fraud to do so, but because it really as equity:

> From: Julius Schwarz
> Sent: Monday, April 30, 2007 7:04 PM
> To: Jody Kriss
> Subject: is FL coming in as equity or debt?
>
> **_Call it equity but for tax purposes its debt. Otherwise we write a huge check to the IRS. As a 49 percent equity partner they are still equity. There is no other way around it_**.

743. Of course it″s 62 per cent, not 49 per cent, but:

744. If Schwarz says this was a $50,000,000 tax fraud, a disguised sale hidden behind a sham "loan" perpetrated so they didn″t write a huge check to the IRS, neither Plaintiffs nor this Court should argue the point with him.

745. QED.

153

**THE SATTER FRAUDS II**

746.     By late 2007, Satter″s million dollar a year skim had reached $3,750,000. Pursuant to a "note" executed in 2006, with "interest" he "owed" nearly $5,000,000, but the "note" was a sham, as Schwarz can be heard admitting to Kriss on the MP3 Kriss made., ¶236.

747.     Schwarz then executed a scheme he had been planning all through 2007 to betray Arif and Satter by taking advantage of their legal exposure for the years of tax fraud on those "loans".

748.     After planting or encouraging a New York Times story, Exh. B, about Satter″s mob ties to whip up pressure from Bayrock lenders to get rid of Satter, Schwarz attempted to extort Arif and Satter into handing Bayrock over to him, under the guise of launching a quite unethical, and by its terms quite criminal, hostile takeover of his own client Bayrock, using its own money.

749.     Schwarz "suggested" Bayrock Group LLC would redeem Arif″s membership interests for $6,000,000, then told Satter either Bayrock would somehow use $5,000,000 to pay Satter″s personal tax liabilities and Satter would abandon his membership interests, or Schwarz would turn Satter in to the IRS, which in a break for Schwarz had just begun auditing Bayrock Group LLC″s 2004 return and expressed major interest in the sham "loan" (turning Satter in would turn Arif in as well; as Schwarz himself says on that MP3, ¶236, Arif had extreme legal exposure):

> RE: Sale and Restructuring of Bayrock Group, L.L.C. (the "Company")
>
> The following sets forth the material terms of sale of Tevfik Arif and Felix Sater″s [sic] economic and voting interest, as applicable (collectively, the "Interest") in the Company to Arie Kotler and Julius Schwarz (collectively, "Buyer"):
>
> 1. Tevfik Arif shall sell all of his Interest to Buyer for $6 Million (US), which shall be payable (i) $3 Million now and (ii) $3 Million from Company profits after any and all payments made by the Company or its subsidiaries to FL Group.
>
> 2. Felix Sater shall sell all of his interest to Buyer, in exchange for which the Company shall pay for his existing federal income taxes [sic] liabilities up to $5 Million US.

750.     Schwarz should have left extortion to the professionals, because this blew up in his face.

751.     Within days, thanks to that article Bayrock″s audit problems tripled when iStar, the $275,000,000 Trump SoHo construction lender, not thrilled that it now looked like they were

financing a Mafia and Russian mob project, said they, too, would audit Bayrock, followed days later by the Sapir Organization, Bayrock"s money partner in Trump SoHo, which, not to be outdone, said it would conduct not just an audit, but a full forensic fraud audit, of Bayrock.

752.    Arif refused to submit to Schwarz"s extortion, and Satter, who knew a thing or two about extortion, proffers, and cooperation agreements and so knew Schwarz would never turn anyone in to the IRS because Schwarz was involved up to his eyeballs in the tax frauds and other crimes and would never get immunity, also refused to submit, though to protect himself he ordered a Bayrock employee to make and keep in his home copies of Bayrock email servers in case they "met with an accident", interesting since Satter had for years demanded the servers be constantly wiped and threatened physical violence if someone sent email with "too much information".

753.    In response, Schwarz quickly backpedaled and aligned himself with Arif, then retained Defendant Nixon Peabody to help convince Arif that Satter "had to go" no matter what the cost.

754.    Arif, Satter, Schwarz, Salomon, Weinrich, and Nixon Peabody then conspired to, and did, defraud the IRS of millions of dollars by subscribing and filing fraudulent schedules and returns for Satter, falsely stating that Satter was an employee of Bayrock Group LLC and was being paid a $3,500,000 "salary" all in one lump sum in December 2007, with $1,600,000 of "withholding".

755.    This was all fraud. There was no salary payment, because there was no salary and never could have been because Satter had been a partner all along; and as Defendant Gilbert[49] put it in one email on December 5, 2007, "he really looks like a partner":

---

[49] Nixon Peabody was also involved with yet another tax fraud. Right after the FL deal closed, the first transaction Bayrock and FL did together as new partners through Bayrock/FL Holdings was to acquire a significant piece of a Florida development project from Michael Samuel. FL put in its 75%, about $25,000,000, and Bayrock put in its 25%, about $8,000,000. Of that $8,000,000, Bayrock contributed $5,000,000 in cash and the little 5% piece of Midtown Miami that started everything years ago, the piece for which Arif had put up the $450,000. Bayrock contributed this to the FL deal and as such would not have realized gain, except in a pre-arranged side deal arranged by Nixon Peabody Michael Samuel agreed to take $3,000,000 of the money Bayrock/FL Holdings, or its new Sub for this project, paid him and launder it through Sobay and then into Samuel Banyan LLC, where it would go back out to Bayrock as "payment" on that "convertible note" that was really a partnership interest. In other words, a disguised sale again, a transfer of appreciated property (the little interest in Midtown Miami) with a pre-arranged, related indirect transfer back

756. The emails show how Gilbert conspired with them:

> From: Adam Gilbert
> To: Julius Schwarz
> Subject: Felix
>
> Ultimately, the tax treatment should follow the facts and circumstances. What we know, without looking at documents, is that he gets periodic draws from Tevfik; that there is a note...; that all interst is accrued; and that he pays no tax. In addition, we know that he receives health benefits...
>
> At the current time, he really looks like a partner. Everyone else in the company draws a salary; he has a loan. Everyone else at the company also has some profit participation - Felix's interest is really a large, back-end profit participation. He can be characterized as Tevfik's partner, with Tevfik advancing him monies during the term of the partnership...
>
> Felix can be characterized either as an employee; independent contractor; or partner. The latter [partner] is horrible...[as an independent contractor] ...Felix will have not only 6 years of ordinary income for which he will have paid no tax but also interest and penalties. He probably does not have the cash to pay the tax, and the Company wil not have withheld anything nor bear any share of the tax.
>
> I will discuss with my labor partners, but I am most comfortable with employee. It places him in the same position as everone else from a tax point of view (other than Tevfik as owner), and is consistent with the **testimony that you and Felix have given**.

757. The evidence of criminal conspiracy begins with the phrase "without looking at documents". Given Schwarz's recorded admission that they concealed Felix's employment agreement, Exh. D, from the IRS, ¶236,

> But...he [Satter] also has a note separate from that...a promissory note...**we could have kept the fallacy going that he was paying off the note**...we got worried about the IRS so we paid his payroll taxes because **he had an employment agreement at the same time as the note**...**so the IRS could have seen both** ...

758. This was a criminal conspiracy to conceal that document from the IRS and treat Satter as an employee in order to misappropriate millions of dollars of Bayrock's money to pay some of Satter's tax liabilities without triggering additional tax liability to him.

---

to Bayrock of $3,000,000 that originated in the transferee Sub partnership. All these side agreements were hidden away out of sight and not in the main deal, just as the lawyer for the CBRE investor had objected to in the FL deal.

759.    In other words, Satter owed about $3,000,000 in taxes, penalties, and interest as a partner who paid no taxes on what were taxable transfers from Bayrock disguised as sham "loans".

760.    If Bayrock transferred $3,000,000 to him, other than as a sham "loan", unless it were not taxable because it was a distribution in respect of a partnership interest in which Satter had proper outside basis, and they couldn't do that because of all the payroll frauds they had been running for years, pretending partners were employees, then any way they gave him $3,000,000 would give him another $1,500,000 tax liability, and if they gave him that it would be another tax liability, and so on (it would take about $5,000,000 to cover it all, hence Schwarz's offer of that sum).

761.    The only way out was further tax fraud, to pretend that Satter had been an employee all along and was to get a $3,500,000 "salary" against which they would "withhold" $1,600,000.

762.    $1,600,000 wasn't even the right number; it was way too low, but they decided to take Felix's word, without any receipts, that he had spent $1,000,000 of the "loan" amount on personal AMEX charges that were really business expenses, and they just "forgot" about that sum.

763.    In furtherance of the conspiracy, Weinrich prepared spreadsheets to figure out how much they had to dummy up the numbers under various scenarios, for example, would it be cheaper for them to say he had been paid salary all along and everyone just "forgot" to withhold; would it be cheaper to say he was getting millions of dollars in salary all at once in December 2007.

764.    Weinrich was asked to reverse engineer what a W-2 would look like for 2007 so that the amount of tax withheld would equal the taxes, penalties, and interest that Satter, who had never reported the millions of dollars he skimmed, would have to pay under two fraudulent scenarios.

| | If Taxable Each Year | | | | | | If Taxable All in 2007 |
|---|---|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** | **Total** | |
| **Advances** | **355,000** | **578,201** | **673,160** | **654,965** | **1,475,085** | **3,736,412** | **3,736,412** |
| | | | | | | | |
| **Computations:** | | | | | | | |
| Plus: Employee's FICA | 5,394 | 5,450 | 5,580 | 5,840 | 6,045 | 28,309 | 6,045 |
| Equals: "net" for computation | 360,394 | 583,651 | 678,740 | 660,805 | 1,481,130 | 3,764,721 | 3,742,457 |
| "Gross" = "net" ÷ (1-rate) | 558,750 | 893,116 | 1,038,623 | 998,195 | 2,635,463 | 6,124,147 | 6,659,176 |
| Grossup (ex. FICA) = "gross" - "net" | 198,356 | 314,915 | 365,463 | 343,230 | 1,160,378 | 2,382,342 | 2,922,764 |
| **Rates Used:** | | | | | | | |
| Federal withholding rate | 25% | 25% | 25% | 25% | 35% | | 35% |
| Medicare withholding rate | 1.45% | 1.45% | 1.45% | 1.45% | 1.45% | | 1.45% |
| NY withholding rate | 9.05% | 8.20% | 8.20% | 7.35% | 7.35% | | 7.35% |
| total withholding rates | 35.50% | 34.65% | 34.65% | 33.80% | 43.80% | | 43.80% |
| Number of months delinquent | 48 | 36 | 24 | 12 | - | | - |
| | | | | | | | |
| **Results for Satter's W-2** | | | | | | | |
| Advances | 355,000 | 578,201 | 673,160 | 654,965 | 1,475,085 | 3,736,412 | 3,736,412 |
| Federal withholding | 139,688 | 221,771 | 257,368 | 241,711 | 817,167 | 1,677,705 | 2,058,285 |
| FICA withholding | 5,394 | 5,450 | 5,580 | 5,840 | 6,045 | 28,309 | 6,045 |
| Medicare withholding | 8,102 | 12,863 | 14,927 | 14,019 | 47,396 | 97,307 | 119,381 |
| NY withholding | 50,567 | 80,281 | 93,167 | 87,499 | 295,815 | 607,329 | 745,099 |
| Grossup total | 203,750 | 320,365 | 371,043 | 349,070 | 1,166,423 | 2,410,651 | 2,928,809 |
| | | | | | | | |
| **W-2 Taxable amount** | **558,750** | **898,566** | **1,044,203** | **1,004,035** | **2,641,508** | **6,147,062** | **6,665,221** |
| **Results for Bayrock** | | | | | | | |
| Cash required for grossup | 203,750 | 320,365 | 371,043 | 349,070 | 1,166,423 | 2,410,651 | 2,928,809 |
| Employer's share of FICA & Medicare | 13,496 | 18,313 | 20,507 | 19,859 | 53,441 | 125,616 | 125,426 |
| Late filing penalties estimated @25% | 54,312 | 84,669 | 97,888 | 92,232 | 304,966 | 634,067 | 0 |
| Interest estimated @ 12% per year | 104,278 | 121,924 | 93,972 | 44,272 | 0 | 364,446 | 0 |
| | 375,836 | 545,271 | 583,410 | 505,433 | 1,524,829 | 3,534,779 | 3,054,234 |

765.   This is an excerpt from the actual spreadsheets Salomon and Bayrock personnel worked up to figure out which fraudulent cover-up of the skimming would be cheaper.

766.   First, suppose Satter, whom they obviously knew was not reporting the income or filing the returns, were to file all the late returns and pay all the penalties as if all the "loans" had been W-2 salary all along. Second, suppose instead Satter were to simply pretend he had gotten the entire amount of all those "loans", $3,736,412, as W-2 salary all in 2007, all in one lump sum.

767.   For example, they computed they could prepare a W-2 for 2007 that said they paid Satter a make-believe $6,665,211 in salary in 2007; they would pretend to "withhold" $2,928,809 then

pay it to the government, plus FICA, leaving a make-believe $3,736,412, which they would pretend to pay him and which he would pretend to use to repay his "loans", which would disappear off the books. Or, they could prepare five W-2"s showing an aggregate make-believe salary paid to him over prior years of $6,147,062, pretend to "withhold" $2,410,651, add $998,513 for make-believe late wihholding penalties and interest, and pay the government $3,535,779, including FICA, leaving the same make-believe $3,736,412.

768.     (In fact, they paid only half what they calculated they needed to, "only" $1,700,624.)

769.     In other words, they were figuring out which fraudulent cover story was cheapest for them to use to get that skim off the books and keep the IRS from coming after Arif, Satter, and Schwarz; this is to say the least a novel concept in tax law, that the correct tax treatment of all these skims is whichever tax treatment costs you less to try to get away with.

770.     To the question, why was Gilbert asking his labor people when that document, Exh. E, which he didn"t want to look at said, notarized, witnessed, negotiated for months with tax lawyers at Ed Baker"s firm and Akerman that these service providers had to be partners, had to have membership interests, and all the documents before that dating back to 2003 that show Satter had membership interests, and not his tax people, the answer is, he did ask his tax people, who were sent the Weinrich spreadsheets to check, and didn"t like what they had to say in this email a tax partner wrote to him and Salomon on December 18, 2007, after he reviewed those documents:

> [Weinrich] gave me his yesterday, and I"ve used some of his work but taken a slightly different approach to the calculation. My bottom line is that it costs Bayrock $3.0 mill to report it [Satter"s four-year $3,750,000 skim, without adding in the sham $750,000 "interest"] all in 2007, and the risk of having an IRS audit that spreads it over all the years is an extra $600k. Those penalty and interest numbers are rough. **Also, this assumes no accusations of criminal tax avoidance, in which case the risk is denominated in years rather than dollars**. [Emphasis added.]

771.     Gilbert"s response to this, unsurprisingly _not_ copied to Salomon,  in this email to Scharz the same day was:

> Just fyi. I have not reviewed. Please forgive [the tax partner″s] last sentence. We have the accountant″s advice defense, and can also treat the incremental payment, should we chose to make it, as insurance. I would recommend it to you.

772.    Salomon will be no doubt gratified to read this, that all these lawyers were conspiring to blame it all on him, will drafting him to do all the labor.

773.    Finally, two points. First, while Plaintiffs cannot know until disclosure what exactly Schwarz and Satter told the IRS in their testimony that Gilbert refers to, and may not even then (not surprisingly, but illegally, in a recent deposition in an unrelated case Schwarz has refused to discuss any of the terms under which this or other money was paid to Satter, or the terms of the trust planned into which they would transfer Satter″s membership interests to hide his ownership going forward; Schwarz claimed somehow that the financial terms of this cover-up were all "privileged"). From the prior allegations it is clear enough that they lied to make Satter look like an employee, to be consistent with all the frauds they had perpetrated, the condominium offerings, the bank documents, and the tax frauds and took Gilbert″s hint to make sure this was presented to the IRS "without the IRS looking at documents".

774.    Second, what did Gilbert say on December 22, 2008 about those concealed documents?

> ...*__Felix has a 50% membership interest in Bayrock LLC and various affiliates__*...

775.    Plaintiffs will determine in disclosure what happened after this in detail, but can allege that Satter had $1,600,000 of his taxes paid, that $1,600,000 of income to him concealed, and that he was given $52,000 a month for some time, that he was paid $1,500,000 in the form of a sham "investment" in Defendant Bayrock Group Inc. to evade tax on that as well.

# PRAYERS FOR RELIEF

### AGAINST THE BAYROCK RICO DEFENDANTS

776.    **Money Damages**. For these Defendants" violation of 18 USC §1962(c) by their operation of Bayrock Group LLC through a pattern of racketeering, and their violation of 18 USC §1962(d) by conspiring to so violate 18 UC §1962(c), Plaintiffs pray this Court award them treble money damages for the injury they suffered to their business or property, as such has the meaning set forth in 18 USC §1964(c), the amount of such damages to be determined at trial, judgment for the entire such amount to be awarded against each and all of these Defendants, jointly and severally.

777.    **Attorney's Fees and Costs**. For these Defendants" same violation of 18 USC §1962(c) and §1962(d), Plaintiffs pray this Court award them  their attorneys fees and costs of this action, judgment for the entire amount of which to be awarded against each and all of these Defendants, jointly and severally.

778.    **Equitable Relief**. For these Defendants" same violation of 18 USC §1962(c) and §1962(d), pursuant to 18 USC §1962(a) and, alternatively, in its exercise of its inherent equitable powers, Plaintiffs pray this Court enter judgments:

A.    Ordering each such Defendant to divest himself of every interest, direct or indirect, in Bayrock Group LLC and in each and every other component of the Bayrock Organization as this Court shall determine is just and proper.

B.    Ordering each such Defendant to disgorge any and all amount(s) by which they were unjustly enriched as a result of their violation of 18 USC §1962(c) and §1962(d).

C.    Ordering the judicial dissolution of Defendants Bayrock Group LLC, Bayrock Spring Street LLC, Bayrock Whitestone LLC, Bayrock Merrimac LLC, and Bayrock Camelback LLC, and such other entities as this court shall determine is just and proper.

D.    Ordering such other relief as it shall deem just and proper.

**AGAINST THE RICO CONSPIRACY DEFENDANTS**

779.  **Money Damages**. For these Defendants" violation of 18 USC §1962(d) by their conspiring to violate 18 UC §1962(c), Plaintiffs pray this Court award them treble money damages for the injury they suffered to their business or property, as such has the meaning set forth in 18 USC §1964(c), the amount of such damages to be determined at trial, judgment for the entire such amount to be awarded against each and all of these Defendants, jointly and severally.

780.  **Attorney's Fees and Costs**. For these Defendants" same violation of 18 USC §1962(d), Plaintiffs pray this Court award them  their attorneys fees and costs of this action, judgment for the entire amount of which to be awarded against each and all of these Defendants, jointly and severally.

781.  **Equitable Relief**. For these Defendants" same violation of 18 USC §1962(d), pursuant to 18 USC §1962(a) and, alternatively, in its exercise of its inherent equitable powers, Plaintiffs pray this Court enter judgments:

A.  Ordering each such Defendant to divest himself of every interest, direct or indirect, in Bayrock Group LLC and in each and every other component of the Bayrock Organization as this Court shall determine is just and proper.

B.  Ordering each such Defendant to disgorge any and all amount(s) by which they were unjustly enriched as a result of their violation of 18 USC §1962(d).

C.  Ordering such other relief as it shall deem just and proper.

**AGAINST ALL DEFENDANTS EXCEPT NATIONAL UNION**

782.     Against the professionals themselves jointly and severally and their firms, that is, Salomon and Weinrich with respect to Salomon & Company, Domb with respect to Akerman Senterfitt, Brown, Stachenfeld, and Granin with respect to Duval & Stachenfeld, Gilbert with respect to Nixon Peabody; and Pisem with respect to Roberts & Holland; without limitation, disgorgement and restitution of all fees, compensation, payments, and remuneration ever received at any time from any person in or in relation to or in respect of any work done for or in relation to or in respect of the Bayrock Organization or any other Defendant in connection therewith; damages for breach of fiduciary duty; damages for malpractice; in particular this includes assertions the existence of direct attorney client relationships between Kriss and Akerman and Pisem, and all allegations including without limitation as to breach of fiduciary duty and malpractice made against them are also made against them by Kriss as a client as well as by all Plaintiffs in all relevant direct and derivative capacities hereunder.

783.     Against all Defendants, damages for, or the monetary equitable equivalent thereof, or non-monetary relief as may be the case, and without limitation, breach of contract, breach of fiduciary duty, tortious interference, unjust enrichment, prima facie tort, conversion, trespass to chattel, misappropriation, rescission, restitution, fraud, concealment, defalcation, malfeasance, negligence, intentional interference with contract, and all other damages or other relief at law or in equity, including attorneys fees and costs, as this Court may deem just and proper, and as to all Defendants, such liability to be all and each of primary, through aid and abettance, and through civil conspiracy, and in all cases joint and several.

**AGAINST ALL DEFENDANTS EXCEPT NATIONAL UNION**

784.     Against National Union, declaratory relief adjudicating the status of that certain Directors and Officers D&O Policy the issuance of which Plaintiffs allege to have been induced by fraud.

**AGAINST ALL DEFENDANTS**

785.    Each and every such prayer for relief explicitly or implicitly stated herein or as may be available is hereby demanded, in each combination, (i) directly, by Plaintiff Kriss; (ii) directly, by Plaintiff Ejekam; and (iii) derivatively, by Plaintiff Kriss on behalf of Bayrock Group LLC, Bayrock Spring Street LLC, and Bayrock Whitestone LLC; and by Plaintiff Ejekam on behalf of Bayrock Spring Street LLC and Bayrock Whitestone LLC.

===== end =====

**COUNSEL:**

Signed this 10th day of May, 2010

_____

Frederick M. Oberlander, Counsel for Plaintiffs

**THE LAW OFFICE OF FREDERICK M. OBERLANDER**
Frederick M. Oberlander, Esq. (FO1955)
28 Sycamore Lane, Box 1870
Montauk, New York 11954
212.826.0357    Tel
212.202.7624    Fax
fred55@aol.com

**United States District Court**
**Southern District of NY**

JODY KRISS and MICHAEL EJEKAM, directly and derivatively on behalf of
BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC; and
BAYROCK WHITESTONE LLC;

     Plaintiffs,

     v.

BAYROCK GROUP LLC; TEVFIK ARIF; JULIUS SCHWARZ;    **VERIFIED**
FELIX SATTER; BRIAN HALBERG; SALVATORE LAURIA;    **COMPLAINT**
ALEX SALOMON; JERRY WEINRICH; SALOMON & COMPANY. PC;
AKERMAN SENTERFITT LLP; MARTIN DOMB; CRAIG BROWN;    **JURY**
**TRIAL**
DUVAL & STACHENFLED LLP; BRUCE STACHENFELD;    **DEMANDED**
DAVID GRANIN; NIXON PEABODY LLP; ADAM GILBERT;
ROBERTS & HOLLAND LLP; ELLIOT PISEM; MICHAEL SAMUEL;
MEL DOGAN; BAYROCK SPRING STREET LLC; JOHN DOES 1-100;
BAYROCK WHITESTONE LLC; BAYROCK CAMELBACK LLC:
BAYROCK MERRIMAC LLC; BAYROCK GROUP INC.; and
NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA.;

     Defendants
     and

BAYROCK GROUP LLC, BAYROCK SPRING STREET LLC, and
BAYROCK WHITESTONE LLC

     Nominal Defendants (Derivative Plaintiffs)

## VERIFICATION

I, Jody kriss, pursuant to 28 USC 1746, declare as follows:
I am over eighteen years of age and have personal knowledge of the facts contained in this
Declaration. I have read the foregoing Complaint, which I declare to be true and correct to the
best of my knowledge, information, and belief. I declare under the penalty of perjury that the
foregoing is true and correct.

Executed on May 10, 2010
    2