# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

IN RE CIVIL CONTEMPT

## 12-MC-0557 (BMC)
## 16-MC-0706 (BMC)

## MOTION OF RESPONDENT
## RICHARD E. LERNER

## TO REQUEST THE RESIGNATION
## OF THE SPECIAL MASTER

-----

## AND FOR RELATED RELIEF

# FOR THE CONVENIENCE OF THE COURT

Because of the complexity of the subject matter, we provide this frontspiece.

### The relief requested.

This is in sum a motion for recusal, except that as set forth below we have concluded that such a motion cannot lie with respect to a special master, who can be asked to resign but otherwise can be removed involuntarily only by motion to revoke the reference.

Accordingly the statutory bases for removing a judge cannot apply either.

Therefore, while reserving our right to refashion this as a motion for recusal should it be held by competent authority that that's is what it should be, and to then apply the statutory bases assuming they apply, we are left with the request that the master resign the case in the interests of both justice and the appearance thereof and we do so by explaining that the master's position is untenable given the overwhelming basis on which to conclude that his actions either have been due to prejudice, or appear to have been so, or, to an unconstitutionally high measure have probably been so.

## MOTION FOR JUDICIAL ACCOUNTABILITY

### Removal for *lack of authority* to preside while due must be sought elsewhere.

We seek the removal of the currently presiding adjudicator. However, the proper procedural mechanism is unclear because the legal status of the adjudicator is unclear.

As set forth in the following paragraphs, this is a matter of first impression raising constitutional issues of historic import. The court has declined the full extent of extension requested and as a result we have no alternative but to respectfully reserve the right to supplement this with alternative motions even if the ultimate relief they request is the same.

In 2011 the Second Circuit issued temporary injunctions *pendente lite*. For practical purposes, because the last of them, issued February 14, 2011, says precisely so and overlaps in decretal provisions of all the preceding ones, all of them bind (1) us; (2) Sater; (3) the government; and (4) all of the privies thereto.[1]

Unless the words "temporary" and "*pendente lite*" are legal dross, common sense, and the law, should compel the conclusion that when the Circuit issued a final mandate on December 2011 and so gave up jurisdiction, those injunctions died, if they were even still then alive. The "court" has to date refused to acknowledge this.

And while the "court" has once in the past denied a motion to rule that it has no jurisdiction, it did not address that temporal issue and more to the point, it is substantially certain that the "court" had no jurisdiction to determine its own jurisdiction, as only an actual court *serving* as a court may do that, such power inherent in Article III *status* of the

---

[1] That February 14, 2011 order expressly provides so, explicitly incorporating the list of persons bound as would have been bound under the common law of equity before the rules and under FRCP § 65 thereafter.

tribunal, not that of the person presiding over it. Even more to the point is that we have cautioned over five years ago by letter on or about June 22, 2011 that this "court" is merely a Special Master with necessarily limited authority but the court never acknowledged it.[2]

We argue that for the same reason we put the word "court" in quotes, *viz.* the "court's" pronouncement on May 10, 2016 that it considers itself to be a Special Master serving pursuant to the reference appointment of the Second Circuit, which appointment was directed to the Chief Judge of the EDNY for selection from EDNY district judges.

The appointment of a special master is ordinarily done by a federal district court and there is an elaborate set of procedures that governs that, but it is clear that, with one likely exception, federal appellate courts have the authority to appoint special masters.

What they do not have is the authority to exercise original jurisdiction to charge, let alone try, indirect criminal contempt, at least outside the regulatory context. Another is the authority to transfer contempt authority that does exist by reason of district court orders from one issuing judge to another, as the Second Circuit itself has held, or to assume it for itself – which then creates the unresolved issue of what and for whom is the "court" serving as a special master in respect of alleged contempt of district court orders.

Thus, one basis on which to remove the "court," even if only partially, is for lack of authority to exist and to serve in the first place.

---

[2] We wrote that the Second Circuit in *City of New York v. Mickalis Pawn Shop*, 2011 U.S. App. LEXIS 9104, had voided an injunction for delegating too much power to a master to decide what would be contempt:

> The power of...federal courts to appoint special masters to monitor compliance with their remedial orders is well established"...But the Supreme Court has...warned "use of masters is to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause, and not to displace the court." Serious constitutional questions arise when a master is delegated broad power to determine the content of an injunction as well as effectively wield the court's powers of contempt.

That, however, is not a motion to recuse, and should not be directed to the "court" but to the referring tribunal which "created" it.

The problem is, the "court" has issued its own decretal orders. Special Masters do not have such equity authority unless they are given it by the reference and only then on the concurrent consent thereto of the parties, which in this matter is a consent we never gave and an equity authority which we have constantly denied exists.

Nor should it matter that the "court" is in its normal function itself an Article III judge. Were this court sitting as an appellate judge by designation, 28 U.S.C. § 144, which provides for the removal of district court judges, would not apply; by the same logic, it is not clear that that statute would apply to a district court judge sitting as a Special Master.

28 U.S.C. § 455 also provides for the removal of district court judges, and for the removal of other judges and presiding adjudicative officials, but not masters.

There are three reported cases involving the removal of a master; two relied on § 455 and §144 without any analysis of the preceding; one did not and relied on the common law (presumably Fifth Amendment due process as interpreted) of disqualification.

In the end, the only applicable precedent is that of *United States v. Shipp*, a criminal contempt trial heard by the United States Supreme Court, sitting in original jurisdiction because it was its own order that had been violated and it had appointed its own special prosecutor to proceed; there, a Special Master was used, though that Court's deputy clerk, not a sitting judge, and solely to collect evidence, with actual argument heard by, and evidentiary submissions and testimonial transcripts reviewed by, that Court itself, as would have to happen here by the Second Circuit's activation of Fed. R. Crim. Pro. § 42 itself.

**Removal for *cause* is due but equally unclear as to the proper venue to seek it.**

The phrase "judicial[3] accountability" suggests bifurcation between consideration of (1) what is a judge's duty; and (2) what is the remedy if he violates it. We agree.

**Duties**. For this paper we confine our analysis to the following two judicial duties:

- **A judge must adhere to the law**. A judge is obligated to provide a proceeding adhering to procedural and substantive standards required by the constitution, the canons, statute, and common law. *A judge must adhere to the law*, adhering to precedent and adjudicating in an independent, unbiased, unprejudiced manner.

  We assume no need to establish a requirement of impartiality. A requirement to abide by the law and precedent in the context of misconduct lies in adherence rules codified in the Code of Conduct for United States Judges. Canon 2A says, "A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 3A(1) says, "A judge should be faithful to and maintain professional competence in the law…" Commentary to Canon I states,

  > Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges…[which]… depend in turn on their acting without fear or favor. *Although judges should be independent, they should comply with the law*, as well as with the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this code diminishes public confidence in the judiciary and therefore does injury to the system.

  In sum, legal error, when it is not real "error" at all, is necessary and sufficient.

- **A judge must *appear* to adhere to the law**. Unique in modern societies, the American "law of judging" is as concerned with the *appearance* of impropriety as with the actuality of it. Because the effectiveness of the judiciary is limited by

---

[3] Hereafter, we use "court," "judge," "judicial," "master," and the like interchangeably, without quote.

the respect in which it is held by the public, supra, a judge must make sure that his actions do not *appear* improper even if they are in actuality not improper.

Though not a factor in this case, by definition we include within this category all "*per se*" status contra indicators other than those provided by statute or other authority, for example common law rules that judges must not preside when they have familial or financial relationships or are otherwise "stakeholders" in the case are merely special cases of preserving the appearance of adherence, where adherence includes independence, lack of bias, and lack of prejudice.

**Basis**. There are two direct sources for removal authority (that is, there are two sources by which a litigant may claim the remedy of a right to remove, not two sources for the standards of behavior the breach of which must be established for removal):

- **Pursuant to statute**. 28 U.S.C. § 144 allows removal for the *actuality* of bias. 28 U.S.C. § 455 allows removal for the *appearance* of bias.

- **Pursuant to the constitution**. There is no serious debate that actuality of bias is a *per se* violation of Fifth Amendment due process. As of *Caperton*[4], there is no serious debate that the appearance of bias is as well.

**Remedy**. For this paper we confine our analysis to the following remedy:

**Removal**. A judge who violates those requirements by definition commits mis-conduct and thus must be subject to some form sanction, and indeed that is so, whether that sanction be impeachment, other removal, prosecution, censure, disapproval, or civil suit in the case of non-judicial actions or judicial actions taken in the absence of jurisdiction, when absolute immunity will not lie. In this

---

[4] *Caperton v. A. T. Massey Coal Co.*, 556 U.S. 868 (2009). Most commentators agree that the difference between the Caperton standard of "unconstitutionally high probability of bias," and common law, ethical, and § 455 standard of "appearance of bias" are identical  as to the semiotics of *probability of bias* vs. *appearance of bias* in context of removal decision under uncertainty.

light, removal by requested or *sua sponte* resignation, disqualification, or by administrative or supervisory order, are merely special cases of remedies.

**Avoidance**. Fifth Amendment violations due to bias or the probability or appearance thereof are *structural* error, entitling the aggrieved petitioner to have the proceedings overturned if not voided *ab initio*.[5]

**<u>Venue</u>**. As noted previously, the venue to address a motion for involuntary removal is not clear here because the juridical status of the court is not clear here.

**<u>Process</u>**. Concomitantly, the method for seeking involuntary removal is not clear. There appear to be only two procedures possible, again separating procedure from venue and again recognizing that the first of these two may not apply at all, *supra*:

- **Pursuant to statute**. 28 U.S.C. §§ 455 and 144 provide specific mechanisms by which to seek recusal of, respectively, a judge or similar (but not a master, at least not by specific inclusion) and a judge.

- **Pursuant to the constitution**. Otherwise, normal motion practice is appropriate, certainly when removal is predicated upon constitutional grounds.

  One key difference is this: Unlike the two statutory-based procedures, nothing in the Fifth Amendment *requires* that a motion for removal be made to the court in question; there is no reason why, for example, relief cannot be sought directly by writ or similar device, which would have the added benefit of removing from the adjudication the court whose removal is being sought.[6]

---

[5]

[6] Another example of the judiciary excluding itself from its own laws, as the principle that *nemo judex in parte sua* ("no man can be the judge of his own cause") which has served Western law since Roman times and forms the rationale, if one may call it that, for the collateral bar rule that even unconstitutional orders must be obeyed ("The rule of law that Alabama followed in this case reflects a belief that, in the fair administration of justice, no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion," *Walker v. Birmingham*, 388 U.S. 307 (1967)) doesn't apply in statutory recusal cases where judges see nothing wrong in sitting in judgment over themselves.

**Proof**. Here, too, the situation is equally clear:

- **Pursuant to statute**. Statutory removal on grounds of bias or the appearance thereof is typically held to require a showing of an extra-judicial source for it. Otherwise, 28 U.S.C. § 144 allows proof by affidavit and counsel certificate of good faith therein and 26 U.S.C. § 455 requires establishment of the appearance by consideration of the objective view of an educated, disinterested observer.

- **Pursuant to the constitution**. Where constitutionally based, not only is no extra-judicial source required, there could never be. *This is the provenance of the use of "legal error that is not really error" as grounds to assert removable misconduct.*

Of course in either case, but predominantly in the constitutional case, proof of mens rea or motive will typically be indirect, by pattern of such error.

## LEGAL "ERROR" IS REMOVABLE MISCONDUCT

**With utter disdain for the rule of law, defendants Mark A. Ciavarella, Jr. and Michael T. Conahan, in combination and conspiracy with other[s] …have collectively perpetrated, through their acts and omissions, what ranks as one of the largest and most serious violations of children's rights in the history of the American legal system…In choosing to treat children as commodities that could be traded for cash, the defendants have placed an indelible stain on the Luzerne County juvenile justice system.**

These were a few of the opening lines of a class action suit filed by the Juvenile Law Center (JLC)—a public interest law group from Philadelphia—on behalf of dozens of children following the "Kids-for-Cash" scandal in Pennsylvania state court.

The root of this scandal was over $2,600,000 of secret income from a series of deals with developers of a privately run for-profit juvenile detention center. The judges received that income in exchange for their official acts, which included placing juvenile offenders in the detention center, as well as procuring state funding to house them.

On September 9, 2009, a federal grand jury indicted them for honest services fraud, defraud conspiracy, racketeering, bribery, money laundering, and extortion. In the descriptions of their misdeeds, the most egregious was the charge they had not only guaranteed placement of *guilty* juveniles in the private detention center but *were actively funneling juveniles into the center **whether or not their "crimes" warranted confinement at all**.*[7]

Conahan pled guilty and was sentenced to 17.5 years. Ciavarella was convicted on twelve counts and sentenced to 28 years. Both were ordered to pay restitution.

---

[7] STENGEL, ABSOLUTE JUDICIAL IMMUNITY MAKES ABSOLUTELY NO SENSE, 84 Temple L. Rev 4 (2012), quot. at n.14, Indictment, *U.S. v. Conahan*, 09-cr-272 (M.D. Pa. Sep. 9, 2009) "[A]ccused…offenders were ordered detained by the defendant even when Juvenile Probation Officers did not recommend detention and…detention was unreasonable and unwarranted under the circumstances…On…occasions, probation officers were pressured to change recommendations of release to recommendations of detention.").

Now imagine oneself the counsel for one of the youths appearing before Judge Conahan in 2008 and imagine that you've managed to figure all this out on your own, but this is pre-indictment. Nevertheless, you have a client who is about to be sentenced for making an insulting Facebook post and you have every reason to believe that for wont of all cause the court is going to sentence her to commitment in that facility. Finally, imagine that federal, not state, substance and procedure applies.

How do you seek to remove the judge? If the answer is, "§ 144 or § 455 work because the source of bias is extra-judicial," change the hypothetical to one where there is no hidden financial interest, but the two judges have agreed that they "have to teach these kids a lesson" and so are committing them for wont of all cause.

Sentencing your client in the absence of all basis to do so is still a judicial act[8]; how can the pattern and practice of doing so not be grounds for removal before the sentencing; in corollary (1) why should your client have to submit to the punishment and rely on appeal, and (2) even if the judge were soon thereafter indicted and even convicted, how would it recompense your client for the punishment if the only remedy available was an appeal while imprisoned and watching the judge's trial?

Mr. Stengel covers the point by describing the various remedies available for judicial misconduct – impeachment, sanction, removal, prosecution, etc. – even when it rises to a criminal level (the Conahan and Chiavarella prosecutions confirming that

---

[8] *See Wiggins v. Hess*, 531 F.2d 920 (CA8 1976) (judge who sentenced misdemeanant to prison when offense carried no sentence immune from suit); *Robinson v. McCorkle*, 462 F.2d 111 (CA3 1971), cert. denied, 409 U.S. 1042 (1972) (judge who committed individual to state hospital per repealed statute immune from suit).

even judicial acts can be *evidence* of criminal corruption as well as the *actus reus* itself[9]), but his work is limited to post-malignant remedy, not *in litem* remedy.

It is not consistent with Fifth Amendment due process that a litigant who is being subjected to judicial misconduct by means of "error" that is no real error at all, but deliberate, culpable failure to adhere to the law, especially to a degree of culpability that would support criminal charges, cannot seek removal because not only do statutory bases require an extra-judicial source but the Fifth Amendment does as well.

**The Fifth Amendment does not *create* a right to a trial free of such juridical rot, it *guarantees* it as a preexisting, natural right and it *protects* it by providing the covenantal basis by which the aggrieved litigant may call down the authority of the government to help rid herself of it *in litem*.**

**And to the extent there is a factual dispute on the existence *vel non* of the actuality, appearance of, or unconstitutionally high probability of legal "error" as does justify *in litem* remedy, the abused litigant may demand a factual hearing, which to the extent she has alleged the participation of other judges, pursuant to *Dennis* subjects them to subpoena so their judicial acts may be examined as evidence if not *res* thereof.**

## AN EXAMPLE OF SUCH LEGAL "ERROR" AS MISCONDUCT

---

[9] *Dennis v. Sparks*, 449 U.S. 24, 30 (1980) (immunized judicial acts may be used as evidence of predicate crimes where judge alleged to have been participant; judge may be compelled to give evidence).

**"Roe is an attorney at law whose identity is known to all participants in this litigation and who has been given the name Richard Roe as a legal placeholder because the disclosure of his true identity in this litigation may for the time being lead to the improper disclosure of the materials at issue."[10]**

On May 10, 2016, there was an open court proceeding before reporters from media, including the Associated Press, whose audience is in the billions. Also present were United States Attorneys from the Northern District, whom this court knew were investigating us for criminal contempt. The hearing was held to hear motions to unseal filings on the docket.

In an attempt to explain in the face of withering press coverage why it had kept every one of the 280 documents ever filed here sealed for five years without once holding hearings or making findings or otherwise complying with the law when by the court's admission at the hearing at least 85% of those documents had been entirely sealed away for no lawful reason, this court, referring to the above headline words of the Second Circuit, stated:

> The Second Circuit, however, recognized the danger of [publications] when it *enjoined* Mr. Oberlander from even using his own name in these proceedings because his name became synonymous with the disclosure of the information. So I couldn't have the parties filing things on the docket in front of me that were open to the public which would do the very harm that the Second Circuit's injunction was meant to prevent. And specifically what the Circuit *held* [*sic*] was this…[quoting the above headline language]

However, (1) the language is not decretal; (2) the court *knows* that; therefore (3) no conclusion is possible beside the obvious, *that the court fabricated an order out of non-decretal language in the presence of those it had asked to investigate us for violating orders.*

That the language is not decretal is clear: (1) the Summary Order containing it also has an actual injunction that is written as one, in full decretal flower; confirming that the

---

[10] Roe is co-respondent Frederick M. Oberlander.

Circuit knows how to write an injunction if it wants to[11]; and (2) the Summary Order *was*
*written in real time* at the February 14, 2011 hearing; the transcript shows the panel ad-
journed with their clerks to write the Summary Order, then returned and read through it,
page by page, *referring to page 2, where the language is, as* **mere background history recital**.[12]

But if the word of the court that wrote it and was explaining it as they did does not
suffice to convince the court that it is not decretal, perhaps this analysis will:

> The second paragraph in the Court of Appeals summary order filed Febru-
> ary 14th, 2011, simply notes that the Court is referring to Richard Roe as
> Richard Roe because the disclosure of his true identity might lead to the
> improper disclosure of materials here at issue. That is not a decretal para-
> graph; it is simply a statement of the reason why the Court of Appeals is
> using a pseudonym. That first recital paragraph in the Second Circuit's or-
> der is not a decretal paragraph.

> It ought to be convincing, ***as your honor ordered it in those words on February 27,***
> ***2012 when you denied contempt charges against us for allegedly violating that language***.[13]

## THE CHARGES SUPPORTING THIS REQUEST FOR RELIEF

---

[11] Accordingly…we hereby ORDER that ALL PARTIES, THEIR OFFICERS, AGENTS, SERVANTS,
EMPLOYEES, AND ATTORNEYS, AND ALL OTHER PERSONS WHO ARE IN ACTIVE CONCERT
OR PARTICIPATION WITH THEM, see Fed. R. Civ. P. 65(d)(2), are TEMPORARILY-and WITHOUT
PREJUDICE…ENJOINED from…

[12] Exh. A is a copy of the Summary Order as distributed at the hearing. It shows the language is on page 2.
Exh. B is a copy of the transcript. It is sealed at the Circuit, but as your honor has assumed the power to unseal
part of their February 10, 2011 order so the public may understand the charges against us, we ask you do the
same for these parts of the transcript so the public may understand the charges against the court. pg. 38:

> JUDGE CABRANES: We will recess, and we may have something for you. We would like you to
> stand by, and we are going to consult with the Clerk of Court and others and we hope to have some-
> thing for you promptly. Thank you. (Recess)

> JUDGE CABRANES: It is 2:53 p.m. I have asked the clerk to enter an order that was entered for-
> mally at 2:45 p.m., *copies of which are being delivered at this very moment to those counsel who are present.*
> *We will take a moment or two to review the order.* **Page 2 of course is a description of past proceedings.**

[13] Transcript of hearing on February 27, 2012, ECF ____, passim and at pgs. 9 and 19.

**Legal "error" as misconduct.**

The Hon. Brian J. Cogan, by acts taken alone and in concert with others, either (1) *actually* did; or (2) *appears* to have; or (2) to an unconstitutionally high degree *probably* did, abuse his position as either or both a Special Master or an Article III judge presiding hereover with the intent or the specific intent[14] to deprive movants of their civil rights, or in reckless disregard of the substantial likelihood that such deprivation would occur, or grossly negligent with respect thereto, such rights including, without limitation, their civil substantive rights to freedom of expression and petition pursuant to the First Amendment and their procedural rights to due process pursuant to the Fifth Amendment, including without limitation their rights to be tried, if at all, or heard before an impartial tribunal informed in the law, by the following methods and means:

**Actūs and Mens Rea**. Acting alone, and with those acting in concert with him, he agreed to and then actually did carry out the following actions including, without limitation:

Willfully, knowingly, intentionally, recklessly, or grossly negligently, as the case may be, refusing to adhere to the law; in that with such culpable state of mind he entered new orders, re-interpreted existing orders, and "fabricated" into existence non-existent orders from non-decretal language; in each case knowing or intending that the result would be orders either or both unsupported by the record or unconstitutional if not illegal, or being recklessly indifferent to the substantial risk thereof, or grossly negligent as to it.

---

[14] Specific intent is required for a criminal conviction for violation of 18 U.S.C. § 241 or § 242, but there is no requirement that the misconduct here be of that level of culpable mens rea, merely that it be at such level that it violates the Fifth Amendment.

Did so for purposes including, without limitation, of chilling, or freezing, Movant's protected expression and petition by putting Movant in fear of criminal prosecution for contempt thereof,

Did so for purposes including, without limitation, to bring about the investigation of Movants by the Department of Justice in contemplation prosecution, even where he knew, was recklessly indifferent to the substantial risk of, or grossly negligent as to the risk that such prosecution would be illegal but for the collateral bar rule.

Did so for purposes including, without limitation, to bring about actual prosecution, even where he knew, was recklessly indifferent to the substantial risk of, or grossly negligent as to the risk that such prosecution would be illegal but for the collateral bar rule.

Willfully, knowingly, intentionally, recklessly, or grossly negligently, as the case may be, making or purporting to make "findings of fact" based on little or no admissible evidence while refusing to allow movants to submit sufficient evidence in their own behalf.

Willfully, knowingly, intentionally, recklessly, or grossly negligently, as the case may be, suspending or purporting to suspend authority, such as the Local Rules of the district, where such authority to so suspend has been removed from judges by the Rules.

**Motive**. He did those acts, alone and in concert, without limitation for the corrupt purpose of perpetrating a cover-up of the concealment of the Sater criminal case and its consequences, including without limitation that Sater was given an illegal sentence, his victims defrauded of their right to restitution or to sue to get it, and was allowed to use the absence of a federal court criminal record to commit nearly a billion dollars of fraud while serving as a cooperator pursuant to an agreement not to commit crime.

He did those acts, alone and in concert, without limitation for the corrupt purpose of "punishing" Movants by causing them to be investigated and trying to cause them to be prosecuted in vindictive retaliation for their role in revealing the Sater scandal and to send a message to members of the bar that they should keep quiet and not challenge the system.

However, Movants do not only so charge, because corrupt motive is not an prerequisite for constitutional removal, and repeat for avoidance of ambiguity that the acts alleged above with the culpability alleged above, without regard to overarching motive, suffice.[15]

**Futility**. He did those acts, alone and in concert, without limitation despite knowing that they would be futile with respect to any legitimate objective.

**Overt bias**. He did those acts, alone and in concert, without limitation despite knowing that he was doing them solely to benefit the petitioners at the expense of movants..

**Legal "error" as incompetence.**

That as to all the above, he did those things, in the alternate, without such culpable mental state as set forth above but with such mental state, negligent or otherwise, that he violated the Canons by failing to maintain knowledge of the law.

**Evidentiary issues.**

The number and frequency of those acts establish such pattern of error as allows the conclusion of misconduct other than by incompetence; or by incompetence. The acts described above include those set forth in the accompanying Declaration, especially pp. 34, 55, and 72-97, but the entirety of which is deemed incorporated herein as if here intact.

---

[15] Corrupt motive should not be a Fifth Amendment requirement for removal *See supra*.

## A STUDY IN FUTILITY

Within the last 120 days two sitting federal judges in the Eastern District of New York have each prohibited the public from accessing, and used their contempt power to criminalize the dissemination of, information in documents submitted in cases before them, information which they openly admit is not only of core, public concern but is also publicly available elsewhere. What is the proper response to this, and by whom?

### Neither law nor equity will act in vain or enforce what would be frivolous.

First Amendment law is often thought to be necessarily doctrinal. For example, if the information subject to those courts' bars on dissemination had been heard by a reporter in open proceedings before either of those judges, in seeking vacatur of the order criminalizing dissemination the reporter, citing *Sheppard v. Maxwell*[16], might argue that

> There is nothing that proscribes the press from reporting events that transpire in the courtroom.

Or, citing *Craig v. Harney*[17], he might argue that

> A trial is a public event. What transpires in the courtroom is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt…those who see and hear what transpired can report it with impunity."

But, he could also cite *Oklahoma Pub. Co. v. District Court* to argue that [18]

> [The First Amendment] will not permit a…court to prohibit the publication of widely disseminated information obtained at court proceedings that were, in fact, open to the public.

---

[16] 384 U. S. 333, 362-363 (1966).

[17] 331 U. S. 367, 374 (1947).

[18] 430 U.S. 308 (1977).

Without loss of generality, we may say the first arguments, and the cited decisions supporting them, are *doctrinal*, while the third is *pragmatic*. *Sheppard* and *Craig* sweep broadly and do not depend on the extra-judicial provenance of the information; *Oklahoma* on the other hand is of narrower scope, dealing only with information of such provenance. Yet both are as vital as ever. What explains this?

It's dangerous to psychoanalyze the Court, but the answer here is clear: as a matter of *constitutional parsimony*, there is no need to create doctrine when as a practical, *pragmatic*, matter the prohibition in question cannot accomplish its purported goal, or for that matter any constitutionally cognizable goal. In short, when the prohibition would be *futile*.

To be sure, futility is of broad and ancient origin; the maxim that neither law nor equity will act in vain has been around in one form or another for as long as there has been law.[19] But for our purposes, we are concerned with the self-evident proposition that *the First Amendment does not permit suppression of core speech when suppression would be futile.*

First, consider that the futility of enjoining publication of the history of involvement in Vietnam[20], details of a grisly rape and mass murder[21], and instructions for making a hydrogen bomb[22] were at the center of three of the most famous prior restraint cases.

---

[19] *See* EASTON, CLOSING THE BARN DOOR AFTER THE GENIE IS OUT OF THE BAG: RECOGNIZING A "FUTILITY PRINCIPLE" IN FIRST AMENDMENT JURISPRUDENCE, 45 DePaul L. Rev. 1 (1995) at n.27 where Prof. Easton cites to BROOM, A SELECTION OF LEGAL MAXIMS, CLASSIFIED & ILLUSTRATED, 174 (10th ed. 1939) ("The law will not itself attempt to do an act which would be vain…nor to enforce one which would be frivolous"). The next few pages of text draw heavily on Prof. Easton's article.

[20] In *New York Times v. United States*, 403 U.S. 713 (1971) (per curiam), the Pentagon Papers case, where no more than three justices subscribed to any one of nine separate opinions, seven relied public availability.

> There are numerous sets of this material in existence and they apparently are not under any controlled existence. Moreover, the President has sent a set to the Congress. We start then with a case where there already is rather wide distribution of the material that is destined for publicity, not secrecy. *Id.* at 722 n.3 (Douglas and Black, J.J., concurring).

Nest, beyond *suppression* cases, consider that futility was also instrumental in the development of the constitutional right of access to court proceedings and documents.[23]

---

[P]ublication has already begun and a substantial part of the threatened damage has already occurred. The fact of a massive breakdown in security is known, access to the documents by many unauthorized people is undeniable, and the efficacy of equitable relief against these or other newspapers to avert anticipated damage is doubtful at best. Id. at 733 (White and Stewart, J.J. concurring).

[Before reaching the merits, we must address] [w]hether the threatened harm to the national security or the Government's possessory interest in the documents justifies the issuance of an injunction against publication in light of … [t]he extent to which the materials at issue have apparently already been otherwise disseminated. *Id*. at 54-55 (Harlan, Blacmun, J.J. and Burger, C.J. dissenting).

[21] In *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976), Justice Burger, writing for the Court, noted:

[T]he events disclosed by the record took place in a community of 850 people. It is reasonable to assume that, without any news accounts being printed or broadcast, rumors would travel swiftly by word of mouth…plainly a whole community cannot be restrained from discussing a subject intimately affecting life within it. *Id*. at 567.

Justice Brennan's concurrence, arguing that all prior restraints were unconstitutional, also noted futility:

*Much of the information that the Nebraska courts enjoined petitioners from publishing was already in the public domain, having been revealed in open court proceedings or through public documents. Our prior cases have foreclosed any serious contention that further disclosure of such information can be suppressed before publication or even punished after publication. Id. at 567.* [Emp. Add.]

[22] In *United States v. Progressive, Inc.*, 467 F. Supp. 990 (E.D. Wis. 1978), *appeal dismissed*, 610 F.2d 819 (7th Cir. 1979), the federal government sought to enjoin The Progressive magazine from publishing an article which purported to explain how to make a hydrogen bomb. The Progressive argued that the author had only used information in the public domain. The government argued the opposite, and that the compilation was classified under the Atomic Energy Act of 1954. The trial judge granted a TRO based on his finding that much of what was in the article was not public and that the downside risk of a mistake was thermonuclear annihilation: "In tat event, our right to life is extinguished and the right to publish becomes moot."

In the end, it was the government's claim that became moot, and not the magazine's right to publish, as the government voluntarily withdrew its cse when two other newspapers published similar material while the case was pending appeal. If the details of The Progressive's article had ever been secret, as the government claimed, they were certainly in the public domain after the newspaper's actions, and the government accepted the futility of continuing the case.

[23] In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982), although the Court had two years before held in *Richmond Newspapers v. Virginia* that the public had a First Amendment right to attend criminal trials, it did not rely solely on that right in striking down a Massachusetts statue that denied the public access to the courtroom during testimony of minor sexual assault victims, instead calling on the futility doctrine to find that Massachusetts had not asserted a compelling interest sufficient to overcome that right:

Although [the statute] bars the press and general public from the courtroom during the testimony of minor sex victims, the press is not denied access to the transcript, court personnel, or any other possible source that could provide an account of the minor victim's testimony. Thus [it] cannot prevent the press from publicizing the substance of a minor victim's testimony, as well as his or her identity. If the Commonwealth's interest in encouraging minor victims to come forward depends on keeping such matters secret, [it] hardly advances that interest in an effective manner. *Id*. at 610

*See also In re The Charlotte Observer*, 882 F.2d 850,854-55 (CA4 1989) (reversing closure of a hearing on motion for change of venue where "all of the publicity whose exposure in this hearing is the subject of concern is already in the public domain"); *In re Herald Co.*, 734 F.2d 93, 101 (CA2 1984) (remanding order to close

Finally, there is a third area in which the doctrine factors decisively, the *punishment* cases. If we adopt the paradigm that speech cases present in three kinds, (1) the right to *access* information; (2) the right to *disseminate* it; and (3) the right to be *free of punishment* for doing so, it must follow that if futility prohibits (1) a bar on access to publicly available information and (2) a prior restraint against disseminating publicly available information, it must also prohibit (3) a bar on *punishment* for such dissemination. And indeed it does.[24]

In sum, punishment futility cases, like access and prior restraint futility cases, not only confirm that core speech which is already public may not be suppressed, directly or indirectly, but further confirm that *by itself* the futility of attempting to bar additional access or restrain or punish additional dissemination should *by itself* be sufficiently determinative of unconstitutionality without consideration of the compelling interest allegedly at stake.

---

pretrial suppression hearing to determine whether "the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account").

*See also Commercial Broadcasting Sys., Inc. v. United States Dist. Court*, 765 F.2d 823, 825-26 (CA9 1985) (unsealing documents filed in a post-conviction criminal proceeding where "most of the information the government [sought] to keep confidential concem[ed] matters that might easily be surmised from what [wa]s already in the public record), cited with approval in The Wash. Post v. Robinson, 935 F.2d 282, 291-292 (D.C. Cir. 1991) (unsealing plea agreement with potential witness in ongoing criminal investigation where the fact and terms of the agreement had already been published in the newspaper).

[24] In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975), the Supreme Court held that "States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." 420 U.S. at 495. *Cox* was as a suit for damages under a Georgia statute that made it a crime to publish a rape victim's name. The father of a young victim had sued Cox., which had named her in a broadcast about the trial of the boys charged with her rape and murder. In granting the father's motion for summary judgment, the trial court rejected Cox's constitutional arguments. The state Supreme Court upheld the statute's constitutionality, finding disclosure of a rape victim's name unprotected by the First Amendment.

The United States Supreme Court focused on the question of liability for broadcasting truthful statements found in public court records, finding support for its decision in the Restatement (Second) of Torts:

> There is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life which are matters of public record.) *Id*. at 493-494 (quoting RESTATEMENT (SECOND) OF TORTS § 6520 cmt. c (Tentative Draft No. 13, 1967.

Applying that principle, the Court found that the First Amendment interest in a vigorous press outweighs the "fading" interest in privacy when the information already appears on the public record.

The Court followed *Cox Broadcasting* with *Oklahoma Publishing Co. v. District Court*, striking down a court order enjoining reporters attending a juvenile proceeding from publishing the name or photo of a boy involved in that proceeding. Although the mode of suppression was a prior restraint, subject to punishment by contempt, the Supreme Court relied on *Nebraska Press* and *Cox Broadcasting* to hold that the First and Fourteenth Amendments will not permit a state court to punish by contempt, thus will not permit it to enjoin, publication of now-publicly available information obtained at court proceedings which were in fact open to the public.

And, in *Daily Mail*, the Court struck down a West Virginia statute which imposed fine and imprisonment on any newspaper publishing the name of anyone charged as a juvenile offender without prior approval of the court. Reporters had obtained the name of a 14-year-old charged with killing a classmate by interviewing witnesses, police, and a prosecuting attorney. A local paper, *The Charleston Gazette*, then published the name, and at least three radio stations broadcast the information. When the *Daily Mail* published the juvenile's name a Kanawha County grand jury indicted the newspaper. The state supreme court quashed the indictment on the ground that the statute operated as a prior restraint on speech and that the state's interest in protecting the identity of the juvenile offender did not overcome the heavy presumption against its constitutionality.

In affirming, the United States Supreme Court brushed aside the state court's *doctrinal* arguments in favor of a futility *pragmatism*, finding that only the "highest form of state interest" will sustain the validity of sanctions for publishing truthful information lawfully obtained about a matter of public interest, whether or not the information was provided by the government. Applying this standard, the Court concluded that the state's interest in preserving anonymity of juvenile offenders was not of the "highest order." And, the Court stated, even if that asserted interest had passed muster, the statute did not effectively accomplish that purpose as:

> The statute does not restrict the electronic media or any form of publication, except "newspapers," from printing the names of youths charged in a juvenile proceeding. In this very case, three radio stations announced the alleged assailant's name before the *Daily Mail* decided to publish it

Concurring in the judgment, Justice Rehnquist embraced futility, even though he rejected the Court's holding that protecting the anonymity of a juvenile offender could never constitute an interest of the highest order:

> It is difficult to take very seriously West Virginia's asserted need to preserve the anonymity of its youthful offenders when it permits other, equally, if not more, effective means of mass communication to distribute this information without fear of punishment.

Then, in *Florida Star v. BJF*, 491 U.S. 524 (1989), the Court combined *Cox Broadcasting*, *Oklahoma Publishing*, and *Daily Mail* into a unified futility principle, voiding a state statute that made it a crime to disseminate the name of a rape victim in mass communication. A *Florida Star* reporter had copied the name of such a victim from a police report in the department's pressroom, and it was put in an article in the paper. The victim sued the *Florida Star* for negligent violation of the statute. At trial, the judge rejected the Star's First Amendment arguments and directed a verdict for BJF. The jury awarded her $100,000 in damages. The First District Court of Appeal affirmed and the Florida Supreme Court denied review. The United States Supreme Court granted certiorari and analyzed the case under *Daily Mail*, identifying futility as "undergirding" that case:

> As *Daily Mail* observed in its summary of *Oklahoma Publishing*, "once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination." *Id.* at 535 (citations omitted).

The Court listed three reasons why Florida could not impose liability to protect the anonymity of rape victims: (1) the information reported was available in the pressroom, (2) the negligence standard in by the statute was too broad, and (3) the statute was facially underinclusive. All three implicate futility:

First, if the futility principle has any meaning at all, it surely encompasses situations in which the information at issue has been published as a press release:

> The government's issuance of such a release, without qualification, can only convey to recipients that the government considered dissemination lawful, and indeed expected the recipients to disseminate the information further. *See id.* at 538-39.

**The EDNY orders were *admittedly* futile and so must be at least suspected, if not presumed, to have been issued in knowing violations of the law.**

The first order was entered May 9, 2016 after public judgment and conviction in a criminal case in which the defendant had cooperated, which fact, by the time of sentence, had become public.[25] The court was hearing a motion of the *Daily News* to unseal sentencing letters which had been submitted by the government. Assuming without deciding that the First Amendment conveyed a public right of access to them, the court ordered:

> [S]ubstantially all of the information contained in the…letters is a matter of public record, having been discussed at…sentencing. Other judges…have found that, where information regarding a cooperator is already public… the government interest in protecting any materials containing that information disappears, and the public's right to access necessarily prevails.
>
> In my view…while alternate sources of information lessen the government interest in secrecy, they also diminish the urgency of the public's need for the sealed materials. "[T]o the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that [the] constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper*, 457 U.S. at 604-05…Here, the open proceedings…enabled the public to learn the reasons behind that sentence…***A nominal public interest in access might prevail where the only countervailing government interest is***

---

Second, the statute could not be saved absent a requirement of case-by-case analysis of, for example, "whether the identity of the victim is already known throughout the community." *Id.* at 539. If this is material to its constitutionality, so is futility, as this is an alternate statement of the principle.

Finally, as it had rejected West Virginia's limiting application of its statute to newspapers in *Daily Mail*, the *Florida Star* Court disapproved Florida's limiting application of its statute to an "instrument of mass communication." Noting Florida's admission that the statute would not apply to the "backyard gossip who tells 50 people," the Court concluded that a "ban on disclosures effected by 'instrument[s] of mass communication' cannot be defended on the ground that partial prohibitions may effect partial relief."

So important is this third iteration of the futility principle that Justice Scalia said it formed the entire basis for his vote to strike down the statute. By its failure to prevent the dissemination of the victim's identity among her friends and acquaintances, Justice Scalia asserted that the statute had the

> [H]ad the appearance of a prohibition that society is prepared to impose on the press but not upon itself. Id. at

In 1994, the Florida Supreme Court used similar reasoning when it struck down the criminal provisions of the same statute, declining to save it from fatal underinclusiveness. *See State v. Globe Communications Corp.*, 648 So. 2d 110, 113 (Fl. 1994) ("[T]he "broad sweep" and 'underinclusiveness' of [the statute] are even more troublesome when the statute is used to mandate criminal sanctions.").

[25] *United States v. Armstrong*, 2016 U.S. Dist. LEXIS 61008 (E.D.N.Y. May 9, 2016) (Gershon, J.).

*in the secrecy of information that is no longer actually secret. Here, however, the government has an interest in demonstrating institutional support for cooperators that is distinct from, and survives beyond, its interest in secrecy.* Under the particular facts of this case…sealing of the two government letters, is a narrowly tailored means of protecting this compelling interest.

*Armstrong* provides a useful didactic illustrating the difference between doctrinal and pragmatic First Amendment analysis.

*Doctrinally*, Armstrong is error. First, the presence of the information in the letters, and the manner of its presentation there, is public property of public concern, as is the fact of its presence there and, like the dog that didn't bark, the fact of the absence of what is *not* there; thus it is a window into the mind of the prosecutor which the court may not shutter.

Second, it is a remarkable repudiation of the Supreme Court opinion in *Globe,* n.23:

> *The Commonwealth has offered no empirical support for the claim that the rule of automatic closure contained in §16A will lead to an increase in the number of minor sex victims coming forward and **cooperating** with state authorities. Not only is the claim speculative in empirical terms, but it is also open to serious question as a matter of logic and common sense.* Although § 16A bars the press and general public from the courtroom during the testimony of minor sex victims, the press is not denied access to the transcript, court personnel, or any other possible source that could provide an account of the minor victim′s testimony. Thus, § 16A cannot prevent the press from publicizing the substance of a minor victim′s testimony, as well as his or her identity. If the Commonwealth′s interest in encouraging minor victims to come forward depends on keeping such matters secret, § 16A hardly advances that interest in an effective manner. And even if § 16A effectively advanced the State′s interest, it is doubtful that the interest would be sufficient to overcome the constitutional attack, for that same interest could be relied on to support an array of mandatory closure rules designed to encourage victims to come forward: surely it cannot be suggested that minor victims of sex crimes are the *only* crime victims who, because of publicity attendant to criminal trials, are reluctant to come forward and testify. The State′s argument based on this interest therefore proves too much, and runs contrary to the very foundation of the right of access recognized in *Richmond Newspapers:* namely, "that a presumption of openness inheres in the very nature of a criminal trial under our system of justice." [Emph. Add.] 457 U.S. at 609.

*Pragmatically*, there is no need to go for that analysis. If the public can obtain the information *there*, it is futile, thus unconstitutional, to restrict them from obtaining it *here*; if necessary *Globe* may be cited to show pragmatism is properly applied in this context.

*****

There is, however, another point to *Armstrong*. And that is, particularly given the court's citation to Globe, there seems little likelihood that the error in *Armstrong* is actually error as opposed to intentional disregard for the law. However, while that suspicion may be quite valid on a human level, the system demands more than one such "error" before it will support the conclusion that the court in question is willfully ignoring the law.

Even where it can be properly established that the court is, or sufficiently likely is, or can be established to be, or appears to be, willfully ignoring the law, what can or should be done about it?

## CONCLUSION

Accordingly, we ask the court resign the reference or otherwise stay all process pending our petition for the master's removal for cause, and ask for such other relief as may be just and proper.

*****

We certify that all of the preceding is true and correct to the best of our knowledge and that the attached are true and correct copies of that which they are represented to be.

/s/ Richard E. Lerner

122 W. 27th Street 10th Floor
New York, New York 10001